Thomas M. Biesty, NY Bar No. 4172896
(seeking admission *pro hac vice*)
(202) 326-3043 / tbiesty@ftc.gov
Rhonda Perkins, VA Bar No. 75300
(seeking admission *pro hac vice*)
(202) 326-3222 / rperkins@ftc.gov
Andrew Hudson, DC Bar No. 469817
(seeking admission *pro hac vice*)
(202) 326-2213 / ahudson@ftc.gov
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580

Local Counsel
John Jacobs, CA Bar No. 134154
(310) 824-4300 / jjacobs@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4380 (fax)

Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission**, <br><br> Plaintiff, <br><br> vs. <br><br> **OTA Franchise Corporation**, a Nevada Corporation, <br><br> **Newport Exchange Holdings, Inc.**, a California corporation, <br><br> **NEH Services, Inc.**, a California corporation, | No. 8:20−cv−287 <br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

1

**Eyal Shachar**, also known as Eyal Shahar, individually and as an officer of OTA Franchise Corporation, Newport Exchange Holdings, Inc., and NEH Services, Inc.

**Samuel R. Seiden**, individually and as an officer of OTA Franchise Corporation, and

**Darren Kimoto**, individually,

    Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the CRFA, 15 U.S.C. § 45b, in connection with the sale and marketing of training programs, including seminars, courses, and instructional materials on trading and investing.

## SUMMARY OF THE CASE

2. Operating under the name "Online Trading Academy" ("OTA" (alternatively meaning the "Corporate Defendants" collectively)) and led by Eyal Shachar, Defendants purport to teach consumers how to "invest like the pros on Wall Street." Defendants claim to show their "students" how to find "low-risk, high-potential investing opportunities" by applying a "patented strategy to any asset class including stocks, options, futures and currencies."

3.     Defendants target older consumers "with visibility to retirement age, near retirement or retired."  To convince consumers to pay thousands and often tens of thousands of dollars for OTA's training and related services, Defendants routinely represent, directly or by implication, that purchasers are likely to generate substantial income with OTA's trading strategy.  Typical examples include:

- A letter from OTA's CEO and owner, Eyal Shachar, promising that OTA "students" will "be introduced to Online Trading Academy's patented supply and demand trading and investing strategy which allows us to anticipate market moves with a high degree of accuracy."

- A promotional video featuring a retiree who purportedly used OTA's trading strategy to create "a retirement income that was bigger than his income while he was working," including "$40,000 in a single trade."

- A testimonial from a purported OTA customer stating, "It took me 18 years to develop a decent salary.  After three months here at OTA, I'm making almost as much money as my business."

- The story of Jasmine Wang, an OTA employee, who purportedly grew a $12,000 trading account to $128,000 in nine months.

4.     Defendants have routinely claimed that consumers who purchase OTA training programs can quickly attain proficiency in OTA's strategy and deploy it to earn substantial income, regardless of their background and prior experience.

5.     Defendants' earnings claims are false or unsubstantiated.  OTA's strategy does not work as advertised, Defendants do not track the trading performance of their customers, and Defendants have no data that would allow them to predict the trading performance of their customers.

6.     Many dissatisfied customers have requested refunds of the monies they paid for OTA's training.  In numerous instances, when Defendants agree to honor a refund request, they condition the refund on the consumer signing an

agreement barring the consumer from posting negative reviews about OTA and its services, and from providing negative information about OTA and its employees, including potential law violations, to law enforcement agencies.

7.     Defendants have collected hundreds of millions of dollars from numerous consumers across the country.  In perpetrating their scheme, they have violated the FTC Act and the Consumer Review Fairness Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), and 53(b).

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

10.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the CRFA, 15 U.S.C. § 45b.

11.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the CRFA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 45b(d)(2)(A), 53(b), 57b, and 56(a)(2)(A).

## DEFENDANTS

12.     Defendant OTA Franchise Corporation ("OTA Corp."), also doing business as Online Trading Academy, is a Nevada corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614.  OTA Corp. transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with

others, OTA Corp. has advertised, marketed, distributed, or sold training programs and related goods and services to consumers throughout the United States.

13.     Defendant Newport Exchange Holdings, Inc. ("NE Holdings"), also doing business as Online Trading Academy, is a California corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614.  NE Holdings transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, NE Holdings has advertised, marketed, distributed, or sold training programs and related goods and services to consumers throughout the United States.

14.     Defendant NEH Services, Inc. ("NE Services"), also doing business as Online Trading Academy, is a California corporation with its principal place of business at 17780 Fitch Avenue, Irvine, California 92614.  NE Services transacts or has transacted business in this district and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, NE Services has advertised, marketed, distributed, or sold training programs and related goods and services to consumers throughout the United States.

15.     Defendant Eyal Shachar, also known as Eyal Shahar ("Shachar"), is the chief executive officer, sole director, and former president of OTA Corp.  He is also the founder and president of NE Holdings, and the CEO of NE Services. Shachar resides in California, and is the owner, directly or indirectly, of all of the Corporate Defendants.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Shachar, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.  Shachar is responsible for the direction of Defendants' global expansion and he is involved in Defendants' day-to-day operations in marketing, finance, and sales.

16.     Defendant Samuel R. Seiden ("Seiden") is OTA's Chief Trading Strategist, and has previously served in a number of other executive roles at OTA. He is the creator and most visible exponent of Defendants' proprietary trading strategy to consumers and the investing public, whose benefits and income generation potential are the main reason offered for consumers to purchase OTA training programs.  Defendant Seiden has featured prominently in OTA's marketing, and has been held out to consumers at OTA's live events as the creator of OTA's patent and "an impeccable master" of OTA's trading strategy.  Seiden curated OTA's Market Timing Orientation ("MTO") slide presentation from 2014-2017.  He has also participated in managing the MTO sales process more generally, including addressing issues with individual salespeoples' compensation or performance, and disseminating an "MTO Master Document" outlining the content to be delivered at each phase of the MTO sales pitch.  Seiden resides in Illinois.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Seiden, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.     Defendant Darren Kimoto ("Kimoto") is one of OTA's chief salespeople, and the head of the sales force that presents OTA's three-day MTO sales event, discussed in Paragraphs 81 to 116.  Kimoto resides in Utah.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Kimoto, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**Common Enterprise**

18.     Defendants OTA Corp., NE Holdings, and NE Services (collectively, "Corporate Defendants" or "OTA") have operated as a common enterprise while engaging in the deceptive acts and practices alleged below.  Defendants have conducted the business practices described below through an interrelated network of companies that have unified advertising, common ownership, officers, managers, business functions, employees, and office locations.   Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Shachar and Seiden formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

19.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

20.     Defendants market investment-training programs under the name "Online Trading Academy."

21.     Defendants represent to consumers that purchasers of OTA training programs and related services (collectively, "OTA Training") are likely to earn substantial income by applying Defendants' patented trading "strategy."

22.     Since at least 2004, Defendants have advertised, marketed, distributed, promoted, and sold training programs, including seminars, courses, and instructional materials on trading and investing, to consumers throughout the United States and internationally.

23.     Defendants offer OTA Training for sale at live events held in hotel conference rooms and over 40 brick-and-mortar training centers throughout the

United States and internationally, as well as online.  Defendants own and operate some of these centers, while others are owned and operated by franchisees of Defendants.

24.     NE Holdings owns and operates an Online Trading Academy center located in Irvine, California.

25.     As of December 31, 2017, OTA owned and operated ten Online Trading Academy training centers in Westwood Los Angeles, California; Woodland Hills Los Angeles, California; Sacramento, California; Long Island, New York; New York City, New York; Boston, Massachusetts; Cincinnati, Ohio; Austin, Texas; Vancouver, Canada; and London, England.

26.     In 2017, Defendants generated $44.1 million in revenue from the Online Trading Academy training centers they own and operate.

27.     Within the last five years, consumers have paid hundreds of millions of dollars for OTA Training.

**Online Trading Academy Franchisees**

28.     Defendants began offering Online Trading Academy franchises on April 20, 2004.

29.     As of December 31, 2017, thirty-one Online Trading Academy outlets were owned and operated by franchisees, including franchised locations in Arizona, California, Canada, Colorado, Connecticut, Florida, Georgia, Illinois, India, Indonesia, Kansas, Maryland, Michigan, Minnesota, New Jersey, North Carolina, Pennsylvania, Singapore, Texas, United Arab Emirates, United Kingdom, Washington DC, and Wisconsin.

30.     To acquire an Online Trading Academy outlet, franchisees must sign a franchise agreement with OTA Corp., pay an initial franchise fee, and a monthly royalty fee in the amount of 10% of gross revenue.

31.     Franchisees are also required to pay additional fees, including various marketing and advertising fees.  OTA Corp. established a marketing fund to pool the marketing and advertising fees it receives from franchises.

32.     OTA Corp. has sole discretion over all matters, including operational and marketing matters, relating to the marketing fund.  OTA Corp. uses the marketing fund to promote the Online Trading Academy brand and the Online Trading Academy training centers.

**Online Trading Academy's Sales Process**

33.     Defendants advertise OTA Training to consumers through a variety of marketing mediums including television, radio, direct mail, search engine advertising, Internet banner advertisements, email, websites, online videos, telemarketing, webinars, social media, and live events.

34.     Defendants widely disseminate their advertising for Online Trading Academy throughout the United States.

35.     Defendants' advertising targets older consumers "with visibility to retirement age, near retirement or retired."

36.     Defendants also target consumers "who are dissatisfied with the state of their financial affairs, worry about the sufficiency of their portfolios and seek more control over their financial future."

37.     Defendants rely on a multi-step sales process to attract consumers.

38.     First, Defendants engage in mass marketing to drive consumers to register and attend a free three-hour seminar Defendants call "Market Timing Preview" or "Power Trading Workshop" ("Preview Event").

39.     Second, Defendants use the Preview Event to entice consumers to enroll in a three-day seminar called "Market Timing Orientation."

40.     Defendants typically offer the Market Timing Orientation for $299. Some consumers are offered attendance at a Market Timing Orientation for free.

41.     Third, Defendants use the Market Timing Orientation seminar to convince consumers to enroll in courses and seminars that cost thousands to tens of thousands of dollars.

42.     To entice consumers to purchase OTA Training, Defendants make false or unsubstantiated earnings claims throughout their sales process.

43.     Defendants routinely offer to finance part or all of the cost of the OTA Training.  OTA Corp. often offers loans with interest rates at or around 18%, with forgiveness of all interest if the loan is paid in full within the first six months.

44.     In some instances, Defendants' representations, express or implied, have led consumers to the belief that they would be able to quickly pay off their loans with earnings from trading using Defendants' strategy.

**Defendants' Mass Marketing Campaign**

45.     Defendants promote the Preview Events through numerous venues, including television, radio, websites, Internet banner ads, search engine advertising, YouTube videos, and direct mail.

46.     For example, Defendants aired an infomercial nationally in 2019 that included the following representations about OTA Training, among others:

- It will show consumers how "to create daily, weekly, and monthly income."
- It "can help you learn to make the right buy and sell decisions."
- The strategy is "designed to make money in any market, whether it's going up or down."
- The strategy can "help you to generate daily or monthly income, while also protecting and growing wealth."
- The strategy is "proven."
- "No matter your experience and goals, Online Trading Academy can teach you how to apply strategies to create an additional source of income."

- A testimonial from a purchaser stating –"in three hours I made $12,000" in a single trade.
- A testimonial from a purchaser stating – "I made $32,000 in less than seven trading days."
- A testimonial from a purchaser stating that, prior to purchasing and using the OTA Training, she was a dentist, but now "I don't have to work for anybody."

47.    Defendants' radio advertisements make similar claims.  For example, on February 25, 2019, Kevin Young of OTA Minneapolis joined "The Need To Know Morning Show" with radio host Steve Hallstrom on AM 1100 The Flag to promote a Preview Event in Fargo, North Dakota.  Young claimed that OTA "teach[es] people … to generate income" and that consumers should not think trading in the market is not for them, because "80% of the individuals that come through our doors don't know a stock from a rock."  Young opined that many people need a new source of income to supplement their salary, or so that they can quit their job entirely, and suggested that OTA Training can provide that income.

48.    OTA radio spots aired frequently throughout 2018 and 2019 in the New York City metro area and represented that consumers who purchased OTA Training would likely earn substantial income, using phrases such as "generate monthly cash flow," "generate income," and "make money in the market."

49.    One such New York City area radio ad dramatizes an alleged encounter between two friends.  The one who has recently purchased OTA Training says, "It's almost like having a second paycheck without having a second job," leading the other friend to later say, "Now I don't have to ask my boss for a raise, I'll just give myself one!"

50.    In another New York City area radio ad, a purported OTA instructor who lost his job at age 60 before finding OTA, is held up as a "success story"; he explains that he came to OTA with the goals to "never to work for anyone again, to

11

make money wherever I was in the world, 'cause I got people I love all over the place, and generate income and wealth for the rest of my life and then teach my kids how to do this."

51.     The New York City area radio ads claim that using OTA Training, consumers will earn enough income to alter their lifestyle.  One ad claims, "Do you wish you could have more income to live the lifestyle you want?  What about retirement?  Are you relying on your job as your sole source of income?  We'd like to show you a plan to generate active income from the market, and create passive income to build your retirement."

52.     Another such ad boasts, "At Online Trading Academy, we help people develop the skills necessary to generate monthly cash flow, so you can spend time on the things that matter the most.  Taking care of your family.  Retiring comfortably.  Or just making it easier to pay off those bills."  Yet another, which aired as recently as August 30, 2019, asks, "Wouldn't it be nice to have enough money to vacation whenever you want, for life?  You COULD!  Larry Mullins here, with a program I signed up for that could unlock that potential."

53.     A number of radio advertisements represent that, by simply attending OTA's free Preview Event, consumers will learn how to use OTA's strategy to earn income.  For example, an ad played in the New York City area in 2018 or 2019 stated: "attend one of [OTA's] free classes where you can learn how to earn income in the market and achieve a life of financial freedom.  In this free class Online Trading Academy will show you how to generate income by identifying low-risk, high-reward opportunities."

54.    OTA's websites make similar claims.  For example, on March 5, 2019, the website tradingacademy.com, a screenshot of which is depicted below, stated, "You don't have to work on Wall Street to make money like Wall Street."



55.    Defendants also use earnings claims in promotional videos on the Internet.  For example, a video published on OTA's YouTube channel, screenshots of which are depicted below, features Bill Avery, a purported OTA Training purchaser who purportedly created "a retirement income that was bigger than his income while he was working."  During the video, Mr. Avery proclaims:  "Online Trading Academy teaches you how to make money and how to avoid losing it." He also claims he was able to make "$40,000 in a single trade."





**Defendants' Free Preview Events**

56.     Defendants typically invite consumers to enroll in a Preview Event by registering online through OTA's website or calling a toll-free number.

57.     During their telephone interactions with consumers, OTA's telemarketers reinforce the notion that consumers are likely to earn substantial income through deploying OTA's trading strategy.

58.     Attempting to convince consumers to enroll in OTA's Market Timing Orientation workshop, OTA presenters make earnings claims throughout the Preview Event, including via testimonials of purported OTA "students."

59.     For example, at a Preview Event held at OTA's Irvine headquarters on December 13, 2018, OTA presenter Dawn Landry claimed that:

- consumers "could potentially make $50,000 of annual income with an account size as low as $5,000."

- OTA "ha[s] a patent on the fact that you can time the markets," which "gives us the ability to know when to get in and when to get out, long-term and short-term."

- OTA has "strategies … that you can actually use the trading to create a secondary income and then also the potential of making it a full-time career."

60.     At a Preview Event held in OTA's offices in New York City on June 12, 2019, an OTA presenter who introduced himself as "Tarantino" claimed that:

- Consumers could potentially make $50,000 of annual income with an account size as low as $5,000.

- OTA can help consumers make "trading … [your] primary source of … income," calling it "fire [your] boss level" income.

- Consumers come to OTA to make income that allows them to work less, "so you can spend more time with the family."

15

- With OTA's strategy, "you can be wrong 60 percent of the time and still end up on top."

61.     At the Preview event, Defendants typically offer the Market Timing Orientation workshop at $299, or a similar price, while claiming that this is a "special discount," and that the "retail" price is $600 or considerably higher.

62.     After they enroll in the Market Timing Orientation workshop, consumers typically receive a letter from Shachar, welcoming them to the "Online Trading Academy Family."  The letter states that during the Market Timing Orientation, the consumer will "start to define [her] strategy for generating short-term income and building long-term wealth" and "be introduced to Online Trading Academy's patented supply and demand trading and investing strategy which allows us to anticipate market moves with a high degree of accuracy."

63.     Shachar's letter also claims that "[o]ver 35,000 of our graduates have the opportunity to live more comfortable and satisfied lives as a result of the skills they've learned here at the Academy."

**Defendants' "Education Counselors"**

64.     OTA typically assigns an "Education Counselor" to enrollees in a Market Timing Orientation workshop.

65.     OTA's Education Counselors are salespersons hired by OTA or its franchisees to sell OTA Training.  They earn commissions based on the payment collected from their gross sales of OTA Training.

66.     Education Counselors typically do not reveal to consumers that they are commission-based salespersons.

67.     Education Counselors often have little to no experience with education or counseling.

68.     Education Counselors typically make contact with consumers in preparation for the Market Timing Orientation workshop.  OTA often refers to these contacts as "Touch Points" or TPs."

69.     Education Counselors typically conduct the Touch Points by telephone and email before the classes begin and then conduct in-person Touch Points during the event.

70.     Defendants use the Touch Points to reinforce the notion that consumers are likely to profit substantially if they purchase OTA Training.

71.     For example, during a Touch Point telephone call on March 19, 2019, Online Trading Academy Education Counselor Erik Leoni made the following representation to an FTC investigator who attended a Preview Event undercover: "[W]hen we talk about wealth management we call it [P]roactive [I]nvestor. Basically what we do is we teach our students how to move it around once a month.  You know, we're not active in there, but we're making our 1 to 2 percent a month and, you know, we're protecting if a crash and, you know, compounding that so that -- you know, that adds up pretty quick."

72.     During a Touch Point meeting on June 27, 2019, an OTA Education Counselor Adam Sande told an FTC investigator, who attended a Market Timing Orientation workshop undercover, that with OTA's strategy, "you can make a profit on your trade if [the market] goes up, down, or it just stays sideways," and that "a lot of students" who finance their OTA purchase use trading profits to pay off their loans.  Mr. Sande also claimed that some consumers simply copy OTA instructors' trades, "[a]nd they're happy – and that's their trading income. …. they're happy with that."

73.     Defendants train their Education Counselors not to "look like, act like or sound like, a traditional salesperson," but instead to take on a "role" and lead consumers through "The Pain Funnel," a set of questions designed to elicit and overcome consumers' problems and fears, to induce them to purchase.

74.     During the sales process, Education Counselors give consumers the impression that admission into the Online Trading Academy is selective and based on admissions criteria designed to determine whether it is suitable for them.

75.     In truth and in fact, Defendants will enroll anyone who has the money to pay for their courses and seminars or who is eligible for financing.  OTA Corp. instructs their Education Counselors to turn someone away only if he or she will "poison" the "room."  That is, that the consumer's skepticism might dissuade other consumers from purchasing.

76.     During the Touch Points, Education Counselors typically ask each consumer to complete a questionnaire known as an Income and Wealth Education Planner ("IWEP").  The IWEP asks consumers to disclose all of their assets, including real estate and tax-protected retirement accounts.

77.     Education Counselors typically tell consumers that they will use the IWEP to prepare a customized "Education Plan" for each of them.  Education Counselors typically present consumers with their Education Plan during the Market Timing Orientation workshop.

78.     The Education Plans presented to consumers are typically based on predetermined templates.

79.     Education Counselors typically use the Education Plan as a sales tool to upsell packages of courses and seminars to consumers during the Market Timing Orientation workshop.

80.     Education Counselors also can, and sometimes do, directly leverage the asset disclosures in their sales pitch.  For example, by suggesting higher-priced products to wealthier consumers, and identifying specific assets, such as retirement accounts, that they suggest the consumer liquidate or borrow from to fund the purchase of OTA Training.

**Defendants' Three-Day "Market Timing Orientation" Workshops**

81.     Defendants hold three-day Market Timing Orientation workshops at OTA centers worldwide and online.

82.     During the Market Timing Orientation workshops, OTA presenters attempt to convince consumers to enroll in courses that are more expensive and

buy additional products and services.  These include, among others, OTA's "Income Solution" package for $18,995 and "Mastermind Total Solution" package for $51,995.

83.    During the Market Timing Orientation workshops, Defendants repeat, reinforce, and expand on the earnings claims made in the mass marketing and in the Preview Events.

84.    The Market Timing Orientation workshops consist mainly of oral presentation by OTA representatives, presented as "instructors," aided by a slideshow prepared and provided by OTA Corp.

85.    The "instructors" are OTA salespeople paid on commission.  They typically do not reveal that fact to workshop attendees.

86.    During breaks in the presentation, OTA Education Counselors meet with consumers to attempt to close sales, leveraging the earnings and similar claims made by the presenters.

87.    OTA presenters often convey to workshop attendees that OTA's strategy will enable them to replace their income from work and quit their jobs. For example, in workshops held in March 2019 at OTA's California headquarters, and in June 2019 at an OTA New York City office, OTA presenters asked attendees whether they would quit their day jobs if OTA showed them how to make more money with its strategy than they currently earn at their jobs.

88.    Indeed, the slides that OTA Corp. provides to the presenters instruct the presenters to tell attendees that "quite a few" people come to OTA seeking to trade for "supplemental income or their main stream of income for their family."

89.    During the Market Timing Orientation workshops, OTA presenters routinely show consumers purported trades yielding significant profits.  Presenters routinely claim that they have made these trades, often earlier that same day, and that they have reaped certain specific dollar amounts in profits from them.

90.    In some instances, these claims are not true; rather, trades shown to consumers are simulated, not real trades.

91.    OTA presenters state or imply that consumers, too, are likely to achieve similar profits using OTA's strategy.  Defendants provide workshop attendees with a booklet that, among other things, represents that the presenter's trades are real trades.

92.    For example, Defendant Kimoto – an OTA presenter who also oversees OTA's other Market Timing Orientation presenters – led a March 2019 workshop held at OTA's California headquarters, where he made the following statements:

- "So this trade executed right here and then it dropped down to an area right here where I anticipated that it should start to rally. So I got out right here.  And that trade literally, just so you know, that's on five-minute intervals.  So that was in five, 10, 15, 20, 25, 30-minute period of time, ended up locking in $1,200 in profit.  How many of you think you might be interested in short-term trading? ... But you've got to learn how to time the market.  And we can do that with a high degree of certainty.  Not a guarantee, but do I need to be right all the time? ... No.  I can be right …40 percent, and I'm still making good money."

- "How much money? $15,000 was tied up ...  So if you tie up 15 grand and make 12 [hundred dollars], that's almost 8 percent in half an hour.  How many of you are making 8 percent a year, in let alone a half an hour?  Right.  Most of you are making half a percent a year, right?"

- "Daily income is money that we make every…day.  So the trade that I showed you today, that would be what kind of

income?...Daily.  I was in and out within the day, $1,200, daily income.  All right?  Imagine if you could make $1,000 a day consistently.  That is a decent additional income, yes or no?"

93.    In a June 2019 workshop held at an OTA office in New York City, OTA presenter Darek Zelek made the following statements to attendees:

- "I actually have a position right now that I should probably manage.  Is it okay if I make some adjustments on my stocks, guys? ... so let's, here, so I have 10 contracts on this, guys ... So what I'm going to do, let me do this, let's, it's moving pretty fast, guys, okay, so, so what I'm going to do is I'm going to adjust my stocks [stops] ... So I went short NASDAQ, I'm still in it.  There we go, price is still moving down, okay, so this is this, this number, are you guys connecting on this? ... I just adjusted my stock [stop], so I'm guaranteed to walk away with the 5 grand, now that's a guarantee … What I'm doing is I'm just waiting for price to further go down … I took this trade today in the morning right around 8:30 or so.  I like to take some of the transactions on futures just about an hour before market opens ... There, done, I closed for 6,050, done."

- "So what is your rate of return on something like this?  The way you calculate this, you take 6,050 … Divide by the money that you outlay, which is 20,900, and what do you get? … Right, so basically it's 28 percent rate of return, ROR, on your capital, 28 percent."

94.    During the Market Timing Orientation workshops, OTA presenters typically make numerous representations about their own purported trading and personal experience, creating the impression that they are successful traders who have become wealthy by employing OTA's strategy.

21

95.     For example, in the March 2019 California workshop, Defendant Kimoto:

- Claimed he once "was sitting in your seat right there," and "had been struggling as a trader," with "close to $60,000 in losses."

- Claimed that, after learning to apply OTA's strategy, he quit his job "because I was making as much in the trading."

- Told stories about travelling the globe, including an anniversary trip to Bora Bora with his wife where they swam with sharks, visiting castles while vacationing in Scotland with his wife, and claiming "I've taken my kids all over the world.  You know, we've been to Asia, we've been to Europe, South America."

- Described enjoying expensive hobbies, including paragliding, surfing, golf (including hiring a golf pro to improve his game), and surfing behind his expensive ski boat.

- Described the "very affluent neighborhood" he lives in, where "kids in the neighborhood" have "live-in nannies, cooks, gardeners," and the latest iPhones and Apple watches.

- Described how, once you are earning a million dollars a year, "[y]ou're able to associate with another socio-economic group…."

- Described how his income from trading has improved his life, allowing him to attend his younger daughter's competitions and events and removing a source of stress from his marriage.  He boasted, "money is not a limiting factor in our lives anymore."

96.     Also in the March 2019 California workshop, OTA presenter Ryan Kaestner described his idyllic life living "on the beach down in Florida," and claimed he recently spent six weeks on vacation in Thailand with his fiancé.

97.     Similarly, in the June 2019 workshop in New York City, Darek Zelek:

- Said he was a full-time trader, but previously was a contractor who knew nothing about trading until becoming an OTA "student."

- Claimed that he struggled to pay the cost of his OTA courses, saying, "I had to decide whether it was, you know, food or utilities, and how do you think the conversation went with my wife?"  He claimed that after financing much of his OTA training, he was left with only $7,000 he could invest, yet made sufficient profits investing that $7,000 to live off of it, and pay off his loan within eight months.

- Described the wealth and exclusivity of the town where he now lives, including that his neighbor is swimming champion Michael Phelps, who taught his daughter to swim, and told consumers they wouldn't be able to achieve such wealth "from a regular job," but only "through investments," claiming that he purchased his home there with profits from trading.

- Claimed income from trading has enabled him to live abroad, including in Dubai, Europe (where his family lives three months per year), and India (where he had household staff).

- Described the expensive hobbies he and his family enjoy, including frequent scuba diving, skiing at resorts such as Whistler, and, for his young daughter, horseback riding and ballet.

- Claimed he drives a "750" (the BMW 750 is a luxury car) and that he built a "casita" on his property so that his parents can have their own residence when they come to visit his family.

- Claimed he makes so much money, just his tax payments could support more than three families, or buy a "super luxury car" every year.

- Implied that anyone can be as successful as him by attributing his success to OTA's strategy: "as long as I follow the system, the outcome will be provided."

98.   In numerous cases, the presenters' claims of personal trading success are false.  And in numerous cases, OTA does not have substantiation for presenters' claims of personal trading success.

99.   The Market Timing Orientation workshops typically include examples and testimonials of purportedly successful OTA "students."  For example, a 2019 slideshow presentation provided by OTA Corp. includes:

- A testimonial stating, "I'm doing an average of $800 a day now."

- A testimonial from a "student" who achieved a 31.7% profit in "Short Term Income" with "No Prior Trading Knowledge."

- A testimonial stating, "I'm profitable 85% of the time." Expanding on this testimonial at the March 2019 California workshop, Defendant Kimoto added, "In November, he made $7,000 in profit … December made $17,000 ... January made $41,000 in profit."

100.   During the March 2019 Workshop Defendant Kimoto also:

- Related the story of an underprivileged youth who was trained by OTA, then"[r]ealized gains [of] almost a million dollars in six months."

- Related the story of an OTA employee, Jasmine Wang, who set herself a challenge to grow a $12,000 account using only trades taken from the Daily Grid, a menu of trade suggestions

provided by OTA to Mastermind-level purchasers every trading day.  Ms. Wang purportedly grew the account to $128,000 (1,067% increase) in just nine months.

- Read a testimonial from a consumer stating, "It took me 18 years to develop a decent salary.  After three months here at OTA, I'm making almost as much money as my business."

101.    During the June 2019 New York City workshop, presenter Zelek presented the following purported success stories to attendees:

- An engineer who had been laid off and had only $3,000 to invest after paying for OTA Training; a year later, he supported his wife and two children with income from trading.

- A hedge fund manager, who, after being trained by OTA, deployed its "strategy" to manage a majority of the fund's assets.

102.    During the March 2019 California workshop, Defendant Kimoto, who is in charge of all Market Timing Orientation presenters and curates the slide presentation, told consumers that all of the testimonials "have been audited," explaining, "[o]therwise it's not fair because maybe they had one week where they were successful, but maybe they just got lucky.  Right?"

103.    In truth, Defendants do not audit testimonials to ensure that the results presented in the testimonials are typical for consumers who purchase OTA Training and attempt to deploy its strategy.

104.    In the Market Timing Orientation workshops, Defendants also use hypotheticals, including purported trading plans, to convey the type of profit that OTA "students" should expect.  Typical examples include:

- A hypothetical trade where "Risk of $100" yields "Profit of $3000."

- A "plan" for a consumer yielding "Avg. $300/Day" using only "$5,000" of capital and "2 Hours/Day."

- A "plan" for a working couple with children with "Lack of Time" and "Limited Resources" yielding "$100 Average Per Day."

- "Now, this was on a little longer term time frame.  So in about a week, you had a nice runoff of that, you know, a week later.  If you had done this investment, you would have had a 30-to-one reward to risk ratio.  That means every $1,000 you risk, you made $30,000 within a week off of that trade…"

- "[I]f you make 9,000 dollars in a day, you know, or five grand in a day, how many of these do you need to pay off the [OTA] tuition?  I'm just saying, you know.  Not too many, yes or no?"

- "How many of you would like to invest $1.4 million?  All you need is $15,000 in the futures market to do it.  And then you benefit from the $1.4 million investment.  If $1.4 million moves by 2 percent, that's a $20,000 return.  And all you had was $15,000 posted.  That's fan-freaking-tastic.  Does everybody see why we like futures, yes or no?"

- "How many of you, if you made $1,000 a day of additional income that would change your life?  Yeah. Change your zip code for sure."

- "And it can compound very, very fast.  What if you -- okay.  Six thousand dollars extra in a month.  Six thousand dollars extra in a month.  Would that be meaningful?  For some of you, that's another income stream.  Does that make sense?"

26

- "If you could make $700 in cash flow per day, because this hasn't even been 24 hours, by the way, is that good cash flow for a day?  Extra cash flow."
- "If you did two contracts, you're up $800.  If you make $800 in a trading session, $800 a day, that's … [f]our grand a week, 16 grand a month.  That's about $200,000 a year.  $800 a day is $200,000 a year of additional income.  How many of you, that's an okay additional income for you?  …. And this was done in, what, an hour?  …. So you could have just gone in that morning, looked at all the trades he identified and said I've got to run off to work, set your stops, your targets and go to work."
- "You would have made $2,000 in a day off of this trade, or $1,000 in a day off this trade only using $2,000 in capital to do it, which is a 50 percent rate of return potential per day in the currency market.  That's your opportunity here, everybody."
- "So every day you expect one to be a loser, one to be a winner, on average.  Three-to-one.  So you lose one on one and you make three on the other, so everyday you're coming out with a - - basically two times your risk.  So whatever you're risking, every day you're making twice that on average.  If you risk $100 per trade, you're pacing at $200 a day with that formula.  Does everybody see that?"
- "So that trade would have made us $12,825 … for a little over a month-and-a-half worth of time … How many of you think you might like an additional $12,000 in monthly income?
- "If you want to make six, seven figures in a year, this is a skill, and it will pay, it will pay well, but it takes time to develop that skill."

**OTA's Daily Grid**

105.   At the Market Timing Orientation workshops, OTA presenters promote Defendants' most expensive offering, "Mastermind," typically spending significant time on one of its features in particular, referred to as the "Daily Grid" or the "Supply and Demand Grid."

106.   The Daily Grid is a set of buy and sell signals for several dozen specific financial assets, created by OTA's "best traders" and provided daily to Mastermind subscribers.  Defendants claim that the Daily Grid identifies market turning points "with a high degree of accuracy," applying "our education in real market conditions" to reduce the time Mastermind subscribers must spend identifying profitable trades.

107.   The workshop slideshow includes numerous examples of profitable Daily Grid trades.  Defendant Kimoto told consumers in the March 2019 California workshop that the Daily Grid is OTA's "crown jewel," that a majority of the trades it suggests are winners, and that consumers could make $10,000 in a single day, just by making two trades off the Daily Grid.

**Claims That Everyone Can Make Money with OTA's Proven Strategy**

108.   Throughout the sales process, from its advertisements to the Market Timing Orientation workshops, OTA routinely represents, explicitly or implicitly, that anyone, regardless of skill level and experience, can learn to use OTA's strategy to profit; that the strategy is rules-based, objective, or otherwise accessible to all; and that attaining proficiency in deploying it does not require any special aptitude or facility.

109.   For example, one OTA infomercial that aired in 2019 advertises OTA's "rules-based strategy" to "generate daily or monthly income," calling it "a proven step-by-step approach." The ad claims "anybody could do this from any level.  You don't need to have a special type of background."

110.   Another infomercial that aired in 2018 and early 2019 claims that consumers will learn "how to make money whether the markets are going up, down or sideways," that consumers can use OTA's strategy to profit "[w]hether you only have a few hours a week or a few hours a month," and that OTA "can help you generate monthly cash flow so you're able to spend more time on the things that matter most to you."  The ad further claims that "it doesn't matter how much or how little you currently know about the financial markets," and that "the markets know no age, no race, no gender, no background or even education level."

111.   During the March 2019 workshop, Defendant Kimoto told consumers:

- That making money with OTA's strategy was like baking cookies:  all you have to do is follow the recipe.

- That OTA's strategy "stack[s] odds in your favor," and thus profits are a "mathematical certainty."

- "And so every day you spend an hour, identify your trades, you're done for the day.  And it's a money-making machine that's just happening in the background for you.  Does everybody get that?  Set and forget, set and forget.

- "[D]o you have to sit here and monitor and watch this all the time?  No.  It can fit into any lifestyle.  So if you have a job, no big deal."

- "Because it takes how long to analyze and find one of these trades?  You can do that per chart in 10 minutes.  Ten minutes per chart, you should be able to identify a good quality zone, execute a trade."

- Regardless of how big the shortfall between a consumer's retirement goal and current means, "[t]here's not one of you that we cannot help fix.  Is everybody clear?  Because it really all starts with increased income.  If all of a sudden I help you

start generating an extra $1,000 a day in income, that will forever change your life."

112.   Also during the March 2019 workshop, Education Counselor Erik Leoni told an undercover FTC investigator that he "never went to college" and "barely made it through high school," and "if I can get it, anybody can get it."

113.   The Market Timing Orientation course book further reinforces these claims, stating that:

- "Core Strategy offers students very low-risk, high-reward, and high-probability trading and investing opportunities.  Through a simple step-by-step, rule-based strategy, you learn the fundamentals to consistently identify these quality trading and investing opportunities with a high degree of accuracy."
- OTA's strategy "has proven to successfully work regardless of the type of investor you are or the financial markets you trade in."
- The minimum time commitment needed to use OTA's strategy to trade different asset classes starts as low as 1 hour per day.

114.   In fact, in numerous cases consumers have been unable to attain proficiency in OTA' strategy, or have been unable to implement it due to their limited time or financial resources.

115.   Through the representations described above, Defendants create the impression that consumers who purchase OTA Training are likely to earn substantial income.

116.   In truth, consumers who purchase OTA Training are not likely to earn substantial income, and Defendants have no adequate basis for conveying such a claim.

**Defendants' Disclaimers Do Not Cure their Deception**

117.   In some instances, Defendants include disclaimers in their marketing, course materials, and contracts.

118.   For example, pages 2-4 of the 2019 Course Workbook for OTA's Market Timing Orientation includes the following dense and wordy disclaimer:

### Disclosure Acknowledgment

Parts of this course of instruction may refer to trading concepts and strategies but none of this education is designed to prepare you to actively invest or trade securities and/or other financial instruments. OTA's full courses of instruction are designed to prepare you to actively invest/trade securities and/or other financial instruments only for your own account at an appropriate financial firm which utilizes the electronic transmissions of securities and other financial instruments to execute transmissions of securities and other financial instruments to execute trades for its customers.   None of OTA's education will prepare you to be a Licensed Broker in the financial industry and will not provide any education credits of certification or prepare you to find employment in any area of business.

**Disclosure for Crypto Currency** This course of instruction is not a trading course.  This course is informational only.  This course will not prepare you to actively invest/trade in crypto-currencies or any other asset class. None of this information or education is designed to prepare you to actively invest or trade cryptocurrencies securities and/or other financial instruments.

31

### Representations

Online Trading Academy makes no representations or warranties, guarantee[s] or promises. All participants recognize and acknowledge[] that individual performance depends upon the individual skills, time availability and dedication of each Student in the training program. This Online Trading Academy program should not be construed as a recommendation or an offer to buy or sell any security or the suitability of any investment strategy for Student. The purchase, sale, or advice regarding any security, other financial instrument or system can only be performed by a licensed Industry representative such as, but not limited to a Broker/Dealer, Introducing Broker, FCM and/or Registered Investment Advisor. Neither Online Trading Academy nor its representatives are licensed to make such advisements. All purchasers of the Online Trading Academy training programs or products are encouraged to speak with a licensed representative of their choice regarding the appropriateness of investing/trading or of any particular investment/trading strategy.

**Additional Representations for Cryptocurrencies** This Online Trading Academy informational course should not be construed as a recommendation or an offer to buy or sell any crypto-currency or as to the suitability of any investment strategy for any Student.

### Risk Disclosure

No offer on our part with respect to the sale or purchase of any cryptocurrency or any securities is intended or implied, and nothing contained herein is to be construed as a recommendation to take a position in any market. It is possible that at this date or some

subsequent date the officers, directors, and/or shareholders of Online Trading Academy and its affiliates own cryptocurrency, securities, or buy or sell cryptocurrency or securities mentioned in this presentation or those not so mentioned. The intent of the information is for instructional purposes only. The material presented herein has been obtained or derived from sources believed to be accurate, but we do not guarantee its accuracy. Any fair use of third-party trademarks or logos does not imply affiliation or sponsorship.

**All trading involves high risk; past performance is not necessarily indicative of future results. There have been no promises, guarantees or warranties suggesting that any trading – training will result in a profit or will not result in a loss. ….**

….

## Risk

- All trading involves high risk
- Past performance is not necessarily indicative of future results
- We do not endorse trading in any crypto currencies. Crypto currencies involve exceptional high risks as it is easy to lose it all, the operation of crypto currency is currently unregulated, and may become regulated.
- We make no promises, guarantees or warranties suggesting that any trading or training will result in a profit or will not result in a loss

119.   Such disclaimers do not cure the impression created by Defendants' extensive use of earnings and related claims that purchasers of OTA Training are likely to earn substantial income.

**Defendants' Attempts to Silence Consumer Complaints**

120.   In numerous instances, purchasers of OTA Training have concluded that the impression created by OTA of the consumer's ability to generate substantial income using OTA's strategy is not consistent with their experience.

121.   Many dissatisfied purchasers sought refunds from OTA after the three-day cancellation window allowed under OTA's form purchase agreement. Defendants have often refused to grant refunds under these circumstances.

122.   In numerous instances, Defendants, as a condition for a refund, have required that consumers sign a form contract with a non-disparagement provision inhibiting consumers' ability to communicate with others, including law enforcement agencies and the Better Business Bureaus, about OTA and its conduct.

123.   For example, some such contractual provisions bar consumers from making "negative … comments" about OTA, its business, its management, officers, and employees to "any person or entity," including "any … government entity."  These contractual provisions also specifically bar posting negative comments "on any blog, internet chat room, website, including all forms of social media."

124.   Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

**<u>VIOLATIONS OF THE FTC ACT</u>**

125.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

126.   Misrepresentations of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I — False or Unsubstantiated Earnings Claims**

(Against All Defendants)

127.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of OTA Training, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase OTA Training are likely to earn substantial income, such as thousands or tens of thousands of dollars.

128.   The representations set forth in Paragraph 127 of this Complaint are false or misleading or were not substantiated at the time the representations were made.

129.   Therefore, Defendants' representations as set forth in Paragraph 127 of this Complaint constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II — Other Misrepresentations Regarding OTA Training**

(Against All Defendants)

130.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of OTA Training, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a)   Any consumer can attain proficiency with OTA's strategy and deploy it to earn income, regardless of education, background, skills or other inherent aptitudes;

    b)   Consumers can deploy OTA's strategy to earn substantial income without the need to possess or deploy significant amounts of investable capital;

    c)   Consumers can deploy OTA's strategy to earn meaningful income without spending significant time trading, including by representing that consumers working full-time jobs can use OTA's strategy to earn additional income;

d)    OTA's instructors are active traders who have amassed
substantial wealth through trading in financial markets.

131.   The representations set forth in paragraph 130 are false or misleading
or were not substantiated at the time the representations were made.

132.   Therefore, Defendants' representations as set forth in paragraph 130
of this Complaint constitute deceptive acts or practices in violation of Section 5(a)
of the FTC Act, 15 U.S.C. §45(a).

## VIOLATION OF THE
## CONSUMER REVIEW FAIRNESS ACT OF 2016

133.   In 2016, Congress passed the Consumer Review Fairness Act of 2016,
P.L. 114-258, 15 U.S.C. § 45b.

134.   The Consumer Review Fairness Act of 2016 ("CRFA") defines
"covered communication" to mean " a written, oral, or pictorial review,
performance assessment of, or other similar analysis of, including by electronic
means, the goods, services, or conduct of a person by an individual who is party to
a form contract with respect to which such person is also a party."  15 U.S.C. §
45b(a)(2).

135.   The CRFA defines "form contract" to mean "a contract with
standardized terms (i) used by a person in the course of selling or leasing the
person's goods or services; and (ii) imposed on an individual without a meaningful
opportunity for such individual to negotiate the standardized terms."  15 U.S.C. §
45b(a)(3).

136.   Effective March 14, 2017, the CRFA renders void any provision of a
form contract if such provision (A) prohibits or restricts the ability of an individual
who is a party to the form contract to engage in a covered communication or (B)
imposes a penalty or fee against an individual who is a party to the form contract
for engaging in a covered communication.  15 U.S.C. § 45b(b)(l).

137.   Effective March 14, 2017, the CRFA prohibits any person from offering a form contract containing a provision described as void in sub-section (b) of the CRFA.  15 U.S.C. § 45b(c).

138.   Pursuant to the CRFA, a violation of sub-section (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(l)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. 15 U.S.C. § 45b(d). Congress empowered the FTC to enforce the CRFA with respect to contracts in effect on or after December 14, 2017.  15 U.S.C. § 45b(e).

139.   Corporate Defendants and Defendant Shachar have offered "form contract[s]," as that term is defined in the CRFA.  15 U.S.C. § 45b(a)(3).

### Count III — Unlawful Use of Non-Disparagement Provisions

(Against the Corporate Defendants and Defendant Shachar)

140.   In numerous instances on or after December 14, 2017, Corporate Defendants and Defendant Shachar have offered, in the course of selling their goods or services, form contracts containing provisions that (A) prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication and/or (B) impose a penalty or fee against an individual who is a party to the form contract for engaging in a covered communication.

141.   Corporate Defendants and Defendant Shachar have thereby violated the CRFA, 15 U.S.C. § 45b(c).

### CONSUMER INJURY

142.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the CRFA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

1

### THE COURT'S POWER TO GRANT RELIEF

2      143.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court

3 to grant injunctive and such other relief as the Court may deem appropriate to halt

4 and redress violations of any provision of law enforced by the FTC.  The Court, in

5 the exercise of its equitable jurisdiction, may award ancillary relief, including

6 rescission or reformation of contracts, restitution, the refund of monies paid, and

7 the disgorgement of ill-gotten monies, to prevent and remedy any violation of any

8 provision of law enforced by the FTC.

9      144.  Section 19 of the FTC Act, 15 U.S.C. §57b, authorizes this Court to

10 grant such relief as the Court finds necessary to redress injury to consumers

11 resulting from Defendants' violations of the CRFA, including the rescission or

12 reformation of contracts, and the refund of monies paid, the disgorgement of ill-

13 gotten monies, and prejudgment interest.

14

### PRAYER FOR RELIEF

15     Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act,

16 15 U.S.C. §§ 53(b) and 57b, and Section 2(d) of the CRFA, 15 U.S.C. § 45b(d),

17 and the Court's own equitable powers, requests that the Court:

18     A.  Award Plaintiff such preliminary injunctive and ancillary relief as may

19 be necessary to avert the likelihood of consumer injury during the pendency of this

20 action and to preserve the possibility of effective final relief, including but not

21 limited to, temporary and preliminary injunctions;

22     B.  Enter a permanent injunction to prevent future violations of the FTC

23 Act and the CRFA by Defendants;

24     C.  Award such relief as the Court finds necessary to redress injury to

25 consumers resulting from Defendants' violations of the FTC Act and the CRFA,

26 including but not limited to, rescission or reformation of contracts, restitution, the

27 refund of monies paid, and the disgorgement of ill-gotten monies; and

28

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  February 12, 2020            /s/ Thomas M. Biesty

Thomas M. Biesty
Rhonda Perkins
Andrew Hudson
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3043 / tbiesty@ftc.gov
(202) 326-3222 / rperkins@ftc.gov
(202) 326-2213 / ahudson@ftc.gov

John Jacobs
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
(310) 824-4300 / jjacobs@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2020, I caused a copy of the foregoing Complaint to be served on all parties in the manner specified below:

**Via Email**

Leonard L. Gordon
Venable LLP
1270 Avenue of the Americas
New York, NY 10020
(212) 370-6252 /
lgordon@venable.com

Eric Berman
Katherine Wright Morrone
Venable LLP
600 Massachusetts Ave NW
Washington, DC 20001
(202) 344-4661 /
esberman@venable.com
(202) 344-4262 /
kwmorrone@venable.com

*Counsel for Defendants OTA
Franchise Corporation, Newport
Exchange Holdings, Inc., NEH
Services, Inc., Eyal Shachar, Samuel
R. Seiden, and Darren Kimoto*

/s/ Thomas M. Biesty
Thomas M. Biesty