# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission**,

           Plaintiff,

  vs.

**OTA Franchise Corporation**, et al.,

           Defendants.

No. 8:20−cv−287

**FEDERAL TRADE COMMISSION'S EXHIBITS IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

**VOLUME X**

i

1

## Exhibit Volume X: Table of Contents

2

3   EX 13   Attachment ZX (TradeStation Interrogatory Responses) ..............7393

4   Attachment ZY (Pacific Premier Bank Records)...........................7401

5   Attachment ZZ (OTA Franchise Disclosure Document) ...............7404

6   Attachment ZA (OTA Corp. – State Filings) .................................7631

7   Attachment ZZB (NE Holdings – State Filings) ...........................7634

8   Attachment ZZC (NEH Services – State Filings)..........................7639

9   Attachment ZZD (Web Posting by Purported Insider) .................7644

10  Attachment ZZE (Patent).............................................................7658

11  Attachment ZZF (Press Release) .................................................7679

12  Attachment ZZG (Keeley Hubbard IH Transcript).......................7682

13  Attachment ZZH (First Survey Results PowerPoint) ...................7763

14  Attachment ZZI (Keeley Hubbard Emails) ..................................7800

15

16

17

18

19

20

21

22

23

24

25

26

27

28

 **TradeStation®**

October 3, 2019

***FOIA CONFIDENTIAL TREATMENT REQUESTED***

*(Secure file transfer via link at securemail.ftc.gov)*

Mr. Reeve Tyndall
Federal Trade Commission, NW
Mail Stop CC-8528
Washington, DC  20580

Re:    **TradeStation Securities, Inc. (FTC File No. 1823175)**

Dear Mr. Tyndall:

This letter is submitted on behalf of TradeStation Securities, Inc. ("TradeStation") in response to the September 12, 2019 Civil Investigative Demand ("CID") relating to the Federal Trade Commission's ("FTC") non-public investigation into the Subject Entities as defined in the CID Schedule.  TradeStation has completed the Meet-and-Confer with FTC staff counsel, Thomas Biesty and Andrew Hudson, and herewith provide answers and responses to the FTC Interrogatories and Document Requests (collectively, the "Information").  TradeStation appreciates the FTC's representation that it will not disclose the Information under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  TradeStation expressly requests nondisclosure of the Information, pursuant to FOIA Exemption 4, since the Information contains trade secrets and commercial or financial information which should be protected from public inspection.

Each Interrogatory and Document Request propounded in the CID is restated in ***bold italics*** with TradeStation's responses immediately underneath.

   A.  <u>Interrogatories</u>

*1.     Identify and describe in detail all accounts maintained or used by the Subject Entities (or any of them), including but not limited to the (a) account number; (b) account name; (c) account holder; (d) account opening date; and (e) account closing date.*

   <u>Response to Interrogatory 1</u>

   <u>Preliminary Statement</u>

From September 1, 2016 through on or about September 30, 2019, the only accounts maintained or used by any of the Subject Entities were TradeStation brokerage accounts custodied in the name of OTA Franchise Corporation or OTA Franchise Corporation-International (collectively, "OTA") under the August 2013 Agreement and Non-U.S. Agreement described in the response to Interrogatory 2 below. They consisted of two (2) master equities

Mr. Reeve Tyndall
October 3, 2019
Page 2

FOIA Confidential Treatment Requested

accounts, for stocks, options and other exchange-traded funds ("Equities Accounts"), and three (3) master commodity futures accounts for commodity and financial index futures ("Futures Accounts") (collectively, the "OTA Accounts"). The OTA Accounts were used for no purpose other than as educational tools to provide training to students in the classrooms of OTA and its franchisees (the "OTA Classrooms"), and were not to be used to seek or gain profit of any kind. While the OTA Accounts were used for educational purposes in the OTA Classrooms by both OTA Instructors and OTA Classroom Students, they were accounts solely with OTA and not any other person or entity (including any franchisee of OTA). The OTA Instructors and OTA Students were able to use these master OTA Accounts in the OTA Classrooms for educational training purposes through "subaccount" designations, which permitted separate individual access under the master OTA account being used; however, subaccounts were not separate accounts, but only technological coding and access enablement so that OTA Instructors and OTA Students could use their own classroom computer terminals and track their own progress in educational training exercises under the master OTA Account being used in the OTA Classrooms.

The answers for (a) through (e) of Interrogatory 1 for such Equities Accounts and Futures Accounts are as follows:

| Account No. | Type | Account Name | Opening Date[1] | Closing Date[2] |
|---|---|---|---|---|
| 17305154 | Equities/Options | OTA Franchise Corporation | 06/13/2008 | |
| 18210655 | Equities/Options | OTA Franchise Corporation-INT'L | 12/19/2008 | |
| 21033213 | Futures | OTA Franchise Corporation | 09/25/2009 | |
| 21081111 | Futures | Online Trading Academy Franchise International | 09/26/2009 | |
| 2105459P | Futures | OTA Franchise Corporation | 07/17/2018 | 07/18/2019 |

**2.      Describe in detail the financial relationship between You and the Subject Entities (or any of them), including but not limited to: (a) any amounts paid by You to the Subject Entities (or any of them) for or relating to the referral of OTA Students or the opening or use of accounts by OTA Students; (b) any discounts to Your fees or other incentive offered to OTA Students for the opening or use of accounts; and (c) any amounts paid by the Subject Entities (or any of them) to You. Such description shall include the dates or time periods during which any of the described payment arrangements were in effect.**

---

[1] The August 2013 Agreement, referenced in response to Interrogatory 2 below, superseded and replaced a similar agreement between the parties dated September 3, 2008.

[2] For those accounts without closing dates, TradeStation and OTA are in the process of winding them down pursuant an August 15, 2019 termination without cause notice given by OTA to TradeStation prior to TradeStation's receipt of the CID (see Response to Document Production 3 below).

**Attachment ZX**

Mr. Reeve Tyndall
October 3, 2019
Page 3

### Response to Interrogatory 2

From September 1, 2016 through September 30, 2019[3], TradeStation and its affiliate, TradeStation International Ltd ("TIL") (formerly known as TradeStation Europe Ltd ("TSIL")), a United Kingdom private company, had contractual/business relationships with OTA Franchise Corporation (again, defined for purposes of these responses as "OTA"), but none of the other Subject Entities. Those contractual/business relationships were pursuant to three (3) contracts: (i) Agreement, dated August 1, 2013, between TradeStation and OTA Franchise Corporation (the "August 2013 Agreement"); (ii) Agreement for Educational Use of Trading Application, dated September 3, 2008, between TSIL (now TIL) and OTA Franchise Corporation, as amended by First Amendment, dated January 21, 2010, to Agreement for Educational Use of Trading Application (as amended, the "Non-U.S. Agreement"); and (iii) Services Agreement, dated March 10, 2014, between TradeStation and OTA Franchise Corporation, a Nevada corporation (the "March 2014 Agreement").

These contractual/business relationships for the subject period are described as follows:

August 2013 Agreement:   Under the August 2013 Agreement, TradeStation provided to OTA Classrooms, for use by OTA Instructors and OTA Students for education and training relating to equities, options and futures (the "Relevant Asset Classes"), (a) the *TradeStation* display platform, which permits users to conduct charting and analysis and initiate trade order messages (the "Trading Application"), (b) related real-time market data from exchanges, and (c) the OTA Accounts described in the response to Interrogatory 1 (collectively, the "Classroom Online Technology Tools"). TradeStation did not charge OTA for use of the Classroom Online Technology Tools, subject to maximum use limits. In exchange, OTA agreed that OTA Classrooms would not use display platforms and related functions to educate and train OTA Students with regard to the Relevant Asset Classes other than the Classroom Online Technology Tools, and OTA sent to TradeStation Securities each week lists of students who completed courses relating to the Relevant Asset Classes in OTA Classrooms. TradeStation agreed that any such OTA Student who became a TradeStation brokerage customer would be offered a 20% commission discount from TradeStation's standard, published commission rates until the cost of the OTA class taken by the OTA Student was recouped. No amounts were paid by TradeStation to OTA for, or based on, such lists, or whether a student ended up opening or using a TradeStation brokerage account. The August 2013 Agreement related only to OTA Classrooms in the United States.

Non-U.S. Agreement.  The Non-U.S. Agreement is similar to the August 2013 Agreement, except that this agreement applied to OTA Classrooms outside of the United States.

March 2014 Agreement.  This agreement is separate from the August 2013 Agreement and the Non-U.S. Agreement.  Under the March 2014 Agreement, OTA provided to TradeStation Securities traditional marketing opportunities, such as web-display and email advertisements and promotions, in exchange for a fixed monthly payment of $67,000.  The specific services and monthly payment terms were to be reviewed each year.  For the 2017 calendar year, the agreed-

---

[3] There has been no business relationship with any of the Subject Entities after September 30, 2019 other than the wind down of accounts referenced in footnote 2 above.

Mr. Reeve Tyndall
October 3, 2019
Page 4

FOIA Confidential Treatment Requested

upon monthly fee paid was $63,333.33, plus TradeStation purchased three customary name sponsorships for OTA conferences during the 2017 year, one in March for $5,000, one in July for $35,000 and one in October for $35,000.  For the 2018 calendar year, the agreed-upon monthly fee paid was $63,333.33, plus TradeStation purchased two customary name sponsorships for OTA conferences during the 2018 year, one in March for $20,000, and one in October for $50,000.  After December 2018, this agreement continued on a month-to-month basis at the $63,333.33 monthly fee rate, no conference sponsorships were purchased, the agreement formally terminated on September 14, 2019, and the last $63,333.33 payment made to OTA was for the July 2019 month.

**3.      *Describe in detail the accounts opened by or for OTA Students, including: (a) the type(s) of such accounts (if more than one); (b) the number of each type of account opened in each year from September 1, 2016 to present; and (c) the average length of time active trading occurred in such accounts.***

<u>Response to Interrogatory 3</u>

| (a) | Equities/Options | Futures |
|---|---|---|
| (b) | 8,592 | 7,067 |
| (c) | See Orders_Executed column in the Excel Chart titled *OTA_Accounts.xlsx* in response to Document Request 5. | See Orders_Executed column in the Excel Chart titled *OTA_Accounts.xlsx* in response to Document Request 5. |

**4.      *Describe in detail the fees You charge to OTA Students who open or use accounts including but not limited to: (a) fees related to margin use; (b) fees for or relating to placing orders for the purchase or sale of tradeable assets; and (c) fees for or relating to executing orders for the purchase or sale of tradeable assets.***

<u>Response to Interrogatory 4</u>

The fees TradeStation charges to OTA Students who opened or use accounts are the standard fees charged to a typical TradeStation retail client.  These fees are outlined in detail at: https://www.tradestation.com/pricing/.   For your convenience, copies of the pricing pages, as of October 2, 2019, are attached at Bates Nos. TSS000001-TSS000020.  Some of these fees may have changed during the relevant time period.  TradeStation will produce legacy versions of the pricing pages upon request.

**5.      *Describe in detail the extent and circumstances under which You execute trades for OTA Students on margin, in whole or in part, or otherwise extend credit or refrain from requiring full payment or security for the cost or potential cost of a trade.***

<u>Response to Interrogatory 5</u>

OTA Students are treated like all other TradeStation customers in regards to margin trading regardless of the Relevant Asset Class used.  Each TradeStation customer (including all

**Attachment ZX**

EX 13
7396

FOIA Confidential Treatment Requested

OTA Students who become TradeStation customers) may decide how, and to what extent, they want to apply leverage (i.e., margin) to their trading strategies. Each OTA Student who qualifies for, and opens, a TradeStation account is required to sign a customer agreement that contains provisions that allow TradeStation to offer margin trading (Copies of the current versions of the TradeStation Securities account agreements (futures, equities and options) are attached at Bates Nos. TSS000021-TSS000053. Each OTA Student also receives, and acknowledges having read, the Margin Disclosure Statement at the time of account opening (see Bates Nos. TSS000054.

If an OTA Student wants to trade equities or exchange-traded funds on margin, their buying power is calculated in accordance with Regulation T (12 C.F.R. § 220), FINRA Rule 4210 and TradeStation's own margin requirements. This type of margin trading may be employed by customers using either regular margin or day trading margin for customers who qualify as pattern day traders. (A copy of FINRA Rule 4210 is attached at Bates Nos. TSS000055-TSS000098. Easy-to-understand, investor-oriented explanations of margin trading can be found at:

https://www.finra.org/investors/learn-to-invest/advanced-investing/day-trading-margin-requirements-know-rules (Bates Nos. TSS000099-TSS000101);

https://www.finra.org/investors/learn-to-invest/advanced-investing/purchasing-margin (Bates Nos. TSS000102-TSS000103); and

https://www.finra.org/investors/learn-to-invest/advanced-investing/understanding-margin-accounts (Bates Nos. TSS000104-TSS000105).

Commodity futures margin is the amount of money that a customer must deposit and keep on hand with its futures commission merchant when a futures position is opened. It is not a down payment, and you do not own the underlying commodity. A good explanation of how commodity futures margin works can be found at:

https://www.cmegroup.com/education/courses/introduction-to-futures/margin-know-what-is-needed.html (Bates Nos. TSS000106-TSS000107).

**6.**     *If You provide any services to OTA Instructors on terms other than those offered to the general public, describe in detail the nature of such terms and how they differ from those offered to the general public.*

### Response to Interrogatory 6

During the relevant time period, OTA Instructors were offered the following terms which were different than TradeStation's standard rates and fees:

### Equities Flat Ticket

- Commission-free trading for stocks, ETFs, and options
  - -Equity Trades up to 10,000 shares, .$001/share assessed thereafter
  - -Direct-routed orders will be charged an additional $.005/share

**Attachment ZX**

Mr. Reeve Tyndall                                                    FOIA Confidential Treatment Requested
October 3, 2019
Page 6

-$14.95 fee applies for options exercises or assignments

-For early options exercises/assignments, $1.50/contract fee applies with $5.95 minimum

- No base commission for options up to 50 contracts per trade

-Option Trades up to 50 contracts, $.50/contract assessed thereafter

-$.50/contract fee for index options

-Direct routing options orders incur an additional $1.00/contract

-No options cancellation fees

- No TradeStation software fees for platform, RadarScreen and Portfolio Maestro

**Futures Flat Ticket**

- Discounted commissions for futures: $.45/contract per side with no carry charge
- No TradeStation software fees for platform, RadarScreen and Portfolio Maestro

**B.  Document Requests**

*1.       For all accounts identified in response to Interrogatory 1, produce statements for all sub-accounts intended for use by OTA Instructors, for the time period September 1, 2016 to present.*

**Response to Document Request 1**

Full compliance with Document Request 1 would result in an extremely large Excel file. During the Meet-and-Confer with FTC staff counsel, it was agreed that TradeStation can, preliminarily, produce a representative sample of the trading records. Attached is an Excel spreadsheet titled *Branch Trading.xlsx* that contains order record history for all OTA branches from July 1, 2019 through July 8, 2019.  If FTC staff counsel wants additional documents responsive to Document Request 1, please inform the undersigned.

*2.       Produce statements for all OTA Instructor accounts, for the time period September 1, 2016 to present.*

**Response to Document Request 2**

Pursuant to a letter dated October 2, 2019, FTC staff counsel has extended the time for TradeStation's response to Document Request 2 until October 17, 2019.

*3.       Produce all contracts or other Documents evidencing any agreement or arrangement with or pertaining to the Subject Entities (or any of them).*

**Response to Document Request 3**

Documents responsive to Request 3 are attached at Bates Nos. TSS000108-TSS000150.

*4.       Produce all complaints from OTA Students or relating to the Subject Entities (or any of them).*

**Attachment ZX**

Mr. Reeve Tyndall
October 3, 2019
Page 7

FOIA Confidential Treatment Requested

### Response to Document Request 4

During the Meet-and-Confer, FTC staff counsel agreed to limit Document Request 4 to only those complaints from OTA Students complaining about OTA and the services provided by OTA. TradeStation has no such complaints responsive to Document Request 4, as so limited by FTC staff counsel.

**5.     Produce documents sufficient to show, for all accounts opened by or for OTA Students: (a) the opening date; (b) the opening balance; (c) the number of trade orders placed; (d) the number of trades executed; (e) the average balance, from account opening to date; (f) the highest balance ever achieved from account opening to date; (g) the total amount of all withdrawals from the account; (h) the total amount of all deposits to the account; (i) the closing balance, or, if none, the current balance; and (j) the total amount of fees paid to You from or relating to the account.**

### Response to Document Request 5

Attached is an Excel spreadsheet titled *OTA_Accounts.xlsx* with information responsive to Document Request 5 (a-f and i). Also attached is a Text file titled *MoneyMovement_Fee_PipeDelimted.del* with information responsive to Document Request 5 (g, h and j). The "average balance" and "highest balance" columns are based on end-of-day valuations. The "opening date" is either the fund date (if the account was funded) or the approved date (if never funded). Please let us know if you require any assistance understanding this data

Feel free to contact me with any questions.

Very truly yours,

Steven M. Greenbaum
Senior Vice President and General Counsel

CC:     Thomas Biesty, Esq.
        Andrew Hudson, Esq.
        Herbert Walton, Chief Compliance Officer

**Attachment ZX**

EX 13
7399

# Certificate of Compliance

*FOIA Confidential Treatment Requested by TradeStation Securities, Inc.*

Re: <u>Civil Investigative Demand (Matter No. 1823175)</u>

To: <u>TradeStation Securities, Inc. (the "Firm")</u>

I do certify that all of the documents, information and tangible things required pursuant to the above-referenced Civil Investigative Demand, which are in the possession, custody, control, or knowledge of the Firm, have been submitted to the U.S. Federal Trade Commission, subject to the understanding that the documents produced in response to Document Request No. 5 consist of various data files which were created by the Firm following numerous discussions with FTC staff (the "Files"). The Files contain responsive data retrieved from the Firm's back and middle office records and the customer relationship management database and, in some cases, were summarized to conform to the FTC staff's requests. The Firm believes the Files contain reasonably accurate information. The Firm notes that FTC staff has not, as of the date of this Certificate, requested copies of monthly statements and trade confirmations generated on behalf of OTA Students, which, the Firm submits, reflect the most accurate books and records of activity in the OTA Students' accounts. The documents

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

I verify that, subject to the provisos set forth above, the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Signature: _____

Name:     Herbert L. Walton

Title:     Chief Compliance Officer

Sworn to before me this day:

February 5, 2020

Steven M. Greenbaum
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG148322
Expires 2/3/2022

**Attachment ZX**

| Account Holder's Names | Account Holder's Addresses | Account Numbers | Types of Accounts |
|---|---|---|---|
| OTA FRANCHISE CORPORATION | 17780 FITCH STE 200, IRVINE CA 92614-6060 | 3653<br>4984<br>8513<br>8166<br>94<br>13<br>1708<br>2490<br>4272<br>1280<br>1298<br>5038<br>6046<br>3158<br>1391 | • ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ONE YEAR CD<br>• ONE YEAR CD<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• BUSINESS MONEY MARKET |
| OTA REAL ESTATE INC | 17780 FITCH STE 200, IRVINE CA 92614-6060 | 16<br>36 | • ANALYZED BUSINESS CK |
| NEWPORT EXCHANGE HOLDINGS INC | • 17780 FITCH STE 200, IRVINE CA 92614-6060<br>• 18004 SKY PARK CIR STE 140, IRVINE CA 92614-6427 | 1690<br>1757<br>0001<br>0002<br>0003<br>0006<br>0003<br>0004<br>0004<br>0008<br>512<br>895 | • ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN<br>• ONE YEAR CD<br>• ONE YEAR CD |

PPB12742

Confidential

**Attachment ZY**

EX 13
7401

| | | | |
|---|---|---|---|
| OTA TAX PROS INC | 17780 FITCH STE 200, IRVINE CA 92614-6060 | • ▮7424 | • ANALYZED BUSINESS CK |
| NEH SERVICES INC | • 17780 FITCH STE 200, IRVINE CA 92614-6060<br>• 18004 SKY PARK CIR STE 140, IRVINE CA 92614-6427 | • ▮5733<br>• ▮1979<br>• ▮0006 - (NEH SERVICES INC IS THE GUARANTOR AND NEWPORT EXCHANGE HOLDING INC IS THE BORROWER)<br>• ▮0010 - (NEH SERVICES INC IS THE BORROWER) | • ANALYZED BUSINESS CK<br>• BUSINESS MONEY MARKET<br>• COMMERCIAL LOAN<br>• COMMERCIAL LOAN |
| ONLINE TRADING ACADEMY (DBA) - LINK WITH NEWPORT EXCHANGE HOLDINGS INC | 18004 SKY PARK CIR STE 140, IRVINE CA 92614-6427 | • ▮1690<br>• ▮1757 | • ANALYZED BUSINESS CK<br>• ANALYZED BUSINESS CK |
| REDACTED | | | |
| REDACTED | | | |
| REDACTED | | | |

PPB12743

Confidential

**Attachment ZY**

EX 13
7402



EYAL SHACHAR

SANTA ANA, CA

- BASIC CHECKING
- BASIC CHECKING
- CONSUMER MONEY MARKET
- LIFE STY 50 NON INT

PPB12744

Confidential

**Attachment ZY**



**FRANCHISE DISCLOSURE DOCUMENT**

**OTA FRANCHISE CORPORATION**
A Nevada corporation
17780 FITCH, SUITE 200
IRVINE, CALIFORNIA 92614
949-475-5652
www.tradingacademy.com

OTA Franchise Corporation offers franchises for the training of trading, investment and financial education services to independent operators throughout the United States under the names OTA Franchise Corporation, Online Trading Academy® and OnlineTradingAcademy.com®.

The total investment necessary to begin operation of an Online Trading Academy Center ranges from $389,800 to $684,500 per Center. This amount includes $100,000 to $250,000 that must be paid to us or an affiliate.

This Disclosure Document summarizes certain provisions of your Franchise Agreement and other information in plain English.  Read the disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payments us or an affiliate in connection with the proposed franchise sale.  **Note, however, that no government agency has verified the information contained in this document.**

You may wish to receive your Disclosure Document in another format that is more convenient for you.  To discuss the availability of disclosures in different formats, contact Ralph Loberger at OTA Franchise Corporation, 17780 Fitch, Suite 200, Irvine, California 92614.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully.  Show your contract and this disclosure document to an advisor, like a lawyer or accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind.  Information about comparisons of franchisors is available.  More information on franchising, such as "A Consumer's Guide to Buying a Franchise", which can help you understand how to use this Disclosure Document is available from the Federal Trade Commission.  You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, DC 20580.  You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency listed on Exhibit D or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state.  Ask your state agencies about them.

**THE ISSUANCE DATE OF THIS DISCLOSURE DOCUMENT IS MARCH 30, 2018**

**Attachment ZZ**

EX 13
7404

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state.   REGISTRATION OF THIS FRANCHISE WITH A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed on Exhibit D for information about the franchisor, or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES.  YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following Risk Factors before you buy this franchise:

1.      THE FRANCHISE AGREEMENT REQUIRES ARBITRATION FOR NEARLY ALL DISPUTES BETWEEN YOU AND US, AND ALSO PROVIDES FOR A FACE-TO-FACE MEETING AND MEDIATION TO SETTLE DISPUTES. THE MEDIATION, ARBITRATION (AND ANY LITIGATION) WILL TAKE PLACE IN THE COUNTY WHERE OUR THEN-CURRENT HEADQUARTERS ARE LOCATED (CURRENTLY IRVINE, CALIFORNIA), AND THAT MAY COST YOU MORE AND RESULT IN A LESS FAVORABLE SETTLEMENT THAN IF THESE PROCEEDINGS TOOK PLACE IN YOUR HOME STATE. COSTS OF THESE PROCEEDINGS MAY BE GREATER THAN IN YOUR HOME STATE.

2.      THE FRANCHISE AGREEMENT PROVIDES THAT CALIFORNIA LAW GOVERNS THE AGREEMENT AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS CALIFORNIA LAW.  YOU MAY WANT TO COMPARE THESE LAWS.

3.      WE MAY TERMINATE THE FRANCHISE AGREEMENT IF YOU FAIL TO ACHIEVE MINIMUM PERFORMANCE AND FINANCIAL STANDARDS.

THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Effective Date: See the next page for state effective dates.

**Attachment ZZ**

## STATE EFFECTIVE DATES

The following states require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration:   California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This Franchise Disclosure Document is registered, on file or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

**California:**        Exempt

**Hawaii:**

**Illinois:**

**Indiana:**

**Maryland:**

**Michigan:**

**Minnesota:**

**New York:**

**North Dakota:**

**Rhode Island:**

**South Dakota:**

**Virginia:**

**Washington:**

**Wisconsin:**

In all other states, the effective date of this Franchise Disclosure Document is the issuance date of March 30, 2018

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7406

**OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT**
**TABLE OF CONTENTS**

| | | |
|---|---|---|
| ITEM I | THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS AND AFFILIATES | 1 |
| ITEM 2 | BUSINESS EXPERIENCE | 3 |
| ITEM 3 | LITIGATION | 5 |
| ITEM 4 | BANKRUPTCY | 6 |
| ITEM 5 | INITIAL FEES | 6 |
| ITEM 6 | OTHER FEES | 6 |
| ITEM 7 | ESTIMATED INITIAL INVESTMENT | 11 |
| ITEM 8 | RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES | 14 |
| ITEM 9 | FRANCHISEE'S OBLIGATIONS | 17 |
| ITEM 10 | FINANCING | 18 |
| ITEM 11 | FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING | 19 |
| ITEM 12 | TERRITORY | 31 |
| ITEM 13 | TRADEMARKS | 36 |
| ITEM 14 | PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION | 39 |
| ITEM 15 | OBLIGATIONS OF THE FRANCHISEE TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS | 40 |
| ITEM 16 | RESTRICTIONS ON WHAT FRANCHISEE MAY SELL | 42 |
| ITEM 17 | RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION | 43 |
| ITEM 18 | PUBLIC FIGURES | 46 |
| ITEM 19 | FINANCIAL PERFORMANCE REPRESENTATIONS | 46 |
| ITEM 20 | OUTLETS AND FRANCHISEE INFORMATION | 49 |
| ITEM 21 | FINANCIAL STATEMENTS | 57 |
| ITEM 22 | CONTRACTS | 57 |
| ITEM 23 | RECEIPTS | 58 |

Exhibits

| | |
|---|---|
| Exhibit A | Franchise Agreement with Exhibits |
| Exhibit B | Financial Statements |
| Exhibit C | ACH Debit Authorization |
| Exhibit D | List of State Administrators and Agents for Service of Process |
| Exhibit E | State Addendum to Disclosure Document and Franchise Agreement |
| Exhibit F | Statement of Prospective Franchisee |
| Exhibit G1 | List of Franchisees |
| Exhibit G2 | List of Reacquired or Transferred Franchisees |
| Exhibit H | GMS Participation Agreement |
| Exhibit I | Receipt |

**Attachment ZZ**

## OTA FRANCHISE CORPORATION
### FRANCHISE DISCLOSURE DOCUMENT

### ITEM 1:   THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES

To simplify the language in this Disclosure Document, "OTA," "we," "us," "Company" or "our" means the Franchisor, OTA Franchise Corporation, that does business under the names OTA Franchise Corporation, and Online Trading Academy. "You" means the person who buys the franchise.  If a corporation, limited liability company or partnership is awarded a franchise, "you" generally includes the franchisee's owners.  OTA is a Nevada corporation that was incorporated as OTA Franchise Corporation on March 8, 2004. Our principal business address is 17780 Fitch Avenue, Irvine CA 92614. Capitalized words that are not defined in this Disclosure Document have the meaning described in the Franchise Agreement.

OTA's agent for service of process is listed in "Exhibit "D".

Our parent company is Newport Exchange Holdings, Inc. ("NEHI"), a California corporation, incorporated on December 29, 1999. The principal business address of NEHI is also 17780 Fitch Avenue, Irvine CA 92614. NEHI currently operates one Online Trading Academy® Center similar to the business offered under this Disclosure Document.  NEHI began operating the Center in Irvine, CA in 1999 and opened a Center in San Diego California in October 2013. The San Diego Center was transferred to an incoming franchisee in December 2017. NEHI does not and has never sold franchises for the business being franchised or any other line of business.

NEHI also owns all of the stock of Online Trading Academy, a California corporation formed on March 19, 1998.  This entity operated similar training classes and developed some of the concepts on which our current System is based.  This entity also conducted some limited licensing activities using the mark "Online Trading Academy.com®" over a period of approximately 8 months between late 2000 until early 2001 to foreign nationals with businesses located in foreign countries.  This entity still exists but has been non-operational since September of 2001.  Online Trading Academy.com provides no services or products to Online Trading Academy franchisees.  The principal business address of Online Trading Academy is also 17780 Fitch Avenue, Irvine CA 92614.

Our affiliate, NEH Services, Inc., ("NEHSI") is a California corporation incorporated January 3, 2000.  The principal business address of NEHSI is also 17780 Fitch Avenue, Irvine CA 92614.  The agent for service of process is Theodore M. Hankin at 1400 Quail Street., Ste. 200, Newport Beach, CA92660.  NEHSI has the right to acquire qualifying tuition loan agreements from our approved tuition loan provider as described in Item 10 below. NEHSI does not and has never operated a business of the type being franchised, nor offered franchises for the business being franchised. NEHSI has not offered franchises for sale in any other line of business.

Our affiliate OTA Tax Pros, Inc., ("OTP") is a California corporation incorporated June 22, 2011. The principal business address of OTP is also 17780 Fitch Avenue, Irvine CA 92614.  The agent for service of process is Theodore M. Hankin at 1400 Quail Street., Ste. 200, Newport Beach, CA92660. OTP is currently offering tax seminars and services through its website and as part of a bundle of services included in programs sold through franchised locations and through our Company Owned Locations.  We require our franchisees to offer OTP services to their customers. OTP does not and has never operated a business of the type being franchised, nor offered franchises for the business being franchised. OTP has not conducted business in any other line of business nor offered franchises for sale in any other line of business.

Our affiliate OTA Real Estate, Inc. dba OTA Real Estate ("OTARE") is a California corporation incorporated July 2, 2014. The principal business address of OTARE is also 17780 Fitch Avenue, Irvine CA 92614.  The agent for service of process is Theodore M. Hankin at 1400 Quail Street., Ste. 200, Newport Beach, CA92660. From July 2014 through December 2017 OTARE offered real estate investment seminars and services through its website and in Company Owned territories and often hosted at our Company Owned Locations.  During this time OTARE and OTA  entered into Collaborative Pilot Programs with OTA

OTA Franchise Corporation  FTC  Disclosure Document
March 30, 2018

## Attachment ZZ

EX 13
7408

franchisees to test certain aspects of the OTARE business concept. The pilot period is now completed and OTA Real Estate Inc., has stopped offering these services. OTA now includes a range of Real Estate courses as an additional asset class which is part of the OTA approved curriculum. Franchisees wishing to offer the Real Estate Classes curriculum, services and/or bundled curriculum and services to their customers may do so. OTARE does not and has never operated a business of the type being franchised, nor offered franchises for the business being franchised. OTARE has not conducted business in any other line of business nor offered franchises for sale in any other line of business.

OTA began offering franchises on April 20, 2004 on a limited basis. The business of OTA is to offer franchises for trading education and financial education and training centers operated by independent owners and operators (the "Online Trading Academy Center", "OTA Center" or "Center") throughout the United States and other countries that utilize our distinctive format and method of doing business (the "System") and our proprietary, copyrightable and/or trade secret information and materials ("Intellectual Property") offering our clients efficient and cost-effective trading and financial education solutions. Our activities in general, and the trading and financial education for individuals who wish to trade for their own account using licensed third parties, and training programs that we franchise in particular, are undertaken to develop, maintain and enhance the awareness of the Online Trading Academy brand and the value of the Intellectual Property as well as to build our reputation for total service throughout the United States and in other countries.  Neither the franchisee nor the franchisor nor any of its affiliates will open customer accounts or provide trading services, i.e., customers may not open accounts and trade through the franchisees or the franchisor.

As of December 31, 2017, we operated ten Online Trading Academy® Centers similar to the business offered under this Disclosure Document in Westwood Los Angeles California; Woodland Hills Los Angeles California, Sacramento California, New York City, New York; Long Island, New York, Cincinnati, Ohio, Boston Massachusetts, Austin, Texas and London, England and Vancouver Canada as described in Item 20. Of these ten, the three located in Austin Texas, Cincinnati Ohio and Sacramento California, are Satellite Centers.

The standard terms and conditions for the operation of the Franchised Business are described in the Franchise Agreement ("Franchise Agreement").

Before you begin operations, you must obtain all required licenses and approvals to operate the franchised business, including compliance with state and other educational institution, franchising and related requirements.  Each state and some local jurisdictions have different registration, licensing and other requirements for those involved in trading and financial education and training centers, which we describe only in very general terms below.  While we can pass on to you information we have received, you are the only one responsible for investigating the rules and regulations that apply within your Territory before purchasing your franchise.  You must pay applicable license or permit fees, which may vary from territory to territory.

State and other requirements vary widely (and can change over time) and we strongly urge you to research the applicability of all legal requirements before signing any binding documents, paying any amounts or making any other commitments. In some States there may be industry specific laws and regulations regarding education and training which may apply to the operation of an Online Trading Academy Center in your Territory. It is your obligation to comply with all applicable laws.  These laws, and their interpretations, could materially affect your ability to do business.

The market for your business is the general public who desire to learn to trade and invest for their own account using licensed third parties and those who seek an education in financial matters in general.  The market is developing and may depend on economic trends.  Although there are no direct competitors with physical campuses in multiple locations throughout the US, you will be competing with all others who provide trading and financial education and training at all different price points and with a variety of resources. Such entities may include t3Live (formerly Pristine) and TradeWarrior.  Other online trading and investing education is available through Investopedia, Udemy and Great Courses, and free trading and

**Attachment ZZ**

investing education is available through brokers such as TD Ameritrade and E*Trade. There are also indirect competitor systems who offer real estate courses such as Fortune Builders/Than Merrill, and Rich Dad Education and various for-profit on-line entities. Neither we nor any predecessor or affiliates have offered any franchises in a similar line of business.  OTA does not offer franchises in any other line of business.

A fundamental requirement of your joining and remaining part of the Online Trading Academy System will be your commitment to the operation of your Online Trading Academy Center in accordance with the then-current Online Trading Academy System.  During the term of the Franchise Agreement, you must, at all times, develop and operate your Center in compliance with all System standards and the Manuals, as we may modify in the future.

You should also understand the following business realities:  Operating an Online Trading Academy Center involves substantial risks, which cannot be eliminated.  We do not guarantee your success or any level of profits or otherwise.  Among other things, you'll be responsible for an aggressive, proactive local marketing effort using the techniques of the Online Trading Academy System.  Your possible success is dependent on the location or area you choose, the local market for the products and services offered, competition, your business ability in operating your Franchised Business, the extent to which you follow the Online Trading Academy System, your financial and other resources available to you.  Although our principals have experience operating similar Affiliate-owned, Online Trading Academy Centers, our business model continues to evolve.

We retain the right to award, or not award, an Online Trading Academy Franchise to any prospective franchisee, regardless of the stage of the franchise award process, costs expended by the prospective franchisee or otherwise.  We may award franchises on different terms, to suit the circumstances of a specific transaction.

OTA has elected to become a public benefit corporation and to become certified as a "B Corp" which are for-profit companies certified by the nonprofit, B Lab, to meet rigorous standard for corporate responsibility. A B Corp is a relatively new type of certification for companies who commit to use the power of business to solve social and environmental problems. Effective July 21, 2017 OTA Franchise Corporation became a Certified B Corp. https://www.bcorporation.net/community/ota-franchise-corporation. The certification is provided by B Lab using tools and services provided by B Lab to measure and manage our impact (referred to as the "Measures What Matters" campaign), using our mission to enrich lives worldwide with exceptional financial education to be the best *for* the world.

## ITEM 2:          BUSINESS EXPERIENCE

### Eyal Shahar – Director, President and Secretary

Mr. Shahar is currently Sole Director, President and Secretary of OTA. He is also President and Co-Founder of Newport Exchange Holdings, Inc. located in Irvine, California, and has been since its inception in 1999.  As President of OTA, he is responsible for the direction of the company's global expansion and he is involved in the day-to-day operations in marketing, finance and sales.

### Gene Longobardi – Chief Operating Officer

Mr. Longobardi was promoted to Chief Operating Officer in September 2011. Before that, he became our Senior Vice President of Franchise Operations in November, 2007.

### Aaron Neilsen – Chief Financial Officer

Mr. Neilsen became our Chief Financial Officer in November, 2009.  Before that, from February,

2005 to October, 2009, Mr. Neilsen served as Chief Financial Officer for Gatekeeper Systems, located in Irvine, California.

**Sam Seiden - Chief Trading Strategist**

Sam Seiden became our Chief Trading Strategist effective January 2018. Prior to that Sam was our Chief Education Products and Services Officer from October 2012 through December 2017. Previously he was Vice President of Education from September 2010 through September 2012. Before that, he was Director of Online Education beginning in August, 2009. Before that, he served as Online Education Director for OTA from February 15, 2007 to August, 2009.

**Jeremy Nosek - Chief Marketing Officer**

Jeremy Nosek was promoted to Chief Marketing Officer in July 2014. Previously Jeremy was Vice President of Global Services from September 2012. Prior to that he was our Director of Global Marketing Services from June 2011 through August 2012. Prior to this time, he became our Director of Online Marketing in October, 2009.  Before that, Mr. Nosek served as Online Marketing Manager from October 2007 to October, 2009.

**Eyal Marmareli – Chief Technology Officer**

Eyal Marmareli was promoted to Chief Technology Officer in July 2014. Previously, from February 2011 Eyal was our Vice President of Information Technology. Prior to that he was our Director of Technology from March 2008 to February 2011.

**Tony Harkey - Vice President of Marketing**

Mr. Harkey joined OTA as Vice President of Marketing in December, 2006.

**Steve Albin – Vice President of Operations**

Steve Albin has been serving as our Vice President of Operations since May, 2008 to the present.

**Ralph Loberger – Vice President of Business Development**

Mr. Loberger joined us as Vice President of Franchise Development in May, 2005.  Effective December 2010, Mr. Loberger's title became Vice President of Business Development, and Mr. Loberger is now responsible for both franchise development and business development

**Nicola McDowall – General Counsel**

Nicola McDowall joined us as General Counsel in March 2013.  Before that, she served as President of McDowall Law P.C. from August 2006 through March 2013 located in Orange County, California. Nicola McDowall is a Certified Specialist, Franchise and Distribution Law State Bar of California Board of Legal Specialization.

**Drew Cartwright – Director of Training and Development**

Drew Cartwright joined OTA as Franchise Training manager in January 2008.

**Mark Patrick – Vice President of Franchise Support**

Mark Patrick was promoted to Vice President in December 2016. Mark originally joined OTA as Director of Franchise Support in November 2011.

**Attachment ZZ**

**Lisa Kolibar – Vice President of Marketing**

Lisa joined us as Vice President of Marketing in August 2016. Previously from August 2015 to August 2016, she was Senior Director Customer Relationship Management, at Experian Consumer Services. From March 2010 through July 2015, Lisa was Director, Customer Relationship Management Mitsubishi Motors North America in Cypress, CA.

**Todd Coe – Director of Franchise Support**

Todd joined us as Franchise Support Manager in November 2012 and was promoted to Director of Franchise Support effective February 2018.

**ITEM 3:        LITIGATION**

Fernando Gonzales v. Newport Exchange Holdings, Inc., dba Online Trading Academy, a California corporation, OTA Franchise Corporation, a Nevada corporation, Eyal Shahar, an individual and Michael McMahon, an individual, and Does 1 to 10, inclusive. (Case No. CV09-03784 GW (AGRx). On May 28, 2009, Gonzalez filed a complaint for copyright infringement, breach of contract, fraud, and related causes of action, alleging that he is the rightful owner of the copyrights for the Broad Market Analysis and Active Investor course materials, and alleging that he was falsely promised that he would be paid substantial money, over and above what he was already paid by Online Trading Academy (the "Lawsuit"). OTA filed a Motion to Compel Arbitration. The Motion was granted and this matter was ordered to arbitration.

On October 20, 2010, the arbitrator issued his interim award, in favor of OTA, declaring OTA to be the prevailing party. A final award of attorneys' fees and costs was issued in favor of OTA. Gonzalez has filed bankruptcy. Thus, it is unlikely OTA will collect amounts Gonzalez owes under the arbitrator's final award.

Franchisor Initiated Litigation:

On or about January 21, 2013 Franchisor served a demand for arbitration for unpaid royalty fees and declaratory relief: OTA Franchise Corporation vs. More Champs, Inc. and James Champa. The matter was filed with FranArb, Inc. (dba "FAM") effective January 29, 2013 and was assigned Case No. 13A0101. The FAM arbitration occurred on April 25, 2013. In an Arbitration Award dated May 16, 2013 the arbitrator awarded OTA Franchise Corporation the sum of $188,955.82 as damages for breach of contract. In addition the arbitrator awarded OTA Franchise Corporation the arbitrators fees of $16,558 and gave declaratory relief to OTA Franchise Corporation specifically stating that the offsets and damage claims made by More Champs, Inc. and James Champa were without merit and that the franchise agreement was and is fully enforceable and remains enforceable as to all post termination provisions. On or about May 30, 2013 Franchisor filed a Complaint in the Superior Court of the State of California, County of Orange seeking (1) Confirmation of the Arbitrator's Final Award and (2) Judgment against the Alter Ego and Guarantor James Champa. The case is OTA Franchise Corporation v. More Champs Inc., and James Champa, Case number 30-2013-00651835-CU-MC-CJC. On or about July 10 James F Champa filed a Motion to Vacate the Arbitration Award pursuant to C.C.P. 1286.2 and 1281.9 or, in the alternative to dismiss as to James F. Champa Pursuant to C.C.P. 430.10(e) and request for hearing. The hearing was held on October 28, 2013. The matter was taken under submission and a Minute Order issued on November 6, 2013 denying the Motion to Vacate the Arbitration Award. Franchisor filed a Motion to Confirm the Arbitration Award and on February 13, 2014 the court entered Judgment in favor of Franchisor according to the terms of the Arbitration award ($205,513.82) with interest at a rate of 10% from May 16, 2013. In addition Franchisor was awarded the costs incurred in the suit.

Other than this one action, no litigation is required to be disclosed in this Item.

**Attachment ZZ**

ITEM 4:        **BANKRUPTCY**

No bankruptcies are required to be disclosed in this Item.

ITEM 5:        **INITIAL FEES**

The initial franchise fee ranges from $100,000 to $250,000 based on population and designated marketing area ("DMA") ranking. The population figures are derived from an independent zip code directory service or other source selected by us as based on current census data and the designated market area ranking is derived from the then current Neilsen Media Markets report. The initial franchise fee, including additional fees for increased population segments within each additional zip code and or DMA, is paid in full on signing the Franchise Agreement and becomes part of our general funds.  There is no limitation on its use by us.

All initial fees are entirely non-refundable except as expressly provided in the Franchise Agreement. You understand that the initial franchise fee may not be the same for all franchisees and may take into account factors such as size of territory, number of franchises to be awarded, or otherwise.

If you are unable to acquire a site for the Center within the 120 day time frame described more fully in Item 11, we may terminate the Franchise Agreement.  If we terminate the Franchise Agreement, we may refund you the lesser of (a) 1/2 of the initial franchise fee paid to us or (b) the initial franchise fee paid to us, less all our expenses related to your franchise, but only if you sign a General Release and a document acceptable to us that preserves the post termination provisions of the Franchise Agreement described in Item 17.

Any attendee, including you, that fails to satisfactorily complete our initial training program will not be permitted to continue in a management capacity at your Center.  If after additional training, at your sole cost and expense, you do not satisfactorily complete the initial training, the Franchise Agreement will be cancelled by us.  If we terminate the Franchise Agreement, we may refund you the initial franchise fee paid to us, less all our expenses related to your franchise but only if you sign a General Release and a document acceptable to us that preserves the post termination provisions of the Franchise Agreement described in Item 17.

ITEM 6:        **OTHER FEES**

| Type of Fee (1) | Amount | Due Date | Remarks |
|---|---|---|---|
| Ongoing Royalty Fee (4) | The greater of $3,000 or 10% of Monthly Gross Volume (2) commencing on the earlier of the date you open your Center or 120 days after the Effective Date of your Franchise Agreement. Thereafter, beginning on the 1st anniversary of the Royalty Commencement Date, 10% of Monthly Gross Volume or the required monthly minimum, whichever is greater. | Ongoing Royalty Fee must be received by us on or before the 15th day of each applicable month during the term of Franchise Agreement. | The greater of a) 10% of Monthly Gross Volume, or b) the monthly minimum. The monthly minimum during the first year is $3,000, and increases to $4,000 in the second year, $5,000 in the third year and $6,000 in the fourth year and each subsequent year. If this is a Renewal Franchise, the minimum royalty will be $6,000 per month. |

**Attachment ZZ**

| Type of Fee (1) | Amount | Due Date | Remarks |
|---|---|---|---|
| Marketing and Advertising Fee (3 and 4) | Greater of $1,000 or 3% of Monthly Gross Volume | Must be received by us on or before the 15th day of each applicable month during term of Franchise Agreement. | Minimum subject to inflation adjustment. |
| Special Marketing Projects (3) | Not more than $50,000 in any one year | Must be received by us on or before the 15th day after invoice(s) has been received | Payments may be set up on a three to six month payment plan. Minimum subject to inflation adjustment. |
| Center Marketing Activities (3) | A minimum of 15% of Gross Volume | Verification of expenditure due as we request. | At least $15,000 per month payable to us for Global Marketing Services (3); the rest payable to third party suppliers. Minimum subject to inflation adjustment. |
| Portal Subscription Fee ("Network Connection") | Not to exceed $100 per Month | Must be received by us on or before the 15th day of each applicable month during term of Franchise Agreement. | Fee may be adjusted annually in a reasonable amount. |
| Website Service Fee | $195 per month for hosting and scheduling updates per Online Trading Academy Center. | Payable on a monthly basis as determined by us. | Subject to inflation adjustment. Work beyond the ordinary will be billed separately. |
| Search Engine Key Word Positioning Fee (7) | $295 per month per Online Trading Academy Center you operate. | Payable on a monthly basis as determined by us. | Subject to inflation adjustment. |
| Trading Costs and Software Data Fee (8) | $50 - $100 per month per workstation used in classroom training | Payable monthly as determined by us. | Subject to inflation adjustment or vendor price changes. |
| Email Fee | Up to $400 per month per Center. | Payable monthly as determined by us | Subject to inflation adjustment or vendor price changes including costs for excess usage. |
| Email Hosting Fee | Current pass through fee is $7 per user per month | Email Hosting Fee | Current pass through fee is $7 per user per month (If you are operating a Center within a Center each employee counts only once) |

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7414

| Type of Fee (1) | Amount | Due Date | Remarks |
|---|---|---|---|
| Salesforce License | Current License fee of $1,200 per user per year. One Salesforce license is required for Center and one for each Education Counselor and Student Support Specialist. | 2 months prior to opening and as each Educational Counselor or Student Support Specialist is hired. | Licenses are on an annual basis and cannot be pro-rated should a Center lose a user. The franchise agreement estimates $1,200 - $1,500 per license to cover third party annual costs increases. |
| Transfer Fee | 5% of the gross sales price or a minimum fee of $25,000 if you sell your franchised business. | Before consummation of transfer. | See FA Section 9.2(K): Transferee pays additional $15,000 transition assistance fee |
| Renewal Fee | $20,000 | At the time of election to renew. | Minimum subject to inflation adjustment. |
| Interest Fee | Due on all amounts past due | Due only if payments are late. | No amounts charged will exceed or violate any applicable legal restrictions. |
| Late Payments and Reports Fee | $150 for the 1st late report and/or late payment, increasing by $100 for each occurrence so that the late fee for the 2nd late report or payment is $250, and the 3rd is $350 and so on. | Due only if payments are late. | No amounts charged will exceed or violate any applicable legal restrictions. |
| Indemnification | An amount equal to the value of all losses and expenses incurred by us | Upon being incurred by us. | You are obligated to indemnify us from all losses and expenses incurred in any action that is based upon any of the items listed in Section 16.2 of the Franchise Agreement. |
| Initial Franchise Training | No charge for the 1st 3 people. We may charge up to $250/day per person for more than 3 people. | Before commencing training. | You are responsible for travel, lodging, and meals for you and all personnel while training. |
| Sales Personnel and Operations Administrative Personnel Training (4 Days) | No charge | Within 60 days of hire – for all staff throughout the Term | You are responsible for travel, lodging, and meals for you and all personnel while training. |
| Instructor Fee | Current rate is $690 per day (or $670 per day if paid via ACH) and is subject to change. For certain classes the Instructor Fee may be incentive based. | Two weeks in advance if scheduling allows | On an as needed basis. Franchise Agreement 8.1(h) (12) |

**Attachment ZZ**

| Type of Fee (1) | Amount | Due Date | Remarks |
| --- | --- | --- | --- |
| Annual Meeting | A reasonable fee not to exceed $600 per attendee per meeting may be charged | Before attending the meeting. | Required annual business meeting for Franchisee and General Manager and all full time supervisorial or managerial personnel. |
| Audit | Cost of the audit, including, accounting fees, and related travel and per diem charges | As incurred | Only payable if we audit and as a result of your failure to timely submit reports or understatement of Gross Volume in excess of 2%. |
| Management Fee | $600/day per manager | Within 5 business days of our notice to you. | Only payable if you default and we exercise our right to manage the Center until all defaults are cured. |
| Late Opening Fee (9) | $5,000 per month | By the 5th day of each applicable month | Only payable if you fail to select a Site and we elect to extend the opening period by 90 days in lieu of termination |
| Sales Commission Fee | Currently 5% of Sales price | Upon the close of a transfer of the Franchised Business | Payable to us for the provision of a buyer for the Franchised Business (Franchise Agreement Section 9.2(k)) |
| Online class and services fulfillment fee (10) | The then current flat fee per class sold | Payment shall be paid at the time of the sale. | We may charge your designated ACH bank account if the fee is not paid timely. (Franchise Agreement Section 14.4) |
| Online Retake Fees | $200 per student who purchases any course with lifetime retakes. | Payment shall be paid on the day of the sale. | We may charge your designated ACH bank account if the fee is not paid timely. (Franchise Agreement Section 4.15) |
| Special Events Fee | Currently Range between 5% and 9 %of revenues generated from the event and additional fees are charged if additional sales support is requested | Within 7-15 days of the date of the event | Payable to us if you elect to hire our staff to put on a special event at your Center or in your Territory. (Franchise Agreement Section 4.16) |
| National TV Advertising Contribution Pilot Program (12) | A Pro Rata Contribution to National TV Advertising spend – currently ranging between $4,000 to $13,000 per franchisee Center per month. The range could increase to between $11,000 - $20,000 per month during the pilot. | Quarterly sums paid by installments, monthly as determined by us | Subject to (i) quarterly review of proposed National TV Advertising campaigns by us and the FAC and (ii) change in pro rata calculation methods and (iii) number of operating franchisees and company owned locations, (iv) in our Business Judgement. (Franchise Agt. sections 4.19 and 10.7) |

**Attachment ZZ**

(1)      All fees are uniformly imposed by and are payable to OTA Franchise Corporation, except for the certain of the Center Marketing Activities expenditure which may be payable to third party suppliers. You must participate in our then-current electronic funds transfer and reporting program(s).  (See Exhibit C) All royalties owed and any other amounts designated by us must be received or credited to our account by pre-authorized bank debit by end of business on or before the 15th day as stated above.  All fees are non-refundable.

(2)      Gross Volume includes all charges and/or revenues that are received or earned by you (and/or any franchisee related affiliate) in accordance with OTA's revenue recognition policies as set out in the Manuals:

   A)  by, at or with regard to your Online Trading Academy Center;
   B)  relating to the kinds of goods or services available now or in the future through an Online Trading Academy Center and/or distributed in association with the Marks or the System;
   C)  relating to the operation of any similar business;
   D)  with respect to any tenants or subtenants; and/or
   E)  with respect to any co-branding activities.

      Client contract sales which comply with OTA's then current approved payment terms shall be included in Gross Volume on a cash basis and all other sales and/or billings, whether collected or not, will be included in Gross Volume in full when a sales agreement has been executed. Gross Volume does not include sales tax collected and paid when due to the appropriate taxing authority and actual customer refunds, adjustments and credits.  You must register for a resale license and collect and report sales tax in compliance with all applicable laws.

(3)     The Marketing and Advertising Fee, and Center Marketing Activities requirements are explained in detail in Item 11 of this Disclosure Document. Franchisees are required to participate in our Global Marketing Services. Participants will pay to us an initial deposit of $15, 000 which must be renewed up to the $15, 000 minimum every month depending upon the sum expended in the previous month. Within this program, participants either (i) pay for actual usage based on the cost of delivered lead generation or class registration or alternative on a monthly basis or (ii) proportional to Franchisee's share of media costs as described and calculated in accordance with the relevant GMS Program Description. See Item 8 and Item 11 for a description of this program. Participation in the Global Marketing Services is included in the Local Advertising Fees requirement.

      Special Marketing Projects will be financed with funds outside the scope of the Marketing Fund. (Franchise Agreement Section 10.6). All Franchised Businesses will contribute to the cost of Special Marketing Projects including company owned Centers. Such funding may be initially provided by Franchisor and franchisees will be invoiced during the relevant financial year, or Franchisor may require that franchisees provide up front contributions to such costs. There may be more than one Special Market Project in any one calendar year.  Payment for the Special Marketing Projects shall be made as set out in section 4.18 of the Franchise Agreement.

(4)      To insure that we receive full Royalty Fees and any Marketing Fees to which we may be entitled, as the amount thereof may vary from time to time, you will pay us, upon demand, whether in arrears, in advance, in a lump sum or in the same manner as Royalties and Marketing Fees are paid to us, the amount of all taxes paid by us to any governmental authority on revenue we earn or collect based upon your use of our intellectual property or other intangibles or based upon the existence of this Agreement, within the governmental authority's domain during each of our fiscal years throughout the entire term of the Franchise Agreement.

(5)      The Customer Relation Management Program Fee is explained at Section 4.9 of the Franchise Agreement.

(6)      Please see Section 10.6 of the Franchise Agreement, for further information on this fee –

(7)     Please see Section 10.3 B of the Franchise Agreement for further information on this fee.

(8)     Please see Section 8.2 (b) of the Franchise Agreement for further information on this fee.

(9)     Please see Section 3.1 (C) of the Franchise Agreement for further information on this fee.

(10)    The Online Class Fulfillment Fee payable to Us for each online class are currently charged on a flat fee per student per class basis and are subject to change on thirty days' notice by OTA or its Affiliates at any time. Payment of the Online Class Fulfillment Fees by Franchisee must be made to Us through Our online store immediately upon the sale of the online courses, or shall be paid as described in the Franchise Agreement at Section 4.14. All such payments will be made via a transactions process which will occur within 7-14 days of the date of sale, and will include a cancellation period If you fail to make any payments required on or before the day which is 30 days after the reported sale we will charge the designated bank account directly at any time after the 30 day period via ACH transfer.  For any bundle of programs that includes services (in addition to online fulfillment of classes) we may charge a one-time fee to set up the purchaser with access to those services. For the purposes of payment this fee is due at the time of sale (like an Online Fulfilment Fee) and may change from time to time. One time set fees for services are currently charged for Mastermind and Financial Matters services

(11) From time to time we may operate global referral programs designed to acquire high quality and inexpensive registrations. Your participation in any such program will be mandatory and for every referred customer to your Center who registers for a class you will be charged for the cost of the rewards to the referring customer. Referral programs will be designed to pay for themselves and direct expenses and administrative costs may be passed through to participating franchisees.

(12)  In 2018 after a unanimous vote of acceptance by the FAC we implemented a pilot program to use the collective purchasing power of the US franchisees and company owned locations to facilitate national advertising and reduce the costs of acquiring TV air time nationally. In addition, some TV air time for infomercials can only be acquired nationally so the National TV Campaign provides access to cable channels not otherwise accessible to franchisees. If, and as, this program continues, you will be required to pay the pro rata share of National TV Advertising (as defined in section 10.7 of the Franchise Agreement) for your Territory. All US centers including, franchisor owned Centers, are charged their pro rata share of the total quarterly advertising spend. You will be billed monthly in advance in installments to cover the next calendar quarter spending. At the date of this Agreement the current monthly fees range for participating franchisees range between $4,436 (1.9% pro rata share) to $12,903 (5.5% pro rata share). TV Air time needs to be acquired quarterly in advance. The program monthly spend may be increased or decreased and the program may be amended, changed or discontinued at any time.  (Franchise Agreement section 4.19)

## ITEM 7:    ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

| Type of Expenditure | Amount | Method of Payment | When Due | To whom payment is to be made |
|---|---|---|---|---|
| Initial Franchise Fee (see Note 9) | $100,000 - $250,000, based on population and DMAs. | One Payment | Upon signing Franchise Agreement | Us |
| Grand Opening Costs | $5,000 to $10,000 | As arranged | As incurred | Third Party Suppliers |
| Travel & Related Expenses for Training (Note 1) | $5,000 to $8,000 | As arranged | As incurred | Airlines, Hotels & Restaurants, etc. |
| Computer & office equipment & | $75,000 to $90,000 | As arranged | As incurred | Third Party Suppliers. Some or all may be |

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7418

| | | | |
|---|---|---|---|
| classroom furniture and furnishings and related equipment (Note 2) | | | leased which will lower the initial costs. |
| Real Estate Lease Fees (Note 3) | $24,000 - $60,000 | As arranged | At lease signing | Landlord |
| Inventory and Supplies | $7,000 to $9,500 | As arranged | As incurred | Third Party Suppliers |
| Permits & Licenses | $3,500 to $4,000 | As arranged | As incurred | Various Government Agencies |
| Telephone Equipment & Internet Installation | $7,000 to $8,000 | As arranged | As incurred | Your local telephone company & Internet Service Provider |
| Signage, Promotional & Marketing Materials (Note 4) | $7,500 | One Payment | Before Opening | Our Approved Vendor |
| Legal & Accounting | $5,000 to $10,000 | As arranged | As incurred | Third Party Suppliers |
| Insurance (Note 5) | $800 to $1,500 | As arranged | Before Opening | Insurance Company |
| Establish a Live Trading Account for education only with Approved Broker Dealer (Note 6) | $0  to $26,000 | As Arranged | Before first Online Trading Academy Training Course | Paid to us or approved Broker Dealer |
| Additional Operating Funds for 3 Months (Note 7) | $150,000 - $200,000 | As arranged | As Incurred | Not Applicable |
| Total Estimated Initial Investment (excluding real estate) (Note 8) | $389,800 to $684 ,500 | | | |

Notes:

1.  You must pay for your transportation, accommodations, meals and other expenses associated with the initial training program. The initial training will take place at our headquarters in Irvine, California and your actual expense will depend on the cost of traveling from your home to Irvine, California and the number of people you bring to training. We reserve the right to assess a reasonable training fee not to exceed $250/day per person for training more than 3 attendees as described in Item 5.

2.  As described in Items 8 and 11, you must purchase or lease certain computer hardware/software and related equipment for the operation of the Franchised Business. The specific quality and brand of the equipment is described in the Franchise Agreement, or the Manuals, though the source of the equipment is up to you. We will make every effort to help you with the most efficient resources.  The schedule above assumes purchase of the equipment for a two classroom Center, although leasing would lower these investment figures. You may elect to lease a three-classroom facility in which case your equipment and furniture costs may increase, and range between: $37,000 to $45,000, depending on the size of the additional space. You must also ensure that your personnel are trained to use the QuickBooks software as described in Item 11.

3.  This estimate is based on a two-classroom facility and covers a range of an initial payment of two months deposit to a two months deposit plus the first three months estimated rent. This number will differ according

**Attachment ZZ**

to the amount of any free rent period at the start of the lease and the TI build out allowance. It may be possible that the cost of the build out may be subsidized by the landlord or paid for by landlord and amortized over the life of the lease.  You are advised to work with your real estate advisors in this respect.  The table does not reflect an amount for investment in real estate or build out of your Center since you may either lease or buy business premises.  We anticipate that the facility will generally be leased.  Costs reflect a two month lease deposit plus monthly rent through the start-up phase. For a three classroom facility the costs may increase by a range between $4,000 to $25,000 depending on the size of the additional space

4.  Before opening your center, or within 30 days of acquiring an existing Franchise Business if needed, you will purchase from our approved vendor and install a "Franchise Start-up Kit" which will include certain required signage, plaques and other center merchandising and art work. (see Franchise Agreement Section 3.3)

5.  You shall have in effect on the Effective Date and maintain during the term of the Franchise Agreement, insurance in the types and amounts outlined in the Manual. You must pay for all insurance premiums including comprehensive general liability insurance and workman's compensation. You must name us as an additional insured at your expense and furnish us annually with certificates of insurance along with, insurance policy endorsements and other evidence of compliance with these requirements. These policies of insurance shall not be subject to cancellation or modification except with 30 days prior written notice to us. You are liable for any cost and expense, including attorneys' fees, which we incur, associated with any matters insured pursuant to the insurance required under the Franchise Agreement. The insurance policies described in the Manuals are minimum requirements and Franchisee may purchase and maintain additional insurance policies or insurance policies with greater coverage limits.

6.  This item is required to perform live trading in your Online Trading Academy classes. You must have an open Trading Account with an Online Trading Academy approved Broker Dealer. At the date of this Disclosure Document we have made arrangements for our franchisees to use educational only trading platforms using sub accounts under our master agreement with our currently approved Broker Dealer. These arrangements are not guaranteed to continue and we will make commercially reasonable efforts to maintain these arrangements throughout the term of the Franchise Agreement. If we are unable to maintain this type of arrangement with a Broker Dealer you may have to open your own account which would require a minimum of $26,000 to open, and this amount could change. Or we may be able to make alternative arrangements which may require you to pay a deposit to us to maintain a sub- account. At all times you must work with our approved Broker Dealers to provide a live trading experience in the classroom in order that the learning experience your students receive will be uniform throughout the System. You may be required to sign a written agreement with the Broker-Dealer.

You may be required to pay commissions, if any, and fees for transactions in your sub accounts. Your students will not experience a loss or a gain in their practice trades, but have the opportunity to experience a "real time" trading experience. This process is essential to the risk management learning experience you provide your students.

7.  Additional Operating Funds is an <u>estimate</u> of certain funds needed to run your business (excluding <u>personal</u> expenses) during the first 3 months of operation of the franchised business.  You will need capital to support on-going costs of your business, such as payroll, monthly marketing spend, utilities, taxes, loan payments and other expenses, to the extent that revenues do not cover business costs.  <u>New businesses (franchised or not) often have larger expenses than revenues.</u>  This is only an estimate, and we can't guarantee that the amounts specified will be adequate.  You may need additional funds during the first 3 months of initial operation or afterwards.  We do not furnish or authorize our salespersons or any other persons or entities to furnish estimates as to the capital or other reserve funds necessary to reach "break-even" or any other financial position nor should you rely on any estimates.

The 3-month period from beginning business is expected to cover the time by which most Online Trading Academy Franchisees are fully in operation but does not necessarily mean that you will have reached "break-even", "positive cash flow", or any other financial position by that time.  In addition, the estimates presented relate only to costs associated with the franchised business, reflect minimal employee

**Attachment ZZ**

wages, and do not cover any personal, "living" unrelated business or other expenses you may have such as royalty payments, Marketing Fund contributions, debt service on any loans, state sales, and/or use taxes on goods and services, and a variety of other amounts not described above.  Although we make no estimates or representations regarding financial performance of an Online Trading Academy Center, we recommend that, in addition to the additional funds shown, you have sufficient personal savings and/or income so that you will be self-sufficient and need not draw funds from your franchised Online Trading Academy Business for at least 3 months after start-up.

Since costs can vary with each Franchisee, we strongly recommend that you (1) obtain, before you buy a franchise or make any commitments, independent estimates from third-party vendors and your accountant of the costs that would be needed to establish and operate an Online Trading Academy Franchise, (2) discuss with current Online Trading Academy Franchisees their economic experiences (including initial costs) in opening and operating an Online Trading Academy Franchise and (3) carefully evaluate the adequacy of your total financial reserves.

8.  We relied on our experience in compiling these estimates. You should review these figures carefully with a business advisor before making any decision to purchase the Franchised Business. We don't offer any financing directly or indirectly for any portion of the initial investment.

 9. The initial Franchise Fee may be refundable in part only in the circumstances described in the Franchise Agreement at Sections 3.1 and 7.1 and as set out in Item 5 above and Item 11 below. The range of fees begins at $80,000 and increases based upon additional population and other demographic, marketing and economic factors of the territory.

Except as described in Item 10, we do not offer direct or indirect financing.

## ITEM 8:     RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

### Nature of Restrictions and Items Subject to Restrictions

The operation of the Franchised Business in compliance with the System is critical to us, you and all other franchisees operating under the System.  The learning experience you provide your students must be uniform throughout the System; therefore, your Online Trading Academy Business will purchase, use and offer each of, and only, the types, brands and/or quality of Course Materials, Educational Products, broker-dealer services and other products and services as we designate and, where we require, use only those suppliers that we designate.  You will be required to follow the "Curriculum" or course outline established by us for use within the Center classrooms.  There are certain specific broker-dealers whose trading platforms, methodologies and adherence to our tuition rebate program authorize them to be approved suppliers for all classroom and other educational activities.  Currently, the categories of goods and services for which we designate only certain suppliers are customized software, course materials, course curriculum, educational products, and certain services, broker-deal services and specific marketing materials and we may change these categories at any time.  These suppliers may include, and may be limited to, us and/or companies affiliated with us.  We may designate a single supplier or limited number of suppliers, may designate a supplier only as to certain items and may concentrate purchases with one or more suppliers in our absolute discretion. Specifications for suppliers may be found in the Manuals. If in the future we develop proprietary and/or customized software, you will be required to use this software when it is available and you must use any later amended version provided to you.  We do not solicit suggestions from you regarding alternative suppliers. There is no process for approval or disapproval of suppliers suggested by franchisees. 100% of your purchases of Course Materials, Educational Products, Curriculum, broker-dealer services, trademarked products, computers and supplies and other products must be purchased in accordance with our specifications.

You must obtain, use and maintain at your sole expense accounting, sales, reporting and records retention systems conforming to any requirements we prescribe including any electronic systems with full time unrestricted online access for us.  These systems may include computer and accounting systems, and software programs, and may have components only available from us, a franchisor related entity and/or

**Attachment ZZ**

designated suppliers.  We reserve the right to use, as we deem appropriate, and to have full time unrestricted online access to, all accounting systems, computer and any other systems, and the information and data they contain.  We may charge a reasonable fee for the license, modification, maintenance or support of software or any other goods and/or services that we furnish to you with any of the systems.  Please see Item 11 for further information.

If in the future we develop proprietary and/or customized software, you will be required to use this software when it is available and you must use any later amended version provided to you.  We do not solicit suggestions from you regarding alternative suppliers. There is no process for approval or disapproval of suppliers suggested by franchisees.

You may (a) create original course materials content to be used within your Territory using the Online Trading Academy Brand, content standards and business processes (the "Franchisee Created Content") only upon our approval and (b)  translate the course materials into foreign languages appropriate to the demographics in your local market (the "Translated Materials") subject in each case to each of the following terms and conditions:  You acknowledge and agree that (i) the intellectual property rights in all your Franchisee Created Content and Translated Materials shall belong to us and you will take all actions and execute all documents to ensure that title to all Franchisee Created Content and Translated Materials vests in us, (ii) all Franchisee Created Content and Translated Materials shall be made available to us to share with all other franchisees in the Online Trading Academy Network, (iii) no Franchisee Created Content or Translated Materials will be used in the System without our prior written approval, and (iv) Royalties will be due on all sales and licensing of all Franchisee Created Content and Translated Materials.

If you decide to lease the land and or building for your Online Trading Academy Center, you shall include in the lease specific provisions relating to sales and other operations information, use, default, notice, length of term, assignment, all of which are described in detail in the Franchise Agreement.  If your Online Trading Academy Center Franchise Agreement terminates, or you default under the lease for your Center, we may assume your lease and operate your Center directly or through another franchisee. You shall deliver to us a definitive copy of the lease within 5 days of full execution.

## How We Issue and Modify Standards and Approvals of Suppliers and Related Items

Specification of a supplier may be conditioned on requirements relating to frequency of delivery, standards of service, including prompt attention to complaints, as well as payments, contributions or other consideration to us or other parties designated by us, and may be temporary, in each case in our absolute discretion.  We may withhold, condition and/or revoke our approval of particular items or suppliers we choose.  You'll notify us in writing (and submit to any information and samples we request) if you propose to purchase, use or offer any type, brand and/or quality of items that we have not previously specified, or if you propose to use any supplier we have not previously specified for the proposed item and will pre-pay reasonable charges connected with our review and evaluation of any proposal.  We'll notify you within 2 to 8 weeks whether or not you're authorized to purchase or use the proposed item or to deal with the proposed supplier.

## Our Revenues Based on Your Use of Approved Items

Currently, we have no agreements or arrangements with any suppliers or vendors to our franchise system regarding payments, commissions or rebates to us on purchases by any of our franchisees, except as disclosed in this Disclosure Document. See Item 10 for the arrangements with financing companies and below for Direct Mail vendors.

As indicated above, we and/or our Affiliates are currently approved suppliers for certain goods. Other than the services provided by OTP, we are the only approved supplier for Course Materials and Educational Products. We charge you 15% of the suggested retail price for any Educational Products that you purchase

**Attachment ZZ**

from us and varied prices for Educational Products purchased from other approved vendors. Our then-current price list will be made available to you on our franchise portal. This revenue will help us recover our costs of development, production and creation of Online Trading Academy training content.

Certain of our approved preview class advertising includes the offer to a prospect of receiving additional free educational products loaded onto a USB stick and available at the preview location. If you elect to acquire the USB sticks, you must purchase them from us.

You are required to purchase welcome gifts for each new customer who executes an enrollment agreement including asset classes, and an additional welcome gift for students purchasing access to Mastermind Community which includes lifetime retakes. At this time the cost of the welcome gift will be paid directly to us as a pass through cost. We do not receive any fee in relation to this purchase. As this is a new program at the date of this Disclosure Document this may change in the future.

We have entered into a global arrangement with a vendor to promote the franchised business on the vendor's website. This is a test program which includes a video and a call to action. The program landing page contains IP detection and a zip code look up, allowing interested prospects to find the Center nearest them and enroll in a market timing orientation class. All transactions are processed through our franchise store which we host and manage. Currently, 50% of the revenues go to the vendor and the other 50% are passed through directly to the Center where the prospect enrolled. Other than the royalty fee paid on all Center revenues, there are no fees charged to the Center for this program. Franchisor only receives revenues if a prospect enrolls at a franchisor owned Center. The commercial aim of this program is to generate low cost leads and prospect engagement. We are testing this program which may be amended or terminated in our business judgement. We may also test certain similar programs.

You are required to provide all new Mastermind Community customers with a welcome to the Mastermind Community gift. At the date of this Disclosure Document the cost of the Mastermind community gifts may either be included in the Mastermind Fulfillment fee which you pay to us for each Mastermind customer or you may acquire the Mastermind Welcome gifts directly from us. In each case the intent is to provide these gifts to customers at no profit to the franchisor.

You are required to purchase all Course Materials directly from US. We charge you a pass through cost.  We do not receive any fee in relation to this purchase. This may change in the future.

We estimate that 100% of your purchases of Course Materials, delivery of online education, Educational Products, Curriculum, broker-dealer services, trademarked products, computers and supplies and other products in establishing and operating your franchise business on an on-going basis must be purchased in accordance with our specifications.

During the fiscal year ended December 31, 2017, we received $33,406,126 or 40% of our total revenues of $82,667,396 from purchases of these products and services including the purchase of Global Marketing Services as described below, by franchisees and company owned Centers. You are not required to purchase, Educational Products, Live events, teleservices or infomercials, but if you choose to do so, we are the only approved supplier of these items. You are required to purchase Global Marketing Services as described below.

OTA or its Affiliates may also receive revenue from customer referrals to approved vendors. OTA or its Affiliates may, but have no obligation to, contribute a percentage of any such revenue to promote the Brand through activities of the Marketing Fund and otherwise.  OTA or its Affiliates will encourage efforts to continue to generate and collect these revenues but this program is subject to change by OTA or its Affiliates at any time.

We now offer all qualifying customers the opportunity to receive online training by participating in "online courses" and entry into our student education and training community currently known as MyOTA. Certain of these online courses are currently marketed as Extended Learning Track or "XLT" classes. Customers in any territory or in open territories may either buy admission to XLT or online courses directly

**Attachment ZZ**

from us via the website or directly from an Online Trading Academy Center. When the customer purchases from a Center the Center will pay Us a delivery fee for the delivery of the online class or XLT to their customer. The entire fees charged by the Center to the customer will be income to the franchisee and will be subject to Royalties. All Franchisees must be in Good Standing to be permitted to participate in the sale of online courses and seminars. The delivery fees payable to Us for each online course are currently charged on a flat fee per student per class basis and are made available to Franchisees via our Manuals and are subject to change on thirty days' notice by OTA or its Affiliates at any time. Payment of delivery fees by Franchisees must be made to Us through Our online store in advance of delivery of the online courses and seminars. We have now developed the capacity for online retakes of most of our core curriculum and accordingly for each new customer who executes an enrollment agreement which includes lifetime retakes the Center will be charged a lifetime online retake fee payable to Us at a current rate of $200 per customer.

There are no other approved suppliers in which any of our officers owns an interest.

**Legal Benefits Based on Use of Designated or Approved Sources**

We don't provide material benefits or condition providing benefits (such as the award of a renewal or additional franchise) to a franchisee based on a franchisee's purchase of particular products or services or use of designated or approved sources.  However, failure to use approved items and suppliers might, like other matters, be a default under the Franchise Agreement and, in general, any Franchisee in default would not be awarded a renewal or additional franchise and might even be subject to termination. We may in the future negotiate purchase agreements with suppliers, including price terms, for our and your benefit.

We have developed a marketing and advertising co-operative in the form of the Global Marketing Services Program. This program has been developed so that we may manage various national and global advertising and marketing programs which may purchase media generally at a more cost-effective rate than any franchisee may purchase locally, and which may not be available to franchisee on a local level. Participation by you in the Global Marketing Services / Global Advertising Program is required. The program also includes other Global Marketing Services options and the franchisee may choose a different level of participation (which may be zero) in each non-mandatory option. We may require a different level of participation in the future as the costs per lead, per class registration or per attendance or per media buy, decrease for all franchisees based on the number of franchisees participating in each program option. We may also require participation in a regional media advertising group in markets where mass media impacts multiple centers.

**ITEM 9:     FRANCHISEE'S OBLIGATIONS**

**This table lists your principal obligations under the Franchise Agreement and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

|    | Obligation | Section in Franchise Agreement | Disclosure Document Item |
|----|------------|-------------------------------|--------------------------|
| a. | Site selection and acquisition/lease | 2.2D, 3.1, 3.2 | 7, 11 |
| b. | Pre-opening purchases/leases | 8.1, 8. 2, 8. 4 | 8 |
| c. | Site development and other pre-opening requirements | 3.1, 3.3, 3.4 | 5, 7, 11 |
| d. | Initial and ongoing training | 7. 1, 7.2, 7.3, 7. 4, 7. 5, 7.6 | 11 |
| e. | Opening | 3.6, 3.7, 8. 1 | 11 |
| f. | Fees | 4, 5.3(H), 7.2, 7.3, 8.2, 9.2(k), 10.2 and 10.3 | 5, 6, 7 |
| g. | Compliance with standards and policies/Operating Manual | 2.3, 6, 8.1, 8.3, 8.4, 8.9, 8.11, 11.5 | 11, 12, 13 |

**Attachment ZZ**

EX 13
7424

|  | Obligation | Section in Franchise Agreement | Disclosure Document Item |
|---|---|---|---|
| h. | Trademarks and proprietary information | 2.1, 6.1-6.4, 8.3, 8.4, 8.12 | 13, 14 |
| i. | Restrictions on products/services requirements | 2, 6.2, 8.4 | 16 |
| j. | Warranty and customer service requirements | 8.1, Manual | 8 |
| k. | Territorial development and sales quotas | Not Applicable | Not Applicable |
| l. | Ongoing product/service purchases | 8.1, 8.2 | 8, 11 |
| m. | Maintenance, appearance and remodeling requirements | 5.2, 5.3 | 11 |
| n. | Insurance | 8.6 | 7 |
| o. | Advertising | 3.7, 4.3, 8.4, 10 | 6, 7, 11 |
| p. | Indemnification | 16.2 | 16 |
| q. | Owner's participation/management/staffing | 8.1 | 11, 15 |
| r. | Records/reports | 8.8 – 8.10 | 11, 12 15 |
| s. | Inspections/audits | 8.7, 8.8 | 11, 11 |
| t. | Transfer | 3 and 9 | 17 |
| u. | Renewal | 5 | 17 |
| v. | Post-termination obligations | 12 | 17 |
| w. | Non-competition covenants | 8.13, 12.4 | 17 |
| x. | Dispute resolution (1) | 13 | 17 |

(1)  The Franchise Agreement contains a mandatory arbitration clause governing nearly all disputes between you and us, as well as other clauses covering dispute resolution and which may affect your rights.  You should read Articles 13 and 15 of the Franchise Agreement and you may want to consult an attorney regarding the effect of these provisions.  You and we agree that the Federal Arbitration Act governs the Franchise Agreement.

**ITEM 10:   FINANCING**

Neither we, nor any affiliate of ours offers either direct or indirect financing for the purchase of this franchise.

**Optional UGA Franchisee Customer Financing Arrangements and Financing Terms**.

We have negotiated with Universal Guardian Acceptance, LLC and its affiliates (together "UGA") to provide financing packages to our franchisees qualified customers and collection services to our franchisees the "UGA Programs". If you elect to participate in one or more of the UGA Programs you will sign a UGA Franchisee Contract in the then current UGA form.

No Financing is provided directly to you. Financing will **not** be offered to you through the UGA Programs, but you will be in a position to offer tuition financing to your customers through a UGA Consumer Loan Agreement. The benefit to you will be that for qualified franchisee customers, you will receive from UGA the accelerated tuition payment less the UGA service fees, instead of relying on the customers to make contractual installment payments over time.

Alternatively, if a franchisee customer does not meet UGA requirements for UGA to purchase the UGA Consumer Loan Agreement, you may elect to contract with UGA to provide collections services.  In this arrangement UGA will, for a fee, collect the installment payments from your customer and provide you

with the balance of the payments.

In consideration for UGA making these arrangements available to franchisees of the System, we have agreed to guarantee the performance of the delivery of the tuition for all tuition agreements purchased by UGA. In consideration of our facilitation and support of these arrangements throughout the Network, UGA has agreed to deliver reimbursement fees related to all UGA Consumer Loan Agreements purchased by UGA with a duration of greater than 185 days.

We may negotiate to make available additional financing arrangements for our franchisees to offer to their qualified customers. Any such programs may be made available to our franchisees subject to compliance with the then current relevant program guidelines.

In addition, we have established an affiliated services company known as NEH Services, Inc., ("NEHSI") (see Item 1) which has entered into a Contract Purchasing Program with UGA. The purpose of the program is to permit NEHSI, at its option, to purchase franchisee's qualifying UGA Consumer Loan Agreements, NEHSI may receive revenues in the form of interest payments and servicing fees in consideration for the management and servicing of purchased loans.

As of the date of this Disclosure Document, except by facilitating your participation in the UGA Programs, it is not our practice to sell, assign or discount to a third party all or part of any financing arrangement, although we may do so in the future.  Other than as described above, we do not offer direct or indirect financing.  We do not guarantee your note, lease or obligation.

We are registered with the SBA Franchise Registry.  This affiliation may assist you with obtaining expedited loan processing if you should seek SBA financing.

**ITEM 11:   FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS AND TRAINING**

**Except as listed below OTA Franchise Corporation is not required to provide you with any assistance.**

Before you open your business, we will:

(1)     Designate your exclusive territory. (Franchise Agreement, Section 2.2 and Exhibit 2.2)

(2)     Conduct a new franchisee and employee training program lasting between four days and two weeks, (depending upon the particular duties and responsibilities of each attendees) for you, and any instructor, sales manager Education Counselor, center administrator and/or General Manager that you designate.  (Franchise Agreement, Section 7.1)

During the operation of the franchised business we will:

(1)     Provide guidance and assistance in the operation of your Online Trading Academy Business.  (Franchise Agreement, Section 7.5)

(2)     Loan you a copy of the Manuals. (Section 8.3 of the Franchise Agreement.)  You will have the opportunity to view the Franchise Owner Manual before you sign the Franchise Agreement.

**Attachment ZZ**

(3).      Make available to you for purchase from our approved vendor and install a "Franchise Start-up Kit" which will include certain required signage, plaques and other center merchandising and art work. (See Franchise Agreement Section 3.3)

The Manual will contain mandatory and suggested specifications, standards and operating procedures that Franchisor develops for Centers and information relating to other obligations of Franchisee. Any required specifications, standards, and/or operating procedures exist to protect Franchisor's interests in the System and the Marks and to create a uniform customer experience, and not for the purpose of establishing any control or duty to take control over those day-today operational matters that are reserved to Franchisee.

**Training**

Any training provided by us to any of your employees will be limited to training or guiding the employees regarding the delivery of approved services to clients in a manner that reflects the customer and client service standards of the System. You are, and will remain, the sole employer of your employees during all training programs, and you are solely responsible for all employment decisions and actions related to your employees. You must ensure that your employees receive adequate training. (Franchise Agreement section 7.4)

The training programs conducted by the staff of Online Trading Academy include all phases of operation as described in the Charts below.  You must successfully complete our training courses to our satisfaction.  Training for maximum of 3 total persons is included in the Initial Franchise Fee.  You are responsible for all travel, meals, lodging and other expenses for you and your personnel during initial or additional training.  All Owners and General Managers must attend all of the 5 courses totaling twenty days of training. The 3.5-day Initial Franchise Training is currently provided on an as needed basis at our corporate training center in Irvine, California, but the frequency and/or location may be changed by us periodically. The 2-day Presenter Training is held generally 2 times a year. The 4.5 day OTA Essentials Training is currently held on a six weeks cycle excluding the months around our annual franchise conference in October. It is anticipated that you will complete all of these classes within 30 – 40 days of the execution of your Franchise Agreement. If specific training events are not offered within this time period, it is anticipated you will complete these events at their next offering date

In addition to IFT, Presenter and OTA Essentials Training, all Online Trading Academy franchisees, General Managers, instructors and sales personnel are required to successfully complete both the 7-Day "core" course series given to Online Trading Academy customers called "Core Strategies Series" and the 3-day Market Timing Orientation, both, at a convenient time during or after completion of any other applicable training for these persons, but all applicable training must be completed before you open your Online Trading Academy Center.

Additionally, we reserve the right to require that you attend classes similar to those listed below in an online format.  All Online Trading Academy franchisees must successfully complete the 11 Day Initial Franchise Training Program ("IFTP") consisting of IFT, Sales & Presenter Training and which is required for both you and your General Manager (whether you or someone other than you), and includes both on-site and course instruction.

Initial sales training for all of your sales personnel and operations training for administrative personnel is mandatory within the first 60 days of their employment at the next available training date.

Any attendee, including you, that fails to satisfactorily complete any required training course, will not

be permitted to assume responsibilities that require training at your Center.  If after additional training (at your sole cost and expense), you do not satisfactorily complete any required training course, we may, in our Business Judgment, cancel the Franchise Agreement, refunding one-half of the Initial Franchise Fee paid by you minus our expenses for training sales, and otherwise, related to the award of the Franchise to you. You will be required to sign a general release and be subject to the Post Termination Provisions.

If you obtain a renewal franchise, we may require that your personnel attend and successfully complete any retraining program(s), and at the times and location(s), as we then specify.  We do not charge for any retraining program(s), however, for trainees exceeding three people or additional training we may charge $250 per day per person.  (Franchise Agreement, Section 7.2)

Usually in October of each year, we conduct an International Conference to discuss Online Trading Academy business activities or other matters relating to the Franchised Business. In addition, we generally hold an Owners/General Managers Summit, usually sometime between February and May in each year. Attendance by you and your General Manager at the International Conference is mandatory and attendance at the Summits is highly recommended. Attendance at the annual international conference for all sales personnel and Center Administrators is mandatory (and attendance at the International Conference is highly recommended for all other personnel). You are responsible for all travel, living, incidental and other expenses and compensation for you and your personnel attending this program, and we may charge a reasonable fee to attend these annual meetings, not to exceed $600 per person per meeting. You and your managers and supervisorial or managerial personnel may attend any additional training programs, regional or system-wide events offered by us from time-to-time which we designate as optional.  (Franchise Agreement, Section 7.2).

## **TRAINING PROGRAM**

**The 7 Day Core Strategies Part 1 and Part 2 Course is as follows:**

| Day | Subject Matter | Hours of Classroom Training | Hours of On The Job Training | Location |
|---|---|---|---|---|
| Day 1 | Foundation - Terminology, Supply & Demand, Formations, Odds Enhancers, Zoning Process | 6.5 | | Southern California |
| Day 2 | Decision Matrix, Entry Types and Proper Exit, Odds Enhancers and Scoring the Trade, Margin/Leverage/Cost/Risk, Position Sizing | 6.5 | | Southern California |
| Day 3 | Bracket Orders using Chart Trading, Placing Orders, Trading Purpose, Establish Reward/Risk Rules, Create Watch List, Review Results, Check Reports | 6.5 | | Southern California |
| Day 4 | Bracket Orders Using the order Bar/Chart Trading, Trading Labs | 6.5 | | Southern California |
| Day 5 | Analysis Techniques, Trading Labs | 6.5 | | Southern California |
| Day 6 | Trading Labs, Trading Plan | 6.5 | | Southern California |
| Day 7 | Trading Labs, Final Exam, Survey, Graduation | 6.5 | | Southern California |
| Total | | 45.5 Hours | | |

**Attachment ZZ**

EX 13
7428

**The 3 Day Market Timing Orientation is as follows:**

| Day | Subject Matter | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|---|
| Day 1 | Terminology, elements of a trade, basic charting, supply and demand | 7.5 | | Southern California or other |
| Day 2 | Forex trading, Options, Pro-picks and Mastermind | 7.5 | | Southern California or other |
| Day 3 | Stock Program, market traps. Core strategy, getting started | 7.5 | | Southern California or other |
| Total | | 22.5 Hours | | |

**The 3.5-Day Initial Franchise Training Program is as follows:**

| Day | Subject Matter | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|---|
| Day 1 | Our Mission and Values Our "Why" Marketing, Sales Model Overview & Education Products & Student Success | 7.5 | 2 | Southern California |
| Day 2 | Administration & Accounting | 7.5 | 2 | Southern California |
| Day 3 | MTP, MTO & Course Scheduling Strategies, Salesforce Training, IT Infrastructure and Telephone Systems | 7.5 | | Southern California |
| Day 4 | Marketing Organization & Overview, Direct Mail, Online Marketing, TV, PR and build Marketing Plan | 7.5 | | Southern California |
| Total | | 26.5 Hours | 4 Hours | |

**The 2 Day Presenter Training is as follows:**

| Day | Subject Matter | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|---|
| Day 1 | Market Timing Preview Presenter Training – Building the Deficit | 7.5 | 2 | Southern California or other |
| Day 2 | Market Timing Preview Presenter Training – Presenting the Solution | 7.5 | 2 | Southern California or other |
| Total | | 15 Hours | 4 Hours | |

**The 5 Day OTA Essentials Training is as follows:**

| Day | Subject Matter | Hours of Classroom Training | Hours of on the Job Training | Location |
|---|---|---|---|---|
| Day 1 | Introduction to the Sales Model & Product Training | 7.5 | 2 | Southern California |
| Day 2 | Outbound Calling, Market Timing Preview Income Wealth Education Planner Process with Role Play. | 7.5 | 3 | Southern California |
| Day 3 | Salesforce; Income, Wealth & Education Screening and Qualifying Process with Role Play. Marketing. | 7.5 | 4 | Southern California |
| Day 4 | Finance, Asset Classes and Solution Planning. Market Timing Class Coaching, case studies & role Play | 7.5 | 1 | Southern California |
| Day 5 | Onboarding students, Managing your day and Role Plays | 3.5 | 1 | Southern California |
| Total | | 33.5 Hours | 11 Hours | |

Our training programs are taught by Eyal Shahar, Gene Longobardi, Jeremy Nosek, Tony Harkey, Drew Cartwright, Aaron Neilsen, Steve Albin and Mark Patrick whose biographical information is set out in Item 2 above.  In addition, training is provided by: Larry Jacobson who has over 25 years of finance, training & management experience and four years as a student, instructor, and director at OTA. Larry joined us in 2014 as Director of Student Services and was promoted to Director of Instructor Development in 2016; Gaylene Galliford who has over 25 years training & management experience, six of which supporting Retail Franchises in Canada and seven supporting Financial Education Franchises in the US. Ms. Galliford joined us in 2009 to manage content and curricula development and distribution and was promoted to Director of Product Solutions in 2013.

In addition training is provided by April Coulter who has 8 years of experience as a Center Administrator

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7430

and became our Operations Training Manager in September 2014. Opal is responsible for training all Operations Managers and Center Administrators for all locations worldwide. April hosts live trainings in Irvine for all new employees usually every 6 weeks, as well as monthly online forums for all Operations Managers and Center Administrators. The average experience of our instructors includes 11 or more years relevant to the subject taught.  These training programs are our primary source of instruction.

**Typical Length of Time to Open Your Business**

We estimate the typical length of time between the signing of the Franchise Agreement, obtaining a site and opening of your Center should be no more than 120 days. Factors which may affect this time period include satisfactory completion of initial training and obtaining a suitable site for your Center. You are encouraged to begin researching the availability of suitable office space as early as possible to make your investment decision and maximize your time.

**Computer System**

You must obtain and maintain at your sole expense accounting, sales, reporting and records retention systems conforming to any requirements we prescribe including any electronic systems with full time unrestricted online access for us.  These systems may include computer and accounting systems, and software programs, and may have components only available from us, a franchisor related entity and/or designated suppliers.  We reserve the right to use, as we deem appropriate, and to have full time independent and unrestricted online access to, all accounting systems, computer and any other systems, and the information and data they contain.  We may charge a reasonable fee for the license, modification, maintenance or support of software or any other goods and/or services that we furnish to you with any of the systems.  (Franchise Agreement, Section 8.2)

We use a web-based proprietary software program for our franchise portal which we currently refer to as our "Network Connection". You are required to pay to us a Portal Subscription Fee in an amount initially not to exceed $100 per month and use thereof by you will be mandatory. (Franchise Agreement Section 4.4.)

You must obtain and maintain adequate quantities of computers and related equipment necessary for the conduct of the Franchised Business. We in our sole discretion may require additional software, hardware and other equipment and you agree to upgrade and change your computer system and equipment periodically as required by us. (Franchise Agreement, Section 8.2)

You shall maintain, at your sole cost, computer equipment capable of running any electronic communication services or trading applications in your classroom(s) which we may require. (Franchise Agreement, Section 8.2)

We do not currently require any proprietary hardware systems.  You must purchase a minimum of 20 desktop computers for use by your customers attending your courses.  You must also purchase a computer system for general operational use related to your Franchised Business as specified in the Manuals. You may purchase or lease computers from any source you choose, as long as they are new model PCs with brand names (like DELL or HP) with Intel or equivalent processors and sufficient memory, hard drive space and speed to run the required computer functions.  Examples of computers that meet these requirements are listed in our Manuals or on our franchise portal. You will also be required to have dedicated internet connections with sufficient bandwidth, late model network switch and firewall as specified in our Manuals.  The initial cost of a server and 20 computers is included in the estimate in Item 7.

**Attachment ZZ**

Classroom monitors and projectors:

Recommended View Sonic PJD6552LWS Projector
*Laser projector is recommended for large rooms or rooms with high ceilings
22" or larger flat screen with minimum resolution of 1280x800
LCD Projector with a minimum of 3,200 lumens and a resolution capacity of 1280x1024
Large, high quality screen (white board or wall film behind it)

Instructor computer – classroom:

Lenovo ThinkCentre M710S
Windows 10
Intel Core i5-7400 Processor (6M Cache, 3.0GHz)
8 DDR4 2400 UDIMM
128 GB SSD M.2 PCIe
22" flat screen monitor resolution of 1280 x 1024 (recommended Lenovo, Dell, or ViewSonic, must be black or silver)
Monitor card supporting dual monitors
Bluetooth wireless keyboard and mouse (Logitech recommended)

Student computer – classroom:

Lenovo ThinkCentre M715q
Windows 10
AMD A10-9700E Pro Processor (2MB Cache, 3.0GHz)
8 GB DDR4 2400 UDIMM
128 GB SSD M.2 PCIe
Lenovo ThinkCentre Tiny-in-One 22 – LED monitor

Office computer:

Lenovo ThinkCentre M710S
Windows 10
Intel Core i5-7400 Processor (6M Cache, 3.0GHz)
8 DDR4 2400 UDIMM
128 GB SSD M.2 PCIe
22" flat screen monitor resolution of 1280 x 1024 (recommended Lenovo, Dell, or ViewSonic, must be black or silver)
Monitor card supporting dual monitors

We estimate the cost of the computer equipment to be approximately $35,000 to $45,000 for a two classroom Center.  Please see our Manuals for further information.

We do not currently require any proprietary software systems.  If we do so in the future, you will be required to update/convert your systems and will bear the costs associated with conversion.  We currently require that all computers run on the most current version of Microsoft Windows 10 and potentially other applications on certain computers. You must also use Salesforce.com® or any new database software we choose, and QuickBooks® or QuickBooks Pro® online with us named as administrator. Owners and center administrators must take the basic QuickBooks class online. At the date of this Franchise Disclosure Document the course fee (at the date of this Disclosure Document) is $449.99 per person and is described at the following link: https://quickbookstraining.com/ondemand-training/mastering-quickbooks-online-ondemand-1.html

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

We currently do not require that you purchase a maintenance, repair, upgrade or update service contract for your computer system, but we reserve the right to do so in the future.  The current annual cost of a service contract would range from $4,000 to $5,000 per year.

**Site Selection**

We don't select the site for your Online Trading Academy franchise, but we do approve the site. You select the site for your Online Trading Academy Center that complies with the Franchise Agreement and Manuals and must receive our approval of your proposed facility and floor plan.  (Franchise Agreement, Section 3.1 A)  Before you open your Online Trading Academy Center you agree to execute and deliver to us an ADA Certification in the form required by us to confirm and certify that your Online Trading Academy Center and any proposed renovations comply with the ADA and other requirements. (Franchise Agreement, Section 3.3) All matters related to the site selection, development, negotiations, etc. are your sole responsibility. (Franchise Agreement, Section 3.1D)

**Marketing**

We have established a Marketing Fund (the "Marketing Fund") to promote Online Trading Academy Centers and the Brand.  You are required to make a monthly contribution of the greater of $1,000 or 3% of the Monthly Gross Volume, as described in Item 6.  The Marketing Fund operates primarily to provide strategic guidance, creative materials and messaging, access to agencies and printers, targeted email campaigns, direct mail, radio and television buys for Online Trading Academy Centers to implement at a local level.  Your participation in certain of our Global Marketing Services Programs conducted and financed by us is required, as set out below. We have sole discretion over all matters relating to the Marketing Fund, operational, marketing or any other matter (consistent with its purposes and the provisions of the relevant Franchise Agreement). The Marketing Fund may be used for product marketing and development; signage; creation, production and distribution of marketing, advertising, public relations and other materials in any medium, including all matters related to the internet the website and online reputation management ; administration expenses; brand/image campaigns; media; public relations; expos; national, regional and other marketing programs; activities to promote current and/or future Online Trading Academy Centers and the Brand; agency and consulting services; research; any expenses approved by us and associated with any franchise advisory council or group that we may establish.  Among other things, Marketing Fund contributions may be used for web site and social media development/operation, development and customization of technologies integrated with Salesforce.com, QuickBooks or other technologies we use, and to pay Internet, Intranet, URL, 800 or similar numbers, and other charges, fees and/or expenses.  We may also use Marketing Fund for socially responsible marketing opportunities to benefit the brand and the network. (Franchise Agreement, Section 10.1 A-C)

We will not use Marketing Fund monies for franchise development or for items primarily related to marketing franchise opportunities; general corporate research unrelated to marketing activities which we are authorized to perform under the Franchise Agreement; administrative expenses not permitted by the relevant Franchise Agreements; or franchise support and field services performed by us.  A brief statement regarding the availability of Online Trading Academy franchises may be included in advertising and other items produced using the Marketing Fund. (Franchise Agreement, Section 10.1 C)

We and/or any Franchisor-Related Persons/Entities can provide goods, services, materials, etc. (including administrative services and/or "in-house advertising agency" services) and be compensated and/or reimbursed for the same by the Marketing Fund, provided that any such compensation must be reasonable in amount.  We can arrange for goods, services, materials, etc. (including administrative services) to be provided by independent persons/companies and we may receive full or partial reimbursement from such third parties for our direct costs associated with such goods and services and other associated costs may be paid by the Marketing Fund. While we are not required to do so, if we have formed an FAC and submit any matters for approval to the FAC and approval is granted by a majority of the members, the approval will be binding on you.  (Franchise Agreement, Section 10.1 D)

**Attachment ZZ**

We'll account for the Marketing Fund separately.  We may use the fund to pay all administrative and other costs of the Marketing related to its activities and purposes and/or as authorized by the relevant Franchise Agreements.  The Marketing Fund is responsible for all taxes of any kind incurred by the Marketing Fund, its activities, contributions to the Marketing Fund and/or any other Fund aspect, whether imposed on us, the Marketing Fund or any other related party.  Upon request, we will provide you with a financial statement that will be prepared annually and may be audited.  The Marketing Fund will pay any related accounting or auditing costs.  All funds in the Marketing Fund must be expended, before termination of the Marketing Fund, only for the purposes authorized by the relevant Franchise Agreement(s.)  If we spend less than the total of all contributions to the Marketing Fund during any fiscal year, we may accumulate the sums for use in later years.  (Franchise Agreement, Section 101 E) No profit, gain or other financial benefit will directly accrue to us from the Marketing Fund.

During the fiscal year ending December 31, 2017, the Marketing Fund spent 2% of the Fund on the production of advertising and other marketing material, 45for marketing department employee-related costs and general and administrative expenses, 41% for web site, sale and marketing integration, technologies, development and support,  4% for Brand Research, 2% on Reputation Management and 5% for B2B and Public relations.

You will not make any misrepresentations in your advertising and marketing and will not advertise in any way that would suggest or imply to a consumer that the training offered could lead to an employment opportunity or a credential that could be marketable to a future employer.

We are responsible for financial management of the Marketing Fund.  We may in our discretion and consistent with the provisions of the Franchise Agreement:

1)   compensate ourselves, any Franchisor Related Person/Entity, and/or any third party for reasonable salaries, administrative costs, overhead and other expenses incurred in Marketing Fund related programs/activities, including production, accounting, research, insurance, and collection expenses, as well as any legal expense related to the activities and purposes of the Marketing Fund.  We will pay for: i) the salaries and benefits of any of our employees who will act as a manager of the Marketing Fund or provide marketing services to the System, and (ii) the costs of our in-house staff to collect and account for contributions to the Fund, so long as the employee time to perform these accounting/collection activities is less than the equivalent of a full time employee;

2)  charge the Marketing Fund for attorney's fees and other reasonable costs related in any way to claims against us and/or any of the Franchisor-Related Persons/Entities regarding the Marketing Fund.  We must reimburse the Marketing Fund for any attorneys' fees and/or costs paid by the Marketing Fund for any action in which we are finally found to have acted unlawfully or to be guilty of wrongdoing with respect to the Marketing Fund;

3)  spend in any fiscal year an amount greater or less than the aggregate contributions to the Marketing Fund in that year, and the Marketing Fund may borrow from us or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus;

4)  collect for remission to the Marketing Fund any advertising or promotional amounts offered by any supplier based upon franchisee or customer purchases or referrals;

5)  pay the advertising, marketing, public relations and related reasonable costs involved in any co-branding, dual franchising or other multi-sponsor programs;

6)  revise marketing and other programs, and/or make reasonable expenditures from the Marketing Fund, to take account of cultural and other differences (and/or we may delegate management of a portion of the Marketing Fund for this purpose);

7)  defer, waive and/or compromise claims for current/future contributions to, and/or claims against

**Attachment ZZ**

or with respect to, the Marketing Fund and fund the same with the Marketing Fund;

    8)  take legal or other action against any franchisee in default of their obligations to the Marketing Fund;

    9)  merge the Marketing Fund with any Marketing Fund otherwise established for Online Trading Academy Businesses, so long as the restrictions of the relevant Franchise Agreement(s) continue to apply to contributions made by Franchisees under the arrangements;

    10)  maintain Marketing Fund assets in one or more accounts designated as "trust accounts" for purposes of protecting these assets from claims of third-party creditors, (but the action shall not be deemed to create any "trust," "fiduciary relationship" or similar special arrangement);

    11)  incorporate the Marketing Fund or operate it through an entity separate from us, which is subject to all rights and duties of ours relating to the Marketing Fund;

    12)  take other actions with regard to the Fund as we consider to be appropriate and as are consistent with the provisions of the Franchise Agreement. (Franchise Agreement, Section 10.1 F)

    We have no obligation to ensure that expenditures by the Marketing Fund are or will be proportionate or equivalent to contributions to the Marketing Fund by Online Trading Academy Businesses operating in any geographic area, or that any Online Trading Academy Business will benefit directly, indirectly or in proportion to its contribution to the Marketing Fund.  You understand that some Online Trading Academy Franchisees and company owned locations may have Marketing Fund obligations that are different from yours, if any. (Franchise Agreement, Section 10.1 G)

    As previously disclosed in Item 1, as of December 31, 2017 we operated twelve Online Trading Academy Centers in Westwood Los Angeles California, Woodland Hills, Los Angeles California, , Sacramento, California, Boston Massachusetts, New York City, New York, Long Island New York, Cincinnati Ohio, Austin, Texas, Vancouver Canada and London, England as described in Item 20. Of these ten, the three located in Austin Texas,  Cincinnati Ohio and Sacramento California, are Satellite Centers,

    Our parent company Newport Exchange Holdings, Inc. owns and operates one center in Irvine California at this time.

    We may provide advertising, creative, concepts and other content and/or materials to Marketing Funds for Online Trading Academy Business franchisees and/or to franchisees located outside of the United States and these funds/franchisees may be required to bear a reasonable portion of the costs for these items (and or reimburse the Marketing Fund for this amount) as determined by us.

    Neither we (nor any of the Franchisor-Related Persons/Entities) will be liable for any act or omission with regard to the Marketing which is consistent with this Agreement.  None of the relationships with you with regard to the Marketing Fund are in the nature of a "trust," "fiduciary" or similar special arrangement. (Franchise Agreement, Section 10.1 H)

    We may deny access to any and all programs and/or materials created by, and benefits of, the Marketing Fund to you and to any Franchisees who are in default in any obligations to the Marketing Fund and/or otherwise in default under the Franchise Agreement.

    We may decide to form one or more associations and/or sub-associations of Online Trading Academy Centers to conduct various marketing-related activities on a cooperative basis as a Franchise Marketing Group ("FMG").  If one or more FMGs, local, regional and/or national, are formed covering your area, you must join and actively participate.  Each Center, whether franchised or non-franchised, will be entitled to one vote, but in order to vote, franchised Centers must be in Good Standing.  You may be required to contribute any amounts as are determined from time-to-time by these FMGs.  Each FMG may adopt its own bylaws, rules, regulations and procedures, subject to our consent.  Any failure to timely pay amounts

due to, or to comply with the bylaws, rules, regulations and procedures of an FMG shall be a breach of the Franchise Agreement.  We will have the right to have a representative participate in all FMG meetings as a non-voting participant.  If we submit any matters for approval to an FMG of which you are a member, and approval is granted, the approval will be binding on you. (Franchise Agreement, Section 10.4)

You must participate in all Marketing Fund programs.  You have the right to set your own prices, except that we may specify maximum prices for goods or services to the greatest degree permitted by law. You will fully honor all coupons, price reductions and other promotions/programs as we direct.  The Marketing Fund may furnish you with marketing, advertising and promotional materials or other marketing resources; however, we may require that you pay the cost of developing, producing, shipping and handling for these materials.  (Franchise Agreement, Section 10.2)

The minimum you must spend for local advertising and promotion of your Online Trading Academy Center within the Territory each month (including your participation in the Global Marketing Services Programs as set out below) will be the greater of $15,000 or fifteen percent (15%) of Gross Volume, subject to inflation adjustment, in Item 6.  If we request it, you will submit verification of your expenditures in a form required by us. You are highly encouraged to advertise and market at both the local and global level and you are required to participate in the Global Marketing Services / Global Advertising Programs. (Franchise Agreement, Section 10.3)

You will use only the email address and/or URL we designate for you for use with your Franchised Business and communicate using only these identifiers.  We will own the rights in and to any email address and/or URL as described in this Agreement.  We will manage and maintain your URL, including monitoring emails, as a subsection of our website to maintain a uniform and consistent appearance and quality control. No other URLs may be maintained by you related to your Franchised Business.  You must provide to us for prior approval and consent to use samples of all proposed advertising and promotional materials, including all emails, and direct mail or electronic media materials of any kind or web properties or social media profiles and any proposed use of the Marks or Brands and/or other forms of commercial identification. You will comply with our compliance standards in all our Manuals as to content and delivery of any and all approved advertising and promotional materials and for any media authorized. We may condition or withhold our approval and consent to use in our sole discretion.  All advertising and promotional materials that are pre-approved, such as course or seminar schedules and contact information, will appear in the Manuals on the franchise portal or through our Marketing Department electronic communications with you. Your advertising must be in good taste, conform to ethical and legal standards and our requirements.  You will not use any materials or programs disapproved by us at any time and will use all materials and programs designated by us as mandatory.  We can require that a brief statement regarding the availability of Online Trading Academy franchises be included in advertising used by you and/or that brochures regarding purchase of Online Trading Academy franchises be displayed in your Online Trading Academy Center.  We may establish standards and requirements for yellow page and other directory advertising, which you must follow. We require that you use a designated Internet/Intranet Service Provider (which can be us or an Affiliate), to receive such communications. You may only participate in email services in accordance with the then current process and requirements as set out in the Manuals. ((Franchise Agreement Sections 4.3, 4.8 and 10.3 B)

In addition to the Marketing Fund activities, we may manage various national and global advertising and marketing programs which may purchase media generally at a more cost-effective rate than you may purchase locally, and or which may not be available to you on a local level ("Global Marketing Services Programs"). Participation by you in our Global Marketing Services is required. You will be required to sign our GMS Participation Agreement (copy attached to this Disclosure Document as Exhibit H). Participants will pay to us an initial deposit of $15,000 which must be renewed up to the $15,000 minimum every month depending upon the sum expended in the previous month. Within this program, participants either (i) pay for actual usage based on the cost of delivered lead generation or class registration or attendance on a monthly basis or (ii) proportional to Franchisee's share of media costs as described and calculated in accordance with the relevant GMS Program Description. Additional Global Marketing Services Programs such as the Telemarketing Services Program are also available and not mandatory. Participation in such programs is highly encouraged and the costs of such participation will be included in the Center Marketing Activities required spending level as set out above. Global Marketing Services Programs may be either performance

**Attachment ZZ**

based programs or shared costs programs. For performance based programs you will pay the costs based on leads, seminar registrations and/or attendances received by you as detailed in the relevant GMS Program Description. For shared costs programs, cost shall be borne by you proportional to your share of media costs as described and calculated in accordance with the relevant GMS Program Description. Such costs may include, but are not limited to, cost of media purchases, servicing costs, management costs of the campaigns including the cost of our personnel, technology-related costs and other costs as determined by us to manage the campaigns. You acknowledge and agree that your monthly participation in additional Global Marketing Services Programs is a System requirement. (Franchise Agreement, Section 10.5)

In addition to (a) the Marketing Fund activities, which at the date of this Disclosure Document are primarily focused on providing marketing products and development, marketing infrastructure and analytics, support and consultation, online reputation management, search engine optimization, and email communications, and (b) the GMS Program activities which at the date of this Disclosure Document are primarily focused on specific direct response marketing activities that currently include but are not limited to online and broadcast opportunities for franchisees to generate workshop registrations, we may also elect to (c) initiate and manage special marketing projects.

A special marketing project will focus on advertising growth opportunities that will be used in the activities of the Marketing Fund and GMS and will include the work of outside third party agencies. An example of a special marketing project may be the development of a creative multi-media branding campaign for a consistent message throughout TV spots, direct mail, online communications and social media and radio. Another example may be the development or refreshing of existing infomercials or any other projects that aim to benefit and enhance the platforms and channels supported by the Marketing Fund, and / or GMS platforms "Special Marketing Project". (Franchise Agreement section 10.6)

Special Marketing Project will be financed with funds outside the scope of the Marketing Fund. All Franchised Businesses will contribute to the cost of Special Marketing Projects including company owned Centers. Such funding may be initially provided by Franchisor and franchisees will be invoiced during the relevant financial year, or Franchisor may require that franchisees provide up front contributions to such costs. There may be more than one Special Market Project in any one calendar year. (Franchise Agreement section 4.18).

**Franchisee Advisory Council**

We may elect to form a Franchisee Advisory Council ("FAC") to provide advice and suggestions regarding specified matters to us. The FAC will consist of a designated number of Online Trading Academy franchisees selected by Us or, at our discretion, by vote of franchise owners ("Franchisee Members"). All Franchisee Members shall be in Good Standing (as defined in the Franchise Agreement). We may select Franchisee Members from any national or international regions in which that Franchisee Member resides or does business (the "Regions"). The Franchisee Members need not be from different Regions. The FAC shall also consist of a designated number of OTA Corporate Members who may be employees or agents of OTA and selected by OTA ("Corporate Members"). Franchisee and Corporate FAC Members shall collectively be referred to as the "Members". Appointments to the Council will be announced publicly via email to all franchisees. (Franchise Agreement, Section 8.1 (i))

We may adopt governing rules for the meetings and procedures of the FAC. The purpose of the FAC is to provide constructive, open and two-way communications between franchisees and their franchisor, OTA. In particular, the FAC will provide a cooperative forum for Members to receive and discuss information, to provide input, advice and planning regarding various limited and specified matters and to encourage each franchise owner to remain in Good Standing as the Online Trading Academy system grows and develops through fostering communications between franchisees and OTA. While we are not required to do so except as specified in this Agreement, if we submit any matters for approval to an FAC and approval is granted, the approval will be binding on you. (Franchise Agreement, Section 8.1 (i))

In January 2018 we assembled a Franchise Advisory Council (Marketing) to provide a cooperative

forum for franchisees and OTA to discuss the potential benefits and growth opportunities available to the franchise system through existing and innovative marketing in all mediums.

Franchisor operates a National TV Advertising Program which may include, infomercials and long-form and short form spots. This program is designed to (a) leverage the collective purchasing power of the franchisees and company owned locations, (b) manage the timing of campaigns as TV airtime must be booked a calendar quarter in advance, and (c) provide access to cable channels not otherwise accessible to franchisees as some TV air time for infomercials can only be acquired nationally. National TV Advertising spend is committed quarterly in advance with input from the then current FAC (Marketing). All US centers, including franchisor owned Centers, are charged their pro rata share of the total quarterly advertising spend. This calculation is currently based on the number of households in each respective Territory and is subject to change depending on the number of operating Centers, the introduction of a new method of calculating pro rata share, and the then current quarterly needs as reviewed by the FAC (Marketing) and determined by the Franchisor in its Business Judgment.  You will be billed monthly in advance in installments as set out in Section 4.19 of the Franchise Agreement. Franchisor may amend or change or discontinue the National TV Advertising Program at any time.

You will agree to operate your OTA Center in keeping with the mission and culture of the System and to use your best efforts to engage in socially responsible activities using business as a force for good as outlined in the Manuals. (Franchise Agreement 8.1(m))

## ITEM 12:   TERRITORY

We award you a franchise to operate a single Traditional Online Trading Academy Center from a single premises within an exclusive Territory approved by us.  We will designate a Territory described by zip codes, counties and or designated marketing areas (DMAs) as appropriate in each geographic location as reported by an independent zip code directory service and the then current Neilsen Media Markets report or other future source that may become available. Continuation of your territorial exclusivity depends on you maintaining the Performance Standards outlined below. Failure to do so may result in termination of your Franchise Agreement. The Territory may be increased by the addition of immediately adjacent zip code areas, or DMAs with incremental price changes based on population, designated marketing area information and other demographic, marketing and economic factors in the territory.   We do not make any guarantees as to the exact number of individuals within the Territory at the outset, nor that the Territory will maintain this population or the designated marketing area ranking during subsequent years.

This Franchise applies only to trading and financial education training centers (and related products and services as specified by us periodically).  The Franchise does not grant you any rights with respect to other and/or related businesses, products and/or services, in which we or any Franchisor Related Persons/Entities may be involved, now or in the future.

We will not enter into a Franchise Agreement licensing a Traditional Online Trading Academy Center, or open a Franchisor-owned Center, servicing customers inside the Territory described in Exhibit 2.2 of the Franchise Agreement.  Your rights in the Territory are exactly as expressly described in Sections 2.1 and 2.2 of the Franchise Agreement and are limited to the rights:

1) to open a "Traditional" Online Trading Academy Center within your Territory as your principal Franchised Business location;
2) to conduct your Franchised Business at alternative sites in your Territory, for example, to accommodate large classes or to conduct training at complimentary locations in your Territory (subject to our prior written approval);
3) to sell all approved Products and Services, subject to the revenue splits or delivery fees

**Attachment ZZ**

EX 13
7438

as described in our Manuals and as we may modify from time to time;

4) to fulfill classes to "Retake Customers" (as defined in the Manuals) referred to your Center and to have classes for Retake Customers that you refer to other Online Trading Academy franchisees fulfilled in accordance with the Manuals;

5) to sell classes for fulfillment by other Online Trading Academy franchisees or us, retaining the "Selling Fee" portion of the revenue (as defined in the Manuals) and conversely, the obligation to fulfill classes sold by other Online Trading Academy franchisees or us and collect only the "Fulfillment Fee" portion of the transaction (as defined in the Manuals);

6) the right to sell an online course or class for delivery by us or our designee, paying to us the "Online Class Fulfillment Fees" of the revenue (as may be further defined in the Manuals). Your portion of all such revenue will be included in Gross Volume;

7) to market within your Territory and;

8) to sell Products and Services to local venues within your Territory, other than Special Accounts, and retain the revenue from these activities occurring within your Territory; *unless* this activity results in the establishment of a national account consisting of activities to occur outside your Territory, then you agree to do so only with our prior written approval to the terms and conditions of this national arrangement which we may withhold or condition in our Business Judgment.

Except for the operation of an Online Trading Academy Center within the Territory, you have no right to exclude, control or impose conditions on the location of present or future Online Trading Academy (or any other brand) Businesses or distribution channels of any type, franchised or Franchisor-owned, regardless of their location or proximity to the Territory.

As described above, you are awarded the rights to operate a Traditional Online Trading Academy Center. The term "Traditional Online Trading Academy Center" does not include non-traditional Online Trading Academy Centers and/or other distribution opportunities including, without limitation, Special Accounts, our attendance at conferences and events such as "expos", conventions and speaking engagements, Internet sites, online courses, and/or direct mail operations.

Except as described above, you do not have the right to use any other channels of distribution to make sales inside or outside your Territory.

We expressly reserve the rights to these non-traditional Online Trading Academy operations.

We currently operate an OTA Virtual Campus in all Territories. The registration process for the OTA Virtual Campus in all Territories includes a website landing page which is a place where we solicit and accept orders for free introductory classes ("Previews"). In all Territories if a customer comes to a landing page and does not register for an on-location free Preview, then, before leaving the landing page, the customer will be offered the opportunity to register for a free Preview online class. This stand-alone service is currently free to all Franchisees while in test mode.

Franchisees at their election, may opt in to further use this registration process to offer customers who have taken an online Preview the chance to register for an on-location Marketing Timing Class ("MTO") in one of two ways.

First, Franchisees may elect to add a call to action inviting customers in their territory who have taken a free online Preview to register for an on location MTO at the Franchisee's Center in the Franchisee's Territory at a date on Franchisee's public schedule which schedule is controlled by the Franchisee.

Customers who click through this option will be directed to our franchise store and will enter a zip code to log the customer as a customer of a franchisee territory. The customer will provide a credit card payment which will be collected and retained by Franchisor in consideration of providing both the service

and a lead generation which is free to the Franchisee.

Second, Franchisees may elect to add online registration to their landing sites, such that customers responding to an initial call to action in Franchisee's Territory may immediately be offered the choice to either (i) elect to attend a fee on location Preview at Franchisee's Center in Franchisee's Territory or (ii) to register for a free online Preview. This setting can be set at Franchisee's option so that (for example) all customers in a geo radius greater than 10 miles from the Franchisee's Center will be offered both on location and online registration options. From here the customers who attend an online Preview will then be invited to attend an on location MTO at Franchisee's Center in the Franchisee's Territory at a date on Franchisee's public schedule which schedule is controlled by the Franchisee.

Again, Customers who click through this option will be directed to our franchise store and will enter a zip code to log the customer as a customer of a franchisee territory. The customer will provide a credit card payment which will be collected and retained by Franchisor in consideration of providing both the service and a lead generation which is free to the Franchisee.

We are testing to gather data to support our belief that the virtual campus is an extension of the Traditional Online Trading Academy Centers' physical business and that this registration and delivery process both increases the opportunity for more customers to register for classes and materially reduces the costs per registration.

At the date of this Franchise Disclosure Document there are Franchisees testing both scenarios. Franchisor reserves the right to make this registration process mandatory in the future.

In addition, we have entered into a global arrangement with a vendor to promote the franchised business on the vendor's website. This test program operates in all Territories and includes a video and a call to action. The program landing page contains IP detection and a zip code look up, allowing interested prospects to find the Center nearest them and enroll in a market timing orientation class. All transactions are processed through our franchise store which we host and manage. Currently, 50% of the revenues go to the vendor and the other 50% are passed through directly to the Center where the prospect enrolled. Other than the royalty fee paid on all Center revenues, there are no fees charged to the Center for this program. Franchisor only receives revenues if a prospect enrolls at a franchisor owned Center. The commercial aim of this program is to generate low cost leads and prospect engagement. We are testing this program which may be amended or terminated in our business judgement. We may also test other similar programs.

We and Franchisor-Related Persons/Entities expressly reserve the rights to:

1)    own and/or operate ourselves, and/or authorize others to own and/or operate: a) Special Accounts within the Territory and b) any kind of business outside of the Territory, including without limitation, Traditional Online Trading Academy Centers, whether or not using the Online Trading Academy Marks and System;

2)    sell Online Trading Academy brand products and services to customers located anywhere (including within the Territory) using any channel of distribution, including the Internet, telemarketing, or other direct marketing sales, other than a Traditional Center using our principal trademarks or under trademarks different from the ones you will use under the franchise agreement.  Our current policies provide that (i) revenue from retail sales generated within your Territory will be shared with you (in accordance with the revenue sharing specified in the Manuals) when processed by us and sold directly to the customer (other than Special Accounts) from our website (ii) revenue from retail sales of online courses sold by you in your Territory or sold by us directly through our website to qualified residents in your Territory, for delivery by us, after payment to us of the then current delivery fees, will be revenue retained by you and subject to royalties. Revenue will not be shared for sales to Special Accounts except as authorized by us in advance.  Our Manuals contain our current policies on revenue sharing.  These policies are subject to change by us without notice.

**Attachment ZZ**

3)  sell or make arrangements or customer referrals with third parties to sell, lease or otherwise deliver, any non-competitive product and/or service under other than Online Trading Academy brand, to customers located anywhere, although this will not interfere with our rights to designate products and services and suppliers required for use by you in your Franchised Business;

4)  develop or become associated with other non-competitive concepts (including dual branding and/or other franchise systems), not using the Online Trading Academy System and/or the Marks, and award franchises under other concepts for locations anywhere;

5)  acquire, be acquired by, merge or affiliate with other businesses (whether competitive or not), with units located anywhere.  These transactions may include arrangements involving competing outlets and brand conversions (to or from the Online Trading Academy Marks and System).

We are not required to pay you if we exercise any of the rights specified above inside your Territory.

If you are not in Good Standing (as defined on page 4 in the Franchise Agreement), we may reduce, eliminate or otherwise modify your rights in the Territory, including a reduction in the size of your Territory. We do not make any representation or assurance that you can or will achieve any performance minimums contained in this Agreement.

**Performance Standards**

You and we have a shared interest in your Franchised Business maintaining good performance and high volume and not performing below System Standards, or failing to achieve an appropriate level of Gross Volume. Your maintenance of Online Trading Academy System Standards or Gross Volume at agreed upon levels is vital to our relationship.  "Performance Standards" includes both our "System Standards" and "Financial Standards" as described below.

Online Trading Academy System Standards.  We may choose to evaluate your Online Trading Academy Business for compliance with Online Trading Academy System Standards using various methods (including inspections, field service visits, customer comments/surveys and secret shopper reports).  We will assign your Online Trading Academy System Standards Scores for categories scored at that time.  We'll compare your scores with the average score in each category achieved by all franchised Online Trading Academy Centers in the United States or other geographic area that we reasonably believe appropriate for evaluation purposes.

Online Trading Academy Financial Standards. We may choose to compare your Gross Volume with the then-current "Financial Standard".  The Financial Standard will be determined as follows:

| PERIOD OPEN* | FINANCIAL STANDARDS (ADJUSTED EVERY 6 MONTHS OR MORE) |
|---|---|
| Less than Three Years | 50% of PUA** |
| Three Years or More, But Less Than Four Years | 60% of PUA** |
| Four Years or More | 70% of PUA** |

*Measured from the earlier of your actual opening date or the date by which your Online Trading Academy Center is required to open.

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7441

\*\*"PUA" or "Per Unit Average": The average Gross Volume for all Online Trading Academy Centers in the applicable geographic area during the most recent measuring date whether six (6) months or longer.

We reserve the right to make reasonable revisions to elements of the Financial or System Standards on 6 months written advance notice to you.

We may implement the correction process described below, if your System Standards Score in a scored category is lower than the average System Standards Score or if your Gross Volume does not equal the then-current Financial Standard applicable to you.

<u>Correction Process</u>

1) If we notify you of your failure to meet the then-current average System Standards Score in a scored category, then you will have 6 months from our delivery of written notice to you to cure the deficiency.

If we notify you of your failure to meet the then-current, applicable Financial Standard, then you will have 6 months from our delivery of written notice to you to cure the deficiency.

2) We will reasonably cooperate with and assist you in your efforts to meet your performance objectives. This assistance may include on site consultations, meetings at our headquarters, recommendations on your resource contributions and/or retraining activities or programs at designated locations. You are responsible for any costs associated with these activities, including travel, meals, lodging and any other related expenses and will participate in the same upon our request.

If at the end of the applicable Correction Period your Online Trading Academy Center does not meet the average Online Trading Academy System Standards score for any category and/or the then applicable Financial Standards (whichever applies), then we may elect to terminate the Franchise Agreement. If we elect to terminate the Franchise Agreement, you will have 90 days after the end of the applicable Correction Period to complete a sale of your franchise to a third party if:

1) You provide us written notice of your desire to sell your franchise within 10 days of the expiration of the applicable Correction Period along with a General Release signed by you and each of your owners and Affiliates; and

2) The transfer meets all requirements of the Franchise Agreement.

If you do not provide us the notice or complete an authorized sale within the 90 day period, then we may elect to terminate the Franchise Agreement immediately upon delivery of written notice to you. The fact that any correction process with you may be ongoing does not prevent us from exercising our rights and/or remedies, including our right to terminate this Agreement for another default committed by you under this or any other agreement with you.

**<u>Relocation of your Online Trading Academy Center</u>**

Any relocation of the Online Trading Academy Center requires our written consent, will be at your sole expense and will require that you and each Affiliate and owner of yours sign a General Release if we request.

**ITEM 13:    TRADEMARKS**

Newport Exchange Holdings, Inc. owns all of the trademarks and has filed all documents required to maintain registration of our principal mark in the principal register of the United States Patent and Trademark Office:

Online Trading Academy® Reg. No. 3035060 Registration Date:  December 27, 2005

Online Trading Academy logo and wordmark in black and white Reg. No. 3762672 Registration Date: March 23, 2010

Online Trading Academy Stylized Logo   Reg. No. 4831993 Registration Date: October 13, 2015

Pro-Active Investors wordmark Reg. No. 3956550 Registration Date: May 10, 2011

Pro-Active Investors logo Reg. No. 3987746 Registration Date: July 5, 2011

Newport Exchange Holdings, Inc. has also registered the following mark in the United Arab Emirates:

Online Trading Academy® Reg. No. 54855 Registration Date:  August 17, 2005, renewed through 01 24 2027

Newport Exchange Holdings, Inc. has also registered the following mark in the country of Kuwait:

"Online Trading Academy® & Device in Colours" Reg. No. 63225 Registration Date:  January 22, 2007, renewed through 02 20 2026.

Newport Exchange Holdings, Inc. has also registered the following mark in the Kingdom of Saudi Arabia:

"Online Trading Academy & Device in Colours", Reg. No.  913/63     Registration Date:  April 29, 2007, renewed through 07 10 2025.

Newport Exchange Holdings, Inc. has also registered the following Community Trade Mark (figurative mark) with the Office for Harmonization in the International Market:  Registration No. 5, 639, 182: Registration Date: April 2, 2008



and has renewed the filing with the updated logo (set out below) through 05 08 2027



Newport Exchange Holdings, Inc. has also registered the following figurative wordmark and logo "Online Trading Academy" – USPTO Ref. No. A0009857 for International Registration under the Madrid Protocol:  Registration number 944841: Registration date October 8, 2007 and which filing was renewed effective 10 08 2017.

**Attachment ZZ**



Newport Exchange Holdings, Inc. has also registered the following figurative wordmark and logo "Online Trading Academy" with the Canadian Intellectual Property Office:  Registration number TMA 813,025 Registration Date: November 30, 2011.



Newport Exchange Holdings, Inc. has also registered the following marks in the country of Hong Kong:

Online Trading Academy Logo – Registration number: 301732040; Registration Date: August 10, 2010

XLT logo – Serial No. 301732022 – Registration number: 301732022; Registration Date: August 10, 2010

Newport Exchange Holdings, Inc. has also registered the following marks in the country of Indonesia:

Online Trading Academy black and white logo – Registration number. J 002010030070; Registration Date: September 6, 2011

Extended Learning Track wordmark – Registration number J002010030071: Registration Date: September 6, 2011

On October 5, 2007, Newport Exchange Holdings, Inc. filed an application in Malaysia for the wordmark Online Trading Academy and the figurative wordmark and logo "Online Trading Academy" - Serial No: 07019735 which has been renewed through 04 10 2027

On July 27, 2009, Newport Exchange Holdings, Inc. filed the following applications in the country of India:

Online Trading Academy wordmark – Serial No. 1844178   which mark is registered effective August 10, 2012.
Online Trading Academy black and while logo – Serial No. 1844177 which mark is registered effective December 8, 2014.

On August 10, 2009, Newport Exchange Holdings, Inc. filed the following application in the country of India:

Online Trading Academy color logo – Serial No. 1849121 which mark is registered effective December 15, 2014.

On September 20, 2010, Newport Exchange Holdings, Inc. filed an application with the Canadian Intellectual Property Office for the XLT wordmark with Application Number 1496506:  The mark is registered

**Attachment ZZ**

EX 13
7444

effective August 12, 2011.

On September 20, 2010, Newport Exchange Holdings, Inc. filed an application with the Canadian Intellectual Property Office for the Pro-Active Investor wordmark with Application Number 1496511:  The mark is registered effective February 6, 2012.

OTA Real Estate, wordmark registration number 4,831,992, which mark is registered effective October 13, 2015.

MyOTA, wordmark registration number 5,233,017 which mark is registered effective June 27, 2017

Newport Exchange Holdings, Inc. has issued to us a perpetual license to use and sublicense all of the Online Trading Academy trademarks with our sale and administration of Online Trading Academy trading and financial education center franchises throughout the world. The license does not limit our right to use or license the use of any of the trademarks in any manner material to the franchise. No other agreements are currently in effect which limit our use of the trademarks in any manner material to the franchise.

We or others from whom we derived our rights have filed all required affidavits of use with regard to the applications for trademark registration.

There are no currently effective material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, nor are there any pending infringement, opposition or cancellation proceedings or material litigation, involving the Marks.  We do not know of any infringing uses that could materially affect your use of the trademark.

The Franchise Agreement grants you the non-exclusive right to the Intellectual Property, subject to protection by applicable law, as expressly authorized by us. The Intellectual Property includes i) all software, including the data and information processed or stored thereby; ii) the Manuals and all other directives, policies or information we issue periodically; iii) all customer relationships and information; iv) the Marks; v) all Confidential Information and trade secrets, certain of the Course Materials; and vi) all other proprietary, copyrightable and/or trade secret information and materials developed, acquired, licensed or used by us in our operation of the System. Online Trading Academy may change or modify its Intellectual Property or commercial symbols and you must adopt, use, and display the new or modified commercial symbols.  You must use all names and marks in full compliance with the rules required by us.  You are prohibited from using any name or mark as part of any corporate name or with any prefix, suffix, or other modifying words, forms, designs or symbols (other than logos licensed by Online Trading Academy to you). In addition, you may not use any name or mark with the sale of any unauthorized product or service in any other manner not explicitly authorized in writing by Online Trading Academy.  You agree to immediately notify us of any apparent or actual infringement of, or of any challenge to your use of, the Intellectual Property.

If it becomes advisable at any time, for you to modify or discontinue the use of any of the Marks or use one or more additional or substitute trademarks or service marks, you will promptly comply (at your sole expense) with our directions to modify or otherwise discontinue the use of these Marks, or use one or more additional or substitute trademarks or service marks, including (but not limited to) replacement of all signage, etc.  We will not have any liability or obligation (whether of defense, indemnity, expense reimbursement or otherwise) to you, and you agree to make no claim, for, or with regard to, any modification, discontinuance or otherwise, and/or any dispute regarding the Marks and/or your and/or our rights in or to them.  We make no guaranty that a modification, discontinuance or otherwise may not be required, whether as a result of expiration, termination or limitation of our rights to the Marks or otherwise.

**Attachment ZZ**

EX 13
7445

You understand that there is always a possibility that there might be one or more businesses, similar to the business covered by the Franchise, operating in or near the area(s) where you may do business or otherwise, using a name and/or marks similar to ours and with superior rights to this name and/or marks as a result of prior use or otherwise.  We strongly urge you to research this possibility, using telephone directories, local filings and other means, before signing the Franchise Agreement, any other documents, expending or paying any sums or making any commitments and you understand that if you fail to do so, you're at risk.  (Franchise Agreement, Section 6.4)

## ITEM 14:     PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

Effective February 11, 2014, the United States Patent and Trademark Office has issued a patent registration number US 8,650,115 B1 to our parent company NEHI The patent is a process patent covering proprietary trading methodology.   The invention is based on a unique understanding of the forces of supply and demand and how they work in the financial markets and is named Computer Based Trading System and Methodology Utilizing Supply and Demand Analysis.

NEHI currently has three additional material patent applications that have been filed with the USPTO, and which are currently pending.

The first application was filed on April 8, 2015, accorded Application No. 14/681,171, and is entitled, "Computer Based Trading System and Methodology for Identifying Trading Opportunities."  The invention is directed to a system and method for predicting price movement of a financial instrument based upon a real time status of supply and demand and generating a trading signal in response to the prediction.

The second application was filed on June 28, 2016, accorded Application No. 15/196,001, and is entitled, "Computer Based Trading System and Methodology for Identifying Trading Opportunities Associated with Optionable Instruments."  The invention is directed to a system and method for obtaining option value determinations and corresponding trading strategies, based on a level of volatility for an underlying asset.

The third application was filed on February 28, 2018, and is entitled, "Collaborative Real Estate Investing System and Methodology."  The invention is directed to enhancing collaborations between potential parties to a transaction for real property by increasing a disclosure of information pertinent to the transaction.

We have registrations issued and applications pending registration on file with the Library of Congress for copyright protection for certain Manuals, Course Materials and Educational Products), which are material to the franchise.

We have completed and won an arbitration proceeding for an action originally filed on May 28, 2009 by Fernando Gonzalez alleging copyright infringement, breach of contract, fraud, and related causes of action. The two items subject to the claims are obsolete and no longer offered as part of our curricula. Please see Item 3 for further details.

We own all records with respect to the customers and other service professionals of, and/or related in any way to, your Online Trading Academy business, including, all databases (whether in print, electronic or other form), including all names, addresses, phone numbers, e-mail addresses, customer purchase records, etc., and may use, transfer, etc. these records in any way we wish, both before and after any termination, expiration, repurchase, transfer or otherwise.

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7446

We have the right to use any financial report or statement, or any information derived therefrom, relating to your Franchise for aggregate statistical purposes, such as in an earnings disclosure, without providing your name.  You further consent to our use and publication of income and expense information related to your Franchise via Intranet or other non-public media.  Any publication of income may identify your Center, however, publication of expense and net profit will be on an anonymous basis only or with your written consent.  You agree that; (i) any information that you provide to us in your reports or financial statements that includes any customer information collected or received electronically via the Internet or in any other format will be provided to us with the informed consent of the customer, and (ii) we will rely on this representation by you and will require you to indemnify us in this respect under the provisions of the Franchise Agreement.

You agree that we own and control all domain names and URLs ("Uniform Resource Locator") relating to any Online Trading Academy Franchised Businesses, as well as all information, lists and data related to past, present and future customers of your Online Trading Academy Franchised Business. Your only interest in any of this proprietary and/or Confidential Information (as defined in the Franchise Agreement) is the right to use it under the Franchise Agreement. In addition, your use of the Internet, World Wide Web, including but not limited to all social and commercial media sites and other electronic means of marketing and distribution of goods and/or services is restricted by us (as defined in the Franchise Agreement).

You agree to disclose to us all ideas, techniques, methods and processes relating to an Online Trading Academy Center which are conceived or developed by you and/or your employees.  We shall have the perpetual right to use, and to authorize others to use, such ideas, without payment to you.

You will cause each of your employees, agents, principals and Affiliates to sign a form of confidentiality agreement containing substantially the same provisions as described in Exhibit 8.1 of the Franchise Agreement and as may be approved by us. You will provide us copies of the same upon request. You will also cause each of your employees and contractors to complete the Compliance Program and attend all training at your request and at your expense, educational and testing requirements as described in the Franchise Agreement (section 7.4) and will manage all of your employees and contractors to ensure that you comply with all your ongoing requirements under the Franchise Agreement. You understand that no employee or contractor will be provided with any access to the System databases until the Compliance Program has been completed.

If your Online Trading Academy Center will be located and/or operated within, in conjunction with, or as part of another business, you will first arrange for the other business and its personnel (as specified by us) to enter into appropriate arrangements to protect our Intellectual Property and other interests, including (but not limited to) signing agreements with us regarding non-competition, confidentiality, non-solicitation of employees and customers and indemnity/insurance arrangements.

**ITEM 15:**     <u>**OBLIGATIONS OF THE FRANCHISEE TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS**</u>

Your Online Trading Academy Business must be personally managed on a full-time basis by a person who has successfully completed mandatory training and met then-current standards. You shall complete, to our satisfaction, our Initial Franchise Training Program ("IFTP") before the opening of the Franchised Business.  If you will not be acting as General Manager, you will at all times be required to employ or engage the services of at least one full-time General Manager who has successfully completed IFTP.  Each General Manager shall devote his or her full time to the management, operation and development of the Franchised Business. Your Center must remain open on a full time and continuous basis (as defined in the Manuals), except for excused closures outlined in the Franchise Agreement i.e., Acts of God. You shall file periodic sales activity reports in the form and frequency specified in the Manuals and the Franchise Agreement.

**Attachment ZZ**

EX 13
7447

You are responsible for the hiring and management of your Online Trading Academy Business employees, for the terms of their employment, for ensuring your and their compliance with all applicable employment laws and regulations.

All employees you hire or employ In the Franchised Business will be your employees and your employees alone, and will not, for any purpose, be deemed to be our employees or subject to our direct or indirect control, most particularly with respect to any mandated or other insurance coverage, taxes or contributions, or requirements regarding withholdings, levied or fixed by any governmental authority.  You will file your own tax, regulatory and payroll reports, and be responsible for all employee benefits and workers compensation insurance payments for your employees and operations. We will not have the power to hire or fire your employees. Our authority under the Franchise Agreement to train and approve your supervisorial or managerial personnel for qualification to perform certain functions at your Franchised Business does not directly or indirectly vest us with the power to hire, fire or control any of your personnel. You and you alone will be solely responsible for all hiring and employment decisions and functions relating to the Franchised Business, including those related to hiring, firing, training, establishing remuneration, compliance with wage and hour requirements, personnel policies, benefits, recordkeeping, supervision and discipline of employees, regardless of whether you have received advice from us on these subjects or not. Any guidance we may give you regarding employment policies should be considered merely examples. You will be responsible for establishing and implementing your own employment policies, and should do so in consultation with local legal counsel experienced in employment law

All personnel employed or engaged by you in the Franchised Business must be trained in accordance with our then current training and operations standards and shall maintain such standards of training competence and demeanor as shall be established by us. You must ensure that all personnel performing managerial or supervisory functions, all personnel receiving special training and instruction and all persons employed by you having access to any of our confidential information agree not to disclose and do not disclose any confidential information which may be revealed to them during the period of their employment or engagement and, upon our request, shall execute a confidentiality agreement in a form substantially similar to the form we provide.  We shall be deemed to be a third- party beneficiary under such confidentiality agreement. You must use only qualified instructors who have executed our then-current form of Instructor Agreement and Confidentiality Non-Solicitation and Assignment of Rights Agreement, and agreed to comply with our Compliance Program. You must take steps necessary to ensure that good customer relations are preserved and maintain training standards established by us.  You and your General Manager, other officers, directors, and shareholders shall agree to the non-competition and nondisclosure terms contained in the Franchise Agreement and shall sign a statement to that effect at our request (Section 8.3(g) of the Franchise Agreement).

We do not require that the General Manager hold an equity interest in the franchise. You will ensure that our administrative records for your Online Trading Academy Business employees are kept current and promptly advise us in writing of any changes including home addresses and telephone numbers of all personnel.

If you are a business entity, we may require that each of your owners personally guarantee the performance of your obligations under the Franchise Agreement.  (See Exhibit 1 to the Franchise Agreement.)

During the term of the Franchise Agreement and anywhere in the United States, you shall not have any interest in any financial and trade training business other than the Franchised Business.  You may not employ or try to employ any employee of ours, of a franchisor-related person/entity or of any other Online Trading Academy franchisee or any of our instructors, whether employed by us or independent contractors, without providing notice to the respective employer and obtaining their prior written consent.

During the term of the Franchise Agreement and continuing beyond the term, you and your employees will keep confidential all trade secrets licensed to you and/or your related companies, and will not use the Confidential Information (as defined in the Franchise Agreement and Exhibit 8.1) other than within the course and scope of your employment responsibilities and functions.

**Attachment ZZ**

You will not release or divulge any Confidential Information unless first expressly authorized to do so in writing by us; provided, however, that during the period of employment of any employees, you and they will be permitted to release or divulge the same, or any portion thereof, to persons employed or otherwise closely associated with you, but only to the extent that such persons have a need to know the same within the course and scope of their employment by, or close association with you (for example, attorneys and/or accountants retained by you).

Any and all publications/copies/disclosures of the Confidential Information in any form, which may be presented to you or your employees or to which you may be granted access, are on loan and will at all times remain, the exclusive property of you and us; the Confidential Information is being given to you and your employees in trust and confidence; and you will accept the same subject to such trust.

During the period of any employment, you and your employees will take all necessary steps to safeguard and maintain the secrecy and confidentiality of the Confidential Information in your possession or control, including (by way of illustration and not limitation) (i) securing the Confidential Information in locked or otherwise secured files; and (ii) refraining from making copies or reproductions of the Confidential Information, or any portions thereof, unless necessary for the carrying out of any employment responsibilities, or if first expressly authorized to do so by us.

Upon the termination of any employment, you will immediately cause your employees to return Confidential Information and all copies thereof which you or they may have generated or copied, as well as any physical property of yours, including books, tapes, equipment, and the like, whether proprietary or not, which they may have in their possession or control. You must immediately notify us of any terminations so that we may update our records and remove their access to Confidential Information and business systems.

For 2 years after the termination of the Franchise Agreement for any reason, you shall not have any interest in any financial or trading training business in the Territory or in any other Center's territory nor employ or try to employ any employee of ours, or interfere with any of existing business relations with our independent contractors and our trained and approved instructors  or those of a franchisor-related person/entity or of any other Online Trading Academy franchisee, without providing notice to the respective employer and obtaining their prior written consent.  For 12 months after termination you shall not accept or solicit any person, firm or company on our customer list at the time of termination, nor try to divert any these customers from any Online Trading Academy Center or Online Trading Academy enterprise of any kind (including any operations owned by any franchisor-related person/entity).

**ITEM 16:**     **RESTRICTION ON WHAT FRANCHISEE MAY SELL**

You must only offer services and products that Online Trading Academy designates for the Franchised Business. Required services include trading and financial education training related instruction to retail customers at the Center, or at the business location of customers. All instruction provided at the Center will be according to a published schedule of training which you will maintain on at least a rolling three month basis. You will provide only Online Trading Academy approved Course Materials and Educational Materials.  We may require that you do not provide certain products and/or services that we so designate periodically.  This means that you are required to offer just (but not all) products and services specified by us and will not offer any products and services which have not been approved by us.  We may change the types of designated products and/or services periodically and there are no limits on our right to do so.  You must promptly obtain all required licenses, permits or otherwise.

You will not engage in any other business or activity that may conflict with your obligations under the Franchise Agreement or reduce the Gross Volume of your Online Trading Academy Business. You do not have the right to use any other channels of distribution to make sales inside or outside your Territory (see Item 12).

**Attachment ZZ**

**ITEM 17:   RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION**

### THE FRANCHISE RELATIONSHIP

**This table lists certain important provisions of the Franchise Agreement and related agreements. You should read these provisions in the agreements attached to this disclosure document.**

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| a.  Length of the term of the franchise | 2.1 | 10 years.<br>Expiration date of the remaining term of the Franchise Agreement or 10 years for an acquisition of existing franchise. |
| b.  Renewal or extension of the term | 5.1 | Additional consecutive terms of 5 years each subject to Franchisor's qualifications. |
| c.  Requirements for franchisee to renew or extend | 5.2 | Give no less than 6 months and no more than 12 months' notice and upon renewing, sign a new Franchise Agreement, must be in Good Standing, maintain possession of and upgrade premises, comply with then-current requirements for new Online Trading Academy business, pay amounts owed, comply with then-current training and qualification, pay fee, and execute a release. The terms and conditions of the new Franchise Agreement may differ materially from the terms and conditions of your existing Franchise Agreement. (See footnote 1) |
| d. Termination by franchisee | 11.10 | You can terminate only as permitted by applicable law for a default by us. |
| e. Termination by franchisor without cause | Not Applicable | Not Applicable |
| f. Termination by franchisor with cause | 11 | Online Trading Academy can terminate if you default or engage in certain prohibited conduct. |
| g. "Cause" defined – curable defaults | 11 | 10 day cure - Failure to: maintain required insurance; correct dangerous condition; comply with dispute resolution provisions; timely submit reports; make payments.<br>30 day cure: default under lease; delinquency to taxing authorities, landlords, equipment lessors, suppliers; failure to comply with Franchise Agreement. |
| h. "Cause" defined – non-curable defaults | 11 | Failure to  complete site selection, development, opening and other requirements; bankruptcy; felony conviction or no contest plea to felony; any unauthorized assignments; abandonment of business; unauthorized use of confidential information or the Marks; loss |

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7450

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | of possession of premises without relocation; you make any misrepresentation to us; engage in any misconduct that unfavorably affects your reputation, your Online Trading Academy Center, us or the goodwill associated with the Marks; failure to maintain required records; failure to cooperate with audit or inspection; 5 or more material customer complaints with respect to your Online Trading Academy Business in any 6 month period, whether or not resolved. |
| i.  Franchisee's obligations on termination/nonrenewal | 11,12 | Pay all fees owing plus applicable continuing fees, discontinue use of Online Trading Academy marks, return or destroy materials, cancel or assign fictitious business names; remove signage; transfer phone numbers, directory listings and internet sites and addresses; comply with continuing obligations. |
| j. Assignment of contracts by franchisor | 9.1 | No restriction on our right to assign. |
| k. "Transfer" by franchisee - definition | 9.2 | Includes transfer of contract or assets or ownership change. |
| l.  Franchisor approval of transfer by franchisee | 9.2 | We have the right to approve all transfers except for certain transfers to owners, officers or employees and to corporations with the same ownership.  We will not unreasonably withhold approval. |
| m. Conditions for franchisor's approval of transfer | 3.3 and 9.2 | You are in compliance with Franchise Agreement and any other agreement with us, sign release and pay transfer fee. Transferee has personal interview with us at transferee's expense, completes training at transferee's expense, signs then-current agreement at our option, pays transfer/transition assistance fee. Franchisee must be current on all payments to Franchisor including unpaid Online Class Fulfillment Fees and the Center must conform to all of Franchisor's current Design Standards and specifications. |
| n.  Franchisor's right of first | 9.3 | We can match any offer for your business. |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| refusal to acquire franchisee's business | | |
| o.  Franchisor's option to purchase franchisee's business | 9.4 | We will have the right, but not the obligation, to repurchase your Franchise, your Franchised Business and/or the assets of your Franchised Business upon 90 days prior written notice to you at a price mutually agreed upon in advance. |
| p.  Death or disability of franchisee | 9.2(e) | The transferee is one or more of the decedent's spouse, parents, siblings, nieces, nephews, descendants or spouse's descendants, adequate provision is made for managing the business and any successor General Manager successfully completes the training program. |
| q.  Non-competition covenants during the term of the franchise | 8.13 | No involvement in competing business within Center Marketing Areas and E Marketing Areas. If you hire one of our employees or interfere with our business relationships, a penalty equal to $250,000 must be paid by you. |
| r.  Non-competition covenants after the franchise is terminated or expires | 8.13 | Can't compete within Territory or territory of any other franchised or affiliated Online Trading Academy Center or in E Market Areas for 2 years. |
| s.  Modification of the Agreement | 17 | Franchise Agreement cannot be modified except in writing signed by all parties or by our reduction of the scope of any of your obligations. |
| t. Integration or merger clauses | 17 | Only the terms of the Franchise Agreement and any exhibits control (subject to federal law).  Any representations or promises outside of the Disclosure Document and Franchise Agreement may not be enforceable (subject to state law). |
| u. Dispute resolution by arbitration or mediation | 13 | Except for a few types of claims, all disputes are resolved through face-to-face meeting, mediation, and/or binding arbitration at a neutral location in the county where our then-current headquarters is located; limited rights of appeal and pre-trial discovery; waiver of jury or court trial; limitation of types and periods to bring claims; mandatory notice of claims by you. |
| v.  Choice of forum | 13 | Mediation, arbitration at a neutral location in the county where our then-current headquarters is located.  Litigation in the U.S. District Court encompassing our headquarters. Please see the state-specific |

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7452

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | addenda to the Disclosure Document and Franchise Agreements in Exhibit E. |
| w. Choice of law | 13 | Laws of California apply, but Federal Arbitration Act preempts. Please see the state-specific addenda to the Disclosure Document and Franchise Agreement in Exhibit E. |

## ITEM 18:   PUBLIC FIGURES

We currently do not use any public figure to promote our franchises.

## ITEM 19:   FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

This Item sets forth certain historic financial performance representation about the franchise system's existing franchised outlets in the United States of America, which were owned by franchisees for the whole of the financial year ending December 31, 2017.

The Centers are located in cities throughout the USA. All operate a fully built out OTA training Center and all have been operated in the same location or in new premises very close to the original location for over 5 years. 9 Centers have expanded into new premises and two Centers have satellites premises. 5 Centers are operated by their original owners, 8 Centers have second owners, 5 Centers have third owners and two Centers have had 4 owners.

2 Centers have been operated for 6-7 years
3 Centers have been operated for 7-8 years
4 Centers have been operated for 8-9 years
4 Centers have been operated for 9-10 years
8 Centers have been operated for 10-11 years

The representation relates to past performance of the 21 franchised OTA Centers during the financial year commencing January 1, 2017 and ending December 31, 2017.

The total number of outlets that existed in the United States of America in the relevant period is 27. The additional 6 were owned and operated by the Franchisor or NEHI, for the whole or part of the fiscal year 2017 and are not included in this financial performance representation.

All 21 franchised Centers that were owned and operated by franchisees during the whole of the fiscal year 2017 are included in the representations below.

"Sales", as used in this Item, includes all sums agreed to be paid in cash or by financing at the date of sale less any cancellations post sale.

**Attachment ZZ**

EX 13
7453

76.2% of Centers had Sales of $2,000,000 or more
71.4% of Centers had Sales of $3,000,000 or more
61.9% of Centers had Sales of $4,000,000 or more
42.9% of Centers had Sales of $5,000,000 or more
28.6% of Centers had Sales of $6,000,000 or more



Average Sales per Center = $4,848,263.

Those 5 Centers in the top quartile had average Sales of $8,404,828
Those 5 Centers in the third quartile had average Sales of $5,531,690
Those 5 Centers in the second quartile had average Sales of $4,048,271
Those 6 Centers in the first quartile had average Sales of $1,981,596



These Centers are mature Centers and have developed beyond the original model. One Center has 4 Classrooms, 14 have 3 classrooms whereas a startup Center is required to have a minimum of 2 classrooms.

A new franchisee's individual financial results may differ from the result stated in this financial performance representation. Some Centers have sold this amount. Your individual results may differ. There is no assurance you will sell as much. Written substantiation for the financial performance representation will be made available to the prospective franchisee upon reasonable request.

Other than the preceding financial performance representation, OTA does not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections for your future income, you should report it to the franchisor's management by contacting Eyal Shahar, 17780 Fitch, Suite 200, Irvine, California 92614 (949) 475-5652, the Federal Trade Commission and the appropriate state regulatory agency.

ITEM 20:    **OUTLETS AND FRANCHISEE INFORMATION**

**TABLE NO. 1**
**SYSTEMWIDE OUTLET SUMMARY**
**FOR YEARS 2015 to 2017***

| OUTLET TYPE | YEAR | OUTLETS AT THE START OF THE YEAR | OUTLETS AT THE END OF THE YEAR | NET CHANGE* (+ or -) |
|---|---|---|---|---|
| **Franchised** | | | | |
| | **2015** | **24** | **24** | **0** |
| | **2016** | **24** | **27** | **+3** |
| | **2017** | **27** | **31** | **+4** |
| **Company Owned** | | | | |
| | **2015** | **11** | **13** | **+2** |
| | **2016** | **13** | **12** | **-1** |
| | **2017** | **12** | **10** | **-2** |
| **Total Outlets** | | | | |
| | **2015** | **35** | **37** | **+2** |
| | **2016** | **37** | **39** | **+2** |
| | **2017** | **39** | **41** | **+2** |

**\* Figures are as of December 31, 2017. Our Fiscal Year 201 ends December 31.**
.
\*\*As of December 31, 2017, we operated 10 Online Trading Academy Centers in Westwood Los Angeles, California,  Woodland Hills Los Angeles, California, Sacramento, California,  Long Island, New York, New York City, New York, Boston, Massachusetts, Cincinnati Ohio, Austin Texas, Vancouver Canada and London, England. The current Center located in Irvine, California is owned and operated by our Affiliate, NEHI This Center is not included in this table.
Of these ten Company Owned locations, the three located in Austin Texas, Cincinnati Ohio and Sacramento, California, are Satellite Centers.
In October 2017 we sold the Toronto Center to an incoming franchisee.
In December 2017  we sold the San Diego Center to an incoming franchisee.
During 2017 our Franchisee in India opened two additional satellite Centers in Bengaluru and Ahmedabad

**Attachment ZZ**

EX 13
7456

**TABLE NO. 2**
**TRANSFER OF OUTLETS FROM FRANCHISEES TO NEW OWNERS (OTHER THAN FRANCHISOR or AN AFFILIATE)**
**FOR YEARS 2015 to 2017***

| STATE | YEAR | NUMBER OF TRANSFERS** |
|---|---|---|
| Dallas Texas | 2015 | 1 |
| Orlando and Tampa Florida | 2016 | 2 |
| Toronto and San Diego | 2017 | 2 |
|  |  |  |
| Total Outlets |  |  |
|  | 2015 | 1 |
|  | 2016 | 2 |
|  | 2017 | 2 |

*Figures are as of December 31, 2076 Our Fiscal Year 2017ends December 31.
The information relating to the transferees is in the Franchisee lists attached to this Disclosure Document as Exhibit G.
** In October 2017, the Toronto company owned location was transferred to a new franchisee and in December 2017 the San Diego company owned location was transferred to a new franchisee.

**TABLE NO. 3**
**STATUS OF FRANCHISED OUTLETS**
**FOR YEARS 2015 to 2017***

| STATE | YEAR | OUTLETS AT START OF YEAR | OUTLETS OPENED | TERMINATIONS | NON-RENEWALS | REACQUIRED BY FRANCHISOR | CEASED OPERATIONS-OTHER REASONS | OUTLETS AT END OF THE YEAR |
|---|---|---|---|---|---|---|---|---|
| Arizona | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| California | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| * | 2017 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Canada | | | | | | | | |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ** | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Colorado | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Connecticut | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Florida | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| | 2017 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| Georgia | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

OTA Franchise Corporation  FTC  Disclosure Document
March 30, 2018

51

**Attachment ZZ**

| STATE | YEAR | OUTLETS AT START OF YEAR | OUTLETS OPENED | TERMINATIONS | NON-RENEWALS | REACQUIRED BY FRANCHISOR | CEASED OPERATIONS-OTHER REASONS | OUTLETS AT END OF THE YEAR |
|---|---|---|---|---|---|---|---|---|
| **Illinois** | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| **India** | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| *** | 2017 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| **Indonesia** | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Kansas** | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Maryland** | | | | | | | | |
| | 2014 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Massachusetts** | | | | | | | | |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Michigan** | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

**Attachment ZZ**

OTA Franchise Corporation  FTC  Disclosure Document
March 30, 2018

EX 13
7459

| STATE | YEAR | OUTLETS AT START OF YEAR | OUTLETS OPENED | TERMIN-ATIONS | NON-RENEWALS | REACQUIRED BY FRANCHISOR | CEASED OPERATIONS OTHER REASONS | OUTLETS AT END OF THE YEAR |
|---|---|---|---|---|---|---|---|---|
| Minnesota | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| New Jersey | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| New York | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina | | | | | | | | |
| | 2015 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2017 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Pennsylvania | | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Singapore | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Texas | 2015 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2017 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |

OTA Franchise Corporation  FTC  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7460

| STATE | YEAR | OUTLETS AT START OF YEAR | OUTLETS OPENED | TERMIN-ATIONS | NON-RENEWALS | REACQUIRED BY FRANCHISOR | CEASED OPERATIONS OTHER REASONS | OUTLETS AT END OF THE YEAR |
|---|---|---|---|---|---|---|---|---|
| United Arab Emirates | 2015 | 1 | | | | | | 1 |
| | 2016 | 1 | | | | | | 1 |
| | 2017 | 1 | | | | | | 1 |
| United Kingdom | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington DC | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Washington | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Wisconsin | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Total Outlets | 2015 | 24 | 0 | 0 | 0 | 0 | 0 | 24 |
| | 2016 | 24 | 3 | 0 | 0 | 0 | 0 | 27 |
| | 2017 | 27 | 4 | 0 | 0 | 0 | 0 | 31 |

\* The San Diego, CA Company owned Center was transferred to an incoming Franchisee in December 2017.

\*\* The Toronto, Canada Company owned Center was transferred to an incoming Franchisee in October 2017.

\*\*\* The Franchisee in India opened two new satellite Centers in Bengaluru and Ahmedabad in 2017.

As at the date of this Franchise Disclosure Document the Vancouver, Canada company owned Center was transferred to an incoming franchisee in February 2018 and the Austin Texas Center was transferred to an incoming franchisee effective April 2018. Figures are as of December 31, 2017. Our Fiscal Year ends December 31.

**Attachment ZZ**

55

OTA Franchise Corporation Franchise Disclosure Document
March 30, 2018

EX 13
7462

**TABLE NO. 4**
**STATUS OF COMPANY OWNED OUTLETS**
**FOR YEARS 2015 to 2017***

| STATE | YEAR | OUTLETS AT START OF YEAR | OUTLETS OPENED | OUTLETS REACQUIRED FROM FRANCHISEE | OUTLETS CLOSED | OUTLETS SOLD TO FRANCHISEES | OUTLETS AT END OF THE YEAR |
|---|---|---|---|---|---|---|---|
| California | | | | | | | |
| | 2015 | 2 | 1 | 0 | 0 | 0 | 3 |
| | 2016 | 3 | 1 | 0 | 0 | 0 | 4 |
| * | 2017 | 4 | 0 | 0 | 0 | 1 | 3 |
| Florida | | | | | | | |
| | 2015 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 0 | 0 | 0 | 2 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | | | | | | | |
| | 2015 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 1 |
| New York | | | | | | | |
| | 2015 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2017 | 2 | 0 | 0 | 0 | 0 | 2 |
| Ohio | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 1 |
| Texas | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 1 | 0 |
| United Kingdom | | | | | | | |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2017 | 1 | 0 | 0 | 0 | 0 | 1 |
| Canada | | | | | | | |
| | 2015 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2016 | 2 | 0 | 0 | 0 | 0 | 2 |
| ** | 2017 | 2 | 0 | 0 | 0 | 1 | 1 |
| Total Outlets | | | | | | | |
| | 2015 | 11 | 0 | 0 | 0 | 0 | 13 |
| | 2016 | 13 | 1 | 0 | 0 | 2 | 12 |
| | 2017 | 12 | 0 | 0 | 0 | 2 | 10 |

Figures are as of December 31, 2017. Our Fiscal Year 2017 ends December 31.

* The San Diego, CA Company owned Center was transferred to an incoming Franchisee in December 2017.

** The Toronto, Canada Company owned Center was transferred to an incoming Franchisee in October 2017.

As at the date of this Franchise Disclosure Document the Vancouver, Canada company owned Center was transferred to an incoming franchisee in February 2018 and the Austin Texas Center was transferred to an incoming franchisee effective April 2018.

**Attachment ZZ**

**TABLE NO. 5**
**PROJECTED OPENINGS AS OF DECEMBER 31, 2017**

| STATE | FRANCHISE AGREEMENTS SIGNED BUT OUTLET NOT OPENED | PROJECTED NEW FRANCHISED OUTLETS IN THE NEXT FISCAL YEAR | PROJECTED NEW COMPANY OWNED OUTLETS IN THE NEXT FISCAL YEAR |
|---|---|---|---|
| Hong Kong | 1 | 0 | 0 |
| India | 0 | 4 | 0 |
| Total Outlets | 0 | 0 | 0 |

*This franchisee has signed Franchise Agreements, but have not opened their Online Trading Academy Centers as of the date of this disclosure document.   Current information for these franchisees is included in Exhibit G.

Our Franchisee in India is anticipating opening 4 new satellite Centers in 2018.

In March 2018 a new franchise executed a new franchise agreement and plans to open a new Center in Nashville in 2018.

During the last 3 years, in some instances, current and former franchises sign provisions restricting their ability to speak openly about their experience with Online Trading Academy.  You may wish to speak with current and former franchisees, but be aware that not all such franchises will be able to communicate with you.

Exhibit G1 lists the names of all current franchises and the addresses and telephone numbers of their outlets as of December 31, 2017.  Two franchisees were terminated, or did not renew in the fiscal year ending December 31, 2017. The list of franchisees whose franchises were re-acquired or transferred are set out in Exhibit G2.  There are no franchisees who have otherwise ceased to do business or who have not communicated with us within 10 weeks of the issuance date of this Disclosure Document.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

There are no independent franchisee organizations that have asked to be included in this Disclosure Document.


**ITEM 21:    FINANCIAL STATEMENTS**

Exhibit B contains our audited financial statements as of December 31, 2015, December 31, 2016 and December 31, 2017.  Our fiscal year end is December 31.

**ITEM 22:    CONTRACTS**

A.    Franchise Agreement
D.    ACH Debit Authorization
G.    Statement of Prospective Franchisee
I.     GMS Participation Agreement
J.     Receipt

**ITEM 23:**   <u>**RECEIPT**</u>

      Two copies of an acknowledgment of your receipt of this Disclosure Document appear as Exhibit I.  Please sign and date one copy and return it to us.  Retain the other copy for your records.  You should also complete and return the Statement of Prospective Franchisee (Exhibit F) to us before you sign any Franchise Agreement or pay any sums.

**EXHIBIT A TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**FRANCHISE AGREEMENT**

**OTA FRANCHISE CORPORATION**

**FRANCHISE AGREEMENT**

**DISCLOSURE DOCUMENT**

---

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS | 3 |
| 2. | AWARD OF FRANCHISE | 6 |
| 3. | DEVELOPMENT AND OPENING OF YOUR ONLINE TRADING ACADEMY CENTER | 9 |
| 4. | PAYMENTS BY FRANCHISEE | 11 |
| 5. | RENEWAL RIGHTS | 14 |
| 6. | INTELLECTUAL PROPERTY | 16 |
| 7. | INSTRUCTION AND OPERATING ASSISTANCE | 17 |
| 8. | OPERATION OF BUSINESS | 18 |
| 9. | ASSIGNMENT, TRANSFER AND REPURCHASE | 26 |
| 10. | MARKETING AND ADVERTISING | 30 |
| 11. | TERMINATION OF FRANCHISE | 34 |
| 12. | RIGHTS AND OBLIGATIONS ON TRANSFER, REPURCHASE, TERMINATION, ETC. | 38 |
| 13. | DISPUTE AVOIDANCE AND RESOLUTION | 40 |
| 14. | NOTICES AND PAYMENTS | 46 |
| 15. | ACKNOWLEDGMENTS AND REPRESENTATIONS, ENTIRE AGREEMENT, ETC. | 46 |
| 16. | GENERAL CONDITIONS AND PROVISIONS | 48 |
| 17. | CONSTRUCTION OF AGREEMENT | 49 |
| 18. | SUBMISSION OF AGREEMENT | 49 |

**Attachment ZZ**

**EXHIBITS**

| | |
|---|---|
| **EXHIBIT 1** | **OWNER'S GUARANTY AND ASSUMPTION OF BUSINESS ENTITY FRANCHISEE'S OBLIGATIONS** |
| **EXHIBIT 1.2** | **CURRENT FORM OF RELEASING LANGUAGE** |
| **EXHIBIT 2.2** | **TERRITORY** |
| **EXHIBIT 3.2** | **COLLATERAL ASSIGNMENT OF LEASE** |
| **EXHIBIT 3.3** | **ADA AND RELATED CERTIFICATIONS** |
| **EXHIBIT 8.1** | **EMPLOYEE CONFIDENTIALITY, ETC. AGREEMENT** |
| **EXHIBIT 10.4** | **EXECUTIVE ORDER 13224 AND RELATED CERTIFICATIONS** |

**Online Trading Academy ®**
**Summary Page To Franchise Agreement**

FRANCHISE TERM: 10 years from Effective Date.

EFFECTIVE DATE:   _____

EXPIRATION DATE:   _____

*FRANCHISEE:*

*BUSINESS TYPE:*   corporation    limited liability company       partnership       proprietorship

*ADDRESS:*

_____
CITY                              STATE                          ZIP                            COUNTY

_____                    _____
AREA CODE – TELEPHONE                          AREA CODE - FACSIMILE

FRANCHISED ADDRESS:

_____
CITY                    STATE                    ZIP                    COUNTY

_____                    _____
AREA CODE – TELEPHONE                          AREA CODE – FACSIMILE

**INITIAL FEES:  Single Center Franchise Fee:  starts at $100,000 and increases based on additional population and other demographic and economic factors of the territory.**

**The Initial Franchise Fee for this Agreement is $N/A**_____
**OTHER CONTINUING FEES\*:**

Royalty Fee: Greater of 10% of Gross Volume or $3,000 minimum per month, minimum increasing to $4,000 on the 1st anniversary of opening, $5,000 on 2nd anniversary and to $6,000 on the 3rd anniversary, and thereafter. If this is a Renewal Franchise, or on a purchase of an existing Franchised Business, the minimum royalty will be $6,000 per month.

Marketing and Advertising Fee:  Greater of 3% of Gross Volume or $1,000 minimum per month.

*\*Please refer to our Franchise Disclosure Document for a full description of all fees.*

**Attachment ZZ**

EX 13
7469

**Online Trading Academy ®**
**Franchise Agreement**

THIS FRANCHISE AGREEMENT (this "Agreement") is made and entered into on this _____ day of _____ 201_ (the "Effective Date") by and between **OTA FRANCHISE CORPORATION,** a Nevada Corporation, (hereinafter referred to as "we", "us", "our" "OTA" or "Franchisor") and the person(s) signing this Agreement as the Franchisee(s), hereinafter referred to as the ("you", "your" or "Franchisee"). The purpose of this Agreement is to set forth the terms and conditions of the business relationship between Franchisor and the Franchisee.

To simplify this Agreement and make it easier to read and understand, we have defined certain terms used in this Agreement in Article 1. When you see a capitalized word, or if you don't understand the meaning of a particular reference, look at Section 1 to see whether the term has been defined. Capitalized words that are not defined in Section 1 are defined in the section where they first appear.

You're asked to initial certain items in this Agreement to indicate that they've been discussed and read, understood and agreed to by you. Initialing those areas doesn't lessen the importance or enforceability of other provisions. Please initial at all points indicated.

**RECITALS:**

**WHEREAS,** we and our Affiliates have expended time money and effort to develop a "System" under certain Intellectual Property operated in accordance with the provisions of this Agreement and our Manuals, all of which we may improve or modify in our Business Judgment; and,

**WHEREAS**, we identify our Products and Services with certain Intellectual Property, including, but not limited to the trademark, Online Trading Academy® for use in connection with the System; and,

**WHEREAS,** our Affiliate, Newport Exchange Holdings, Inc., a California corporation, has granted to OTA the unlimited, exclusive, royalty-free right and license to license others to use the System and the Intellectual Property in connection with its award of Franchises; and,

**WHEREAS,** we are engaged in the business of licensing independent trading and financial education and training centers which utilize our unique System and Intellectual Property offering our clients efficient and cost-effective trading and financial education solutions. Our activities in general, and the trading and financial education and training programs we franchise in particular, are undertaken to develop, maintain and enhance Brand awareness, the value of the Intellectual Property and build our reputation for total service throughout the United States and in other countries; and,

**WHEREAS,** you desire that we award you a franchise to use the System and the Intellectual Property in connection with the Franchised Business pursuant to and in the manner described in this Agreement and in strict compliance with our Manuals; and,

**WHEREAS,** you desire to become part of our team of franchisees, understanding that, as an Online Trading Academy franchisee, it is critical that you operate your Franchised Business in strict compliance with our System Standards and fulfill your obligations under this Agreement as they may change from time to time, and without this commitment from you, we would not enter into this Agreement with you; and,

**WHEREAS,** in consideration of the promises, undertakings and commitments of each party to the other set forth herein, we have agreed to award you a franchise pursuant to the terms and conditions of this Agreement.

**NOW, THEREFORE**, based upon the foregoing and the mutual and dependent promises contained herein and for good and valuable consideration, the parties hereby agree as follows:

**Attachment ZZ**

EX 13
7470

1.   **DEFINITIONS**

The following terms shall have the following meanings when they appear capitalized in this Agreement.

**Abandoned**. The term "Abandoned" shall mean closure of the "Center" (as defined in this Article I) for a period of ten consecutive business days without our prior written consent. A repeated pattern of closures of any Center for periods of more than three consecutive business days may result in the Center being deemed Abandoned, if in our reasonable judgment such closure adversely impacts the Franchised Business. The Center shall not be deemed Abandoned if the closure is due to acts of God or other matters beyond your control (other than your inability to procure money), provided that (i) you give notice of any such closure to us within ten days after the initial occurrence of the event resulting in the closure, (ii) we acknowledge in writing that the closure is due to one of the foregoing causes and (iii) you reestablish the Franchised Business and it is fully operational in another approved Center in an approved location within 60 days or such longer period as we may permit after the initial occurrence of the event which resulted in the closure.

**Affiliate.** Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party. For purposes of this definition of "Affiliate," the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

**Brand.** The Online Trading Academy® brand, , the XLT brand the Mastermind brand,  the MyOTA brand and any future brands we acquire or develop for use within the System as applied to various goods and/or services as authorized by us from time to time.

**Business Entity.** Includes a corporation, partnership, joint venture, limited liability company, limited partnership, or other form of business recognized in any jurisdiction.  If you are a Business Entity, then we may require each of your owners to guaranty your performance.  Our current form of Owners Guaranty is attached as Exhibit 1 of this Franchise Agreement.

**Business Judgment.**  Means that we may exercise our judgment however we consider appropriate in our sole and absolute discretion, without any limitation.  You and we agree that when in this Agreement we describe instances in which we may exercise Business Judgment, we must and do have the unrestricted right to make decisions and/or take (or refrain from taking) actions.  We have this right even if a particular decision/action may have negative consequences for you, a particular franchisee or group of franchisees.  This is a defined term for the purposes of this Agreement and is not intended to incorporate principles related to the application of the business judgment rule in a corporate law context.  Please refer to Section 13.8 of this Agreement for further explanation and our philosophy regarding implementation of this concept.

**Premises, Center or Online Trading Academy Center**. The term "Premises" shall mean the physical facility in which you conduct the Franchised Business. Franchisee also may conduct the Franchised Business at the customer's place of business or other locations within the Territory.

**Confidential Information.**  Includes all information (current and future) relating to the operation of an Online Trading Academy Center or the System, including, among other things, all: i) Manuals, training, techniques, processes, policies, procedures, systems, data and know how regarding the development, marketing, operation and franchising of Online Trading Academy  Centers; ii) designs, specifications and information about Products and Services, iii) all information regarding customers and suppliers, customer, supplier and product lists, technical processes and know how, specifications, manuals, notes, reports, memoranda, data, equipment and/or secured areas (in written, audio, magnetic and/or electronic format), including any statistical and/or financial information and all lists, together with various designs, techniques, know-how, marketing concepts and information, operating procedures and technical information and ancillary products, services and techniques and other related applications which are not generally known in the industry or to the public, and, in addition, iv) any other items that an arbitrator or court deems

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

reasonably appropriate for protection. Confidential Information is _not_ intended to include any information that: is or subsequently becomes publicly available (other than by breach of any legal obligation), or became known to you other than through a breach of a legal obligation.

**Control**. The term "Control" shall mean the possession of the direct or indirect power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Course Materials**. The term "Course Materials" shall refer to (i) all items approved by us for use by the Online Trading Academy student, including course manuals, examples, sample data disk, CD-ROMs, DVDs, MP3 and MP4 files, USBs and downloadable electronic files, live and recorded online classes, command templates, etc. and (ii) any materials or technology related to financial and trading instruction including multi-media as approved by us from time to time.

**Educational Products**.  The term "Educational Products" shall include all products of any kind including CDs, books, DVDs, MP3 MP4 files, USBs and/or downloadable electronic files which are currently for sale or that become available for sale by you during the Term of this Agreement, where you shall be an authorized reseller to the end user as designated or approved by us from time to time.

**Equity Holder**. The term "Equity Holder" shall mean a person owning shares of common voting stock or other ownership interest coupled with voting rights in the Franchise.

**Franchise.**  The right or license to operate a single Online Trading Academy Center and offer related Products and Services in the Territory under the terms of this Agreement.

**Franchised Business**. The business operations conducted by, at or in connection with your Online Trading Academy Center within the Territory or outside the Territory if our prior written approval is given.

**Franchisor-Related Persons/Entities.** Online Trading Academy, the Marketing Fund, the Franchise Advisory Council and each and all of the following, whether past, current and/or future: each and all company(ies) and/or person(s) acting through, in concert with us and/or any of the foregoing, and/or as Affiliates of ours and/or of any of the foregoing; each and all of the partners, shareholders, officers, directors, agents, attorneys, accountants, - and/or any of the foregoing; and each and all of the predecessors, successors and/or assigns of us and/or any of the foregoing

**General Manager**. The term "General Manager" shall mean the employee or agent of yours, if any, who has been designated by you as the person responsible for the day-to-day operation of the Franchised Business and who has satisfactorily completed our Initial Franchisee Training Program.

**General Release**. The term "General Release" shall mean a form of release agreement that will include the Franchisor's then current releasing language. The releasing language current as of the date of this agreement is attached hereto as Exhibit 1.2

**Good Standing.** You are in "Good Standing" if you (and each of your owners and Affiliates) are not in default of any obligation to us and/or any of the Franchisor-Related Persons/Entities, whether arising under this Agreement or any other agreement between you (and each of your owners and Affiliates) and us (and/or any of the Franchisor-Related Persons/Entities), the Manuals or other System requirements (collectively, the "Obligations"); provided that you are not in Good Standing if you have been in default of any Obligations and such defaults are incurable by nature and/or part of a series of repeated defaults as defined in this Agreement

**Gross Volume**. Gross Volume includes all charges and/or revenues which are, or could be, received or earned by you (and/or any Affiliate) in accordance with OTA's revenue recognition policies as set out in the Manuals:

      A.     by, at or in connection with your Online Trading Academy Center;
      B.     relating to the kinds of goods or services available now or in the future through a OTA Center and/or distributed in association with the Marks or the OTA System, including deposits at the time

paid and not upon fulfillment;

       C.     relating to the operation of any Similar Business;

       D.     with respect to, any tenants and/or subtenants of yours on the Premises (including rent and other lease payments);

       E.     with respect to any co-branding activities; and/or

       F.     with respect to any advertising or other revenues of any kind received from third parties including the Franchisor-Related Parties and Entities.

Client contract sales which comply with OTA's then current approved payment terms shall be included in Gross Volumes on a cash basis and all other sales and/or billings, whether collected or not, will be included in Gross Volume in full when a sales agreement has been executed, with no deduction for credit card or other charges.  Gross Volume does not include sales tax collected and paid when due to the appropriate taxing authority and actual customer refunds, adjustments and credits.

**Immediate Family**. The parents, spouse, children, and siblings of the individual executing this Agreement on behalf of the Franchisee.

**Inflation Adjustments.** Amounts specified as being subject to Inflation Adjustment may be adjusted by us annually in our Business Judgment in proportion to the changes in the Consumer Price Index (U.S. Average, all items) maintained by the U.S. Department of Labor (or any successor index) as compared to the previous year.  We will notify you of any such percentage adjustment.

**Initial Franchisee Training Program**. The term "Initial Franchisee Training Program" shall mean training in the System provided by us to you and the General Manager, if any, and other responsible management personnel designated by you, as provided in Article VII of this Agreement.

**Intellectual Property.** Includes, regardless of the form or medium involved, i) all software, including the data and information processed or stored thereby; ii) the Manuals and all other directives, policies or information we issue from time to time; iii) all customer relationships and information; iv) the Marks; v) all Confidential Information and trade secrets; vi) the Course Materials; and vii) all other proprietary, copyrightable and/or trade secret information and materials including patented and patentable processes, developed, acquired, licensed or used by us in our operation of the System.

**Manuals.**  Specifications, standards, policies and procedures, confidential processes, procedures, tools, resources, information, financial forms and documents prescribed by us and provided to you in any media (including electronic) and which are to be followed in the operation of your Online Trading Academy Center and for use of our Marks and Brands as they may be changed or eliminated by us in our Business Judgment, including but not limited to the Operations Manual, Sales Manual, Marketing Manual and Compliance Manual. Access to the Manuals will be provided via internal and external websites and direct emails. Access to the Manual and the downloadable materials as updated from time to time is available to you on loan during the term of this Agreement.

**Marks.** The trademarks, service marks and other commercial symbols now and/or in the future owned by (or licensed to) us to identify the services and/or products offered by Online Trading Academy Centers, including (but not limited to) Online Trading Academy®, onlinetradingacademy.com®, OTA, the Trade Dress and other logos, slogans and identifiers designated by us from time to time.

**Online Class Fulfillment Fees.**

We offer all qualifying customers the opportunity to receive online training via the internet by participating in online classes. Online classes include our XLT courses, certain specialty courses, and any and all of the classes that are also available as classroom courses including recorded classes in full or any portion of those classes. When customers purchase online courses from a Center the Franchisee will pay OTA an Online Class Fulfillment Fee for the delivery of the online class to its customer. The Online Class Fulfillment Fee payable to Us for each online class are currently charged on a flat fee per student per class basis and are subject to change on thirty days notice by OTA or its Affiliates at any time. Payment of the Online Class

Fulfillment Fees by Franchisee must be made to Us through Our online store immediately upon the sale of the online courses, or shall be paid as described in Section 4.14.

**Post Termination Provisions.** Those promises contained in this Agreement that survive its expiration, Transfer, Repurchase, or Termination for any reason, including without limitation the confidentiality, non-competition, indemnification, and dispute resolution and other provisions contained in Sections 8.12, 8.13 and Articles 13, 15 and 16.

**Products and Services.** All products and services authorized by us for you to sell and offer for sale in the Franchised Business including but not limited to Educational Products, classroom training and Online Classes and the delivery of financial educational products and services through any existing physical and online medium including Mastermind and including social media and any future delivery systems.

**Similar Business.**  Any enterprise that offers, is otherwise involved in, or deals with any goods, products and/or services, which are substantially similar to those goods, Products and/or Services now or in the future authorized by us to be offered at or from Online Trading Academy Centers or otherwise (including any such enterprise and/or entity awarding franchises or licenses to operate or be involved with any such business).  Our receipt of any royalties with respect to any Similar Business is not an approval of your involvement with any Similar Business.

**Special Account.** Classes of special customers (which may include national accounts, other large businesses, government agencies, Affiliates and/or otherwise) as designated by us from time.

**System**. The distinctive format and method of doing business developed and used for the operation of an Online Trading Academy Franchised Business, and subject to change by us in our Business Judgment.

**Terminate or Termination.**   "Terminate" or "Termination" when used in this Agreement means the Termination or cancellation of your rights and our obligations under this Agreement for any reason before the initial term expires.  All of our rights are not cancelled on Termination since you have certain obligations that survive the ending of the Agreement in any manner, such as, but not limited to certain promises regarding non-competition, confidentiality and indemnity.  Both of us are bound by the dispute resolution provisions (Article 13) of this Agreement, even after the Agreement is ended for any reason.

**Territory**. The term "Territory" shall mean those designated zip codes or counties defined in Exhibit A attached hereto, your rights in respect of which are set forth in section 2.2 hereof.

**Trade Dress.**  The Online Trading Academy Center design and image authorized by us and subject to change by us at any time and in our Business Judgment.

**Traditional Online Trading Academy Center.**  A "Traditional Online Trading Academy Center" means a full, standard size, "brick and mortar" retail facility located in a free-standing building or other commercial center accessible to the general public within the Territory and using the Intellectual Property and System.

**Transfer**. The term "Transfer" shall mean to sell, assign, transfer, convey, pledge, mortgage, encumber, abandon, eliminate or give away, voluntarily or involuntarily, by operation of law or otherwise.


2.      **AWARD OF FRANCHISE.**

        2.1      **Award of Franchise; Term, Your Basic Commitment.**


        A.      We are pleased to award you a franchise to operate a single Traditional Online Trading Academy Center at a single location in the Territory approved by us, and to use the Marks and the Online Trading Academy System in the operation of that Traditional Online Trading Academy Center.  You must open this Center and maintain it as your principal location for your Franchised Business while this Agreement is in effect.  In addition to this Center, you will have the right to use the System and the Intellectual Property at alternative sites within the Territory as appropriate, for example; to accommodate

large class size or to conduct training at complimentary locations such as universities or hotels for approved classes or computer centers in your Territory. Any use of the System or Intellectual Property outside the Territory without our prior written consent is prohibited. The Franchise awarded to you by this Agreement is to operate an Online Trading Academy Franchised Business and to use the Intellectual Property and the System only for purposes of conducting a business in accordance with this Agreement, the Manuals and other communications from us.

B.      If this Agreement is awarded in connection with a new franchise, the franchise is awarded for a term of ten (10) years, commencing on the date of this Agreement; but if the lease or sublease for the Premises is terminated or expires before the end of such franchise term (and no substitute location has been consented to by us in writing and occupied by you before the termination/expiration of such lease/sublease), we may Terminate this Agreement as of the termination/expiration of such lease/sublease.

C.      If this Agreement is awarded in connection with your acquisition of an existing Online Trading Academy franchise, then the term of this Agreement will, at our option, either:

1)      end on the expiration date of the franchise agreement granted to the party from whom you acquired the franchise; or

2)      be for the term provided in Section 2.1 (B);

in each case subject to earlier termination upon termination/expiration of the relevant lease/sublease as described in Section 2.1 (B), above. The applicable Expiration Date is noted on the first page of this Agreement.

D.      If this Agreement is awarded in connection with the grant of a renewal franchise, then the term of this Agreement will be governed by the renewal provisions of the franchise agreement under which you operated during the initial term (which is now expired).

**2.2     Territory.**

A.      When we make the original award of the Franchise, we will designate a Territory described by zip codes as reported by an independent zip code directory service and designated marketing areas ("DMAs") is derived from the then current Neilsen Media Markets report or other future source that may become available. The Territory may be increased by the addition of one or more immediately adjacent zip code areas or DMAs with incremental price changes based on population and DMA ranking. We cannot and do not make any guarantees as to the exact number of individuals within the Territory at the outset nor that the Territory will maintain this population or DMA ranking during subsequent years.

Subject to any other rights and obligations set forth in this Agreement, you will have the following rights to operate within your Territory (collectively the "Territorial Rights"):

1)  to open a Traditional Online Trading Academy Center within your Territory as your principal Franchised Business location;
2)  to conduct your Franchised Business at alternative sites in your Territory, for example; to accommodate large classes or to conduct trainings or seminars at complimentary locations in your Territory (subject in each instance to our prior written approval);
3)  to sell all approved Products and Services, subject to the revenue splits or delivery fees as set forth in our Manuals and as we may modify from time to time;
4)  to fulfill classes to customers including "Retake Customers" (as defined in the Manuals) referred to your Center and to have classes for Customers that you refer to other Online Trading Academy franchisees fulfilled in accordance with the Manuals;
5)  the right to sell classes for fulfillment by other Online Trading Academy franchisees or us, collecting the "Selling Fee" portion of the revenue (as defined in the Manuals) and conversely, the obligation to fulfill classes sold by other Online Trading Academy franchisees or us and collect only the "Fulfillment Fee" portion of the transaction (as

defined in the Manuals) with your portion of all such revenues included in Gross Volume;

6) the right to sell an online course or class for delivery by us or our designee, paying to us the "Online Class Fulfillment Fees" (as may be further defined in the Manuals). Your portion of all such revenue will be included in Gross Volume;

7) to market within your Territory and;

8) to sell Products and Services to local venues within your Territory, other than Special Accounts, and retain the revenue from such activities occurring within your Territory; *provided that,* if such activity results in the establishment of a national account consisting of activities to occur outside your Territory, you agree to do so only with our prior written approval to the terms and conditions of such national arrangement which we may withhold or condition in our Business Judgment.

Subject to our rights as set forth in this Agreement and for its term, we will not enter into a Franchise Agreement licensing a Traditional Online Trading Academy Center, or open a Franchisor-owned Traditional Online Trading Academy Center, inside the area (the "Territory") described in Exhibit 2.2.  Your rights in the Territory are exactly (and only) as expressly set forth in this Agreement.  Except for the Territory Rights above, you have no right to exclude, control or impose conditions on the location or operation of present or future Online Trading Academy Centers (or those of any other brand) or distribution channels of any type, franchised or Online Trading Academy-owned, regardless of their location or proximity to the Territory.  This Franchise applies only to trading and financial education training centers (and related Products and Services as specified by us from time to time).  The Franchise does not grant you any rights with respect to other and/or related businesses, products and/or services, in which we or any Franchisor Related Persons/Entities may be involved, now or in the future. If you are not in Good Standing, we may reduce, eliminate or otherwise modify your territorial rights.

B.     We and/or our designees expressly reserve the following rights, and can:

1)     own and/or operate ourselves, and/or authorize others to own and/or operate:

a)     Special Accounts within the Territory; and

b)     any kind of business outside of the Territory, including without limitation, Traditional Online Trading Academy Centers, whether or not using the Online Trading Academy Marks and System;

2)     sell any Products and Services (whether or not competitive) to customers located anywhere (including within the Territory) using any channel of distribution other than a Traditional Online Trading Academy Center.  Our current policies provide that (i) revenue from retail sales of Products and Services generated within your Territory (other than Special Accounts) will be shared with you (in accordance with the revenue sharing specified in the Manuals) when processed by us and sold directly to the customer from our website and (ii) revenue from retail sales of all online courses sold by you in your Territory or sold by us directly through our website to qualified residents in your Territory, for delivery by us, after payment to us of the then current delivery fees, will be revenue retained by you and the entire retail price paid by the customer  will be subject to royalties.  Revenue will not be shared for sales to Special Accounts except as authorized by us in advance.  Please consult our Manuals for our current policies on revenue sharing.  These policies are subject to change by us without notice.

3)     sell or make arrangements or customer referrals with third parties to sell, lease or otherwise deliver, any non-competitive products and/or services under other than the Online Trading Academy brand, to customers located anywhere, although this will not interfere with our rights to designate Products and Services and suppliers required for use by you in connection with your Franchised Business

4)     develop or become associated with other non-competitive concepts (including dual branding and/or other franchise systems), whether or not using the Online Trading Academy System and/or the Marks, and award franchises under such other concepts for locations anywhere;

**Attachment ZZ**

5)      acquire, be acquired by, merge or affiliate with other businesses (whether competitive or not), with centers located anywhere.  Such transactions may include (but are not limited to) arrangements involving competing outlets and brand conversions (to or from the Online Trading Academy Marks and System).  Such transactions are expressly permitted under this Agreement, and you agree to participate at your expense in any such conversion as directed by us.

C.      You understand that a "Traditional Online Trading Academy Center" is defined in Section 1.2, above.  This term does not include non-traditional Online Trading Academy Centers and/or other distribution opportunities including, without limitation, Special Accounts, our attendance at conferences and events such as "expos", conventions and speaking engagements, Internet sites, online courses, and/or direct mail operations.  We expressly reserve the rights to these non-traditional Online Trading Academy operations.

D.      Exhibit 2.2 will state if the location and Territory for your Traditional Online Trading Academy Center has not been identified by the date of this Agreement.  If applicable, we will identify the Territory on a document to be initialed by you and us within fifteen (15) days from our notice to you of our acceptance of the location for your Traditional Online Trading Academy Center.  **If:**

1)      you disagree with such Territory; and

2)      you provide us with written notice of your disagreement within fifteen (15) days of your receipt of the Territory boundaries; and

3)      you and we are unable to arrive at a mutually acceptable Territory definition; then,

we will cancel all of our obligations under this Agreement, return your Initial Franchise Fee and receive from you (and each Affiliate of yours) a General Release.  The Post Termination Provisions of this Agreement will survive such cancellation.

**2.3      E-Commerce/E-Mail Business and Special Accounts - Current Policies.**

A.      Your use of the Internet, World Wide Web, including but not limited to all social and commercial media sites and other electronic means of marketing and distribution of goods and/or services is restricted by us.  You will not market or sell through such venue(s) or any channel of distribution not expressly permitted by this Agreement.  Our current policy provides that revenue from retail sales that we process from our website to other than Special Accounts that are generated from your Territory will be shared with you.  Please consult our Manuals for our current policies on revenue sharing.  These policies are subject to change by us without notice.

B.      Unless we provide our prior written consent, you agree not to deal with any Special Accounts, as we specify from time to time.  Our current policy on wholesale or direct retail sales by us to Special Accounts, is *not* to credit to you a portion of our revenues (or net income) from sales to such customers wherever located. We may in our Business Judgment, authorize you to contact specific Special Accounts and will negotiate revenue sharing with you, if any, on a case by case basis.  If you conduct a class training at a physical location within the Territory for a Special Account or otherwise sell education products or services to any Special Account, in all cases, that we have pre-authorized, such revenue (minus our expenses for travel, commissions, etc.) will be shared with you and become part of your Gross Volume.  This policy may be changed and/or eliminated by us at any time in our Business Judgment.

**I have read Sec. 2.1, 2.2, & 2.3, understand and agree with them.**
**Your Initials:  _____/_____**

**Attachment ZZ**

EX 13
7477

**3.**     **DEVELOPMENT AND OPENING OF YOUR ONLINE TRADING ACADEMY CENTER.**

    **3.1**     **Site Selection.**

    A.     You must make commercially reasonable efforts to locate a site acceptable to us, receive the opening notice from us described in Section 3.6, below, and do everything necessary for your Online Trading Academy Center to open for business within one hundred and twenty days (120) days from the Effective Date of this Agreement.  You must not operate an Online Trading Academy Center, use any of the Marks from or at any location, or make any commitments about a site until you have our written site acceptance.  You will select the site for your Online Trading Academy Center that complies with this Agreement and the Manuals and you must receive our approval of your proposed facility and floor plan.  We will not unreasonably withhold our acceptance.   Acceptance by us of any location is not a recommendation, approval or endorsement of such site.  We make no representations or warranties as to the success of any site or as to any other matter of any kind relating to the site.

    B.     In approving or disapproving any proposed location, we will consider such matters as we deem material, including, without limitation, (i) demographic characteristics of the proposed site, (ii) traffic patterns, (iii) parking, (iv) the predominant character of the neighborhood, (v) competition from other business providing similar services within the area, (vi) the proximity to other businesses, (vii) the rights granted to our other franchisees, (viii) the nature of other businesses in proximity to the site, (ix) other commercial characteristics (including the purchase price or rental obligations and other  lease terms for the proposed site), (x) the size of the premises, appearance, and other physical characteristics of the proposed site and (xi) the proximity to freeways and airports.  Further demographic and/or economic factors included in our criteria could change and other relevant factors may be excluded from our criteria, which might alter the potential of a site.  The uncertainty and instability of such criteria are beyond our control.

    C.     If you are unable to acquire a site within the time provided in 3.1 (A), above, then we may either:

    Terminate this Agreement and refund to you the lesser of:

        1)     one-half (1/2) of the initial franchise fee paid to us, or

        2)     the initial franchise fee, less all our expenses related to your franchise (both internal costs and outside expenses); but only if you sign a General Release and a document acceptable to us that preserves the Post Termination Provisions of this Agreement.

Or:     in lieu of termination, we may extend the required opening date by an additional 90 days, in consideration of your monthly payment to us of a Late Opening Fee of $5,000 per month which must be received by us on or before the 15th day (or if this day is not a business day, on the next business day) of each applicable month during the term of this Agreement.

    D.     All matters related in any way to your site are your sole responsibility, regardless of any assistance we may choose to provide.  You are responsible for obtaining any architectural and engineering services required for your facility and for ensuring its compliance with local law.  Neither we, nor any Franchisor-Related Persons/Entity, will have any liability for any site-related matter.

    **3.2**     **Lease of Premises.**

    A.     You agree to submit any lease and all site-related documents to us for our review prior to their execution by you.  You must use commercially reasonable efforts to arrange for the inclusion of provisions in the Lease Addendum or other appropriate site-related documents which accomplish the following:

        1)     Permit you to operate your Online Trading Academy Center in accordance with this Agreement and the Manuals;

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7478

2)      Provide that the Premises will be used only for the operation of an Online Trading Academy Center, and prohibit you from assigning or modifying any of your lease rights, or extending the term without our prior written consent;

3)      Require the lessor to concurrently provide us with a copy of any written notices (whether of default or otherwise) to you under the lease and give us the right to cure any default if we so choose;

4)      Provide us with a right to take assignment and possession of your Online Trading Academy Center, subject to the lessor's approval process and consent upon your default or our Termination in accordance with this Agreement.  If we exercise this right, we will not have any liability for any obligations incurred prior to our occupancy.  You agree to take whatever actions are necessary to accomplish such assignment and will, when you sign this Agreement, also sign the Collateral Assignment of Lease attached as Exhibit 3.2.  If you lose your lease rights to the Premises in connection with any bankruptcy, the lessor will, on our request, and subject to the lessor's approval process, enter into a new lease with us on essentially the same terms as the terminated lease;

5)      Provide that the lessor consents to the use of the Marks, Trade Dress and other aspects of the System, as modified from time to time, and give us the right to enter the premises during normal business hours for purposes of inspection, to take steps to protect the Marks and Trade Dress and/or prevent/cure any default.

You agree that you will not execute a lease or sublease, or any modification or amendment, without our prior written consent, which we may grant, condition or withhold in our Business Judgment.  You agree to deliver a copy of the signed lease, sublease or amendment to us within five (5) days after signing.

**3.3      Online Trading Academy Center Design Standards.**  You agree to comply with any standards, specifications and other requirements (the "Design Standards") that we furnish you for design, decoration, layout, equipment, furniture, fixtures, signs and other items for your Online Trading Academy Center.  Prior to opening your center, or within 30 days of acquiring an existing Franchise Business (if needed) you agree to purchase from our approved vendor and install, a franchise start-up kit which will include certain required signage, plaques and other center merchandising and art work ("Franchise Start-up Kit") and conform the Center to all of Franchisor's current Design Standards and specifications. Any changes from plans provided by us must be submitted to us for our consent, which may be provided in our Business Judgment.  Your compliance with the Design Standards does not release you from your obligations to ensure that your Online Trading Academy Center is designed, constructed and operated in compliance with all local, state, and federal laws, including (without limitation) the Americans with Disabilities Act ("ADA").  You agree to execute and deliver to us an ADA Certification in the form attached to this Agreement as Exhibit 3.3 before you open your Online Trading Academy Center to confirm and certify that your Online Trading Academy Center and any proposed renovations comply with the ADA and other requirements.

**3.4      Development of Your Online Trading Academy Center.**  You must select and hire  a licensed building contractor reasonably acceptable by us.  You are solely responsible for the selection and work of any contractor selected and/or engaged by you, even if referred by us.

**3.5      Equipment, Furniture, Fixtures and Signs.**  You must use only designated equipment and suppliers approved by us in the development and operation of your Online Trading Academy Center as we may require.  We and/or our Affiliates may be such approved suppliers ("Designated Suppliers").

**3.6      Online Trading Academy Center Opening.**  You will open your Online Trading Academy Center for business immediately upon our notice to you that: i) all of your pre-opening obligations have been fulfilled; ii) pre-opening training has been completed; iii) all amounts due us (and/or any Affiliate) have been paid; and iv) copies of all insurance policies (and payment of premiums), leases/subleases and other required documents have been received.

**3.7**    **Grand Opening Program - Marketing.**    You agree to spend at least Fifteen Thousand Dollars ($15,000) on a grand opening marketing program.  You agree to follow the advice and guidance that we provide to you and must conduct your official grand opening at the time and in the manner we prescribe.

**3.8**    **Relocation of Online Trading Academy Center Premises.**    Any relocation (1) shall be to a location within the Territory, (2) requires our prior written consent, which we may reasonably grant, condition or withhold (i.e., if you are not in Good Standing), (3) will be at your sole expense and (4) will comply with all the provisions of sections 3.1 through 3.7 above, and (5) will require that you (and each Affiliate and owner of yours) sign a General Release.  If your Online Trading Academy Center is damaged, condemned or otherwise rendered unusable, or if, in your and our judgment, there is a change in the character of the location of your Online Trading Academy Center sufficiently detrimental to its business potential to warrant its relocation, you agree to relocate your Online Trading Academy Center.

**4.**    **PAYMENTS BY FRANCHISEE**

**4.1**    **Initial Franchise Fee**.

Upon execution of this Agreement, you will pay to us an "Initial Franchise Fee" as set out on the cover page of this Agreement.  We may mutually agree to expand the area and increase the population of the proposed Territory by adding zip codes with incremental price changes based on population.  The zip codes will be for immediately adjacent areas to the proposed Territory and will become a part of the territory for this Agreement by express reference in Exhibit 2.2 attached hereto.  Any additional fees will be due upon signing this Agreement.  The Initial Franchise Fee and additional fees for increased population segments within each additional zip code are fully earned when paid.  The Initial Franchise Fee is only refundable in the limited instances expressly provided in this Agreement.

**4.2**    **Royalty Fee**.

(a)    In addition to the Initial Franchise Fee, you shall pay to us a Royalty Fee equal to the *greater* of: $3,000.00, or 10% of the Gross Volume generated by you each month (or portion thereof), commencing upon the earlier of the month in which you open your Online Trading Academy Center or 120 days from the Effective Date ("Royalty Commencement Date"). The monthly minimum royalty will increase to $4,000.00 on the 1st anniversary of the Royalty Commencement Date; $5,000.00 on the 2nd such anniversary and $6,000.00 on the 3rd such anniversary and thereafter. If this is a Renewal Franchise or  a purchase of an existing Franchised Business, the minimum royalty will be $6,000 per month.

(b)    Royalty, Marketing and all other fees must be received by us on or before the 15th day (or if this day is not a business day, on the next business day) of each applicable month during the term of this Agreement, and will be computed on Gross Volume earned by you in the prior month.

**4.3**    **Marketing Fees.**

We have established an advertising**,** publicity and marketing fund (the "Marketing Fund") to promote Online Trading Academy Centers and the Brand.  Please see Section 10.1 below for further information. You'll contribute to the Marketing Fund the *greater* of $1,000 or three percent (3%) of Gross Volume per month.  The minimum marketing fund fee will be subject to Inflation Adjustment.  Such percentage and minimum marketing contributions will be calculated and payable at the same time and in the same manner as percentage and minimum royalties. Additional monthly and annual fees are described in Sections 10.2 and 10.3.  In addition you are required to participate in the Global Marketing Services at a minimum participation level of $15,000 as further described in Section 10.5 below.

**4.4**    **Portal Subscription Fees.**

We currently utilize a web-based, proprietary application for our franchise internet access portal (currently known as the "Network Connection") and will provide access to it to you for your use in connection

**Attachment ZZ**

with the Franchised Business. You are required to pay to us a Portal Subscription Fee in an amount not to exceed $100 per month for use of the Online Trading Academy Portal.  Use thereof by you is mandatory and the Portal Subscription Fee may be adjusted annually.

### 4.5     Website Service Fee

You will pay us a Website Service Fee of $195 per month for hosting, maintaining and updating the Online Trading Academy Websites. This fee is charged for each Online Trading Academy Center which you operate in your Territory.  This fee is payable on a monthly basis by ACH as set out in Section 4.13 below and is subject to inflation adjustment.  Any additional work beyond hosting, maintaining and updating will be billed separately.  Any additional customized services for your Center will be negotiated between you and us or any approved supplier.

### 4.6     Search Engine Key Word Positioning Fee

You will pay us a Search Engine Key Word Positioning Fee of $295 per month.  This is for a natural selection search engine and not a pay per click search engine. This fee is payable on a monthly basis by ACH as set out in Section 4.13 below, and is subject to inflation adjustment.

### 4.7     Trading Costs and Software Data

We require you to pay to us a Trading Software Data Fee of between $50 - $100 per month per user and any trading losses incurred by students in the classes unless we have made arrangements with a broker dealer or other third party to provide data feeds into your classrooms without charge and/or pay for trading losses, if any. We have no obligation to make such arrangements and any such arrangements made may be for a temporary period. The Trading Software Data Fee will be paid monthly or annually, as we determine, and is subject to inflation adjustment or increase imposed by the vendor.

### 4.8     Email Fee

(a) We require you to pay us an Email Fee of up to $400 per month per Center for access to the mass emailing services we make available through our arrangements with third party approved vendors. We have no obligation to make such arrangements and any such arrangements made: a) may be for a temporary period  and; (b) may be limited to a number of emails per month. The Email Fee will be paid monthly or annually, as we determine, and is subject to inflation adjustment or increase imposed by the vendor including costs for excess usage. You may only participate in email services in accordance with the then current process and requirements as set out in the Manuals.

(b) We require you to use our hosted exchange server which provides branded email addresses for You and your staff. You are required to pay a monthly branded email Hosting Fee for each independent mail box address per month. The hosted email box services we make available through our arrangements with third party approved vendors. The branded email Hosting Fee will be paid monthly or annually, as we determine, and is subject to inflation adjustment or increase imposed by the vendor. You may only participate in email services in accordance with the then current process and requirements as set out in the Manuals.

### 4.9     Customer Relations Management Program Fee

We require that you participate in our customer relations management (CRM) program, currently through "SalesForce.com®" which is a web-based lead and contact management database.  You must communicate with customers using this platform or any other as we designate in a manner that creates a permanent record and is within our requirements, policies and procedures.  This program requires that you pre-pay a fee of $1,200 - $1,500 per user, per year directly to us, and that you will pay an additional fee whenever any additional user is required. You must have separate permissions for each person who will be involved in selling Products and Services and providing customer service and for at least one administrative employee per Center. This program is subject to change by us. You will be subject to Termination and possible damages for any unauthorized use or damage to this database.

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

**4.10    Interest and Late Fees on Late Payments and/or Reports.**

All amounts owed by you to us and/or our Affiliates bear interest at the highest applicable legal rate for open account business credit, but not to exceed one and one-half percent (1.5%) per month. Additionally, we may require you to pay an administrative late fee of One Hundred Fifty Dollars ($150) for the first  late report and/or late payment, thereafter we may charge an additional and incremental one hundred dollars for each late report or late payment during the Term of this Agreement, so that the late fee for the second late report or payment is $250, and the third is $350 and so on.   The foregoing amount is subject to Inflation Adjustment, but will not exceed any applicable legal restrictions.  If we experience repeated late payments by you, then we may require you to pay all amounts by ACH or cashier's check or credit card and your Franchise rights may be subject to Termination by us.

**4.11    Client Contracts and Financing Arrangements.**

You agree to maximize revenue collection and a cash basis of accounting. Accordingly, you agree that all contracts with clients shall be executed and all payments terms at the date of execution of the client contract shall be handled in one, or a combination of the following  three ways:

(a) payment in full in cash or by check'
(b) payment in full by client's personal credit card, or
(c) using completed and accepted credit application forms for tuition financing arrangements offered by a        Franchisor-approved third-party financing company.

You acknowledge and agree that (i) you will not offer your own internally funded financing arrangements (in house financing) for your clients (ii) in accordance with the definition of Gross Volumes, any sales made that do not comply with these conditions will be subject to 100% Royalty Fee on an accrual basis, regardless of when or if payment is received from the client.

Our current arrangements with third party finance companies can be found on our    network connections portal on our website.  To participate, you will be required to execute a contract with the relevant finance company. You acknowledge that the economy and financial markets may change. If at any time during the Term, there is no Franchisor-approved third party finance company to provide a financing arrangement for tuition financing for your customers, then you may find your own source of financing for tuition financing, but such arrangements will be subject to Royalties Fees on the accrual basis. Franchisor may approve or disapprove any third party finance companies and/or proposed arrangements (including the proposed program terms and durations) presented to it by its franchisees.

**4.12    Gross-Up Fees.**

To insure that we receive full Royalty Fees and any Marketing Fees to which we may be entitled, as the amount thereof may vary from time to time, you must pay us upon demand, whether in arrears, in advance, in a lump sum or in the same manner as Royalties and Marketing Fees are paid to us, the amount of all taxes we pay to any governmental authority on revenue earned or collected by us based upon your use of our intellectual property or other intangibles or based upon the existence of this Agreement, within the governmental authority's domain during each of our fiscal years throughout the entire term of this Agreement.

**4.13    ACH Bank Transfer Authorization**

A condition precedent to the effectiveness of this Agreement, you will execute and deliver to us the Bank Account Card Authorization form attached hereto as Exhibit 4.13 and by this reference incorporated herein. If you fail to make any payments required pursuant to this Article 4, on or before the 15th of the month or when due, we will charge the designated bank account directly on the 20th of the relevant month (an "ACH Transfer").

**4.14    Payment of Online Class Fulfillment Fees**

All original sales of Online Classes or programs which include Online Classes and Products and Services shall be recorded on the day of the sale in SalesForce (or any future replacement reporting system). Payment of the Online Class Fulfillment Fees shall be paid at the same time that  the sale is reported, and prior to the customer being granted access to the online course. All such payments will be made via a transactions process which will occur within 7-14 days of the date of sale, and will include a cancellation period. If you fail to make any payments required pursuant to this Section 14.4 on or before the day which is the earlier of 30 days after the reported sale or the start of the online course we will charge the designated bank account directly at any time after five business days after the date of the sale  via ACH transfer.

**4.15    Online Class Retake Fees**

For each new customer who executes an enrollment agreement which includes lifetime retakes the Center will be charged a lifetime online retake fee payable to Franchisor at the current rate of $200 per customer.  This fee may be increased at any time and from time to time on no less than thirty days written notice to you. Payment of the Online Class Retake Fees are due to be paid at the same time that the sale is reported. If you fail to make any payments required pursuant to this Section 14.5 we will charge the designated bank account directly at any time after five business days after the date of the sale via ACH transfer.

**4.16    Special Events Fees**

From time to time we may make available to franchisees the opportunity to hire a special events team from the corporate offices to come to your Center or to an agreed location in your Territory to put on a special event (for example a Live event as described in the Manual). The fee charged for such events will be a percentage of the revenues generated by you as a result of the special event. The current fees range between 5% and 9% and are subject to change upon notice. Additional fees may be charged for extra staff requested and all travel and direct expenses of such events will be borne by you. It is not mandatory for you to hold special events. We may decline your request to conduct any special event at our discretion and we are not obliged to continue to offer this service. The fee is payable within 7 -15 days of each special event.

**4.17    Referral Program Reward Fees**

From time to time we may operate global referral programs designed to acquire high quality and inexpensive registrations. Your participation in any such program will be mandatory and  for every referred customer to your Center who registers for a class you will be charged for the cost of the rewards to the referring customer. The fee charged for such rewards currently ranges from $100 to $400. The more classes or programs a referred customer purchases, the greater the reward to the referring customer. The Rewards Fees may be increased at any time and from time to time on no less than thirty days written notice to you. Payment of the Rewards Fees shall be paid at the same time that  the sale is reported. If you fail to make any payments required pursuant to this Section 14.7 on or before the day which is 30 days after the reported sale we will charge the designated bank account directly at any time after five business days after the date of the sale via ACH transfer.  Referral programs will be designed to pay for themselves and direct expenses and administrative costs may be passed through to participating franchisees.

**4.18    Special Marketing Projects**

You may be required to pay up to $50,000 per calendar year as a contribution to "Special Marketing Projects" as defined in section 10.6 of this Agreement.  Payments shall be made on the fifteenth day of the calendar month after you receive an invoice. We may, in our Business Judgment, allow you to make such payments over a three to six month period rather than in one lump sum.

**4.19**     **National TV Advertising Pro Rata Contribution**

        You will be required to pay the pro rata share of National TV Advertising (as defined in section 10.7 of this Agreement) for your Territory. National TV Advertising may include, informercials and long-form and short form spots. National TV Advertising spend is assessed quarterly in advance with input from the then current FAC (Marketing). All US centers including, franchisor owned Centers, are charged their pro rata share of the total quarterly advertising spend. This calculation is currently based on the number of households in each respective Territory and is subject to change depending on the number of operating Centers, the introduction of a new method of calculating pro rata share, and the then current quarterly needs as reviewed by the FAC (Marketing) and determined by the Franchisor in its Business Judgment. You will be billed monthly in advance in installments to cover the next calendar quarter spending. At the date of this Agreement the current quarterly fees range for participating franchisees range between $4,436 (1.9% pro rata share) to $12,903 (5.5% pro rata share). The program monthly spend may be increased or decreased and Franchisor may amend or change or discontinue the program at any time.

**5.**     **RENEWAL RIGHTS.**

**5.1**     **Your Rights**.

        A.     Upon expiration of the initial term of your Franchise you will be eligible to receive an award of a Renewal franchise as conditioned in this Section.  The Renewal Franchise Agreement that you will sign for the Renewal term may differ materially from this one in financial and other terms.  Subject to all the provisions in this Agreement, the renewal term(s) will be for additional consecutive five (5) year periods, but if the lease or sublease for the Premises is terminated or expires before the end of such Renewal term (and no substitute location has been consented to by us in writing and occupied by you before the termination/expiration of such lease/sublease), we may Terminate the Renewal agreement as of the termination/expiration of such lease/sublease.

        B.     If we announce that we have determined not to continue franchising Online Trading Academy Centers in your state and do not open or award a new Online Trading Academy Center franchise in your state for 12 months after the date of such announcement (we may continue to service existing Franchisees and award renewal franchises when required to do so by outstanding Franchise Agreements), then we will not be required to offer you any Renewal franchise or similar rights and will have no liability or obligation to you with respect thereto.  You agree that if we are legally required to show a "good cause" standard for non-renewal, our compliance with this subsection will be deemed to satisfy such requirement.

        C.     You agree that these provisions are commercially reasonable in part because just as you have the option to not accept a Renewal franchise, we have the option to no longer award Renewal or other franchises, or grant renewals, in certain circumstances.

**5.2**     **Notice of Election**.

        A.     You must give us written notice of election to obtain the Renewal franchise not less than six (6) months, but not more than twelve (12) months, before the expiration of the initial term of this Agreement.  Within ninety (90) days after our receipt of the notice, we will give to you in writing:

                1)     any reasons which could cause us to not award the Renewal franchise, including any deficiencies requiring correction; and

                2)     our then-current requirements relating to the image, appearance, decoration, furnishing, equipping, stocking and programs for a Online Trading Academy Center (collectively, the "specifications and standards") then-applicable for new Online Trading Academy Centers and with the Manuals".

        B.     If you are subject to a Correction Process under Section 11.5 when i) you provide us with

**Attachment ZZ**

notice of your intent to obtain a Renewal franchise, or ii) the Renewal franchise would be awarded, then we may choose in our Business Judgment to defer the award of any Renewal franchise until you have successfully complied with the applicable Online Trading Academy System Standards and Financial Standards.

       5.3    <u>**Conditions to the Award of a Renewal Franchise**</u>.  Any award of the Renewal franchise must meet <u>all</u> of the following conditions, together with the then-current standards applicable to Renewal franchisees, each of which are agreed to be reasonable:

       A.    You (and each Affiliate of yours) must be in Good Standing;

       B.    Your Online Trading Academy Center and its operations must fully comply with all specifications and standards then-applicable for new Online Trading Academy Centers and with the Manuals by the expiration of this Agreement;

       C.    You must present evidence satisfactory to us that you have the right to remain in possession of your Online Trading Academy Center leased premises for the duration of the Renewal franchise.  If you are unable to maintain possession of your Online Trading Academy Center leased premises, or in our Business Judgment your Online Trading Academy Center should be relocated, you must have obtained our consent to and secured substitute premises by the expiration date of this Agreement.  Such premises must comply with all specifications and standards then-applicable for new Online Trading Academy Centers and with the Manuals;

       D.    You (and each Affiliate of yours) must have paid all amounts owed to us and any Franchisor-Related Persons/Entities including all unpaid Online Class Fulfillment Fees for classes sold by Franchisee;

       E.    You must have executed our then-current form of Franchise Agreement and related documents then customarily used by us (with appropriate modifications to reflect the fact that the Franchise Agreement to be awarded relates to a single Renewal franchise as contemplated by this Agreement).  You will not be required to pay the then-current Initial Franchise Fee, and we will not be required to provide you any site location, initial training or other "start-up" services in connection with the award of any Renewal franchise;

       F.    You must have complied with our then-current qualification and training requirements.  We may require your personnel to successfully complete any retraining program(s), at such times and location(s) as we then specify.  There will be no charge for any retraining program(s), but you will be responsible for all travel, meals, lodging and other expenses of your personnel;

       G.    You (and each owner and/or Affiliate of yours) must have executed a General Release, except for any claims exclusively related to the Renewal franchise (where expressly so required by applicable law);

       H.    You must have paid us a Renewal Fee of $20,000.  The fee must be received from you at the time of your election and is non-refundable unless we do not grant a Renewal agreement to you.

       Failure by you and/or your owners to timely complete such requirements will be deemed an election by you not to obtain the Renewal franchise.

## 6.    <u>**INTELLECTUAL PROPERTY**</u>.

       6.1    <u>**Goodwill and Ownership of Intellectual Property**</u>.  You have a non-exclusive right to use the Intellectual Property, subject to protection by applicable law, only as expressly authorized by us under this Agreement.  We have all rights in and to the Intellectual Property.  <u>All goodwill belongs exclusively to us</u>, and you will not obtain any goodwill in the Intellectual Property as a result of this Agreement, your

operation of the Franchise or for any other reason. Any unauthorized use of the Intellectual Property is a breach of this Agreement and an infringement of our proprietary rights. You agree that if you breach any obligation regarding the Intellectual Property, we would have no adequate remedy at law and that we will be entitled to equitable relief. You will not oppose, or engage in any acts or omissions inconsistent with, our rights in and to the Intellectual Property.

**6.2** **Limitations and Use of Intellectual Property.** You will use the Intellectual Property as the sole identification for your Online Trading Academy Center. You will not use any Mark, or modified version or derivative of a Mark, or any other mark or form of commercial identification confusingly similar to the Marks or Intellectual Property, as part of any business or trade name or in any other manner not expressly authorized by us in advance and in writing. Prior to adoption and/or use, any proposed corporate and/or trade name must be approved by us. You will give such trademark and other notices (including notices of independent ownership) as we direct and will, at your expense, obtain fictitious or assumed name registrations as may be required under law. You will indicate that your Franchised Business is "independently owned and operated." You will display the Intellectual Property as required by us and will not use the Intellectual Property so as to negatively affect its goodwill. You will not use the Intellectual Property in connection with the performance or sale of any unauthorized services or products or at any location or in any other manner not pre-authorized in writing by us.

**6.3** **Notification of Infringements and Claims.** You agree to take such actions as we may direct to protect the Intellectual Property. You will not take any action that jeopardizes our interests in, or the validity or enforceability of, the Intellectual Property. You agree to immediately notify us of any apparent or actual infringement of, or of any challenge to your use of, the Intellectual Property. You will not communicate with any third party with respect to such a claim. We will take such action as we deem appropriate in our Business Judgment. As owner of the Intellectual Property, we have the exclusive right to control any settlement, litigation or proceeding arising out of or related to any such matters.

**6.4** **Discontinuance of Use of Intellectual Property.** You agree to comply at your expense with any directions from us to discontinue, modify, substitute or add Marks and Intellectual Property. We cannot and do not make any guaranty that a modification, discontinuance or otherwise may not be required and will have no liability or obligation to you in such event. You agree to make no claim in connection with any modification, discontinuance or other action, and/or with any dispute regarding the Intellectual Property. There is always a possibility that there might be one or more businesses using a name and/or marks similar to ours and with superior rights. We urge you to research this possibility, prior to signing any documents or making any payments or commitments.

**6.5** **Defense of Course Materials,** We are obligated to protect and defend the integrity of the Course Materials to which we claim proprietary rights including patent, trademark, trade secret or copyright and agree to indemnify and hold you harmless from any liability or costs including reasonable attorneys fees related to such defense provided that; you shall give us prompt notice of any event of which you are aware, for which indemnification is required, and we will seek input from you. Any assumption by us shall not modify your obligations under this Agreement. We may, in our sole judgment, take such actions as we deem necessary and appropriate to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereof as may be, in our sole judgment, necessary for the protection of the indemnities or the System.

**7.** **INSTRUCTION AND OPERATING ASSISTANCE**

**7.1** **Initial Franchise Training**. As part of the Initial Franchise Fee, we will provide the training for you, your initial General Manager (whether you or someone other than you), your initial sales and administrative personnel (whether you or someone other than you). All such persons must attend the next available Training after execution of this Agreement except as pre-approved in writing by us. Training consists of between five days and twenty-two days of training, depending upon the particular duties and responsibilities of each person attending. You shall be entirely responsible for the salaries and expenses of all of your trainees, and we reserve the right to refuse entry to any attendee. Training is currently provided on an as needed basis at our corporate headquarters and the frequency and/or location may be changed

**Attachment ZZ**

by us from time to time. Training must be completed to our reasonable satisfaction before commencement of your operations of the Franchised Business. Any attendee, including you, that fails to satisfactorily complete Training, will not be permitted to assume or continue with responsibilities that require training at your Center. If, after additional training, (at your sole cost and expense), you do not satisfactorily complete Training, we may, in our Business Judgment, cancel this Agreement, refunding the Initial Franchise Fee paid by you minus our expenses for training, sales, and otherwise, related to the award of the Franchise to you. You will be required to sign a General Release and be subject to the Post Termination Provisions.

**7.2** **Expenses**. You shall be solely responsible for all travel, food, lodging and other expenses for all attendees while training. We reserve the right to assess a reasonable charge (not to exceed $250 per day per person being trained) for training more than three of your attendees at the Training or for supplemental training that you may request after the Training.

**7.3** **Mandatory Meetings**. Not more often than once each year, we may conduct a system-wide or series of regional or national meetings to discuss Online Trading Academy business activities or other matters relating to the Franchised Business. Attendance by you and your General Manager at these meetings is mandatory, and attendance at the annual international conference for all sales personnel and the Center administrator is mandatory, (and is highly recommended for other personnel). You must pay all costs incurred as a result thereof including the cost of transportation, accommodations and living expenses. We may charge you a reasonable fee to attend such annual meetings not to exceed $500 per person, per meeting. The annual meetings referenced in this Section 7.3 are in addition to any voluntary convention or sales conference which may be coordinated by us.

**7.4** **Staff Training Courses**. We may make available to you both optional and mandatory staff training courses, other training courses, seminars, conferences or other programs, at our current corporate training center, or at a suitable location in our discretion, or by using DVDs and other electronic media as we determine. Attendance at staff or other training courses, seminars, conferences or other programs which are deemed by us to be relevant or appropriate to the successful operation of the System is highly recommended. Initial sales training for all of your sales personnel and operations training for administrative personnel is mandatory within the first 60 days of their employment or engagement at the next available training date. No fees shall be charged by us for required training courses, seminars, conferences or other programs; however, all other related costs and expenses incurred by you in respect of required training courses, seminars, conferences or other programs shall be borne solely by you.

All personnel employed or engaged by you in the Franchised Business must be trained in accordance with our then-current training and operations standards and shall maintain such standards of training as shall be established by us.

Any training provided by us to any of your employees or agents will be limited to training or guiding the employees or agents regarding the sale and delivery of approved services to clients in a manner that reflects the customer and client service standards of the System. You are, and will remain, the sole employer of your employees during all training programs, and you are solely responsible for all employment decisions and actions related to your employees. You must ensure that your employees receive adequate training. You are, and will remain, the sole hirer of your independent contractors and agents during all training programs, and you are solely responsible for all decisions and actions related to your independent contractors and agents. You must ensure that your independent contractors and agents receive adequate training.

**7.5** **Ongoing Support**. We shall provide periodic support, supervision and assistance as we deem appropriate. The nature, frequency and duration of such assistance by representatives of ours shall be in our sole discretion. In addition, we will be available by telephone and/or email on an ongoing basis for consultation and guidance with respect to the operation and management of the Franchised Business. In addition to the Manuals, we may from time to time provide you with additional materials relating to the Franchised Business.

**7.6** **Timing**. You acknowledge that our ability to provide Initial Franchise Training, other training, continuing assistance and other services provided for under this Article 7 (and Article 8 below) may be affected by various factors including the number of franchisees being incorporated into the System within

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7487

approximately the same time frame. We shall establish a reasonable schedule to provide such services taking such factors into account, and shall exercise our best efforts to provide such services within the times otherwise provided hereunder.

## 8.   **OPERATION OF BUSINESS**

### 8.1    **Your Operational and Staff Requirements**.

(a)      If you will not be acting as General Manager, you will at all times be required to employ or engage the services of at least one full-time General Manager who has successfully completed Initial Franchisee Training Program. The General Manager shall enter into an agreement with you agreeing to maintain the confidentiality and covenants included in this Agreement pursuant to local state law.  Each General Manager, whether you or someone other than you that we approve, shall devote his or her full time to the management, operation and development of the Franchised Business.

(b)      At all times during your operation of the Franchised Business you shall maintain a competent, conscientious, and trained staff, and shall take such steps as are necessary to ensure that your employees preserve good customer relations and render competent, prompt, courteous and knowledgeable service. All employees hired by or working for you shall be your employees, and yours alone, and shall not, for any purpose, be deemed to be employees of ours or subject to our direct or indirect control most particularly with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any Governmental Authority.  Franchisee and Franchisor will each file their own tax, regulatory and payroll reports, and be responsible for all employee benefits and workers compensation insurance payments with respect to their respective employees and operations. You acknowledge and agree that Franchisor will not have the power to hire or fire Your employees. You expressly agrees, and will never contend otherwise, that Franchisor's authority under this Agreement to certify Your supervisorial or managerial personnel for qualification to perform certain functions at the Center does not directly or indirectly vest in Franchisor the power to hire, fire or control any of Your personnel. You alone shall be solely responsible for all hiring and employment decisions and employee functions relating to the Franchised Business, including, without limitation, hiring, firing. training, establishing remuneration, compliance with wage and hour requirements, personnel policies, benefits recordkeeping, supervision, and discipline of employees, regardless of whether You received advice from Franchisor on these subjects or not. You acknowledge and agree that any guidance You receive from Franchisor regarding employment policies should be considered as examples, that You alone are responsible for establishing and implementing Your own employment policies, and that You understand that You should do so in consultation with local legal counsel experienced in employment law. You shall indemnify, defend, reimburse and hold us harmless from any direct and indirect losses, costs and expenses, including attorneys fees, (and interest thereon) arising out of any claim made by or for the benefit of any employee of yours against us regarding employment decisions and employee functions in the Franchised Business, including, without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees.

(c)      Your Center must remain open on a full time and continuous basis (as defined in the Manuals), except for excused closures outlined in this Agreement i.e., Acts of God. You shall file periodic sales activity reports in the form and frequency specified in the Manuals and this Agreement.

(d)      You will be required to purchase certain designated Products and Services directly from Designated Suppliers, including an Opening Inventory Order consisting of binders and other items as specified in the Manuals and the Franchise Start-up Kit. You must purchase Course Materials manufactured either by us or by Designated Suppliers.  Additional Course Materials and updates will be made available to you from time to time. You may order from designated or approved vendors any mix of Course Materials titles from the Online Trading Academy Course Materials library, but may be required to order in minimum quantities.  You are required to order specified Products from Designated Suppliers and are *not* permitted to duplicate materials such as Course Materials, CDs, DVDs or Intellectual Property.  You are prohibited from holding yourself out as an owner of Course Materials in any form or manner. With our prior approval, which we may grant or withhold in our sole Business Judgment,  you may create original course materials content to be used within your Territory using the Online Trading Academy Brand, content standards and

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

22

**Attachment ZZ**

business processes (the "Franchisee Created Content") and you may translate the Course Materials into foreign languages appropriate to the demographics in your local market (the "Translated Materials") subject to the following terms and conditions:  You acknowledge and agree that (i) the intellectual property rights in all such Franchisee Created Content and Translated Materials shall belong to us and you shall take all actions and execute all documents to ensure that title to all Franchisee Created Content and Translated Materials vests in us, (ii) all Franchisee Created Content and Translated Materials shall be made available to us to share with all other franchisees in the Online Trading Academy Network, (iii) no Franchisee Created Content or Translated Materials shall be used in the System without our prior written approval, and (iv) Royalties will be due on all sales and licensing of all Franchisee Created Content and Translated Materials.

(e)       You will be required to follow the "Curriculum" established by us for use within the Online Trading Academy classroom. (Note: "Curriculum" refers to the course outline. It specifies what is taught in a given class and is given as a part of the Franchise package). You agree to have each student complete our course survey at the completion of each course they take.

(f)       You will be authorized to resell certain specified Educational Products which you have purchased from us or our Designated Suppliers.  Each Product will have a suggested retail price, but you are free to set any price you choose.

(g)       You understand and acknowledge that every detail of the appearance and operation of the Franchised Business in compliance with the System is critical to us, you and all other franchisees operating under the System, in order to:

1.   comply with our Performance Standards; and
2.   increase the demand for the Products and Services sold by Online Trading Academy Franchised Businesses; and
3.   protect the Intellectual Property and the System.

(h)       You shall meet and maintain sufficient levels of working capital for use in connection with the management and operation of the Franchised Business as we may reasonably require.

(i)       You shall adhere to such methods, standards and specifications as we may, from time to time, prescribe to ensure that the highest degree of quality and service is uniformly maintained. You shall conduct your business in a manner which reflects favorably at all times on the System and the Intellectual Property. You shall at no time engage in deceptive, misleading or unethical practices or conduct any other act which may have a negative impact on our reputation and goodwill, any other franchisee operating under the System or any of our Affiliates. Pursuant to this ongoing responsibility, you agree:

(1) To maintain in sufficient supply (as we may prescribe in the Manuals or otherwise in writing) and use at all times, supplies as conform to our standards and specifications, and to refrain from deviating therefore without our prior written consent;

(2) To sell or offer for sale only and all such Products and Services as meet our uniform standards of quality and quantity and which have been expressly approved for sale in writing by us in accordance with our methods and techniques;

(3) To refrain from any deviation from the System and/or our Performance Standards and specifications for offering  or selling Products or Services; and to discontinue selling and offering for sale any Products or Services as we may, in our sole discretion, disapprove in writing at any time;

(4) To operate the Franchised Business at a standard of excellence consistent with the requirements set forth in the Manuals and in this Agreement;

(5) Not to advertise, offer for sale, or sell any Products that are damaged, deteriorated, or "out-of-date," as provided in the Manuals or as specified on the Product itself;

**Attachment ZZ**

EX 13
7489

(6) To use only us or our Affiliates for any authorized Internet-related development and hosting services;

(7) To abide by our enrollment and cancellation policies as set forth in the Manuals;

(8) To refrain from conducting any form of trading operations or be affiliated in any way with a brokerage firm or an investment advisor without our prior written approval which we may withhold in our Business Judgment;

(9) To use and to recommend to customers only those specific, authorized broker-dealers whose trading platforms, methodologies and adherence to our tuition rebate program qualify them to be approved suppliers for all classroom and other educational activities;

(10) You shall comply with our program as set forth in the Manuals regarding fulfillment and revenue sharing requirements for customers sold by other Online Trading Academy Franchisees;

(11) In the training, teaching and delivering of services to your customers you agree to use and cause your instructors to use, the then-current designated approved Online Trading Academy trading platform as set forth in the Manuals.

(12) You are required to utilize only instructors who have executed our then-current form of Instructor Agreement and Confidentiality Non Solicitation and Assignment of Rights Agreement, and agreed to comply with our Compliance Program, completed our training and satisfactorily been evaluated through the customer survey and test process. We will attempt to assist you with replacement instructors on a temporary, "as available" basis. Two weeks before the class begins, you agree to pre-pay us in full for such instructor services at a daily (per diem) rate prevailing at the time. You further agree to make and pay for all travel, lodging and incidental costs associated with such instructors in accordance with the Manuals. All arrangements made with any of our Authorized Trainers are subject to the provisions of sections 8.13 and 16.1.2 below. You may not contract directly with our instructors or attempt to employ them in your Franchised Business without our prior written consent.

(13) If required, open a trading account with a Broker-Dealer designated by us with approximately $26,000 capital to allow students in your classes to conduct trades using that account and pay all commissions and costs related to the account. You may be required to sign a written agreement with the Broker-Dealer. We will provide you with the best commission pricing we can negotiate with our affiliate Broker-Dealers.

(j)     We may elect to form a Franchisee Advisory Council ("FAC") to provide advice and suggestions regarding specified matters to us. The FAC will consist of a designated number of Online Trading Academy franchisees selected by Us or, at our discretion, by vote of franchise owners ("Franchisee Members"). All Franchisee Members shall be in Good Standing (as defined in the Franchise Agreement). We may select Franchisee Members from any national or international regions in which that Franchisee Member resides or does business (the "Regions"). The Franchisee Members need not be from different Regions. The FAC shall also consist of a designated number of OTA Corporate Members who may be employees or agents of OTA and selected by OTA ("Corporate Members"). Franchisee and Corporate FAC Members shall collectively be referred to as the "Members". Appointments to the Council will be announced publicly via email.

We may adopt governing rules for the meetings and procedures of the FAC. The purpose of the FAC is to provide constructive, open and two-way communications between franchisees and OTA. In particular, the FAC will provide a cooperative forum for Members to receive and discuss information, to provide input, advice and planning regarding various limited and specified matters and to encourage each franchise owner to remain in Good Standing as the Online Trading Academy system grows and develops through fostering communications between franchisees and OTA. While we are not required to do so except as specified in this Agreement, if we submit any matters for approval to an FAC and approval is granted, the approval will be binding on you.

**Attachment ZZ**

(k)  Accounting and Record Retention.  You agree to obtain and maintain specified accounting, sales, reporting and records retention systems conforming to any requirements prescribed by us from time to time, including electronic systems with full time unrestricted online access by us.  Such systems may include, but are not limited to, computer and point-of-sale systems, and software programs, and may have components only available from us, a Franchisor-Related Person/Entity and/or designated suppliers.  We reserve the right to use, and to have full time unrestricted access to, all registers, computer and any other systems, and the information and data they contain.  We may charge a reasonable fee for the license, modification, maintenance or support of software or any other goods and/or services that we furnish to you in connection with any of the systems.

(l)  Electronic Funds Transfer.  You must execute the ACH form attached hereto as Exhibit 4.13. and participate in the this payment method and  must participate in modified electronic funds transfer and reporting program(s) within 30 days of our notification of any such modified electronic funds transfer and reporting program(s). We require that all royalties owed and any other amounts designated by us must be received or credited to our account by pre-authorized bank debit by end of business on or before the 15th day (or if this day is not a business day, on the next business day) of each month computed based on Gross Volume or minimum amounts due for the prior month.  If any fee payment owed is not received when due, but you have timely submitted a proper report, you authorize us to debit from your account the reported amounts or minimum royalty and/or marketing fee, whichever is *greater* and any other fees then due.  However, if a royalty and/or marketing fee payment owed is not timely received but you do not timely submit a proper report, you authorize us to debit your account by estimated amounts equal to one and one half times the royalty fee and/or marketing fee and any other fees then due for the immediately prior month plus an additional twenty percent (20%).  Any estimated and collected amounts in excess of actual amounts due from you, excluding late fees and interest described in Section 4.8 will be credited toward future fee payments due from you.  Any amounts still owing after our collection of such estimated amounts, excluding late fees and interest owed, will be due immediately upon our request for such amounts.  Any such non-payment or late payment of the actual amount due is a breach of this Agreement.  We may also require that any amounts owed or to be owed to us and/or any of the Franchisor-Related Persons/Entities be paid by ACH or cashier's check or charges against your credit card, and you agree to provide us with appropriate authorizations on our request.

(m) You agree that you will operate your Center in keeping with the mission and culture of the System and will use your best efforts to engage in socially responsible activities using business as a force for good as outlined in the Manuals.

### 8.2  Computer System Requirements.

(a)  Pursuant to Section 4.4 above, you are required to pay to us a Portal Subscription Fee in an amount not to exceed $100 per month for use of the Online Trading Academy Portal.  Use thereof by you is mandatory and the Portal Subscription Fee may be adjusted annually.

(b)  We require you to pay to us a Trading Software Data Fee of $50 per month per user unless we have made arrangements with a broker dealer or other third party to provide data feeds into your classrooms without charge.  This amount will be paid monthly or annually, as we determine, and is subject to inflation adjustment or increase from the vendor.

(c)  You must obtain and maintain adequate quantities of computers and related equipment necessary and appropriate to the conduct of the Franchised Business. Minimum quantities per classroom and type of computer will be prescribed by us. You understand that as technology develops and the System matures, we in our sole discretion may require additional software, hardware and other equipment. You understand and agree that you will upgrade and change your computer system and equipment periodically as required by us. We do not currently require any proprietary software systems.  If we do so in the future, you will be required to update/convert your systems and will bear the costs associated with conversion. We currently require that all computers run on the most current version of Microsoft operating system and potentially other applications on certain computers. You must also use SalesForce.com® or any new database software we choose, and QuickBooks® or QuickBooks Pro® online with us named as an administrator. Owners and center administrators must take the basic QuickBooks class online.

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7491

(d)     You shall maintain, at your sole cost, computer equipment capable of running any electronic communication services or trading applications in your classroom(s) which we may from time to time require of System members. You agree to comply with all changes in accordance with our instructions. You must purchase a server and the minimum number of desktop computers for use by your customers attending your courses as we determine and communicate via the Manuals or the Franchise Portal.  You must also purchase a computer system for general operational use related to your Franchised Business as specified in the Manuals. You may purchase or lease computers from any source you choose, as long as they are new model PCs with brand names (like DELL or HP) with Intel or equivalent processors and sufficient memory, hard drive space and speed to run the required computer functions.  Examples of computers that meet these requirements are listed in our Manuals or on the Online Trading Academy Portal.  You will also be required to have dedicated internet connections with sufficient bandwidth, late model network switch and firewall as specified in our Manuals.

(e) You must obtain and maintain at your sole expense accounting, sales, reporting and records retention systems conforming to any requirements we prescribe including any electronic systems with full time unrestricted online access for us.  These systems may include computer and accounting systems, and software programs, and may have components only available from us, a Franchisor Related Entity and/or designated suppliers.   We reserve the right to use, as we deem appropriate, and to have full time unrestricted online access to, all accounting systems, computer and any other systems, and the information and data they contain.  We may charge a reasonable fee for the license, modification, maintenance or support of software or any other goods and/or services that we furnish to you with any of the systems.

**8.3     Manuals**.

(a)     The Manuals will contain mandatory and suggested specifications, standards and operating procedures that Franchisor develops for Centers and information relating to other obligations of Franchisee. Any required specifications, standards, and/or operating procedures exist to protect Franchisor's interests in the System and the Marks and to create a uniform customer experience, and not for the purpose of establishing any control or duty to take control over those day-today operational matters that are reserved to Franchisee. A copy of the Manuals shall be loaned to you at or before the Initial Franchise Training Program.  Any part of the Manuals which is transmitted electronically or made available electronically is also deemed "loaned" and shall be returned in accordance with this Agreement.

(b)     We shall have the right to modify the Manuals at any time by the addition, deletion or other modification of the provisions thereof.  All such additions, deletions or modifications shall be equally applicable to all similarly situated Online Trading Academy Franchisees.

(c)     Other applicable manuals, video tapes, audio tapes, CD's or other printed or recorded media containing information related to the System may be loaned to you at or before the Initial Franchise Training Program and otherwise made available to you during the franchise term.

(d)     You acknowledge and agree that we have developed certain Products, Services, operational systems and management techniques and may continue to develop additional products and proprietary methods and techniques for use in the operation of the Franchised Business which are all highly confidential and which are trade secrets of Online Trading Academy.  Because of the importance of quality control, uniformity of Products and Services and the significance of such proprietary Products and Services in the System, it is to the mutual benefit of the parties that we closely control the dissemination of this proprietary information. Accordingly, you agree that in the event such information and techniques become a part of the System, you shall comply and strictly follow these techniques in the operation of your Franchised Business and shall purchase from us, our Affiliates or from an approved source designated by us any supplies or materials necessary to protect and implement such techniques.

(e)     You shall at all times use your best efforts to promote and increase the sales and consumer recognition of the services offered by the Franchised Business pursuant to the System and the Manuals, to effect the widest and best possible distribution of our services from the Franchised Business and to

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7492

devote your best efforts in controlling the Franchised Business.

(f)     You shall display our Intellectual Property in the manner prescribed by us. The color, design and location of said displays shall be specified by us and may be changed from time to time at our sole discretion.

(g)     You and your employees, officers, directors, shareholders and independent contractors shall agree to the non-competition and nondisclosure terms contained in this Agreement and will sign if asked by us a statement to that effect. You and all of your employees and independent contractors must satisfactorily complete the Compliance Program and execute a confidentiality agreement in a form substantially similar to the form provided (see Exhibit 8.1) in order to be given access to any of our proprietary information and technologies. We shall be deemed to be a third-party beneficiary under such confidentiality agreement. You understand that no employee or contractor will be provided with any access to the System databases until the Compliance Program has been completed. Subject to the local laws in your State, you are required to carry out all appropriate background checks before hiring or engaging employees and independent contractors.

(h)     You shall comply with all other requirements set forth in this Agreement, in the Manuals or as we may reasonable designate from time to time.

**8.4     Signs and Display Materials**.   All signs, display materials and other Materials shall be in full compliance with the specifications provided in, and in conformity with, the Manuals. Said Materials may be purchased and procured by you from us or suppliers designated or approved by us in accordance with the Manuals guidelines.

**8.5     Telephone Numbers**.   At your sole expense, you shall obtain appropriate telephone directory listings in the form, size and content and in accordance with procedures prescribed by the Manuals, in at least one applicable telephone directory of general distribution covering the Territory, or such other areas as we may direct, using your authorized Online Trading Academy fictitious business name as promptly as possible after the Effective Date of this Agreement, and shall list telephone numbers for the Center. If you are involved in businesses other than the Franchised Business, you must maintain different telephone numbers and may make no reference to the Franchised Business in any telephone directory listings of such other businesses. Unless we indicate otherwise, upon Termination of this Agreement, for any reason, you shall change any listed telephone numbers relating to the Franchised Business, shall not provide call forwarding or telephone number referral with respect to any such disconnected telephone number (except to a telephone number designated by us) and shall not indicate in any manner it was previously affiliated with us.   You agree to execute any applicable supersedure or other telephone transfer forms relating to telephone numbers for the Center (including 800 numbers).   Also, you hereby irrevocably appoint and designate us as your attorney-in-fact to change any listed telephone numbers relating to the Franchised Business and to discontinue telephone directory listings using your authorized fictitious name, in the event of termination of this Agreement. You must answer the telephones solely in the manner prescribed in the Manuals.

**8.6     Insurance**. You shall have in effect on the Effective Date and maintain during the term hereof insurance in such types and amounts as specified in the Manuals. All policies of insurance to be maintained by you shall contain a separate endorsement naming us, and if required, our Affiliates, as additional insured parties. These policies of insurance shall not be subject to cancellation or modification except with 30 days prior written notice to us. You shall cause certificates of insurance showing compliance with the above requirements, insurance policy endorsements and other evidence of compliance with these requirements, to be delivered to us annually upon renewal and at such other times as we may request. The insurance policies described in the Manuals are minimum requirements and Franchisee may purchase and maintain additional insurance policies or insurance policies with greater coverage limits.

**8.7     Our Inspections, etc.**   We and/or our agents will have the right, during business hours, and without prior notice to you, to: i) inspect your Online Trading Academy Center and related activities and records; ii) remove samples of records and materials; iii) interview personnel; iv) interview customers; v) conduct inventories; and, vi) review general business operations.   You agree to cooperate in connection with such matters.

**8.8**     **Audit.**  We and/or our agents will have the right, on two days notice, to inspect and/or audit the business (including financial) records relating in any way to your Online Trading Academy Franchised Business and the books and records of any person(s), corporation or partnership, in which you hold an equity or management position, which holds, or does business with, the Franchise.  Our right to audit includes the right to access all computers and other equipment by electronic means.  You agree to cooperate fully with such matters.

**8.9**     **Gross Volume Understatements and other under payments.**

(a)     If any inspection or audit discloses an understatement of Gross Volume or any other sums due to Franchisor (for example, minimum royalties), you will pay to us the unpaid amount and/or the royalties and marketing contributions due on the understated amount, plus interest and late fees, from the date originally due until the date of payment.  We may require you to reimburse us for the cost of the inspection or audit, including, without limitation, accounting fees, and related travel and per diem charges, if:

(i.) any inspection or audit is necessary because of your failure to timely furnish required information/reports; or

(ii.) Gross Volume (together with any other under payments) is understated for any period by more than two percent (2%).

In addition to all other remedies and rights we may have, we may Terminate this Agreement if (i) Gross Volume is understated for any period by more than five percent (5%); or (ii) any understatement is determined by us to have been intentional.

**8.10**     **Use of Financial Data and Customer Information.**     You agree that we have the right to use any financial report or statement, or any information derived therefrom, relating to the Franchised Business, for aggregate statistical purposes, such as in an earnings disclosure, without providing your name.  You further consent to our use and publication of income and expense information related to your Franchised Business within our System via Intranet or other non-public media.  Any publication of income may identify your Center, however, publication of expense and net profit will be on an anonymous basis only or with your written consent.  You agree that; (i) any information that you provide to us in your reports or financial statements that includes any customer information collected or received electronically via the Internet or in any other format will be provided to us with the informed consent of the customer, and (ii) we will rely on this representation by you and accordingly you will indemnify us for any breach of this Section 8.10 in accordance with Section 16.2.

**8.11**     **Compliance with Laws.**

(a)     You shall (i) operate the Franchised Business in compliance with all applicable laws, rules and regulations of all governmental authorities and agencies, (ii) comply with all applicable wage, hour and other laws and regulations of the federal, state or local governments, (iii) prepare and file all necessary tax returns, and (iv) pay promptly all taxes imposed upon you or upon your business or property.  You represent and warrant that you shall obtain and at all times maintain all necessary permits, certificates, registrations or licenses necessary to operate the Center.  Within 5 business days from service of documents on you, you will immediately notify us of any litigation or arbitration proceeding brought against or involving you, or any of your Affiliates, agents, employees, owners, directors or partners of yours, which notification shall include all relevant details in respect thereof.

(b)     Any forms or materials provided by us as examples of forms or materials used by us or others in connection with the Franchised Business do not constitute an assurance or implication that such forms or materials comply with all laws specific to you. Such forms and materials are used by you at your own risk, and we recommend that before such use, you consult with your counsel to insure compliance with applicable law and section 8.11(a) above.

(c)     Franchisee is solely responsible for protecting itself from disruptions, Internet access failures,

**Attachment ZZ**

Internet content failures, and attacks by hackers and other unauthorized intruders and Franchisee waives any and all claims Franchisee may have against Franchisor as the direct or indirect result of such disruptions, failures, or attacks.

### 8.12    Confidential Information - Non-Disclosure and Non-Use.

A.       "Confidential Information" is defined in Section 1 above.  You agree that we own and control all domain names and URLs ("Uniform Resource Locator") web properties and social media profiles and sites relating to any Online Trading Academy Franchised Businesses, as well as all information, lists and data related to past, present and future customers of your Online Trading Academy Franchised Business. Your only interest in any of this proprietary and/or Confidential Information is the right to use it pursuant to this Agreement.  You have the burden of proof and of going forward in any dispute between you and us involving the proprietary or confidential nature of any information.

B.       Value of Confidential Information. You acknowledge and agree the Confidential Information is not generally known by the public or parries other than us, our Affiliates, our franchisees and you, derives independent economic value (actual or  potential) from not being generally known to the public or persons unaffiliated with us or you; and is the subject of our efforts that are reasonable under the circumstances to maintain the secrecy of the Confidential Information, including, without limitation,  (i) not revealing the Confidential Information to unauthorized parties (ii) requiring our franchisees to acknowledge and agree in writing that the Confidential Information is confidential (iii) requiring our franchisees to agree in writing to maintain the confidentiality of the Confidential Information, (iv) monitoring electronic access to the Confidential Information by the use of passwords and other restrictions so that electronic access to the Confidential Information is limited to authorized parties (v) requiring our franchisees to return all Confidential Information to us upon the expiration or termination of their Franchise Agreements.

C.       Both during and for five (5) years after the termination of this Agreement (except for trade secrets, which shall be subject to your permanent obligation), you agree:

1)       to use the Confidential Information only for the operation of your Online Trading Academy Franchised Business under an Online Trading Academy Franchise Agreement;

2)       to maintain the confidentiality of the Confidential Information;

3)       not to make or distribute, or permit to be made or distributed, any unauthorized copies of any portion of the Confidential Information, including, without limitation, duplication of Manuals, CDs, DVDs or Course Materials;

4)        not to alter, appropriate, use or distribute any Online Trading Academy designs or specifications, or any substantially similar designs or specifications; and

5)       to implement all prescribed procedures for prevention of unauthorized use or disclosure of the Confidential Information.

D.       You agree to disclose to us all ideas, techniques, methods and processes relating to an Online Trading Academy Center which are conceived or developed by you and/or your employees.  We shall have the perpetual right to use, and to authorize others to use, such ideas, without payment to you.

E.       You-must ensure that all personnel performing managerial or supervisory functions, all personnel receiving special training and instruction and all persons employed by you having access to any of our confidential information agree not to disclose, and do not disclose any confidential information which may be revealed to them during the period of their employment and you  will cause each of your employees, agents, principals and Affiliates to sign a form of confidentiality agreement containing substantially the same provisions as are set forth in Exhibit 8.1.  You will provide us copies of the same upon request. We shall be deemed to be a third-party beneficiary under such confidentiality agreement.

F.      If your Online Trading Academy Center will be located and/or operated within, in conjunction with, or as part of another business, you will first arrange for the other business and its personnel (as specified by us) to enter into appropriate arrangements to protect our Intellectual Property and other interests, including (but not limited to) signing agreements with us regarding non-competition, confidentiality, non-solicitation of employees and customers and indemnity/insurance arrangements.

**8.13    Exclusive Relationship, Restrictions on Similar Businesses During Franchise Term and After Transfer, Termination, Expiration, Repurchase, etc.**

A)      In Term Restrictions: During the term of this Agreement and any Renewal franchise, neither you, nor any Affiliate of yours, nor any shareholder, member or partner of yours (if you are or become a business entity), nor any Immediate Family member of any of the foregoing, will:

1)      have any direct or indirect interest anywhere in any Similar Business, or in any entity awarding franchises or licenses or establishing joint ventures or other business enterprises for the operation of Similar Businesses; or

2)      perform any services anywhere as an employee, agent, representative or in any capacity of any kind for any Similar Business, or for any entity awarding franchises or licenses or establishing joint ventures to operate Similar Businesses; or

3)      employ or try to employ or interfere with any of existing business relations with any employee of ours, our independent contractors and our trained and approved instructors or those of any Franchisor-Related Person/Entity, without providing notice to the respective employer or contracting party and obtaining their prior written consent.  If you violate Section 8.13 (A) during or after the term of this Agreement, then our remedies will include (but not be limited to) payment to us by you of Two Hundred Fifty Thousand Dollars ($250,000), such amount having been mutually agreed on by you and us in view of the extreme difficulty in accurately determining the damages suffered as a result of such breach.

B.      Post Term Restrictions: For two (2) years after the later of the following terminating events: i) any transfer, Repurchase and/or Termination of this Agreement; ii) the expiration of this Agreement (if a Renewal franchise or renewal term is not granted); or iii) the date on which you stop operating your final Online Trading Academy Center or using the Intellectual Property and/or System, all of the persons and entities named in Section 8.13 (A), above:

1)      shall not accept or solicit any person, firm or company on our customer list at the time of Termination, for a period of 2 years after termination, nor try to divert any such customers from any Online Trading Academy Center or Online Trading Academy enterprise of any kind (including any operations owned by any Franchisor-Related Persons/Entity); and

2)      shall be subject to all of the restrictions stated in Section 8.13 (A), above, with respect to Similar Businesses located, and/or services to be performed, in the Territory and in the marketing area of any Online Trading Academy Center ("Marketing Area") or any other open territories marketed into (including but not limited to available internet access to online courses) but not sold as a territory ("E-Marketing Area"). For the purposes of this Agreement, a Marketing Area for a Center is the territory defined by the applicable franchise agreement.

3)      You are responsible for learning whether or not a particular location is within an Online Trading Academy Center Marketing Area or E Marketing Area by providing us a written request for such information.  Any and all determinations that we make regarding the Marketing Area or E Marketing Area will be final and binding.

4)      You agree to ensure the compliance of each of the persons identified in Section 8.13 (A), with the restrictions described in this Section 8.13 and we agree to use reasonable judgment in evaluating whether the conduct of an Immediate Family member warrants exercising our rights under this

**Attachment ZZ**

provision. The restrictions of this Section do not apply to the ownership of shares of a Similar Business (with securities listed on a stock exchange or traded on the over-the-counter market) that represent less than three percent (3%) of the number of issued and outstanding shares.

        5)     You and we share a mutual interest in ensuring compliance with the limitations on competition described in this Section 8.13. An Online Trading Academy franchisee's non-compliance with these restrictions would damage you, us and other Online Trading Academy franchisees and unfairly limit reasonable expansion alternatives for us and Online Trading Academy System members. You confirm that you possess valuable skills unrelated to the Franchised Business and can be self-supporting and employed regardless of these competitive restrictions. You and we also acknowledge that these restrictions will <u>not</u> generally prevent you from practicing a lawful trade or business. You and we agree that the restrictions are limited to the solicitation of customers and operation of a Similar Business in both Marketing Areas and E Marketing Areas.

        6)     If you violate any of the foregoing restrictions, our remedies will include (but not be limited to) the right to obtain equitable relief and to receive all profits generated in connection with the operation of a Similar Business until the date you cease to violate such restrictions. All competitive restrictions will extend for the length of time that any breach of the Post Termination Obligations is on-going. If any of the restrictions of this Section are determined to be unenforceable because of excessive duration, geographic scope, business coverage or otherwise, they will be reduced to the level that provides the greatest protection to us and the Online Trading Academy System, but which is still enforceable, notwithstanding any choice-of-law or other provisions in this Agreement to the contrary.

    **8.14**    <u>**Grant of Security Interest.**</u>

    For valuable consideration, as security for the payment of all amounts owing or to be owed by you (and/or any Affiliate of yours) to us (and/or any Affiliate of ours) under this Agreement or any other agreements, and your performance of all obligations thereunder, you hereby grant to us a security interest in all proceeds of your Online Trading Academy Center and in all of the assets, including equipment, furniture, fixtures and signs, used by, at or in connection with, your Online Trading Academy Center and its related business and (the "Collateral"). You will not remove the Collateral or any portion thereof without our prior written consent. You represent and warrant that the security interest granted is prior to all other security interests in the Collateral except for (i) bona fide purchase money security interests and (ii) the security interest granted to a third party in connection with your original financing for your Online Trading Academy Center, if any. In connection with any request for our approval of a security interest, we will make commercially reasonable efforts to accommodate reasonable lender's requirements, including the subordination of our interests to the lender's and/or lessor's, as applicable, in our Business Judgment, bearing in mind the interests of the borrower, lender, ourselves and the System. On the occurrence of any event entitling us to Terminate this Agreement or any other agreement between the parties, or if we reasonably determine that we are not assured that your (and/or any Affiliates') obligations will be timely and fully paid and/or performed, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your Online Trading Academy Center is located, including, without limitation, the right to take possession of the Collateral. You will execute and deliver to us or to our approved lenders including Franchisor-Related Persons/Entities any financing statements (including executed UCC1 filing forms) and/or such other documents as we or they reasonably deem necessary to perfect our or their interest in the Collateral within ten (10) days of your receipt of such documents from us. In addition you agree that at any time during the Term when Franchisee is in noticed and uncured monetary default we may require an updated credit report against the Franchisee and the Equity Holders.

---

| |
|---|
| **I have read Sec 8.10, 8.11, 8.12 and 8.13, understand and agree with them.**<br>**Your Initials:  _____ / _____** |

**9.      ASSIGNMENT, TRANSFER AND REPURCHASE.**

**9.1      Assignment by Us**.    We shall have the right to Transfer any or all of our direct or indirect interest in this Agreement (including without limitation the economic benefits derived from this Agreement), and any or all of our rights and privileges hereunder to any other person, firm or corporation (in such context, "Assignee of Franchisor"); provided that, in respect to any Transfer (in such context, "Assignment by Franchisor") resulting in the subsequent performance by such Assignee of Franchisor of the functions of Franchisor, (i) at the time of Assignment by Franchisor, Assignee of Franchisor is financially responsible and economically capable of performing the obligations of Franchisor hereunder, (ii) the Assignee of Franchisor expressly assumes and agrees to perform such obligations, and (iii) Franchisor shall be relieved of all obligations or liabilities then existing or thereafter assertable under this Agreement (except that if you continue to comply with all terms and conditions of this Agreement, including but not limited to Section  2.1 and Articles 6 and 8 hereof, then you shall be entitled during such continued compliance to use the Intellectual Property licensed hereunder until the end of the then current term of this Agreement.  At the end of such period of continued compliance and use of the Intellectual Property, you shall comply with the terms of Section 12.4 below).

**9.2      Assignment by You.**

(a)      Restriction on Transfer. This Agreement is being entered into in reliance upon and in consideration of the singular personal skills and qualifications of you and/or principals and the trust and confidence placed in them by us. Therefore, except as otherwise provided in this Article 9, neither you nor any immediate or remote successor to you, nor any individual, partnership, corporation, or other legal entity which directly or indirectly owns an equity interest (as that term is defined herein) in you, shall Transfer any direct or indirect interest in this Agreement, in the Franchised Business or in the economic benefits derived therefrom, or any equity interest in you, in whole or in part, in any manner (in such context, "Assignment by Franchisee"), except as permitted by this Agreement. Any purported Transfer of any interest in this Agreement, the Franchised Business or an equity interest in you not in accordance with this Agreement shall be void and shall constitute a material breach of this Agreement, for which we may terminate this Agreement without prior notice or opportunity to cure, pursuant to Section 11.1 of this Agreement.

(b)      Transfers to Employees, Officers, Owners. Except as otherwise provided in this Agreement, without our prior written consent, (i) you or any Equity Holder may Transfer or issue in any single transaction less than 49% of the equity interest in you to an employee or officer of yours who has been directly involved in the operation of the Franchised Business on a full-time basis (working an average of 35 or more hours per week) for at least one year as of the time of such Transfer or issuance, and (ii) an Equity Holder may receive a Transfer of up to 49% of the equity interest in you from other Equity Holders; provided (in either case) that such Transfer, when combined with all other Transfers that have occurred since you shall have been a franchisee of Franchisor, does not exceed 49.9% of the equity interest or otherwise effect a change in control of you.  Any transfer under this section is not subject to Franchisor's right of first refusal under Section 9.3 nor the Transfer Fee set forth in Section 9.2(k) hereof.

(c)      Transfers to Family Members. You or an Equity Holder, if a natural person, may with our consent, which will not be withheld unreasonably, Transfer the Franchised Business or an equity interest in you to such person's spouse, parent, sibling, niece, nephew, descendant or spouse's descendant provided that (i) adequate provision is made for the management of the Franchised Business, (ii) any successor General Manager has successfully completed Initial Franchise Training Program, and (iii) a transferor who has demonstrated adequate financial capacity guarantees in form and substance satisfactory to Franchisor the performance of the transferee's obligations under this Agreement. Any transfer under this section is not subject to our right of first refusal under this Section 9.3 nor the Transfer Fee set forth in section 9.2(k) hereof.

(d)      Transfers to Corporations with Same Ownership.  At any time within 90 days after the Effective Date, you or an Equity Holder, if a natural person, sole proprietorship or partnership, may upon prior written notice to us, Transfer the Franchised Business or an equity interest in you to a corporation entirely owned by such natural person, sole proprietorship or partnership, as the case may be, in the same proportionate amount of ownership as prior to such Transfer, provided that (i) adequate provision is made for the management of the Franchised Business, (ii) any successor General Manager has successfully

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7498

completed Initial Franchise Training Program, and (iii) the transferor guarantees, in form and substance satisfactory to Franchisor (see Exhibit 1), the performance of the transferee's corporations obligations under this Agreement.  Any transfer under this section is not subject to our right of first refusal under section 9.3 nor the Transfer Fee set forth in section 9.2(k) hereof, and shall require verification in a form satisfactory to Franchisor.

(e)    Transfers Upon Death and Incapacity. In the event of the death or legal incapacity of you or an Equity Holder, if a natural person, we will recognize that such person's interest in this Agreement or its equity interest in you will Transfer in accordance with such person's will or, if such person dies intestate, in accordance with laws of intestacy governing the distribution of such person's estate, provided that (i) adequate provision is made for the management of the Franchised Business, (ii) any successor General Manager has successfully completed Initial Franchise Training Program, and (iii) the transferee is one or more of the decedent's spouse, parents, siblings, nieces, nephews, descendants or spouse's descendants. Any transfer under this section must be completed within 6 months of the date of death or incapacity and is not subject to our right of first refusal under section 9.3 nor the Transfer Fee set forth in section 9.2(k) hereof.  If no transfer occurs within 6 months, the Franchise will automatically terminate at the end of such period, unless extended by us.

(f)    Restrictions on Granting Security Interests and Sub-franchising. Except as otherwise set forth below, you shall not have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement, nor sub-franchise or otherwise Transfer, or attempt to sub-franchise or otherwise Transfer the Franchised Business, or to Transfer or sub-franchise a portion but not all of your rights hereunder without our express prior written permission, which permission may be withheld for any reason in our sole discretion. However, without our prior written consent and for the sole purpose of obtaining financing for the operation of the Franchised Business and provided you are in full compliance with all of the terms and conditions of this Agreement, and any other agreement, arrangement or understanding with Franchisor, (i) you shall have the right to enter into a commercial, third party equipment lease or financing arrangement for the provision of equipment for use in the Franchised Business, (ii) you shall have the right to pledge your accounts receivable and (iii) your shareholders (if a corporation) may pledge their shares of stock in you as additional collateral security provided that such pledge if foreclosed upon would not result in a transfer of control of you to another person, firm or entity.

(g)    Other Transfers. Except as otherwise provided in this Agreement and subject to our right of first refusal under Section 9.3 hereof, you or an Equity Holder may affect any Transfer of a direct or indirect interest in this Agreement, in the Franchised Business or in the economic benefits derived therefrom, or any equity interest in you, not permitted by the preceding sections 9.2(b) through 9.2(e), only after written notice to us and only with our written consent, which may not be withheld unreasonably. We must exercise our good faith business judgment in determining whether to give or withhold our consent to a Transfer under this section 9.2(g). In exercising good faith business judgment, we must consider skills and qualifications of the prospective transferee which are of business concern to us, including without limitation the following (i) entrepreneurial and managerial abilities; (ii) financial and operational skills; (iii) qualifications, financial resources, reputation and character of the prospective transferees; (iv) the ability of the prospective transferee(s) to fully and faithfully conduct the Franchised Business as contemplated by this Agreement; (v) commitment to social responsibility in keeping with the Franchisor's core values and mission statement, and (vi) the effect that the Transfer and the prospective transferees will have or may reasonably be expected to have on the reputation or business operations of the Franchised Business, the System, us or any of our Affiliates . In addition, any Transfer will be conditional upon (i) the Franchisee being current on all payments due to Franchisor including unpaid Online Class Fulfillment Fees for all online classes sold to customers through the date of the transfer and (ii) the Center conforming to all of Franchisor's current Design Standards and specifications.

(h)    Equity Interest Defined.  An "equity interest" in an entity shall mean any stock or partnership interest or other direct or indirect beneficial interest in such entity (whether partnership, corporation, trust or otherwise), or in the economic benefits derived therefrom, and if the holder of such equity interest is not a natural person, "equity interest" shall also include any stock or partnership interest or other direct or indirect beneficial interest in, or in the economic benefits derived from, such holder. "Equity Interest" in you shall also include any direct or indirect interest in this Agreement, in the Franchised Business or in the economic benefits derived therefrom or in the assets of the Franchised Business if such assets are

transferred in connection with a Transfer of a substantial portion of such assets.

(i)  <u>Computing Equity Interests</u>. In computing the percentages of equity interests in you, limited partners will not be distinguished from general partners and our judgment will be final if there is any question of the definition of "equity interest" or as to the computation of relative equity interests, the principal considerations being: (i) direct and indirect power to exercise control over the affairs of yours; (ii) direct and indirect right to share in your profits; and (iii) amounts directly or indirectly exposed to risk in your business. Equity interests may be transferred only if the Transfer is registered or exempt from registration under federal securities laws.

(j)  <u>Registration of Proposed Transfer</u>. If a proposed Transfer of an equity interest in you requires registration under any federal or state securities law, you shall: (i) request our consent at least 45 days before the proposed effective date of the registration; (ii) accompany such requests with payment of the non-refundable transfer fee set forth in section 9.2(k) below; (iii) reimburse us for expenses incurred by us in connection with review of materials concerning the proposed registration, including without limitation attorneys fees and travel expenses; and (iv) together with all participants in the proposed offering subject to registration, agree (A) to fully indemnify us against any costs or liabilities in writing (in form and substance satisfactory to us) in connection with the registration, (B) to furnish us all information requested by us, (C) avoid any implication of our participating in or endorsing the offering, and (D) to use the Intellectual Property only as directed by us.

(k)  <u>Transfer Fees</u>.  Excepting transfers pursuant to sections 9.2(b), 9.2(c), 9.2(d) or 9.2(e) hereof, in the event of any Transfer pursuant to this Article 9, you shall pay to us a non-refundable transfer fee of 5% of the gross sales price or a minimum fee of $25,000 if you sell the whole or any part of the assets or ownership of your Franchised Business, whichever is greater, at the Closing of the Transfer. In addition we will charge

(i)  the transferee/assignee a transition assistance fee of $15,000

(ii) and if we provide a qualified transferee, we will charge Franchisee a sales commission fee of 5% of the total sales price of the OTA Franchised Business.

(l)  <u>Conditions Precedent to Transfer</u>. We may impose certain conditions precedent to our consent to a Transfer including but not limited to and without limitation the following:

(i)  the proposed transferee (or the principal Equity Holders thereof) presents himself, herself or themselves for a personal interview at our corporate office, or such other location designated by us, at such date and time reasonably requested by us, without expense to us and prior to such Transfer;

(ii)  You shall have complied fully as of the date of any such Transfer with all of your obligations to us under this Agreement, or any other agreement, arrangement or understanding with us;

(iii)  the proposed transferee agrees that all of our training and orientation programs then required by us shall be satisfactorily completed by transferee's necessary personnel within 30 days after the effective date of such Transfer, and such transferee agrees to pay for all of its expenses incurred in connection therewith, including travel, hotel and meal expenses; and

(iv)  in our sole discretion, the assignee executes our then current form of Franchise Agreement for a term equal to the term remaining under your Franchise Agreement or a new term; and

(v)  The transferee agrees to assume all training obligations to our customers, and.

(vi)  if not already current, the Center will be upgraded to conform to all of Franchisor's current Design Standards and specifications.

(m)    <u>No Waiver.</u> You acknowledge that (i) any consent granted or withheld by us under this Article IX shall not serve to waive our right to grant or withhold consents thereafter and (ii) we may consider the effect (cumulative or otherwise) of prior Transfers in determining whether to grant or withhold our consent to any Transfer.

(n)    <u>Notice</u>. If a Transfer occurs that is permitted without our prior written consent pursuant to this Section 9.2, you and the transferor shall give us notice of such Transfer within ten days after such Transfer and shall provide all related information reasonably requested by us.

**9.3    <u>Right of First Refusal.</u>**

(a)    Except as otherwise provided in section 9.3 hereof, the right of you and Equity Holders to Transfer any equity interest in you or any direct or indirect interest in this Agreement, the Franchised Business or the economic benefits derived therefrom, or in the assets of the Franchised Business (if the Transfer of these assets would result in a transfer of a substantial portion of your assets), shall be subject to our right of first refusal with respect thereto if such Transfer (i) is in excess of 49.9% of such equity interest in any single transaction (or series of related transactions) or (ii) otherwise effects a change in Control of you, unless the transferee is an Equity Holder. Our right of first refusal may be exercised in the following manner:

You or the Equity Holder shall serve upon us a written notice setting forth (i) all of the terms and conditions of any bona fide offer relating to a proposed Transfer by such person, and (ii) all available information concerning the proposed transferee of such person, (iii) within ten business days after our receipt of such notice (or if it shall request additional information, within ten business days after receipt of such additional information), we shall notify the proposed transferor of one of the following:

a.    We will be exercising our right of first refusal as provided herein; or

b.    We grant our consent to the Transfer under the terms stated in the notice; or

c.    We will not be exercising our right of first refusal but for other reasons within our discretion (our right of first refusal in no way modifies or diminishes our right to withhold consent to a Transfer), we do not consent to the Transfer.

(b)    If we elect to exercise our right of first refusal, we shall purchase the equity interests or assets proposed to be transferred on the same terms and conditions as set forth in the bona fide offer. If we elect not to exercise our right of first refusal and consent to the Transfer, the proposed transferor shall for a period of 90 days be free to Transfer to the proposed transferee upon the terms and conditions specified in said notice. If, however, the terms of the offer are materially changed, or if the 90-day period expires, we shall again have a right of first refusal with respect thereto and the proposed transferor shall again be required to comply with section 9.3(a) above.

**9.4    <u>Right of Repurchase.</u>**

We will have the right, but not the obligation, to repurchase your Franchise, your Franchised Business and/or the assets of your Franchised Business upon 90 days prior written notice to you.  The price will be mutually agreed upon by you and us in advance.  If no agreement regarding the purchase price can be reached, no repurchase will occur.

Your and our rights regarding the Franchise are controlled by the provisions of this Agreement. Other than your interest in the Franchised Business as a going concern and any value associated therewith or with any assets that you own related to the Franchised Business in accordance with the System and/or Manuals, you will have no equity or any other continuing interest in the Franchise license or any goodwill

associated with the Marks, the System or the Intellectual Property upon repurchase, expiration and/or Termination of the Franchise.

## 10.   Marketing and Advertising

### 10.1   Marketing Fund.

A.      We have established an advertising**,** publicity and marketing fund (the "Marketing Fund") to promote Online Trading Academy Centers and the Brand.  You'll contribute to the Marketing Fund the greater of $1, 000 or three percent (3%) of Gross Volume per month.  The minimum marketing fund fee will be subject to Inflation Adjustment.   Such percentage and minimum marketing contributions will be calculated and payable at the same time and in the same manner as  the Royalty Fee.

B.      The Marketing Fund operates primarily to provide strategic guidance, creative materials and messaging, access to agencies and printers, targeted email campaigns, direct mail, radio and television campaigns for Online Trading Academy Centers to implement at a local level.  Your participation in certain of our National and Global Marketing Services Programs is required and participation in others is highly encouraged and may become required as set out in Section 10.5 below.

C.      We have sole discretion over <u>all</u> matters relating to the Marketing Fund, operational, marketing or any other matter (consistent with its purposes and the provisions of this Agreement).  The Marketing Fund may be used for (among other things) product marketing and development; signage; creation, production and distribution of marketing, advertising, public relations and other materials in any medium, including all matters related to the Internet website and online reputation management; administration expenses; brand/image campaigns; media; public relations; expos; national, regional and other marketing programs; activities to promote current and/or future Online Trading Academy Centers and the Brand; agency and consulting services; research; any expenses approved by us and associated with the FAC or other Franchisee advisory groups (if any). Among other things, Marketing Fund contributions may be used for web site development/operation, development and customization of technologies integrated with Salesforce.com, QuickBooks or other technologies we use, and to pay Internet, Intranet, URL, 800 or similar number, and other charges, fees and/or expenses.  A brief statement regarding the availability of Online Trading Academy franchises may be included in advertising and other items produced using the Marketing Fund. We may also use Marketing Fund for socially responsible marketing opportunities to benefit the brand and the network.

D.      We and/or any Franchisor-Related Persons/Entities can provide goods, services, materials, etc. (including administrative services and/or "in-house advertising agency" services) and be compensated and/or reimbursed for the same by the Marketing Fund, provided that any such compensation must be reasonable in amount.   We can arrange for goods, services, materials, etc. (including administrative services) to be provided by independent persons/companies and we may receive full or partial reimbursement from such third parties for our direct costs associated with such goods and services and other associated costs may be paid by the Marketing Fund.  While we are not required to do so, if we have formed an FAC and submit any matters for approval to the FAC and approval is granted by a majority of the members, the approval will be binding on you.

E.      The Marketing Fund will be accounted for separately and may be used to pay all administrative and other costs of the Marketing Fund related to its activities and purposes and/or as authorized by the relevant Franchise Agreements.  All taxes of any kind incurred in connection with or related to the Marketing Fund, its activities, contributions to the Marketing Fund and/or any other Fund aspect, whether imposed on us, the Marketing Fund or any other related party, will be the sole responsibility of the Marketing Fund.  We will prepare financial statements for the Marketing Fund annually, which will be furnished to you upon written request. Such statements may be audited and any related accounting/auditing costs will be paid by the Marketing Fund.  Funds in the Marketing Fund must be expended, prior to termination of the Marketing Fund, only for the purposes authorized by the relevant Franchise Agreement(s). If we spend less than the total of all contributions to the Marketing Fund during any fiscal

year, we may accumulate the sums for use in later years.  No profit, gain or other financial benefit will directly accrue to us from the Marketing Fund.  All interest earned on monies contributed to, or held in, the Marketing Fund will be remitted to the Marketing Fund and will be subject to the restrictions of the relevant Franchise Agreement(s).

F.    Financial management of the Marketing Fund will be our sole responsibility.  We may in our Business Judgment:

1)    compensate ourselves and/or any Franchisor-Related Person/Entity for salaries, administrative costs, overhead and other expenses incurred in Marketing Fund related programs/activities, including but not limited to production, research, insurance, and collection expenses, as well as any legal expense related to the activities and purposes of the Marketing Fund (consistent with the provisions of this Agreement. Such compensation may include payment for: i) the salaries and benefits of our employees who will act as managers of the Marketing Fund or who provide marketing services to the System, and (ii) the costs of our in-house staff to collect and account for contributions to the Fund, so long as the employee time to perform these accounting/collection activities is less than the equivalent of a full time employee;

2)    charge the Marketing Fund for attorneys' fees and other costs related in any way to claims against us and/or any of the Franchisor-Related Persons/Entities regarding the Marketing Fund. However, we shall be required to reimburse the Marketing Fund for any attorneys' fees and/or costs paid by the Marketing Fund in connection with any action in which we are finally found to have acted unlawfully or to be guilty of wrongdoing with respect to the Marketing Fund;

3)    spend in any fiscal year an amount greater or less than the aggregate contributions to the Marketing Fund in that year, and the Marketing Fund may borrow from us or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus;

4)    collect for remission to the Marketing Fund any advertising or promotional amounts offered by any supplier based upon franchisee or customer purchases or referrals.  Any such contributions, whether or not made with respect to purchases by you, will not count toward your required Fund contributions;

5)    pay the advertising, marketing, public relations and related costs involved in any co-branding, dual franchising or other such multi-sponsor programs;

6)    revise marketing and other programs, and/or make expenditures from the Marketing Fund, to take account of cultural and other differences (and/or we may delegate management of a portion of the Marketing Fund in connection therewith);

7)    defer, waive and/or compromise claims for current/future contributions to, and/or claims against or with respect to, the Marketing Fund and fund the same with the Marketing Fund;

8)    take legal or other action against any Franchisee in default of their obligations to the Marketing Fund;

9)    merge the Marketing Fund with any marketing fund otherwise established for Online Trading Academy Centers for use as described in this Section 10.1, so long as the restrictions of the relevant Franchise Agreement(s) continue to apply to contributions made by Franchisees under such arrangements;

10)    maintain Marketing Fund assets in one or more accounts designated as "trust accounts" for purposes of protecting such assets from claims of third-party creditors, (but such action shall not be deemed to create any "trust," "fiduciary relationship" or similar special arrangement);

11)    incorporate the Marketing Fund or operate it through an entity separate from us, which is subject to all rights and duties of ours relating to the Marketing Fund;

12) take such other actions in connection with the Fund as we consider to be appropriate and as are consistent with the provisions of this Section 10.1.

G. You acknowledge and agree that we have no obligation to ensure that expenditures by the Marketing Fund are or will be proportionate or equivalent to contributions to the Marketing Fund by Online Trading Academy Centers operating in any geographic area, or that any Online Trading Academy Center will benefit directly, indirectly or in proportion to its contribution to the Marketing Fund. You understand that some Online Trading Academy Franchisees may have Marketing Fund obligations that are different from yours, if any

H. Neither we (nor any of the Franchisor-Related Persons/Entities, including the FAC (if any)) will be liable for any act or omission in connection with the Marketing Fund which is consistent with this Agreement or which is done in subjective good faith. You and we expressly agree that none of the relationships with you in connection with the Marketing Fund are in the nature of a "trust," "fiduciary" or similar special arrangement.

I. Subject to the express requirements of this Agreement that your contributions will only be spent as authorized herein, you agree that we may deny access to any and all programs and/or materials created by, and benefits of, the Marketing Fund to you and to any Franchisees who are not in Good Standing.

**10.2    Your Participation in the Marketing Fund.** You agree to participate in all Marketing Fund programs. You have the right to set your own prices, except that we may specify maximum prices for goods or services to the greatest degree permitted by law. You will fully honor all coupons, price reduction and other promotions/programs as directed by us. The Marketing Fund may furnish you with marketing, advertising and promotional materials or other marketing resources; however, we may require that you pay the cost of developing, producing, shipping and handling for such materials.

**10.3    Your Center Marketing Activities.**

A. The minimum you must spend for advertising and promotion of your Online Trading Academy Center within the Territory each month (including your participation in the Global Marketing Services Programs as set out in Section 10.5 below) will be  a minimum of fifteen percent (15%) of Gross Volume, subject to Inflation Adjustment. If we request it, you will submit verification of your expenditures in a form prescribed by us. Appropriate local advertising expenditures may include, but are not limited to, classified telephone directory listings and advertising. The value of discounts, coupon redemptions and/or Products or Services given without charge shall not be considered toward meeting your local advertising obligation under this Section. You are required to advertise and market at both the local and global level and to participate in certain of the Global Marketing Services Programs as described in section 10.5 below.

B. You will use only the email address[es] and/or URL[s] we designate for you in connection with your Franchised Business and communicate using only such identifiers. We will own the rights in and to each and every  such email address and/or URL as described in this Agreement. We will manage and maintain your URL, which may include monitoring your email, as a subsection of our website to maintain a uniform and consistent appearance and quality control. No other URLs may be maintained by you related to your Franchised Business. You must provide to us for prior approval and consent to use samples of all proposed advertising and promotional materials, including all emails, and direct mail or electronic media materials or web properties or social media profiles of any kind and any proposed use of the Marks or Brands and/or other forms of commercial identification. You will comply with our compliance standards in all our Manuals as to content and delivery of any and all approved advertising and promotional materials and, for any media authorized under this Agreement. We may condition or withhold our approval and consent to use in our Business Judgment. All advertising and promotional materials that are pre-approved, such as course or seminar schedules and contact information, will appear in the Manuals on the franchise portal or through our Marketing Department electronic communications with you. Your advertising will be in good taste and conform to ethical and legal standards and our requirements. You agree not to use any

materials or programs disapproved by us at any time in our Business Judgment and will use all materials and programs designated by us as mandatory.  We can require that a brief statement regarding the availability of Online Trading Academy franchises be included in advertising used by you and/or that brochures regarding purchase of Online Trading Academy franchises be displayed in your Online Trading Academy Center.  We require that you use a designated Internet/Intranet Service Provider (which can be us or an Affiliate), to receive such communications - see section 4 above.

C.      You may hire or engage independent marketing agents to assist you in promoting your Franchised Business.  In order to ensure the maintenance of Brand standards and the protection of Confidential Information and Intellectual Property Franchisor will approve the use of all such agents who will be solely  compensated by you as you will negotiate separately and directly with them.  Such expenditures will not be counted toward meeting your minimum or other Local Advertising requirements or marketing contributions.  Such agents must be familiar with the Online Trading Academy sales process and general standards.

**10.4    Franchisee Marketing Group(s) ("FMG").**  We may decide to form one or more associations and/or sub-associations of Online Trading Academy Centers to conduct various marketing-related activities on a cooperative basis (an "FMG").  If one or more FMGs (local, regional and/or national) are formed covering your area, then you must join and actively participate. Each Center, whether franchised or non-franchised, will be entitled to one (1) vote, but in order to vote franchised Centers must be in Good Standing.  You may be required to contribute such amounts as are determined from time-to-time by such FMGs.  Each FMG may adopt its own bylaws, rules, regulations and procedures, subject to our consent in our Business Judgment.  Any failure to timely pay amounts due to, or to comply with the bylaws, rules, regulations and procedures of an FMG, is a breach of this Agreement.  We may offset against amounts we or any Affiliate owe to you the amount of your unpaid FMG obligations. We will have the right to have a representative participate in all FMG meetings as a non-voting participant.  While we are not required to do so, if we submit any matters for approval to an FMG of which you are a member, and approval is granted, the approval will be binding on you.

**10.5    National and Global Marketing Services Programs.** In addition to the Marketing Fund activities we may manage various national and global advertising and marketing programs which may purchase media generally at a more cost-effective rate than you may purchase locally, and or which may not be available to you on a local level ("Global Marketing Services Programs"). You are required to participate in our Global Marketing Services / Global Advertising Program. You will pay to us an initial deposit of $15,000 which must be renewed up to the $15,000 minimum every month depending upon the sum expended in the previous month. Within this program, you will either (i) pay for actual usage based on the cost of delivered lead generation or class registration or attendance on a monthly basis or (ii) proportional to your share of media costs as described and calculated in accordance with the relevant GMS Program Description. Participation by you in all such programs is highly encouraged and the costs of such participation will be included in the Center Marketing Activities required spending level as set out above. Global Marketing Services Programs may be either performance based programs or shared costs programs.  For performance based programs  you will pay the costs based on leads, seminar registrations and/or attendances received by you as detailed in the relevant GMS Program Description. For shared costs programs, cost shall be borne by you proportional to your share of media costs as described and calculated in accordance with the relevant GMS Program Description. Such costs may include, but are not limited to, cost of media purchases, servicing costs, management costs of the campaigns including the cost of our personnel, technology-related costs and other costs as determined by us to manage the campaigns. Check this matches current GMS agreementYou acknowledge and agree that your monthly participation in additional Global Marketing Services Programs is a System requirement.

**10.6    Special Marketing Projects**

In addition to (a) the Marketing Fund activities which at the date of this Agreement are primarily focused on providing marketing products and development, marketing infrastructure and analytics, support and consultation online reputation management, Search engine optimization, and email communications, and (b) the GMS Program activities which at the date of this Agreement are primarily focused on specific

direct response marketing activities that currently include but are not limited to online and broadcast opportunities for franchisees to generate workshop registrations,  we may also elect to (c) initiate and manage special marketing projects.

For the purposes of this Agreement a special marketing project will focus on advertising growth opportunities that will be used in the activities of the Marketing Fund and GMS and will include the work of outside third party agencies. An example of a special marketing project may be the development of a creative multi-media branding campaign for a consistent message throughout TV spots, direct mail, online communications and social media and radio. Another example may be the development or refreshing of existing infomercials or any other projects that aim to benefit and enhance the platforms and channels supported by the Marketing Fund, and / or GMS platforms "Special Marketing Project".

For the purposes of this Agreement a Special Marketing Project will be financed with funds outside the scope of the Marketing Fund.   All Franchised Businesses will contribute to the cost of Special Marketing Projects including company owned Centers. Such funding may be initially provided by Franchisor and franchisees will be invoiced during the relevant financial year, or Franchisor may require that franchisees provide up front contributions to such costs. There may be more than one Special Market Project in any one calendar year.  Payment for the Special Marketing Projects shall be made as set out in section 4.18 above.

### 10.7   National TV Advertising Program

Franchisor operates a National TV Advertising Program which may include, informercials and long-form and short form spots. This program is designed to (a) leverage the collective purchasing power of the franchisees and company owned locations, (b) manage the timing of campaigns as TV airtime must be booked a calendar quarter in advance, and (c) provide access to cable channels not otherwise accessible to franchisees as some TV air time for infomercials can only be acquired nationally. National TV Advertising spend is committed quarterly in advance with input from the then current FAC (Marketing). All US centers, including franchisor owned Centers, are charged their pro rata share of the total quarterly advertising spend. This calculation is currently based on the number of households in each respective Territory and is subject to change depending on the number of operating Centers, the introduction of a new method of calculating pro rata share, and the then current quarterly needs as reviewed by the FAC (Marketing) and determined by the Franchisor in its Business Judgment.  You will be billed monthly in advance in installments as set out in Section 4.19 above. Franchisor may amend or change or discontinue the National TV Advertising Program at any time.


## 11.   TERMINATION OF THE FRANCHISE.

11.1   **Defaults with No Right to Cure.**  This Agreement will automatically Terminate upon delivery of our written notice of Termination to you (without further action or opportunity to cure) if you:

A.     fail to timely meet the site selection, development, opening and other requirements provided in Sections 3.1 (A) and 3.6, above;

B.     abandon or fail to operate your Online Trading Academy Center for more than ten (10) consecutive calendar days without prior authorization from us, or lose the right to possession of the premises and do not relocate your Online Trading Academy Center in accordance with this Agreement;

C.     make any material misrepresentation or omission in your application for the Franchise;

D.     are judged bankrupt, become insolvent, make an assignment for the benefit of creditors, are unable to pay your debts as they become due, or a petition under any bankruptcy law is filed by or against you or a receiver or other custodian is appointed for a substantial part of the your assets;

E.     are convicted of, or plead no contest to, a felony, or to any crime or offense that is likely to

adversely affect your reputation, your Online Trading Academy Center, us or the goodwill associated with the Marks;

F.　　engage in any misconduct that unfavorably affects your reputation, your Online Trading Academy Center, us or the goodwill associated with the Marks (including, but not limited to health or safety hazards, drug or alcohol problems, or permitting unlawful activities at your Online Trading Academy Center);

G.　　make, or attempt to make, an unauthorized "Transfer" as defined in this Agreement or surrender control without our prior written approval;

H.　　make an unauthorized use of the Marks or any unauthorized copy, use or disclosure of any Confidential Information;

I.　　violate any of the In Term or Post Term Restrictions against competition provided in Section 8.13 above (or any other person identified therein commits such a violation);

J.　　commit any act or omission of fraud or misrepresentation, whether with respect to us, any of the Franchisor-Related Persons/Entities and/or any third party;

K.　　fail to permit or cooperate with us or our designee in any audit or inspection or fail to retain or produce any records you are required to maintain or produce;

**11.2**　**Defaults with Right to Cure.**  This Agreement will automatically Terminate on delivery of our written notice of Termination to you in compliance with Article 14 (without further action or opportunity to cure beyond that set forth in this Section):

A.　　10 Day Cure.  If within ten (10) calendar days after delivery of our written notice to you, you do not cure any:

1)　　failure to maintain required insurance;

2)　　failure to correct any condition that, in our reasonable judgment, might pose a danger to public health and/or safety;

3)　　failure to accurately and/or timely submit any properly completed report, lease or sublease;

4)　　failure to make payments of any amounts due us, any Franchisor-Related Person/Entity, any designee of ours and/or any supplier/creditor of yours;

5)　　failure to comply with any of the dispute resolution provisions of this Agreement.

With respect to items (A) 1 and/or (A) 2 above, we may require you to immediately cease all operations until such defaults are fully cured.

B.　　30 Day Cure.  If within thirty (30) calendar days after delivery of our written notice to you, you do not cure any:

1)　　default under the lease or sublease for your Online Trading Academy Center within the applicable cure period set forth in the lease or sublease.  If the cure period under your lease/sublease is less than the thirty (30) day cure period provided in this Section, then the shorter cure period in your lease/sublease shall apply;

2)　　delinquency in your obligations to taxing authorities, landlords, equipment lessors, suppliers or others;

3) .      have three (3) or more material customer complaints with respect to your Online Trading Academy Center in any six (6) month period, whether or not resolved;

4)      failure to comply with any other provision of this Agreement, any other agreement with us and/or any Affiliate of ours, or any specification, standard or operating procedure or rule in the Manuals or other writing which does not require a shorter notice period.

If a default under this Section11.2 (B) cannot reasonably be corrected within thirty (30) days, then you must at least undertake diligent efforts within the thirty (30) day period to come into full compliance. Upon our request, you must furnish proof acceptable to us of such efforts and the date full compliance will be achieved.  In any event, all such defaults must be fully cured within ninety (90) days after delivery to you of the initial written notice of Termination.

**11.3      Repeated Defaults.**  This Agreement will automatically Terminate upon delivery of  written notice of Termination to you in compliance with Article 14 (without further action  or opportunity to cure) if you or any Affiliate has committed two (2) or more "applicable defaults" within any twelve (12) consecutive months, or three (3) or more applicable defaults within any twenty-four (24) consecutive months.  An "applicable default" is a single breach of any obligation under this Agreement and/or the Manuals, or under any other agreement with us and/or any of our Affiliates, whether or not such default is cured, or is the same as or similar to a prior event of default.

**11.4      Cross-Defaults.**  Any default by you (or any owner or Affiliate of yours) under this Agreement may be regarded by us as a default under any other agreement between us (or any Franchisor-Related Persons/Entities) and you (or any owner or Affiliate of yours).  Similarly, any default under any other agreement or any other obligation between us (or any Franchisor-Related Persons/Entities) and you (or any owner or Affiliate of yours) may be regarded as a default under this Agreement.  Any default by you (or any owner or Affiliate of yours) under any agreement, lease, sublease, loan agreement, Broker-Dealer agreement, or security interest relating to the Franchised Business may be regarded as a default under this Agreement, regardless of whether or not any such agreements are between you (or any owner or Affiliate of yours) and us (or any Franchisor-Related Persons/Entities).

**11.5      Performance Standards**.

A.      You and we have a shared interest in your Franchised Business maintaining good performance and high volume and not performing below System Standards, or failing to achieve an appropriate level of Gross Volume.  "Systems Standards" are the criteria we establish and may modify from time to time, in the Manuals or elsewhere in writing, for the operation and marketing of Online Trading Academy Centers.  Rather than setting arbitrary quotas, the process we may in our Business Judgment choose to implement is a flexible, market sensitive evaluation process based on current performance levels of your franchisee-peers and by any Company-owned Centers.  Performance Standards help us maintain customer confidence in our Products and Services and positive Brand recognition.  We expect that all Online Trading Academy franchisees will do so and would not enter into this relationship with you if we anticipated that you would not meet these Performance Standards. "Performance Standards" includes both our "System Standards" and "Financial Standards" as described in this Section.

B.      System Standards.  We may choose in our Business Judgment to evaluate your Center for compliance with our System Standards using a variety of methods including, but not limited to, inspections, field service visits, customer comments/surveys and secret shopper reports.  Your Online Trading Academy Center will be assigned System Standards Scores for categories being evaluated at that time.  Your scores will be compared with the average score achieved in each category by all Online Trading Academy Centers in the United States, or other geographic area that we reasonably believe appropriate.

C.      Financial Standards.  We may choose in our Business Judgment to compare your Gross Volume with the then-current "Financial Standard".  The Financial Standards will be determined as follows:

**Attachment ZZ**

| PERIOD OPEN* | FINANCIAL STANDARDS (ADJUSTED EVERY 6 MONTHS OR MORE) |
|---|---|
| Less than Three Years | 50% of PUA** |
| Three Years or More, But Less Than Four Years | 60% of PUA** |
| Four Years or More | 70% of PUA** |

*Measured from the earlier of your actual opening date or the date by which your Online Trading Academy Center is required to open.

**"PUA" or "Per Unit Average":  The average Gross Volume for all Online Trading Academy Centers in the applicable geographic area during the most recent measuring date whether six (6) months or longer.

> D.      We reserve the right to make reasonable revisions to elements of the Financial or System Standards but will provide you with six (6) months prior written notice if we do so.  We will not use a measuring period of less than six (6) months between evaluations and may use a longer measuring period in our Business Judgment.

> E.      If your System Standards Score in a scored category is lower than the average System Standards Score or your Gross Volume for the applicable measurement period does not equal or exceed the then-current Financial Standard, we may (but are not required to) implement the correction process described in Section 11.5 (F), below to attempt to assist you further with meeting Performance Standards.

> F.      <u>Correction Process</u>

>> 1)      To allow you time to correct your Performance Standards and bring your Franchised Business into compliance, we will allow you six (6) months from delivery of our written notice to you of your failure to meet the then-current Performance Standards to correct the deficiency.

>> 2)      As it is in both of our interests that you achieve better performance results, we will reasonably cooperate with and assist you in your efforts to meet your Performance Standards.  Our assistance to you may include, but is not limited to, on-site consultations, meetings at our headquarters, and/or retraining activities or programs at designated locations.  You are responsible for any costs associated with such activities, including travel, meals, lodging and any other related expenses and will participate in these additional activities and programs upon our request.

> G.      If at the end of the six (6) month correction period, your Franchised Business does not meet our Performance Standards, then we may elect to Terminate this Agreement.  You will have ninety (90) days after our notice to Terminate to complete a sale of your franchise to a third party if:

>> 1)      You provide us written notice of your desire to sell your franchise within ten (10) days of the notice to Terminate along with a General Release signed by you and Affiliates; and

>> 2)      Any such transfer meets all requirements of this Agreement, including those provided in Section 14.3, above.

> H.      If you do not provide us with either the 10-day notice described above, or complete an authorized sale within the ninety (90) day period provided above, we may Terminate this Agreement immediately upon delivery of written notice to you.

> I.      The fact that any correction process with you may be ongoing does not prevent us from exercising our rights and/or remedies, including our right to Terminate this Agreement for another default

committed by you under this or any other agreement with you.

**11.6**   **Non Exclusive Remedies.**  No right or remedy that we may have (including Termination) is exclusive of any other right or remedy, and we may pursue any rights and/or remedies available.  If we have the right to Terminate this Agreement under this Article 11, we may elect in our Business Judgment to cancel any and/or all of your territorial or similar rights whether arising under this Agreement or in any other manner or document.


**11.7**   **Extended Cure Period**.   Despite provisions to the contrary in this Agreement, we may grant you, in our Business Judgment, an extension to allow you to cure any breach.  You acknowledge that our decision to grant such an extended cure period does not operate as a waiver of any of our rights.

**11.8**   **Management of the Center After Issuance of Notice of Default**.

A.    If we issue a notice of default, we will have the right (but not the obligation) to manage your Franchised Business until you have cured all defaults.  All revenues received by the Franchised Business while we (or our designee) are managing it will be kept in a separate fund.   All Franchised Business expenses, including compensation, travel and living expenses for our appointed manager may be paid out of such fund.  You agree that this fund will be debited for a management fee of Six Hundred Dollars ($600) per day (subject to Inflation Adjustment) per management-level person needed. If such fund is insufficient to pay Franchised Business expenses, we shall notify you.  You shall, within five (5) business days, deposit such amounts as shall be required by us to attain a reasonable fund balance.

B.    Operation of the Franchised Business by us during any such period shall be on your behalf; provided that we shall only have a duty to use reasonable efforts and shall not be liable to any creditor of yours or for any debts, losses or obligations incurred by the Franchised Business.  This Section does not limit our right to Terminate this Agreement as herein provided or affect any of our indemnity or other rights under this Agreement.


**11.9**   **Our Right To Discontinue Supplying Items Upon Default.**   We and any Franchisor-Related Persons/Entities have the right, in addition to all other rights and remedies, to require upon the issuance of a default that you pay C.O.D. (cash on delivery) or by certified check, ACH, credit card or wire transfer for any and all goods and/or services related to the operation of your Franchised Business.  We and any Franchisor-Related Persons/Entities also have the right to stop selling and/or providing any goods and/or services to you until you have cured all defaults.

**11.10**   **Prompt Notice of Claims by You.**   You understand that you are only permitted to Terminate this Agreement for any default committed by us as permitted by applicable law.  If you are permitted to Terminate this Agreement under applicable law, you must give us written notice and thirty (30) days from our receipt of such notice to cure. Any action by you to Terminate may not proceed until we have had such notice and opportunity to cure.  If we cannot reasonably cure within thirty (30) days, and we are diligently continuing efforts to cure, then we will have ninety (90) days to cure; *provided that* i) any dispute regarding our consent to a proposed transfer by you, or any other dispute in which our delay may cause you significant harm or loss, may immediately proceed as provided in Section 13.1 starting with a face to face meeting and no notice and opportunity to cure need be provided by you; and ii) any claim for equitable relief relating to the Marks or Intellectual Property is not subject to this Section but must proceed under 13.1 (H) due to the special nature of such matters.

**Attachment ZZ**

**12.**     **RIGHTS AND OBLIGATIONS ON TRANSFER, REPURCHASE, TERMINATION AND/OR EXPIRATION OF THE FRANCHISE.**

12.1     **Payments of All Amounts Owed, etc.**  You must pay all royalties, marketing contributions, unpaid Online Class Fulfillment Fees and all amounts of any kind owed to us and/or any Franchisor-Related Persons/Entities within ten (10) days after the Repurchase, Termination or expiration of the Franchise, or from a later date when the amounts due can be determined.

12.2     **Intellectual Property, Confidential Information, Trade Dress, etc.**  After any Transfer, Repurchase, Termination or expiration of the Franchise:

A.     You agree to immediately and permanently discontinue your Franchised Business and any use of the Intellectual Property and/or the Confidential Information, as defined in Section 1, and will not use any similar or derivative marks, or materials, or colorable imitations of any of the Intellectual Property in any medium or manner or for any purpose;

B.     You will return to us or (at our option) destroy all software, Manuals, forms, materials, signage and any other items containing any Intellectual Property or Marks, or otherwise identifying or relating to a Online Trading Academy Center (to the extent they have not been assigned in connection with an authorized Transfer or a Repurchase);

C.     You will take such actions as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark which have not been assigned in connection with an authorized Transfer or a Repurchase;

D.     You will remove from the Premises any distinctive signage, physical and/or structural features associated with the Trade Dress of Online Trading Academy Centers, so that the Premises are clearly distinguished from other Online Trading Academy Centers and do not create any public confusion (to the extent they have not been assigned in connection with an authorized Transfer or a Repurchase);

E.     You agree not to identify yourself, or any business you may operate or in which you may become involved, or to advertise or promote yourself in any manner, as a present or former Online Trading Academy franchisee;

F.     You will furnish to us within thirty (30) days satisfactory evidence of your compliance with the obligations described in this Section 12.2 and in Section 12.3, below.  If you operate any business using any of the Intellectual Property, Marks, Confidential Information or any aspect of the System, our remedies will include (but will not be limited to) recovery of the greater of i) all profits earned by you in the operation of such business, or ii) all royalties, advertising contributions and other amounts which would have been due if this Agreement remained in effect with you.

G.     We and/or our agents will have the right on two days notice to inspect and/or audit the business (including financial) records relating in any way to your Online Trading Academy Franchised Business and the books and records of any person(s), corporation or partnership, in which you hold an equity or management position, which holds, or does business with, the Franchise. Our right to audit includes the right to access all computers and other equipment by electronic means.  You agree to cooperate fully with such matters.

12.3     **Telephone and Other Directory Listings, Internet Sites.**

A.     You understand and agree that we own all telephone numbers, domain names, Internet addresses/sites and/or other communications services links (collectively, the "Numbers"), and any related directory listings/advertising, used in connection with the operation of your Online Trading Academy Center. We may, in our Business Judgment, require you to sign an assignment of such Numbers prior to training or at another time.  After any Termination, Repurchase and/or expiration of the Franchise, you will promptly transfer, call-forward, discontinue or otherwise deal with the Numbers and any related directory listings/advertising as we direct. You agree to sign any documents and/or pay any amounts required by a

telephone/communication services provider as a condition to our exercising any rights under this Section. By signing this Agreement, you irrevocably appoint us your attorney in fact to take any such actions regarding the Numbers and any related directory listings/advertising if you do not do so yourself within ten (10) days after the Termination, Repurchase or expiration of this Franchise. Such companies may accept this Agreement as conclusive evidence of our exclusive rights in such Numbers and related directory listings, web pages and advertising/marketing.

B.      If we choose at any time to be direct billed by a provider for any account for the Numbers and/or directory listings/advertising, you agree to pay us all amounts due such providers within ten (10) days of our written notice to you. If you fail on two or more occasions to pay any such amounts to us when due, then we may require you to maintain a deposit with us in an amount reasonably determined by us based upon usage history and other relevant factors.

**12.4     Continuing Obligations.**

A.      All obligations and rights which expressly or by their nature survive the Transfer, Repurchase, Expiration or Termination of this Agreement will continue in full force and effect until they are satisfied or by their nature expire (including but not limited to indemnity, non-competition and confidentiality rights and obligations; obligations to pay and the provisions of Articles 13 and 15). These obligations continue notwithstanding any rejection of this Agreement in a bankruptcy proceeding or otherwise.

B.      If this Agreement is Terminated because of a default of yours, you will not be released or discharged from your obligations, including payment of all amounts then due and other amounts which would have become due under this Agreement if you had continued in operation as an Online Trading Academy Franchisee for the full term. Our remedies will include (but are not limited to) the right to collect the present value of these amounts and to receive the benefit of our bargain with you, as well as to accelerate the balances of any promissory notes owed and to receive any other unpaid amounts owed to us or any of our Affiliates. You and we agree that it would be commercially unreasonable and damaging to the integrity of the Online Trading Academy System if an Online Trading Academy Franchisee could default and then escape the financial consequences of his contractual commitment to meet payment obligations for the term of the Agreement. You (and each of your owners/Affiliates) agree to sign a General Release, if we choose in our Business Judgment, to waive our rights to collect any amounts that would have become due if you had continued in operation as an Online Trading Academy Franchisee. This option of ours may be exercised at any time.

+---------------------------------------------------------------+
| I have read Sec. 12.1-12.4, understand and agree              |
| with them.  Your Initials:  _____ /_____                    |
+---------------------------------------------------------------+

**13.     DISPUTE AVOIDANCE AND RESOLUTION.**

For the purposes of this Article 13, "you" shall be deemed to include your owners, Affiliates and their respective employees, and "we" shall be deemed to include "Franchisor-Related Persons/Entities."

**13.1     Mediation and Mandatory Binding Arbitration, Waiver of Right to Jury Trial.**
You and we believe that it is important to resolve any disputes amicably, quickly, cost effectively and professionally and to return to business as soon as possible. You and we have agreed that the provisions of this Article 13 support these mutual objectives and, therefore, agree as follows:

A.      **Claim Process**:  **Any** litigation, claim, dispute, suit, action, controversy, or proceeding **of any type whatsoever** including any claim for equitable relief and/or where you are acting as a "private attorney general," suing pursuant to a statutory claim or otherwise, between or involving you and us on whatever theory and/or facts based, and whether or not arising out of this Agreement, ("Claim") will be processed in the following manner, you and we each expressly waiving all rights to any court proceeding,

except as expressly provided below at Section 13.1 (H).

      1)    <u>First</u>, discussed in a face-to-face meeting held at a venue of our choosing within thirty (30) days after either you or we give written notice to the other proposing such a meeting.

      2)    <u>Second</u>, if not resolved, submitted to non-binding mediation for a minimum of four (4) hours before i) Judicial Arbitration and Mediation Service ("JAMS") or its successor (or an organization designated by JAMS or its successor), or ii) any other mediation organization approved by all parties,, if JAMS cannot conduct such mediation and the parties cannot agree on a mediation organization.  We will pay the costs of the first four (4) hours of any mediation, and no mediation is required to extend beyond such four (4) hour period.  Any mediation/arbitration (and any appeal of arbitration) will be conducted by a mediator/arbitrator experienced in franchising.  Any party may be represented by counsel and may, with permission of the mediator, bring persons appropriate to the proceeding.

      3)    <u>Third</u>, <u>submitted to and finally resolved by binding arbitration</u> before and in accordance with the arbitration rules of JAMS or its successor (or an organization designated by JAMS or its successor); provided that, in any case, arbitration may be filed prior to a face-to-face meeting and/or mediation, with such face-to-face meeting and/or mediation to follow as quickly thereafter as possible.  All arbitrators shall be experienced in franchising.  On election by any party, arbitration and/or any other remedy allowed by this Agreement may proceed forward at the same time as mediation.  Judgment on any preliminary or final arbitration award will be final and binding, and may be entered in any court having jurisdiction (subject to the opportunity for appeal as contemplated below).  The arbitrator's award shall be in writing.  On request by either party, the arbitrator shall provide to all disputants a reasoned opinion with findings of fact and conclusions of law and the party so requesting shall pay the arbitrator's fees and costs connected therewith.

      4)    <u>Fourth</u>, a final award by an arbitrator (there will be no appeal of interim awards or other interim relief), may be appealed within thirty (30) days of such final award.  Appeals will be conducted before a three (3) arbitrator panel appointed by the same organization as conducted the arbitration, each member of which shall be experienced in franchising.  The arbitration panel will not conduct any trial de novo or other fact-finding function.  Such panel's decision shall be in writing, may be entered in any court having jurisdiction and will be binding, final and non-appealable.  On request by either party, the arbitration panel shall provide to all disputants a reasoned opinion with findings of fact and conclusions of law and the party so requesting shall pay the arbitration panel's fees and costs connected therewith.

    B.    <u>Confidentiality</u>:  The parties to any meeting/mediation/arbitration will sign confidentiality agreements, excepting only public disclosures and filings as are required by law.

    C.    <u>Location and Attendees</u>:  Any mediation/arbitration (and any appeal) will be conducted exclusively at a neutral location in the county in which our then-current headquarters is located, which may change from time to time, and be attended by you and us, and/or designees authorized to make binding commitments on each of our respective behalves; provided that if any court determines that this provision is unenforceable for any reason, mediation/arbitration (and any appeal) will be conducted at a location near your Center.

    D.    <u>Arbitration Authority</u>:  Arbitrators in any proceeding under this Article 13 shall apply all applicable law, and a failure to apply the applicable law in accord with Section 13.13 shall be deemed an act in excess of authority.  The arbitrator shall decide any questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including but not limited to applicability, subject matter, timeliness, scope, remedies, claimed unconscionability and any alleged fraud in the inducement.  The arbitrator may issue summary orders disposing of all or part of a claim and provide for temporary restraining orders, preliminary injunctions, injunctions, attachments, claim and delivery proceedings, temporary protective orders, receiverships and other equitable and/or interim/final relief.  Each party consents to the enforcement of such orders, injunctions, etc. by any court having jurisdiction.  The subpoena powers of the arbitrator with respect to witnesses to appear at the arbitration proceeding shall not be subject to any geographical limitation.

E.     _Discovery_:  The disputants shall have the same discovery rights as are available in civil actions under the state law selected in Section 13.13.

F.     _Compulsory Counter-claims_:  Each participant must submit or file any claim which would constitute a compulsory counter-claim (as defined by the applicable rule under the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any such Claim which is not submitted or filed in such proceeding will be forever barred.  In no event may offers and/or other communications made in connection with, or related in any way to, mediation, possible settlement or other resolution of a dispute be admitted into evidence or otherwise used in any arbitration or other proceeding, and any arbitration award in violation of this provision shall be vacated by the arbitration appeal panel (described above) and/or any court having jurisdiction.

G.     _Fees and Costs_: Subject to the provisions of Section 13.7, the parties will bear their own fees and costs, including attorneys' fees; provided that for matters not settled through agreement of the parties, the arbitrator may assess all, or any portion, of the fees and costs incurred in connection with any arbitration and/or appeal (but not any attorneys' fees) against the party who does not prevail.

H.     _Disputes Not Subject to the Mediation/Arbitration Process_: Claims or disputes relating primarily to the validity of the Marks and/or any Intellectual Property licensed to you may be subjected to court proceedings or to the Process outlined in 13.1 (A), above, at our sole election; provided that only the portion of any claim or dispute relating primarily to the validity of the Marks and/or any Intellectual Property licensed to you and requesting equitable relief shall be subject to court action, and any portion of such claim seeking monetary damages will be subject to the Process outlined in 13.1 (A).  Any action to compel a party's compliance with Section 13.1 must be consistent with Section 13.2, below.

I.     _Your and Our Intentions_:  You and we mutually agree (and have expressly had a meeting of the minds) that, notwithstanding any contrary provisions of state, provincial or other law, and/or any statements in our Disclosure Document required by a state/province as a condition to registration or for some other purpose:

1)     _all_ issues relating to arbitration and/or the enforcement of arbitration-related provisions of this Agreement will be decided by the arbitrator (including all Claims that any terms were procured by fraud or similar means) and governed only by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration and exclusive of state statutes and/or common law;

2)     all provisions of this Agreement (including, but not limited to, Articles 13 and/or 15) shall be fully enforced, _including (but not limited to) those relating to arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, shortened periods in which to bring Claims_;

3)     you and we intend to rely on federal preemption under the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and, as a result, the provisions of this Agreement will be enforced only according to its terms;

4)     **you and we each knowingly waive all rights to a court trial** (except as expressly provided in this Agreement), understanding that arbitration may be less formal than a court or jury trial, may use different rules of procedure and evidence and that appeal is generally less available, but still strongly preferring mediation and/or arbitration as provided in this Agreement; and

5)     the terms of this Agreement (including but not limited to this Article 13) shall control with respect to any matters of choice of law.

**13.2    Venue.**  Without in any way limiting or otherwise affecting your and our obligations under Section 13.1, above, you and we agree that any litigation will be held in the United States District Court encompassing our then-current headquarters (the "Proper Federal Court").  Proceedings will be held only in the Proper Federal Court, subject to the following exceptions:

A.       if a basis for federal jurisdiction does not exist, then any such proceeding shall be brought exclusively before a court in the most immediate state judicial district encompassing our then-current headquarters and having subject matter jurisdiction (the "Proper State Court");

B.       proceedings to remove or transfer a matter to the Proper Federal Court and/or to compel arbitration as contemplated by this Agreement may be brought in the court where the applicable action is pending and/or the Proper State or Federal Court; and

C.       any action primarily with respect to any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) may be brought in any court of competent jurisdiction and/or the Proper State or Federal Court.

**13.3     Terms Applicable to All Proceedings, Waiver of Trial by Jury, Class Action Rights.** With respect to any arbitration, litigation or other proceeding of any kind, you and we:

A.       **Knowingly waive all rights to trial by jury;**

B.       **Will pursue any proceeding on an individual basis only, and not on a class-wide or multiple plaintiff basis**; provided that if this provision is not enforceable for any reason, then you and we agree that with respect to any multiple plaintiff or class action, a court will supervise the procedural aspects directly related to the multiple plaintiff/class nature of the proceeding (e.g. certification of the class, appropriateness of class representation, approval of attorneys' fees incurred on behalf of the class, approval of any settlement, etc.) and the arbitrator will decide all substantive matters related to the actual claims, including liability and damages.

**13.4     Periods In Which to Make Claims.** No arbitration, action or suit (whether by way of claim, counter-claim, cross-complaint, raised as an affirmative defense, offset or otherwise) by either you or us will be permitted against the other, whether for damages, rescission, injunctive or any other legal and/or equitable relief, in respect of any alleged breach of this Agreement, or any other Claim of any type, unless such party commences such arbitration proceeding, action or suit before the expiration of the earlier of:

1)       One (1) year after the date on which the state of facts giving rise to the cause of action comes to the attention of, or should reasonably have come to the attention of, such party; or

2)       Eighteen (18) months after the initial occurrence of any act or omission giving rise to the cause of action, whenever discovered.

The above periods may begin to run, and will not be tolled even though the claiming party was not aware of the legal theories, statutes, regulations, case law or otherwise on which a claim might be based. If any federal, state or provincial law provides for a shorter limitation period than is described in this Section, then such shorter period will govern.  The time period for actions for indemnity shall not begin to run until the indemnified party(ies) have been found liable and any time for appeals has run in the underlying action.

**13.5     Survival of Obligations.**

A.       Each provision of this Article 13, together with the provisions of Article 15, will be deemed to be self-executing and continue in full force and effect subsequent to and notwithstanding the expiration, Termination, rescission, or finding of unenforceability of this Agreement (or any part of it) for any reason; will survive and will govern any Claim for rescission; and will apply to and govern any Claim against, or with respect to, the Marketing Fund.  Notwithstanding any bankruptcy or other proceeding, you and we wish to have the dispute avoidance and resolution provisions of this Agreement strictly enforced according to their terms.

B.       Non-competition, confidentiality, protection of the Marks and indemnity/hold harmless obligations, and all other Post-Termination Provisions, provided in this Agreement shall survive the expiration and/or Termination of this Agreement according to their terms.

**13.6** **Costs and Attorneys' Fees.**  Except as expressly provided regarding recovery of attorneys' fees as part of indemnification rights hereunder, or in this Section, or as otherwise expressly provided in this Agreement, the parties will each bear their own costs of enforcement and/or defense (including but not limited to attorneys' fees), including those matters resolved pursuant to a settlement agreement between the parties.  However, if any case is summarily disposed of in an arbitration or litigation proceeding for lack of merit (such as by summary judgment or award, judgment on the pleadings, judgment n.o.v., non-suit, motion to dismiss, directed verdict or similar disposition in arbitration or court), the party bringing such case shall pay for the other party's costs of enforcement and/or defense (including, but not limited to, attorneys' fees and interest thereon.)

**13.7** **Binding Effect, Modification.**  This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns, and successors in interest, and will not be modified or supplemented except by means of a written agreement signed by both you and our President or one of our Vice Presidents.  However, you and we understand and agree that changes to the Manuals made in accordance with this Agreement are binding and do not require any acceptance by you, written or otherwise, to be effective and enforceable.  No other officer, field representative, salesperson or other person has the right or authority modify this Agreement, or to make any representations or agreements on our behalf, and any such modifications, representations and/or agreements shall not be binding.

**13.8** **Our Exercise of "Business Judgment" and/or Meaning of "Sole Discretion"; Express Agreement.**

You understand and agree that the exercise of judgment is critical to our role as Franchisor of the System and to our goals for its continuing improvement.   We understand that we each have a vested interested in each other's success.  When we use the phrases "sole and absolute discretion", "sole discretion" and/or "Business Judgment", whether in this Agreement or another context, you and we agree that we have the wholly unrestricted right to make decisions and/or take (or refrain from taking) actions.  We shall use our judgment in exercising such discretion based on our assessment of the interests we consider appropriate and will not be required to consider any particular interest group, including, your individual interests or the interests of any other Franchisee(s).  You, we and all other Franchisees have a collective interest in working within a franchise system with the flexibility to adjust to business conditions, including but not limited to the competitive environment, new regulatory developments and emerging business opportunities.  Therefore, you and we agree that the ultimate decision-making responsibility for the Online Trading Academy System must be vested in us.  So long as we act in compliance with the requirements of this Agreement, we will have no liability for the exercise of our discretion in accordance with the provisions of this Agreement.

**13.9** **Construction, etc.**

A.     Section and Article headings are for convenience only and do not define, limit, or construe such provisions.

B.     References to a "controlling interest" are to a shareholder, membership or partnership interest, as applicable, which enables the holder(s) of such interest to determine the outcome of a decision making process for the applicable entity.

C.     This Agreement will be executed in multiple copies, each of which will be deemed an original.

D.     Each of us have carefully reviewed and thought about each provision of this Agreement. Therefore, you and we agree that it should be deemed to have been drafted equally and that no presumptions or inferences concerning terms or interpretation will result because we initially prepared this Agreement.

**13.10    Non-Retention of Funds.**  Neither party has the right to offset or withhold payments of any kind owed or to be owed to the other against amounts purportedly due as a result of any dispute of any nature or otherwise, except as authorized by an arbitration award.

**13.11    Severability; Substitution of Valid Provisions.**  Each provision of this Agreement, and any portion of any provision, is severable (including, but not limited to, any provision related to dispute resolution).  Each party reserves the right to challenge any law, rule or judicial or other construction which would have the effect of varying or rendering ineffective any provision of this Agreement.  To the extent that any provision of this Agreement, or any specification, standard or operating procedure prescribed by us, is invalid or unenforceable, you and we agree that such provisions will be modified or enforced to the fullest extent permissible under, and to be compliant with, governing law.  This Agreement will be deemed automatically modified to comply with governing law if such law requires: i) a greater time period for notice of the Termination of, or refusal to renew, this Agreement; or ii) the taking of some other action not described in this Agreement.  Such modifications to this Agreement shall be effective only in such jurisdiction.  You and we agree that the unenforceability of any provision of this Agreement will not affect the remainder of this Agreement.  If any limitation on your and/or our rights (including, but not limited to, any limitation on damages, waiver of jury trial, shortened period in which to make any claim or otherwise) is held unenforceable with respect to one party, then such limitation will not apply to the other party.

**13.12    Waivers; Cumulative Rights.**  Subject to the provisions of Section 13.5, no waiver by either party of any breach, default or unfulfilled condition under this or any other agreement between the parties shall be deemed a waiver of any subsequent or other breach, default or unfulfilled condition.  No waiver shall be effective unless in writing and signed by an authorized representative of the signing party.  The rights and remedies provided in this Agreement are cumulative.  Except as expressly provided in this Agreement, no party will be prohibited from exercising any rights or remedies provided under this Agreement or permitted under law or equity.

**13.13    Choice of Laws.**  You and we agree on the practical business importance of certainty as to the law applicable to your and our relationship and its possible effect on the development and competitive position of the System.  Therefore, you and we also agree that, except with respect to the applicability of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and the effect of federal pre-emption of state law by such Act, and except to the extent governed by the United States Trademark Act and other federal laws and as otherwise expressly provided in this Agreement, this Agreement and all other matters, including, but not limited to respective rights and obligations, concerning you and us, will be governed by, and construed and enforced in accordance with, the laws of California.

You and we agree that this provision shall be enforced without regard to the laws of such state relating to conflicts of laws or choice of law; except that the provisions of any law of that state regarding franchises (including, without limitation, registration, disclosure, and/or relationship laws) shall not apply unless such state's jurisdictional, definitional and other requirements are met independently of, and without reference to, this Section.

**13.14    Application of Agreement to Parties and Others; Joint and Several Liability.**

A.     The rights and obligations of this Agreement run directly between you and us and are not intended to create any third-party beneficiary or similar rights or obligations unless specifically expressed in this Agreement; except that the protections which apply to us relating to indemnification and/or releases shall also apply to any past, current and/or future Franchisor-Related Persons/Entities as if they were expressly named beneficiaries thereof.

B.     We have the right to elect in our Business Judgment to not enforce (or to selectively enforce) any provision of this or any Agreement, standard or policy, whether with respect to you and/or any other franchisee or other person, in a lawful manner without liability.

C.     If two (2) or more persons are at any time the Franchisee or the Franchisee owners, all of their obligations and liabilities under this or any other agreement with us and/or any Franchisor-Related

Persons/Entities will be joint and several.

**13.15    Fundamental Business Intention to Mediate and/or Arbitrate, Severability of Dispute Resolution Provisions, Federal Arbitration Act Governs, etc.**

Irrespective of any statute, regulation, decisional law or otherwise, it is your and our fundamental agreement and intention that you and we do not wish to engage in any court proceedings (except as expressly provided for in the rare instances specified in this Agreement), viewing the dispute resolution mechanism established by this Agreement (including, particularly, mediation and binding arbitration) to be superior from a business standpoint, less expensive, faster, more confidential, more likely to generate creative business-oriented solutions and compromise, and more accommodating to our business relationship and the needs of an evolving and diverse franchise system. Therefore, if any provisions of this Article 13 are deemed by a court to be unenforceable for any reason, you and we agree and intend that such provisions will be i) modified so as to be enforceable or ii), if that cannot be done, severed and, in any event, any remaining portions of this Article 13 shall remain in full force and effect.   You and we agree that such remaining portions will still form an appropriate and complete dispute resolution mechanism. You and we acknowledge that your and our activities relating to the franchise relationship are in interstate commerce and that this Agreement is governed by the Federal Arbitration Act.

> **I have read Sec. 13.1-13.15, understand and agree with them. Your Initials:  _____ / _____**

**14.    NOTICES AND PAYMENTS.**

All written notices and reports to be delivered by the provisions of this Agreement or of the Manuals will be deemed so delivered when delivered by hand, immediately on transmission by facsimile transmission or other electronic system, including e-mail or any similar means, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to us at OTA Franchise Corporation, 17780 Fitch, Suite 200, Irvine, California 92614 (or our then-current headquarters), to the attention of the President, and to you, at your Online Trading Academy Center.  Until your Online Trading Academy Center has opened for business, we may send you notices at any address appearing in your application for a franchise or in our records.  Any required payment or report not actually received by us during regular business hours on the date due will be deemed delinquent.  Notice to any one Franchisee, or owner of the Franchisee, shall be deemed effective as to all Franchisees under this Agreement and all owners of the Franchisee(s).  Any party may change its address for receipt of notices by providing prior written notice of such change to the other party.

**15.    ACKNOWLEDGMENTS AND REPRESENTATIONS, ENTIRE AGREEMENT, NO FIDUCIARY RELATIONSHIP, ETC.**

A.    You and we agree that your and our relationship is not a fiduciary or similar special relationship, but rather is an ordinary commercial relationship between independent business people with arms length dealings.

B.    You acknowledge that you (and each of your owners, if you are a Business Entity) have had the opportunity and been advised by us to have this Agreement and all other documents reviewed by your own attorney, and that you have read, understood, had an opportunity to discuss and agreed to each provision of this Agreement.  You agree that you have been under no compulsion to sign this Agreement.

C.    You and we expressly acknowledge and agree that the provisions of Article 13, above, (whether relating to arbitration, mediation, waiver of jury trial, venue, limitations on damages, prohibition against multiple plaintiff-class actions, shortened statutes of limitation, and/or otherwise) may require you to travel to a distant location to resolve a dispute, expend additional funds, and/or raise challenges for you

and/or us in prosecution of claims/actions.  You and we view these provisions in the context of a diverse franchise system with both large and small, sophisticated and unsophisticated participants, and that requires uniformity and predictability.  As such, you and we knowingly accept such provisions and limitations as justified by business necessities and representative of a reasonable balancing of your and our interests, and those of the System as a whole, and not as unfair or burdensome.

D.      You and we agree that this Agreement contains the final, complete and exclusive expression of the terms of your and our agreement [along with concurrently signed writings, such as, but not limited to personal guarantees, Statement of Prospective Franchisee, addenda, exhibits, releases and any other related documents (collectively, the Related Documents)] and supersedes all other agreements and/or representations of any kind or nature.  Any understandings, agreements, representations, or otherwise (whether oral or written) which are not fully expressed in this Agreement and the Related Documents are expressly disclaimed by you and us, including but not limited to any promises, options, rights of first refusal, guarantees, and/or warranties of any nature (excepting only the written representations made by you in connection with your application for this franchise).  Neither you nor we believe it to be fair or reasonable for the other party to have to deal with allegations about understandings, representations, etc. not fully expressed in writing in this Agreement.

E.      You specifically acknowledge that you have not received or relied on (nor have we or anyone else provided) any statements, promises or representations that you will succeed in the franchised business or at any location; achieve any particular sales, income or other levels of performance; earn any particular amount, including any amount in excess of your Initial Franchise Fee or other payments to us; or receive any rights, goods, or services not expressly set forth in this Agreement.

F.      You represent, warrant and agree that no contingency, prior requirement, or otherwise (including but not limited to obtaining financing) exists with respect to you fully performing any or all of your obligations under this Agreement.  You further represent to us, as an inducement to our entering into this franchise relationship, that you have made no misrepresentations or material omissions in obtaining the Franchise.

---

**Your Initials:  _____ / _____**

---

G.      You acknowledge that you have not received or relied on (nor have we or anyone else provided, except as may have been contained in the Franchise Disclosure Document received by you):

1)      any sales, income or other projections of any kind or nature; or
2)      any statements, representations, charts, calculations or other materials which stated or suggested any level or range of sales, income, profits or cash flow; or

3)      any representations as to any profits you may realize in the operations of the Franchised Business or any working capital or other funds necessary to reach any 'break-even' or any other financial level.
If any such information, promises, representations and/or warranties have been provided to you, they are unauthorized and inherently unreliable.  You agree to advise us of the delivery of any such information.  You must not rely upon any such information, nor shall we be bound by it.  We do not, nor do we attempt to, predict, forecast or project future performance, revenues or profits of any you or any franchisee.  We are unable to reliably predict the performance of an Online Trading Academy Center even operated by us, and certainly cannot predict results for your Online Trading Academy Center.

You understand and agree that Online Trading Academy franchisees are separate and distinct from us and are independently owned and operated and that while we may encourage you to speak with such Franchisees in connection with your evaluation of this franchise opportunity, they do not act as our agents or representatives in providing any information to you and we will have no obligations or liabilities with respect to (and you should not rely on) any information, opinions or otherwise they may provide to you.

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7519

```
Your Initials:  _____ / _____
```

H.      You acknowledge and agree that the success of the business venture contemplated to be undertaken by you is speculative and will be dependent on your personal efforts, and success is not guaranteed. You acknowledge and represent that you have entered into this Agreement and made an investment only after making an independent investigation of the opportunity, including having received a list with your Franchise Disclosure Document of others currently operating, or who have operated, our franchises.

I.      You acknowledge that you (and each of your owners) has received, fully read and understood, and all questions have been answered regarding, i) a copy of our Franchise Disclosure Document with all exhibits at least fourteen (14) calendar days prior to signing any binding documents or paying any sums (whichever occurred first), and ii) a copy of this Agreement and all other agreements complete and in form ready to sign prior to signing any binding documents or  paying any sums (whichever occurred first).

```
Your Initials:  _____ / _____
```

J.      You understand, acknowledge and agree that i) we may have offered franchises in the past, may currently be offering franchises and/or may offer franchises in the future, on economic and/or other terms, conditions and provisions which may significantly differ from those offered by this Agreement and any related documents and ii) we may, from time to time, deal with our Franchisees on differing economic and/or other terms (including making special arrangements for payments of amounts due, waiving defaults and/or otherwise) to suit individual business circumstances, in each case in our Business Judgment and without being required to offer similar terms to other Franchisees, such flexibility being a practical necessity to respond to distinct business situations.

K.      You understand that we are relying on you to bring forward in writing at this time any matters inconsistent the representations contained in this Article 15.  You agree that if any of the statements or matters set forth in this Article 15 are not true, correct and complete that you will make a written statement regarding such next to your signature below so that we may address and resolve any such issue(s) at this time.

L.      You acknowledge and agree that the officers, directors, employees, and agents of the Franchisor act only in a representative capacity and not in an individual capacity, and that no other persons and/or entities other than the Franchisor has or will have any duties or obligations to you.

```
Your Initials:  _____ / _____
```

16.     **GENERAL CONDITIONS AND PROVISIONS**

16.1     **Independent Contractor Relationship**.

16.1.1   It is expressly agreed that you and we intend by this Agreement to establish an independent contractor relationship.  It is further agreed that you have no authority to create, use or assume in our name or on behalf of Franchisor, any obligation, express or implied, or to act or purport to act as agent or representative on our behalf for any purpose whatsoever. Neither we nor you are the employer, employee, partner, agent, fiduciary or co-joint venture partner of or with the other, each being independent. You agree that you will not hold yourself out as the agent, employee, partner or co-joint venture partner of ours or the owner of the Intellectual Property. Except for our arrangements with you regarding our authorized and

approved trainers (the "Authorized Trainers"), all employees or agents hired or engaged by or working for you shall be only the employees or agents of you and shall not for any purpose be deemed employees or agents of ours or the owner of the Intellectual Property, nor subject to our control; and in particular, we shall have no authority to exercise control over the hiring or termination of such employees, independent contractors or others who work for you, their compensation, working hours or conditions, or the day-to-day activities of such persons, except to the extent necessary to protect the Intellectual Property. You agree to respond to customer indications of dissatisfaction with services rendered by you in a diligent and professional manner and agree to cooperate with representatives of ours or the owner of the Intellectual Property in any investigation undertaken by us of complaints respecting your activities.  Each of the parties agrees to file its own tax, regulatory and payroll reports with respect to its respective employees or agents and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever by virtue thereof.

16.1.2   We may provide training and certification to our employees or representatives who provide these individuals with the status of Authorized Trainer. We may make Authorized Trainers available to you to hire for temporary assignments to provide training to customers at your Center. We have entered into contractual relationships with our Authorized Trainers which exist for the benefit of the System as a whole. The contractual relationships exist in part to protect the Confidential Information and Trade Secrets disclosed to the Authorized Trainers and the investment made in the training and certification.  Any attempts to interfere with these contractual relationships will be subject to the restrictions as set out in section 8.13 above.

**16.2**   **Indemnity**. You hereby agree to protect, defend and indemnify us, and our Affiliates and designees, and hold them harmless from and against any and all costs and expenses actually incurred by them or for which they are liable, including attorney's fees, court costs, losses, liabilities, damages, claims and demands of every kind or nature (and interest thereon), and including those incurred pursuant to a settlement entered into in good faith, arising out of or in connection with the Franchised Business, including specifically without limitation any claim or controversy arising out of (i) any Transfer by you referred to in Section 9. 2 hereof, (ii) acts or omissions by you which are not in strict compliance with this Agreement and the Manuals in respect of use or display of the Intellectual Property, or (iii) acts or omissions of yours or your employees' action or inactions which tend to create an impression that the relationship between the parties hereto is other than one of franchisor and you. Notwithstanding the foregoing, you shall have no obligation to protect, defend or indemnify us, or our Affiliatew or designees, from and against any such costs or expenses arising from the conduct of ours found to be willful, malicious or grossly negligent. In any proceeding in which we have been found to have been actively negligent (as opposed to passively negligent or vicariously liable), we shall each bear all of such costs and expenses either in proportion to any finding of comparative negligence made in such proceeding or, if no such finding has been made, as shall be determined in an arbitration proceeding pursuant to section 13.1 hereof, based on application of comparative negligence standards.

**16.3**   **Guarantee**. Your Equity Holders shall each guarantee your obligations in this Agreement and shall execute a form of continuing guarantee as attached hereto as Exhibit 1 and incorporated herein by this reference.

**16.4**   **Counterparts**. This Agreement may be executed in any number of copies, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument.

## 17.   CONSTRUCTION OF AGREEMENT

**17.1**   **Entire Agreement.** This Agreement, together with any and all exhibits, addenda or attachments, contains all of the terms and conditions agreed upon by the parties hereto with reference to the subject matter hereof. No other agreements oral or otherwise shall be deemed to exist or to bind any of the parties hereto and all prior agreements and understandings are superseded hereby.  No officer or employee or agent of ours has any authority to make any representation or promise not contained in this Agreement. You agree that you have executed this Agreement without reliance upon any such unauthorized

representation or promise.  Notwithstanding the foregoing, nothing in this Agreement is intended to disclaim representations Franchisor made to Franchisee in the Franchise Disclosure Document or in any related document that Franchisor heretofore furnished to Franchisee.

This Agreement cannot be modified or changed except by (i) written instrument signed by all of the parties hereto, or (ii) by our reduction of the scope of any of your obligations under this Agreement, which may be done without your consent (except as restricted by applicable law) and which is effective immediately upon notice.

**17.2**  **Titles for Convenience Only**. Section titles used herein are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants or conditions hereof.

**17.3**  **Gender.**  All terms used in any one number or gender shall be extended to mean and include any other number and gender as the facts, context or sense of this Agreement or any Article or section may require.

## 18.   SUBMISSION OF AGREEMENT

The submission of this Agreement to you does not constitute an offer and this Agreement shall become effective only upon the execution thereof by both parties.  THIS AGREEMENT SHALL NOT BE BINDING ON US UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY AN OFFICER OF OTA FRANCHISE CORPORATION. THIS AGREEMENT SHALL NOT BE COME EFFECTIVE UNTIL AND UNLESS YOU SHALL HAVE BEEN FURNISHED BY FRANCHISOR WITH ANY DISCLOSURE, IN WRITTEN FORM, AS MAY BE REQUIRED UNDER APPLICABLE LAW.

**IN WITNESS** Whereof, the parties hereto have duly executed, sealed and delivered this Agreement as of the date first written above.

**ATTEST:**                                            **FRANCHISOR:**
                                                       OTA FRANCHISE CORPORATION

_____            By_____

                                                       Title_____

**ATTEST:**                                            **FRANCHISEE:**

_____            By_____

                                                       _____
                                                       Print Name and Title

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**                                       EX 13
                                                         7522

**OTA FRANCHISE CORPORATION**

**EXHIBIT 1**

**OWNER'S GUARANTY AND ASSUMPTION OF**
**BUSINESS ENTITY FRANCHISEE'S OBLIGATIONS**

In consideration of, and as an inducement to, the execution by OTA Franchise Corporation, a Nevada corporation, ("Franchisor") of a franchise agreement of even date herewith (the "Agreement") between Franchisor and _____, a(n) _____ (*state/province of formation*) _____ (*type of entity: LLC, LLP, corporation, etc.*) (the "Business Entity Franchisee"), each of the undersigned hereby personally and unconditionally, jointly and severally:

1)       guarantees to Franchisor, its Affiliates, the Franchisor-Related Persons/Entities (as defined in the Agreement) and each of their successors and assigns, for the term of the Agreement, and for any renewal franchise term, and thereafter as provided in the Agreement, that the Business Entity Franchisee will punctually pay and perform, each and every undertaking, agreement and covenant set forth in the Agreement, as currently set forth and as amended and/or otherwise changed in the future, including any renewal franchise agreement;

2)       agrees to be personally bound by, and personally liable for, the breach of, each and every provision in the Agreement (including all confidentiality, non-competition, indemnity and Post Termination Provisions), as currently set forth and as amended or otherwise changed in the future, including any renewal franchise agreement; and

3)       agrees to be personally bound by, and personally liable for, each past, current and/or future obligation of the Business Entity Franchisee to Franchisor, its Affiliates, the Franchisor-Related Persons/Entities and each of their successors and assigns.

The undersigned intending that the guarantees and other obligations herein be unqualifiedly general and without limitation in scope, nature and/or effect.  Franchisor, and/or its Affiliates, the Franchisor-Related Persons/Entities and each of their successors and assigns, need not bring suit first against the undersigned in order to enforce this guarantee and may enforce this guarantee against any or all of the undersigned as it chooses in its/their sole and absolute discretion.

Each of the undersigned waives: presentment, demand, notice of demand, dishonor, protest, nonpayment, default and all other notices whatsoever, including (without limitation): acceptance and notice of acceptance, notice of any contracts and/or commitments, notice of the creation and/or existence of any liabilities under the Agreement or otherwise and of the amounts, terms or otherwise thereof; notice of any defaults, disputes or controversies between the Franchisor and the Business Entity Franchisee or otherwise, and any settlement, compromise or adjustment thereof; any right the undersigned may have to require that an action be brought against Franchisor, Business Entity Franchisee or any other person as a condition of liability, and any and all other notices and legal or equitable defenses to which he or she may be entitled.

Each of the undersigned consents and agrees that:

1)       his or her direct and immediate liability under this guaranty will be joint and several;

2)       he and/or she will render any payment or performance required under the Agreement on demand if the Business Entity Franchisee fails or refuses to do so punctually;

3)       such liability will not be contingent or conditioned on pursuit by Franchisor or otherwise of any remedies against the Business Entity Franchisee or any other person;

**Attachment ZZ**

EX 13
7523

4)        such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor or otherwise may from time-to-time grant to the Business Entity Franchisee or to  any other person, including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this guaranty, which will be continuing and irrevocable during the term of the Agreement and any renewal franchise term;

5)        the liabilities and obligations of the undersigned, whether under this document or otherwise, will not be diminished or otherwise affected by the Termination, rescission, expiration, renewal, award of a renewal franchise, modification or otherwise of the Agreement;

6)        terms not defined in this document shall have the meanings assigned in the Agreement; and

7)        the provisions of Articles 18 through 22 of the Agreement are incorporated in and will apply to this document as if fully set forth herein and shall apply to any dispute involving the Franchisor, its Affiliates, the Franchisor-Related Persons/Entities and each of their successors and assigns and any of the undersigned.

In connection with such guarantee and the Franchisor (a) not requiring that the Franchise be initially awarded in the name of one or more of the Guarantors and/or (b) not requiring the payment of a full transfer fee in connection with any related transfer from the undersigned to the Business Entity Franchisee, each of the undersigned hereby grants a General Release of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, known or unknown, against the Franchisor, its Affiliates, the Franchisor-Related Persons/Entities and each of their successors and assigns.

IN WITNESS WHEREOF, each of the undersigned has here unto affixed his or her signature on the same day and year as the Agreement was executed.

GUARANTOR(S)                                    PERCENTAGE OF OWNERSHIP
                                                OF BUSINESS ENTITY FRANCHISEE

_____          _____%

_____          _____%

_____          _____%

_____          _____%

Business Entity Franchisee:

_____, a _____ corporation.

By _____

Its _____

Franchise Agreement Number: _____

**OTA FRANCHISE CORPORATION**

**EXHIBIT 1.2**

**CURRENT FORM OF RELEASING LANGUAGE**
***(SUBJECT TO CHANGE BY FRANCHISOR)***

Release - General Provisions.  The Franchisee(s), jointly and severally, hereby release and forever discharge each and all of the Franchisor-Related Persons/Entities (as defined below) of and from any and all causes of action, in law or in equity, suits, debts, liens, defaults under contracts, leases, agreements or promises, liabilities, claims, demands, damages, losses, costs or expenses, of any nature whatsoever, howsoever arising, **known or unknown**, fixed or contingent, past or present, that the Franchisee(s) (or any of them) now has or may hereafter have against all or any of the Franchisor-Related Persons/Entities by reason of any matter, cause or thing whatsoever from the beginning of time to the date hereof (the "Claims"), it being the mutual intention of the parties that this release be unqualifiedly general in scope and effect and that any Claims against any of the Franchisor-Related Persons/Entities are hereby forever canceled and forgiven.

THE FRANCHISEE (S) ACKNOWLEDGE THAT THEY ARE FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

THE FRANCHISEE(S), BEING AWARE OF THIS CODE SECTION, HEREBY EXPRESSLY WAIVE ALL OF THEIR RIGHTS THEREUNDER AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT OF ANY APPLICABLE JURISDICTION, INCLUDING, WITHOUT LIMITATION, CALIFORNIA AND/OR JURISDICTIONS OF FRANCHISEE(S)' RESIDENCE AND LOCATION OF FRANCHISED CENTER; *provided that if this Release is given in connection with the award of a franchise, then this release shall not apply to Claims relating to the offer and sale of such franchise under the California Franchise Investment Law or any rule or order issued thereunder.*

The Franchisee(s) expressly assume the risk of any mistake of fact or fact of which they may be unaware or that the true facts may be other than any facts now known or believed to exist by Franchisee(s), and it is the Franchisee(s) intention to forever settle, adjust and compromise any and all present and/or future disputes with respect to all matters from the beginning of time to the date of this document finally and forever and without regard to who may or may not have been correct in their understanding of the facts, law or otherwise.  All releases given by the Franchisee(s) are intended to constitute a full, complete, unconditional and immediate substitution for any and all rights, claims, demands and causes of action whatsoever which exist, or might have existed, on the date of this document.  The Franchisee(s) represent and warrant that they have made such independent investigation of the facts, law and otherwise pertaining to all matters discussed, referred to or released in or by this document as the Franchisee(s), in the Franchisee(s) independent judgment, believe necessary or appropriate.  The Franchisee(s) have not relied on any statement, promise, representation or otherwise, whether of fact, law or otherwise, or lack of disclosure of any fact, law or otherwise, by the Franchisor-Related Persons/Entities or anyone else, not expressly set forth herein, in executing this document and/or the related releases.

Franchisee(s) Initials: _____

No Assignment or Transfer of Interest.  The Franchisee(s) represent and warrant that there has been, and there will be, no assignment or other transfer of any interest in any Claims that the Franchisee(s) may have against any or all of the Franchisor-Related Persons/Entities, all Claims having been fully and finally extinguished, and the Franchisee(s) agree to forever indemnify and hold the Franchisor-Related Persons/Entities harmless from any liability, claims, demands, damages, losses, costs, expenses or

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7525

attorneys' fees (and interest thereon) incurred by any of the Franchisor-Related Persons/Entities as a result of any person asserting any interest in any of the Claims and/or any voluntary, involuntary or other assignment or transfer, or any rights or claims under any assignment, transfer or otherwise.  It is the intention of the parties that this indemnity does not require payment by any of the Franchisor-Related Persons/Entities as a condition precedent to recovery against the Franchisee(s) under this indemnity.

Franchisee(s) Initials: _____

Attorneys' Fees.  If the Franchisee(s), or anyone acting for, or on behalf of, the Franchisee(s) or claiming to have received, by assignment or otherwise, any interest in any of the Claims, commence, join in, or in any manner seek relief through any suit (or otherwise) arising out of, based upon or relating to any of the Claims released hereunder or in any manner asserts against all or any of the Franchisor-Related Persons/Entities any of the Claims released hereunder, the Franchisee(s) agree to pay all attorneys' fees and other costs (and interest thereon) incurred by any of the Franchisor-Related Persons/Entities in defending or otherwise responding to said suit or assertion directly to the Franchisor-Related Persons/Entities incurring such costs.

Franchisee(s) Initials: _____

"Franchisor-Related Persons/Entities."  Franchisor, Franchisor's Affiliates (as that term is defined in the Franchise Agreement) , any advertising fund, any Franchisee Advisory Group and each of the following, whether past, current or future: companies and/or persons acting through and/or in concert with us and/or with any of the foregoing; partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees of ours and/or of any of the foregoing; and predecessors, successors and/or assigns of ours and/or of any of the foregoing.

Franchisee(s) Initials: _____

Date of Releases, Joint and Several Liability.  The releases granted hereunder shall be deemed effective as of the date hereof.  The liabilities and obligations of each of the Franchisee(s) (and any other person/entity providing releases to the Franchisor-Related Persons/Entities) shall be joint and several.

Franchisee(s) Initials: _____

**OTA FRANCHISE CORPORATION**

**EXHIBIT 2.2**

**TERRITORY**

The "Territory" is comprised of the zip codes that are now or in the future may be included in the following counties in the state of _____:

Note:    Boundary lines include only the area <u>within</u> the boundary line and extend only to the middle of the boundary demarcation (for example, only to the <u>middle</u> of a street or highway.)  You have <u>no rights</u> under this Agreement or otherwise with respect to a facility on the other side of the boundary line, street or highway or otherwise, and no matter how close to such boundary a facility may be, regardless of the distance from, impact on, or vicinity of, your Online Trading Academy Center or the number of Online Trading Academy Centers, other outlets or otherwise in any area or market.  Your rights are limited as set forth in the Franchise Agreement.

FRANCHISOR:                                             FRANCHISEE(s):
OTA Franchise Corporation,
a Nevada corporation

                                                                   _____
                                                                   Signature
                                                                   _____
By:   _____          Printed Name
        Signature
Title:   President

**Attachment ZZ**

EX 13
7527

**OTA FRANCHISE CORPORATION**

**EXHIBIT 3.2**

**COLLATERAL ASSIGNMENT OF LEASE**

THIS COLLATERAL ASSIGNMENT OF LEASE (this "Assignment") is entered into as of _____ between ("Franchisee") and OTA Franchise Corporation, a Nevada corporation ("Franchisor.")

Subject to the provisions hereof, and Landlord's approval process, the Franchisee, to secure its obligations to the Franchisor under the franchise agreement between the Franchisor and the Franchisee for the operation of an Online Trading Academy Center franchise, dated _____ (the "Franchise Agreement"), hereby assigns, transfers and sets over unto Franchisor [and/or such person(s)/entity(ies) as Franchisor may from time-to-time designate] all of Franchisee's right, title and interest, whether as tenant or otherwise, in, to and under that certain lease (the "Lease"), a copy of which is attached to this Assignment, dated _____, between Franchisee and _____ ("Landlord"), respecting that property commonly known as _____ (the "Premises"). The Franchisor shall have no liabilities or obligations of any kind arising from, or in connection with, this Assignment, the Lease or otherwise (including, but not limited to, any obligation to pay rent and/or other amounts) until and unless the Franchisor, in its sole and absolute discretion, takes possession of the Premises pursuant to the terms hereof _and_ expressly (and in writing) assumes the rights and obligations of Franchisee under the Lease, the Franchisor only being responsible for those obligations accruing after the date of such assumption.

The Franchisee agrees to indemnify and hold harmless the Franchisor from and against all claims and demands of any type, kind or nature made by the Landlord or any third party that arise out of or are in any manner connected with the Franchisee's use and occupancy of the Premises subject to the Lease.

The Franchisee represents and warrants to the Franchisor that, subject to Landlord's approval process, the Franchisee has full power and authority to assign the Lease and its interest in the Lease, as evidenced by the execution of the Franchise Addendum to Lease Agreement attached to the Lease and incorporated therein by reference.

The Franchisor will not take possession of the Premises until and unless the Franchisee defaults (and/or until there is a termination, cancellation, rescission or expiration of the Franchisee's rights) under the Lease, any sublease, the Franchise Agreement or other agreement between the Franchisee and the Franchisor (or any Affiliate, as that term is defined in the Franchise Agreement), and until Landlord has approved the assignment. In such event, the Franchisor (or its designee) shall have the right, and is hereby empowered, (but has no obligation) to take possession of the Premises, expel Franchisee therefrom, and, in such event, Franchisee shall have no further right, title or interest in or under the Lease or to the Premises, all such rights thereby passing to the Franchisor or its designee, in each case with the Landlord's consent. The Franchisee agrees to do all acts necessary or appropriate to accomplish such assignment on the Franchisor's request. The Franchisee will reimburse the Franchisor for the costs and expenses incurred in connection with any such retaking, including, without limitation, the payment of any back rent and other payments due under the Lease (whether such payments are made by a separate agreement with the Landlord or otherwise), attorney's fees and expenses of litigation incurred in enforcing this Assignment, including obtaining Landlord's consent, costs incurred in reletting the Premises and costs incurred for putting the Premises in good working order and repair.

Franchisee agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Franchisor, and will notify Franchisor of any

impending negotiations in accordance with section 3.2 of the Franchise Agreement.  Throughout the term of the Franchise Agreement, Franchisee agrees that it shall elect and exercise on a timely basis all options to extend the term, or renew or assume in bankruptcy, the Lease, unless Franchisor otherwise agrees in writing.  Upon failure of Franchisee to so elect to extend or renew or assume the Lease, Franchisee hereby appoints Franchisor as its true and lawful attorney-in-fact to exercise such options in the name, place and stead of Franchisee for the sole purpose of effecting any extension, renewal or assumption, in each case for the account of the Franchisee and without any liability or obligation of the Franchisor

Failure of the Franchisor to exercise any remedy hereunder shall not be construed or deemed to be a waiver of any of its rights hereunder.  The rights and remedies of the Franchisor under this Assignment are cumulative and are not in lieu of, but are in addition to, any other rights and remedies which the Franchisor shall have under or by virtue of the Franchise Agreement or otherwise.  The terms, covenants, and conditions contained herein shall bind the Franchisee and its successors and assigns, and inure to the benefit of the Franchisor and its successors and assigns.  In the event of any dispute between the parties regarding this Assignment, or any matter related in any way to it, the dispute resolution provisions (including, but not limited to, mediation, binding arbitration, waiver of jury trial and limitation of damages) of the Franchise Agreement between the Franchisor and the Franchisee shall apply.  The arbitrator in any such proceeding shall have the full power and authority to grant an appropriate award to give full effect to this Assignment, expelling the Franchisee from the Premises and awarding possession to the Franchisor, as well as granting such other relief as may be proper and fair at law and by equity.  If there is more than one Franchisee, their obligations hereunder will be joint and several.

This Assignment, any memorandum hereof or any financial statement related hereto may be recorded by, and at the expense of, the Franchisor.  The Franchisee hereby appoints the Franchisor as its attorney in fact to execute any and all documents and to take any and all such actions, as are necessary or appropriate to record such instrument referenced above.

Notwithstanding anything to the contrary contained herein, the Franchisee agrees to indemnify, defend and hold harmless the Franchisor with respect to all obligations and liabilities, including, without limitation, the obligations to pay all rent and other monies due under the Lease, that arise after the date of any assignment of the Lease that transpires under this Assignment; provided, however, nothing hereunder shall affect any obligations or covenants of the Franchisee owed under its Franchise Agreement with the Franchisor, including, without limitation, any post-termination covenant not to compete.

FRANCHISEE:

_____                    _____
Signature                                          Signature

_____                    _____
Printed Name                                       Printed Name

**OTA FRANCHISE CORPORATION**

**EXHIBIT 3.3**

**ADA AND RELATED CERTIFICATIONS**

OTA Franchise Corporation ("Franchisor") and _____ ("Franchisee") are parties to a franchise agreement dated _____, 20__ (the "Franchise Agreement") for the operation of an Online Trading Academy Center at _____ (the "Center"). In accordance with Section 3.3 of the Franchise Agreement, Franchisee certifies to Franchisor that the Center and its adjacent areas comply with all applicable federal, state and local accessibility laws, statutes, codes, rules, regulations and standards, including but not limited to the Americans with Disabilities Act and all local zoning regulations and building codes. Franchisee acknowledges that it is an independent contractor and the requirement of this certification by Franchisor does not constitute ownership, control, leasing or operation of the Center. Franchisee acknowledges that Franchisor has relied on the information contained in this certification. Furthermore, Franchisee agrees to indemnify Franchisor and each and all of the Franchisor-Related Persons/Entities, in connection with any and all claims, losses, costs, expenses, liabilities, compliance costs, and damages incurred by the indemnified party(ies) as a result of any matters associated with Franchisee's compliance (or failure to comply) with the Americans with Disabilities Act, all local zoning regulations and building codes and otherwise, as well as the costs, including attorneys' fees, related to the same.

FRANCHISEE

By: _____

Printed Name: _____

Title: _____

Date: _____

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7530

**OTA FRANCHISE CORPORATION**

**EXHIBIT 4.13**

**OTA FRANCHISE CORPORATION -  ACH BANK ACCOUNT AUTHORIZATION**

Bank Name:

Routing Number:   _____

Account Number:              _____

I hereby authorize OTA Franchise Corporation or its designee ("OTA"), to charge the above account monthly for any and all sums due and owing to OTA at that time, I understand that all fees including Online Class Fulfillment Fees are a mandatory part of the Agreement I/My/Our Company has with OTA. Charges will be made on the 15th of each month. If any fee payment owed is not received when due, but a proper report has been submitted, I authorize OTA to debit from the above account the reported amounts or minimum royalty and/or marketing fee, whichever is greater and any other fees including Online Class Fulfillment Fees then due. If a royalty and/or marketing fee payment owed is not timely received but no proper report has been submitted, I authorize OTA to debit the above account by estimated amounts equal to one and one half times the royalty fee and/or marketing fee and any other fees then due for the immediately prior month plus an additional twenty percent (20%).  Any estimated and collected amounts in excess of actual amounts due, excluding late fees of $100 and interest at 1.5% per month will be credited toward future fee payments due.  Any amounts still owing after collection of such estimated amounts, excluding late fees and interest will be due immediately upon our request for such amounts.  Any such non-payment or late payment of the actual amount due is a breach of this Agreement.  Further, as outlined in the Franchise Agreement, the fees covered by this authorization may be increased, for example for inflation. If that occurs, I continue to authorize OTA. or its designee to similarly adjust the monthly charges to this account.

FRANCHISEE (Individuals)

_____          _____
Signature                                                           Signature

_____          _____
Printed Name                                                     Printed Name

FRANCHISEE (Corp., LLC, or Partnership)
_____
Legal Name of Business Entity

a_____ _____
    Jurisdiction of Formation          Corporation, LLC, or Partnership

By: _____
       Signature

Title:_____

**Attachment ZZ**

EX 13
7531

**OTA FRANCHISE CORPORATION**

**EXHIBIT 8.1(A)**

**EMPLOYEE CONFIDENTIALITY, ETC. AGREEMENT**

*(Note to Franchisee: This is a form that has **not** been checked by us for compliance with local laws and should be reviewed by your attorney for your protection and to maximize enforceability.  You are responsible for ensuring that the terms of the agreement used by you comply with all applicable laws, since they may vary from one state or province to another. Please also note that the arbitration provisions of section 16 below may need to be set out in a separate agreement to be enforceable in your jurisdiction. See Exhibit 8.1 (B) attached hereto as an example)*

In consideration of the employment of the below named Employee, and as inducement for disclosure by _____ [*franchisee entity or individual name*] (the "Franchisee"), doing business as an independent Online Trading Academy Franchisee, for the continuation of such employment, and for the compensation which I have received and may receive during the period of such employment, I, the undersigned Employee, hereby agree that during my employment with the Franchisee and for any post-term periods specified in this Agreement:

1)   My employment by the Franchisee will be in accordance with the policies, rules and regulations of the Franchisee, as the same now exist, or as they may be established or modified from time to time.

2)   The Franchisee has, subject to a Franchise Agreement with OTA Franchise Corporation, (the "Franchisor") acquired specified rights to use certain "Confidential Information," which includes all information (current and future) relating to the operation of an Online Trading Academy Center or the Online Trading Academy System, including, among other things, all: i) Manuals, training, techniques, processes, policies, procedures, systems, data and know how regarding the development, marketing, operation and franchising of Online Trading Academy Centers; ii) designs, specifications and information about Products and Services, iii) all information regarding customers and suppliers, customer, supplier and product lists, technical processes and know how, specifications, manuals, notes, reports, memoranda, data, equipment and/or secured areas (in written, audio, magnetic and/or electronic format), including any statistical and/or financial information and all lists, together with various designs, techniques, know-how, marketing concepts and information, operating procedures and technical information and ancillary products, services and techniques and other related applications which are not generally known in the industry or to the public, and, in addition, iv) any other items that an arbitrator or court deems reasonably appropriate for protection.

3)   "Confidential Information" is not intended to include any information that: is or subsequently becomes publicly available (other than by breach of any legal obligation), or became known to you other than through a breach of a legal obligation.

4)   By virtue of my employment by the Franchisee, the Employee will or may have access to Confidential Information.

5)   With reference to the Confidential Information, the Employee agrees as follows:

a.   The Confidential Information is a valuable trade secret licensed to the Franchisee by the Franchisor and/or related companies, and I will not use the Confidential Information other than within the course and scope of my employment responsibilities and functions.

b.   I will not release or divulge any Confidential Information in any manner including by electronic means by any email discussion or posting on any social media, including but limited to, any blog site, facebook, linked in or twitter unless first expressly authorized to do so in writing by a superior or an officer

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

66

**Attachment ZZ**

of the Franchisee; provided, however, that during the period of my employment, I will be permitted to release or divulge the same, or any portion thereof, to persons employed or otherwise closely associated with the Franchisee, but only to the extent that such persons have a need to know the same within the course and scope of their employment by, or close association with, the Franchisee (for example, attorneys and/or accountants retained by the Franchisee.)

c.   Any and all publications/copies/disclosures of the Confidential Information in any form, which may be presented to me or to which I may be granted access, <u>are on loan and will at all times remain, the exclusive property of the Franchisee and/or the Franchisor; the Confidential Information is being given to me in trust and confidence; and I will accept the same subject to such trust</u>.

d.   During the period of my employment by the Franchisee, I will take all necessary steps to safeguard and maintain the secrecy and confidentiality of the Confidential Information in my possession or control, including (by way of illustration and not limitation) (i) securing the Confidential Information in locked or otherwise secured files; and (ii) refraining from making copies or reproductions of the Confidential Information, or any portions thereof, unless necessary for the carrying out of my employment responsibilities, or if first expressly authorized to do so by a superior or an officer of the Franchisee.

e.   Upon the termination of my employment by the Franchisee, I will immediately return to the Franchisee any and all Confidential Information and all copies thereof, which may have been entrusted to me or which I may have generated or copied, as well as any physical property of the Franchisee, including books, CDs, DVDs, mp3s, any other form of electronic files, tapes, equipment, and the like, whether proprietary or not, which I may have in my possession or control.

f.   My obligations with respect to the Confidential Information will continue beyond the period of my employment.

6)   All inventions, discoveries, developments, improvements, innovations, and writings, whether or not eligible for patent and/or copyright protection (hereinafter collectively referred to as "Innovations" or "Inventions" as may be appropriate), conceived or made by me either solely or in concert with others, during the period of my employment by the Franchisee (including, but not limited to, any period prior to the date of this Agreement) whether or not made or conceived during working hours, which (a) relate in any manner to the existing or contemplated business, or the development of activities, of the Franchisee and/or the Franchisor, or (b) are suggested by, or result from, my work for the Franchisee, or (c) result from my use of the Franchisee's time, materials, or facilities, will be the sole and exclusive property of the Franchisor.  Any Inventions made by me, or disclosed by me to a third party, or described in a patent application of mine, within nine (9) months following the period of my employment by the Franchisee, will be presumed to have been conceived or made by me during the period of my employment with the Franchisee, unless I can prove they were entirely conceived and made by me following the period of such employment.

7)   I will promptly make a full disclosure to the Franchisor, and hold in trust for the sole right and benefit of the Franchisor, any and all Inventions which I may solely or jointly conceive, write, develop, reduce to practice; or cause to be conceived, written, developed, or reduced to practice, during the period of time I am employed by the Franchisee, and thereafter in accordance with the provisions of this Agreement.

8)   I hereby assign and agree to assign to the Franchisor, all of my right, title and interest in and to all my Inventions, if any, and agree, during and subsequent to my employment, to execute and deliver to the Franchisor, ownership, title and exclusive rights therein, all without charge.

9)   I hereby assign and agree to assign to the Franchisor all of my right, title and interest in and to any and all United States and foreign patents and copyrights covering my Inventions, and all reissues, registrations and renewals thereof.  I further agree, during and subsequent to my employment, to aid (i) in the prosecution of any United States or foreign applications for Letters Patent or the registration of copyrights covering such inventions and (ii) in the enforcement of any such patents or copyrights.  In this connection, I will, at the

Franchisor's request and expense, execute, acknowledge and deliver any and all documents and oaths, and take such further action considered necessary by the Franchisor for the foregoing purposes, without charge.

10) In the event the Franchisor is unable, for any reason whatsoever, to secure my signature to any lawful and necessary documents required to assign, apply for, or prosecute any United States or foreign applications for Letters Patent or the registration of copyrights in and to my Inventions or otherwise which belong to the Franchisor by virtue of the provisions of this Agreement or otherwise, I hereby irrevocably designate and appoint the Franchisor and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such assignments and applications, and to do all other lawfully permitted acts to further the prosecution and issuance of Letters Patent thereon and/or registrations of copyrights with the same legal force and effect as if executed by me.

11) My compensation as an employee of the Franchisee will cover any Inventions which I may conceive or make hereunder, and I will not be entitled to any additional compensation therefore.

12) I represent to the Franchisee and the Franchisor that I have no right, title or interest in or to any invention which has been made, conceived or reduced to practice by me (solely or jointly with others) prior to my employment by the Franchisee.

13) My services, and the Confidential Information which may be entrusted to me, are unique, and, if I breach this Agreement, the Franchisee and the Franchisor may not be adequately compensated by damages. Therefore, if I violate the terms of this Agreement, either during or after my employment, the Franchisee and the Franchisor will be entitled, in addition to all other remedies available to either, to equitable relief by injunction or otherwise, thereby enjoining or restraining me, and those persons acting in concert with me, from the continuation of any breaches hereof. The right to equitable relief granted in the foregoing sentence will not preclude the Franchisee or the Franchisor from seeking actual money damages from me or any other party in the event of a breach or threatened breach of this Agreement.

12) During my employment by the Franchisee, and for one (1) year after termination of such employment, I will not; i) directly or indirectly, or in concert with others, employ or attempt to employ or solicit for any employment any of the Franchisee's or Franchisor's employees, ii) conduct, operate, consult, advise or in any manner be associated, directly or indirectly, with any business or operation substantially similar to or competitive with that conducted by the Franchisee within the Franchisee's Territory (as defined by Franchisee's franchise agreement). Such restriction includes the furnishing and/or use of the Confidential Information to any person and/or entity, whether gratuitously, on a consulting basis, as an owner, shareholder, partner, employee or associate. For informational purposes, the Territory as it currently exists is shown on an attachment to this Agreement.

15) Nothing contained in this Agreement will be construed to prevent me from engaging in a lawful profession, trade or business after my employment with the Franchisee. I confirm that I possess valuable skills unrelated to the Franchised Business and have the ability to be self-supporting and employed regardless of the restrictions described in this Agreement. I also acknowledge that the restrictions of this Agreement will not prevent me from practicing a lawful profession, trade, or business and are limited to the express restrictions detailed herein. This Agreement will be construed only as one which prohibits me from engaging in practices unfair to the Franchisee, and which are in violation of the confidence and trust reposed in me by the Franchisee with respect to its Confidential Information.

16) The parties agree to the following dispute resolution provisions:

    a. **Any litigation, claim, dispute, suit, action, controversy, or proceeding of any type whatsoever** including any claim for equitable relief and/or where you are acting as a "private attorney general," suing pursuant to a statutory claim or otherwise, between or involving you and us on whatever theory and/or facts based, and whether or not arising out of this Agreement, and including any dispute involving the Franchisor, ("Claim") will be processed in the following manner, you and we each expressly waiving all rights to any court proceeding, except as expressly provided below at sub-sections (g) and (h) below:

i)     <u>First</u>, submitted to non-binding mediation for a minimum of four (4) hours before 1) the Judicial Arbitration and Mediation Service ("JAMS") or its successor (or an organization designated by JAMS or its successor), if JAMS cannot conduct such mediation and the parties cannot agree on a mediation organization. The Franchisee will pay the costs of the first four (4) hours of any mediation, and no mediation is required to extend beyond such four (4) hour period. Any mediation/arbitration (and any appeal of arbitration) will be conducted by a mediator/arbitrator experienced in franchising. Any party may be represented by counsel and may, with permission of the mediator, bring persons appropriate to the proceeding.

ii)     <u>Second</u>, <u>submitted to and finally resolved by binding arbitration</u> before and in accordance with the arbitration rules of JAMS or its successor (or an organization designated by JAMS or its successor); provided that, in any case, arbitration may be filed prior to a face-to-face meeting and/or mediation, with such face-to-face meeting and/or mediation to follow as quickly thereafter as possible.

iii)     <u>Third</u>, a final award by an arbitrator (there will be no appeal of interim awards or other interim relief), may be appealed within thirty (30) days of such final award. Appeals will be conducted before a three (3) arbitrator panel appointed by the same organization as conducted the arbitration, each member of which shall be experienced in franchising. The arbitration panel will not conduct any trial de novo or other fact-finding function. Such panel's decision shall be in writing, may be entered in any court having jurisdiction and will be binding, final and non-appealable.

b.     <u>Any mediation/arbitration (and any appeal of arbitration) will be conducted at the Franchisee's then-current principal offices and by a mediator/arbitrator experienced in the legal subject matter of the matter; but if the Franchisor provides notice that it believes its interests are involved in any such mediation/arbitration, in which case the mediation/arbitration will be conducted at the Franchisor's then-current principal offices (the Franchisor's present principal offices are located at 17780 Fitch, Suite 200, Irvine, California 92614) and the parties to this Agreement understand that conducting any mediation/arbitration at those offices, or at the Franchisee's or Franchisor's then-current principal offices, may involve additional expense and/or inconvenience for the undersigned.)</u> The Franchisee shall pay the fees and expenses of the mediator(s) and arbitrator(s) (but if the Franchisor provides notice that it believes its interests are involved in any such mediation/arbitration the Franchisor and Franchisee will equally share such costs); provided that i) the parties shall otherwise each bear their own costs, including attorneys fees, and ii) for matters not settled through agreement of the parties, the arbitrator may assess all, or any portion, of the fees and costs incurred in connection with any arbitration and/or appeal (but not any attorneys' fees) against the party who does not prevail. Each participant must submit or file any claim that would constitute a compulsory counterclaim (as defined by the applicable rule under the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim, which is not submitted or filed in such proceeding, will be forever barred. The arbitrator's award shall be in writing. On request by either party, the arbitrator (or appeal panel) shall provide to all disputants a reasoned opinion with findings of fact and conclusions of law and the party so requesting shall pay the arbitrator's fees and costs connected therewith.

c.     Judgment on any preliminary or final arbitration award (subject to the opportunity for appeal as contemplated above) may be entered in any court having jurisdiction and will be binding, final and non-appealable.

d.     The parties <u>each knowingly waive all rights to trial by a court or jury</u>, understanding that arbitration may be less formal than a court or jury trial, may use different rules of procedure and evidence and that appeal is generally less available, still strongly preferring, and having mutually selected, mediation and/or arbitration as provided in this Agreement to resolve any disputes, the parties having had an express meeting of the minds on each these matters. The Franchisee <u>intends to, and the Employee expressly agrees that the Franchisee may, fully enforce each of the provisions of this Agreement, including those relating to arbitration, waiver of jury trial, venue, choice of laws, or otherwise, having had an express meeting of the minds regarding each of such matters.</u>

e.     Notwithstanding any provision of this Agreement or otherwise relating to which state or other laws this Agreement will be governed by, any provisions of state, or other law to the contrary, the

Franchisee and the Employee mutually intend and agree that (1) the arbitrator shall decide any and all questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including but not limited to applicability, subject matter, timeliness, scope, remedies, claimed unconscionability and any alleged fraud in the inducement and/or the enforcement of the agreement to arbitrate contained herein and that this Agreement and all related matters shall be governed exclusively by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration and (2) the Franchisee and the Employee mutually intend and agree (and have expressly had a meeting of the minds) to fully enforce all of the provisions of this Agreement and all other documents signed by the Franchisee and the Employee, including (but not limited to) all venue, choice-of-laws, mediation/arbitration provisions and other dispute avoidance and resolution provisions and to rely on federal preemption under the Federal Arbitration Act (9 U.S.C. § 1 et seq.).

f.     No party will be required to post a bond in order to obtain any injunctive or other equitable relief.  Any claim will be conducted and resolved on an individual basis only and not on a class-wide, multiple plaintiff or similar basis.

g.     These dispute resolution provisions apply to any claims/arbitration between the parties (including any dispute involving the Franchisor and/or any person/entity related in any way to it), and/or by any owner and/or affiliate thereof, or which could be brought in their behalf or by any successor; provided that any claims or disputes relating primarily to the validity of the Franchisor's Marks and/or any Intellectual Property licensed to the Franchisee will be subjected to court proceedings; provided that only the portion of any claim or dispute relating primarily to the validity of the Marks and/or any Intellectual Property licensed to the Franchisee and requesting equitable relief shall be subject to court action, and any portion of such claim seeking monetary damages will be subject to the process outlined above

h.     Subject to the foregoing obligations regarding mediation/arbitration, any litigation (for example, to enforce such obligations) between the undersigned (or involving the Franchisor) will be held in the United States District Court encompassing the Franchisee's then-current headquarters (the "Proper Federal Court").  Proceedings will be held only in the Proper Federal Court, subject to the following exceptions:

i)     if a basis for federal jurisdiction does not exist, then any such proceeding shall be brought exclusively before a court in the most immediate state judicial district encompassing the Franchisee's then-current headquarters and having subject matter jurisdiction (the "Proper State Court");

ii)     proceedings to remove or transfer a matter to the Proper Federal Court and/or to compel arbitration as contemplated by this Agreement may be brought in the court where the applicable action is pending and/or the Proper State or Federal Court; and

iii)     any action primarily with respect to any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) may be brought in any court of competent jurisdiction and/or the Proper State or Federal Court.

17)  Upon the termination of the Employee's employment, the Franchisee may notify anyone thereafter employing me of the existence and provisions of this Agreement.

18) At no time during or after the term of the employment shall Employee make any public postings on the internet about the Franchisee, Franchisor or any other person employed or hired by the Franchisee which disparage, defame, denigrate or criticize the Franchisee in any manner by any email discussion or posting on any social media, including but limited to, any blog site, facebook, linked in or twitter.

19)  The employee understands that his/her employment is at will, and that just as the Employee may terminate his/her employment at any time and for any reason (or for no reason), the Franchisee may do the same, unless a fixed term is specified herein or in another writing, executed by the Employee and the Franchisee.

20)  The Employee represents that he/she has no existing agreements with, obligations to, or interest in any other party that keep the Employee from complying with his/her obligations under this Agreement, or

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

which may give rise to a conflict of interest, except those identified on the attached list signed by the Employee and the Franchisee.  If no list is attached, the Employee agrees that there are no such agreements, obligations or interests on my part.  In addition, the Employee agrees to promptly disclose in writing to his/her superior any future agreements, obligations and/or interests which may preclude or conflict with his/her obligations hereunder.

21)  The Employee will not use on behalf of, or divulge, in any manner including by electronic means by any email discussion or posting on any social media, including but limited to, any blog site, facebook, linked in or twitter, to, the Franchisee, or its agents or employees, during his/her employment by the Franchisee, confidential or trade secret information acquired during any prior employment of his/hers or from any other source outside of the Franchisee, provided, of course, that the Employee knows or should know of its nature as confidential or a trade secret.

22)  The Employee understands and confirms that he/she has no authority whatsoever to make any commitment or enter into any arrangement or contract on behalf of the Franchisee unless authorized by an officer of the Franchisee in writing.

23)  The Franchisee and the Employee agree that this Agreement supersedes any prior oral agreement and/or written agreement by and between them relating generally to the subject matter of this Agreement; the Employee represents and warrants that there are no such prior oral agreement and/or written agreement.

24)  The Franchisee and the Employee agree that, if it is determined that any provision of this Agreement is illegal or unenforceable, such provision will be enforced to the fullest extent permissible under governing law and such determination will solely affect such provision and not impair the remaining provisions of this Agreement.  The time period of the restrictions described in this Agreement will be extended by the length of time during which the Employee is in breach of any such provision of this Agreement.

25)  The Franchisee and the Employee agree that this Agreement will be construed, and the validity, performance and enforcement hereof will be governed by the laws of the State in which the Franchisee's headquarters is located.

26) A waiver by the Franchisee or Franchisor of any breach of this Agreement on the Employee's part will not operate as or be construed as a waiver of any subsequent breach hereof.

27)  This Agreement will inure to the benefit of and be enforceable by the Franchisee and the Franchisor, and any successors and assigns of the foregoing, and that it will be binding upon the Employee, his/her executors, administrators, legatees, distributees, heirs and other successors in interest.  The Franchisor is an intended third-party beneficiary of this Agreement and may protect its interests by enforcing the parties' obligations, but the Franchisor is not a party to this Agreement, is not the employer of, and has no obligations to, the Employee.

28)  The Employee has read the foregoing provisions, understands that this Agreement defines the terms and conditions under which the Franchisee is willing to employ or continue to employ the Employee, is executing this Agreement and agreeing to abide by its provisions voluntarily, and the Franchisee has given the Employee a copy of this Agreement for his/her future reference so as to avoid any possible oversights or misunderstandings regarding its provisions.

Dated _____, 20____ at _____, _____
                                                                                      City                                                  State

**FRANCHISEE:**

_____                    _____
                                                                                      Employee's signature

By:_____

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

EX 13
7537

**OTA FRANCHISE CORPORATION**

**EXHIBIT 8.1(B)**
**EMPLOYEE ARBITRATION AGREEMENT**

*(Note to Franchisee: This is a CA form that has **not** been checked by us for compliance with any local laws and should be reviewed by your attorney for your protection and to maximize enforceability. You are responsible for ensuring that the terms of any such agreement used by you comply with all applicable laws, since they may vary from one state or province to another.)*

This Arbitration Agreement ("Agreement") is made as of _____date) by and between _____("Employee") and _____", ("Employer" or "Company"). The parties to this Agreement agree to arbitrate any and all disputes, claims, or controversies ("claims") they may have against each other, including Employer's current and former agents, owners, officers, directors, or employees, which arise from the employment relationship between Employee and Employer or Employer's affiliates, or the termination thereof. Claims covered by this Agreement include, but are not limited to: claims based upon federal or state statutes including, but not limited to employment discrimination and harassment under Title VII of the Civil Rights Act, as amended; the California Fair Employment & Housing Act; the Age Discrimination in Employment Act, as amended; the Americans with Disabilities Act; 42 U.S.C. section 1981; the Employment Retirement Income Security Act; the FLSA, as amended; the Family and Medical Leave Act, the Fair Labor Standards Act or other wage statutes, the WARN Act, the California Labor Code, including any claims brought by the Employee related to wages, meal and rest breaks, penalties; breach of employment contract or the implied covenant of good faith and fair dealing; wrongful discharge; invasion of privacy or tortious conduct (whether intentional or negligent) including defamation, misrepresentation, fraud, infliction of emotional distress, but excluding claims for workers' compensation benefits to remedy work-related injury or illness. This Agreement further applies to claims based upon tort or contract laws or common law or any other state or federal or local law affecting employment in any manner whatsoever. The parties understand and agree that they are waiving their right to bring such claims to court, including the right to a jury trial and waiving their right to appeal the decision of the arbitrator.

The arbitration shall be conducted by a neutral arbitrator in accordance with the National Rules for the Resolution of Employment Disputes issued by the American Arbitration Association ("AAA") attached hereto and incorporated herein by reference. The Employer will pay the arbitrator's fee for the proceeding, as well as any room or other charges assessed by the AAA. Either party may file pre-hearing motions directed at the legal sufficiency of a claim or defense equivalent to a demurrer or summary judgment prior to the arbitration hearing. The arbitration shall be conducted in Orange County, California.

The arbitrator will issue a detailed written decision and award, resolving the dispute. The arbitrator's written opinion and award shall decide all issues submitted and set forth the legal principle(s) supporting each part of the opinion.

The decision or award of the arbitrator shall be final and binding upon the parties. The arbitrator shall have the power to award any type of legal or equitable relief that would be available in a court of competent jurisdiction including, but not limited to attorneys' fees and punitive damages (and interest thereon) when such damages and fees are available under the applicable statute and/or judicial authority. Any arbitral award may be entered as a judgment or order in any court of competent jurisdiction. The parties agree that any relief or recovery to which they are entitled arising out of the employment relationship or cessation thereof shall be limited to that awarded by the arbitrator.

Nothing in this Agreement precludes Employee from filing a charge or from participating in an administrative investigation of a charge before any appropriate government agency. However, Employee understands and agrees that Employee cannot obtain any monetary relief or recovery from such a proceeding.

The parties agree to file any demand for arbitration within the time limit established by the applicable statute of limitations for the asserted claims or within one year of the conduct that forms the basis of the

claim if no statutory limitation is applicable.  Failure to demand arbitration within the prescribed time period shall result in waiver of said claims.

Neither the terms nor the conditions described in this Agreement are intended to create a contract of employment for a specific duration of time or to limit the circumstances under which the parties' employment relationship may be terminated.  Since employment with the Employer is voluntarily entered into, Employee is free to resign at any time.  Similarly, the Employer may terminate the employment relationship without cause or notice at any time.

This Agreement shall be governed by and shall be interpreted in accordance with the laws of the State of California.  The terms of this Agreement shall not be orally modified.  This Agreement can be modified only by a written document signed by the President  of the Company and the Employee.

A court or other entity construing this Agreement should administer, modify, or interpret it to the extent and such manner as to render it enforceable.  If, for any reason, this Agreement is declared unenforceable and cannot be administered, interpreted, or modified to be enforceable, the parties agree to waive any right they may have to a jury trial with respect to any dispute or claim relating to employment, termination from employment, or any terms and conditions of employment with the Employer.

By signing this Agreement, Employee and Employer waive their right to commence, be a party to, or class member of any court action, including collective actions, against the other party relating to employment issues.  Further, the parties waive their right to commence or be a party to any group, class or collective action claim in arbitration or any other forum.  The parties agree that any claim by or against Employee or Employer shall be heard without consolidation of such claim with any other person or entity's claim.  If any claim is found not to be subject to this Agreement and the arbitration procedure, it must be brought in a federal or state court in Orange County, California.

If any provision of this Agreement is determined to be invalid or unenforceable, it is agreed that the remainder of this Agreement shall remain in full force and effect.  The parties agree that this Agreement may be interpreted or modified to the extent necessary for it to be enforceable and to give effect to the parties' expressed intent to create a valid and binding arbitration procedure to resolve all disputes not expressly excluded.

Employee understands that s/he would not be hired by the Company if s/he did not sign this Agreement.  Employee has signed it in consideration of employment by the Company.  Employee has been advised of his or her right to consult with counsel regarding this Agreement.

**EMPLOYEE AND EMPLOYER UNDERSTAND THAT, ABSENT THIS AGREEMENT, THEY WOULD HAVE THE RIGHT TO SUE EACH OTHER IN COURT, TO INITIATE OR BE A PARTY TO A GROUP OR CLASS ACTION CLAIM, AND THE RIGHT TO A JURY TRIAL, BUT, BY EXECUTING THIS AGREEMENT, BOTH PARTIES GIVE UP THOSE RIGHTS AND AGREE TO HAVE ALL EMPLOYMENT DISPUTES BETWEEN THEM RESOLVED BY MANDATORY, FINAL AND BINDING ARBITRATION.**

EMPLOYEE                                              EMPLOYER


_____          _____
Signature                                              Signature


_____          _____
Date                                                  Date


_____          _____
Print Name                                            Print Name


                                                      _____
                                                      Title

OTA Franchise Corporation Franchise Agreement –
Copyright @OTA Franchise Corporation March 30 2018

**Attachment ZZ**

**OTA FRANCHISE CORPORATION**

**EXHIBIT 10.4**

**EXECUTIVE ORDER 13224 AND RELATED CERTIFICATIONS**

If the Franchisee is an individual or individuals, the Franchisee certifies that he/she/they are not, nor to my/our best knowledge have I/us been designated, a terrorist and/or a suspected terrorist, nor am I/us associated and/or affiliated in any way with any terrorist and/or suspected terrorist person and/or organization, as defined in U.S. Executive Order 13224 and/or otherwise.

If the Franchisee is a company, the person(s) signing on behalf of the Franchisee certifies(y) that, to the Franchisee's and such person's best knowledge, neither the Franchisee, such person, and/or any owners, officers, board members, similar individuals and/or affiliates/associates of the Franchisee have been designated, a terrorist and/or a suspected terrorist, nor is the Franchisee or any such persons and/or affiliates/associates owned, controlled, associated and/or affiliated in any way with any terrorist and/or a suspected terrorist person and/or organization, as defined in U.S. Executive Order 13224 and/or otherwise.

Franchisee agrees to fully comply and/or assist Franchisor in its compliance efforts, as applicable, with any and all laws, regulations, Executive Orders or otherwise relating to antiterrorist activities, including without limitation the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or other regulations, including properly performing any currency reporting and other obligations, whether relating to the Franchise or otherwise, and/or required under applicable law.  The indemnification responsibilities provided in the Franchise Agreement cover the Franchisee's obligations hereunder.

FRANCHISEE

By: _____

Printed Name: _____

Title: _____

Date: _____

**EXHIBIT B TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**FINANCIAL STATEMENTS**

**Attachment ZZ**

EX 13
7541

*Financial Statements*

# OTA Franchise Corporation and Subsidiaries

December 31, 2017 and 2016

EX 13
7542



# Haynie & Company
**(a professional corporation)**

**Certified Public Accountants and Management Consultants**
4910 Campus Drive  Newport Beach, California  92660-2119  (949) 724-1880  FAX (949) 724-1889

INDEPENDENT AUDITORS' REPORT

To the Board of Directors and
Stockholders of OTA Franchise Corporation
Irvine, California

We have audited the accompanying consolidated financial statements of OTA Franchise Corporation (a Nevada Corporation) and Subsidiaries, which comprise the consolidated balance sheets as of December 31, 2017 and 2016, and the related consolidated statements of income, stockholder's equity and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the consolidated financial statements based on our audits.  We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.  The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

Associated Offices
in Salt Lake City and
Ogden, Utah, and
Denver, Colorado

A member of PrimeGlobal — An Association of Independent Group of Accounting Firms)
USA • Canada • Worldwide

**Attachment ZZ**

EX-13
7543



Auditors' report
Page Two

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects,  the financial position of OTA Franchise Corporation and Subsidiaries as of December 31, 2017 and 2016, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

Haynie & Company

March 29, 2018
Newport Beach, California

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Balance Sheets
December 31, 2017 and 2016

| **ASSETS** | | 2017 | | 2016 |
|---|---|---|---|---|
| Current assets: | | | | |
| Cash and cash equivalents | $ | 990,820 | $ | 961,809 |
| Short-term investments - certificates of deposit | | 684,552 | | 684,552 |
| Current portion of accounts receivable, net of allowance for doubtful accounts of approximately $1,039,000 and $794,000 for 2017 and 2016, respectively | | 7,292,387 | | 5,869,047 |
| Notes receivable | | 111,858 | | 206,443 |
| Inventory | | 161,263 | | 106,609 |
| Deferred costs and other current assets | | 2,384,969 | | 2,998,605 |
| **Total current assets** | | 11,625,849 | | 10,827,065 |
| Accounts receivable, net of current portion | | 4,486,191 | | 3,587,726 |
| Notes receivable, net of current portion | | 217,710 | | 2,500 |
| Due from affiliates, net | | 11,835,780 | | 4,133,012 |
| Property and equipment, net of accumulated depreciation and amortization | | 1,448,067 | | 2,148,285 |
| Asset purchases | | 1,155,544 | | 1,569,473 |
| Goodwill | | 379,131 | | 379,131 |
| Restricted assets | | 180,000 | | 180,000 |
| **Total assets** | $ | 31,328,272 | $ | 22,827,192 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 5,775,370 | $ | 4,723,582 |
| Deferred revenue and other current liabilities | | 2,312,455 | | 1,646,037 |
| Capital leases, current portion | | 32,314 | | - |
| **Total current liabilities** | | 8,120,139 | | 6,369,619 |
| Capital leases, net of current portion | | 54,809 | | - |
| Due to parent company | | 8,008,214 | | 4,135,322 |
| Deferred rent liability | | 513,270 | | 472,619 |
| **Total liabilities** | | 16,696,432 | | 10,977,560 |
| Stockholder's equity: | | | | |
| Common stock | | | | |
| Authorized - 1,000,000 shares, $.001 par value, issued and outstanding - 1,000,000 shares | | 1,000 | | 1,000 |
| Additional paid-in capital | | 100,000 | | 100,000 |
| Retained earnings | | 14,850,877 | | 12,301,917 |
| Accumulated other comprehensive loss | | (320,037) | | (553,285) |
| **Total stockholder's equity** | | 14,631,840 | | 11,849,632 |
| **Total liabilities and stockholder's equity** | $ | 31,328,272 | $ | 22,827,192 |

See notes to consolidated financial statements.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Income
For the Years Ended December 31, 2017 and 2016

|  | 2017 | 2016 |
|---|---|---|
| Revenues: |  |  |
| Franchise | $ 38,543,465 | $ 30,509,710 |
| Company owned | 44,123,931 | 38,007,386 |
| Total revenues | 82,667,396 | 68,517,096 |
| Operating expenses: |  |  |
| Sales and marketing expenses | 41,936,422 | 34,848,773 |
| Franchising expenses | 4,569,576 | 2,761,723 |
| Content development and fulfillment | 6,977,548 | 6,835,139 |
| General and administrative | 25,599,492 | 20,153,291 |
| Subtotal | 79,083,038 | 64,598,926 |
| Operating income before depreciation and amortization | 3,584,358 | 3,918,170 |
| Depreciation and amortization expense | 869,586 | 873,609 |
| Operating income | 2,714,772 | 3,044,561 |
| Other income (expense): |  |  |
| Foreign currency loss | (9,113) | (360,872) |
| Other income | 47,289 | 54,455 |
| Gain on sale of franchises | 80,972 | 250,345 |
| Interest expense | (668) | (529) |
| Total other income (expense) | 118,480 | (56,601) |
| Income before provision for income taxes | 2,833,252 | 2,987,960 |
| Provision for income taxes | (284,292) | (223,674) |
| **Net income** | 2,548,960 | 2,764,286 |
| Other comprehensive gain from foreign currency translation adjustments | 233,248 | 297,680 |
| **Comprehensive income** | $ 2,782,208 | $ 3,061,966 |

See notes to consolidated financial statements.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Changes in Stockholder's Equity
For the Years Ended December 31, 2017 and 2016

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balances, December 31, 2015 | 1,000,000 | $ 1,000 | $ 100,000 | $ 9,537,631 | $ (850,965) | $ 8,787,666 |
| Net income | - | - | - | 2,764,286 | - | 2,764,286 |
| Other comprehensive income, net of tax - foreign currency translation adjustment | - | - | - | - | 297,680 | 297,680 |
| Balances, December 31, 2016 | 1,000,000 | 1,000 | 100,000 | 12,301,917 | (553,285) | 11,849,632 |
| Net income | - | - | - | 2,548,960 | - | 2,548,960 |
| Other comprehensive income, net of tax - foreign currency translation adjustment | - | - | - | - | 233,248 | 233,248 |
| Balances, December 31, 2017 | 1,000,000 | $ 1,000 | $ 100,000 | $ 14,850,877 | $ (320,037) | $ 14,631,840 |

See notes to consolidated financial statements.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
For the Years Ended December 31, 2017 and 2016

|  | 2017 | 2016 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income | $ 2,548,960 | $ 2,764,286 |
| Items not requiring cash: | | |
| Depreciation and amortization | 869,586 | 873,609 |
| Provision for losses on accounts receivable | 245,238 | (274,400) |
| Gain on sale of franchises | (80,972) | (250,345) |
| (Increase) decrease in assets: | | |
| Accounts receivable, net | (2,567,043) | 1,384,446 |
| Notes receivable | 179,376 | (65,600) |
| Inventory | (54,654) | 98,510 |
| Due from affiliates, net | (7,066,368) | (2,934,056) |
| Deferred costs and other current assets | 613,636 | 302,523 |
| Asset purchases | - | (46,503) |
| Increase (decrease) in liabilities: | | |
| Accounts payable and accrued expenses | 964,665 | 478,834 |
| Deferred revenue and other current liabilities | 666,418 | (408,150) |
| Due to parent company | 3,236,492 | (1,504,348) |
| Deferred rent liability | 40,651 | 350,478 |
| **Net cash from operating activities** | (404,015) | 769,284 |
| **Cash flows from investing activities:** | | |
| Acquisition of property and equipment | (195,781) | (1,090,517) |
| Proceeds from sale of franchises | 398,048 | 538,000 |
| **Net cash from investing activities** | 202,267 | (552,517) |
| **Cash flows from financing activities** | | |
| Payments on notes payable | - | (275,000) |
| Payments on capital leases | (2,489) | - |
| **Net cash from financing activities** | (2,489) | (275,000) |
| Effect of exchange rate changes on cash | 233,248 | 297,680 |
| Net increase in cash and cash equivalents | 29,011 | 239,447 |
| Cash, beginning of year | 961,809 | 722,362 |
| **Cash, end of year** | $ 990,820 | $ 961,809 |

See notes to consolidated financial statements.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
For the Years Ended December 31, 2017 and 2016

|  | 2017 | 2016 |
|---|---|---|
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid during the year for: | | |
| Interest | $        - | $        - |
| Income taxes | $   226,838 | $   198,952 |
| **Supplemental disclosure of non-cash investing and financing activities:** | | |
| Non-cash proceeds from sale of franchises | $   300,000 | $        - |
| Acquisition of property and equipment through the issuance of long-term debt | $   89,612 | $        - |

See notes to consolidated financial statements.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The summary of significant accounting policies of OTA Franchise Corporation and subsidiaries is presented to assist in the understanding of the Company's financial statements.  The financial statements and notes are representations of the Company's management, who is responsible for their integrity and objectivity.

Organization

OTA Franchise Corporation (the "Company") was organized for the purpose of franchising independent trading and financial education training centers that utilize proprietary products, systems and services.  The Company has domestic and international franchising activity with locations in the United Kingdom, Canada, Dubai, India, Indonesia and Singapore.

The Company is a wholly-owned subsidiary of Newport Exchange Holdings, Inc. (the "Parent").

During 2012, the Company purchased all the outstanding common stock of Redahead LTD (the "Subsidiary") in connection with reacquiring the London center.

The Company created a Canadian wholly-owned subsidiary, Online Trading Academy Limited  (the "Canadian Subsidiary").

Principles of consolidation

The consolidated financial statements included the accounts of OTA Franchise Corporation and the Subsidiaries.  All significant intercompany accounts, transactions and profits have been eliminated upon consolidation.

Use of estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain amounts and disclosures.  Accordingly, actual results could differ from those estimates.

Cash and cash equivalents

Cash consists of monies held in checking and money market accounts.  For purposes of the statement of cash flows, the Company considers all highly liquid debt instruments purchased with a maturity date of three months or less to be cash equivalents.  The Company, from time to time, maintains cash balances that exceed the FDIC insurance limits.  Amounts in excess of these limits as of December 31, 2017 and 2016, approximated $558,000 and  $449,000, respectively.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

Short-term investments

Short-term investments consist of certificates of deposits with maturity dates greater than 3 months but less than 1 year.  The Company can convert the certificates of deposits to cash before the maturity date for a nominal fee.

Accounts receivable

Accounts receivable represent amounts due from customers and franchisees in connection with trading classes and franchising services sold.  The Company's determination of allowance for doubtful accounts receivable includes a number of factors, including the age of the balance, past experience with the customer account, changes in collection patterns and general industry conditions.

When accounts receivable are sold to a financial institution, the cash proceeds are recorded, the related accounts receivable are removed from the balance sheet, and the difference between the amount of cash received and the carrying amount of the assets sold is recognized as a discount fee.

Certain accounts receivable are financed by the Company with terms up to three years.  Certain accounts receivable contracts entered into by the Company are serviced by a third-party financing company and an affiliated company.

Notes receivable

Notes receivable are stated at unpaid principal balances, less an allowance for loan losses, if any. Interest on notes is recognized over the term of the loan and is calculated using the simple-interest method on principal amounts outstanding. The Company's determination of allowance for loan losses includes a number of factors, including past experience with the debtor, changes in collection patterns and general industry conditions.

Inventory

Inventories consist primarily of marketing and course materials, and are valued at the lower of cost or market value. The cost of new inventory is determined using the first-in, first-out (FIFO) method.  A valuation allowance is provided for obsolete and slow-moving inventory to write the cost down to net realizable value (market) when necessary.

**Attachment ZZ**

## OTA FRANCHISE CORPORATION AND SUBSIDIARIES
Notes to consolidated financial statements

1. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

Property and equipment

Significant additions and betterments are capitalized.  Expenditures for maintenance, repairs and minor renewals are charged to expense as incurred.  The Company maintains a policy to expense acquisitions of computer equipment when the amount is less than $1,000.

Property and equipment are stated at cost.  Depreciation and amortization is calculated using the straight-line method over the estimated useful lives of such assets, which range from 3 to 7 years.

Long-lived assets

Management reviews long-lived assets for impairment when circumstances indicate the carrying amount of an asset may not be recoverable based on the undiscounted future cash flows of the asset.  If the carrying amount of an asset may not be recoverable, a write-down to fair value is recorded.  Fair values are determined based on the discounted cash flows, quoted market values, or external appraisals, as applicable.  Long-lived assets are reviewed for impairment at the individual asset or the asset group level for which the lowest level of independent cash flows can be identified.  Management has evaluated the long-lived assets and has not identified any impairment as of December 31, 2017 and 2016.

Advertising

The Company expenses advertising costs as they are incurred. Advertising expenses for the years ended December 31, 2017 and 2016, were approximately $12,858,000 and $11,201,000,respectively.

Asset purchases

Asset purchases represent acquired franchise centers which the Company currently operates.  The Company expects to operate these centers on an ongoing basis for the foreseeable future.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

    Goodwill

    Cost of investments in purchased companies in excess of the underlying fair value of net assets at dates of acquisition are recorded as goodwill and assessed annually for impairment. If considered impaired, goodwill will be written down to fair value and a corresponding impairment loss recognized.  For the years ended December 31, 2017 and 2016, no impairment was recorded in connection with goodwill.

    Income taxes

    The Company filed with the Internal Revenue Service to be treated as a Subchapter S corporation for federal and state tax purposes effective November 1, 2013.  As such, the tax attributes of the Company pass to the shareholder, and the Company is not liable for federal income taxes.  California income taxes are payable at a corporate rate of 1.5%.  Certain other state jurisdictions require minimum filing fees.

    The Company has adopted the Financial Accounting Standards Board ("FASB") authoritative guidance in connection with accounting for income taxes and deferred income taxes.  Deferred income taxes, when shown, arise from timing differences in reporting of income and expense items for financial statement and tax purposes.

    The Company files a consolidated tax return with it's parent.

    Fair-value of financial instruments

    The carrying value of cash and cash equivalents, accounts receivable, short-term investments, notes receivable, accounts payable and short-term borrowings approximate their fair values due to the short-term nature of these investments.

    Reclassifications

    Certain reclassifications have been made to the 2016 financial statement presentation to correspond to the current year's format. Total equity and net income are unchanged due to these reclassifications.

    Subsequent event disclosures

    The Company has evaluated subsequent events through March 29, 2018, the date which the financial statements were available.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

    Recent accounting pronouncements

    Management has reviewed and adopted applicable recent Accounting Standards Updates and revisions issued by the FASB (including its Emerging Issues Task Force), the American Institute of Certified Public Accountants, and the Security and Exchange Commission during the year ended December 31, 2017. Management believes the adoption of such pronouncements and revisions do not have a material impact on the Company's financial statements other than certain footnote disclosures which have been incorporated into these financial statements.

2.  **ACCOUNTS RECEIVABLE**

    Purchase agreement

    The Company entered into a purchase agreement with a financial institution to sell certain receivable contracts. Based upon the terms of the agreement, the third-party financial institution will purchase certain contracts at various discount rates depending on the terms of the contract.

    When accounts receivable are sold to a third-party financial institution, the cash proceeds are recorded, the related accounts receivable are removed from the balance sheet, and the difference between the amount of cash received and the carrying amount of the assets sold is recorded as a loan purchase discount fee. For certain international accounts receivable, the difference between the amount of cash received and the carrying amount of the assets sold is split between a loan purchase discount fee, which is a component of general and administrative expense, and a holdback reserve account included in other current assets.

    When accounts receivables are sold to an affiliated company an intercompany balance is recorded, the related accounts receivable are removed from the balance sheet and the difference between the amount of intercompany balance recorded and the carrying amount of the assets sold is recorded as a loan purchase discount fee.

    Based upon the terms of the agreement, the Company allows for proceeds from the Company's serviced accounts payments to be used to offset projected write-offs of the purchased portfolio in the event that write-offs become excessive as defined under the agreement.

    Servicing agreement

    The Company entered into a servicing agreement with a third-party financial institution. Based upon the terms of the agreement, the Company contracted for the periodic billing of its owned and operated franchise locations' accounts receivable, collection of those receivables, and other services for a fee. The term of this agreement is for one year.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

## 2.   ACCOUNTS RECEIVABLE (CONTINUED)

Age and interest accrual status of financing receivables

The following tables present informative data by class of financing receivables regarding their age and interest accrual status as of December 31, 2017 and 2016:

| December 31, 2017 | Current | 30-59 days | 60- 89 days | >90 days | Total Past Due | Total Financing Receivables | Total Financing Receivables on Non Accrual Status | Financing Receivables Past due >90 days and still Accruing interest |
|---|---|---|---|---|---|---|---|---|
| | | | Past Due | | | | Status of Interest Accruals | |
| Trade receivables | $ 12,432,300 | $   385,388 | $        - | $        - | $   385,388 | $ 12,817,688 | $        - | $        - |
| Total | $ 12,432,300 | $   385,388 | $        - | $        - | $   385,388 | $ 12,817,688 | $        - | $        - |

| December 31, 2016 | Current | 30-59 days | 60- 89 days | >90 days | Total Past Due | Total Financing Receivables | Total Financing Receivables on Non Accrual Status | Financing Receivables Past due >90 days and still Accruing interest |
|---|---|---|---|---|---|---|---|---|
| | | | Past Due | | | | Status of Interest Accruals | |
| Trade receivables | $ 10,164,211 | $   12,123 | $   74,311 | $        - | $   86,434 | $ 10,250,645 | $        - | $        - |
| Total | $ 10,164,211 | $   12,123 | $   74,311 | $        - | $   86,434 | $ 10,250,645 | $        - | $        - |

## 3.   NOTES RECEIVABLE

Notes receivable consisted of the following:

| | 2017 | 2016 |
|---|---|---|
| Franchise centers | $      329,568 | $      208,943 |

Annual principal payments approximate the following:

| Year ending December 31: | |
|---|---|
| 2018 | $      111,858 |
| 2019 | 119,740 |
| 2020 | 97,970 |
| | $      329,568 |

The notes receivable bear interest at a rate ranging from 0% to 10% and are secured by franchise rights, when applicable.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

4.  **RESTRICTED ASSETS**

Certain brokerage firms require the Company to maintain minimum cash balances in connection with trading accounts used in classroom instruction.  As of December 31, 2017 and 2016, restricted cash consisted of $180,000 and $180,000, respectively.

5.  **RELATED PARTY TRANSACTIONS**

As of December 31, 2017 and 2016, the Company had net amounts due to the Parent totaling $8,008,214 and $4,135,322, respectively.  The Company does not have a current requirement to repay these balances, however the Company can make repayments at their discretion.  The Parent has agreed not to require the repayment of outstanding balances within 24 months of any given report date.

The Company leases office space from the Parent.  The lease is classified as an operating lease and payments are based on usage.  Rent expense for the years ended December 31, 2017 and 2016 was $507,567 and $310,742, respectively.

The assets of the Company are collateralized in connection with lines-of-credit held by the Parent company.  As of December 31, 2017 and 2016, the aggregate outstanding balance of the lines-of-credit held by the Parent company was $12,942,699 and $9,087,849, respectively.

As of December 31, 2017 and 2016, the Company had net amounts due from affiliates totaling $11,835,780 and $4,133,012, respectively. The affiliates do not have a current requirement to repay these balances, however the affiliates can make repayments at their discretion.  The Company has agreed not to require the repayment of the outstanding balances within 24 months of any given report date.

A subsidiary of the Parent company is engaged in the purchase of receivable contracts associated with center-owned locations of the Company. Total purchases of receivable contracts in 2017 and 2016, were approximately $14,543,000 and $4,033,000, respectively.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

6. **PROPERTY AND EQUIPMENT**

Property and equipment consist of the following:

|  | 2017 | 2016 |
|---|---|---|
| Vehicle | $ 76,258 | $ 76,258 |
| Computer equipment | 2,673,996 | 2,522,002 |
| Furniture and equipment | 1,093,245 | 1,232,275 |
| Computer software | 1,190,172 | 1,051,332 |
| Leasehold improvements | 983,169 | 1,110,003 |
| Intangible assets | 257,164 | 257,164 |
| Work in progress | - | 16,577 |
|  | 6,274,004 | 6,265,611 |
| Less accumulated depreciation and amortization | (4,825,937) | (4,117,326) |
| Property and equipment, net | $ 1,448,067 | $ 2,148,285 |

7. **DEFERRED COST AND OTHER CURRENT ASSETS**

Deferred cost and other current assets consist of the following:

|  | 2017 | 2016 |
|---|---|---|
| Deferred costs | $ 400,377 | $ 329,736 |
| Prepaid expenses | 1,373,462 | 1,832,912 |
| Due from officer | 10,761 | 5,784 |
| Holdback reserve | 316,370 | 514,747 |
| Other current assets | 283,999 | 315,426 |
|  | $ 2,384,969 | $ 2,998,605 |

8. **CAPITAL LEASES**

As of December 31, 2017, the Company had various assets capitalized under the terms of certain capitalized leases. The leases call for monthly payments ranging from approximately $636 to $1,201 including interest from 1.32% to 4.1% (with an average rate of 2.5%) and maturing through the year 2020. All of the leases are secured by the related equipment which had capitalized costs of approximately $89,612 and related accumulated depreciation of approximately $10,555 as of December 31, 2017.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

8. **CAPITAL LEASES (CONTINUED)**

The following is a schedule by years of future minimum lease payments under capital leases, together with the present value of the net minimum lease payments:

| Year ending December 31: | | |
|---|---|---|
| 2018 | $ | 32,314 |
| 2019 | | 32,314 |
| 2020 | | 29,621 |
| Total minimum lease payments | | 94,249 |
| Less amount representing interest | | (7,126) |
| Present value of minimum lease payments | | 87,123 |
| Less current portion | | (32,314) |
| Long-term lease obligations under capital leases | $ | 54,809 |

9. **FRANCHISING**

The Company executes franchise agreements that set the terms of its arrangement with each franchisee.  The franchise agreement requires the franchisee to pay an initial, non-refundable fee ranging from $100,000 to $250,000, and continuing fees based upon, among other things, gross sales.  Subject to the Company's approval and payment of a renewal fee, a franchisee may generally renew its agreement upon its expiration.  Direct costs of sales and servicing of franchise agreements are charged to expense as incurred.

When an individual franchise is sold, the Company agrees to provide certain services to the franchisee, including territory approval, training, systems implementation, and design of a quality control program.  The Company recognizes initial fees as revenue when substantially all initial services required by the franchise agreement are performed.  Continuing fees are recognized when earned, with an appropriate provision for estimated uncollectible fees charged to expense. The Company recognizes renewal fees as income when a renewal agreement becomes effective.

Fees included in revenues for the year ended December 31, 2017 and 2016 were approximately $68,000 and $137,000, respectively.

## OTA FRANCHISE CORPORATION AND SUBSIDIARIES
Notes to consolidated financial statements

9.   **FRANCHISING (CONTINUED)**

Following is a summary of revenue and costs by OTA Franchise Corporation (franchisor) and company-owned centers:

|  | 2017 | 2016 |
|---|---|---|
| **Franchised centers:** | | |
| Revenue | $ 38,543,465 | $ 30,509,710 |
| Operating expenses | (36,669,974) | (27,309,407) |
|  | $ 1,873,491 | $ 3,200,303 |
| **Company-owned centers:** | | |
| Revenue | $ 44,123,931 | $ 38,007,386 |
| Operating expenses | (42,413,064) | (37,289,519) |
|  | $ 1,710,867 | $ 717,867 |

Information about the number of franchised centers is as follows:

|  | 2017 | 2016 |
|---|---|---|
| **Franchised centers:** | | |
| Centers sold | 2 | 2 |
| In operation as of December 31 | 37 | 35 |
| **Company-owned centers:** | | |
| Purchased | - | - |
| In operation as of December 31 | 7 | 9 |

During the years ended December 31, 2017 and 2016, the Company also operated 3 satellite centers.

10.   **INCOME TAXES**

Prior to November 1, 2013, the Company had operated as a C Corporation.  Effective November 1, 2013, the Company has elected S Corporation status.

The provision for income taxes consists of the following:

|  | 2017 | 2016 |
|---|---|---|
| States and local | $ 57,454 | $ 24,722 |
| Foreign | 226,838 | 198,952 |
|  | $ 284,292 | $ 223,674 |

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

10. **INCOME TAXES (CONTINUED)**

The Company files income tax returns in the U.S. federal jurisdiction and various state jurisdictions.  Generally, the Company's tax returns remain open for federal income tax examination for three years from the date of filing and four years for California.

The Company follows the provisions of uncertain tax positions as addressed in FASB Accounting Standards Codification 740-10-65-1. The Company recognized no increase in the liability for unrecognized tax benefits. The Company has no tax position as of December 31, 2017 or 2016, for which the ultimate deductibility is highly certain but for which there is uncertainty about the timing of such deductibility. The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in operating expenses. No such interest or penalties were recognized during the period presented. The Company had no accruals for interest and penalties as of December 31, 2017 and 2016.

11. **EMPLOYEE BENEFIT PLAN**

The Company participates in a 401(k) profit sharing plan (the "Plan") established by the Parent company covering substantially all eligible employees.  Under the Plan, the Company may contribute discretionary matching and profit sharing contributions for each participant.  The Company made approximately $108,000 and $88,000 in contributions to the Plan for the years ended December 31, 2017 and 2016, respectively.

12. **COMMITMENTS AND CONTINGENCIES**

As discussed in note 5, the Company leases office space from a related party based upon usage.

The Company currently operates seven franchises and three satellite centers which have lease commitments related to the buildings in which these franchises operate. Certain lease agreements contain clauses that call for minimum rental increases.  The Company accounts for rent expense on a straight-line basis over the term of the lease.  Total deferred rental liabilities associated with existing facility leases as of December 31, 2017 and 2016, approximated $513,000 and $473,000, respectively.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

## 12.  COMMITMENTS AND CONTINGENCIES (CONTINUED)

Future minimum lease payments consist of the following:

Year ending December 31,

| | | |
|---|---|---:|
| 2018 | $ | 1,802,596 |
| 2019 | | 1,691,051 |
| 2020 | | 1,551,334 |
| 2021 | | 1,394,157 |
| 2022 | | 1,033,438 |
| Thereafter | | 3,126,568 |
| | $ | 10,599,144 |

The two centers that were sold during 2016 are subleased to two unrelated parties under noncancelable leases that expire in 2018 and 2020. The Company's lease expense will be offset by payments due under the subleases as follows:

| | | |
|---|---|---:|
| 2018 | $ | 184,968 |
| 2019 | | 112,332 |
| 2020 | | 47,720 |
| | $ | 345,020 |

For 2017, both rent expense and rental income from the subleases approximated $182,000.

The Company is involved in certain cases arising in the normal course of business.  In the opinion of management, any unfavorable outcome would not materially impact the financial condition of the Company.

## 13.  FRANCHISE MARKETING AGREEMENT

In February of 2013, the Company entered into a three-year franchise marketing agreement with an individual representative that covers the marketing and selling of franchise locations in certain countries (territories).  Based upon the terms of the agreement, if as a result of the representative's efforts the Company opens a franchise anywhere within the defined territories, the representative shall receive 30% of the franchise fee paid to the Company by the franchisee and 30% of all revenues derived by the Company from the franchisee for a period of five years.  If certain conditions of the agreement are not met the Company has the right to cancel the agreement.  This agreement was cancelled in March of 2016.

*Financial Statements*

# OTA Franchise Corporation and Subsidiaries

December 31, 2016 and 2015



**Haynie & Company**

(a professional corporation)

**Certified Public Accountants and Management Consultants**
4910 Campus Drive  Newport Beach, California  92660-2119  (949) 724-1880  FAX (949) 724-1889



INDEPENDENT AUDITORS' REPORT

To the Board of Directors and
Stockholders of OTA Franchise Corporation

We have audited the accompanying consolidated financial statements of OTA Franchise Corporation (a Nevada Corporation) and Subsidiaries, which comprise the consolidated balance sheets as of December 31, 2016 and 2015, and the related consolidated statements of income, stockholder's equity and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the consolidated financial statements based on our audits.  We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements.  The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

Associated Offices
in Salt Lake City and
Ogden, Utah, and
Denver, Colorado

A member of PrimeGlobal (An Association of Accounting Firms)
USA • Canada • Worldwide

Attachment ZZ

EX-13
7563



Auditors' report
Page Two

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of OTA Franchise Corporation and Subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Haynie & Company*

March 23, 2017
Newport Beach, California

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Balance Sheets
December 31, 2016 and 2015

| **ASSETS** | 2016 | 2015 |
|---|---:|---:|
| Current assets: | | |
| Cash and cash equivalents | $ 961,809 | $ 722,362 |
| Short-term investments - certificates of deposit | 684,552 | 673,043 |
| Current portion of accounts receivable, net of allowance for doubtful accounts of approximately $794,000 and $1,068,000 for 2016 and 2015, respectively | 5,869,047 | 6,610,888 |
| Notes receivable | 206,443 | 143,343 |
| Inventory | 106,609 | 205,119 |
| Due from affiliates, net | 4,769,412 | 1,835,356 |
| Deferred costs and other current assets | 2,998,605 | 3,301,128 |
| **Total current assets** | 15,596,477 | 13,491,239 |
| | | |
| Accounts receivable, net of current portion | 3,587,726 | 3,955,931 |
| Notes receivable, net of current portion | 2,500 | - |
| Property and equipment, net of accumulated depreciation and amortization | 2,148,285 | 2,006,563 |
| Asset purchases | 1,569,473 | 1,746,948 |
| Goodwill | 379,131 | 379,131 |
| Restricted assets | 180,000 | 180,000 |
| | | |
| **Total assets** | $ 23,463,592 | $ 21,759,812 |

| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
|---|---:|---:|
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 4,723,582 | $ 4,244,748 |
| Deferred revenue and other current liabilities | 1,631,037 | 2,039,187 |
| Note payable | - | 275,000 |
| **Total current liabilities** | 6,354,619 | 6,558,935 |
| | | |
| Due to parent company | 4,771,722 | 6,276,070 |
| Franchisee deposits | 15,000 | 15,000 |
| Deferred rent liability | 472,619 | 122,141 |
| | | |
| **Total liabilities** | 11,613,960 | 12,972,146 |
| | | |
| Stockholder's equity: | | |
| Common stock | | |
| Authorized - 1,000,000 shares, $.001 par value, issued and outstanding - 1,000,000 shares | 1,000 | 1,000 |
| Additional paid-in capital | 100,000 | 100,000 |
| Retained earnings | 12,301,917 | 9,537,631 |
| Accumulated other comprehensive loss | (553,285) | (850,965) |
| **Total stockholder's equity** | 11,849,632 | 8,787,666 |
| | | |
| **Total liabilities and stockholder's equity** | $ 23,463,592 | $ 21,759,812 |

See notes to consolidated financial statements.

**Attachment ZZ**

EX 13
7565

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Income
For the Years Ended December 31, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| Revenues: | | |
| Franchise | $ 30,509,710 | $ 33,203,468 |
| Company owned | 38,007,386 | 41,161,550 |
| Total revenues | 68,517,096 | 74,365,018 |
| Operating expenses: | | |
| Sales and marketing expenses | 34,848,773 | 36,054,977 |
| Franchising expenses | 2,761,723 | 2,689,940 |
| Content development and fulfillment | 6,835,139 | 7,303,986 |
| General and administrative | 20,153,291 | 21,560,873 |
| Subtotal | 64,598,926 | 67,609,776 |
| Operating income before depreciation and amortization | 3,918,170 | 6,755,242 |
| Depreciation and amortization expense | 873,609 | 722,187 |
| Operating income | 3,044,561 | 6,033,055 |
| Other income (expense): | | |
| Foreign currency loss | (360,872) | (361,961) |
| Other income | 54,455 | 25,284 |
| Loss on disposal of assets | - | (15,322) |
| Gain on sale of franchise | 250,345 | - |
| Interest expense | (529) | (832) |
| Total other income (expense) | (56,601) | (352,831) |
| Income before provision for income taxes | 2,987,960 | 5,680,224 |
| Provision for income taxes | (223,674) | (294,865) |
| **Net income** | 2,764,286 | 5,385,359 |
| Other comprehensive gain (loss) from foreign currency translation adjustments | 297,680 | (625,633) |
| **Comprehensive income** | $ 3,061,966 | $ 4,759,726 |

See notes to consolidated financial statements.

**Attachment ZZ**

EX 13
7566

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Changes in Stockholder's Equity
For the Years Ended December 31, 2016 and 2015

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balances, December 31, 2014 | 1,000,000 | $ 1,000 | $ 100,000 | $ 4,152,272 | $ (225,332) | $ 4,027,940 |
| Net income | - | - | - | 5,385,359 | - | 5,385,359 |
| Other comprehensive loss, net of tax - foreign currency translation adjustment | - | - | - | - | (625,633) | (625,633) |
| Balances, December 31, 2015 | 1,000,000 | 1,000 | 100,000 | 9,537,631 | (850,965) | 8,787,666 |
| Net income | - | - | - | 2,764,286 | - | 2,764,286 |
| Other comprehensive income, net of tax - foreign currency translation adjustment | - | - | - | - | 297,680 | 297,680 |
| Balances, December 31, 2016 | 1,000,000 | $ 1,000 | $ 100,000 | $ 12,301,917 | $ (553,285) | $ 11,849,632 |

See notes to consolidated financial statements.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
For the Years Ended December 31, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income | $ 2,764,286 | $ 5,385,359 |
| Items not requiring cash: | | |
| Depreciation and amortization | 873,609 | 722,187 |
| Loss on disposal of assets | 66,517 | 15,322 |
| Provision for losses on accounts receivable | (274,400) | 328,041 |
| Gain on sale of franchise | (250,345) | - |
| (Increase) decrease in assets: | | |
| Accounts receivable, net | 1,384,446 | (1,706,772) |
| Notes receivable | (65,600) | (126) |
| Inventory | 98,510 | (116,481) |
| Due from affiliates, net | (2,934,056) | (1,835,356) |
| Deferred costs and other current assets | 302,523 | 2,109,910 |
| Asset purchases | (113,020) | (206,784) |
| Increase (decrease) in liabilities: | | |
| Accounts payable and accrued expenses | 478,834 | 926,458 |
| Deferred revenue and other current liabilities | (408,150) | 192,517 |
| Due to parent company | (1,504,348) | (4,031,087) |
| Deferred rent liability | 350,478 | 122,141 |
| **Cash provided by operating activities** | 769,284 | 1,905,329 |
| **Cash flows from investing activities:** | | |
| Acquisition of property and equipment | (1,090,517) | (1,279,190) |
| Proceeds from sale of franchise | 538,000 | - |
| **Cash used in investing activities** | (552,517) | (1,279,190) |
| **Cash flows from financing activities** | | |
| Payments on notes payable | (275,000) | (227,945) |
| Payments on capital lease | - | (3,054) |
| **Cash used in financing activities** | (275,000) | (230,999) |
| Effect of exchange rate changes on cash | 297,680 | (625,633) |
| Increase (decrease) in cash | 239,447 | (230,493) |
| Cash, beginning of year | 722,362 | 952,855 |
| **Cash, end of year** | $ 961,809 | $ 722,362 |

See notes to consolidated financial statements.

**Attachment ZZ**

EX 13
7568

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Consolidated Statements of Cash Flows
For the Years Ended December 31, 2016 and 2015

|  | 2016 | 2015 |
|---|---|---|
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid during the year for: | | |
| Interest | $          - | $          832 |
| Income taxes | $     198,952 | $   201,212 |

See notes to consolidated financial statements.

**Attachment ZZ**

## OTA FRANCHISE CORPORATION AND SUBSIDIARIES
Notes to consolidated financial statements

1. <u>**SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**</u>

The summary of significant accounting policies of OTA Franchise Corporation and subsidiaries is presented to assist in the understanding of the Company's financial statements.  The financial statements and notes are representations of the Company's management, who is responsible for their integrity and objectivity.

<u>Organization</u>

OTA Franchise Corporation (the "Company") was organized for the purpose of franchising independent trading and financial education training centers that utilize proprietary products, systems and services.  The Company has domestic and international franchising activity with locations in the United Kingdom, Canada, Dubai, India, Indonesia and Singapore.

The Company is a wholly-owned subsidiary of Newport Exchange Holdings, Inc. (the "Parent").

During 2012, the Company purchased all the outstanding common stock of Redahead LTD (the "Subsidiary") in connection with reacquiring the London center.

The Company created a Canadian wholly-owned subsidiary, Online Trading Academy Limited  (the "Canadian Subsidiary").

<u>Principles of consolidation</u>

The consolidated financial statements included the accounts of OTA Franchise Corporation and the Subsidiaries.  All significant intercompany accounts, transactions and profits have been eliminated upon consolidation.

<u>Use of estimates</u>

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain amounts and disclosures.  Accordingly, actual results could differ from those estimates.

<u>Cash and cash equivalents</u>

Cash consists of monies held in checking and money market accounts.  For purposes of the statement of cash flows, the Company considers all highly liquid debt instruments purchased with a maturity date of three months or less to be cash equivalents.  The Company, from time to time, maintains cash balances that exceed the FDIC insurance limits.  Amounts in excess of these limits as of December 31, 2016 and 2015, approximated $449,000 and  $617,000, respectively.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

Short-term investments

Short-term investments consist of certificates of deposits with maturity dates greater than 3 months but less than 1 year.  The Company can convert the certificates of deposits to cash before the maturity date for a nominal fee.

Accounts receivable

Accounts receivable represent amounts due from customers and franchisees in connection with trading classes and franchising services sold.  The Company's determination of allowance for doubtful accounts receivable includes a number of factors, including the age of the balance, past experience with the customer account, changes in collection patterns and general industry conditions.

When accounts receivable are sold to a financial institution, the cash proceeds are recorded, the related accounts receivable are removed from the balance sheet, and the difference between the amount of cash received and the carrying amount of the assets sold is recognized as a discount fee.

Certain accounts receivable are financed by the Company with terms up to three years.  Certain accounts receivable contracts entered into by the Company are serviced by a third-party financing company.

Notes receivable

Notes receivable are stated at unpaid principal balances, less an allowance for loan losses, if any. Interest on notes is recognized over the term of the loan and is calculated using the simple-interest method on principal amounts outstanding. The Company's determination of allowance for loan losses includes a number of factors, including past experience with the debtor, changes in collection patterns and general industry conditions.

Inventory

Inventories consist primarily of marketing and course materials, and are valued at the lower of cost or market value. The cost of new inventory is determined using the first-in, first-out (FIFO) method.  A valuation allowance is provided for obsolete and slow-moving inventory to write the cost down to net realizable value (market) when necessary.

**Attachment ZZ**

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

   Property and equipment

   Significant additions and betterments are capitalized.  Expenditures for maintenance, repairs and minor renewals are charged to expense as incurred.  The Company maintains a policy to expense acquisitions of computer equipment when the amount is less than $1,000.

   Property and equipment are stated at cost.  Depreciation and amortization is calculated using the straight-line method over the estimated useful lives of such assets, which range from 3 to 7 years.

   Long-lived assets

   Management reviews long-lived assets for impairment when circumstances indicate the carrying amount of an asset may not be recoverable based on the undiscounted future cash flows of the asset.  If the carrying amount of an asset may not be recoverable, a write-down to fair value is recorded.  Fair values are determined based on the discounted cash flows, quoted market values, or external appraisals, as applicable.  Long-lived assets are reviewed for impairment at the individual asset or the asset group level for which the lowest level of independent cash flows can be identified.  Management has evaluated the long-lived assets and has not identified any impairment as of December 31, 2016 and 2015.

   Advertising

   The Company expenses advertising costs as they are incurred. Advertising expenses for the years ended December 31, 2016 and 2015, were approximately $11,201,000 and $11,202,000,respectively.

   Asset purchases

   Asset purchases represent acquired franchise centers which the Company currently operates.  The Company expects to operate these centers on an ongoing basis for the foreseeable future.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

    Goodwill

    Cost of investments in purchased companies in excess of the underlying fair value of net assets at dates of acquisition are recorded as goodwill and assessed annually for impairment. If considered impaired, goodwill will be written down to fair value and a corresponding impairment loss recognized.  For the years ended December 31, 2016 and 2015, no impairment was recorded in connection with goodwill.

    Income taxes

    The Company filed with the Internal Revenue Service to be treated as a Subchapter S corporation for federal and state tax purposes effective November 1, 2013.  As such, the tax attributes of the Company pass to the shareholder, and the Company is not liable for federal income taxes.  California income taxes are payable at a corporate rate of 1.5%.  Certain other state jurisdictions require minimum filing fees.

    The Company has adopted the Financial Accounting Standards Board ("FASB") authoritative guidance in connection with accounting for income taxes and deferred income taxes.  Deferred income taxes, when shown, arise from timing differences in reporting of income and expense items for financial statement and tax purposes.

    The Company files a consolidated tax return with it's parent.

    Fair-value of financial instruments

    The carrying value of cash and cash equivalents, accounts receivable, short-term investments, notes receivable, accounts payable and short-term borrowings approximate their fair values due to the short-term nature of these investments.

    Subsequent event disclosures

    The Company has evaluated subsequent events through March 23, 2017, the date which the financial statements were available.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

1.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

    Recent accounting pronouncements

    Management has reviewed and adopted applicable recent Accounting Standards Updates and revisions issued by the FASB (including its Emerging Issues Task Force), the American Institute of Certified Public Accountants, and the Security and Exchange Commission during the year ended December 31, 2016.  Management believes the adoption of such pronouncements and revisions do not have a material impact on the Company's financial statements other than certain footnote disclosures which have been incorporated into these financial statements.

2.  **ACCOUNTS RECEIVABLE**

    Purchase agreement

    The Company entered into a purchase agreement with a financial institution to sell certain receivable contracts.  Based upon the terms of the agreement, the third-party financial institution will purchase certain contracts at various discount rates depending on the terms of the contract.

    When accounts receivable are sold to a third-party financial institution, the cash proceeds are recorded, the related accounts receivable are removed from the balance sheet, and the difference between the amount of cash received and the carrying amount of the assets sold is recorded as a loan purchase discount fee.  For certain international accounts receivable, the difference between the amount of cash received and the carrying amount of the assets sold is split between a  loan purchase discount fee, which is a component of general and administrative expense, and a holdback reserve account included in other current assets.

    Based upon the terms of the agreement, the Company allows for proceeds from the Company's serviced accounts payments to be used to offset projected write-offs of the purchased portfolio in the event that write-offs become excessive as defined under the agreement.

    Servicing agreement

    The Company entered into a servicing agreement with a third-party financial institution.  Based upon the terms of the agreement, the Company contracted for the periodic billing of its owned and operated franchise locations' accounts receivable, collection of those receivables, and other services for a fee.  The term of this agreement is for one year.

## OTA FRANCHISE CORPORATION AND SUBSIDIARIES
Notes to consolidated financial statements

2.  **ACCOUNTS RECEIVABLE (CONTINUED)**

Age and interest accrual status of financing receivables

The following tables present informative data by class of financing receivables regarding their age and interest accrual status as of December 31, 2016 and 2015:

| | | Past Due | | | | | Status of Interest Accruals | |
| December 31, 2016 | Current | 30-59 days | 60- 89 days | >90 days | Total Past Due | Total Financing Receivables | Total Financing Receivables on Non Accrual Status | Financing Receivables Past due >90 days and still Accruing interest |
|---|---|---|---|---|---|---|---|---|
| Trade receivables | $ 10,164,211 | $ 12,123 | $ 74,311 | $ - | $ 86,434 | $ 10,250,645 | $ - | $ - |
| Total | $ 10,164,211 | $ 12,123 | $ 74,311 | $ - | $ 86,434 | $ 10,250,645 | $ - | $ - |

| | | Past Due | | | | | Status of Interest Accruals | |
| December 31, 2015 | Current | 30-59 days | 60- 89 days | >90 days | Total Past Due | Total Financing Receivables | Total Financing Receivables on Non Accrual Status | Financing Receivables Past due >90 days and still Accruing interest |
|---|---|---|---|---|---|---|---|---|
| Trade receivables | $ 9,770,116 | $ 1,845,211 | $ 19,764 | $ - | $ 1,864,975 | $ 11,635,091 | $ - | $ - |
| Total | $ 9,770,116 | $ 1,845,211 | $ 19,764 | $ - | $ 1,864,975 | $ 11,635,091 | $ - | $ - |

3.  **NOTES RECEIVABLE**

Notes receivable consisted of the following:

| | 2016 | 2015 |
|---|---|---|
| Franchise centers | $  208,943 | $  143,343 |

Annual principal payments approximate the following:

| Year ending December 31: | |
|---|---|
| 2017 | $   206,443 |
| 2018 | 2,500 |
| | $   208,943 |

The notes receivable bear interest at a rate ranging from 0% to 10% and are secured by franchise rights, when applicable.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

4. **RESTRICTED ASSETS**

Certain brokerage firms require the Company to maintain minimum cash balances in connection with trading accounts used in classroom instruction.  As of December 31, 2016 and 2015, restricted cash consisted of $180,000 and $180,000, respectively.

5. **RELATED PARTY TRANSACTIONS**

As of December 31, 2016 and 2015, the Company had net amounts due to affiliates totaling $4,771,722 and $6,276,070, respectively.  The Company does not have a current requirement to repay these balances, however the Company can make repayments at their discretion.  The affiliates have agreed not to require the repayment of outstanding balances within 24 months of any given report date.

The Company leases office space from the Parent.  The lease is classified as an operating lease and payments are based on usage.  Rent expense for the years ended December 31, 2016 and 2015 was $310,742 and $327,582, respectively.

The assets of the Company are collateralized in connection with lines-of-credit held by the Parent company.  As of December 31, 2016 and 2015, the aggregate outstanding balance of the lines-of-credit held by the Parent company was $9,087,849 and  $2,837,849, respectively.

As of December 31, 2016 and 2015, the Company had net amounts due from affiliates totaling $4,769,412 and $1,835,356, respectively.

A subsidiary of the parent company is engaged in the purchase of receivable contracts associated with center-owned locations of the Company. Total purchases of receivable contracts in 2016 and 2015, were approximately $4,033,000 and $0, respectively.

EX 13
7576

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

6.  **PROPERTY AND EQUIPMENT**

Property and equipment consist of the following:

|  | | 2016 | | 2015 |
|---|---|---:|---|---:|
| Vehicle | $ | 76,258 | $ | 76,258 |
| Computer equipment | | 2,522,002 | | 2,360,922 |
| Furniture and equipment | | 1,232,275 | | 1,099,496 |
| Computer software | | 1,051,332 | | 1,038,372 |
| Leasehold improvements | | 1,110,003 | | 512,813 |
| Intangible assets | | 257,164 | | 257,164 |
| Work in progress | | 16,577 | | 7,750 |
| | | 6,265,611 | | 5,352,775 |
| Less accumulated depreciation and amortization | | (4,117,326) | | (3,346,212) |
| Property and equipment, net | $ | 2,148,285 | $ | 2,006,563 |

7.  **DEFERRED COST AND OTHER CURRENT ASSETS**

Deferred cost and other current assets consist of the following:

|  | | 2016 | | 2015 |
|---|---|---:|---|---:|
| Deferred costs | $ | 329,736 | $ | 336,959 |
| Prepaid expenses | | 1,832,912 | | 1,482,674 |
| Due from officer | | 5,784 | | 1,875 |
| Holdback reserve | | 514,747 | | 1,390,310 |
| Other current assets | | 315,426 | | 89,310 |
| | $ | 2,998,605 | $ | 3,301,128 |

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

8. **NOTE PAYABLE**

| | 2016 | 2015 |
|---|---|---|
| Note payable to third-party, payable based on terms of the note, including monthly installments of $15,000 for the first twelve months and the greater of $20,000 or 7% of cash based revenues (as defined) for the remaining twelve months | $ - | $ 275,000 |
| | - | 275,000 |
| Less current portion | - | (275,000) |
| | $ - | $ - |

9. **FRANCHISING**

The Company executes franchise agreements that set the terms of its arrangement with each franchisee. The franchise agreement requires the franchisee to pay an initial, non-refundable fee ranging from $80,000 to $250,000, and continuing fees based upon, among other things, gross sales. Subject to the Company's approval and payment of a renewal fee, a franchisee may generally renew its agreement upon its expiration. Direct costs of sales and servicing of franchise agreements are charged to expense as incurred.

When an individual franchise is sold, the Company agrees to provide certain services to the franchisee, including territory approval, training, systems implementation, and design of a quality control program. The Company recognizes initial fees as revenue when substantially all initial services required by the franchise agreement are performed. Continuing fees are recognized when earned, with an appropriate provision for estimated uncollectible fees charged to expense. The Company recognizes renewal fees as income when a renewal agreement becomes effective.

## OTA FRANCHISE CORPORATION AND SUBSIDIARIES
Notes to consolidated financial statements

9. **FRANCHISING (CONTINUED)**

Fees included in revenues for the year ended December 31, 2016 and 2015 were approximately $137,000 and $145,000, respectively.

Information about the number of franchised centers is as follows:

|  | 2016 | 2015 |
|---|---|---|
| Centers sold | 2 | - |
| In operation as of December 31 | 35 | 33 |

During the year ended December 31, 2016, the Company resold 2 franchise locations and opened a new center. The Company did not reacquire any additional locations. During the year ended December 31, 2015, the Company did not reacquire, open new locations or resell any franchise locations.  As of December 31, 2016, the Company owns and operates 9 centers.  Additionally, the Company owned and operated 3 satellite centers.  During the year ended December 31, 2016 and 2015, the Company incurred related operating expenses approximating $32,896,000 and $35,835,000, respectively.

10. **FRANCHISEE DEPOSITS**

Franchisee deposits consist of the amounts paid to the Company to fund its share of the Company's master trading minimum cash balances for classroom education only. The franchisees are required to deposit funds with the Company which allows them to use the Company's account for training purposes.  The amounts are non-interest bearing and are to be repaid when the franchisee sells the franchise, discontinues operations, or no longer uses the Company's trading account.  Franchisee deposit amounts at December 31, 2016 and 2015, were $15,000 for each year.

11. **INCOME TAXES**

Prior to November 1, 2013, the Company had operated as a C Corporation.  Effective November 1, 2013, the Company has elected S Corporation status.

The provision for income taxes consists of the following:

|  | 2016 | 2015 |
|---|---|---|
| States and local | $ 24,722 | $ 131,946 |
| Foreign | 198,952 | 162,919 |
|  | $ 223,674 | $ 294,865 |

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

11. **INCOME TAXES (CONTINUED)**

The Company files income tax returns in the U.S. federal jurisdiction and various state jurisdictions. Generally, the Company's tax returns remain open for federal income tax examination for three years from the date of filing and four years for California.

The Company follows the provisions of uncertain tax positions as addressed in FASB Accounting Standards Codification 740-10-65-1. The Company recognized no increase in the liability for unrecognized tax benefits. The Company has no tax position as of December 31, 2016 or 2015, for which the ultimate deductibility is highly certain but for which there is uncertainty about the timing of such deductibility. The Company recognizes interest accrued related to unrecognized tax benefits in interest expense and penalties in operating expenses. No such interest or penalties were recognized during the period presented. The Company had no accruals for interest and penalties as of December 31, 2016 and 2015.

12. **EMPLOYEE BENEFIT PLAN**

The Company participates in a 401(k) profit sharing plan (the "Plan") established by the Parent company covering substantially all eligible employees. Under the Plan, the Company may contribute discretionary matching and profit sharing contributions for each participant. The Company made approximately $88,000 and $100,000 in contributions to the Plan for the years ended December 31, 2016 and 2015, respectively.

13. **COMMITMENTS AND CONTINGENCIES**

As discussed in note 5, the Company leases office space from a related party based upon usage.

The Company currently operates nine franchises and three satellite centers which have lease commitments related to the buildings in which these franchises operate. Certain lease agreements contain clauses that call for minimum rental increases. The Company accounts for rent expense on a straight-line basis over the term of the lease. Total deferred rental liabilities associated with existing facility leases as of December 31, 2016 and 2015, approximated $473,000 and $122,000, respectively.

**OTA FRANCHISE CORPORATION AND SUBSIDIARIES**
Notes to consolidated financial statements

13. **COMMITMENTS AND CONTINGENCIES (CONTINUED)**

Future minimum lease payments consist of the following:

Year ending December 31,

| | |
|---|---:|
| 2017 | $   1,832,518 |
| 2018 | 1,894,746 |
| 2019 | 1,783,201 |
| 2020 | 1,645,941 |
| 2021 | 1,493,679 |
| Thereafter | 4,524,918 |
| | $   13,175,003 |

The two centers that were sold during 2016 are subleased to an unrelated party under noncancelable leases that expire in 2018 and 2020. The Company's lease expense will be offset by payments due under the subleases as follows:

| | |
|---|---:|
| 2017 | $   195,624 |
| 2018 | 184,968 |
| 2019 | 112,332 |
| 2020 | 47,720 |
| | $   540,644 |

For 2016, both rent expense and rental income from the subleases approximated $76,000.

The Company is involved in certain cases arising in the normal course of business. In the opinion of management, any unfavorable outcome would not materially impact the financial condition of the Company.

14. **FRANCHISE MARKETING AGREEMENT**

In February of 2013, the Company entered into a three-year franchise marketing agreement with an individual representative that covers the marketing and selling of franchise locations in certain countries (territories). Based upon the terms of the agreement, if as a result of the representative's efforts the Company opens a franchise anywhere within the defined territories, the representative shall receive 30% of the franchise fee paid to the Company by the franchisee and 30% of all revenues derived by the Company from the franchisee for a period of five years. If certain conditions of the agreement are not met the Company has the right to cancel the agreement. This agreement was cancelled in March of 2016.

**EXHIBIT C TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**ACH DEBIT AUTHORIZATION**

**Attachment ZZ**

**OTA Franchise Corporation**

**Exhibit C**

OTA FRANCHISE CORPORATION - ACH BANK ACCOUNT AUTHORIZATION

Bank Name:

Routing Number:  _____

Account Number:         _____

I hereby authorize OTA Franchise Corporation or its designee ("OTA"), to charge the above account monthly for any and all sums due and owing to OTA at that time, I understand that all fees including Online Class Fulfillment Fees are a mandatory part of the Agreement I/My/Our Company has with OTA. Charges will be made on the 15th of each month. If any fee payment owed is not received when due, but a proper report has been submitted, I authorize OTA to debit from the above account the reported amounts or minimum royalty and/or marketing fee, whichever is greater and any other fees including Online Class Fulfillment Fees then due. If a royalty and/or marketing fee payment owed is not timely received but no proper report has been submitted, I authorize OTA to debit the above account by estimated amounts equal to one and one half times the royalty fee and/or marketing fee and any other fees then due for the immediately prior month plus an additional twenty percent (20%).  Any estimated and collected amounts in excess of actual amounts due, excluding late fees of $100 and interest at 1.5% per month will be credited toward future fee payments due.  Any amounts still owing after collection of such estimated amounts, excluding late fees and interest will be due immediately upon our request for such amounts.  Any such non-payment or late payment of the actual amount due is a breach of this Agreement.  Further, as outlined in the Franchise Agreement, the fees covered by this authorization may be increased, for example for inflation. If that occurs, I continue to authorize OTA. or its designee to similarly adjust the monthly charges to this account.

FRANCHISEE (Individuals)

_____          _____
Signature                                                            Signature
_____          _____
Printed Name                                                       Printed Name

FRANCHISEE (Corp., LLC, or Partnership)
_____
Legal Name of Business Entity
a_____          _____
   Jurisdiction of Formation          Corporation, LLC, or Partnership
By: _____
      Signature

Title:_____

**Attachment ZZ**

EX 13
7583

**EXHIBIT D TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**LIST OF STATE ADMINISTRATORS AND AGENTS FOR SERVICE OF PROCESS**

**Attachment ZZ**

EX 13
7584

**CALIFORNIA**
Department of Business Oversight
320 West 4th Street, Suite 750
Los Angeles, California 90013
(213) 576-7505
(866) 275-2677

**CONNECTICUT**
Department of Banking
Securities and Business Investments Division
260 Constitution Plaza
Hartford, Connecticut 06103-1800
(860) 240-8230

**FLORIDA**
Tom Kenny, Regulatory Consultant
Department of Agriculture & Consumer Services
Division of Consumer Services
P.O. Box 6700
Tallahassee, Florida  32314
(850) 488-2221
Fax:  (850) 410-3804

**HAWAII**
 (for service of process)
Commissioner of Securities of the State of Hawaii
Department of Commerce and Consumer Affairs
Business Registration Division
Securities Compliance Branch
335 Merchant Street, Room 203
Honolulu, Hawaii 96813

(state agency)
Department of Commerce &
Consumer Affairs
King Kalakaua Building
335 Merchant Street, Rm 203
Honolulu, Hawaii 96813
(808)586-2722
(808) 587-7559 (fax)

**ILLINOIS**
Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706

**INDIANA**
(for service of process)
Indiana Secretary of State
201 State House
Indianapolis, Indiana 46204

(state agency)
Securities Commissioner
Indiana Secretary of State
Securities Division, Franchise Section
302 West Washington Street,

**Attachment ZZ**

EX 13
7585

Room E-111
Indianapolis, Indiana 46204
(317) 232-6681

**IOWA**
Dennis Britson
Director of Regulated Industries Unit
Iowa Securities Bureau
340 Maple
Des Moines, Iowa  50319-0066
(515) 281-4441
Fax:  (515) 281-3059
email:  iowasec@iid.state.ia.us

**MARYLAND**
(for service of process)
Maryland Securities Commissioner
Division of Securities
200 St. Paul Place
Baltimore, Maryland 21202-2020

(state agency)
Office of the Attorney General
Division of Securities
200 St. Paul Place
Baltimore, Maryland 21202-2020
(410) 576-6360

**MICHIGAN**
(for service of process)
Michigan Department of Consumer and Industry Services
Bureau of Commercial Services
Corporations Division
PO Box 30054
Lansing, Michigan 48909
(517) 241-6470

(state agency)
Department of the Attorney General
Consumer Protection Division
Attn: Franchise Section
P.O. Box 30213
Lansing MI 48913
(517) 373-7117

Street address for certified/regular mail
525 W. Ottawa Street
G. Mennen Williams Building
1s Floor
Lansing MI48913
Zip code for UPS Next Day / Fed Ex  48933

**MINNESOTA**
Commissioner of Commerce
85 Seventh Place East, Suite 280
St. Paul, MN 55101-2198
(651)  539 1600
OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7586

**NEBRASKA**
Department of Banking & Finance
1200 N. Street, Suite 311
P.O. Box 95006
Lincoln, Nebraska 68509 (402) 417-3445

**NEW YORK**
(for service of process)
SECRETARY OF THE STATE OF NEW YORK ATTENTION: UCC
NEW YORK DEPARTMENT OF STATE
ONE COMMERCE PLAZA
99 WASHINGTON AVENUE, 6TH FLOOR
ALBANY, NEW YORK 12231
(518) 474-4750473-2492

(state agency)
SECURITIES OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
INVESTOR PROTECTION BUREAU
FRANCHISE SECTION
120 BROADWAY, 23RD FLOOR
NEW YORK, NEW YORK 10271-0332
(212) 416-8236000 ATTN: BARBARA LASOFF

**NORTH DAKOTA**
(for service of process)
North Dakota Securities Commissioner
600 East Boulevard, 5th Floor
Dept. 414
Bismarck, North Dakota 58505-0510

(state agency)
Office of Securities Commissioner
600 East Boulevard Avenue
State Capitol Fifth Floor, Dept. 414
Bismarck, North Dakota 58505-0510
(701) 328-2910

**OREGON**
Director, Department of Consumer &
Business Services
Division of Finance & Corporate Securities
Labor and Industries Building
Salem, Oregon 97310
(503) 378-4140
Fax:  (503) 947-7862

**RHODE ISLAND**
Director
Department of Business Regulation
State of Rhode Island
Department of Business Regulation
Securities Division
Building 69, First Floor
1511 Pontiac Avenue
Cranston, RI 02920-4407
(401) 462-9588

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7587

**SOUTH DAKOTA**
Department Of Labor And Regulation
Division Of Insurance Securities Regulation
124 S Euclid, Suite 104
PIERRE SD  57501 (605) 773-3563

**TEXAS**
Statutory Document Section
Secretary of State
1719 Brazos
Austin, Texas  78701
(512) 475-1769

**UTAH**
Director, Division of Consumer Protection
Utah Dept. of Commerce
160 East Three Hundred South
SM Box 146704
Salt Lake City, Utah  84114-6704
(801) 530-6601 Fax:  (801) 530-6001

**VIRGINIA**
(for service of process)
Clerk of the State Corporation Commission
1300 East Main Street, 1st Floor
Richmond, Virginia 23219
(804) 371-9733

(state agency)
Director
State Corporation Commission
Division of Securities and Retail Franchising
1300 East Main Street, 9th Floor
Richmond, Virginia 23219
(804) 371-9051

**WASHINGTON**
(for service of process)
Administrator, Department of Financial Institutions
Securities Division
150 Israel Road SW
Tumwater, Washington 98501

(for other matters)
Administrator, Department of Financial Institutions
Securities Division
150 Israel Road SW
Tumwater, Washington 98501
(360) 902-8760 (360) 902-0524 (fax)

**WISCONSIN**
Securities and Franchise Registration
Wisconsin Securities Commission
201 W. Washington Avenue, Suite 300
Madison, Wisconsin 53703
608/266-1064.
OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7588

(In all other states process may be served on us at our corporate address)

EXHIBIT E TO
**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**STATE ADDENDUM TO DISCLOSURE DOCUMENT
AND FRANCHISE AGREEMENT**

**Attachment ZZ**

**CALIFORNIA ADDENDUM**
**OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT.  ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT at www.dbo.ca.gov

The following language as added to the end of Item 3 of the Disclosure Document:

Neither the Franchisor, any person or franchise broker in Item 2 of the FDD is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling these persons from membership in this association or exchange.

The following paragraphs are added to Item 17 of the Disclosure Document:

California Business and Professions Code Sections 20034 through 20043 provide rights to the franchisee concerning termination or non-renewal of a franchise.  If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement provides for termination upon bankruptcy.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.)

The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the Franchise.  This provision may not be enforceable under California law.

The Franchise Agreement requires arbitration for nearly all disputes between you and us, and also provides for a face-to-face meeting and mediation to settle disputes.  The mediation, arbitration (and any litigation) will take place in the county where our then-current headquarters are located (currently Irvine, California), and that may cost you more and result in a less favorable settlement than if these proceedings took place in your home state.  Costs of these proceedings may be greater than in your home state.

The Franchisor may terminate the Franchise Agreement if you fail to achieve minimum performance and financial standards.

The Franchise Agreement requires binding arbitration.  The arbitration will occur at our then-current headquarters with the costs borne by all parties equally.  This provision may not be enforceable under California law.

Prospective franchisees are encouraged to consult private counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

The Franchise Agreement contains a liquidated damages clause.  Under California Civil Code Section 1671, certain liquidated damages are unenforceable.

The Franchise Agreement requires you to execute a general release of claims upon renewal or transfer of the franchise agreement.  California Corporations Code Section 31512 provides that any

**Attachment ZZ**

EX 13
7590

condition, stipulation or provision purporting to bind any person acquiring a franchise to waive compliance with any provision of that law or any rule or order thereunder is void.

The Franchise Agreement requires a shortened statute of limitations period.  Pursuant to Corporations Code Section 31512, this provision is void, to the extent that it is inconsistent with the provisions of Corporations Code Section 31303 and 31304.

Section 31512 voids a waiver of your rights under Franchise Investment Law (California Corporations Code Section 31000-31516).  Business and Professions Code Section 20010 voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000-20043).

California Corporations Code, Section 31125 requires us to give you a disclosure document, approved by the Department of Business Oversight, prior to a solicitation of a proposed material modification of an existing franchise.

**Attachment ZZ**

EX 13
7591

**ILLINOIS ADDENDUM**
**TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**

**ADDITIONAL DISCLOSURES REQUIRED BY**
**THE STATE OF ILLINOIS IN THE**
**FRANCHISE DISCLOSURE DOCUMENT OF**
**OTA FRANCHISE CORPORATION**

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987, as amended (the "**Act**"), the Disclosure Document is amended as follows:

1. Illinois law governs the agreements between the parties to the Franchise Agreement.

2. Section 4 of the Act provides that any provision in the Franchise Agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a Franchise Agreement may provide for arbitration outside of Illinois.

3. Section 41 of the Illinois Franchise Disclosure Protection Act provides that any condition, stipulation or provision that purports to bind a person acquiring any franchise to waive compliance with the Act or any other law of Illinois is void.

4. Your rights upon termination and non-renewal of the Franchise Agreement are set forth in sections 19 and 20 of the Act.

**Attachment ZZ**

EX 13
7592

## ADDENDUM TO THE OTA FRANCHISE CORPORATION
## FRANCHISE AGREEMENT FOR USE IN ILLINOIS

**THIS ADDENDUM TO FRANCHISE AGREEMENT** (this "**Addendum**") dated _____, is intended to be a part of, and by this reference is incorporated into that certain Franchise Agreement (the "**Franchise Agreement**") dated _____, by and between OTA Franchise Corporation, a Nevada corporation, as franchisor ("**Franchisor**"), and _____, as franchisee ("**Franchisee**"). Where and to the extent that any of the provisions of this Addendum are contrary to, in conflict with or inconsistent with any provision contained in the Franchise Agreement, the provisions contained in this Addendum shall control. Defined terms contained in the Franchise Agreement shall have the identical meanings in this Addendum.

1.  Illinois law governs the agreements between the parties to the Franchise Agreement.

2.  Section 4 of the Illinois Franchise Disclosure Act provides that any provision in the Franchise Agreement that designates jurisdiction or venue outside the State of Illinois is void. However, a Franchise Agreement may provide for arbitration outside of Illinois.

3.  Section 41 of the Illinois Franchise Disclosure Protection Act provides that any condition, stipulation or provision that purports to bind a person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

4.  Franchisee's rights upon termination and non-renewal of the Franchise Agreement are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

IN WITNESS WHEREOF, each of the undersigned hereby acknowledges having read this Addendum, and understands and consents to be bound by all of its terms.

OTA FRANCHISE CORPORATION          FRANCHISEE

By:_____          _____

Its:_____          _____

                                             Individually and/or as an officer or partner of
                                             _____ , a
                                             (_____) corporation
                                             (_____) partnership
                                             LLC, or Proprietorship

**Attachment ZZ**                                    EX 13
                                                     7593

**THIS ADDENDUM TO AREA DEVELOPMENT AGREEMENT** (this "**Addendum**") dated _____, is intended to be a part of, and by this reference is incorporated into that certain Area Development Agreement (the "**Development Agreement**") dated _____, by and between OTA Franchise Corporation, a Nevada corporation, as franchisor ("**Franchisor**"), and _____, as area developer ("**Area Developer**"). Where and to the extent that any of the provisions of this Addendum are contrary to, in conflict with or inconsistent with any provision contained in the Franchise Agreement, the provisions contained in this Addendum shall control. Defined terms contained in the Franchise Agreement shall have the identical meanings in this Addendum.

1. Illinois law governs the agreements between the parties to the Area Development Agreement.

2. Section 4 of the Illinois Franchise Disclosure Act provides that any provision in the Area Development Agreement that designates jurisdiction or venue outside the State of Illinois is void. However, an Area Development Agreement may provide for arbitration outside of Illinois.

3. Section 41 of the Illinois Franchise Disclosure Protection Act provides that any condition, stipulation or provision that purports to bind a person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

4. Your rights upon termination and non-renewal of the Area Development Agreement are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

IN WITNESS WHEREOF, each of the undersigned hereby acknowledges having read this Addendum, and understands and consents to be bound by all of its terms.


OTA FRANCHISE CORPORATION                    AREA DEVELOPER

By:_____              _____

Its:_____             _____

                                             Individually and/or as an officer or partner of
                                             _____, a
                                             (_____) corporation
                                             (_____) partnership
                                             LLC, or Proprietorship

**Attachment ZZ**

**MARYLAND ADDENDUM**
**TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**

**ADDITIONAL DISCLOSURES REQUIRED BY**
**THE STATE OF MARYLAND IN THE**
**FRANCHISE DISCLOSURE DOCUMENT OF OTA FRANCHISE CORPORATION**

The following statement is added at the end of Item 1:

You should note that any statements requiring you to disclaim the occurrence and/or acknowledge the non-occurrence of acts in order to purchase the franchise constitute a violation of the Maryland Franchise Disclosure Law and acknowledgements and representations are not intended to nor shall they act to relieve the Franchisor of any liability under the Maryland Franchise and Disclosure Law.

The following statement is added to the end of Items 5, 11 and 12:

Maryland Code 02.02.08.16L provides that any general release required as a condition of sale shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

The following statements are added at the end of the table in Item 17:

Section 14-216(c) (25) of the Maryland Franchise Registration and Disclosure Law requires a franchisor to file an irrevocable consent to be sued in the State of Maryland.  A Franchisee may bring any court litigation for claims arising under the Maryland Franchise Registration and Disclosure Law in Maryland.

Maryland Code 02.02.08.16L provides that any general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

Claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the Franchise.

**Attachment ZZ**

**MARYLAND ADDENDUM TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE AGREEMENT AND OTHER AGREEMENTS**

This Addendum is entered into this _____ day of _____, 20____, by and between OTA

Franchise Corporation, a Nevada corporation ("we," "us" or "our"), and

_____ ("you" or "your").

       1**.**    **Background.**  The provisions of this Addendum form an integral part of, and are incorporated into, the OTA Franchise Corporation Franchise Agreement.  Nevertheless, the provisions of this Addendum govern, control and supersede any inconsistent or conflicting provisions of the Healthy Inspirations Franchise Agreement.  This Addendum is being executed because (a) the offer or sale of the franchise for the Online Trading Academy Franchise to be operated by you pursuant to the Franchise Agreement that was made in the State of Maryland and/or (b) because you are a resident of the State of Maryland and/or (c) your Online Trading Academy Franchise will be located or operated in the State of Maryland.

       2.    **Releases.**  The following sentence is added to the end of Sections 2.2, 3.1, 3.8, 5.3, 7.1, 11.5, 12.4 and Exhibit 1 of the Franchise Agreement:

       The general release required as a condition of renewal, sale, and assignment/transfer shall not apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

       3.    **Periods in Which to Make Claims.**  The following language is added to Section 13.5 of the Franchise Agreement:

       Claims arising under Section 14-227 of the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the Franchise.

       4.    **Venue.**  The following language is added to the end of Section 13.2 of the Franchise Agreement:

       Section 14-216(c) (25) of the Maryland Franchise Registration and Disclosure Law requires that the Franchisor file an irrevocable consent to be sued in Maryland.  A Franchisee may bring any court litigation for claims arising under the Maryland Franchise Registration and Disclosure Law in Maryland.

       5.    **Acknowledgements and Representations.**  The following language is added to Section 15 of the Franchise Agreement and to the Statement of Prospective Franchisee:

       You should note that these acknowledgements and representations are not intended to nor shall they act to relieve the Franchisor of any liability under the Maryland Franchise and Disclosure Law.

       6.    **Remaining Provisions Unaffected.**  The remaining terms, conditions, and provisions of the Franchise Agreement remain in full force and effect and binding on you and us.

*Intending to be legally bound,* the parties now execute this Addendum.  The effective date of this Addendum is the date we sign it.

**(SIGNATURES ON FOLLOWING PAGE)**

**Attachment ZZ**

OTA FRANCHISE CORPORATION

FRANCHISEE

By:_____

_____

Its:_____

_____

Individually and/or as an officer or partner of
_____, a

(_____) corporation

(_____) partnership
LLC, or Proprietorship

**Attachment ZZ**

**MICHIGAN ADDENDUM**
**THE OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**

**DISCLOSURES REQUIRED BY MICHIGAN LAW**

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS.  IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

**(a)      A prohibition on the right of a franchisee to join an association of franchisees.**

**(b)      A requirement that a franchisee assent to a release, assignment, novation, waiver or estoppel which deprives a franchisee of rights and protections provided in this act.  This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.**

**(c)      A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause.  Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.**

**(d)      A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings.  Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation.  This subsection applies only if:  (i) The term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of the franchisor's intent not to renew the franchise.**

**(e)      A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances.  This section does not require a renewal provision.**

**(f)      A provision requiring that arbitration or litigation be conducted outside this state.  This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.**

**(g)      A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause.  This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise.  Good cause shall include, but is not limited to:**

**(i)      The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.**

**(ii)      The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.**

**Attachment ZZ**

EX 13
7598

(iii)     The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)     The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Michigan law provides that a franchisor whose most recent statements are unaudited and which show a net worth of less than $100,000 shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee or subfranchisor until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled.  At the option of the franchisor, a surety bond may be provided in place of escrow.  In the event that an escrow is so established, the escrow agent shall be a financial institution authorized to do business in the State of Michigan.  The escrow agent may release to the franchisor those amounts of the escrowed funds applicable to a specific franchisee or subfranchisor upon presentation of an affidavit executed by the franchisee and an affidavit executed by the franchisor stating that the franchisor has fulfilled its obligation to provide real estate, improvements, equipment, inventory, training, or other items.  This portion of the Michigan law does not prohibit a partial release of escrowed funds upon receipt of affidavits of partial fulfillment of the franchisor's obligation.

SHOULD THE PROSPECTIVE FRANCHISEE HAVE ANY QUESTIONS REGARDING THE NOTICE OF THIS FILING WITH THE ATTORNEY GENERAL, SUCH QUESTIONS SHOULD BE ADDRESSED TO:

ADMINISTRATOR
CONSUMER PROTECTION DIVISION
ANTITRUST AND FRANCHISE UNIT
MICHIGAN DEPARTMENT OF THE ATTORNEY GENERAL
525 W. OTTAWA, 6TH FLOOR
LANSING, MICHIGAN  48913 (517) 373-7117

**Attachment ZZ**

EX 13
7599

### MINNESOTA ADDENDUM
### TO THE OTA FRANCHISE CORPORATION
### FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT

1.      Minnesota Statutes §80C.21 and Minnesota Rule 2860.4400J prohibit us from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring the franchisee to consent to liquidated damages, termination penalties or judgment notes.  In addition, nothing in the Disclosure Document or Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, or your rights to any procedure, forum, or remedies provided for by the laws of jurisdiction.

2.      With respect to franchises governed by Minnesota law, the franchisor will comply with Minnesota Statues Section 80C.14, Subdivisions 3, 4 and 5 which require, except in certain specified cases, that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non-renewal of the Franchise Agreement.

3.      Item 13 of the Franchise Disclosure Document and Article 6 of the Franchise Agreement are modified with respect to Minnesota Franchisees as follows:  The Minnesota Department of Commerce requires that the Franchisor indemnify Minnesota Franchisees against liability to third parties resulting from claims by third parties that the Franchisee's use of the Franchisor's trademarks or service marks infringes trademark rights of some third party.  The Franchisor does not indemnify against the consequences of the Franchisee's use of the Franchisor's trademark except in accordance with the requirements of the franchise (and to the extent validly required as a condition to registration), and, as a condition to indemnification, the Franchisee must immediately provide notice to the Franchisor of any such claim and tender the defense of claim to the Franchisor.  If the Franchisor accepts the tender of defense, the Franchisor has the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim.

4.      A general release shall not relieve any person from liability imposed by the Minnesota Franchises Law, Minn. Stat., Chapter 80C, Section 80C.22.

5.      Minn. Rule 2860.4400J prohibits us from requiring a franchisee to consent to a franchisor obtaining injunctive relief.  We may seek injunctive relief.  In addition, a court will determine if a bond is required.

6.      Section 13.5 of the Franchise Agreement is amended to include the following:  You should note that Minnesota Statutes Sec. 80c.17, Subd. 5, requires that no action pursuant to Section 80c.17 may be commenced more than three years after the cause of action accrues.

*Intending to be legally bound,* the parties now execute this Addendum.  The effective date of this Addendum is the date we sign it.

OTA FRANCHISE CORPORATION               FRANCHISEE

By:_____      _____

Its:_____      _____

                                        Individually and/or as an officer or partner of
                                        _____, a

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7600

(_____) corporation
(_____) partnership
LLC, or Proprietorship

**Attachment ZZ**

**NEW YORK ADDENDUM**
**TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**

**ADDITIONAL DISCLOSURES REQUIRED BY**
**THE STATE OF NEW YORK IN THE**
**FRANCHISE DISCLOSURE DOCUMENT OF**
**OTA FRANCHISE CORPORATION**

1.   The following information is added to the cover page of the Franchise Disclosure Document:

**INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 120 BROADWAY, 23RD FLOOR, NEW YORK, NEW YORK 10271. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.   The following paragraphs are inserted in Item 3 of the Franchise Disclosure Document:

Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A.   No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

B.   No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C.   No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10 year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

D.   No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7602

membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3.      The following paragraph is inserted at Item 4 of the Franchise Disclosure Document:

Neither the franchisor, nor any affiliate or predecessors, officers or general partner of the franchisor, nor any person identified in Item 2 above has during the 10-year period immediately before the date of the Disclosure Document:  (a) filed as debtor (or had filed against it) a petition to start as action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in partnership that either filed as debtor (or had an action filed against it ) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after the officer or general partner of the franchisor held this position in the company or partnership.

4.      The following is added to the end of Item 5:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.      The following is added to the end of the "Summary" sections of Item 17(c) titled "**Requirements for franchisee to renew or extend**," and Item 17(m), entitled "**Conditions for franchisor approval of transfer**":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6.      The following language replaces the "Summary" section of Item 17(d), titled "**Termination by franchisee**":

You may terminate the agreement on any grounds available by law.

7.   The following is added to the end of the "Summary" section of Item 17(j), titled "**Assignment of contract by franchisor**":

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

8.   The following is added to the end of the "Summary" sections of Item 17(v), titled "**Choice of forum**", and Item 17(w), titled "**Choice of law**":

The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

**Attachment ZZ**

### ADDENDUM TO THE OTA FRANCHISE CORPORATION FRANCHISE AGREEMENT
### APPLICABLE TO FRANCHISES
### SOLD IN THE STATE OF NEW YORK

This Addendum is entered into this _____day of _____, 20___, by and between OTA FRANCHISE CORPORATION, a Nevada corporation, doing business as Online Trading Academy ("we," "us" or "our"), and _____ ("you" or "your"). Where and to the extent that any of the provisions of this Addendum are contrary to, in conflict with or inconsistent with any provision contained in the Franchise Agreement, the provisions contained in this Addendum shall control. Defined terms contained in the Franchise Agreement shall have the identical meanings in this Addendum.

1**.**    **Background.**  The provisions of this Addendum form an integral part of, and are incorporated into, the Franchise Agreement.  Nevertheless, the provisions of this Addendum govern, control and supersede any inconsistent or conflicting provisions of the Franchise Agreement.  This Addendum is being executed because (a) the offer or sale of the franchise for the Online Trading Academy Franchise to be operated by you pursuant to the Franchise Agreement was made in the State of New York and/or (b) because you are a resident of the State of New York and/or (c) your Online Trading Academy Franchise will be located or operated in the State of New York.

2.    **Successor Franchises - Requirements and Procedures**.  Section 15.3 (G) is amended to read as follows:

Irrespective of any requirements for the franchisee to renew or extend the Franchise Agreement and any conditions that must be met for the franchisor to approve a transfer of the franchise, to the extent required by applicable law, all rights the franchisee enjoys and any causes of action arising in the franchisee's favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

3.    **Termination by Franchisee**.  Section 16 of the Franchise Agreement is amended to add the following language:

11.10    Prompt Notice of Claims by You:  You may terminate the franchise agreement on any grounds available by law.

4.    Irrespective of any rights granted to the franchisor to assign the Franchise Agreement, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

5.    **Governing Law**.  Section 13.13 of the Franchise Agreement is amended to add the following language:

The foregoing choice of law should not be considered a waiver of any right conferred upon you by the GBL of the State of New York, Article 33.

5.    In the event of any conflict between the terms of this Addendum and the terms of the Franchise Agreement, the terms of this Addendum shall prevail.

7.    Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the General Business Law of the State of New York are met independently without reference to this Addendum.

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7604

8.    **Remaining Provisions Unaffected**.   The remaining terms, conditions, and provisions of the Franchise Agreement remain in full force and effect and binding on you and us.

Intending to be bound, you and we sign and deliver this Addendum in 2 counterparts effective on the day and year first written above.

OTA FRANCHISE CORPORATION

_____
Franchisee (Print Name)

By: _____

Print Name: _____

_____
Franchisee (Signature)

Title: _____

Date: _____

Date: _____

**Attachment ZZ**

## NORTH DAKOTA
## ADDENDUM TO THE OTA FRANCHISE CORPORATION
## FRANCHISE DISCLOSURE DOCUMENT AND
## FRANCHISE AGREEMENT

In North Dakota, the Disclosure Document is amended as follows to conform to North Dakota law:

Item 17 (c) of the Disclosure Document and Section 5.3 of the Franchise Agreement are revised to omit any requirement that a general release be signed as a condition of renewal.

Item 17 (i) of the Disclosure Document and Sections 17 and 18 of the Franchise Agreement are amended to add the following: "Any provision in the Franchise Agreement requiring a franchisee to consent to termination or liquidated damages is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law.

Item 17 (r) of the Disclosure Document and Sections 8 and 12 of the Franchise Agreement are amended to add the following: "To the extent that covenants not to compete apply to periods after the term of the franchise contrary to Section 9-08-06, N.D.C.C., they are generally considered unenforceable in the State of North Dakota."

Item 17 (u) of the Disclosure Document and Section 13 of the Franchise Agreement are amended to state that the site of any mediation or arbitration is agreeable to all parties.

Item 17 (v) (venue) of the Disclosure Document and Section 13 of the Franchise Agreement are amended as follows: "Any provision in the Franchise Agreement which designates jurisdiction or venue or requires the franchisee to agree to jurisdiction or venue in a forum outside of North Dakota is void with respect to any cause of action which is otherwise enforceable in North Dakota.

Item 17 (w) (governing law) and Section 13 of the Franchise Agreement are amended as follows: "Any provision in the Franchise Agreement requiring that the Franchise Agreement be construed according to the laws of a state other than North Dakota are unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law.

Section 15 of the Franchise Agreement is amended as follows: "Any provision in the Franchise Agreement which requires a franchisee to waive his or her right to a jury trial has been determined to be unfair, unjust and inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law."

Sections 15 and 16 of the Franchise Agreement are amended as follows: "Any provision in the Franchise Agreement requiring a franchisee to consent to a waiver of exemplary and punitive damages is unfair, unjust or inequitable within the intent of Section 51-19-09 of the North Dakota Franchise Investment Law."

Section 13.4 of the Franchise Agreement is amended as follows: "In the State of North Dakota, the statute of limitations under North Dakota Law will apply".

Section 13.6 of the Franchise Agreement is amended as follows:

"In the State of North Dakota, the prevailing party in any enforcement action is entitles to recover all costs and expenses, including attorney's fees."

In North Dakota, provisions of the Franchise Agreement which unreasonably limit the statute of limitations or remedies under the North Dakota Franchise Investment Law, such as the right to jury trial, may not be enforceable.

Provisions of the Franchise Agreement requiring a franchisee to consent to liquidated damages or termination penalties, requiring a franchisee to consent to a limitation of claims or requiring a franchisee pay all of Franchisor's costs and expenses incurred in enforcing the agreement may not be enforceable under North Dakota law.

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7606

**RHODE ISLAND ADDENDUM**
**TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**


**ADDITIONAL DISCLOSURES REQUIRED BY**
**THE STATE OF RHODE ISLAND IN THE**
**FRANCHISE DISCLOSURE DOCUMENT OF OTA FRANCHISE CORPORATION**

§ 19-28.1-14 of the Rhode Island Franchise Investment Act provides that "[a] provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

**Attachment ZZ**

EX 13
7607

**VIRGINIA ADDENDUM**
**TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT**

The Disclosure Document is amended as follows:

1.      Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause.  If any grounds for default or termination stated in the Franchise Agreement or other agreements does not constitute "reasonable cause" as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7608

**WASHINGTON ADDENDUM**
**TO THE FRANCHISE DISCLOSURE DOCUMENT**
**OF OTA FRANCHISE CORPORATION**

The State of Washington has a statute, the Washington Franchise Investment Protection Act, RCW 19.100.180 (the "Act"), which might supersede this Agreement in your relationship with us, including the areas of termination and renewal of your franchise. There might also be court decisions which supersede the Agreement in your relationship with us, including termination and renewal of your franchise.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the State of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

In the event of a conflict of laws the provisions of the Act, Chapter 19.100 RCW, shall prevail.

A release or waiver of rights executed by you shall not include rights under the Act, except when executed pursuant to a negotiated settlement after the Agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act, such as a right to a jury trial, might not be enforceable.

Transfer fees are collectable to the extent that they reflect our reasonable estimate or actual costs in effecting a transfer.

       The following paragraph is added at the end of Item 17:

If any of the provisions in this Disclosure Document or Franchise Agreement are inconsistent with the relationship provisions of Revised Code of Washington Section 19.100.180 or any other requirements of the Act, the provisions of the Act will prevail over the inconsistent terms of the Disclosure Document or Franchise Agreement.

**Attachment ZZ**

**ADDENDUM TO THE OTA FRANCHISE CORPORATION**
**FRANCHISE AGREEMENT**
**APPLICABLE TO FRANCHISES**
**SOLD IN THE STATE OF WASHINGTON**

The state of Washington has a statute (RCW 19.100.180) which may supersede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and renewal of your franchise.  There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the State of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

A release or waiver of rights executed by a Franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, rights or remedies under the act such as a right to a jury trial may not be enforceable.

Transfer fees are collectable to the extent that they reflect the Franchisor's reasonable estimated or actual costs in effecting a transfer.

The undersigned does hereby acknowledge receipt of this addendum.


OTA FRANCHISE CORPORATION          FRANCHISEE

By:_____          _____

Its:_____          _____

Individually and/or as an officer or partner of
_____, a
(_____) corporation
(_____) partnership
LLC, or Proprietorship

**Attachment ZZ**                    EX 13
7610

**EXHIBIT F TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**STATEMENT OF PROSPECTIVE FRANCHISEE**

**Attachment ZZ**

EX 13
7611

**OTA FRANCHISE CORPORATION**
**STATEMENT OF PROSPECTIVE FRANCHISEE**

[**Note:** Dates and Answers Must Be Completed
in the Prospective Franchisee's **Own** Handwriting.]

Since the Prospective Franchisee (also called "me," "our," "us," "we" and/or "I" in this document) and OTA FRANCHISE CORPORATION (also called the "Franchisor", "OTA", "you" or "your") both have an interest in making sure that no misunderstandings exist between them, and to verify that no violations of law might have occurred, and understanding that the Franchisor is relying on the statements I/we make in this document, I/we assure the Franchisor as follows:

**A.**   **The following dates and information are true and correct**:

1.   _____, 20____          The date of my/our first face-to-face meeting with any person to discuss the possible purchase of an Online Trading Academy Franchise.

   **Initials** _____

2.   _____, 20____          The date on which I/we received a Franchise Disclosure Document about an Online Trading Academy Franchise.

   **Initials** _____

3.   _____, 20____          The date when I/we received a fully completed copy (other than signatures) of the Franchise Agreement and all other documents I/we later signed.

   **Initials** _____

4.   _____, 20____          The earliest date on which I/we signed the Franchise Agreement or any other binding document (not including any Letter or other Acknowledgment of Receipt.)

   **Initials** _____

5.   _____, 20____          The earliest date on which I/we delivered cash, check or other consideration to the Franchisor, or any other person or company.

   **Initials** _____

**B.**   **Representations and Other Matters**:

1.   No oral, written, visual or other promises, agreements, commitments, representations, understandings, "side deals," options, rights-of-first-refusal or otherwise of any type (collectively, the "representations"), including, but not limited to, any which expanded upon or were inconsistent with the Disclosure Document, the Franchise Agreement or any other written documents, have been made to or with me/us with respect to any matter (including, but not limited to, advertising, marketing, site location and/or development, operational, marketing or administrative assistance, exclusive rights or exclusive or protected territory or otherwise) nor have I/we relied in any way on any such representations, except as expressly set forth in the Franchise Agreement or a written Addendum thereto signed by the Prospective Franchisee and the Franchisor, except as follows:

_____.
(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____

2.   No oral, written, visual or other claim, guarantee or representation (including, but not limited to, charts, tables, spreadsheets or mathematical calculations to demonstrate actual or possible results based on a combination of variables, such as multiples of price and quantity to reflect gross sales, or otherwise), which stated or suggested any specific level or range of actual or potential sales, costs, income, expenses, profits,

**Attachment ZZ**                                                          EX 13
                                                                          7612

cash flow, tax effects or otherwise (or from which such items might be ascertained), from franchised or non-franchised units, was made to me/us by franchisor, its affiliates or agents/representatives, nor have I/we relied in any way on any such, except for information (if any) expressly set forth in the Franchisor's Disclosure Document (or an exhibit referred to therein), except as follows:

_____.

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____

3.  No contingency, prerequisite, reservation or otherwise exists with respect to any matter (including, but not limited to, the Prospective Franchisee obtaining any financing, the Prospective Franchisee's selection, purchase, lease or otherwise of a location, any operational matters or otherwise) or the Prospective Franchisee fully performing any of the Prospective Franchisee's obligations, nor is the Prospective Franchisee relying on the Franchisor or any other entity to provide or arrange financing of any type, nor have I/we relied in any way on such, except as expressly set forth in the Franchise Agreement, or a written Addendum thereto signed by the Prospective Franchisee and the Franchisor, except as follows:

_____.

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____

4.  The individuals signing for the "Prospective Franchisee" constitute all of the executive officers, partners, shareholders, investors and/or principals of the Prospective Franchisee and each of such individuals has received the Franchise Disclosure Document and all exhibits and carefully read, discussed, understands and agrees to the Franchise Agreement, each written Addendum and any Personal Guarantees.

**Prospective Franchisee's Initials:** _____

5.  I/we have had an opportunity to consult with an independent professional advisor, such as an attorney or accountant, before signing any binding documents or paying any sums, and the Franchisor has strongly recommended that I/we obtain such independent professional advice.  I/we have also been strongly advised by the Franchisor to discuss my/our proposed purchase of, or investment in, an Online Trading Academy Franchise with existing Online Trading Academy Franchisees before signing any binding documents or paying any sums and I/we have been supplied with a list of existing Online Trading Academy Franchisees.

**Prospective Franchisee's Initials:** _____

6.  I confirm that, as advised, I've spoken with past and/or existing Online Trading Academy Franchisees, and that I made the decision as to which, and how many, Online Trading Academy Franchisees to speak with, although I understand that as a new Franchise System, few, if any, Franchisees are available to speak with.

**Prospective Franchisee's Initials:** _____

7.  I/we understand that: entry into any business venture necessarily involves some unavoidable risk of loss or failure, the purchase of an Online Trading Academy Franchise (or any other) is a speculative investment, an investment beyond that outlined in the Disclosure Document may be required to succeed, there exists no guaranty against possible loss or failure in this or any other business and the most important factors in the success of any Online Trading Academy Franchise, including the one to be operated by me/us, are my/our personal business, marketing, sales, management, judgment and other skills.

**Prospective Franchisee's Initials:** _____

    If there are any matters inconsistent with the statements in this document, or if anyone has suggested that I sign this document without all of its statements being true, correct and complete, I/we will (a)

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7613

**immediately** inform the Franchisor's attorney (949 825 5147) and an officer of the Franchisor and (b) make a written statement regarding such next to my signature below so that the Franchisor may address and resolve any such issue(s) at this time and before either party goes forward.

I/we understand and agree that the Franchisor does not furnish or endorse, or authorize its salespersons or others to furnish or endorse, any oral, written or other information concerning actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained), from franchised or non-franchised units, that such information (if any) not expressly set forth in the Franchisor's Disclosure Document (or an exhibit referred to therein) is not reliable and that I/we have not relied on it, that no such results can be assured or estimated and that actual results will vary from unit to unit, Franchise to Franchise, and may vary significantly.

**Prospective Franchisee's Initials:**  _____

I/we understand and agree to all of the foregoing and represent and warrant that all of the above statements are true, correct and complete.

Date:  _____

**PROSPECTIVE FRANCHISEE (Individual)**

_____
Signature

_____
Printed Name

_____
Signature

_____
Printed Name

**PROSPECTIVE FRANCHISEE (Corp., LLC or Partnership) - Must be accompanied by appropriate personal guarantee(s)**

_____
Legal Name of Entity

a_____  _____
  Jurisdiction of Formation    Corporation, LLC or Partnership

By: _____
   Name

   _____
   Signature

Title: _____

**PRINCIPALS**

_____          _____

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7614

_____          _____

All of the above is true, correct and complete to the best of my knowledge:


_____
Franchise Marketing Representative


Reviewed by: OTA FRANCHISE CORPORATION


_____     _____
President                                                    Franchise Agreement Number

**Attachment ZZ**

**EXHIBIT G TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**LIST OF CURRENT FRANCHISEES**

**Attachment ZZ**

**OTA FRANCHISE CORPORATION**
**EXHIBIT G-1**
**LIST OF FRANCHISES AS OF DECEMBER 31, 2017**

Online Trading Academy Phoenix
2444 East University Drive, Suite 120
Phoenix, AZ, 85034
Ken Beckrich
602-441-9646

Online Trading Academy San Jose
1798 Technology Drive, Suite 152
San Jose, CA 93065
Bryan Olson
408-538-6530

Online Trading Academy Denver
7535 E. Hampden Ave., Suite 525
Denver CO 80231 John Henkel
303-325-2776

Online Trading Academy Norwalk,
488 Main Ave., 3rd Floor
Norwalk CT 06851
Steve Flege,
732-887-7866

Online Trading Academy Fort Lauderdale1 Oakwood Blvd., Suite 218
Hollywood, FL  33020
Konstantin Popov
954-668-2424

Online Trading Academy Atlanta
1080 Holcomb Bridge Road
Roswell GA 30076
Steve Champa and Mickey Moores
228-239-5976

Online Trading Academy Chicago
500 Waters Edge
Lombard IL 60148
Nizar Istanbouli and Haider Istanbouli
847-391-8511

Online Trading Academy Kansas City
7501 College Blvd., Suite 275
Overland Park, KS  66210
Christopher Crum
816-560-4720

Online Trading Academy Baltimore
6865 Deerpath Road, Suite 101
Elkridge, MD  21075
Chris Koomey
703-442-8286

OTA Franchise Corporation  Franchise  Disclosure Document
March 30, 2018

**Attachment ZZ**

EX 13
7617

Online Trading Academy Detroit
Mars Corporate Center
25200 Telegraph Road, Suite 125
Southfield, MI  48033
Bob Bolya
248-415-6123

Online Trading Academy Minneapolis
7900 International Drive
Bloomington MN 55425
Kevin Young
952-814-4410

Online Trading Academy New Jersey
65 Challenger Road
Suite 450, Parking level P3
Ridgefield Park, NJ 07660
Steven Alexeev and Leila Wilson
201-537-0480

Online Trading Academy Charlotte
19720 Jetton Road
Suite 101
Cornelius NC 28031
Tim Burdick
704-237-3545

Online Trading Academy Raleigh
4600 Marriott Drive
Suite 250
Raleigh NC 27612
Tim Burdick
704-237-3545

Online Trading Academy Philadelphia
234 Mall Blvd., Suite 250
King of Prussia, PA  19406
Bruce Bell
610-945-9999

Online Trading Academy Houston
110 Vintage Park Blvd.
Building J, Suite 200
Houston TX 77070
Mary Beth Motisi
281/820-8905

Online Trading Academy Dallas
Frisco Bridges, Suite 101
2600 Dallas Parkway
Frisco, TX 75034
Tom Caufield and Michael Ludlow
972/746-4375

**Attachment ZZ**

EX 13
7618

Online Trading Academy - Washington D.C. Metro
8614 Westwood Center Drive, Suite 830
Vienna, VA 22182
Chris Koomey
703-442-8282

Online Trading Academy Seattle
1450 114th Avenue SE,
Bellevue,
Washington 98004
McCauley Learning Systems, Ltd
William Geist
425-307-6610

Online Trading Academy Milwaukee
10850 W. Park Place
Suite 120
Milwaukee, WI 53224
Scott Turriff
262-293-9069

Online Trading Academy Hong Kong
Address TBD
Michael Steven
+62-21-515-2889

Online Trading Academy India
C-428, Phoenix House (C wing), 4th floor
Mumbai 400-013
Sharekhan
Rajesh Vora
+91-982-408-7600

Online Trading Academy Indonesia
Thamrin Learning Centre, Thamrin Residences, Tower C, 3A Floor
(Entrance from Jasmine Lobby), Jln. Thamrin Boulevard,
Kebon Melati, Tanah Abang, Jakarta Pusat 10230
Michael Steven  +6221 2955 3333

**Online Trading Academy Singapore**
Aperia Mall, #03-09
12 Kallang Avenue
Singapore, 339511
Rep. of Singapore
Michael Steven
+65 6423978

Online Trading Academy Dubai, United Arab Emirates
Knowledge Village
Block 2B, Suite G22
Dubai, United Arab Emirates
Tareq Abu Hantash
011/971-4-362-5125

**Attachment ZZ**

EX 13
7619

Online Trading Academy Orlando

100 Colonial Center Pkwy.
Suite 110
Lake Mary, FL 32746
David Weinstein and Dennis Doane
Toll free: 866-276-6044
Phone: 727-619-1007


Online Trading Academy Tampa Bay

1300 4th Street N.
Suite 110
St. Petersburg, FL 33716
David Weinstein and Dennis Doane
Toll free: 866-276-6044
Phone: 727-619-1007


Online Trading Academy Toronto

200 Yorkland Blvd.
Suite 1100
Toronto, ON M2J 5C1
Satya Panda
Phone: 416-222-2552


Online Trading Academy San Diego

6155 Cornerstone Court East
Suite 100
San Diego, CA 92121
Karen Trisko and Robert Montgomery
Phone: 858-746-9101

**Attachment ZZ**

**EXHIBIT G-2 TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**LIST OF FORMER FRANCHISEES FOR LAST FISCAL YEAR**

None

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

**EXHIBIT H TO**

**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**GMS PARTICIPATION AGREEMENT**

**Attachment ZZ**

**Global Marketing Services Participation Agreement**

**Addendum to Franchise Agreement**

This Global Marketing Services Participation Agreement is entered into as of _____, 201_,  by OTA Franchise Corporation with its principal office located at 17780 Fitch, Suite 200, Irvine, CA 92614, referred to herein as "Franchisor" and _____a _____ limited liability company, (referred to in this Amendment as "Franchisee(s)").

RECITALS

1.  Franchisor has made significant investments in (i) the development of national and global advertising creative, media and programs which may not be either available or economically accessible to Franchisee on a local level, and (ii) systems and support infrastructure for such programs.

2.  Franchisor may manage and make available to Franchisee a range of Global Marketing Services developed as "GMS Programs", as described in the individual GMS Program Descriptions posted on Network Connection and as amended from time to time (the "GMS Program Descriptions"), which are hereby incorporated herein by this reference.

3.  This Agreement will allow Franchisee to participate in the GMS Programs.

4.  GMS Programs will be funded and managed separately from the Marketing Fund.

**5.**  In addition, Franchisor has tools and expertise in the area of local online marketing, including bid management platforms and the ability to use dynamic ad placement of media.  Franchisor has developed an Online Targeted Local Marketing Program, which is one of the GMS Programs, to allow Franchisees to choose to hire Franchisor and its then current contracting agency as their "agency" to develop digital banners, landing pages and other assets used for advertising and to place these ads locally on behalf of franchisees.

**6.**  Franchisees may elect to manage their budgets on a monthly basis by electing a Targeted Local Marketing Program in the attached insertion order.

7.  Capitalized terms will have the meanings as set out in this Agreement or if not defined herein they will have the same meaning as in the relevant GMS Program Descriptions provided for each type of advertising and marketing service.

## I. Appointment of Franchisor to Carry Out Advertising and Marketing Services

Franchisee appoints Franchisor and Franchisor agrees to accept such appointment to represent Franchisee in conducting certain advertising and marketing services (the "Service" or "Services") on its behalf, as further defined herein and in the GMS Program Descriptions to be provided for each Service, as amended periodically.

## II. Description of Services to be Performed

Franchisor will conduct the advertising and marketing services as defined in each GMS Program Description on behalf of Franchisee. The Services will be focused on delivering leads, registrations and/or attendees to Franchisee's events and seminars by utilizing global marketing channels which can be more effectively purchased globally and/or are not available at the local level including but not limited to national

**Attachment ZZ**

and global media advertising, certain teleservices which may be managed via a central call center and online marketing. Any changes or additions to the terms and conditions of the Global Marketing Services Programs or Services will be communicated to Franchisee via email and/or posted on Network Connection and in online franchise forums such as Leadership Connection.

### Targeted Online Local Marketing Description

If Franchisee elects to use the Targeted Local Online Marketing Program Franchisor will help franchisee set budgets and goals (i.e. desired number of registrations and expected cost per registration). Franchisees will pay its actual advertising costs plus a 15% management fee. The management fee will cover the costs of the program, including but not limited to:  outside agency fees, ad serving fees, bid management tool fees and personnel assigned to manage online marketing programs.  Franchisee acknowledges that use of the Targeted Local Online Marketing Program provides no guarantee of any specific registration volume or cost per registration.

Given the nature of these forms of advertising costs the prepaid balance may be overspent or underspent in any given month. The aim is to keep this flexibility within + or – 10%. Over and under spending will roll over into the following month and Franchisor will communicate with Franchisee regarding budget pacing.

### III. Leads, Registrations and Attendees

A Lead is defined as a new record placed in the Salesforce database with a valid email address and/or phone number as a result of marketing campaigns conducted under the Global Marketing Services Program as indicated by a Salesforce Global Marketing Services Program campaign code.

A Registration is defined as a new Salesforce record with a valid email address and/or phone number which has been registered to attend a sales event as a result of marketing campaigns conducted under the Global Marketing Services Program as indicated by a Salesforce Global Marketing Services Program campaign code.

An Attendee is defined as any registered guest who arrives at a sales event, and includes any new prospect or existing lead or contact in Franchisee's Salesforce database that is attributable to a Global Marketing Services Program campaign as indicated by a Salesforce Global Marketing Services Program campaign code.

### IV. Performance Based Fees or Shared Costs, Payments and Minimum Participation

Global Marketing Services Programs may be performance based programs or shared costs programs as described in the relevant GMS Program Descriptions. For performance based programs, Franchisee agrees to pay Franchisor a fixed fee for each Lead (the "Lead Fee"), Registration (the "Registration Fee") and / or Attendee (the "Attendee Fee") generated from the Global Marketing Services Program in the amount indicated in the then current relevant GMS Program Descriptions. For shared costs programs, Franchisee agrees to pay Franchisor the Franchisee's proportional share of media costs as described and calculated in accordance with the relevant GMS Program Descriptions (the "Shared Participation Fee").

At the Commencement of Franchisee's participation in any performance based programs, Franchisee will pay an initial Deposit for each Service to be applied against future Lead, Registration and Attendee Fees for each Service as indicated in the GMS Insertion Order. Franchisee authorizes Franchisor to charge its

**Attachment ZZ**

EX 13
7624

credit card or ACH the Deposit amount for each Service on or before the first day of the month for which the Services shall commence, and thereafter charge Franchisee in a similar manner for the exact amount of Lead, Registration or Attendee Fees incurred for the previous month. If Franchisee elects to pay by credit card, an additional credit card processing fee of 3% will be added to Franchisee's billing.

Fees will be prepaid and reconciled each month in a method to be described in the particular Insertion Order.

1. If total Fees incurred during any month exceed the Deposit on hand for each Service, Franchisee will be charged for those Leads, Registrations and/or Attendees and/or Shared Participation, plus an amount to insure the next month's full Deposit amount for each Service is in place. The fees will be calculated and debited on the 5th day of each month after the commencement month.

2. If total Fees incurred during any month are less than the Deposit on hand for each Service, Franchisee will be charged only for those Leads, Registrations and/or Attendees and/or Shared Participation and the credit balance will be applied to the amount to be debited to insure the next month's full Deposit amount is in place by the 5th day of the relevant month.

Franchisor may change the fee structure for any Services at any time. Changes will be communicated to Franchisee via email or Network Connection with at least thirty (30) days' notice (the "Notice Period"). New Fees will be effective on the first day of the next month after the Notice Period has expired. Franchisee may change its GMS Insertion Order within the Notice Period.

Franchisee acknowledges that, to provide the Services, Franchisor needs to recoup its costs. Costs included in the Fees may include, but are not limited to, cost of media purchases, servicing costs, management costs of the campaigns including the cost of personnel, technology-related costs and other costs as determined by Franchisor to manage the campaigns.

Franchisee acknowledges and agrees that minimum Participation is as specified in each GMS Insertion Order. Franchisee will not receive Leads which it does not pay for.

**V. Term and Termination**

Other than the mandatory insertion order attached hereto as Exhibit "A" and by this reference incorporated herein, Franchisee's participation in each Service is currently voluntary, although Franchisee acknowledges and hereby agrees that for Franchisor to provide efficient Services to the Network in the future, Franchisee's participation in certain Services may become mandatory (the "Mandatory Service(s)"). When this occurs, Franchisee agrees to execute a new Insertion Order relating to the Mandatory Services.

Franchisee's participation in each Service will begin on the date indicated in each GMS Insertion Order and continue until such Service is terminated. A GMS Insertion Order will remain in effect until a revised GMS Insertion Order is provided to Franchisor or this agreement is terminated. Franchisee can terminate its participation or (subject to the required minimum) reduce the level of participation in each Program by giving Franchisor written notice of at least thirty (30) days (or longer required period) at any time after the minimum participation period identified in the GMS Program Description. Written notice shall be sent to a designated email address or addresses as provided to Franchisee.

The GMS Insertion Order must be submitted and include each Service Franchisee subscribes to. Franchisor does not guarantee the availability of Global Marketing Services or any specific Service for any

**Attachment ZZ**

EX 13
7625

definite period of time and may terminate any Program or any specific Services at any time.

Within fifteen (15) days of termination by either party, Franchisor will refund to Franchisee any remaining prepaid balance in Franchisee's account relative to the terminated Service. If Franchisee owes more than the amounts previously paid to Franchisor, which may occur, for example, if Franchisee's credit card is refused, Franchisee agrees to pay the remaining balance to Franchisor within fifteen (15) days.

## VI. Events of Default

Franchisee agrees to perform all of its duties as prescribed in the GMS Program Descriptions. Some Services may require Franchisee to record Attendees for billing purposes. Franchisee agrees that any failure to pay Franchisor under this Global Marketing Services Program shall be deemed to be a default of its Franchise Agreement.

## VII. OTA System Privacy and Confidentiality

For the benefit of the OTA System, Franchisee agrees to allow Franchisor at its discretion to share the details of Franchisee's participation in any Services with all other franchisees. This includes, but is not limited to, financial data such as level of spend and revenue resulting from its participation in any Service and other marketing performance data such as number of Leads, Registrations and Attendees, the number and percentage of registrations that attended the workshop and resulting customers and any other data available for these programs. Franchisee agrees that any reporting provided by Franchisor on the performance of this program is Confidential Information and is not to be shared with any other party without the prior written consent of Franchisor.

## VIII. Disclaimer

Franchisee expressly agrees that the Global Marketing Services Program and each Service is available on an "as is" and "as available" basis, without warranty of any kind, expressed or implied.

## IX. Franchise Agreement in Effect

Each GMS Insertion Order shall incorporate by this reference those terms and conditions relating to the relevant governing law, dispute resolution and such other rights and obligations of the parties in the Franchise Agreement as may be required to enforce these terms and conditions. Except as relates specifically to the Global Marketing Services Program, all terms and conditions of the Franchise Agreement between Franchisee and Franchisor shall remain in full force and effect. Franchisee agrees that participation in the Global Marketing Services Program is a privilege for Franchisees in Good Standing as that term is defined in the Franchise Agreement.

FRANCHISEE:                                    FRANCHISOR: OTA FRANCHISE CORPORATION

By:  _____          By:  _____
Name:  _____          Name:  _____
Title:  _____         Title:  _____

**Attachment ZZ**

EX 13
7626

**EXHIBIT "A"**
**Global Advertising Participation Insert**


**Accessed online through eSign**

**Attachment ZZ**

**EXHIBIT I TO**
**OTA FRANCHISE CORPORATION**

**DISCLOSURE DOCUMENT**

---

**RECEIPTS**

**Attachment ZZ**

## RECEIPT

This Disclosure Document summarizes provisions of the Franchise Agreement and other information in plain language.  Read this Disclosure Document and all agreements carefully.

If OTA Franchise Corporation offers you a franchise, OTA Franchise Corporation must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement or make a payment with the Franchisor or an affiliate in connection with the proposed franchise sale or grant.

New York, Oklahoma and Rhode Island require that we give you this Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the Franchise Agreement or other agreement or the payment of any consideration that relates to the franchise relationship.

Michigan requires that we give you this Disclosure Document at least 10 business days before the execution of any binding Franchise Agreement or other agreement or the payment of any consideration, whichever comes first.

If OTA Franchise Corporation does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state authority listed in Exhibit D to this Disclosure Document.

The franchisor is OTA Franchise Corporation, located at 17780 Fitch, Suite 200, Irvine, California 92614.

Issuance Date:   March 30, 2018The name, principal business address and telephone number of each franchise seller offering the franchise: Ralph Loberger, Drew Cartwright, Steve Albin, Gene Longobardi, Aaron Neilsen, Jeremy Nosek, Eyal Marmareli John Anthoney Harkey, and Eyal Shachar, 17780 Fitch, Suite 200, Irvine, California 92614, 949-475-5652 and _____of __ _____ _____ ___ ___ telephone number  (broker's agent), if relevant. and only if that broker is registered where applicable.

OTA Franchise Corporation authorizes the respective state agencies listed in Exhibit D to this Disclosure Document to receive service of process in the particular state.

I have received a Franchise Disclosure Document dated _____. This Disclosure Document includes the following exhibits:

|     |     |
| --- | --- |
| A. | Franchise Agreement |
| B. | Financial Statements |
| C. | ACH Debit Authorization |
| D. | List of State Administrators and Agents for Service of Process |
| E. | State Addendum to Disclosure Document and Franchise Agreement |
| F. | Statement of Prospective Franchisee |
| G-1. | List of Franchisees |
| G-2. | List of Reacquired or Transferred Franchisees |
| H. | GMS Participation Agreement |
| I. | Receipt |

DATE:  _____
BY:  _____
PRINT NAME:  _____

Keep this copy for your records.   This Disclosure Document is also available in pdf format on our website, **www.onlinetradingacademy.com.**

**Attachment ZZ**

EX 13
7629

**RECEIPT**

This Disclosure Document summarizes provisions of the Franchise Agreement and other information in plain language.  Read this Disclosure Document and all agreements carefully.

If OTA Franchise Corporation offers you a franchise, OTA Franchise Corporation must provide this Disclosure Document to you 14 calendar days before you sign a binding agreement or make a payment with the Franchisor or an affiliate in connection with the proposed franchise sale or grant.

New York, Oklahoma and Rhode Island require that we give you this Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the Franchise Agreement or other agreement or the payment of any consideration that relates to the franchise relationship.

Michigan requires that we give you this Disclosure Document at least 10 business days before the execution of any binding Franchise Agreement or other agreement or the payment of any consideration, whichever comes first.

If OTA Franchise Corporation does not deliver this Disclosure Document on time or if it contains a false or misleading statement, or a material omission, a violation of federal and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state authority listed in Exhibit D to this Disclosure Document.

The franchisor is OTA Franchise Corporation, located at 17780 Fitch, Suite 200, Irvine, California 92614.

Issuance Date:  March 30, 2018. The name, principal business address and telephone number of each franchise seller offering the franchise: Ralph Loberger, Drew Cartwright, Steve Albin, Gene Longobardi, Aaron Neilsen, Jeremy Nosek, Eyal Marmareli, John Anthoney Harkey, and Eyal Shachar, 17780 Fitch, Suite 200, Irvine, California 92614, 949-475-5652, and _____ _____of _____ _____telephone number_____ (broker's agent) if relevant, and only if that broker is registered where applicable.

OTA Franchise Corporation authorizes the respective state agencies listed in Exhibit D to this Disclosure Document to receive service of process in the particular state.

I have received a Franchise Disclosure Document dated _____. This Disclosure Document includes the following exhibits:

A.    Franchise Agreement
B.    Financial Statements
C.    ACH Debit Authorization
D.    List of State Administrators and Agents for Service of Process
E.    State Addendum to Disclosure Document and Franchise Agreement
F.    Statement of Prospective Franchisee
G-1.  List of Franchisees
G-2.  List of Reacquired or Transferred Franchisees
H.    GMS Participation Agreement
I.    Receipt

Date: _____
By: _____
Print name: _____

Please sign this copy of the Receipt, date your signature, and return it to OTA Franchise Corporation, 17780 Fitch, Suite 200, Irvine, California 92614, Attn:  Eyal Shachar.

**Attachment ZZ**

EX 13
7630

## (PROFIT) INITIAL/ANNUAL LIST OF OFFICERS, DIRECTORS AND STATE BUSINESS LICENSE APPLICATION OF:

ENTITY NUMBER

NAME OF CORPORATION
**OTA FRANCHISE CORPORATION**

C5848-2004

FOR THE FILING PERIOD OF **MAR, 2019** TO **MAR, 2020**

**USE BLACK INK ONLY - DO NOT HIGHLIGHT**

**\*\*YOU MAY FILE THIS FORM ONLINE AT www.nvsilverflume.gov\*\***

*100103*

☐ Return one file stamped copy.  (If filing not accompanied by order instructions, file stamped copy will be sent to registered agent.)

*IMPORTANT:  Read instructions before completing and returning this form.*

| Filed in the Office of | Business Number **C5848-2004** |
|---|---|
| *Barbara K. Cegavske* | Filing Number **20190082304-09** |
| Secretary of State State Of Nevada | Filed On **02/25/2019** |
| | Number of Pages **1** |

1. Print or type names and addresses, either residence or business, for all officers and directors.  A President, Secretary, Treasurer, or equivalent of and all Directors must be named.  There must be at least one director.  An **Officer** must sign the form.  *FORM WILL BE RETURNED IF UNSIGNED.*

2. If there are additional officers, attach a list of them to this form.

3. Return the completed form with the filing fee.  Annual list fee is based upon the current total authorized stock as explained in the Annual List Fee Schedule For Profit Corporations.  A $75.00 penalty must be added for failure to file this form by the deadline.  An annual list received more than 90 days before its due date shall be deemed an annual list for the previous year.

4. State business license fee is $500.00/$200.00 for Professional Corporations filed pursuant to NRS Chapter 89.  Effective 2/1/2010, $100.00 must be added for failure to file form by deadline.

5. Make your check payable to the Secretary of State.

6. **Ordering Copies:**  If requested above, one file stamped copy will be returned at no additional charge.  To receive a certified copy, enclose an additional $30.00 per certification.  **A copy fee of $2.00 per page** is required for **each additional copy** generated when ordering 2 or more file stamped or certified copies.  Appropriate instructions must accompany your order.

7. Return the completed form to:  Secretary of State, 202 North Carson Street, Carson City, Nevada 89701-4201, (775) 684-5708.

8. Form must be in the possession of the Secretary of State on or before the last day of the month in which it is due.  (Postmark date is not accepted as receipt date.)  Forms received after due date will be returned for additional fees and penalties.  Failure to include annual list and business license fees will result in rejection of filing.

(This document was filed electronically.)
**ABOVE SPACE IS FOR OFFICE USE ONLY**

**CHECK ONLY IF APPLICABLE AND ENTER EXEMPTION CODE IN BOX BELOW**

☐ Pursuant to NRS Chapter 76, this entity is exempt from the business license fee.  Exemption code: ____

NRS 76.020 Exemption Codes
001 - Governmental Entity
006 - NRS 680B.020 Insurance Co.

**NOTE:  If claiming an exemption, a notarized Declaration of Eligibility form must be attached.  Failure to attach the Declaration of Eligibility form will result in rejection, which could result in late fees.**

☐ This corporation is a publicly traded corporation.  The Central Index Key number is: ____

☐ This publicly traded corporation is not required to have a Central Index Key number.

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| EYAL SHACHAR | **PRESIDENT** (OR EQUIVALENT OF) | | | |
| ADDRESS | CITY | | STATE | ZIP CODE |
| 17780 FITCH SUITE 200 | IRVINE | | CA | 92614 |

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| EYAL SHACHAR | **SECRETARY** (OR EQUIVALENT OF) | | | |
| ADDRESS | CITY | | STATE | ZIP CODE |
| 17780 FITCH SUITE 200, | IRVINE | | CA | 92614 |

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| EYAL SHACHAR | **TREASURER** (OR EQUIVALENT OF) | | | |
| ADDRESS | CITY | | STATE | ZIP CODE |
| 17780 FITCH SUITE 200, | IRVINE | | CA | 92614 |

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| EYAL SHACHAR | **DIRECTOR** | | | |
| ADDRESS | CITY | | STATE | ZIP CODE |
| 17780 FITCH SUITE 200, | IRVINE | | CA | 92614 |

None of the officers or directors identified in the list of officers has been identified with the fraudulent intent of concealing the identity of any person or persons exercising the power or authority of an officer or director in furtherance of any unlawful conduct.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

**X** AARON NEILSEN

**Signature of Officer or Other Authorized Signature**

| Title | Date |
|---|---|
| CFO | 2/25/2019 4:00:09 PM |

Nevada Secretary of State List Profit
Form: 100103   Revised: 7-1-17

**Attachment ZZA**

EX 13
7631

**(PROFIT) INITIAL LIST OF OFFICERS, DIRECTORS AND RESIDENT AGENT OF**

OTA Franchise Corporation

(Name of Corporation)

FILE NUMBER

5848-2004

FOR THE FILING PERIOD OF March 8, 2004       TO December 31, 2004

The corporation's duly appointed resident agent in the State of Nevada upon whom process can be served is

04-05#135
EP $75

FILED # _____

APR 2 7 2004

IN THE OFFICE OF
DEAN HELLER, SECRETARY OF STATE

☐ CHECK BOX IF YOU REQUIRE A FORM TO UPDATE YOUR RESIDENT AGENT INFORMATION

Important: Read instructions before completing and returning this form.

THE ABOVE SPACE IS FOR OFFICE USE ONLY

1. Print or type names and addresses, either residence or business, for all officers and directors, a President, Secretary, Treasurer, or equivalent of and all Directors must be named. Have an officer sign the form. FORM WILL BE RETURNED IF UNSIGNED.
2. If there are additional directors attach a list of them to this form
3. Return the completed form with the $125.00 filing fee. A $75.00 penalty must be added for failure to file this form by the last day of first month following the incorporation/initial registration with this office.
4. Make your check payable to the Secretary of State. Your cancelled check will constitute a certificate to transact business per NRS 78 155. To receive a certified copy, enclose an additional $30.00 and appropriate instructions.
5. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, NV 89701 4201, (775) 684-5708.
6. Form must be in the possession of the Secretary of State on or before the last day of the first month following the incorporation/initial registration date. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties.

FILING FEE $125.00   LATE PENALTY $75.00

**CHECK ONLY IF APPLICABLE**

☐ This corporation is a publicly traded corporation. The Central Index Key number is:

☐ This publicly traded corporation is not required to have a Central Index Key number.

| NAME | TITLE(S) | | |
|------|----------|---|---|
| Eyal Shachar | | **PRESIDENT** (OR EQUIVALENT OF) | |
| ADDRESS | CITY | ST | ZIP |
| 18004 Skypark Circle South, Suite 204 | Irvine | CA | 92614 |
| NAME | TITLE(S) | | |
| Eyal Shachar | | **SECRETARY** (OR EQUIVALENT OF) | |
| ADDRESS | CITY | ST | ZIP |
| 18004 Skypark Circle South, Suite 204 | Irvine | CA | 92614 |
| NAME | TITLE(S) | | |
| Eyal Shachar | | **TREASURER** (OR EQUIVALENT OF) | |
| ADDRESS | CITY | ST | ZIP |
| 18004 Skypark Circle, Suite 204 | Irvine | CA | 92614 |
| NAME | TITLE(S) | | |
| Eyal Shachar | | **DIRECTOR** | |
| ADDRESS | CITY | ST | ZIP |
| 18004 Skypark Circle, Suite 204 | Irvine | CA | 92614 |

POSTED

I declare, to the best of my knowledge under penalty of perjury, that the above mentioned information has complied with the provisions of NRS 360.780 and acknowledge that pursuant to NRS 239.330 it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X Signature of Officer       Title President       Date April 1, 2004

**Attachment ZZA**

EX 13
7632



**DEAN HELLER**
Secretary of State
206 North Carson Street
Carson City, Nevada 89701-4298
(775) 684 5708
Website: secretaryofstate.biz

FILED #
C - 5808-04
MAR 0 8 2004

IN THE OFFICE OF
_____
DEAN HELLER, SECRETARY OF STATE

# Articles of Incorporation
(PURSUANT TO NRS 78)

*Important. Read attached instructions before completing form.*

ABOVE SPACE IS FOR OFFICE USE ONLY

| | | |
|---|---|---|
| 1. **Name of Corporation:** | OTA Franchise Corporation | |
| 2. **Resident Agent Name and Street Address:** (Must be a Nevada address where process may be served) | National Registered Agents, Inc. of NV  Name  1000 William Street, Suite 204  Street Address  Optional Mailing Address | Carson City  City  **NEVADA** 89701  State Zip Code  City State Zip Code |
| 3. **Shares:** (number of shares corporation authorized to issue) | Number of shares with par value: 5,000,000 | Par value: $ .001  Number of shares without par value |
| 4. **Names & Addresses of Board of Directors/Trustees:** (attach additional page there is more than 3 director/trustees) | 1. Eyal Shachar  Name  18004 Skypark Circle South, Suite 140  Street Address  2.  Name  Street Address  3.  Name  Street Address | Irvine  City  CA 92614  State Zip Code  City State Zip Code  City State Zip Code |
| 5. **Purpose:** (optional-see instructions) | The purpose of this Corporation shall be: | |
| 6. **Names, Address and Signature of Incorporator.** (attach additional page there is more than 1 incorporator) | Thomas N. Burnham  Name  4140 Miller Road  Address | Signature  Ann Arbor MI 48103  City State Zip Code |
| 7. **Certificate of Acceptance of Appointment of Resident Agent:** | I hereby accept appointment as Resident Agent for the above named corporation.  _Deana Perrin, Assistant Secretary_  Authorized Signature of R. A. or On Behalf of R. A. Company | Date 3/4/04 |

*This form must be accompanied by appropriate fees. See attached fee schedule.*

3/8/2004  2:53:35 PM  $280.00
NE C200040280-8446

Nevada Secretary of State Form 78 ARTICLES 2003
Revised on 10/04/03

EX 13
7633

**State of California**
**Secretary of State**

| S |

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

**GB03112**

**FILED**

In the office of the Secretary of State
of the State of California

**NOV-27 2019**

1. CORPORATE NAME

NEWPORT EXCHANGE HOLDINGS, INC.

2. CALIFORNIA CORPORATE NUMBER

C2182604

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. | STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5. | STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6. | MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 7. | CHIEF EXECUTIVE OFFICER/ | | | | |
| 8. | SECRETARY | | | | |
| 9. | CHIEF FINANCIAL OFFICER/ | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 10. | NAME | | | | |
| 11. | NAME | | | | |
| 12. | NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 15. | STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

17. 11-27-2019 BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

ACCOUNTING MANAGER

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|
| SI-200 (REV 01/2013) | AMY QUACH | | APPROVED BY SECRETARY OF STATE |

**Attachment ZZB**

EX 13
7634

## State of California
### Secretary of State

**S**

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FS66581**

# FILED

In the office of the Secretary of State
of the State of California

**DEC-04 2017**

| 1. CORPORATE NAME |
|---|
| NEWPORT EXCHANGE HOLDINGS, INC. |

This Space for Filing Use Only

| 2. CALIFORNIA CORPORATE NUMBER |
|---|
| C2182604 |

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 17780 FITCH SUITE 200, IRVINE, CA 92614 | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | | |
| 17780 FITCH SUITE 200, CITY, CA 92614 | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ | | | | |
| EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |
| 8. SECRETARY | | | | |
| EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |
| 9. CHIEF FINANCIAL OFFICER/ | | | | |
| EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME | | | | |
| EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

| 14. NAME OF AGENT FOR SERVICE OF PROCESS |
|---|
| THEODORE MICHAEL HANKIN |

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 1400 QUAIL STREET, NEWPORT BEACH, CA 92660 | | | |

**Type of Business**

| 16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION |
|---|
| EDUCATION SERVICES |

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 12/04/2017 | AMY QUACH | ACCOUNTING MANAGER | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

**Attachment ZZB**

EX 13
7635

A0537047

2182604

FILED
In the office of the Secretary of State
of the State of California

DEC 2 9 1999

BILL JONES, Secretary of State

CERTIFICATE OF AMENDMENT

OF

ARTICLES OF INCORPORATION

The undersigned certifies that:

1.  He is the incorporator of Hankin Shelf Number One, a California Corporation.

2.  Article I of the Articles of Incorporation of this corporation is amended to read as follows:

"The Name of this corporation is NEWPORT EXCHANGE HOLDINGS, INC."

3.  No directors were named in the original Articles of Incorporation and none have been elected.

4.  No shares have been issued.

I further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of my own knowledge.

Date: 22 Dec 99

THEODORE M. HANKIN, ESQ.,
Incorporator

**Attachment ZZB**

EX 13
7636

# NEWPORT MANAGEMENT

December 28, 1999

California Secretary of State

Newport Exchange Inc. dba Newport Management gives permission to Hankin Shelf Number One to change its name to Newport Exchange Holdings.

Eyal Giladi
Vice President, Newport Exchange, Inc.

_4199 Campus Drive, Suite F    Irvine CA  92612 Tel    (714) 854-4040  Fax (714) 854-4044_

**Attachment ZZB**

EX 13
7637

2182604

FILED
in the office of the Secretary of State
of the State of California

NOV 1 7 1999

*Bill Jones*
BILL JONES, Secretary of State

ARTICLES OF INCORPORATION

OF

HANKIN SHELF NUMBER ONE, A CALIFORNIA CORPORATION

I

The name of this corporation is HANKIN SHELF NUMBER ONE, a California corporation.

II

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

III

The name and address in the State of California of this corporation's initial agent for service of process is:

THEODORE M. HANKIN, ESQ.
ONE NEWPORT PLACE, STE. 900
NEWPORT BEACH, CA  92660

IV

This corporation is authorized to issue only one class of shares of stock; and the total number of shares which this corporation is authorized to issue is:  100,000,000

THEODORE M. HANKIN, Esq.
Incorporator

**Attachment ZZB**

# State of California
## Secretary of State

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**S**

**GB03495**

# FILED
In the office of the Secretary of State
of the State of California

**NOV-27 2019**

This Space for Filing Use Only

1. CORPORATE NAME

NEH SERVICES, INC.

2. CALIFORNIA CORPORATE NUMBER

C2207153

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

☑ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17**.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. | STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5. | STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6. | MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 7. | CHIEF EXECUTIVE OFFICER/ | ADDRESS | | | |
| 8. | SECRETARY | ADDRESS | | | |
| 9. | CHIEF FINANCIAL OFFICER/ | ADDRESS | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 10. | NAME | ADDRESS | | | |
| 11. | NAME | ADDRESS | | | |
| 12. | NAME | ADDRESS | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS

15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL**   CITY   STATE   ZIP CODE

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

17. 11/27/2019 BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

ACCOUNTING MANAGER

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|
| | AMY QUACH | | |

SI-200 (REV 01/2013)   APPROVED BY SECRETARY OF STATE

**Attachment ZZC**

## State of California
### Secretary of State

**S**

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**F459782**

# FILED

In the office of the Secretary of State
of the State of California

**MAR-06 2015**

1. **CORPORATE NAME**
NEH SERVICES, INC.

2. **CALIFORNIA CORPORATE NUMBER**
C2207153

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)
3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>17780 FITCH SUITE 200, IRVINE, CA 92614 | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>17780 FITCH SUITE 200, IRVINE, CA 92614 | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/<br>EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |
| 8. SECRETARY<br>EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |
| 9. CHIEF FINANCIAL OFFICER/<br>EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME<br>EYAL SHACHAR | 17780 FITCH, IRVINE, CA 92614 | | | |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
THEODORE MICHAEL HANKIN

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 1400 QUAIL STREET, NEWPORT BEACH, CA 92660 | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
FINANCING SERVICES

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 03/06/2015 | AMY QUACH | ACCOUNTING MANAGER | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

**Attachment ZZC**

EX 13
7640

NCTO                                                        A0708895

220 7/5 2

**CERTIFICATE OF AMENDMENT TO THE
ARTICLES OF INCORPORATION
OF
EXPO HOLDINGS, INC.,
a California corporation**

**FILED**
in the office of the Secretary of State
of the State of California

NOV   3 2010

The undersigned certifies that:

1.    They are the president and the secretary of Expo Holdings, Inc., a California
corporation.

2.    Article I of the Articles of Incorporation of this corporation is amended to read as
follows:

I

The name of this corporation is NEH Services, Inc.

3.    The foregoing amendment of the Articles of Incorporation has been duly
approved by the board of directors.

4.    The foregoing amendment of the Articles of Incorporation has been duly
approved by the required vote of shareholders in accordance with Section 902,
California Corporations Code.  The total number of outstanding shares of the
corporation is 5,000. The number of shares voting in favor of the amendment
equaled or exceeded the vote required.  The percentage vote required was more
than 50%.

The undersigned further declares under penalty of perjury under the laws of the State of
California that the matters set forth in this certificate are true and correct of their own
knowledge.

Dated: October 1, 2010

Eyal Shachar, President and Secretary

1151854.1

**Attachment ZZC**

EX 13
7641

A054349T

# 220753

FILED
In the office of the Secretary of State
of the State of California

APR 1 7 2000

BILL JONES, Secretary of State

CERTIFICATE OF AMENDMENT

OF

ARTICLES OF INCORPORATION

The undersigned certifies that:

1. They are the Vice President and Assistant Secretary of Hankin Shelf Number Four, a California Corporation.

2. Article I of the Articles of Incorporation of this corporation is amended to read as follows:

    "The Name of this corporation is Expo Holdings, Inc."

3. The foregoing amendment of Articles of Incorporation has been duly approved by the board of directors.

4. No shares have been issued.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Date: 4/14/00

THEODORE M. HANKIN, Vice President

JANICE GREEN, Assistant Secretary

2207153

**FILED**
In the office of the Secretary of State
of the State of California

JAN - 3 2000

*Bill Jones*

BILL JONES, Secretary of State

ARTICLES OF INCORPORATION

OF

HANKIN SHELF NUMBER FOUR, A CALIFORNIA CORPORATION

I

The name of this corporation is HANKIN SHELF NUMBER FOUR, a California corporation.

II

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

III

The name and address in the State of California of this corporation's initial agent for service of process is:

THEODORE M. HANKIN, ESQ.
ONE NEWPORT PLACE, STE. 900
NEWPORT BEACH, CA  92660

IV

This corporation is authorized to issue only one class of shares of stock; and the total number of shares which this corporation is authorized to issue is:  100,000,000

THEODORE M. HANKIN, Esq.
Incorporator

**Attachment ZZC**

EX 13
7643



Forums    Resources    Brokers    Software    Members

Log in or Sign up

💬 Recent Posts

Search...

ET NEWS & SPONSOR INFO

Announcements

Events

GENERAL TOPICS

Trading

Journals

Wall St. News

Economics

Hook Up

MARKETS

Stocks

Options

ETFs

Index Futures

Commodity Futures

Financial Futures

Forex

Cryptocurrencies

TECHNICAL TOPICS

Order Execution

Automated Trading

Technical Analysis

Programming

Strategy Development

Risk Management

Psychology

BROKERAGE FIRMS

Retail Brokers

Prop Firms

Forex Brokers

COMPANY SPECIFIC

Interactive Brokers

TOOLS OF THE TRADE

Trading Software

Data Sets and Feeds

Networking and Security

Hardware

Educational Resources

Forums  ›  Tools of the Trade  ›  Educational Resources  ›

# Online Trading Academy Epic Fail

Discussion in 'Educational Resources' started by DrugDoc, Jul 19, 2016.



1    2    Next >

| DrugDoc | 4 Posts | 1 Likes |

http://lessons.tradingacademy.com/article/oops-bought-high/

So I got one of their random emails and in this article, their "god", this Sam Seiden guy is comparing important price turn levels they supposedly provide to their subscribers and how they trade them. But in this particular post, the levels were from a USDCAD forex market and the chart from from the DOW futures, and he used them to make his case. I don't think even they have realized it yet.

Makes me wonder what else they brew behind the scenes to convince the sheeple that his strategy actually works. I had blasted that strategy for quite sometime as it never worked for me. This proves they engineer that stuff to make it look good and sell to unsuspecting naive investors....smh

#1    Jul 19, 2016                                              🐦 Share

| Zestilio | 264 Posts | 66 Likes |

Classical scam dedicated to sucking money from unexperienced traders.

#2    Jul 20, 2016                                              🐦 Share

👍 Muffhands and wally like this.

| Baron     ET Founder | 5,104 Posts | 2,395 Likes |

**Attachment ZZD**

EX 13
7644

TRADING FOR A LIVING

Professional Trading

Taxes and Accounting

COMMUNITY LOUNGE

Entrepreneurship

Chit Chat

Politics

Religion and Spirituality

Health and Fitness

Science and Technology

Luxury and Lifestyle

Music, Movies and Entertainment

Sports

SITE SUPPORT

Feedback

Hilarious:



#3   Jul 20, 2016                                                                   🐦 Share

 **speedo**

| | 5,524 Posts | 5,028 Likes |

Oops..

#4   Jul 20, 2016                                                                   🐦 Share

 **fordewind**

| | 2,313 Posts | 658 Likes |

"Distribution of this grid in any form is cause for immediate daectivation of Mastermind Membership"

LOL.....................how dare they!

#5   Jul 23, 2016                                                                   🐦 Share

 **Handle123**

| | 7,254 Posts | 6,275 Likes |

> 💬 *Baron said:* 🔺
> *Hilarious:*
>
> *View attachment 165473*

What are the numbers at bottom of chart?

Passive income? HUH?

#6   Jul 24, 2016                                                                   🐦 Share

 **wally**

| | 3 Posts | 4 Likes |

*Though I could not caution all* I yet may warn a few:

If anyone is thinking of Online Trading Academy, better think twice...

(please see uploads for pricing)

Attached:
-Pricing.
--Sales questions the commission salesperson asks you over the phone - which is secretly tape recorded, using "Tape-A-Call".
-The "Pain" questions the OTA commission sales people will ask to soften you up when they get you alone in the "Pain Room".
-Online Trading Academy Sales Process; they're trained to act the opposite of a 100% Commission Salesperson.

*OTA is a con, a scam. I used to work there, so I know all about it.*

The "educational counselors" are all commission sales people making $150,000 to $350,000. The "instructors" are also entirely on commission, making more than the "educational salespersons". No one at Online Trading Academy is a real trader and no one uses the system to make money. Because the system does not work.

OTA is a hard core sales operation. You'll be asked a series of "pain questions" like, "What is the cost of doing nothing?" "How do you feel about it?" They get you feeling terrible so you'll buy.

But the trading system does not work. It uses simple fibonacci and support and resistance to get lucky once out of eight times - so you lose seven times, but win once. This makes you think it might work if you could learn it better.

Since you will always be losing money with their trading method, this gives them the opportunity to up-sell you on more markets, at about $12,000 each. They say, "More markets, more opportunity" and "You're not making money because you need more training!"

But that's the secret lie - it is the trading system that doesn't work, not you. A study by Univ of California, Berkeley, Haas Business School found that 98% of day traders lose All their money.

They say that you lose small and win big - just another lie to cover up the many many losses for one small win. Your account slowly goes down and you blame yourself for not making the system work - but it's a losing system, not you! You may even fall for buying more education for thousands more dollars.

Note that OTA's trading method supposedly uses supply and demand levels that they identify - some from many years ago! But big traders and institutions never leave pending trades lying around, never. Not even overnight or over the weekend because a news event could cause a huge loss. In fact, most institutional trades are high frequency trades in and out of the market in less than a second! But OTA will try to tell you supply and demand levels last for years. Don't believe a word they say. It's all a scam and like all cons, the lies really sound good!

**Attachment ZZD**

No you can't trade like the institutions (who often lose big, by the way) - you don't have the money like they do and you can't push the market around like they can.

Before you come in to a seminar the salespeople take half the chairs out of the room - so it looks like lots of people are showing up, more than expected, then they bring back the chairs. Smart, right?

There will be one or two OTA employees acting like students in the room. They buy and everyone else thinks, if they bought, I should too. OTA calls this "social proof". They have about a hundred more tricks up their sleeve - you won't have a chance.

They'll take you for $12,000 to $60,000. No money, no problem, you can finance it at 17%. The back of the contract says you can't sue them and also you can't join a class action lawsuit.

Online Trading Academy is exactly like Trump University and Corinthian Colleges, all scams selling a product that does not work to hopeful people ripe for it. Note: they illegally record all telephone calls with "Tape-a-Call".

The salespeople are trained extensively to act sympathetic and listen to your woes about not making enough money and needing retirement, then they tell you your salvation is to pay $12,000 to $60,000 to solve the problem. "All you need is self-discipline and commitment," they tell you. "Earn while you learn!" But no one ever makes money with their "patented" system. Patented does not means it works!

I know all about it. Don't believe the positive reviews. They wrote them. Heck, when I worked there, I wrote some of them!

Everything they do is totally designed to take your money, leaving you dry. When you figure out the trading method does not work they'll try to sell you further training on more markets. See how it works? They tell you that you just need more training for thousands more. It's your fault!

Here's a good trick: The instructor is going on about how you can make lots of money. And then he shows you a live trade he made during the break. It's now up $2000 in one hour!

And think how much you can make doing this. He tells you, trade for one hour a day and make $2000/day times five days a week gives you $10,000/week, easy! You just need to sign up for the training.

The trick is he made Ten random trades, half long buys and half short sells. He chose the one lucky trade that made the best profit to show the class and ignores all the others that are losing. He only shows the profit trade!!

Isn't that a great trick?

The instructors do not trade themselves, they just say they do. Everything is fake. If you see a statement or a testimonial, it's fake. The instructors make much more money from you than they could from trading a losing system.

**Attachment ZZD**

Online Trading Academy is a brilliant, exceptionally well designed scam that steals $100,000,000 from wannabe traders every year - often the uneducated and the poor retired.

| Product/Service | Retail Price |
|---|---|
| Professional Trader (7 Day Class) | $6,990 |
| Stock Trading Extended Learning Track (LifeTime) | $11,500 |
| Stock Pro-Picks | $2,400 |
| Futures Class | $4,990 |
| Futures Extended Learning Track | $11,500 |
| Futures Pro-Picks | $2,400 |
| Forex Class | $4,990 |
| Forex Extended Learning Track | $11,500 |
| Forex Pro-Picks | $2,400 |
| ProActive Investor Class | $4,990 |
| ProActive Investing Extended Learning Track | $11,500 |
| Options Class | $4,990 |
| Options Trading Extended Learning Track | $11,500 |
| Options Pro-Picks | $2,400 |
| OTA Core Tax Strategies | $995 |
| **Retail Tuition Totals** | **$95,045** |



#7   Nov 14, 2016                                                    🐦 Share

👍 RifffRafff, ElectricSavant, tommcginnis and 1 other person like this.



### TraderJim618

| 1 Posts | 1 Likes |
|---|---|

Wally,

Regarding your comment:

"...*But big traders and institutions never leave pending trades lying around, never. Not even overnight or over the weekend because a news event could cause a huge loss. In fact, most institutional trades are high frequency trades in and out of the market in less than a second! But OTA will try to tell you supply and demand levels last for years. Don't believe a word they say. It's all a scam and like all cons, the lies really sound good!* ...

While I agree with your assessment of OTC, you couldn't be more inaccurate about institutions not leaving unfilled orders (inventory) on the Exchanges. Also, while program trading constitutes approximately 75% of the volume almost every day, **HFT** is nothing more than a sneaky market-making function. By executing a whole bunch of little orders over and over, market makers on Level III can add liquidity (or remove it) to certain stocks at certain times. But in index futures, it is a completely different deal. Institutions don't trade the news, they already know it well in advance. Only Retail-ville trades the news. If GSCO or JPMS takes a 1/2 million contract position in the SPY/S&Ps or CL, you think they're gonna unwind their accumulation on a scalping mission trading the news?



> **wally said:** ⊕
>
> *Though I could not caution all I yet may warn a few:*
>
> *If anyone is thinking of Online Trading Academy, better think twice...*
>
> *(please see uploads for pricing)*
>
> ⊡ More...

#8    Mar 1, 2018                                                    🐦 Share

👍 **comagnum** likes this.

| **Winwin** | 2 Posts | 1 Likes |
|---|---|---|

Hi there Wally and TraderJim618, I am interested to hear more from you about Online Trading Academy and their 'doubtful' strategy. Wally in particular, you have quite a fierce opinion of their modus operandum. May I ask when you worked for OTA and in what capacity? And perhaps what evidence you have that they are operating a huge 'scam'. I also notice that you both disagree on whether the institutions have unfilled orders in the exchange as this appears to be the basis upon which the strategy was created.
I am interested in learning more about trading in general and am attracted to the supported learning environment that OTA offers but am obviously put off by your comments.
Thanks for any further thoughts.
Winwin

#9    Aug 25, 2018                                                  🐦 Share

| **mr_byte31** | 235 Posts | 59 Likes |
|---|---|---|

Dont they do any live tading in their webinars to prove their techniques work??

#10    Sep 3, 2018                                                  🐦 Share

1    **2**    Next >                            (You must log in or sign up to reply here.)

Forums  ›  Tools of the Trade  ›  Educational Resources  ›

                                        Contact    Help    Advertise    Home    Top

ET IS FREE FOR TRADERS BECAUSE OF THE FINANCIAL SUPPORT FROM THESE SPONSORS:

Alpaca
Commission Free Stock Trading API

AMP Global Clearing
Futures and FX Trading

Bookmap
Visual Trading Platform

Cannon Trading
Futures and Options Brokerage

Earn2Trade
Trading Education and Funding Challenge

FP Markets

Lightspeed
Equities & Options Trading

MotiveWave
Full-Featured Trading Software

MultiBank Group
Financial Derivatives Providers

NinjaTrader
Trading Software & Brokerage

Optimus Futures
Futures Software and Order Routing

ORATS

SpreadProfessor
Spread Trading Instruction

TopstepTrader
We Fund Traders

TradersStudio
System Development Platform

TradeZero America
Commission Free Trading

Trading Technologies
Trading Software Provider

Tradovate

**Attachment ZZD**                                    EX 13
                                                      7649

Award-Winning Forex Broker

**Innerworks Coaching**
Day Trader Coaching

**Interactive Brokers**
Gateway to World Markets

**Jigsaw Trading**
Advanced Trading Tools

Option Data & Backtesting

**Polygon.io**
Real-Time & Historic Data

**Raltin**
Finance Research Tools

**Rithmic**
Futures Trade Execution Platform

Commision-Free Futures Trading

**TrendSpider**
Automated TA Software

**WealthSignals**
Subscription-based trading strategies

Learn More about Advertising on Elite Trader

Terms and Rules

**Attachment ZZD**

EX 13
7650

| Product/Service | Retail Price |
|---|---|
| Professional Trader (7 Day Class) | $6,990 |
| Stock Trading Extended Learning Track (LifeTime) | $11,500 |
| Stock Pro-Picks | $2,400 |
| Futures Class | $4,990 |
| Futures Extended Learning Track | $11,500 |
| Futures Pro-Picks | $2,400 |
| Forex Class | $4,990 |
| Forex Extended Learning Track | $11,500 |
| Forex Pro-Picks | $2,400 |
| ProActive Investor Class | $4,990 |
| ProActive Investing Extended Learning Track | $11,500 |
| Options Class | $4,990 |
| Options Trading Extended Learning Track | $11,500 |
| Options Pro-Picks | $2,400 |
| OTA Core Tax Strategies | $995 |
| **Retail Tuition Totals** | **$95,045** |

**Attachment ZZD**

**Comment [l10]:** When can that 10 hours/week start?  What will they have to sacrifice to make time for it? How does their spouse feel about the time commitment? Have them talk to you about the next 3-4 months of their life in terms of commitments (i.e. buying a house, vacations, baby on the way, etc.)

**Comment [l11]:** Always use a nurturing tone when asking questions and talking about pain. Remember that you need to get them to talk about the 3 types of pain: Surface, Cost, and Personal Impact.  Pain Questions:  [ ... [1] ]

**Comment [l12]:** •*Talk me you through how they came up with these numbers.  Was it from a market crash?  Was it from your trading account? How did you calculate the opportunity cost?  I don't know your world...is that a big number? Is it fair to say that we're looking at a (i.e. $200K) problem?* More Pain Questions:  [ ... [2] ]

**Comment [l13]:** *Have you ever had a (i.e. $200K) problem before?  How did you go about fixing it?* Ask them if they have had any trading education in the past and if so, what was their experience like? What are they hoping to gain from the Market Timing Program?

**Comment [l14]:** Why did they circle the number that they did?  *"I've got to ask you a tough question. We're looking at a (i.e. $200K) problem here. From a priority standpoint, is it important enough to fix? If it's not important enough, I'm ok...but is it?  I gotta be honest, everyone tells me that.  And when I tell them it takes time and money, they aren't so* [ ... [3] ]

**Comment [I29]:** Start softly planting seeds for other asset classes. Tell them that based on what you've discussed so far, it's looking like Options and Futures (for example) will be ideal solution for their income and wealth goals.  You will figure out a plan for them during class that makes sense to them and that they are comfortable with.

**Comment [I30]:** Find out how important this is to them.  What is the driving force behind them wanting to learn how to trade successfully?  It's not just to make money.  You are looking for answers like "provide me with financial security" or "early retirement" or "peace of mind" or "preserve capital and avoid huge losses" or "spend more time with my family." Have them give you some tangibles—build a new home, set aside money for kids college funds, increase spending money by $2K/month, travel, buy a boat or a car, etc. Tell them that it's important for them to focus on their driving force (their *why*) behind them learning this. And ask them, if they could achieve those goals, how does that change their world?  How does that make them feel?

**Attachment ZZD**

## PAIN QUESTIONS

- What motivated you to sign up for this program?
- How were you hoping we could help you?
- What are some of your biggest trading challenges?
- What's been keeping you from reaching your goals?
- Help me understand... Tell me more...
- In a perfect world, how you expect these accounts to perform?
- When you say _____, can you give me a recent example of what you mean?
- Why do you think that's been happening?
- How long has this been an issue?
- How much has it cost you?
- Is it important enough to fix?
- Have you tried to fix it?  What happened when you did?
- What have you done to attempt to fix it?
- What kind of modifications would you make?
- Looking back, what would you have done differently?
- What's the cost of doing nothing?
- Do you have any alternatives?
- How do you feel about it?
- Why does that upset/frustrate you?
- Why is this important to you?
- How will this impact your World?
- From a priority standpoint, is this important enough to you to fix?

**Attachment ZZD**

## PAIN QUESTIONS

- What motivated you to sign up for this program?
- How were you hoping we could help you?
- What are some of your biggest trading challenges?
- What's been keeping you from reaching your goals?
- Help me understand... Tell me more...
- In a perfect world, how you expect these accounts to perform?
- When you say _____, can you give me a recent example of what you mean?
- Why do you think that's been happening?
- How long has this been an issue?
- How much has it cost you?
- Is it important enough to fix?
- Have you tried to fix it?  What happened when you did?
- What have you done to attempt to fix it?
- What kind of modifications would you make?
- Looking back, what would you have done differently?
- What's the cost of doing nothing?
- Do you have any alternatives?
- How do you feel about it?
- Why does that upset/frustrate you?
- Why is this important to you?
- How will this impact your World?
- From a priority standpoint, is this important enough to you to fix?

**Attachment ZZD**

| | |
|---|---:|
| ProActive Investor Class | $4,990 |
| ProActive Investing Extended Learning Track | $11,500 |
| Stock Pro-Picks | $2,400 |
| Options Class | $4,990 |
| Options Trading Extended Learning Track | $11,500 |
| Options Pro-Picks | $2,400 |
| OTA Core Tax Strategies | $995 |
| **Retail Tuition Totals** | **$38,775** |

**Attachment ZZD**

| | |
|---|---|
| Professional Trader (7 Day Class) | $6,990 |
| Stock Trading Extended Learning Track (LifeTime) | $11,500 |
| Stock Pro-Picks | $2,400 |
| Futures or Forex Class | $4,990 |
| Futures or Forex Extended Learning Track | $11,500 |
| Futures or Forex Pro-Picks | $2,400 |
| OTA Core Tax Strategies | $995 |
| **Retail Tuition Totals** | **$40,775** |

**Attachment ZZD**

US008650115B1

## (12) United States Patent
### Seiden et al.

(10) Patent No.:  **US 8,650,115 B1**
(45) Date of Patent:  **Feb. 11, 2014**

(54) **COMPUTER BASED TRADING SYSTEM AND METHODOLOGY UTILIZING SUPPLY AND DEMAND ANALYSIS**

(71) Applicant: **Newport Exchange Holdings, Inc.,** Irvine, CA (US)

(72) Inventors: **Samuel Seiden**, Northbrook, IL (US); **Steven Albin**, Irvine, CA (US); **Gaylene Galliford**, Santa Ana, CA (US)

(73) Assignee: **Newport Exchange Holdings, Inc.,** Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/722,238**

(22) Filed: **Dec. 20, 2012**

(51) **Int. Cl.**
*G06Q 40/00*  (2012.01)
(52) **U.S. Cl.**
USPC ........................................... **705/37**; 705/35
(58) **Field of Classification Search**
USPC ................................................. 705/35–40
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2012/0041861 A1* | 2/2012 | Nafeh et al. | 705/37 |
| 2013/0124379 A1* | 5/2013 | Gilbert | 705/37 |
| 2013/0179320 A1* | 7/2013 | May | 705/37 |

* cited by examiner

*Primary Examiner* — Thu Thao Havan
(74) *Attorney, Agent, or Firm* — Charles B. Lobsenz; Clifford Hyra; Symbus Law Group, LLC

(57)  **ABSTRACT**

The system and methodology of the present invention operate to generate trading signals based on identifying various trading patterns referred to as setups. When these setups are detected, and depending on the specific setup detected, a supply zone or demand zone is next generated which indicates the price range for the instrument in which a sell or buy trade signal should be issued. When the underlying instrument trades within this range, and under other appropriate conditions, a trading signal is issued which may be sent directly to the appropriate exchange for automatic execution and/or sent to a graphical user interface or other display which alerts a trader to the proposed trade.

**23 Claims, 12 Drawing Sheets**





FIGURE 1



FIG. 2



FIG. 3



FIG. 4







FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIGURE 12

US 8,650,115 B1

**1**

## COMPUTER BASED TRADING SYSTEM AND METHODOLOGY UTILIZING SUPPLY AND DEMAND ANALYSIS

### FIELD OF THE INVENTION

The present invention is directed generally to systems and methodologies for effectively trading securities and other liquid instruments, and, more particularly to systems and methodologies which are designed to provide traders the ability to purchase and sell such securities and other instruments at profitable pricing levels.

### BACKGROUND OF THE INVENTION

While there is some variance depending upon the state of the economy and market conditions in general, the volume of securities traded on various worldwide markets and exchanges is exceedingly large and getting larger. Securities in this context can be any of a number of financial instruments such as stocks, bonds, mortgage backed securities, options, or, alternatively, hard assets such as precious metals, commodities and the like. The common element among these widely traded vehicles (hereinafter collectively referred to as "securities" for ease of reference), however, is that they enjoy a great deal of liquidity and the markets in which they trade are well established with many different buyers and sellers who participate in buying and selling the applicable security.

When there are a large number of buyers and sellers, the market for that security tends to be more active and perhaps more importantly, the spread between the available purchase price (the "ask") and the available selling price (the "bid") tends to be narrower. This in turn encourages buyers and sellers to participate in the buying and selling of that security since they are less likely to overpay or sell for too low of a price solely because of the "transaction cost" associated with the buy/sell spread which is incurred in executing the buy or sell transaction. Additionally, markets for securities tend to be more active where commissions and/or other fees and charges associated with the purchase and sale transaction are lower since the collective costs incurred from such costs and the bid/ask spread directly impact the profitability of trading that security.

In addition to minimizing transaction costs, profitable trading necessarily involves the need to purchase securities at a lower cost than the price at which the security is ultimately sold. Or, in the case of short selling, it is necessary to first sell the security at a higher cost than the price at which the security is ultimately covered. There are various known techniques, systems and methodologies for attempting to do just this. For example, some traders (typically individuals or "retail" traders as opposed to professional or "institutional" traders) will trade manually, largely based on nothing more than a gut feel. Alternatively, various individuals and even sophisticated individuals and institutional traders will use manual "systems" under which they devise a plan to make specific trades under various circumstances and market conditions. For example, such a trading plan may be as simple as buying XYZ stock when it sells for a price of $40 or lower (ask at $40 or below) and selling that same stock which it sells for a price of $44 or above (bid at $44 or above).

The foregoing plan may be implemented as a simple trading policy that a trader manually follows by entering appropriate buy and sell orders at the appropriate times. Or, the trader may utilize an online broker that provides the functionality for the trader to enter standing orders to make these trades when the specified market conditions are met. As yet

**2**

another example, the trader may employ a software based tool that interacts and communicates with his or her brokerage trading platform to execute trades consistent with trading system rules. Other applications and services are also available which offer traders the ability to implement their own trading plan and/or plans and strategies developed by third parties.

The trading plan described above is generally considered to fall within the class of trading methodologies referred to as "technical analysis". In this class of trading methodologies, specific decisions are made based solely on historic price movement for the underlying security as well as expected future price movement based on mathematical analysis tied to price/time chart movements. Technical analysis techniques for predicting and acting upon expected future price movement are in widespread use by retail and institutional traders.

This class of techniques and the systems that implement them, however, do suffer from a number of drawbacks. For example, in many cases, a great many competing traders are using the same systems with the same predictive algorithms and are acting upon these predictions generated by these systems at the same time. At a market based level, this produces undesirable outcomes for these traders since they are competing at the same time to buy a security with others using the same algorithms based on the same predictions at the same time. Further, they are also competing against each other when the system indicates that the trader should sell a security. In both of these cases, an artificial demand (buy signal) or supply (sell signal) is created which tends to move the price up or down, respectively beyond what it would otherwise be and thus resulting, in theory, in a less profitable trade for each of the traders using the same system.

Another disadvantage of technical analysis is that, by definition, it is based on price movement that has occurred in the past and this information is used to predict price movement for the future. Unfortunately, it is theorized that price movement is largely random and instead driven only by supply and demand which exists in real time as opposed to what has happened in the past. The net result of this is that technical analysis tools, while they can be useful, are often times not the ideal predictor of future price movement.

Another class of trading techniques which are in use are those known as "fundamental analysis". This class of techniques relies on examining the fundamental properties of the asset underlying the security. For example, for a common stock associated with a company, trading decisions may be based on earnings, revenue and/or newsworthy events about that company's positioning within its industry. A practically unlimited number of other metrics may be used as well. More common examples include price to earnings ratios, level of debt, earnings growth, deals expected to add to revenue in the future, etc. In the case of securities which represent ownership in hard assets such as gold, oil, etc., trading decisions using fundamental analysis might include such metrics as predicted demand for the underlying asset, predicted supply, newsworthy stories regarding the applicable asset such as new oil wells being drilled, disruptions in the supply chain for bringing the asset to the end user, etc.

While fundamental analysis based decisions and the systems that implement them also have their place in trading, they also suffer from drawbacks. For example, notwithstanding a very good understanding of a company and its financial picture, the market for stock representing ownership in that company may depart from the realities of the value of that company. This is evidenced by the fact that all stocks do not, for example, trade at the same multiple of earnings. There are other factors that go into the real time price for a stock that can

EX 13
7671

US 8,650,115 B1

3

not be addressed by fundamental analysis. Examples include "buzz" about certain companies and industries, rumors concerning that company, and other intangible aspects of the value of a particular stock that can not be measured or predicted using known fundamental analysis techniques.

## SUMMARY OF THE INVENTION

It is thus a primary object of the invention to provide a system and methodology that addresses the shortcomings of the prior art as discussed above.

It is another object of the present invention to provide a system and methodology which provides traders with improved trading results when trading a wide variety of securities, commodities and any other instrument which provides at least a reasonable degree of liquidity.

It is a further object of the present invention to provide a system and methodology which employs the realities of supply and demand in markets to provide enhanced predictions on price movement which in turn generates more profitable trading results.

It is a still further object of the present invention to provide a computer based trading system which generates recommended trading actions based upon the real time status of supply and demand for one or more securities or other tradable instruments.

It is a yet further object of the present invention to provide a computer based trading system for trading stocks based upon the real time status of the supply and demand for a particular stock.

It is another object of the present invention to provide a computer based trading system for trading commodities based upon the real time status of the supply and demand for a particular commodity.

It is a further object of the present invention to provide a computer based trading system for trading currencies based upon the real time status of the supply and demand for a particular currency.

It is a yet further object of the present invention to provide a computer based trading system that identifies one or more price over time patterns and, using known characteristics associated with market supply and demand, generating trading signals based thereupon.

A primary objective the invention disclosed herein is a system and methodology which effectively applies an objective set of rules that are aligned with the governing dynamics of supply and demand that works in any asset class (e.g. stocks, futures, Forex, options), in any market and in any timeframe.

The system and methodology of the present invention operate to generate trading signals based on identifying various trading patterns referred to as setups. When these setups are detected, and depending on the specific setup detected, a supply zone or demand zone is next generated which indicates the price range for the instrument in which a sell or buy trade signal should be issued. When the underlying instrument trades within this range, and under other appropriate conditions, a trading signal is issued which may be sent directly to the appropriate exchange for automatic execution and/or sent to a graphical user interface or other display which alerts a trader to the proposed trade.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is diagram depicting the major components of the system of the present invention in a preferred embodiment thereof;

4

FIG. 2 is a diagram illustrating the supply and demand relationship for an exemplary stock in an exemplary market in which that stock is traded;

FIG. 3 is a diagram illustrating price movement for an underlying instrument in which market conditions reflect supply exceeding demand;

FIG. 4 is a diagram illustrating price movement for an underlying instrument in which market conditions reflect demand exceeding supply;

FIG. 5 is a diagram illustrating the drop-base-rally setup of the present invention in a preferred embodiment thereof as well as action to be taken when such a setup is identified;

FIG. 6 is a diagram illustrating the rally-base-drop setup of the present invention in a preferred embodiment thereof as well as action to be taken when such a setup is identified;

FIG. 7 is a diagram illustrating the supply and demand zones of the present invention in a preferred embodiment including the proximal and distal lines associated therewith;

FIG. 8 is a diagram illustrating an exemplary drop-base-rally setup and an exemplary resulting demand zone which is created as a result thereof;

FIG. 9 is a diagram illustrating various options in constructing demand zones according to the present invention in a preferred embodiment thereof;

FIG. 10 is a diagram illustrating an exemplary rally-base-drop-setup and an exemplary resulting demand zone which is created as a result thereof;

FIG. 11 is a diagram illustrating various options in constructing supply zones according to the present invention in a preferred embodiment thereof; and

FIG. 12 is a flowchart illustrating the steps associated with the process of the present invention as may be executed by the system of the present invention in a preferred embodiment thereof.

## DETAILED DESCRIPTION OF THE INVENTION

With reference now to FIG. 1, the system of the present invention, in a preferred embodiment thereof, is now described. Trading System 100 is preferably a computer based system for implementing the functionality of the present invention as described in greater detail below. While an exemplary architecture is described, it will readily be understood by one of skill in the art, that an unlimited number of architectures and computing environments are possible while still remaining within the scope and spirit of the present invention.

Terminals 10 and 20 communicate with Trading System 100 via one of known methods. Examples include via an internet connection, hardwired, VPN, or on or more of various short range wireless technologies. Additional terminals beyond terminals 10 and 20 will typically also be in communication with Trading System 10 and 20 and the two terminals are shown merely as an example. Terminals 10 and 20 may comprise any of a variety of devices that allow a user to benefit from the trading methodologies and to access the system of the present invention. Terminals 10 and 20 will typically include an input means, a display and some level of internal processing capability. Examples of devices which might be employed as Terminals 10 and 20 include laptop computers, netbooks, smartphones, desktop computers and various other devices permitting user interaction with Trading System 100.

Terminals 10 and 20 as well as Trading System 100 preferably also communicate with brokerage trading platform 50 via one of the communication methods described above. Brokerage trading platform 50 comprises one or more of the

US 8,650,115 B1

5

trading platforms made available by one or more brokerage companies. Interaction between brokerage trading platform **50** and terminals **10** and **20** and Trading System **100** may be though one or more dedicated applications, APIs or other known methodologies that allow commands and data to be passed back and forth between and among brokerage trading platform **50**, Trading System **100** and terminals **10** and **20**. Brokerage trading platform **50** is typically a platform which allows users to place by and sell orders and other trading requests directly or indirectly with applicable exchanges and/ or markets. For example, brokerage trading platform may be operated by an online stock broker or financial institution such as those operated by the likes of Scottrade, Charles Schwab, Fidelity, E*TRADE, etc. These brokers may also be those that participate in markets other than equities such as those that permit access to commodities, futures, and currencies markets as well as others.

In this way, trading commands generated from Trading System **100** can be communicated to the applicable broker for execution on the applicable market(s). Further, reports such as execution and current position reports can be communicated back from brokerage trading platform **50** to one, both or all of user terminals **10** and **20** and Trading System **100**. Commands and requests for information to brokerage platform **50** may be issued by either or both of Trading System **100** and/or terminals **10** and **20**.

Turning now to Supply and Demand Trading System **100** and its various components, such components will now be described at a high level and then the specific functionality and processes relating to each of these components will be explained in further detail below. Trading System **100** is preferably implemented on a general purpose computing platform such as a server computer which has sufficient processing power and input/output capabilities to support multiple sessions with multiple users accessing Trading System **100** simultaneously. At the heart of this computing platform is central processor **200** which manages and executes all processes hereinafter described. User interface **210** serves to provide the interface between Trading System **100** and terminals **10** and **20**. This may include formatting data for transmission and display by user terminals **10** and **20** as well as receiving data from terminals **10** and **20** and formatting and/ or converting such data in a manner such that it is usable by Trading System **100**.

Trade signal generation functionality **290** represents a set of processes which collectively generate trading signals such as buy and sell signals which result from the execution of algorithms and processes which are resident within Trading System **100**, such algorithms and processes being described in detail below. Trade signals are generated by trade signal generation functionality **290** as and when commanded by central processor **200** and such signals are communicated to user interface **210** for further communication to user terminals **10** and **20** and possibly to brokerage trading platform, as applicable. So, for example, if a signal to buy a specific stock results from one of the processes resident within Trading System **100**, central processor **200** ensures that that signal is generated by trade signal generator **290** and communicated to one or more user terminals **10** and/or **20** (and/or others) for action. Thus, for example, a user may see that signal via a graphical user interface display on terminal **10** or **20** and then the user may manually act on that signal by buying the stock at the designated time and according to the designated conditions (explained below) via the user's broker whether online, via a call to the broker, via an email to the broker etc. Alternatively, the buy signal generated by trade signal generator **290** may be communicated directly by Trading System

6

**100** (or indirectly via user terminal **10** or **20**) to brokerage trading platform for automatic buy action without the need for user involvement or action.

Trading system **100** further preferably includes a number of functional components that execute the novel processes of the present invention which are designed to leverage information concerning supply and demand of various stocks, bonds and other vehicles which can be readily traded, to obtain profitable trading results. One of these components is buy setup engine **220** which employs the novel methodologies of the present invention to determine the price levels at which a security or other tradable instrument should be bought according to preferred embodiments of the present invention which are described in detail below. Similarly, sell setup engine **230** determines the price levels at which a security or other tradable instrument should be sold according to the teachings of the present invention in a preferred embodiment thereof. Supply zone generate functionality **250**, which is under the control of central processor **200**, generates a price level zone (range) in which supply and demand for a particular tradable instrument are out of balance in a way that the instrument should be sold since it is believed that an imminent price movement in the downward direction is expected. Further details about how this zone is determined, created and used according to the present invention, in a preferred embodiment, are provided below. Similarly, demand zone generate functionality **260** generates a price level zone (range) at which it is believed that supply and demand are out of balance in a way that a tradable instrument should be purchased since an imminent upwards price movement is expected.

Position size engine **270**, under the control of central processor **200**, may be optionally included within Trading System **100**. Position size engine **270** serves to determine, based upon a specific trader's available capital and risk tolerance, the recommended position which should be purchased and/or sold in connection with the trading signals which are generated by Trading System **100**.

Market data processing and conversion functionality **310** receives market data from one or more external sources and processes and formats this information so that it can be used by the other functional components of Trading System **100** such as buy setup engine **220** and sell setup engine **230**. Examples of such data include real time market feeds associated with a great many tradable instruments of interest to and/or currently being traded by users of Trading System **100**. For example this market data may comprise real time streaming data of price levels associated with various stocks, bonds, commodities, currencies, etc. as such data is made available by the relevant markets as well as third party data providers. In a preferred embodiment, this data represents the most accurate and current data available with respect to the tradable instruments so that signals generated by Trading System **100** are accurate, timely and actionable.

Now that the system of the present invention and its various components, in a preferred embodiment thereof, have been described, the novel teachings of the present invention with respect to the various methodologies employed to generate trading signals will now be discussed. With reference to FIG. **2**, a discussion with respect to the dynamics of supply and demand is now provided as the backdrop for the many novel aspects of the present invention. In this example, the market for ABC which is currently trading at $41.30 per share is illustrated in its initial state to the left of the leftmost arrow. In this state, there are 4 different willing buyers that each seek to buy 100 shares of ABC at a price of $41.30. Further, there are 2 willing sellers that each seek to buy 50 shares of ABC at a

EX 13
7673

US 8,650,115 B1

7

price of $41.30. Due to this equilibrium, willing buyers and sellers that are willing to buy and sell at the same price are matched either randomly or according to one or more predetermined exchange rule(s). In this case, the buyer represented by the top rectangle purchases 100 shares which are obtained from the two willing sellers that are each willing to sell 50 shares at the agreed upon price.

Instantaneously upon completion of the above buy/sell transaction, the market for ABC at a price of $41.30 shifts to that represented to the right of the leftmost arrow. Now, there remain three buyers each willing to purchase at $41.30 but no willing sellers at this price. As a result of this instantaneous market condition, and based on supply and demand, the price at which ABC can be purchased (ask) will go up. In particular, the ask price will go up to the price at which the seller at the now lowest price is willing to sell shares of ABC. This also tends to have the effect of causing the bid price (the price at which buyers are willing to buy ABC) to go up, though this is not always the case. The increase in bid following an increase in ask due to exhaustion of available shares at a previous price may be largely due to human nature (greed) in terms of a desire to purchase the shares (demand) at a higher price notwithstanding that the price at which shares can be purchased has gone up.

In other words, each and every candle (a representation of stock price movement over time) is created as a direct result of an ongoing demand and supply relationship associated with the applicable trading instrument. Order flow with respect to that instrument is thus driven by the demand and supply for that instrument which is based on perceived value, fear and greed. Further, it is important to note that the origin of motion or change in price is an equation where one of two competing forces (buyers and sellers) becomes zero at a specific price.

In order to apply the novel teachings of the present invention to real time trading markets it is critical to determine where and when market prices for instruments turn. With respect to demand, price turns higher at a price level where willing demand exceeds willing supply. With respect to supply, price turns lower at a price level where willing supply exceeds willing demand. Since the markets for tradable instruments are almost always a zero sum game, the trading system and methodologies of the present invention operate to determine these pricing turning points and leverage the human emotions of fear and greed of other competing traders to provide optimum trading results.

The system and method of the present invention leverages knowledge of supply and demand characteristics and expected future price movements based on those characteristics to indicate the optimum times at which an instrument should be purchased or sold. These times coincide with price turning points which are identified by the system and methodologies of the present invention. And further, these turning points occur at times when supply and demand are out of balance for the particular instrument being traded. It is at this point that the system of the present invention identifies low risk, high reward, high probability entry and exit points in the markets via the generation of trading signals by trade signal generator **290** which can either be acted upon manually or which cause automatic trades to be made via brokerage trading platform **50**.

Again, operating under the assumption that trading in most markets is a zero sum game (winners win at the expense of losers losing), it is important to identify the mistakes that other traders typically make in markets so that these can be exploited by Trading System **100**. The first mistake often made by novice traders is buying AFTER a rally in price and the second mistake also often made is buying at a price level

8

where supply EXCEEDS demand. These concepts are illustrated in FIG. **3**. In this figure, the price points between the two horizontal lines represent a market for the instrument in which supply exceeds demand. This is often the case after a rally in the instrument as shown by the rightmost four bars. In this case, there has been a rally in price to the point that there is more supply in the market than there is demand. This is often caused by large amounts of additional supply being added by professional traders at the higher price points. Notwithstanding that this is an inopportune time to buy, many novice traders do just that having seen the rally in the instrument recently occur. As will be discussed in greater detail below, Trading System **100**, using market data available to it, determines where these turning points are and rather than buying in a case where supply exceeds demand, as determined by Trading System **100**, a signal would instead be generated to sell the instrument.

With respect to selling, there are similarly two common mistakes made by novice sellers. These are selling AFTER a decline in price and selling at a level where demand EXCEEDS supply. This is illustrated in FIG. **4**. In this case, the price points between the two horizontal lines represent a market for the instrument in which demand exceeds supply. As can be seen in the figure, following three bars of steep downward price movement, the market gets to a point where demand exceeds supply. Often, novice traders will be selling at this point in time. Instead, Trading System **100** identifies market conditions such as they are and generates a buy signal rather than a sell signal.

Now that the underlying premises driving the strategies implemented by Trading System **100** have been described, the strategies, in a preferred embodiment thereof, will now be discussed. These strategies are largely defined by what are referred to herein as "set-ups" which are, in fact, the identification by Trading System **100** of market conditions which indicate that either a buy or sell transaction in a specific instrument should be made. The first set-up is referred to as a Demand Buy set-up. In this case, market data is received by market data processing and conversion component **310** under the control of central processor **200** and buy setup engine, which is constantly analyzing such market data, has detected one of these Demand Buy set-up conditions within the market for the instrument. This in turn causes a buy signal for the instrument to be generated by trade signal generator **290** and this signal is either communicated to one or more of user terminals **10** or **20** via user interface **210** or sent directly to brokerage trading platform **50** for execution.

FIG. **5** illustrates an example of a Demand Buy set-up as such might be detected by buy setup engine **220** according to a preferred embodiment. It will be understood and acknowledged by one of skill in the art that these specific market conditions are not exhaustive for when a buy set-up would occur. Further, the specific pattern detected is only one example of a setup which could be detected and exploited by the system of the present invention and the present invention is therefore not limited thereto. With reference to FIG. **5**, an exemplary buy set-up which is referred to as a "drop-base-rally" set-up is illustrated. In this case, there are a series of candles in the downward direction (drop), followed next by a demand condition (base) which demonstrates that the instrument is in a market condition at which demand is equal to supply, followed by higher prices for the instrument (rally) identifying the origin of market imbalance where demand exceeds supply. These market conditions are detected by buy setup engine **220** during the start of the rally phase of the setup and as such, trade signal generator **290** generates a buy signal

US 8,650,115 B1

9

which can be acted upon when price returns back to the demand zone where the system determines that demand exceeds supply.

The action which should be taken in the case where a drop-base-rally is identified by buy setup engine **220** is illustrated in the right chart in FIG. **5**. The drop-base-rally setup identifies the demand zone which serves as the entry zone for placing a buy order at the origin of the rally phase. The buy transaction (order) is executed when price revisits the identified demand zone. (a "buy retracement" as illustrated in the right chart). This market condition and its effects are explained in greater detail below. However, it is important to note, as is shown in FIG. **5**, that notwithstanding this retracement, it is expected that prices will continue to rise given the out of balance supply and demand relationship as had been previously identified.

Turning now to FIG. **6**, a similar discussion is provided with respect to a Supply Sell set-up which may be detected by sell setup engine **230** and acted upon by Trading System **100**. Once again, it will be understood and acknowledged by one of skill in the art that these specific market conditions are not exhaustive for when a sell set-up would occur. Further, the specific pattern detected is only one example of a setup which could be detected and exploited by the system of the present invention and the present invention is therefore not limited thereto. With reference to FIG. **6**, an exemplary sell set-up which is referred to as a "rally-base-drop" set-up is illustrated. In this case, there are a series of candles in the upward direction (rally), followed next by a supply condition (base) which demonstrates that the instrument is in a market condition at which supply is equal to demand, followed by lower prices for the instrument (drop) identifying the origin of a market imbalance where supply exceeds demand. These market conditions are detected by sell setup engine **230** during the start of the drop phase of the setup and as such, trade signal generator **290** generates a sell signal which can be acted upon when price returns back to the supply zone where the system determines that supply exceeds demand.

The action which should be taken in the case where a rally-base-drop is identified by sell setup engine **230** is illustrated in the right chart in FIG. **6**. The rally-base-drop setup identifies the supply zone which serves as the entry zone for placing a short sell order at the origin of the drop phase. The sell transaction (order) is executed when price revisits the identified supply zone (a "sell retracement" as illustrated in the right chart). This market condition and its effects are explained in greater detail below. However, it is important to note, as is shown in FIG. **6**, that notwithstanding this retracement, it is expected that prices will continue to drop given the out of balance supply and demand relationship as had been previously identified.

Now that various examples of trading patterns for buy and sell setups have been described, the following discussion provides further details concerning how these set ups are employed by the system of the present invention to generate trading signals. In particular, signals are largely based, as described above, on detecting a series of price points for an underlying instrument in which the price level represents an out of balance supply and demand condition. These price points are identified as being in "supply zones" and "demand zones". A detailed description of how these supply and demand zones are determined by supply zone generator **250** and demand zone generator **260** of the present invention, in preferred embodiments thereof, now follows.

Referring now to FIG. **7**, each of the supply and demand zones are now discussed including where they fall on the price chart according to the teachings of the present invention. It is

10

most basic sense, the supply and demand zones represent price ranges in which supply and demand for an underlying instrument is out of balance. In other words, it is believed that when an instrument's price falls within these zones that, in the case of a supply zone, supply exceeds demand and in the case of a demand zone, demand exceeds supply. According to the teachings of the present invention, when the price of an instrument trades within these zones, a sell or buy trade should be made given the expected future price movement.

While there is no guarantee that the price movement will actually occur in the future as expected, due to various other market forces and conditions including relatively infrequent market inefficiencies, it is believed that the trading signals generated by the present invention, based upon the use of the very powerful supply and demand relationships, represent low risk and high probability trades.

The supply zone is located above the current price of the underlying instrument and is comprised of two horizontal lines as they would appear on a price chart. The horizontal line which is at the lower price point and is closest to the current price is referred to as the proximal line and the higher price point line which is furthest away from the current price is referred to as the distal line. The price points within the range created by proximal and distal lines represent price points within the supply zone. With respect to the demand zone, the two lines are the proximal line which is closest to the current price (but below it) and at the higher price point and the distal line which is furthest from the current price and at the lower price point. The price points within this range represent price points within the demand zone.

Turning now to FIGS. **8** and **9**, the process for determining the demand zone according to the various preferred embodiments of the present invention is now described. In particular, demand zone generator **260** processes market data to determine the demand zone for a particular tradable instrument. In a preferred embodiment of the present invention, this processing as well as the reporting via generation of trade signals by trade signal generator **290** happens in real time or as close to real time as possible so that the trading signals can be most effectively executed in a way that enhances the chances for profitable trading.

The description of the determination of the demand zone including the placement of both the proximal and distal lines setting the boundaries thereof, is best understood through a discussion of an example of price movement in an instrument which is illustrated via a series of candles. It is presumed that one of skill in the art is well versed in the construction and use of Japanese candlestick charts, however a basic overview of the key aspects is now provided for convenience. With reference to FIG. **8**, a series of candles are presented which reflect the instrument's pricing over a particular set of time periods. For example, each candle may represent a time period of one minute, with the chart showing a price movement over a series of one minute periods (each represented by a single candle) for a total of eight minutes given the example of eight successive candles in FIG. **8**. Typically candles are made up of the body and the wicks. In this case, wicks are only shown for the third, fourth and fifth candles in time sequence.

The bodies (rectangular portion) represent the range of the opening and closing price, with the top of the body showing the open (if the instrument's price went down over the course of the relevant time period) and the bottom of the body showing the close (again, assuming the instrument's price went down over the course of the relevant time period. Alternatively, if the instrument's price increased over the course of the relevant time period, the top of the body will be the closing price for the time period and the bottom of the body will be the

EX 13
7675

US 8,650,115 B1

11

opening price for the time period. The wicks, which extend out from the body, reflect the range over the whole trading period with the top of the top wick representing the high price achieved for the time period and the bottom of the bottom wick representing the low price achieved for the time period. In one preferred embodiment of the present invention, the relevant time periods are very short, usually a minute or less so that rapid trades based on fast moving markets can be effectively made. Notwithstanding the foregoing, one unique advantage of the present invention is that it works regardless of the time period. Time periods ranging from a very short time (usually a minute or less) for rapid trading to longer time periods (usually daily and weekly candles) for swing and position trading and investing may be used while remaining within the scope and spirit of the present invention.

With that understanding and again referring to FIG. **8**, the drop-base-rally chart pattern is shown. Darker candles illustrate downward price movement during the relevant period (assume, for example, one minute intervals). Therefore the first two candles show two successive one minute periods where the price of the instrument was dropping (meaning that the opening price for each of these periods is at the top of the body and the closing price for that period is at the bottom of the body). Then, the third, fourth and fifth candles show a basing condition with the third and fifth candles showing smaller downward price movement during the period and the fourth candle showing a small upward price movement during the period. Next, the rally is illustrated by candles **6**, **7** and **8** which each reflect a significantly higher price at the end of the period as compared to the beginning of the period based on the lighter grey shading of the candle body.

According to a preferred embodiment of the present invention, the proximal line of the demand zone is drawn at the top of the basing candle bodies and the distal line is drawn at the bottom of the basing candle wicks. This is shown in FIG. **8** such that the proximal line is drawn at the top of the body of the fourth candle body and the distal line is drawn at the bottom of the bottom wick of the fourth candle body. This is the preferred methodology for generating the demand zone. However, FIG. **9** shows both this preferred methodology as well as alternate methodologies which may alternatively be used. In FIG. **9**, the middle chart shows the preferred methodology while the left chart shows the placement of the proximal line at the top of the highest basing candle wick and the right chart shows placement of the proximal line at the base of the lowest basing candle body. In all cases, it is preferred that the distal line is located at the bottom of the bottom wick of the lowest basing candle. Of course, as will be readily apparent to one of skill in the art, these and other rules for placement of the proximal and distal lines, which in turn define the demand zone, may also be used without departing from the scope and spirit of the present invention.

The determination of the supply zone according to a preferred embodiment of the present invention is similar to that which was just described for the determination of the demand zone. With reference to FIGS. **10** and **11**, this process is now described. Supply zone generator **250** generates the supply zone including the proximal and distal lines in much the same way as described with respect to the demand zone. In this case, the rally-base-drop pattern is identified by sell setup engine **230** and using the exemplary price pattern of FIG. **10**, the basing candles (3rd, 4th and 5th) are used to determine the distal and proximal lines for the supply zone, which as discussed above, determines where sell signals are generated by trade signal generator **290**.

With reference to FIG. **11**, in the supply zone case, the proximal line is located at the bottom of the lowest basing

12

candle body in a preferred embodiment of the present invention. Alternately, the proximal line may be located at the bottom of the lowest basing candle wick (left diagram) or at the top of the highest basing candle body (right diagram). With proximal and distal line placement, there are two primary principals at work. The size of the zone and the placement of the proximal line in relationship to the base of the zone. With respect to zone size, the bigger the zone, the better chance the order will meet entry and the trade will be executed, but also the greater amount of risk taken on. The smaller the zone, the lower the chances of order execution but the risk is minimal as well. With respect to proximal line placement, the closer the proximal line is placed to the current price, the better chance the order will be filled, but the potential profit margin is diminished. In all cases, it is preferable that the distal line be located at the top of the top wick of the highest basing candle body.

According to a preferred embodiment of the present invention, trades are triggered with respect to supply and demand zones according to one of three models. Other models are also possible. In a first model, known as a "limit entry", a sell limit order for a sell entry is placed just above the proximal line of the supply zone with a buy stop order also being placed just above the distal line. Similarly, a buy limit order is placed at the point just below the proximal line with a stop loss sell order also being placed just below the distal line of the demand zone.

A second model is known as a "zone entry". In this case, a sell limit or market order is placed when the price occurs anywhere within the supply zone. Again, it is preferably to also place a buy stop order just above the distal line of the supply zone. A limit or market sell short order may also or alternatively be placed when the price occurs anywhere inside the supply zone. With respect to the demand zone, a limit or market buy order is placed when the price occurs anywhere within the demand zone.

A third model is known as a "confirmation entry". In this case, a sell short order is placed when the price rallies into the supply zone first and is shorted when the price crosses below the proximal line of the supply zone. Further, a buy order is placed when the price drops into the demand zone first and the instrument is purchased when the price crosses above the proximal line.

According to these models, the limit entry has the following advantages:

1) Probability of meeting entry is the highest
2) It is typically a set and forget strategy

and suffers from the following disadvantages:

1) Higher risk than zone entry
2) Lower reward than zone entry
3) Greatest unknown, increasing chance of stopping out

The zone entry has the following advantages:

1) Risk is the lowest of entry types
2) Reward is greatest of entry types
3) Probability of meeting entry is higher than confirmation entry

and suffers from the following disadvantages:

1) Lower probability of meeting entry
2) Typically requires manual entry

The confirmation entry has the following advantages:

1) Risk is the same as limit entry
2) Reward is the same as limit entry
3) Less chance of stopping out

and suffers from the following disadvantages:

1) Lowest probability of meeting entry
2) Typically requires manual entry

**Attachment ZZE**

EX 13
7676

US 8,650,115 B1

13

As will be apparent to one of ordinary skill in the art, the above three models are merely exemplary as possible models for trade entry and exits and other models are possible while remaining within the scope and spirit of the present invention.

Another aspect of the present invention involves selection of the position size to be traded for a specific instrument according to a preferred embodiment. This may be, for example, the proposed number of shares of a stock to buy, sell or sell short. The proposed position size may be based on, for example, trading capital, existing positions, risk tolerance as well as other factors. According to the present invention, first the maximum risk amount is specified based on a percentage of available trading capital. For example, if the available trading capital is $100,000 and the risk percentage is 1%, then the maximum risk amount would be $1000. Next, the stop size is calculated. This is calculated by system **100** as the difference between the buy entry price point and the protective stop point. So, for example, if the buy entry price point is located at the proximal line of the demand zone (assume a price of $22.30) and the protective stop is located just below the distal line of the demand zone (assume a price of $21.90), then the stop size equals $0.40. At the next step, the maximum position size is calculate as the maximum risk amount divided by the stop size—in this example, $1000/0.40, or 2500 shares.

With reference now to FIG. **12**, a discussion of the high level steps undertaken by Trading System **100** in connection with monitoring markets and ultimately issuing trading signals, in a preferred embodiment thereof, is now provided. At step **510**, system **100** receives market data which is processed and formatted for use by market data processing and conversion functionality **310**. This market data may be data for any tradable instrument such as, and without limitation, a stock, bond, currency, commodity etc. Typically, the system of the present invention will be receiving and processing streams of market data for a number of instruments at any one time since multiple users may be accessing system **100** simultaneously and each of those users may themselves be interesting in trading multiple different instruments. It is important to note that system **100** may be implemented with respect to all trading instruments for any timeframe (high speed intraday to longer term investing) while still remaining within the spirit and scope of the present invention. At step **520**, both buy setup engine **220** and sell setup engine **230** process the market data as described above to identify the setups which may represent a trading opportunity.

Once a setup pattern for a particular instrument is identified by either buy setup engine **220** or sell setup engine **230**, either demand zone generator **260** or supply zone generator **250**, respectively, will next generate a demand zone or supply zone, respectively, representing the price range at which the trading opportunity exists as described above. Optionally, at step **540**, a position size associated with the proposed trade is determined as described above. Finally, at step **550**, once the market data indicates that price level for the specific instrument is within the supply zone or demand zone as described above, a trading signal is issued by trade signal generator **290** for proposed action. The trading signal may be issued directly to a brokerage trading platform **50** or to an exchange or other market and/or this signal may be provided to a user at a user terminal (**10** or **20**) via a graphical user interface which may be associated with one or more trading applications resident on the user terminal (**10** or **20**).

While particular embodiments of the present invention have been shown and described, it will be obvious to those skilled in the art that, based upon the teachings herein, changes and modifications may be made without departing from this invention and its broader aspects and, therefore, the

14

appended claims are to encompass within their scope all such changes and modifications as are within the true spirit and scope of this invention. Furthermore, it is to be understood that the invention is solely defined by the appended claims.

The invention claimed is:

**1**. A computer based trading system comprising:
a market data receiving and processing engine which receives pricing data associated with at least one tradable instrument;
at least one trade setup engine which identifies at least one predefined pricing pattern based upon said pricing data associated with said at least one tradable instrument;
at least one pricing zone generator which, upon indication from said at least one trade setup engine that a predefined pricing pattern has been identified, generates a pricing zone defined by proximal and distal price points; and
a trade signal generator which signals a trade recommendation following said generation of said pricing zone.

**2**. The trading system of claim **1** wherein said at least one trade setup engine comprises a buy setup engine.

**3**. The trading system of claim **1** wherein said at least one trade setup engine comprises a sell setup engine.

**4**. The trading system of claim **2** wherein said pricing zone generator generates a demand zone.

**5**. The trading system of claim **3** wherein said pricing zone generator generates a supply zone.

**6**. The trading system of claim **1** wherein said predefined pricing pattern comprises a drop-base-rally setup.

**7**. The trading system of claim **1** wherein said predefined pricing pattern comprises a rally-base-drop setup.

**8**. The trading system of claim **4** wherein said distal price point comprises the price point represented by the bottom of a basing candle wick.

**9**. The trading system of claim **5** wherein said distal price point comprises the price point represented by the top of a basing candle wick.

**10**. The trading system of claim **4** wherein said proximal price point comprises the price point at the top of the highest basing candle body.

**11**. The trading system of claim **5** wherein said proximal price point comprises the price point at the bottom of the lowest basing candle body.

**12**. The trading system of claim **1** wherein said trade signal generator signals a trade execution rather than a trade recommendation.

**13**. A method for generating trading signals comprising the steps of:
Receiving, via a trading system implemented on a computing platform, market data associated with at least one tradable instrument;
identifying, via the trading system, at least one predefined pricing pattern associated with said market data;
based upon the identification of said predefined pricing pattern, generating via the trading system a pricing zone defined by a proximal price point and a distal pricing point; and
generating, via the trading system, a trading signal indicating a recommended trade.

**14**. The method of claim **13** further comprising the step of communicating a trade execution request to a brokerage platform.

**15**. The method of claim **13** further comprising the step of communicating a trade execution request to a market exchange.

**16**. The method of claim **13** wherein said pricing zone comprises a demand zone.

**Attachment ZZE**

EX 13
7677

US 8,650,115 B1

15

16

**17**. The method of claim **13** wherein said pricing zone comprises a supply zone.

**18**. The method of claim **13** wherein said predefined pricing pattern comprises a drop-base-rally setup.

**19**. The method of claim **13** wherein said predefined pricing pattern comprises a rally-base-drop setup.

**20**. The method of claim **16** wherein said distal price point comprises the price point represented by the bottom of a basing candle wick.

**21**. The method of claim **17** wherein said distal price point comprises the price point represented by the top of a basing candle wick.

**22**. The trading system of claim **16** wherein said proximal price point comprises the price point at the top of the highest basing candle body.

**23**. The trading system of claim **17** wherein said proximal price point comprises the price point at the bottom of the lowest basing candle body.

\* \* \* \* \*

Sign in to My OTA    Create an Account

Search...

**FREE CLASS REGISTRATION**

WHY OTA?   LEARN ▾   ABOUT ▾   LOCATIONS   TOOLS ▾   CLIK

**MENU: NEWS**                                                        ▾

Free Class

Home  ›  About Us  ›  Press Releases  ›  April 15, 2013

# ONLINE TRADING ACADEMY NAMES SAM SEIDEN CHIEF EDUCATION OFFICER

## New Chief Education Officer Develops Core Trading Strategy to Benefit Online Trading Academy Students

**Irvine, CA, April 15, 2013** - Online Trading Academy has appointed Sam Seiden to the newly created position of Chief Education Officer. The role of the Chief Education Officer is to develop educational content for Online Trading Academy students that will help them achieve their goals for building long-term wealth and consistent income. The curriculum for on-campus courses, such as the foundational Pro-Trader Course and the Extended Learning Track (XLT) online program, also fall within Seiden's duties.

Seiden developed the Online Trading Academy's core curriculum which helps students understand how to identify real supply and demand levels in the market. For example, if the market declines from a supply level, the conventional buy and hold method of investing will not help the average individual investor. The skill of identifying market turning points and market moves through Online Trading Academy's patent-pending supply and demand strategy helps traders and investors logically understand when they should buy and sell.

"I believe that those who have the knowledge and power to improve the lives of others have the responsibility to do so," said Seiden, "My mission at Online Trading Academy is to deliver real-time, real-world financial educational content to help students succeed in any and all financial markets, whether there goal is consistent income or long term wealth."

Seiden has also been responsible for supporting Online Trading Academy's global network of over 30 financial education centers. He has also been responsible for creating the content for the multiple asset classes. In 2007, Seiden joined the Online Trading Academy team as an instructor and was quickly promoted to Director of Online Education. In 2010, he moved into the Director of Education role and then more recently was promoted to Chief Education Officer. Seiden's educational content has been awarded with the Forex Best Awards in 2011, 2012, and 2013 from FXstreet.com in categories including Best Educator, Best Education Content: "Lesson from the Pros", and Best Webinar. He is also a featured author, regular radio and TV guest and regular contributor to industry leading magazines. He began his career on the floor of the Chicago Mercantile Exchange more twenty years ago.

**Attachment ZZF**

EX 13
7679

To learn more about Seiden, please visit:
www.tradingacademy.com/franchise/leadership/sam-seiden.aspx.

**ABOUT ONLINE TRADING ACADEMY**

Online Trading Academy helps their students by revealing the truth about what it takes to become a successful trader or investor. Their core strategy enables traders and investors to identify market turning points before they happen, with a high degree of accuracy. Students learn under the guidance of experienced professionals in a hands-on, learn-by-doing classroom setting. In the Core Strategy course, students learn trading skills and then practice trading live, in the classroom, with Online Trading Academy's money, without paying commissions or risking their own capital.

Online Trading Academy offers professional instruction from experienced industry professionals, as well as a wide array of beneficial home study materials to supplement classroom study. Over 200,000 investors have experienced Online Trading Academy's Education with classroom locations that include: Atlanta, Austin, Baltimore, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Ft. Lauderdale, Houston, Irvine, Kansas City, Los Angeles, Milwaukee, Minneapolis, New York, Philadelphia, Phoenix, San Jose, Seattle, Secaucus, Stamford, Tampa and Washington D.C., plus international locations in Dubai, Jakarta, London, Mumbai, Singapore, Toronto and Vancouver. For more information, visit www.tradingacademy.com.



Join over 170,000 **Lessons from the Pros** readers. Get new articles delivered to your inbox weekly.

## Sign up for our award-winning newsletter

SUBSCRIBE NOW

| NETWORK | COMPANY |
|---|---|
| My OTA | Careers |
| OTA Tax Pros | Franchising |
| OTAcademy | Reviews |
| | Staff |

| LEGAL | SUPPORT |
|---|---|
| Privacy Policy | Contact Us |
| EU Privacy Notice | Site Map |
| Risk Disclosure | |

**Attachment ZZF**

Do Not Sell My Data



Copyright © 1998 - 2020 Online Trading Academy    17780 Fitch Suite 200, Irvine, CA 92614 USA

Free Class

**Attachment ZZF**

EX 13
7681

```
 1                    FEDERAL TRADE COMMISSION

 2

 3   IN THE MATTER OF:            )

 4   ONLINE TRADING ACADEMY       )  FILE NO:  1823175

 5   -------------------------    )

 6

 7                                Friday June 21st, 2019

 8

 9                                REESE MARKETOS, LLP

10                                750 North Saint Paul Street

11                                Suite 600

12                                Dallas, Texas   75201

13

14           The above-entitled matter came on for

15   investigational hearing, pursuant to civil investigative

16   demand, at 9:45 a.m.

17

18

19

20

21

22

23

24

25
```

**Attachment ZZG**

2

Hubbard

OTA Franchise Corporation                                    6/21/2019

```
 1                    A P P E A R A N C E S
 2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3         Tom Biesty, Esq.
 4         FEDERAL TRADE COMMISSION
 5         Constitution Center
 6         400 7th Street, N.W.
 7         Washington, D.C.  20024
 8         202.326.2836
 9         tbiesty@ftc.gov
10
11    ON BEHALF OF THE WITNESS:
12         Brett Rosenthal, Esq.
13         REESE MARKETOS
14         750 N. Saint Paul Street
15         Suite 600
16         Dallas, Texas  75201
17         214.382.9808
18         brett.rosenthal@rm-firm.com
19
20
21    ALSO PRESENT:
22         Rhonda Perkins, Hearing officer - FTC
23         Andrew Hudson - FTC
24         Henry Rodriguez - FTC
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
7683

3

Hubbard

OTA Franchise Corporation                                    6/21/2019

```
 1                    FEDERAL TRADE COMMISSION

 2                              INDEX
                                                         PAGE
 3    Appearances....................................    2

 4    Exhibit List...................................    4

 5    Proceedings....................................    6

 6    KEELEY HUBBARD:

 7         EXAMINATION BY MR. BIESTY.................    8

 8         EXAMINATION BY MR. ROSENTHAL..............   234

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7684

4

Hubbard

OTA Franchise Corporation                                        6/21/2019

```
 1                          EXHIBITS

 2

 3    NO.    DESCRIPTION                              PAGE

 4    43     Civil Investigated Demand Schedule.......   12

 5    44     E-mail thread, dated mid-September 2014,

 6           Bates KBH05973.........................   42

 7    45     Bates KBH17968.  E-mail thread from June

 8           2017...................................   56

 9    46     Bates KBH0070 through 71. Center Review..   64

10    47     Bates KBH04001 through 037.  Survey......   84

11    48     Bates KBH19431. E-mail thread from June

12           and July of 2015.......................   97

13    49     Bates KBH19508.  E-mail thread from June

14           of 2016................................  107

15    50     Bates KBH04290.  E-mail.................  121

16    51     Bates KBH12979.  E-mail thread from

17           September 2016.........................  124

18    52     Bates KBH05277.  E-mail.................  130

19    53     Bates KBH04062 through 04066.  E-mail

20           chain from October of 2018.............  144

21    54     Bates KBH04069.  E-mail.................  168

22    55     Bates KBH04070.  E-mail.................  177

23    56     Bates KBH04076 through 077.  E-mail.....  178

24    57     E-mail.................................  181

25    58     Bates KBH07658.  E-mail thread.........  205
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                        EX 13
7685

5

Hubbard

OTA Franchise Corporation                                    6/21/2019

```
1                              EXHIBITS

2

3   NO.     DESCRIPTION                                   PAGE

4   59      Bates KBH10045.  E-mail.................    208

5   60      Bates KBH08267.  E-mail from 8/1/15......   210

6   61      Bates KBH15362.  E-mail thread from

7           January 2017...........................     214

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Attachment ZZG**                                    EX 13
                                                      7686

6

Hubbard

OTA Franchise Corporation                          6/21/2019

```
 1                    P R O C E E D I N G S
 2              MS. PERKINS:  This proceeding will come
 3   to order.  This is the investigational hearing of Keeley
 4   Hubbard.  This investigational hearing is convened at
 5   9:45 a.m. on June 21st, 2019 at Reese Marketos, LLP, the
 6   office of Ms. Hubbard's attorney.  Located at 750 North
 7   St. Paul Street, Suite 600, in Dallas, Texas.
 8                    Appearing for the Federal Trade
 9   Commission are myself, Rhonda Perkins, as presiding
10   officer, and Thomas Biesty as commission counsel.
11   Appearing for Keeley Hubbard is her attorney Brett
12   Rosenthal.  FTC Attorney Andrew Hudson is appearing by
13   phone and FTC intern Henry Rodriguez is also attending
14   by phone.
15                    This proceeding is in relation to a
16   nonpublic commission investigation to determine whether
17   certain entities or persons are engaged in deceptive
18   acts or practices, including making false or
19   unsubstantiated earnings claims in connection with the
20   marketing and sell of trading and financial training
21   programs in violation of the FTC Act, 15 U.S.C. Section
22   45 and the Telemarketing Sales Rule, 16 CFR Part 310 and
23   whether commission action to obtain monetary relief
24   would be in the public's interest.
25                    The procedures which will be followed in
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7687

7

Hubbard

OTA Franchise Corporation                                        6/21/2019

1    this investigational hearing are outlined in the

2    Commission's Rules of Practice, specifically Part 2

3    Non-Adjudicated Procedures, Subpart A, which pertain to

4    investigations and investigational hearings beginning

5    with Section 2.1 through 2.14.

6              I would like to draw your attention to

7    Section 2.9 of these rules which provides, among other

8    things, that any person compelled to appear and testify

9    or produce documentary evidence may be accompanied,

10   represented, and advised by counsel according to Federal

11   Trade Commission Rules.

12             Representation by counsel in this hearing

13   will be in accordance with said Rules, as prescribed by

14   Section 2.9, Subparts B 1 through 5.  Attention is

15   invited to Title II of the Organized Crime Control Act

16   of 1970, Part 5, Title 18, U.S. Code Section 6001 SC.

17   Under this act, immunity from criminal prosecution can

18   be ordered only after the witness claims privilege

19   against self-incrimination and the Attorney General

20   approves the order of the agency.

21             The purpose of this proceeding is to

22   receive testimony under compulsory process in the form

23   of a civil investigative demand or CID issued by the

24   commission on May 14th, 2019 and dually served upon

25   Ms. Hubbard.  The original return date was extended to

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                   EX 13
                                                     7688

8

Hubbard

OTA Franchise Corporation                                      6/21/2019

1  today, June 21st, by a letter dated May 24th, 2019 from

2  Lois Greisman, Associate Director of the Division of

3  Marketing Practices.

4             The CID was authorized and issued

5  pursuant to Federal Trade Commission Resolution File

6  No. 0123145, dated April 1st, 2016 and Resolution File

7  No. 9923259, dated August 1st, 2016, which directs the

8  use of compulsory progress in nonpublic investigations.

9             In order to facilitated reference during

10 this hearing, I request that Federal Trade Commission

11 counsel place into the record as commissioned exhibit a

12 copy of the CID, including the Commission's resolution,

13 the specifications, and a cover letter to Ms. Hubbard.

14             With these announcements made, I turn the

15 proceeding over to Mr. Biesty.

16             MR. BIESTY:  Thank you.

17                  KEELEY HUBBARD,

18 having been first duly sworn, testified as follows:

19                  EXAMINATION

20 BY MR. BIESTY:

21    Q.   Good morning, Ms. Hubbard.

22    A.   Good morning.

23    Q.   We've at least spoken on the phone previously,

24 but I just introduced myself.  Again, my name is Tom

25 Biesty.  I'm a lawyer with the Federal Trade Commission.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                      EX 13
                                                        7689

23
Hubbard

OTA Franchise Corporation                                    6/21/2019

1    corporate center, you know, looking for previous sales
2    experience, consultative sales is a big -- I wouldn't
3    say a requirement, but, obviously, very important.
4    Culture has to be a good fit.
5         Q.   Can I ask you:  Consultative sales, what do
6    you mean by that?
7         A.   Relationship-type selling.  It's not a
8    transactional sale where it's, you know, like, you were
9    buying a water bottle or a car.  It was, you know,
10   really, building a relationship with a student to see if
11   it was the right fit for them or not.  Something that I
12   always emphasized with students is that trading
13   certainly isn't for everyone.  And we need to figure out
14   what your goals are and what you're trying to accomplish
15   to see if this even makes sense.
16        Q.   Now, in hiring an education counselor, is
17   experience in the securities field a requirement?
18        A.   No.
19        Q.   How about prior experience in providing
20   education counseling?
21        A.   It wasn't a requirement, but we did have a few
22   people that had come over from, like, University of
23   Phoenix type, you know, industries or companies.  But it
24   wasn't a requirement.
25        Q.   And just to delve a little bit further into

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
7690

29

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    centers that would have, like, an in-house instructor.
2    And I'm not sure if they were paid by that franchise
3    center or by corporate as part of the 1099 pool.
4         Q.    Now, you're familiar with a -- at least during
5    your time at Online Trading Academy when you were there,
6    of a one-day session and a three-day session?  And I'll
7    refer to them as the marketing timing preview and
8    marketing timing orientation.
9         A.    Yes.
10        Q.    Do I have that right?
11        A.    Yes.  There's a lot of names for it.
12        Q.    Now, did those two courses, which I understand
13   were the introduction courses, did those differentiate
14   at all between the franchisees and HQ centers?
15        A.    They're not supposed to.  There's a couple of
16   centers, one being Atlanta, where -- like, normally just
17   like you have the instructor pool, you also had an MTO
18   instructor pool where corporate would assign the
19   instructor for the orientation.  So I said MTO.  MTO
20   means market timing orientation.  So it's supposed to be
21   standardized, a slide deck presentation.
22              At some centers, like Atlanta, the owners
23   themselves they, kind of, do their own thing and do
24   their own orientation there.  They're supposed to be
25   standardized, but I don't know how much that is

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                       7691

30

Hubbard

OTA Franchise Corporation                                          6/21/2019

1    monitored either.

2         Q.   Okay.   Are you familiar with the Income &
3    Wealth Education Planner?

4         A.   Yes.

5         Q.   Can you describe what that is generally?

6         A.   So the -- it's a questionnaire, a form.  It's
7    four or five pages long with questions in there about
8    their current investing or trading experience.  You
9    know, how many years?  What asset classes?  Have they
10   traded?  What are their frustrations or successes with
11   their current investment strategy?  What are their
12   investment goals?  What type of investments do they
13   currently have?  IRAs?  401(k)s?  How committed are they
14   to, you know, getting on track to achieve their goals
15   financially?  And things like that.

16        Q.   Okay.  And that was a form that was provided
17   to them?

18        A.   Yeah.

19        Q.   And were they -- when I say they, the
20   prospective students -- were they required to fill that
21   out on their own or were they assisted in any way?

22        A.   They were required -- not required.  It was --
23   the process was:  They fill it out on their own with
24   their spouse, if they have one.  And then they would
25   have a meeting with the education counselor to discuss

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                      EX 13
                                                        7692

40

Hubbard

OTA Franchise Corporation                                     6/21/2019

1    want to be a part of something and they can afford it

2    and they're excited about it, then it's probably

3    somebody the academy would enroll.  But, again, me

4    personally, if they're older -- and for this guy in

5    particular, he wasn't in great health.  You know, he

6    didn't have a lot of money.  His wife had just passed

7    away.  In my mind, that's not a right thing to do for

8    something.  But I don't know if that's a systematic

9    thing.  I can't say that every education counselor

10   thinks that way.

11       Q.   Did you ever raise that up the food chain at

12   OTA as far as a possible revision to the process?

13   Taking into account age?

14       A.   I never talked about it with any of the

15   executives, more than just my own individual influence

16   that I had.  You know, just sales trainings and whether

17   it was online or that -- that one in person.  We would

18   have monthly sales forum where no matter what I was

19   teaching, I was reminding them that students come first

20   and doing the right thing by people.

21       Q.   How about a student's technological skills?

22   Was that something that was a requirement for entering

23   Online Trading Academy?

24       A.   No.

25       Q.   So, for example, if I never used a computer in

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

Hubbard

OTA Franchise Corporation                                    6/21/2019

1   my life, I -- it wouldn't be held against me as far as

2   signing up for Online Trading Academy?

3        A.   No, not systematically, but, again, I think it

4   depends on the center and the education counselor.  I

5   remember students that I had that were usually older and

6   had never used a computer.  And, you know, my advice to

7   them was:  I want to help you, but you need to go take a

8   computer course first and get a little more familiar

9   with this first before, you know, we enroll you in the

10  academy.

11       Q.   Again, as compared to the age issue, was that

12  something that you tried to move up the food chain at

13  Online Trading Academy?

14       A.   No.

15       Q.   Was there ever any concerns raised by other

16  executives concerning the -- that some students who may

17  lack technological skills were -- were still coming on

18  to the program?

19       A.   Not that I recall.  Unless it was something

20  that became a bigger issue where a student wanted to a

21  refund because they were overwhelmed or frustrated, then

22  an executive would probably hear about it.

23       Q.   We talked about elder citizens.  Was there any

24  minimum age limit for signing up at Online Trading

25  Academy?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7694

42

Hubbard

OTA Franchise Corporation                                        6/21/2019

```
 1        A.    You mean they had to be at least a certain
 2   age?  Like they couldn't be younger?
 3        Q.    Yeah, a minor signing up.  What was -- what
 4   was the cutoff at Online Trading Academy?
 5        A.    There wasn't a specific age.  I know that
 6   there's some students that I had heard about that were
 7   taking a course with their dad or their mom, and they
 8   were 12 or 13 years old.
 9        Q.    I'm terrible about keeping track of exhibit
10   numbers.
11              (Exhibit 44 marked.)
12        Q.    (BY MR. BIESTY)  So I've marked Plaintiff's
13   Exhibit No. 44.  Ms. Hubbard, why don't you take a look
14   at this.  I'm not going to ask you every single thing
15   that's printed here, but just familiarize yourself with
16   it.
17              (Witness reviews document.)
18        A.    Okay.
19        Q.    (BY MR. BIESTY)  Okay.  I've handed you an
20   e-mail thread, Ms. Hubbard, that is from mid-September
21   2014.  And you are copied on a number of these e-mails.
22   First of all, do you recall this thread at all,
23   Ms. Hubbard?
24        A.    Reading it, I vaguely remember.
25        Q.    All right.  I'm going to direct you to the
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                  EX 13
                                                    7695

43

Hubbard

OTA Franchise Corporation                                          6/21/2019

1    second page of the document.  At the bottom of that page

2    there's an e-mail from Leo Mirkin.

3                    MR. BIESTY:  And Brett, I'm going to

4    reference this as KBH05973.  KBH05973.  That is the

5    native document number in our system.  Again, I

6    apologize about the lack of the Bate stamp at the bottom

7    of the document.

8                    MR. ROSENTHAL:  No problem.  Thank you.

9         Q.   (BY MR. BIESTY)  Have you had a chance to read

10   Mr. Murkin's e-mail?

11        A.   Uh-huh.

12        Q.   How often would Online Trading Academy be

13   faced with situations such as this?

14        A.   I'm not sure.  It depends on, you know, the

15   center or, you know, the enrollment.  They could come

16   through every now and then.  This one in particular was

17   from the Worldwide Division, which at the time I was

18   kind of like a consultant to.  I didn't manage it

19   directly, but I would get these every now and then or

20   get copied on them.

21        Q.   Can I ask you:  What -- what is the Worldwide

22   Division?

23        A.   So there's franchisees and then there's

24   company-owned centers, which are typically physical

25   permanent locations.  The Worldwide Division would do

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                          EX 13
                                                             7696

44

Hubbard

OTA Franchise Corporation                                    6/21/2019

1   events in -- usually hotel rooms in cities where we

2   didn't have a center yet.  And that fell under that

3   umbrella.  It could be Honolulu.  At the time, Salt Lake

4   City.  Some of those markets since then have been sold

5   and there are physical campuses there.  But this

6   territory was in charge of basically everything that

7   wasn't a franchise or corporate center.

8        Q.   And what type of events would they put on?

9        A.   The same events as the marketing time preview

10  and the marketing time orientation.

11       Q.   And this is a bit of a diversion from the

12  e-mail, but how were -- if a student took a timing

13  orientation or preview at one of these Worldwide events,

14  how were they -- if they wanted to sign up, how were

15  they then fulfilled?

16       A.   So they could -- some of them had centers.

17  One that comes to mind is Sacramento, where it wasn't

18  like a permanently open facility.  You know, it was kind

19  of run part-time.  So there would be classes scheduled

20  there.

21            If it was a territory like a Honolulu

22  where we don't have a center and we typically aren't

23  fulfilling courses there, they would take their courses

24  online or they could take them at any of the campuses.

25  Like, they could fly to LA or Irvine and take them

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7697

45

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    there.  But a lot of those would be fulfilled online.

2        Q.    Now, if we look at -- to go back to

3    Mr. Murkin's e-mail.  On the last sentence -- the last

4    line, I should say, of the -- of that second page it

5    says, quote, (as read):  I have taken the loan from my

6    home equity to pay the OTA tuition and see no way to pay

7    it back from my social security benefits.  End quote.

8              Is it fair to say that if a student could

9    afford a program or was willing to finance it, OTA would

10   take them on?

11             MR. ROSENTHAL:  Objection, compound.

12       A.    Yes, if they were able to be financed.  But

13   there were guidelines at corporate centers where they

14   needed to be able to, you know, make their payment.

15   It's hard for me, in my mind, because I keep separating

16   what I would do as an education counselor or -- like, I

17   would never have ever enrolled, you know, this student.

18   And if it happened at one of my centers, I would have

19   said refund them immediately.  But most of my education

20   directors knew my guidelines of not taking advantage of

21   people.  But, you know, if -- yeah, if they could -- if

22   they could afford it, it's just:  How do you define

23   afford?

24       Q.    (BY MR. BIESTY)  Now, I understand you have

25   your personal guidelines.  But was there any overarching

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7698

74

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    understood.

2         Q.   And do you have any understanding of how once

3    they were hired and teaching, how instructors were

4    evaluated?

5         A.   Their -- I forget the name -- instructor

6    development management -- I believe Roger Best was one

7    of them.  Might still be one of them.  There were two

8    instructor development managers who were also

9    instructors, but their job was to evaluate and manage,

10   kind of, a team of instructors.

11        Q.   And best was the last name?

12        A.   Best, B-E-S-T.

13        Q.   And the first?

14        A.   Roger.

15        Q.   Roger.

16             And do you have any understanding of what

17   went into those evaluations?

18        A.   No.

19        Q.   Were you aware of any instructors ever being

20   terminated for failure to be active traders?

21        A.   Not that I remember for failure to be active

22   traders.  There's been -- I vaguely remember an

23   instructor or two that left and came back.  There's one

24   in particular.  Her name is Michelle Volmering.  And,

25   you know, this is what I was told.  I thought it was a

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                       7699

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    well-known rumor, but a lot of people knew that she was

2    trading student's money, which, you know, corporate says

3    that's not allowed.  She was trading their money and

4    lost a substantial amount of it.  And So Eyal ended up

5    having to pay the student back and reimburse them, but

6    she's still an instructor.

7        Q.    And that's Volmering?

8        A.    Yeah, I believe it's V-O-L-M-E-R-I-N-G.

9        Q.    Okay.

10       A.    And as far as I know, she's pretty much

11   in-house at the Atlanta campus.

12       Q.    Are you aware of any students -- excuse me.

13   Strike that.

14             Are you aware of any instructors that may

15   have been terminated for failure to be profitable?

16       A.    Not that I'm aware of.

17       Q.    And if I understand your testimony, it's your

18   understanding that -- that profitability was not

19   analyzed by OTA HQ for their instructors?

20       A.    Correct.  I began to learn that right before I

21   left and more so after I was gone.

22       Q.    Sticking with when you were there, how did you

23   begin to learn that?

24       A.    Sam Seiden.

25       Q.    And did OTA make representations that their

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

76

Hubbard

OTA Franchise Corporation                                        6/21/2019

1    instructors were active market participants?

2        A.   I remember them using the word "active

3    traders" in marketing or I vaguely remember a few, you

4    know, online type forums to the company of, you know,

5    the appropriate language that we needed to use, which

6    was "active traders."  But the understanding from the

7    education counselor level, and even things that I've

8    heard have been said, is, you know, the word

9    "professional traders" is used.  Successful traders is

10   used.

11       Q.   Okay.  So OTA did make representations that

12   their instructors were successful traders or market

13   participants?

14       A.   I don't remember it in marketing specifically.

15   I vaguely remember education counselors saying it or it

16   being implied in a market timing orientation instead of

17   the word "active."  There are some, you know, market

18   timing orientation instructors that would, you know, buy

19   the book, and they'd always use the word "active,"

20   but...

21       Q.   And did OTA hire students as instructors?

22       A.   Yes.

23       Q.   How often would they do that?

24       A.   There was a time when they began to expand the

25   instructor pool.  There weren't enough instructors to

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                   EX 13
                                                     7701

77

Hubbard

OTA Franchise Corporation                                      6/21/2019

1    meet the growth, you know, of the company.  So a lot of
2    those instructors, from my understanding, would pulled
3    from the student database.  And they were made aware of
4    them because they were really active in the XLTs.  The
5    XLTs were the online -- it was a mentoring program that
6    students would be in two to three times a week.  There
7    might be 2- to 300 students in there with an instructor.
8         Q.    Were you aware of any other criteria for
9    taking on a student as an instructor?
10        A.    No.
11        Q.    Do you understand how instructors were
12   compensated?
13        A.    The -- so the asset class instructors, right,
14   which are different than the market timing orientation
15   instructors, they were compensated on a daily rate,
16   which I believe was around $500 a day.
17        Q.    These were again?  I'm sorry.
18        A.    They call them asset class instructors.  So
19   fulfillment instructors.  They're different from market
20   timing orientation instructors.  So these were paid a
21   daily rate, and then a commission was introduced within
22   the last couple of years based on continuous education
23   sales.  So if a student was in a course and they only
24   enrolled in two programs, if the instructor could show
25   what's called the Mastermind Community -- which was the,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                       7702

78

Hubbard

OTA Franchise Corporation                                    6/21/2019

1   you know, typical upgrade from an existing student --
2   that they could see how the Mastermind Community could
3   help them accelerate their learning curve or, you know,
4   give them more tools and resources, then if they were to
5   upgrade while they're in that class, the instructor
6   would be paid a commission on the number of students
7   that enrolled.
8         Q.   So it's $500 a day?
9         A.   Somewhere around there, roughly.
10        Q.   Now, would the market -- would the one-day and
11   the three-day instructors be compensated on a different
12   scheme?
13        A.   They're more commissioned base.  The preview
14   presenters, from my knowledge -- and this is for
15   corporate centers -- were paid 2 percent of the market
16   timing orientation sales that their students eventually
17   went through.  So if they enrolled ten students from
18   their, you know, market timing preview that then ended
19   up in a market timing orientation a couple of weeks
20   later and they enrolled, they were paid 2 percent on
21   those enrolls.  The market timing orientation
22   instructors were paid 3 percent on the enrollment and
23   their three-day orientation.
24        Q.   And we discussed Mr. Fulkerson and
25   Mr. Jacobson having oversight over instructors.  Would

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7703

79

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    they -- would they have oversight only over the
2    fulfillment instructors?  Or would they also handle the
3    one- and three-day course instructors?
4          A.   So when Chuck Fulkerson was in charge, he was
5    in charge of everybody.  When Larry Jacobson was put in
6    charge, it was only the asset class instructors and
7    Darren Kimoto was in charge of the market timing
8    orientation instructors.
9          Q.   So that's the three-day course?
10         A.   Yes.
11         Q.   Okay.  Is there somebody for one day?
12         A.   At one time it was Shamus O'Connor, but for
13   the most part the preview instructors reported directly
14   into the owner or the sales manager at the center.  But
15   they have, kind of, like a coach -- you know, a sales
16   coach and that was Shamus O'Connor.  If it was corporate
17   centers and there was a person that would travel around,
18   then they would report directly into him.
19         Q.   And as far as your understanding, I think
20   we've discussed the criteria for hiring a fulfillment
21   instructor: active, profitable trader.  What about a
22   one- and three-day course instructor?  What -- do you
23   understand what criteria was used to hire those
24   individuals?
25         A.   So whenever the company transitioned the sales

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7704

80

Hubbard

OTA Franchise Corporation                                              6/21/2019

1    process, before there was this market timing

2    orientation, students would come into the preview and

3    their enrollment would be in -- directly into the course

4    strategy course.  There was no orientation period.  Some

5    centers it was the course strategy course plus XLT.  The

6    enrollment was 7- to 15,000 dollars.

7              Whenever the company transitioned over to

8    putting in this market timing orientation, they needed

9    instructors to teach it.  So they pulled from the asset

10   class instructor pool.  Taught them sales.  And a lot of

11   those instructors are who became market timing

12   orientation instructors.  I believe there's been a few

13   that were hired on after that that are -- that don't

14   teach asset classes.  And some of the instructors that

15   are really good at market timing orientation don't teach

16   the asset class anymore because they make more money on

17   orientations.

18             As far as preview presenters go, there's

19   some EC, education counselors, that would turn into

20   preview presenters.  As far as criteria goes, it's --

21   really it's based on their ability to deliver a good

22   presentation.

23    Q.    Okay.  Ms. Hubbard, what steps did OTA take in

24   tracking how their clients/students performed in their

25   trading in the markets?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7705

81

Hubbard

OTA Franchise Corporation                                            6/21/2019

1      A.   There wasn't any formal way of tracking that
2  whenever I was with the company, other than initiatives
3  or efforts to get testimonials from students.   Whether
4  it was a successful trade or, you know, they had a
5  successful story, corporate would encourage centers to,
6  you know, send those to corporate to be verified with
7  statements before, you know, they would use them in
8  marketing infomercials and stuff.
9      Q.   Leaving aside, you know, a solitary student
10  that may have one successful trade that exists, were
11  there any efforts at tracking on the long-term how
12  students were performing in the markets?
13      A.   Not that I'm aware of when I was there.   From
14  my understanding, there was a survey conducted after I
15  left.  I believe it was in June of last year.  That the
16  goal was to track student success and the net promoter
17  score.
18      Q.   Were there any discussions among executives at
19  OTA headquarters regarding the tracking of students'
20  long-term performance?
21      A.   Not that I'm aware of.  Sam always pushed for
22  student success and a focus on that, but there was no
23  discussion of tracking of it.
24      Q.   Were there ever any suggestions made that it
25  should be done?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

82

Hubbard

OTA Franchise Corporation                                    6/21/2019

1        A.   Not that I recall.

2        Q.   And on the flip side, were there any

3   suggestions that that's something that OTA shouldn't be

4   involved in?

5        A.   Not that I recall.  I remember there just

6   being a feeling of being very careful how things were

7   worded if you were going to survey the students.  But,

8   again, it was never done when I was at the company, so

9   -- yeah.

10       Q.   Now, you referenced a survey that was done

11  after you left.  Were you aware of any surveys performed

12  during your tenure?

13       A.   There was market research done for marketing.

14  I remember that.  It was a third-party company that did

15  it.  They had students go through the preview and the

16  market timing orientation.  We were able to sit behind,

17  you know, a glass wall and listen to their feedback and

18  how they felt about certain pieces of the process.  But

19  it wasn't related to actual student success or results.

20       Q.   Okay.  Those were one-day and three-day

21  students?

22       A.   Right.

23       Q.   Okay.  You aren't aware of any similar

24  exercises concerning students that had gone into the

25  more expensive coursework?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7707

83

Hubbard

OTA Franchise Corporation                                    6/21/2019

1      A.   Not that I'm aware of.  There were interviews
2  done of successful students to pull material for an
3  infomercial, but that's all I recall.
4      Q.   How were those successful students found?
5      A.   Typically they were identified inside the XLTs
6  or the Mastermind, you know, community.  The instructors
7  would say:  Hey, there's a guy that's been doing really
8  well in the markets or he says he's been doing really
9  well.  Certain centers would push up a testimonial and
10  say:  Hey, this guy has done well.
11      Q.   Now, these successful students that were used
12  in marketing, were they compensated at all for their
13  stories?
14      A.   Not that I'm aware of.  There -- with the
15  infomercial, I feel like I remember there was a
16  testimonial contest or some sort of a trip involved.  It
17  was, like, Disneyland or something local like that, but
18  not monetary compensation I'm aware of.
19      Q.   So a student that was involved in the
20  infomercial, as an example, or testimonial, they would
21  receive travel or a trip or some sort of --
22      A.   Something like that.  Every year there's an
23  international conference in October.  The whole company
24  would come together.  And there were a couple of years
25  where they would have a panel of, you know, students

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7708

84

Hubbard

OTA Franchise Corporation                                      6/21/2019

1    talking about their experience and success stories.  And
2    they were treated well.  I mean, taken, you know, as far
3    as I remember, like a Disneyland trip or something like
4    that.
5                   MR. BIESTY:  Can we go off the record for
6    just one second?
7                   (Discussion held off the record.)
8                   (Exhibit 47 marked.)
9         Q.   (BY MR. BIESTY)  Okay.  Ms. Hubbard, I'm going
10   to hand to you what has been marked as Plaintiff's
11   Exhibit 47.  It has a Bates range of KBH04001 through
12   037.  It's a double-sided document.  I apologize the
13   copy quality is not the finest.
14        A.   No worries.
15        Q.   We won't get into the minutia detail.
16                  (Witness reviews document.)
17        A.   Okay.
18        Q.   (BY MR. BIESTY)  Have you had a chance to just
19   flip through that?
20        A.   Yes.
21        Q.   Ms. Hubbard, do you recognize this document?
22        A.   I remember Sam talking about this at one
23   point.  I think I flipped through it.  I didn't really
24   look through the whole thing.  Sam, kind of, summarized
25   it to me of what -- what he found.  He must have

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7709

85

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    forwarded it to me.  I don't remember it.  But we talked
2    about it at one point.  I just can't remember if I
3    looked at it in his e-mail or if it was in mine.
4         Q.   And understanding your knowledge of it may be
5    limited -- well, this would have been conducted after
6    you left OTA?
7         A.   Uh-huh.
8         Q.   Did Online Trading Academy ever conduct a
9    survey such as this while you were employed with them?
10        A.   Not that I recall.  I remember them talking
11   about the net promoter score when I was there.  They
12   were bragging about it at conference or, you know,
13   getting everybody excited that it was really positive or
14   it was great.  So I'm sure there had to have been some
15   sort of survey conducted to get that promoter score.  I
16   may have been in those meetings or heard about it, but
17   it was primarily marketing that would have handled that.
18        Q.   You mentioned a conference.  Do you remember
19   when that conference was?
20        A.   It may have been -- I don't know exactly.
21   Yeah, I can't recall exactly.
22        Q.   Would that have been an internal OTA
23   conference?
24        A.   Yes.
25        Q.   Okay.  Were those a regular feature of working

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7710

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    at Online Trading Academy?

2          A.    Every year.  There was an international

3    conference in October.

4          Q.    International?

5          A.    Yeah.  International meaning all the franchise

6    owners, all employees, all corporate employees,

7    instructors.  UGA was there.  Trade Station partners.

8          Q.    And where would that be held?

9          A.    Irvine, California.

10         Q.    Okay.  Again, understanding that this was

11   after your tenure at Online Trading Academy, do you know

12   why this particular survey was commissioned?

13         A.    I don't recall exactly why.  All I remember

14   hearing about was the results.

15         Q.    Okay.  And I'll presume you don't, but let me

16   just ask the question.  Do you know if this was

17   conducted by an outside firm or was this done solely by

18   Online Trading Academy?

19         A.    I'm not sure.

20         Q.    Okay.  Let me turn you to Bates stamp No. 20.

21   And these are small numbers.  So these are in the bottom

22   corner.  You'll see down here those are the Bates

23   stamps.

24         A.    Got you.

25         Q.    And I'll just give you a second to take a look

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                          EX 13
                                            7711

87

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    at that.

2                   (Witness reviews document.)

3         A.   Okay.

4         Q.   (BY MR. BIESTY)   Okay.  And it has a title:

5    Making Money.  The first sentence states, (as read):

6    The majority of all students say they are not making

7    money.

8                   Do you see that?

9         A.   Uh-huh.

10        Q.   When you saw that or it was communicated to

11   you by Mr. Seiden, did that surprise you?

12        A.   Based on what I had heard about the education

13   being put into the hands of Larry Jacobson and just the

14   overall performance of, you know, the education

15   products, things like Pro Picks, ProActive Investor

16   portfolio, that those things were declining.  And the

17   more I learned about instructors that I thought were --

18   you know, Bob Dunn, I thought he was an incredible

19   trader.  It didn't surprise me after I learned those

20   things.

21        Q.   Okay.  You believed Mr. Dunn was an incredible

22   trader?

23        A.   When I was at OTA, yes.

24        Q.   Okay.  And when -- did your impression change?

25        A.   After I heard how difficult it was to get him

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
7712

88

Hubbard

OTA Franchise Corporation                                6/21/2019

1    to turn in a statement, yeah.

2        Q.   Why do you believe the transition to Larry

3    Jacobson had something to do with these results?

4        A.   From my understanding, Larry has one of the

5    biggest loans out from Eyal.  So Eyal was -- if an

6    employee fell on hard times and needed some money, you

7    know, he would loan employees money if they needed it.

8    And from my understanding, Larry was, you know, one of

9    the biggest loans from Eyal because he couldn't pay his

10   bills.  And a lot of the trades that he was taking, I

11   were told were on SIM mode, which was a simulated

12   account not real money.

13       Q.   Okay.

14       A.   I was also told that the education was

15   becoming -- they were complicating it.  So Sam felt that

16   his strategy was very simple.  And, you know, he's in

17   charge of the Mastermind students.  Those were the

18   students that had access to Sam.  And that they were

19   complaining that the other instructors were confusing

20   them.  Teaching different things.  And that it got worse

21   whenever it transitioned over to Larry and Steve.

22       Q.   You mentioned ProActive Investor --

23       A.   Uh-huh.

24       Q.   -- is that right?

25            What is -- what does that entail?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                EX 13
                                                  7713

89

Hubbard

OTA Franchise Corporation                                    6/21/2019

1         A.    So ProActive Investor, the program as a whole,
2    is the wealth management education.  So it's designed to
3    teach people how to manage their retirement accounts.
4         Q.    And if I understand your testimony, you
5    believe that was an issue at Online Trading Academy?
6         A.    From my understanding, once a man named Eric
7    Ochotnicki left -- I know.  O-C-H-O-T-N-I-C-K-I -- he
8    was in charge of -- for the most part that program, the
9    mentorship, the XLT.  And then there -- instead of Pro
10   Picks, which are a part of the educational program which
11   are educational trading ideas -- you know, buy/sell
12   signals -- the investor -- they call it a portfolio
13   where there is recommended buy and sells for retirement
14   accounts.  And that that performance had declined after
15   he left.
16        Q.    Okay.  So buy and sell recommendations are
17   made to individuals in those programs?
18        A.    Yes.
19        Q.    Okay.
20        A.    Corporate would phrase it as educational
21   trading ideas or investing ideas.  But, you know,
22   students are told you can trade along with the
23   instructor if you would like.  You can do it
24   un-simulated.  You don't have to take these trades.
25   But, you know, the instructor is talking about the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                        EX 13
                                                          7714

90

Hubbard

OTA Franchise Corporation                                        6/21/2019

1    markets and, you know, these are the positions that
2    we're in and those are tracked inside of a -- what they
3    called a tracked investor portfolio.
4         Q.   Was there any concern internally at Online
5    Trading Academy about buy and sell recommendations being
6    given to students?
7         A.   There were in how it was presented.  That they
8    had to be presented as educational trading ideas.
9         Q.   And who had concerns?
10        A.   Nicola, who is general counsel.
11             MR. ROSENTHAL:  I would just -- it's not
12   our privilege, but I would just -- you should not talk
13   about things that Nicola advised as a lawyer for OTA.
14             THE WITNESS:  Okay.
15             MR. BIESTY:  That's fine.
16        A.   I'm trying to think.  I mean, that's --
17   primarily her.
18        Q.   (BY MR. BIESTY)  Understanding again that you
19   are not an employee when this survey was conducted and
20   the results came out, do you know what the reaction
21   inside of Online Trading Academy was to -- to this
22   result?
23        A.   From what I was told, Eyal was upset about it.
24   And I believe Mike -- so Mike Richardson is the
25   president.  I don't know when he was made president.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7715

91

Hubbard

OTA Franchise Corporation                                      6/21/2019

1   But he was in that meeting as well.  And Eyal said
2   nobody could leave the room with these documents.  They
3   had to turn them in.  And he didn't want anybody
4   discussing it with franchise owners or -- you know, to
5   keep it quite.
6         Q.   Was there an understanding of a time period in
7   which students should be in the markets trading after a
8   certain time period?
9         A.   Learning, for example?
10        Q.   Correct.
11        A.   Not systemized or corporate-wise.  That I
12  recall there was no recommendation.  There were probably
13  some instructors that said you need to practice on, you
14  know, simulated mode.  Most of the classes were -- they
15  would practice on, you know, simulated accounts.  With
16  the exception of the course strategy course, they would
17  trade with real money.  Very small.  Like, ten shares.
18  I feel like that was, kind of, at the discretion of each
19  instructor.
20        Q.   And these -- in the courses that were taught,
21  the fulfillment courses, my limited understanding -- I
22  understand that some trades were done during these
23  courses.  Were those simulated trades or were those live
24  trades?
25        A.   By the instructor?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7716

92

Hubbard

OTA Franchise Corporation                                                6/21/2019

1          Q.    Correct.

2          A.    Depends.

3          Q.    Okay.

4          A.    Sometimes individual instructors would show

5     trades that they were in in their own accounts.  Other

6     instructors would trade on simulated.  Then there's --

7     so that's the center courses or online courses.  Where a

8     lot of trading activity took place was inside of the

9     XLTs, which was the online, kind of, mentorship program.

10    You know, put what you learn to work in the markets.

11    And I'm not sure if those were done on simulated or real

12    accounts.

13         Q.    Okay.  Was that up to the instructor whether

14    they did a simulated or live -- or their own money?

15         A.    I'm not sure.  I do know that corporate

16    provided Trade Station accounts for the instructors to

17    trade.  I do know there were some instructors that would

18    show their own trades in their own accounts.

19         Q.    Discussing about when a student should be

20    actually trading, as an education counselor, was there

21    an expectation by students that they would begin trading

22    in a relatively quick fashion?

23         A.    I'm not sure if that was set.  I know there's

24    some pretty rogue education counselors that -- you know,

25    one of them was on my team that we ended up terminating,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7717

Hubbard

OTA Franchise Corporation                                        6/21/2019

1    you know, because of things like that.  It was -- I
2    mean, it's really -- there's not really anybody managing
3    the education counselors' discussions, other than a
4    compliance hotline if somebody heard something, you
5    know, to say something or turn them in.  Risk management
6    was talked about a lot.  You know, if they were going to
7    start trading -- begin trading, you know, small share
8    size or contract size or managing your risk.
9         Q.    Let me have you turn to page No. 29.
10        A.    Okay.
11        Q.    Okay.  And this has a heading stating: Net
12   Promoter Score.  For the benefit of us big term folks,
13   what's a net promoter score?
14        A.    I wish I could explain it to you.  I don't
15   understand how it was measured.  A lot of these words
16   confuse me.  But my understanding from marketing was
17   that when we had a really good net promoter score, it
18   was as high as Harvard.  Meaning our students were
19   willing to recommend us to friends and family and our
20   rating was as high as students from Harvard.
21        Q.    And was this a score that -- or this -- we'll
22   call it a metric that was tracked at OTA?
23        A.    I'm not sure because I'm not sure how it's
24   tracked other than when they conducted the initial
25   survey, they found how it was really positive and then

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

94

Hubbard

OTA Franchise Corporation                                        6/21/2019

1    this one.

2         Q.   Did the score reflected in this survey

3    document surprise you?

4         A.   Not based on what I've heard about, you know,

5    just the decline of the education and, you know, the

6    instructors inside of XLT.  And just a lot of students

7    complained they were confused on conflicting, you know,

8    trading strategies.  And, again, most of the students

9    that were really happy or, you know, said that they were

10   doing well were inside of the Mastermind Community.

11        Q.   Was it your understanding that to become

12   successful you had to sign up for this Mastermind

13   program?

14        A.   It was never supposed to be communicated that

15   way.  Whether some education counselors said that or

16   not, I don't know.  Whether instructors inside of the

17   asset classes said that or not, I'm not sure.  What was

18   recommended was that companies said to students that if

19   you -- Mastermind Community is for students who want to

20   accelerate their learning curve.  It gives you more

21   tools and resources.

22             The supply and demand grid is one of

23   those.  So the supply and demand grid gives you turning

24   points in the market.  So buy and sell signals.

25             So the idea was, you know, you'll go

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
7719

95

Hubbard

OTA Franchise Corporation                                                6/21/2019

1   through these courses and, you know, either have to

2   learn, kind of, on your own practice how to identify

3   supply and demand zones or turning points in the market.

4   And you don't know if it's a good one or not versus the

5   Mastermind Community that being done for you.  And you

6   can compare what you're seeing in the markets to what

7   the professionals are seeing and, you know, learn from

8   there.

9        Q.   Do you know what reaction this engendered in

10  Online Trading Academy?  This particular result?

11       A.   The net promoter score?

12       Q.   Correct.

13       A.   From my understanding, all I heard was that

14  Eyal was not happy about it.

15       Q.   And if I understand your testimony, he, for

16  lack of a better term, quarantined this report?

17       A.   Yes.

18       Q.   To this day, do you understand if that

19  quarantined was ever lifted?

20       A.   I don't know.  I haven't seen him -- from my

21  understanding, Sam got this from asking one of the newer

22  vice presidents or directors:  Hey, can you send me a

23  copy of that?  And he just e-mailed it to him.

24       Q.   You can put that aside.  We'll go for about

25  another ten minutes and then break for lunch.


For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555


**Attachment ZZG**                                          EX 13
                                                            7720

96

Hubbard

OTA Franchise Corporation                                     6/21/2019

1              Ms. Hubbard, did Online Trading Academy

2    have a stated refund policy?

3         A.    In the enrollment agreement there was a -- I

4    believe a three-day policy where within three days if

5    they asked for a refund, then we would refund their

6    money.  That's really on the larger -- I believe it was

7    in both the enrollment agreement when somebody came to a

8    preview and they're spending $100 to maybe $300 and it's

9    all in the enrollment agreement or when they're, you

10   know, spending thousands of dollars.

11        Q.    Could refunds be given outside that policy?

12        A.    Yes.

13        Q.    Okay.  And stepping back for a second, were

14   there ever any complaints to Online Trading Academy from

15   individuals that purchased the more expensive programs,

16   that the three-day policy was inadequate?

17        A.    Yes.

18        Q.    And what was OTA's reaction to that?

19        A.    If they caused a big enough stink about it, it

20   would get escalated to Gene Longobardi.  Like, if

21   somebody mentioned I'm calling an attorney, that would

22   immediately get escalated.  It was usually sent to Gene,

23   and he would work with general counsel on that.  You

24   know, there was always an effort made to save the sale,

25   whether it was reducing their, you know -- taking them

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7721

97

Hubbard

OTA Franchise Corporation                                    6/21/2019

```
 1   from 30 grand to 20 grand.  Taking a program out they
 2   were unhappy with and substituting another one.  Setting
 3   up individual sessions with Sam.  But if students got
 4   really, really vocal and they were very concerned about
 5   online reviews, then they would refund.
 6       Q.   Were there any other circumstances that a
 7   refund was given?
 8       A.   There's some centers that would refund --
 9   well, are you speaking about the preview purchase or the
10   MTO purchase?
11       Q.   I'm actually thinking of the more big ticket
12   items.
13       A.   Okay.
14       Q.   Yeah, the fulfillment courses.
15       A.   Okay.  You said:  Are there any other...
16       Q.   Circumstances outside of that three-day form
17   refund policy that -- that -- that a refund would be
18   given?
19       A.   If a student demanded it and corporate felt
20   like it was a risk to the brand, then they would do it.
21       Q.   Okay.
22               (Exhibit 48 marked.)
23       Q.   (BY MR. BIESTY)  I'm going to hand you what
24   has been marked as Plaintiff's Exhibit No. 48,
25   Ms. Hubbard.  And this has a document No. KBH19431.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                       7722

98
Hubbard
OTA Franchise Corporation                                        6/21/2019

```
 1                    MR. ROSENTHAL:  19431?

 2                    MR. BIESTY:  Correct.

 3                    (Witness reviews document.)

 4          A.    Okay.

 5          Q.    (BY MR. BIESTY)  Okay.  This is an e-mail

 6     thread from June and July of 2015, Ms. Hubbard.  Do you

 7     recall this e-mail thread?

 8          A.    Yes.

 9          Q.    Okay.  And let me ask you:  We discussed

10     Mr. Seiden -- and I'm looking at the first e-mail in the

11     thread.  There's a -- I don't know how to pronounce.

12     That de Cupper...

13          A.    Loic de Cupper.  He's French.

14          Q.    Okay.  Loic de Cupper.  Who -- who is Mr. De

15     Cupper?

16          A.    He was an Education Director for Toronto.

17          Q.    Okay.  If we look at the bottom of that first

18     page, Ms. Hubbard, the e-mail from Kathy Sullivan on

19     July 7, 2015, with the subject of: Canceling my

20     training, Carlos Alvarez.  The first sentence of that

21     e-mail states, (as read):  We need to refund him and

22     have him sign settlements.  Not to go to blogs, et

23     cetera.

24                    Were students required to sign

25     settlements or releases to get refunds?
```

**Attachment ZZG**                          EX 13
7723

99

Hubbard

OTA Franchise Corporation                                      6/21/2019

1       A.   As far as I know, yes.

2       Q.   What if a student refused to sign a release?

3       A.   As far as my understanding goes, they wouldn't

4   get their refund.

5       Q.   Now, were students more likely to receive a

6   refund if they threatened legal action?

7       A.   Yes.  Or if one guy stood on the corner with a

8   big sign, he got a refund pretty fast.

9       Q.   Is that an actual --

10      A.   Like a big poster.

11      Q.   Please explain that.

12      A.   I don't know what the sign said.  It was right

13  when I came onto corporate.  I just remember they were

14  not happy because they had new potential students coming

15  into a preview driving up to this guy standing out on

16  the corner.  You know, OTA owes me 50 grand.

17      Q.   Where was this located?

18      A.   In Irvine.

19      Q.   And how about if a student threatened, say, a

20  negative online comment or posting something on social

21  media?

22      A.   Yeah, there was a lot of emphasis on online

23  reputation management.  We're all told that marketing is

24  not going to be efficient if we have bad Google and Yelp

25  reviews.  So that was always a concern.

**Attachment ZZG**                                    EX 13
                                                      7724

100

Hubbard

OTA Franchise Corporation                                          6/21/2019

1       Q.    So was it pretty much an automatic that they

2   would get the refund if they threatened to bring a

3   lawyer in or made a complaint?

4       A.    I would say yes.

5       Q.    And at the top of the first e-mail in this

6   e-mail thread, you state, (as read):  I think this is

7   proof of one of those under-the-table cash deals that

8   Mike and Ted were doing.

9             What do you mean by "under-the-table cash

10  deals"?

11      A.    So this -- before corporate started managing

12  the Toronto center, it was owned by a franchise --

13  franchisee.  It was actually owned by a brokerage house

14  named Questrade in Canada.

15      Q.    What was it called?

16      A.    Quest Trade.

17      Q.    Okay.

18      A.    And the two ECs that were there, Mike and Ted,

19  we had found some proof that they were selling deals and

20  taking cash for some of them.  All of them.  There was

21  no record of enrollment agreements, but students were

22  saying:  You know, I -- you know, this is what they

23  promised me or they promised -- overpromised, you know

24  what, their role was going to be in the -- to the

25  education counselor.  So there was some, I guess, repair

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7725

101

Hubbard

OTA Franchise Corporation                                   6/21/2019

1    that had to be done as the students came about and we
2    learned what was promised to them.
3         Q.   And what -- what does corporate taking over a
4    franchise entail?
5         A.   This center -- I believe Questrade sold their
6    center to corporate.  And so corporate would, at that
7    point, put in like an education director.  Sometimes
8    they were temporarily there until we could get somebody
9    permanent hired.  Education counselors, you know, and
10   operations managers were, kind of, transitioned until
11   they evaluated the staff to see if they wanted to keep
12   them, hire more, replace them.  There was certainly a
13   transition period.
14        Q.   Now, if a client received a refund from OTA,
15   let's say in the fulfillment course world, would an
16   instructor suffer any negative financial consequences?
17        A.   Not that I recall.  There were
18   conversations -- I remember it would upset Eyal because
19   of money that -- in corporate centers -- that would be
20   lost if the deal was refunded.  The education counselor
21   would take a hit on their commissions.  But as far as I
22   remember, the market timing orientation instructor and
23   the preview presenter would not.
24        Q.   So an education counselor would suffer some
25   financial consequences because of a refund?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
7726

102

Hubbard

OTA Franchise Corporation                                        6/21/2019

1       A.    Yes.  If they sold 100 grand this month and

2    they had 30,000 in cancellations, they were only paid on

3    a $70,000 commission basis.

4       Q.    Was there any time limit on -- if a student

5    asked for a refund a year after they signed up and, you

6    know, demanded a refund and threatened legal action and

7    got a refund, would the educational counselor still take

8    a hit on that?

9       A.    If it was still their student.  If it was a

10   previous education counselor and they just inherited

11   this student -- because students would be transferred in

12   the database to -- you know, education counselors would

13   have a group of existing students plus new students

14   they're enrolling.  So if it was previous student -- I'm

15   sorry -- a previous education counselor, they wouldn't.

16   But if it was their student from a year ago, yes.

17      Q.    Okay.  Why don't you put that aside, and why

18   don't we break for lunch.

19            MR. ROSENTHAL:  Sure.

20            (Recess held, 12:28 p.m. to 1:10 p.m. )

21      Q.    (BY MR. BIESTY)  Back on the record.

22   Ms. Hubbard, we were discussing before the break some of

23   the particulars about OTA's refund policy and how

24   refunds were given or the reasons they were given.  Were

25   refunds ever refused to consumers?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7727

103

Hubbard

OTA Franchise Corporation                                    6/21/2019

1      A.   I don't recall specific situations.   Initially
2   refused, probably.  And, again, if they caused a big
3   enough fuss about it, went to an attorney, threatened
4   something, they would get a refund.
5      Q.   So if -- in those circumstances if they did
6   threaten legal action, online comments, you wouldn't
7   refuse the refund?
8      A.   At corporate.  Franchisees, I think it was a
9   little bit more difficult for them to, you know, refund
10   even 10 grand.  They're pretty tight month to month.  So
11   I don't know what their policies are.
12      Q.   When we were discussing OTA's fulfillment
13   instructors and their need to be -- your understanding
14   you thought they needed to be both active and successful
15   traders, you were discussing, as I understand, some of
16   the market timing/market orientation classes that there
17   may have been some comments made either by the
18   instructor or an education counselor that they were
19   successful traders.  Do you recall any specific
20   instances where that happened?
21      A.   No, not specifically.  Usually it was implied.
22   Like, if a student would say:  If you're so good at
23   trading or if these instructors are so good at trading,
24   why would they teach?  And, you know, a lot of the
25   responses from the instructors or the education

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7728

Hubbard

OTA Franchise Corporation                                        6/21/2019

1    counselors would say:  Well, they really love to give

2    back or -- which is true, you know, for some of them.

3    Or they would say:  Well, teaching makes me a better

4    trader because it holds me accountable to, you know,

5    what I'm teaching you in my own rules.

6         Q.   Now, were those answers dictated to the

7    instructors?  Was that a company line?

8         A.   No.  I mean, it was given as suggestions to

9    the education counselors.  When trying to explain it, I

10   specifically meant -- remember Gene Longobardi, you

11   know, talking about that.  My father was an instructor

12   at one point when we owned the franchise.  And after

13   that -- and that was his reason, you know.  It made him

14   a better trader and he loved teaching.

15        Q.   Mr. Longobardi did suggest those -- those sort

16   of patented responses though?

17        A.   Yes, and reinfor- -- I mean, reinforced them.

18   I don't know if it originated from him, but reinforced

19   it.  I remember him going around to instructors asking

20   them:  Why do you teach?  Just so education counselors

21   could hear from the instructor to get talk tracks or

22   reasons to give to students in case they asked those

23   questions.  And I remember him doing it in the training

24   that was done at corporate every six weeks.  He would

25   speak for the first, usually, hour of the training and,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

105

Hubbard

OTA Franchise Corporation                                              6/21/2019

1    kind of, kick it off.

2          Q.    And these were instructors for the one- and

3    three-day classes?

4          A.    Initially.  And then they started putting any

5    employees that came on board through the same training.

6          Q.    Okay.  The one that was held every six weeks?

7          A.    Right.

8          Q.    Okay.  Discussing the survey that we talked

9    about a few minutes ago, I think that was Exhibit 48.  I

10   could be wrong -- or 47.

11                      MR. ROSENTHAL:  48.

12                      MR. BIESTY:  48, okay.

13         Q.    (BY MR. BIESTY)  The meeting that occurred

14   that you were informed about, where I was describing it

15   as the reports being quarantined, I believe you

16   testified that Mr. Seiden was not at that particular

17   meeting.

18         A.    He was at the meeting.

19         Q.    Okay.  Oh, he was at the meeting.  Oh, he was.

20   Okay.

21                      Because I understood that you -- you had

22   said he had gotten an e-mail -- he had gotten the report

23   e-mailed to him.  Am I correct?

24         A.    My understanding is that there were physical

25   copies given out at the meeting.  The physical meeting.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7730

Hubbard

OTA Franchise Corporation                                                    6/21/2019

```
 1    And those copies were taken up while everybody left.
 2    And Sam was very concerned about student success
 3    declining.  And for him, you know, this was proof of it,
 4    and he wanted a copy of it.
 5              So he e-mailed -- I don't know if he
 6    e-mailed or he asked one of the new VPs or directors.
 7    And, you know, I think these directors didn't know
 8    better.  I mean, he -- they were like:  Well, it's Sam
 9    Seiden.  He's asking for it.  I'll give it to him.  Even
10    though Eyal didn't want anybody to have it.
11        Q.   So do you -- did Mr. Seiden communicate to
12    you, beyond Mr. Shahar and himself being at the meeting,
13    who else was there?
14        A.   Jeremy Nosek was there.  Mike Richardson,
15    who's the president.
16        Q.   What is Mr. Richardson's role as the
17    president?
18        A.   I don't know because he was made the president
19    after I left.  When I was still there is when he first
20    came on as a consultant.  And he was teaching what he
21    calls an agile -- it's like leadership training.  So
22    Eyal brought him on to do that and eventually hired him
23    full-time.
24        Q.   And as far as you understand, he's still the
25    president of --
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7731

107

Hubbard

OTA Franchise Corporation                                    6/21/2019

```
 1      A.   Yes.
 2      Q.   -- Online Trading Academy?  Okay.
 3           MR. ROSENTHAL:  That's Jeremy Richardson?
 4           THE WITNESS:  Mike.
 5           MR. ROSENTHAL:  Mike.
 6           THE WITNESS:  Mike, yeah.
 7           (Exhibit 49 marked.)
 8      Q.   (BY MR. BIESTY)  Okay.  I'm going to hand to
 9  you what is Exhibit 49.  And just for the record, this
10  is document KBH19508.
11           (Witness reviews document.)
12      A.   Okay.
13      Q.   (BY MR. BIESTY)  Okay.  I've handed you
14  another e-mail thread, Ms. Hubbard, that is from June of
15  2016.  Do you recall these e-mails?
16      A.   Yes.
17      Q.   Okay.  I'm going to draw your attention first
18  to page 3 of the e-mail.  And this is an e-mail from
19  Nick to Michael Kingsbury.  In the second paragraph of
20  that e-mail, Nick states, (as read):  As we've
21  discussed, I'm very unsatisfied with the results of the
22  OTA training.  There was no earning or learning value in
23  the Forex Pro Picks.  In a nutshell, I do not believe
24  that the OTA methods can produce consistent profitable
25  results.  No one has shown me otherwise.
```

**Attachment ZZG**                                    EX 13
                                                      7732

143

Hubbard

OTA Franchise Corporation                                          6/21/2019

1   and to your teammates on your team, so...

2        Q.   And you understand him to be -- he was engaged

3   in some side deal?

4        A.   Rumors of it, before he ever came on board

5   with corporate.

6        Q.   Okay.  Earlier we were discussing Mr. Sam

7   Seiden.  And you gave his title a little while ago.  I'm

8   going to ask you again to tell me what his role was at

9   Online Trading Academy during your tenure.

10       A.   He was vice -- I can't remember when he was

11  promoted to chief officer and what my title was during

12  that time.  But when I reported into him, he was Chief

13  Education Products and Services Officer.

14       Q.   And you report -- why would you have reported

15  into him?

16       A.   He was in charge of education, but also in

17  charge of sales for the network.

18       Q.   Who -- to your understanding, who did he

19  report to?

20       A.   Eyal.

21       Q.   Directly to the --

22       A.   Uh-huh.

23       Q.   -- owner of the company?

24       A.   Yes.

25       Q.   And his title was vice president?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7733

149

Hubbard

OTA Franchise Corporation                                    6/21/2019

1        Q.    And when you reference Steve and Larry --
2    correct me if I'm wrong -- but I'm going to assume
3    that's Steve Albin?
4        A.    Yes.
5        Q.    And Larry Jacobson?
6        A.    Yes.
7        Q.    And what were those two gentlemen's
8    relationship to Mr. Seiden professionally at OTA prior
9    to his being moved out of being in charge of education?
10       A.    They reported into him.
11       Q.    Okay.  Beyond the being pushed out of being in
12   charge of education, were there any other decisions that
13   Eyal made, according to Mr. Seiden, that compromised
14   student success?
15       A.    Not that I know specifically.  I believe he's
16   probably referencing the survey that was conducted.  And
17   even though he found out that students weren't making
18   money, he didn't make any changes in the education
19   department to fix it or put Sam back in charge.  I think
20   at one point, later in the fall, you know, Eyal wanted
21   him to go in there and fix everything.
22            And Sam was mad because Eyal -- there
23   were issues with them financially, with what Eyal owed
24   him in money.  And Sam felt like:  You took this away
25   from me and now it's a big mess and you want me to fix

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7734

150

Hubbard

OTA Franchise Corporation                                              6/21/2019

1    it and you're taking money away from me.  So he wasn't

2    excited about that, which is what led to him wanting to

3    leave.

4        Q.   Okay.  And the second letter on that page is a

5    letter to OTA students.  When it's referenced OTA

6    students, how large of a body of individuals are we

7    talking about here?  When we say the OTA students, are

8    we talking about the entire student body?

9        A.   Yes, that had purchased anything more than,

10   like, the orientation.  So they went through the

11   orientation.  They enrolled.  Whether it was 7,000 or

12   80, they were considered a student.

13       Q.   So Mr. Seiden was contemplating contacting

14   each of those students that went beyond the --

15       A.   No, because he wouldn't have had access to the

16   database.  The plan was to put it on social media.  So

17   students when they were looking why he left, they would

18   at least get his letter of reasons for it.

19       Q.   If you turn the page, we'll see another

20   letter.  This is a demand letter.  And just the

21   beginning of that -- and there's some red lining here.

22   Some editing that I believe Mr. Whitney did in reviewing

23   the document.

24            But there's a statement:  Given the

25   decline in student success.  And I'm wondering, to your

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                        EX 13
                                                          7735

151

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    knowledge, what is the basis for that statement?

2         A.    From my understanding, the survey.

3         Q.    Was there any other sources of information

4    concerning this statement of the decline of student

5    success?

6         A.    System had mentioned XLT performance, Pro

7    Picks performance, and the ProActive investor report

8    portfolio performance.  I'm just not sure how those were

9    tracked.

10        Q.    On the next line there's a statement:  And an

11   increase in questionable selling tactics.

12             MR. ROSENTHAL:  I'm sorry.  Where are you

13   reading?

14             MR. BIESTY:  Oh, I'm sorry.  This is the

15   second page.  Right there (indicating).

16             MR. ROSENTHAL:  Oh, got you.

17        Q.    (BY MR. BIESTY)  There's -- that statement

18   again is:  There's an increase in questionable selling

19   tactics.

20             What did you understand Mr. Seiden to

21   mean with that phrase "increase in questionable selling

22   tactics"?

23        A.    From my recollection, there was a spreadsheet

24   that came out of the Denver center that one of the

25   education counselors there had created.  That basically

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7736

152

Hubbard

OTA Franchise Corporation                                           6/21/2019

1    took some aspect of Pro Picks and simulated:  If you had
2    taken all these trades, here's how much money you could
3    make on this size of an account.  And I can't remember
4    if it was a $5,000 account or a $10,000 account, but it
5    was very unrealistic.
6              And from my understanding, that
7    spreadsheet had made it into Darren Kimoto's hands, who
8    is in charge of the MTO instructors.  And I don't know
9    if he had presented it an MTO in Irvine or if he had
10   distributed it to, you know, other instructors to start
11   using as well.  But that's the one thing I remember that
12   Sam was referencing.
13        Q.   The Denver center, was that a HQ-owned center?
14        A.   No.  Franchise.
15        Q.   Okay.
16        A.   I think he's generally or broadly talking
17   about things that maybe are being said or happening in
18   franchise centers, you know, that's not being
19   controlled.  He went to centers a lot.  So he may have
20   -- I don't know if he heard, you know, ECs saying things
21   that were not compliant or...
22        Q.   Now, would have Mr. Shahar or in a more
23   general sense OTA HQ have any authority over what was
24   said at the franchises by education counselors?
25        A.   If they heard about it, they could, you know,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                          EX 13
7737

153

Hubbard

OTA Franchise Corporation                                                    6/21/2019

1    call an owner or, you know, have a discussion with an EC

2    and say:  That's not complaint.  But they -- from my

3    understanding, they could not terminate a franchisee's

4    employee.

5         Q.   To your understanding, this spreadsheet --

6    let's call it the Denver spreadsheet.  The Denver

7    spreadsheet did -- did the executives at OTA HQ have any

8    knowledge of that spreadsheet?

9         A.   I don't think so.  Because right when we found

10   out about it was pretty close to when he decided to

11   leave.

12        Q.   Is it a thing that you don't know or just --

13   when you say he was getting to ready to leave --

14        A.   I remember Sam holding on to it wanting to

15   give Eyal the impression that there's a lot of things

16   that you're not aware of that are happening, but not

17   tell him exactly what it is.

18        Q.   And as far as Mr. Kimoto, your understanding

19   what it is, is that he did not take a negative stance

20   towards this Denver spreadsheet?

21        A.   I don't know what his stance was.  What I

22   heard was that he was using it as an example -- like

23   hypothetical example.

24        Q.   Okay.  But your understanding was he was

25   taking this document and -- and showing it to

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

154

Hubbard

OTA Franchise Corporation                                              6/21/2019

1    prospective students?

2         A.   Yes.

3         Q.   Do you have any knowledge as to what currently

4    is the status of the Denver spreadsheet?

5         A.   I'm not sure.

6         Q.   Okay.  So that concern: questionable selling

7    tactics.  Is there any other examples you can think of?

8         A.   Sam had concerns about how, like, success was

9    being measured, but this was -- this was after he left.

10   So Steve Albin and Larry were in charge of the supply

11   and demand grid, which is basically a tool inside of the

12   Mastermind Community that gives buy and sell signals.

13   And his concerns are that the way that they're measuring

14   success is, in his opinion, misleading to say:  Okay,

15   this trade -- you know, this many trades worked out or

16   did not work out.  And they've changed the metrics where

17   I believe when Sam and another instructor named Jasmine

18   Wang, who is not with the company anymore, were in

19   charge of putting the levels out there -- right, these

20   buy and sell signals -- that they would measure the

21   success of this tool based on: a trade had to reach a

22   two-to-one reward-to-risk ratio to be considered a

23   winning trade.

24             And my understanding is that Sam said

25   they had changed it to less than one-to-one.  So if a

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7739

155

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    trade went in a positive direction, they're saying:  Oh,

2    it was a winning trade, which is not how the company

3    teaches reward-to-risk ratios in managing risk.  So I

4    think I remember him talking about those things being

5    discussed before he left, and recently that was his

6    concern that those discussions were had.  Not that it's

7    been shown to students yet, but those were the

8    conversations that were being had about how to measure

9    performance of education tools.

10       Q.   Now, this -- this daily grid that you just

11   referenced, as far as being shown -- is that something

12   that's shown to students?  The daily grid?

13       A.   So it's -- if they're a Mastermind student,

14   they have access to it.  But it's used in the sales

15   process for continuous education sales and also at the

16   MTO of:  Here are successful trades that have been

17   taken.

18       Q.   So if I'm summarizing this correctly,

19   Mr. Seiden was concerned that the metrics of what is a

20   successful daily grid had been degraded in his eyes?

21       A.   That's his concern now.  Because he's still --

22   when he was at the company -- sorry, I disconnected it.

23   It made me think of that.  He said that recently to me.

24            But when he was at OTA before he left, he

25   was still in charge -- he wasn't in charge of education,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
7740

156

Hubbard

OTA Franchise Corporation                              6/21/2019

1    but he was responsible for the supply and demand grid

2    with Jasmine, and then he would do Mastermind mentoring

3    sessions every morning.

4         Q.   And this -- Ms. Wang, she -- what was her role

5    at OTA?

6         A.   I believe she was just titled instructor, but

7    she was Mastermind Community instructor.  And she was

8    responsible for generating the supply and demand grid

9    levels every day.

10        Q.   And as I understand it, you said she's no

11   longer with the company?

12        A.   Correct.

13        Q.   Do you know where Ms. Wang is currently

14   employed?

15        A.   I think she is just trading for herself, is

16   what she said when she left.

17        Q.   When did she leave?

18        A.   Like three or four days after Sam quit.

19        Q.   Do you know where she's located?

20        A.   I think she's in New Jersey.  I know she's on

21   the east coast.

22        Q.   Okay.  If we turn to page 3 of this document,

23   Ms. Hubbard, there's -- there's a statement here near

24   the top of the page -- there's a bullet point that

25   starts:  2010, Eyal.  And then there's a more indented

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                          EX 13
                                            7741

157

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    bullet that states -- and it's regarding reducing

2    Mr. Seiden's income.  It states that, (as read):  It

3    would help OTA's bottom line profitability and

4    accelerate the exit/sell of OTA.

5              What does that mean to accelerate the

6    exit sell of OTA?

7        A.   That's the way Eyal pitched it to Sam.  That's

8    his way of reducing his compensation.  When Sam first

9    came on with the company, he was paid based on XLT

10   sales.  So corporate basically sells XLTs to franchises,

11   and it's one of the largest sources of revenue for Eyal.

12   So they pay franchise fees.  3 percent marketing fee.

13   There's about 13 percent in royalties and marketing fees

14   plus they have to purchase XLTs and online courses from

15   corporate.  So Sam was paid on based on XLT sales.

16              And because -- when he first came on with

17   the company, he was able to grow that program.  Students

18   loved his, you know, futures XLT.  Eyal told him:  I'll

19   pay you X amount.  I think it was over $600 for every

20   XLT that sold.  Well, as the company really boomed and

21   grew, you know, Sam's income was huge .  And so Eyal

22   said:  Instead of paying you this income, why don't

23   we -- I'll pay you double what you would have made

24   whenever the company sells.  But if we keep -- you know,

25   instead of me paying this big salary now, let's put it

**Attachment ZZG**                                    EX 13
                                                      7742

158

Hubbard

OTA Franchise Corporation                                    6/21/2019

1   back in the company.  Grow it.  And then whenever we

2   sell it, then you'll get paid that number.  That number

3   just kept growing.

4        Q.   And as I understand it, the XLT is an online

5   course that's presented?

6        A.   Yeah.  It stands for Extended Learning Track.

7   It's like mentoring, you know, sessions or lessons and

8   also, like, live application in the markets.

9        Q.   And both -- although there's only one class, a

10  HQ student and a franchisee student, if the franchise

11  pays, can attend those courses?

12       A.   Yes.  All the students are mixed together in

13  those.

14       Q.   And conceivably, you could have hundreds of

15  students at those classes?

16       A.   Uh-huh.  Sam's -- from what I've been told,

17  his morning session that he still conducts now has close

18  to a thousand.  He has the largest one.  It's Mastermind

19  Community.  I think the other XLTs are a few hundred.

20       Q.   Okay.  If we go further down that page, there

21  will be a heading:  Negative impact and results of

22  removing Sam's leadership from education

23  products/services.

24            The first bullet point, (as read):  Gross

25  revenue has increased.  There's plenty of proof that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                          EX 13
7743

159

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    student success has never been lower.

2                As far as the student success never been

3    lower, what's the proof of that?

4        A.   He's referring to the survey.  He had also

5    mentioned -- you know, he used -- he'd say:  I used to

6    always get a bunch of testimonials.  Like, they would

7    just come in from students of:  Hey, I'm doing great.  I

8    made this much money.  Or on track to replace my income.

9    And he said that those, you know, had stopped and he

10   just never really saw them anymore.  But I believe the

11   proof -- specific proof was the survey.

12       Q.   Inflated and misleading sales metrics without

13   profit/loss proof in company-owned centers, what did you

14   understand him to be referring to there?

15       A.   I believe that whenever we wrote this, we were

16   referring to company-owned centers.  Eyal would have a

17   big push for growth on company-owned centers, and he'd

18   want the franchisees to model his growth and what he was

19   doing.  So he would say:  Irvine is competing with

20   Atlanta.  He always wanted to beat Atlanta because

21   Atlanta was the No. 2=1 franchise and it was just his

22   thing, he had to beat Atlanta.

23               So Irvine was one of the biggest, you

24   know, centers for company owned.  And he would -- the

25   reason Sam is saying this is because they may have 1.2

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

160

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    million in sales, but they spent so much in marketing
2    that the true P&L -- if a franchisee was running it,
3    they would be losing money.  But he's saying that to the
4    franchise owners.  He's saying follow my model.  Look
5    how much I'm growing these centers.
6              When I left, Aaron Neilson was put in
7    charge of the company-owned centers.
8        Q.    As well as being the CFO?
9        A.    And HR and in charge of all the broker
10   partnerships.
11       Q.    Okay.  And we, again, have decline of -- of
12   education, product results, and decline of student
13   success with proof.  And then we have several bullet
14   points beneath that.  Student surveys conducted.  Do you
15   believe he's referring to there, again, the survey that
16   we looked at?
17       A.    Yes.
18       Q.    Okay.  The net promoter score, I presume that
19   is what we looked at earlier today too?
20       A.    Correct.
21       Q.    ProActive investor portfolio performance, I
22   think we touched upon that earlier?
23       A.    Yes.
24       Q.    Okay.  Pro Picks performance.  Then there's L
25   -- XLT instructor performance.  What did you understand

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                  EX 13
                                                    7745

161

Hubbard

OTA Franchise Corporation                                          6/21/2019

1   him to mean there?

2       A.   He said that they would track the trades that

3   instructors would put out in these sessions and how well

4   they did.  And he said they were declining.

5       Q.   And if I understand correctly, those could

6   have been either real trades or simulated trades?

7       A.   Correct.  I don't know if they were required

8   to be real or simulated.

9       Q.   Okay.  It also states:  XLT student

10  significant attendance decline.  And he would know about

11  the attendance decline how?

12      A.   They would keep track of, you know, the

13  numbers inside of the XLTs.  And, I mean, apparently I

14  think it had gone down significantly of:  There used to

15  be a lot of students in them, and it just trickled off

16  whenever they felt the instructors -- they didn't want

17  to attend a specific session because they didn't like

18  that instructor's training style or they were confused

19  by it.

20      Q.   If we turn to the next page, Ms. Hubbard,

21  there is a bullet -- the first bold bullet point.

22  Unethical and deceptive sales messaging.  And beneath

23  that it says:  In centers, including company owned.

24            Do you understand what he's referring to

25  there?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7746

162

Hubbard

OTA Franchise Corporation                                    6/21/2019

1        A.    I believe it's the Denver spreadsheet that's
2   being used.
3        Q.    Okay.  And then there's a statement:
4   Instructors, lack of statements, proof of active, and
5   profitable trading.  And if you could explain that a
6   little bit, please.
7        A.    He's referring to -- like I had mentioned
8   earlier -- that not -- even though they'd say we
9   require -- you know, because I've heard education
10  counselors say this.  Well, we require instructors to
11  turn in their statements.  That's how we vet them to
12  make sure they're active and successful.  And that
13  wasn't the case.  And there were even some instructors
14  that didn't turn in their statements at all.  Bob Dunn
15  being one of them.  Where they said:  Just open an
16  account and take one round trip trade so we can satisfy
17  the requirements.
18            I've heard recently that they're
19  requiring more -- this is very recent.  That they're
20  requiring instructors to turn in all of their -- not all
21  their statements, but at least -- say I've got this much
22  money at each of these brokerage houses, but that
23  profitable training, I believe, only has to be -- as
24  long as the account is profitable.  Even a dollar above,
25  you know, where they started.  But, I mean, that could

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7747

163

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    be -- I don't know if that's correct or not.

2         Q.   And how recent would that be, to your

3    knowledge?

4         A.   The last few months.

5         Q.   Okay.  We go into surveys of student success.

6    (As read):  Surveys taken immediately after a first --

7    after a student's first course are posted on OTA's home

8    page.

9              What does -- what does that mean?

10        A.   So if you go to the trading academy website,

11   there's a big --- I don't know if it's a banner, but it

12   has, like, this many thousand reviews.  And it will say

13   4.7 or 8 or whatever that number is.  And those are

14   typically -- from my understanding whenever I was there,

15   those were polled from students taking their courses and

16   centers.

17             They'd take a course strategy course for

18   the first time.  They'd evaluate the course and the

19   instructor, and then that would funnel into these

20   results that would populate on the website.  The same

21   thing if they took futures, Forex.  You know, there

22   would be a couple of students in there that were

23   retaking classes.  But from my understanding, that's

24   primarily where the surveys would come from.

25        Q.   And that's immediately after the course is

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                       7748

164

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    taken?

2        A.    They do it on-site usually on the last day of

3    class.

4        Q.    Do you think that's an accurate indication of

5    student success?

6        A.    No.  I think it's satisfaction.  Did you like

7    the course?  But in my opinion, they can't be successful

8    if they just learned, you know, even what long and short

9    means and buy and sell in the markets, and they're not

10   really trading yet.

11       Q.    Okay.  When he said -- when this states:  True

12   student success results months and their education is

13   hidden from owners, students, and the public, what is

14   that referring to?

15       A.    The survey.  From my understanding, Eyal

16   wanted to make sure that nobody knew about it, not even

17   the owners.  You know, they at some point, months later,

18   tried to -- they started formulating new questions for a

19   new survey that was going to go out.

20       Q.    What did you understand about the new

21   questions for a survey?

22       A.    I remember seeing them because we had at some

23   point pulled them and screenshots and looked at them.

24   And it's almost like what Sam said they're asking him to

25   do now, which is -- it's like changing the question so

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7749

165

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    you can get the answer that you want.  So instead of

2    saying:  Are you profitable?  Are you successful?  The

3    question that he's being asked to send a link to the

4    students in the Mastermind Community is:  Click on this

5    link and tell us how OTA has changed your life.

6              So you get a bunch of positive stuff, but

7    it's not a true assessment of, you know, success or

8    failure and actually learning how to trade, in my

9    opinion.

10       Q.   And your understanding is that is -- those

11   questions are formulated to engender those responses?

12       A.   It looks that way when you -- when you -- when

13   you look at the timing of the survey done in June and

14   then the new survey questions that they were, you know,

15   formulating a few months later and then what's happening

16   now with just trying to get a bunch of positive

17   testimonials.

18       Q.   And if we look at the next bullet it is:

19   Social media company reputation management.  It states,

20   the next bullet, (as read):  Incentivize instructors and

21   staff to post about the company and/or product on social

22   media.

23              What do you understand this to mean?

24       A.   There was a big push -- probably a couple of

25   years ago -- to all franchisees and corporate centers

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7750

171

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    talking to Eyal and Gene about the state of the
2    franchise and needing to get out of it.  And Gene said
3    to my mother, Katie, this is -- you know, Austin is just
4    not a viable market.  And she said:  Well, then why did
5    you sell it to us?
6              So I did call him out on some of that
7    stuff.  That you know, I had been running Austin under
8    Worldwide and it still wasn't profitable, and he was
9    wanting to sell these centers to other franchise owners.
10   So I think he tried to make it sound like:  Oh, you
11   know, she just has a grudge, but it had nothing to do
12   with that.  You know, if I had a grudge, I wouldn't have
13   worked for him.  It was more so me calling him out on
14   things that, in my opinion, were not right.  He said:
15   Keeley, you can't be so black and white.  And I said:
16   Well, to me the truth is black and white.
17       Q.   Do you recall any specifics that you called
18   him out on?
19       A.   There was one -- I can't remember what the
20   issue was, but he laughed and he said something like:
21   Well, we could just position it as this.  And I said:
22   Yeah, but that would be a lie.  You know, so I would
23   always -- I wouldn't let him get away with statements
24   like that.
25              I'm trying to remember -- so at one point

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                              EX 13
                                                7751

172

Hubbard

OTA Franchise Corporation                              6/21/2019

```
1    there's a program.  At one point it was just the stock
2    program, is what students would go into and --
3    initially.  That's what they'd start their education
4    with and a course strategy.  And he wanted to -- I'm
5    trying to figure out how to explain this without getting
6    complex.
7                     So if student didn't have a lot of money
8    and they could only afford their $14,000 program, I
9    really pushed for:  That $14,000 program needed to
10   include the Forex market.  Because it didn't make sense
11   for them to learn stocks when they wouldn't be able to
12   afford to trade stocks because they didn't have enough
13   money to trade stocks.
14                    And he and I butted heads on that quite a
15   bit.  And he was insistent on, you know, students
16   starting in -- within the stock market.  And I just -- I
17   pushed back on that a lot.  Because I knew from dealing
18   with students that it doesn't make them since for them
19   to spend $14,000 and not be able to trade because they
20   haven't learned the market they really need to learn.
21   So I was always pushing for:  How do we work that into
22   their program?  Even if it's getting them the Forex
23   course for free and include it in there, we need to find
24   way to help these people.
25                    There were -- other little things were
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                      EX 13
                                                        7752

173
Hubbard
OTA Franchise Corporation                                    6/21/2019

1    more just how he would spin things or -- it's like the
2    tuition rebate.  It's, like, well, I'm not lying.  It's,
3    like, yeah, but it's misleading to people.
4         Q.    And how did he take your -- your comments?
5         A.    He wouldn't push back on me because nobody
6    ever called him out in meetings.  And I did it
7    respectfully, but he wouldn't push back.  It was kind of
8    a -- I felt this -- he didn't like me, but he couldn't
9    get rid of me because I was loved by the whole network.
10   Yeah, I mean, he -- he would always say differently.
11   Even now he would say:  Oh, no, I wish you the best.
12   Love you dearly.  But that's not the things that he said
13   to Sam that Sam told me, so...
14        Q.    All right.  Let's look at the bottom of this
15   e-mail.  There's a statement:  What Keeley can do, with
16   a number of bullet points.  And the first one is:  Call
17   seven regulating bodies and their number of agencies.
18   My agency, the Federal Trade Commission, being one of
19   them.
20               Where -- how was this list of to do items
21   generated?
22        A.    Whenever Sam left --
23               MR. ROSENTHAL:  Wait hold on.  Objection,
24   mischaracterizes the document.
25        A.    So whenever Sam left OTA, Eyal said to him:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

186

Hubbard

OTA Franchise Corporation                                      6/21/2019

1    and marketing is represented compared to the surveys

2    that were conducted.

3          Q.    Okay.

4          A.    They see a lot of testimonials and successful

5    trades.  But the other side isn't shown or, you know,

6    the truth of what happened in a survey, that people

7    aren't making money.

8          Q.    Sitting here today, are you saying that the

9    testimonials that were presented in marketing,

10   infomercials, et cetera, weren't representative of

11   actual student performance?

12         A.    I was told that they were and that this -- the

13   testimonials of people that would actually speak on the

14   infomercial had been validated with statements.  But

15   there's a lot in the sales process of individual trades.

16   Like, here's a successful trade that, you know, was

17   taken.  Where a student says I made $2,500 in this

18   trade, but are you doing that once a month?  Is it

19   consistent?  Where are your losses?  You know, that type

20   of thing where it's not -- it's highlighting individual

21   things and not seeing the whole picture.

22         Q.    Okay.  A little further on, (as read):  The

23   CEO is hiding from the franchise owner/students and

24   trying to get new answers from surveys to explain the

25   cover up.

**Attachment ZZG**                                    EX 13
                                                      7754

187

Hubbard

OTA Franchise Corporation                                        6/21/2019

1              The statement: trying to get new answers
2       from surveys to explain the cover up, just refer --
3       you're referring in that sentence to...
4          A.   The survey that was taken in June.  What I had
5       learned from Sam -- and at some point I had a number of
6       screenshots of some of those questions that we were, you
7       know, looking through.  I can't remember exactly what
8       the questions were or how they were phrased, but you
9       could tell they were phrased in a way to get a positive
10      result.  And that the survey that was taken in June was
11      not being shown to franchise owners.
12         Q.   Just a little bit further down, (as read):  We
13      have received tons of e-mails from students complaining
14      they are being charged 180 percent by UGA.
15             I presume that was 18 percent?
16         A.   Yes.
17         Q.   Okay.  (As read):  And that's how they finance
18      getting students the initial 20k, but convince them to
19      learn more, taking on another 18 to 20k at 18 percent
20      financing.
21             What are you referring to when you're
22      stating:  They convince them to learn more taking on
23      another 18 to 20k?
24         A.   Once I had seen the survey showing that very
25      few students were making money, if any, and the ones

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                        EX 13
                                                          7755

188

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    that were were in Mastermind Community -- that's what

2    I'm referring to.  That students, you know, pay 20 grand

3    to join the academy, but they're not in education

4    products that are proven to be successful or performing.

5    And for them to get into Mastermind Community and have

6    access to Sam and those tools, they've got to invest

7    another 20/25 grand.  And most Mastermind students were

8    invested at least usually 40 grand to get in there.

9    Some more.

10       Q.   And you state, (as read):  They have endless

11   deceptive sales practices.

12            What did you mean by that?

13       A.   Thinking back, it's probably the -- that

14   spreadsheet from Denver.  Things like the rebate.  Just

15   the way things are spun.  It's, like, they're not

16   outright lies.  It's just -- it's twisted in a way to

17   create a perception that I believe is dishonest.

18       Q.   How about the marketing, such as the

19   infomercials and radio spots that I -- let's step back.

20   You know, we'll save that.  You can put this aside.

21            MR. BIESTY:  We've been going about an

22   hour and 15 minutes.  Let's take a short break and come

23   back.

24            (Recess held, 3:32 p.m. to 3:43 p.m.)

25       Q.   (BY MR. BIESTY)  We've touched on this several

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                       7756

200

Hubbard

OTA Franchise Corporation                                       6/21/2019

1   were taken down.

2        Q.    And you could post positive comments?

3        A.    Yes.  Yeah, you can post positive reviews.  A

4   lot of times a disgruntled employee would post a

5   negative review, and it would be escalated to Anita or

6   Drew.  And it would many times disappear.

7        Q.    Was Mr. Shahar made aware of OTA clients who

8   had difficulties regarding financing issues?

9        A.    I don't know about specifics.  More so:  What

10  was the status of the billing portfolio and what were

11  cancellation rates?  He was big on that.  What are the

12  cancellation rates and the default rates?  Getting those

13  reduced.

14       Q.    And would he receive reports on those -- to

15  those rates?

16       A.    Yes.

17       Q.    Now, we've talked quite a bit about consumer

18  refunds today.  Was Mr. Shahar's approval required for a

19  refund to be given to a client?

20       A.    Not that I recall.  When it was company-owned

21  centers, it was usually managed at the center level.

22  The Education Director could refund a student.  If

23  somehow it got tangled up with UGA and it was a purchase

24  contract, then it would go to Aaron and we would have to

25  figure out how to -- how to deal with that since UGA had

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**

EX 13
7757

201

Hubbard

OTA Franchise Corporation                                                        6/21/2019

1    already purchased a contract.

2        Q.   Would there be any limit on an Education

3    Director at a center's ability to give a refund?  A

4    dollar limit per se?

5        A.   No, not that I'm aware of.  But there was

6    heavy sales pressure.  So to refund hurt, you know, the

7    monthly numbers for sure.  It was never -- it was never

8    told don't refund or don't refund more than this.  It

9    was:  Do everything you can to save the sale and get the

10   student happy.

11       Q.   And would Mr. Shahar be given a report

12   regarding those refund levels?

13       A.   Yes.  They were all -- there were so many

14   reports.  Everything was tracked with, you know, the

15   stats of the corporate centers.

16       Q.   Okay.

17       A.   Mike Kingsbury did keep, you know, his own --

18   I think his log of how many deals he was able to save

19   versus refunds.

20       Q.   What was Mr. Longobardi's authority at Online

21   Trading Academy?

22       A.   There's mixed opinions on that.  That's kind

23   of hard to figure that out.  He's a COO, but he had no

24   discretion over, like, my centers.  He was really

25   supposed to be, you know, franchisee.  Take care of the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                              EX 13
7758

202

Hubbard

OTA Franchise Corporation                                        6/21/2019

1   franchise owners.  Manage Mark Patrick and his team.

2            When I left, I believe he was managing

3   OTA Tax Pros, which is a smaller division at the

4   company.  But as far as authority, I don't think he had

5   a ton of direct reports.

6       Q.   How about in regards to entering into

7   contracts on behalf of UTA -- OTA?  Did Mr. Longobardi

8   have authority to do that?

9       A.   Not that I'm aware of.  Anything that involved

10  money, Eyal was typically involved, whether it was

11  relationship with brokers.  Compensation being paid.

12  Eyal was -- very, very closely watched his money.

13      Q.   Did Mr. Longobardi have any role in setting

14  compensation for OTA employees?

15      A.   He had opinions on it with my centers or

16  education directors, but it was ultimately Eyal who made

17  the decision.  If it was somebody on his team, like Mark

18  Patrick or the franchise support managers or somebody in

19  Tax Pros, he would -- you know, if he needed to give

20  somebody a raise or change their compensation, he would

21  always have to take it to Eyal.

22      Q.   Was there anybody outside of Mr. Shahar at OTA

23  that would have the authority to make compensation

24  decisions?

25      A.   No, not that I'm aware of.  Even Aaron, when I

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                    EX 13
                                                      7759

203

Hubbard

OTA Franchise Corporation                                    6/21/2019

1    met with him several times about compensation, it was:
2    We've got to check with Eyal first.  And he's the CFO.
3        Q.    How about in regards to marketing expenses?
4    Was anyone outside of Mr. Shahar embodied with authority
5    to make decisions concerning that?
6        A.    To approve, like, the spend of budget?  Not
7    that I'm aware of.  They could suggest it, but it always
8    had to pass through Eyal.
9        Q.    In regards to OTA's marketing efforts -- when
10   I say marketing efforts, it's a wide -- a wide net
11   there.  But let's just say, for example, infomercials.
12   Radio spots.  Things on the website.  Who had
13   responsibility for that?
14       A.    Ultimate responsible was Jeremy.  They would
15   ask me:  Hey, how do you feel this wording on this radio
16   spot?  Or -- like, I did sale training for DIGO and
17   Peppercomm, a marketing agency, just so they could
18   understand, you know, the product.  And my biggest
19   concern was us not coming across cheap and cheesy.  But
20   Jeremy had ultimate, you know, approval or control over
21   that.
22              Whenever we did the infomercial, I was
23   given a script that DIGO, the New York firm had written,
24   that I was very uncomfortable with because it just
25   sounded very cheesey and very salesy.  So I reworked it,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Attachment ZZG**                                           EX 13
                                                             7760

237

Hubbard

OTA Franchise Corporation                                    6/21/2019

1              MS. PERKINS:  All right.  Well, this

2    concludes the investigation hearing of Keeley Hubbard.

3    I would like to add that all of exhibits submitted in

4    the course of this hearing will be retained for copying

5    purposes by commission counsel and are not the

6    responsibility of the court reporter -- or the reporter.

7              MR. BIESTY:  And that concludes today's

8    hearing.  Thank you very much, Ms. Hubbard.

9              THE WITNESS:  Thank you.

10             (Proceedings concluded at 5:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Attachment ZZG**                                    EX 13
7761

Page 238

```
 1    STATE OF TEXAS, to wit:

 2          I, Tammy Staggs, before whom the foregoing

 3    deposition was taken, do hereby certify that the

 4    within-named witness personally appeared before me at

 5    the time and place herein set out, and after having been

 6    duly sworn by me, according to law, was examined by

 7    counsel.

 8          I further certify that the examination was

 9    recorded stenographically by me and this transcript is a

10    true record of the proceedings.

11          I further certify that I am not of counsel to

12    any party, nor an employee of counsel, nor related to

13    any party, nor in any way interested in the outcome of

14    this action.

15          As witness my hand and notarial seal this 27th

16    day of June, 2019.

17

18

19          _____

20          Tammy Lea Staggs
            CSR  7496
21          Expiration Date:  12/31/2019
            Firm No. 807
22          112 Goliad Street
            Fort Worth, Texas  76126
23          817.769.3941

24

25
```

**Attachment ZZG**

EX 13
7762

Electronically signed by Tammy Staggs (401-029-128-2421)

d0351a92-b8b4-4893-a186-ea31185ff008



# ONLINE TRADING ACADEMY
## Invest in Your Why

# Student Success Study
# Findings
## June 2018

KBH04001

Attachment ZZH

EX 13
7763

KBH04002

# Contents

- Background

- Defining Success

- Current Feelings Toward Achievement

- Actions and Success Drivers

- Ratings of OTA

- Student Suggestions



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

EX 13
7764

# Background

Learning Objectives:

- Understand how our students define success

- Assess how they believe they are progressing toward their goals

- Identify areas for improvement to help students achieve their "Why"

Methodology:

- Online survey of Mastermind students and those with at least one XLT in the last 24 months

- Sample n= 340 (231 XLT Students, 73 Mastermind)



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04003

KBH04004

# Defining Success

© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

**Attachment ZZH**

KBH04005

# Defining Success

Improving the quality of one's life for themselves and their family is the _primary_ reason people come to Online Trading Academy.



Q1. Students are empowered to define, believe and achieve their "why", which is their reason or goal for joining Online Trading Academy. Below are some of the most common. N=338

© OTA Franchise Corp. 2017 – CONFIDENTIAL



**Attachment ZZH**

KBH04006

# Defining Success - XLT

For XLT Student, replacing employment income and freedom to work where ever and whenever become more important.



*Q1. Students are empowered to define, believe and achieve their "why", which is their reason or goal for joining Online Trading Academy. Below are some of the most common. n=229*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04007

# Defining Success – Mastermind

For Mastermind Students, increasing retirement savings is marginally more important than replacement income.



*Q1. Students are empowered to define, believe and achieve their "why", which is their reason or goal for joining Online Trading Academy. Below are some of the most common. n=73*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04008

# Defining Success

Open ended responses suggest reasons tend to be more for others.

*"I want to leave a trust fund for my children and grandchildren so they don't have to struggle financially."*

*"Give to charities and individuals."*

*"To have control over my finances."*

*"To help friends and family"*

*"So my husband can retire."*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

Q1. Students are empowered to define, believe and achieve their "why", which is their reason or goal for joining Online Trading Academy. Below are some of the most common.

**Attachment ZZH**

KBH04009

# Current Feelings of Achievement

© OTA Franchise Corp. 2017 – CONFIDENTIAL



**Attachment ZZH**

KBH04010

# Perception of Success

Overall, students feel only modestly successful. Masterminds, tend to feel more success, approximately 25% more successful.

**4.16**
All Students

**3.90**
XLT

**4.88**
Mastermind

Q2. Based on your response to the previous question, on a scale from 1-10, how successful would you say you are in achieving your "why"?
All n=333, XLT n=231, MMC n=73

© OTA Franchise Corp. 2017 – CONFIDENTIAL



ONLINE TRADING ACADEMY

**Attachment ZZH**

EX 13
7772

KBH04011

# Success Over Time

Over time, MMC students may feel more successful, whereas XLT students tend to decline over time.



Average Success Rating by
MMC Purchase Recency



Average Success Rating by
XLT Purchase Recency





© OTA Franchise Corp. 2017 – CONFIDENTIAL

*Q2. Based on your response to the previous question, on a scale from 1–10, how successful would you say you are in achieving your "why"?*
*XLT n= 231, MMC n=73*

**Attachment ZZH**

EX 13
7773

# Against their specific goals

Nearly 65% of our students are progressing or have achieved a key goal of improving the quality of their life. Nearly 50% are protecting their assets and becoming their own boss.



Q3. How would you say you're progressing toward each of the following? n=314

■ Not Progressing   ■ Somewhat/Completely/Achieved

| | Not Progressing | Somewhat/Completely/Achieved |
|---|---|---|
| Improved the quality of life for myself and family | 35.40% | 64.60% |
| Protected my current assets | 52.50% | 47.50% |
| Became my own boss | 53.50% | 46.50% |
| Gained the freedom to work wherever or whenever I want | 56.60% | 43.40% |
| Increased my retirement savings | 62.50% | 37.50% |
| Earned enough to supplement or replace my monthly income | 64.40% | 35.60% |
| Earned enough so I can choose where I can live | 64.90% | 35.10% |
| Traveled more | 66.10% | 33.90% |
| Earned money to give back to my community | 68.20% | 31.80% |
| Improved my home, bought a new home or relocated to a better neighborhood | 70.10% | 29.90% |

ONLINE TRADING ACADEMY

© OTA Franchise Corp. 2017 – CONFIDENTIAL

KBH04012

Attachment ZZH

EX 13
7774

# Improving Life Quality

There is significant decline, however, between 3 months and 18 months. "Not progressing at all" climbs to 41% after 12 months.



**Improve quality of life for myself and family**

| | Not at all progressing | Somewhat progressing | Progressing very well | Completely achieved my goal |
|---|---|---|---|---|
| 3 Months | 17% | 43% | 17% | |
| 6 Months | 21% | 51% | 7% | |
| 12 Months | 41% | 38% | 9% | |
| 18 Months | 29% | 42% | 12% | |
| Above 18 Months | 40% | 31% | 14% | |

*Q4. How would you say you're progressing toward each of the following? n=333*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

KBH04013

**Attachment ZZH**

EX 13
7775

# Increasing Retirement Savings

The trend is consistent for increasing retirement savings.



**Increase Retirement Savings**

This rebound is likely driven by positive feelings from MMC Students. **Nearly 50% feel they are progressing very well after 18 month.**

*Q4. How would you say you're progressing toward each of the following? n=333*

© OTA Franchise Corp. 2017 – CONFIDENTIAL

KBH04014

**Attachment ZZH**

EX 13
7776

# Supplementing or Replacing Income

And, even more pronounced when looking to supplement or replace monthly income. Nearly 75% feel that they are not progressing at wall between 6 and 18 months.



This rebound is likely driven by positive feelings from MMC Students. **45% feel somewhat or progressing very well after 18 month.**

**Supplement or Replace Monthly Income**

*Q4. How would you say you're progressing toward each of the following? n=333*

Legend: Not at all progressing | Somewhat progressing | Progressing very well | Completely achieved my goal

© OTA Franchise Corp. 2017 – CONFIDENTIAL



KBH04015

**Attachment ZZH**

EX 13
7777

KBH04016

# Actions & Success Drivers

© OTA Franchise Corp. 2017 – CONFIDENTIAL



**Attachment ZZH**

EX 13
7778

# What is driving their success - XLT

XLT Students feel the OTA Instructors, the Supply and Demand Core Strategy and OTA Student Support are the primary drivers of their success.



*Q6. Of the following, how would you say these have contributed to your success? N=207*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

KBH04017

**Attachment ZZH**

EX 13
7779

# What is driving their success – MMC

MMC Students assign much more credit to OTA for driving success.  While Instructors and Core Strategy are still primary drivers, Student Support, and Mastermind Tools are seen as big drivers of their success.



*Q6. Of the following, how would you say these have contributed to your success? n=63*

■ 1 Not at all  ■ 2  ■ 3  ■ 4  ■ 5 Completely

© OTA Franchise Corp. 2017 – CONFIDENTIAL

KBH04018

Attachment ZZH

KBH04019

# Insights from Open Ended Responses

- Many have not really begun trading
- Mentoring would help improve their changes of success
- They may see success in others.  Peers are important, they see it "click" in others.
- More education on the trading platform.
- More student support with knowledge.

*"More online class on the platform . It very helpful to have commanding knowledge of the platform."*

*"An additional component I believe that would attribute to my success is having a mentor- a majority of the seasoned teachers at OTA have mentioned they were mentored by someone at the beginning of their career who helped them lay a strong foundation, the confidence and the unique mindset needed for being a successful trader."*

*"I see others' success and believe I can eventually get there."*

Q7. Is there anything else, not previously discussed that you would attribute your success to

© OTA Franchise Corp. 2017 – CONFIDENTIAL



**Attachment ZZH**

# Making Money

The majority of all students say that are not making money. Given the % of students that are spending most of their time in sim mode, this may reflect many students not yet actively trading live accounts.

Note: 10% more Masterminds are saying they're making money, with 10% saying they're "making lots of money".



**MMC**

58%
31%
10%

■ Making No Money ■ Making Some Money ■ Making Lots of Money

**XLT**

68%
30%
1%

■ Making No Money ■ Making Some Money ■ Making Lots of Money

*Q9.  As a result of your experience at Online Trading Academy, would you say you're "making money" through trading and investing?*



ONLINE TRADING ACADEMY

© OTA Franchise Corp. 2017 – CONFIDENTIAL

KBH04020

**Attachment ZZH**

EX 13
7782

KBH04021

# Making Money Over Time

At one year, MMC students tend to turn a corner and report they're making money. XLT students continue to feel like they're not making money.



Q9.  *As a result of your experience at Online Trading Academy, would you say you're "making money" through trading and investing?*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

# Making Money Over Time

Mastermind Students are spending significantly more time each month in XLT Sessions and attending classes. 77% of Masterminds spend 3+ hours per month in session and 67% are attending classes or events.



| | <1 Hour | 1-2 Hours | 3-5 Hours | 6-10 Hours |
|---|---|---|---|---|
| Live Market Trading (MMC) | 42% | 7% | 7% | 43% |
| Live Market Trading (XLT) | 46% | 14% | 6% | 33% |
| SIM Trading (MMC) | 43% | 15% | 10% | 32% |
| SIM Trading (XLT) | 42% | 14% | 13% | 31% |
| Attend XLT sessions (MMC) | 13% | 11% | 24% | 53% |
| Attend XLT sessions (XLT) | 37% | 21% | 14% | 29% |
| Attend classes or events at my center or online (MMC) | 21% | 11% | 10% | 57% |
| Attend classes or events at my center or online (XLT) | 27% | 17% | 19% | 37% |

*Q4. On average, how much time spend on the following each month?*


ONLINE TRADING ACADEMY

© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04022

EX 13
7784

KBH04023

# Rating of OTA

© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

**Attachment ZZH**



# Ratings

Instructors were given the highest marks.



|  | Student Support | Education Counselors | Instructors | Online Customer Care |
|---|---|---|---|---|
| All | 6.34 | 6.03 | 7.8 | 6.24 |
| XLT | 7.32 | 7.15 | 8.68 | 7 |
| MMC | 6.04 | 5.68 | 7.54 | 6 |

■ All   ■ XLT   ■ MMC

*Q11. How would you rate the following? n= 261, n= 201 XLT, n=60 MMC*



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04024

EX 13
7786

# Success Ratings by Center

| Center | XLT | XLT Success Rating | MMC | Rating | Total | Total Success Rating |
|---|---|---|---|---|---|---|
| Irvine, CA | 16 | 2.63 | 15 | 5.20 | 31 | 3.87 |
| Atlanta, GA | 25 | 3.79 | 4 | 4.25 | 29 | 3.86 |
| Kansas City | 15 | 3.33 | 9 | 3.38 | 24 | 3.35 |
| Minneapolis, MN | 9 | 3.89 | 6 | 4.67 | 15 | 4.20 |
| Charlotte, NC | 14 | 4.08 | 0 | 0.00 | 14 | 4.08 |
| Dallas, TX | 7 | 4.29 | 7 | 5.57 | 14 | 4.93 |
| Denver, CO | 10 | 3.80 | 2 | 4.00 | 12 | 3.83 |
| New Jersey - North | 8 | 3.29 | 4 | 4.25 | 12 | 3.64 |
| Seattle, WA | 9 | 5.44 | 3 | 4.33 | 12 | 5.17 |
| Vancouver, Canada | 12 | 4.27 | 0 | 0.00 | 12 | 4.27 |
| Toronto, Canada | 9 | 2.89 | 0 | 0.00 | 9 | 2.89 |
| Mumbai, India | 9 | 4.22 | 0 | 0.00 | 9 | 4.22 |
| Philadelphia, PA | 5 | 3.80 | 3 | 3.33 | 8 | 3.63 |
| Raleigh, NC | 7 | 3.86 | 1 | 7.00 | 8 | 4.25 |
| Washington DC | 7 | 3.71 | 1 | 6.00 | 8 | 4.00 |
| Worldwide | 8 | 3.38 | 0 | 0.00 | 8 | 3.38 |
| Milwaukee, WI | 6 | 4.17 | 1 | 10.00 | 7 | 5.00 |
| San Diego, CA | 5 | 4.00 | 2 | 5.50 | 7 | 4.43 |
| New York, NY | 5 | 3.20 | 1 | 3.00 | 6 | 3.17 |
| San Jose, CA | 6 | 4.67 | 0 | 0.00 | 6 | 4.67 |
| Austin, TX | 4 | 2.50 | 1 | 2.00 | 5 | 2.40 |
| Chicago, IL | 3 | 7.00 | 2 | 6.00 | 5 | 6.60 |
| Boston, MA | 3 | 2.33 | 1 | 6.00 | 4 | 3.25 |
| Ft. Lauderdale, FL | 2 | 2.50 | 2 | 5.50 | 4 | 4.00 |
| Houston, TX | 2 | 2.00 | 2 | 5.00 | 4 | 3.50 |
| Tampa Bay, FL | 4 | 5.25 | 0 | 0.00 | 4 | 5.25 |
| West Palm Beach, FL | 2 | 5.00 | 2 | 6.50 | 4 | 5.75 |
| Detroit, MI | 3 | 6.33 | 0 | 0.00 | 3 | 6.33 |
| Los Angeles - Westwood, CA | 2 | 6.00 | 1 | 8.00 | 3 | 6.67 |
| Los Angeles - Woodland Hills, CA | 2 | 3.00 | 1 | 7.00 | 3 | 5.00 |
| Sacramento, CA | 3 | 3.00 | 0 | 0.00 | 3 | 3.00 |
| Baltimore, MD | 2 | 2.00 | 0 | 0.00 | 2 | 2.00 |
| Norwalk, CT | 2 | 3.50 | 0 | 0.00 | 2 | 3.50 |
| Orlando, FL | 1 | 5.00 | 1 | 3.00 | 2 | 4.00 |
| Phoenix, AZ | 1 | 8.00 | 1 | 7.00 | 2 | 7.50 |
| UK | 2 | 4.00 | 0 | 0.00 | 2 | 4.00 |
| Las Vegas, NV | 2 | 5.00 | 0 | 0.00 | 2 | 5.00 |
| Ignite India | 0 | 0.00 | 1 | 4.00 | 1 | 4.00 |
| Long Island, NY | 1 | 7.00 | 0 | 0.00 | 1 | 7.00 |
| New Jersey - Central | 1 | 7.00 | 0 | 0.00 | 1 | 7.00 |
| Salt Lake City, UT | 0 | 0.00 | 1 | 7.00 | 1 | 7.00 |
| Dubai, UAE | 1 | 4.00 | 0 | 0.00 | 1 | 4.00 |
| OTA Canada | 1 | 7.00 | 0 | 0.00 | 1 | 7.00 |

Note: Should be directional only due to unstable sample sizes

ONLINE TRADING ACADEMY

© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04025

EX 13
7787

# Overall Ratings by Center

| Center | XLT | XLT OTA Rating | MMC | MMC OTA Rating | Total | Total OTA Rating |
|---|---|---|---|---|---|---|
| Irvine, CA | 16 | 6.55 | 15 | 7.40 | 31 | 6.95 |
| Atlanta, GA | 25 | 5.71 | 4 | 9.00 | 29 | 6.05 |
| Kansas City | 15 | 5.14 | 9 | 5.88 | 24 | 5.41 |
| Minneapolis, MN | 9 | 5.60 | 6 | 5.80 | 15 | 5.70 |
| Charlotte, NC | 14 | 5.45 | 0 | 0.00 | 14 | 5.45 |
| Dallas, TX | 7 | 6.43 | 7 | 8.17 | 14 | 7.23 |
| Denver, CO | 10 | 5.33 | 2 | N/A | 12 | 5.33 |
| New Jersey - North | 8 | 6.00 | 4 | 5.00 | 12 | 5.56 |
| Seattle, WA | 9 | 7.22 | 3 | 8.50 | 12 | 7.45 |
| Vancouver, Canada | 12 | 6.63 | 0 | 0.00 | 12 | 6.63 |
| Toronto, Canada | 9 | 5.13 | 0 | 0.00 | 9 | 5.13 |
| Mumbai, India | 9 | 3.88 | 0 | 0.00 | 9 | 3.88 |
| Philadelphia, PA | 5 | 5.67 | 3 | 6.00 | 8 | 5.75 |
| Raleigh, NC | 7 | 5.75 | 1 | 5.00 | 8 | 5.60 |
| Washington DC | 7 | 4.00 | 1 | N/A | 8 | 4.00 |
| Worldwide | 8 | 5.33 | 0 | 0.00 | 8 | 5.33 |
| Milwaukee, WI | 6 | 5.67 | 1 | 10.00 | 7 | 6.29 |
| San Diego, CA | 5 | 5.33 | 2 | 5.00 | 7 | 5.25 |
| New York, NY | 5 | 5.00 | 1 | 1.00 | 6 | 4.00 |
| San Jose, CA | 6 | 4.40 | 0 | 0.00 | 6 | 4.40 |
| Austin, TX | 4 | 8.00 | 1 | 5.00 | 5 | 7.25 |
| Chicago, IL | 3 | 5.50 | 2 | 8.00 | 5 | 6.33 |
| Boston, MA | 3 | 3.50 | 2 | 8.00 | 5 | 5.00 |
| Ft. Lauderdale, FL | 2 | 5.50 | 2 | 7.00 | 4 | 6.25 |
| Houston, TX | 2 | 5.00 | 2 | 7.00 | 4 | 6.33 |
| Tampa Bay, FL | 4 | 5.67 | 0 | 0.00 | 4 | 5.67 |
| West Palm Beach, FL | 2 | 7.00 | 2 | 7.00 | 4 | 7.00 |
| Detroit, MI | 3 | 5.67 | 0 | 0.00 | 3 | 5.67 |
| Los Angeles - Westwood, CA | 2 | 5.00 | 1 | 10.00 | 3 | 6.67 |
| Los Angeles - Woodland Hills, CA | 2 | N/A | 1 | 7.00 | 3 | 7.00 |
| Sacramento, CA | 3 | 0.00 | 0 | 0.00 | 3 | 0.00 |
| Baltimore, MD | 2 | 5.50 | 0 | 0.00 | 2 | 5.50 |
| Norwalk, CT | 2 | 5.50 | 0 | 0.00 | 2 | 5.50 |
| Orlando, FL | 1 | 4.00 | 1 | 3.00 | 2 | 3.50 |
| Phoenix, AZ | 1 | 10.00 | 1 | 9.00 | 2 | 9.50 |
| UK | 2 | 7.00 | 0 | 0.00 | 2 | 7.00 |
| Ignite India | 2 | 6.00 | 0 | 0.00 | 2 | 6.00 |
| Las Vegas, NV | 0 | 0.00 | 1 | N/A | 1 | N/A |
| Long Island, NY | 1 | N/A | 0 | 0.00 | 1 | N/A |
| New Jersey - Central | 1 | 10.00 | 0 | 0.00 | 1 | 10.00 |
| Salt Lake City, UT | 1 | 7.00 | 0 | 7.00 | 1 | 7.00 |
| Dubai, UAE | 1 | 5.00 | 0 | 0.00 | 1 | 5.00 |
| OTA Canada | 1 | 9.00 | 0 | 0.00 | 1 | 9.00 |
| **Total** | **236** | **5.64** | **75** | **6.79** | **311** | **5.91** |

Note: Should be directional only due to unstable sample sizes

© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

**Attachment ZZH**

KBH04026

EX 13
7788

# Core Strategy XLT

- Directionally, there is not a strong correlation between those who took a core strategy XLT and their success rating.

- Example:
  - 87% of KC took CSXLT, but rated success at 3.69
  - Minneapolis and Washington DC both had <60% take CSXLT, but had 4.00 success ratings

Note: Should be directional only due to unstable sample sizes



| Center | Total XLT | Took Core Strategy XLT | % Took Core Strategy XLT | Success Rating |
|---|---|---|---|---|
| Atlanta, GA | 25 | 15 | 60% | 3.73 |
| Irvine, CA | 16 | 10 | 63% | 1.90 |
| Kansas City | 15 | 13 | 87% | 3.69 |
| Charlotte, NC | 14 | 11 | 79% | 4.09 |
| Vancouver, Canada | 12 | 8 | 67% | 3.13 |
| Denver, CO | 10 | 8 | 80% | 3.63 |
| Minneapolis, MN | 9 | 5 | 56% | 4.00 |
| Mumbai, India | 9 | 8 | 89% | 4.00 |
| Seattle, WA | 9 | 9 | 100% | 5.44 |
| Toronto, Canada | 9 | 8 | 89% | 2.50 |
| New Jersey - North | 8 | 5 | 63% | 4.00 |
| Worldwide | 8 | 5 | 63% | 3.40 |
| Dallas, TX | 7 | 7 | 100% | 4.29 |
| Raleigh, NC | 7 | 5 | 71% | 4.60 |
| Washington DC | 7 | 4 | 57% | 3.00 |
| Milwaukee, WI | 6 | 5 | 83% | 4.40 |
| San Jose, CA | 6 | 5 | 83% | 4.20 |
| New York, NY | 5 | 3 | 60% | 4.00 |
| Philadelphia, PA | 5 | 3 | 60% | 3.00 |
| San Diego, CA | 5 | 3 | 60% | 4.33 |
| Austin, TX | 4 | 4 | 100% | 2.50 |
| Tampa Bay, FL | 4 | 4 | 100% | 5.25 |
| Boston, MA | 3 | 2 | 67% | 3.00 |
| Chicago, IL | 3 | 3 | 100% | 7.00 |
| Detroit, MI | 3 | 3 | 100% | 6.33 |
| Sacramento, CA | 3 | 1 | 33% | 1.00 |
| Baltimore, MD | 2 | 2 | 100% | 2.00 |
| Ft. Lauderdale, FL | 2 | 2 | 100% | 2.50 |
| Houston, TX | 2 | 1 | 50% | 3.00 |
| Ignite India | 2 | 2 | 100% | 5.00 |
| Los Angeles - Westwood, CA | 2 | 2 | 100% | 6.00 |
| Los Angeles - Woodland Hills, CA | 2 | N/A | N/A | N/A |
| Norwalk, CT | 2 | 1 | 50% | 6.00 |
| UK | 2 | 2 | 100% | 4.00 |
| West Palm Beach, FL | 2 | 1 | 50% | 9.00 |
| Dubai, UAE | 1 | 1 | 100% | 4.00 |
| Long Island, NY | 1 | N/A | N/A | N/A |
| New Jersey - Central | 1 | 1 | 100% | 7.00 |
| Orlando, FL | 1 | 1 | 100% | 5.00 |
| OTA Canada | 1 | 1 | 100% | 7.00 |
| Phoenix, AZ | 1 | 1 | 100% | 8.00 |
| **Total** | 236 | 175 | 74% | 3.95 |

© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

KBH04027

**Attachment ZZH**

EX 13
7789

KBH04028

# Value for the Money

Value for the money was evenly distributed, with 64% rating average and above.



Q12.  *How would you rate the value of the money of  your education and experience with OTA?*

© OTA Franchise Corp. 2017 – CONFIDENTIAL

n= 309

**Attachment ZZH**

EX 13
7790

KBH04029

# Net Promoter Score®

From our high Net Promoter Score post class (95% satisfaction) our NPS declines substantially over time, with XLT Students are pulling down our overall NPS score.

☐ 42% of Masterminds are promoters with only 25% detractors.
☐ 53% of XLTs are detractors with only 28% promoters.

| Segment | 0-6 | 7 & 8 | 9 & 10 | Total | | NPS Score |
|---|---|---|---|---|---|---|
| XLT Students | 105 | 38 | 57 | 200 | | -24 |
| Masterminds | 15 | 19 | 25 | 59 | | 17 |
| All Respondents | 120 | 57 | 82 | 259 | | -15 |

| Segment | 0-6 | 7 & 8 | 9 & 10 |
|---|---|---|---|
| XLT Students | 53% | 19% | 29% |
| Masterminds | 25% | 32% | 42% |
| All Respondents | 46% | 22% | 32% |

| Segment | Score > 6 |
|---|---|
| XLT Students | 48% |
| Masterminds | 75% |

Q13. How likely is it that you would recommend Online Trading Academy to a friend or colleague? n=259 total, n=200 XLT, n=59 MMC



ONLINE TRADING ACADEMY

© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04030

# NPS Over Time



**Attachment ZZH**

© OTA Franchise Corp. 2017 – CONFIDENTIAL

EX 13
7792

KBH04031

# Suggestions

© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**



KBH04032

# Experience-Based Education





- Some of the XLT's for trading move too quick.

- It would be helpful to have an instructional assistant during lab sessions.

- Refrain from placing an over-experienced 'teacher' in a class of newbies

- People that have not traded before should be scheduled together.



© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

**Attachment ZZH**

EX 13
7794

KBH04033

# Platform Education





- For the beginners attending Core Strategy classes the software used as trading platform(Trade Tiger) need to be explained at least one session.

- It should first be determined whether prospective client has sufficient computer skills to take classes.

- Make sure students are computer competent prior to enrolling in classes

- During class we were often held back by students who are not technologically savvy.



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04034

# 1:1/Coaching/Mentorship



- The only improvement if it can be called such, would be having the opportunity to gain experience of learning one-to-one with a mentor.

- It's hard for an instructor to give a one on one assistance to 20 plus students in a classroom.

- One on one mentoring where you can have discussions about your trades and thoughts. With a Successful Trader. Not a counselor.

- Coaches could communicate a better process after class on where to go from there.





© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY

Attachment ZZH

KBH04035

# Continuity



- Right now the onus is on me to increase my time and effort in improving my skills.

- Still can not get consistently green. Feel like personal help would be beneficial and I am sure more struggling students would appreciate this.

- Support group once a week at the centre -one hour to work on one trade start to finish.



© OTA Franchise Corp. 2017 – CONFIDENTIAL

**Attachment ZZH**

KBH04036

# Online/Mobile Experience



- Recording for core strategy have opportunity for improvement: get to the point; stay on track; finish one example completely before rambling; prepare slides ahead of time

- Better quality videos for the online tutorials, sound quality and video quality can be poor at best.

- Please improve Black Board Collaborate interface to allow consistent downloads of recorded classes from satellite internet connections. Very frustrating.

- Simplify tools, we should be able to take XLTs on phone/ tablet





© OTA Franchise Corp. 2017 – CONFIDENTIAL

**ONLINE TRADING ACADEMY**

Attachment ZZH

KBH04037

# Instructors



- Audit your instructors for their behavior in the classroom. That goes for the onsite lab support personnel as well.

- Consistent instructors that reflect rule based training.

- Instructors should meet teaching academic standards.





© OTA Franchise Corp. 2017 – CONFIDENTIAL

ONLINE TRADING ACADEMY



Attachment ZZH

EX 13
7799

| From: | sam seiden |
|---|---|
| Sent: | Monday, October 22, 2018 3:14 PM CDT |
| To: | Keeley Hubbard; Keeley Hubbard |
| Subject: | Fw: Demand Letter and more -- ATTORNEY CLIENT PRIVILEGE |
| Attachments: | Attorney Review of Messaging _ Demand Letter (dew).docx |

----- Forwarded Message -----
**From:** Douglas Whitney <doug.whitney@dwlollc.com>
**To:** sam seiden ████████ @yahoo.com>
**Sent:** Monday, October 22, 2018, 10:28:42 AM CDT
**Subject:** Re: Demand Letter and more -- ATTORNEY CLIENT PRIVILEGE

ATTORNEY CLIENT PRIVILEGE

Sam — attached are comments and suggestions.

Let me know if you want to discuss.

**Douglas E. Whitney**
Douglas Whitney Law Offices LLC
321 N. Clark St., Suite 1301
Chicago, Illinois 60654
(p)  312-279-0510 (m) 312-623-4562 (f)  312-277-6620
doug.whitney@dwlollc.com / www.douglaswhitneylawoffices.com

On Oct 21, 2018, at 8:09 AM, sam seiden ████████ @yahoo.com> wrote:

Doug,

Hope all is well. This Wednesday is the big meeting with Eyal. Attached are 3 items. 1) Messaging to
Franchise Owners once I am no longer with the company. 2) Messaging to students. 3) A demand letter I
would like to present to Eyal at that meeting and share with whoever after the meeting.

Please review and let me know. Big week, 13 years in the making !!

Thanks for all your guidance.

Sam
<Attorney Review of Messaging _ Demand Letter.docx>

**KBH04062**

**Attachment ZZI**

EX 13
7800

**MESSAGE TO OWNERS**
**Released Immediately following Eyal Conversation on 10/24 (no agreement in place)**

Owners, it's Sam. Please save this # as my new cell.  Eyal has turned off the 847# - please don't text that phone.

I wanted you to be the first to know what's going on as you all know how much I care about you, your business, and the students.

I've just left Eyal's office and I've sent below the demand letter that he now has in his possession. I want to make several things very clear.

Over the last year, Eyal has made several decisions that are out of my control that has dramatically compromised student success.  The theme across these decisions has been him choosing corporate profits over the students.  I have been very concerned about this for a long time and have voiced my concerns to him and many others.

While I've done everything in my power to prevent this from happening, majority of the focus, resources, and efforts continue to drive towards HQ profits.  For those of you that know me well, know that morally this       is       not       a       world       I       am       able       to       live       in.

In addition to student success issue, Eyal has not kept his word on a major financial agreement. I am not and have never been an owner of OTA, all of my personal life sacrifices and decisions I made over the last decade were because of that agreement—and that no longer exists.

I don't know what the end result of this will be but I've unfortunately been left with no other choice than to protect myself and explore other options.  I'm sure this is coming to you as a shock, and of course I'll make myself available to talk about it.

**LETTER TO OTA STUDENTS**
**Released Immediately following Eyal Conversation (*possibility that there is no agreement in place when this is released)**

OTA Students,

If you're reading this, you may have heard at this point that I made the decision to leave the corporate side of the Education Industry.

Over the past 12 years, I've gotten to know many of you very well, both in online trading sessions and events in your city.  And if I haven't had the chance to personally get to meet you, we've spent many hours together in online sessions over the years.  For those of you who really know me, know that all I have ever cared about is helping you achieve  your financial life goals.

I wanted you to hear firsthand and understand why I've decided to leave the corporate education side of the industry and move in a very different direction. I've been with two financial education companies over the last 20 years and what has always bothered me is the inability to reach as many people as possible with quality education that includes a price point that people can afford—this has always been an obstacle because corporate education has massive overhead, driving tuition prices higher and higher.  The other

**Attachment ZZI**

KBH04063
EX 13
7801

challenge for me has been how confusing the education gets when it is delivered by many instructors across a big corporation.  When there is lack of consistency, it really hurts student success.

For those of you that know me well, know that this is not a world I am able to live in… and I've been left with no choice but to move in a very different direction.

The most important thing to me has always been real success for anyone that I've had the opportunity to teach or mentor.  The only way that I can have the biggest impact on student success is by having complete control over the education.  This is why I've decided to launch my own program.
I realize that many of you reading this may not even have access to my live daily morning mentoring sessions because the tuition barrier was $40K+.

As I built out my own education program, there were 3 non-negotiables guiding me…number one, it had to be reasonably priced, number two- it had to be convenient and fit into anyone's busy life, and number 3 and most important- it had to truly help move people closer to achieving their financial life goals.

I'm proud to announce this is exactly what I've done.  To get involved, check out my website…I'll see you there.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
==DEMAND LETTER==
==Given to Eyal on 10/24==
==Released to Owners with Messaging Above @ Top of Document==

Given the decline in student success ~~since~~ after Sam has been removed from the leadership role in Education/Products/Services, and an increase in questionable selling tactics ~~since after he had a~~his direct leadership role in the sales department was removed, below are his terms for remaining as an employee with Online Trading Academy.  Below is a timeline of events, risks, concerns, and results.  These terms are what Sam believes is ultimately best for the students which is always his number one priority.

**Non-Negotiable Demands:**
a) Immediately Pay Sam Seiden what he is owed from 2010 Agreement: $12,692,175
b) Immediately Remove Income Cap
c) Immediately Implement Board of Directors with Sam having Independent Seat to Represent Welfare of the Students
d) Immediately Reinstate Sam to Leadership of the Education/Products/Services Department with Full Discretion, Authority, & Oversight
e) Sam Seiden will Commit to no more than 12 Month Employment Term at Online Trading Academy, Effective Immediately Upon Signing of Agreement

**Sam Seiden Contribution to OTA:**
- 12+ Years of Employment
- Leadership of Product Innovation & Education/Product Strategy
- Leadership of Sales Innovation & Sales Strategy
- Company's Revenue Growth Results:
  - Annual Revenue $200M+
  - 1500+ XLT Sales Per Month ($2M+ Per Month in Fulfillment Revenue)

**Timeline of Events:**

**Attachment ZZI**

KBH04064

EX 13
7802

- Early 2006 Sam Joined OTA & shortly after he agreed to drive OTA Product & Education
  - Annual Revenue Approx. $__M (⬅Insert Revenue from 2006)
  - 20-30 XLT Sales Per Month
- ___ (⬅ Insert Year) Eyal Shahar reduces Sam's Income by 80% *(1st Compensation Reduction)*
- 2010 Eyal reduces Sam's Income by additional 50% with an Agreement of the 50% given up would grow 2X behind the scenes and be paid upon the sale of the company. *(2nd Compensation Reduction)*
  - Eyal verbally expressed multiple times that his reasoning behind reducing Sam's income for the 2nd time was that it would help OTAs bottom-line profitability and accelerate the exit/sale of OTA. Eyal also verbally expressed that he anticipated the sale of OTA within 2-3 years of 2010 agreement.
  - After 2 years of no sale, Eyal continued to verbally express that the company would sell in an additional 2-3 years. This has continued on for 8 years.
- May 8th 2017
  - *(3rd Compensation Reduction)*
  - Eyal presents an agreement to Sam (Sam has Copy of this Agreement) that negates 2010 agreement of money already earned (approx. $9M) by changing it to a flat percentage of the company sale. This created a scenario where Sam would earn far less than original agreement because the minimum of $9M that he had <u>already earned</u> had been eliminated. Sam Doesn't sign.
  - Eyal continues to pressure Sam to sign this agreement each week, and June 26th, Eyal calls a meeting in his office and says, "We are not leaving this room until we have an agreement." He cancels scheduled meetings and he and Sam discuss for hours until they reach an agreement.
  - Sam eventually and regretfully agrees to another reduced compensation plan that removes money already earned and owed. (Sam has Copy of this Agreement)
- November 2017
  - Eyal Removes Sam's Direct Leadership of Education/Product & Instructs Him to be a "Consultant" to all Departments
    - Redirects Leadership of Education/Product to Steve Albin & Larry Jacobson
  - Eyal Changes Sam Title to Chief Trading Strategist
  - Eyal Insists Multiple Times that Sam Changes his Compensation Plan / Sam is Uncomfortable with this because others who have complied with similar compensation plans have only seen reduced income / Sam Complies and Agrees to a Monthly Compensation Income "Cap", further reducing his income by 20+% *(4th Compensation Reduction)*

**Negative Impact & Results of Removing Sam's Leadership from Education/Products/Services:**
- Gross Revenue has Increased but there's plenty of proof that Student Success has never been lower
  - Inflated & Misleading Sales Metrics without P/L Proof in Company-Owned Centers
- Decline of Education/Product Results & Decline of Student Success with Proof:
  - Student Surveys Conducted *(insert date)*
  - Net Promoter Score *(insert date)*
  - ProActive Investor Portfolio Performance
  - Pro Picks Performance
  - XLT Instructor Performance
  - XLT Student Significant Attendance Decline

**Uncomfortable with the Amount of Risk Created by Eyal's Decisions:**
- Use of Sam Seiden's Name & Reputation

KBH04065

EX 13
7803

**Attachment ZZI**

- o OTA purchased www.samseiden.com domain name without Sam's permission & redirected all traffic to OTAs homepage / Did not alert him of this either
- o Sam's name used on messaging in multiple marketing channels (print, radio, tv, online) without Sam's prior approval of specific messaging
- Unethical & Deceptive Sales Messaging
  - o in Centers (Including Company-Owned)
  - o Instructors
    - Lack of Statements/Proof of Active & Profitable Trading
  - o Surveys of Student Success
    - Surveys taken immediately after a student's first course are posted on OTAs home page. True student success results months into their education is hidden from owners, students, & the public.
  - o Social Media / Company Reputation Management
    - Incentivizing Instructors & Staff to Post about the company and/or product on Social Media
    - Discussions in Leadership Meetings about "taking care" of negative reviews and asking multiple employees to post positive reviews
- Cheapening Perception of the Brand & Product through JumpStart, Tablet Giveaways at Previews, Free Market Timing Orientation, etc.
- Risk of Predatory Lending & Unfair Credit Practices
  - o Students express verbally and/or written that they have taken out home equity lines of credit for tuition and/or struggling to pay monthly finance payment to UGA

KBH04066

**Attachment ZZI**

EX 13
7804

| From: | Sam Seiden |
|---|---|
| Sent: | Tuesday, November 20, 2018 2:29 PM CST |
| To: | Keeley Hubbard |
| Subject: | Thoughts |
| Attachments: | Sam $.docx |

Doug,

Here are are my thoughts...

1) Clarify that I have no interest in working with OTA. That thought was related to us promoting each other and playing nice...

2) Options for Eyal:

- **6 Month non-compete for $2.5M**. I would make that in the first month not using social media if we were in business. I release claim to the $8.5M. I can't abandon all the people reaching out for help so we should be able to deliver some content for free.
- **4 Year non-compete for $10M (see below).** I would make much more on my own as every 1000 memberships is $5M and we are on track to do at least 5000 units a year with the partnerships I have in place (obviously don't let them know this)
- **Global release and we compete**. **I give up the $8.5M.**
- If we don't settle, we launch tomorrow. If he sues, he needs to understand that I and many others will share the details of why I had no other choice but to leave Eyal and his fraudulent business. I have overwhelming proof of that fraud and that I made several attempts to fix it. On a related note... I have seen 2 other companies in our industry be shut down by regulators within 24 hours for far less than what Eyal is allowing to happen through OTA. OTA has employees who worked at those firms. All the other companies have been shut down as well over the years but those 2 were within 24 hours. On a related note... I got more emails today (every day) that are losing money because of OTA and are begging me to start the new venture.

The 6 month option is RISKY for me. I would need to be able to say something to my following about it.

Attached to this email is the tracking sheet for my differed income going back to 2010. This was started because of the 2010 agreement. I highlighted July 2017 because that is what he owed me the month we signed the new garbage agreement. **$8,850,137.  This plus a little more is how I came to the $10M.**

With any of these, its all in the details. If we could get this settled by tomorrow that would be great. Eyal will try and stall as that has been working great for him. Perhaps we can warn him that I will start doing things on social media this week.

If we launch this, tomorrow evening or Thursday would be great.

KBH04070

**Attachment ZZI**

EX 13
7805

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Monday, June 27, 2016 7:17 PM |
| **To:** | Keeley Hubbard <keeley.hubbard@otahq.com>; Eyal Shahar <eyal@otahq.com>; Amanda Barberiz <amanda.barberiz@otahq.com> |
| **Cc:** | Jeremy Nosek <jnosek@otahq.com> |
| **Subject:** | RE: Indianapolis MTO report |
| **Attach:** | image008.png; image011.png |

Daren is our top guy, especially for big rooms.

Sam

**From:** Keeley Hubbard
**Sent:** Monday, June 27, 2016 1:55 PM
**To:** Eyal Shahar <eyal@otahq.com>; Amanda Barberiz <amanda.barberiz@otahq.com>
**Cc:** Sam Seiden <sseiden@otahq.com>; Jeremy Nosek <jnosek@otahq.com>
**Subject:** Re: Indianapolis MTO report

I made a mistake below—Darren Kimoto is on Puerto Rico and he's even stronger than Sean.



**Keeley Hubbard**
Vice President of Admissions

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Direct:** 949-648-2040
**keeley@otahq.com**
www.tradingacademy.com

**From:** Eyal Shahar <eyal@otahq.com>
**Date:** Monday, June 27, 2016 at 10:16 AM
**To:** Keeley Hubbard <keeley.hubbard@otahq.com>, Amanda Barberiz <amanda.barberiz@otahq.com>
**Cc:** Sam Seiden <sseiden@otahq.com>, Jeremy Nosek <jnosek@otahq.com>
**Subject:** RE: Indianapolis MTO report

Got it

I agree to change Debbie she is on and off at times.

Eyal Shahar
President
Online Trading Academy
**Virtual Conference**

17780 Fitch, Suite 200 Irvine, CA. 92614
eyal@otahq.com
www.tradingacademy.com
888.346.8710 I Toll Free
949.608.6010 I Direct Line

**Attachment ZZI**

**With passion and possibility - obstacles simply give way**



**From:** Keeley Hubbard
**Sent:** Monday, June 27, 2016 10:10 AM
**To:** Eyal Shahar <eyal@otahq.com>; Amanda Barberiz <amanda.barberiz@otahq.com>
**Cc:** Sam Seiden <sseiden@otahq.com>; Jeremy Nosek <jnosek@otahq.com>
**Subject:** Re: Indianapolis MTO report

Something has been going on with Debbie—her discretion to bring her daughter on the event without consulting with Amanda is unlike her—and definitely negatively affected the event.  Sam is going to call her.  Her recent events haven't been that strong.  We put her on hotel events because historically she has been top instructor when doing hotel events for WW along with Sean Kim.   Sean will be doing Puerto Rico.

It is difficult to overcome the rip-off report objection once it comes up and it's usually a result of a student being  "not ok"  or made to feel uncomfortable or sales pressure from the EC or instructor—it's a trust issue.  And when they go looking for a bad review (specifically searching for bad reviews instead of good ones or legitimate reviews), it's because they want to justify their decision to not move forward.  The one thing that we can prevent is making a student  'not ok'  and which will prevent them from poisoning other grads.  Amanda is addressing with her team and training them on this.

The positive yelp and google+ reviews definitely help our prospects in a normal buy cycle as they make their decision.

It was a tough event with the perfect storm of issues, and I know Amanda beats herself up a lot over it—we talked about it quite a bit last night.  The low results certainly weren't from lack of effort.  She is working with her team to prevent these challenges in the future and we will address the challenge with Debbie ASAP.



**Keeley Hubbard**
Vice President of Admissions

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Direct:** 949-648-2040
**keeley@otahq.com**
www.tradingacademy.com

---

**From:** Eyal Shahar <eyal@otahq.com>
**Date:** Monday, June 27, 2016 at 1:11 AM
**To:** Amanda Barberiz <amanda.barberiz@otahq.com>
**Cc:** Keeley Hubbard <keeley.hubbard@otahq.com>, Sam Seiden <sseiden@otahq.com>, Jeremy Nosek <jnosek@otahq.com>
**Subject:** RE: Indianapolis MTO report

I was wondering why we are using Debbie as she has good and so so events and I would not use her in hotels..

**Attachment ZZI**

KBH11678-2
EX 13
7807

Sorry about Jorden

What is critical is that the teacher and EC's will work together to get negative students out of the class as soon as they possess risk. I know it's hard to do sometime before there is damage.

We also need the teacher to have better control of eth class to avoid this.

There is not a lot we can do with Rip off report based on Jeremy but we will soon have on our website 100% of all class surveys real time with no filters.

See attached.

Keeley we need to develop a strategy how to overcome something like that with the use of the surveys.

Eyal Shahar
President
Online Trading Academy
**Virtual Conference**



17780 Fitch, Suite 200 Irvine, CA. 92614
eyal@otahq.com
www.tradingacademy.com
888.346.8710 I Toll Free
949.608.6010 I Direct Line

**With passion and possibility - obstacles simply give way**

---

**From:** Amanda Barberiz [mailto:amanda.barberiz@otahq.com]
**Sent:** Sunday, June 26, 2016 8:03 PM
**To:** 'coumgmt@tradingacademy.com' <coumgmt@tradingacademy.com>
**Cc:** Amy Chew <amy.chew@otahq.com>; Ryan Cook <ryan.cook@otahq.com>
**Subject:** Indianapolis MTO report

**Education Director: Amanda Barberiz**
**EC Team: Dan Cook, Brian Grolemund, Jordan Stokes**
**Finance: Danny Lopez**
**Instructor: Debbie Hague**

**Target Revenue: $162,000  on 52 Actual MTP Attends**
**Actual Revenue: $62,500**
**Actual Sales Efficiency: $1,157**

**Pending Revenue**: Total Revenue once all pending comes in $118,500 (Sales Efficiency of $2,194)

**Pending Deals:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Charles Ryder | 06/26/16 | 14,000 | 1,400 | 10% | KH | | 100.00 | 0.7% | 1,300.00 |
| Robert Dorant | 06/26/16 | 35,000 | 8,750 | 25% | AB | | 100.00 | 0.3% | 8,650.00 |

**Attachment ZZI**

KBH11678-3
EX 13
7808

| Ralph Wade | 06/26/16 | 7,000 | 1,000 | 14% | KH | | 100.00 | | |

All Pending deals to be completed within next ten days while ECs are helping students to facilitate access to moving their money around to afford down payments.  2/3 deals are resource deals, other $35K total solution total amount is coming from the students RSP account.

**Celebrations:**
- Finance Manager Danny Lopez did a great job on this event and made himself available to all students. He did an exceptional job in walking our total solution student through on how to access his money in his retirement account to help him to afford his tuition.
- Admin Whitney Donahue did a great job on this event from start to finish


**Challenges:**

- On this remote event we did not get enough attends.  We only had 54 attends in Indy vs. the 111 attends we had in Honolulu.  It made for too small of a room on a remote event.  We had 139 initial registrations on Indy, but a low show rate.  Even with a strong close rate of 52% on the PTW we didn't get enough people onto this remote event to get to the revenue number we needed to hit.  However this was not the only contributing factor to the struggle on this event:
- Instructor Debbie Hague was off of the MTO slide deck on this event.  Her price presentation was weak and lacked urgency.  Additionally she was teaching quite a bit of Core Strategy on Day 3 from the front of the room and several of our resourced students that had trading experience commented that they felt they could go home after the 3 days and do this themselves without additional classes.  Debbie also seemed very distracted on this event, taking longer than normal breaks to deal with personal issues surrounding the sale of her home going on during day 2 and 3. The breaks extended so long in the afternoon on Day 3 that students began to leave the MTO because of it. Additionally Debbie had her daughter Tameka attend class all 3 days and sit in the class as if she was a student.  Tameka was implanting herself in conversations with students and then giving ECs feedback on their performance.  Several of the ECs gave feedback that they felt uncomfortable with this happening and that it was leaving them feeling uneasy in general.  ED did not tell instructor to not have Tameka return on Day 3 as she didn't want to discourage the instructor or have the instructor derail on day 3 due to this, however in hindsight ED feels that she should have told the instructor that her daughter could not return on day 3.  ED feels that her daughter has not been trained in our sales process and this was not a good idea at all.  ED believes these actions cost us at least $50-$75K in lost sales.
- EC Jordan Stokes gave his resignation on Day 1 of this event advising ED that this would be his last event with OTA.  ED feels that there wasn't 100% effort put forth on his leads due to him knowing that this would be his last event with OTA.  However, ED did not know until day off that EC was tendering his resignation.  Jordan had a student that eventually worked to poison the rest of the room on Day 3 and impacted several of the students that EC Brian Grolemund was working with.
- EC Brian Grolemund had a good group of students that he felt confident with through the IWEP and in Day 1. However, he had a student who pulled up negative reviews on Rip-off report early on Day 3 which permeated that class and derailed several good potential sales on day 3.  These students could not be swayed to move forward after reading the rip-off report review.  ED believe the negative report on Rip Off cost us at least two solid income solution sales.
- This class could have pulled out at least $200K with only 1 of these issues happening, however with ALL of these issues accumulating the event turned out poorly. Amanda is extremely disappointed with the results and will be working with the team to shore up weaknesses as we forward face into upcoming events.

**Attachment ZZI**

KBH11678-4
EX 13
7809

# Indianapolis    6.24.16-6.26.16

| | |
|---|---|
| Instructor: | **Debbie Hague** |
| Education Director: | Amanda Barberiz |
| Lead: | Amanda Barberiz |
| Finance: | Danny Lopez |
| Center Administrator: | Whitney Donohue |

## KPI Targets

| | |
|---|---|
| # of PTW Attends | 54 |
| Center KPI Revenue Target | $162,000 |
| # of Gross Registrations | 27 |
| EC KPI Revenue Target | $270,000 |

| | | |
|---|---|---|
| $ per PTW Attends | $1,157 | $3,352 |
| $ per Registrations | $2,315 | $6,704 |

## Statistics and Totals

| | Day 1 | Day 2 | Day 3 | Shoe | Pending |
|---|---|---|---|---|---|
| Projected Revenue | $281,000 | $243,000 | $118,500 | $0 | $56,000 |
| Students Attending | 22 | 22 | 15 | | |
| # of Buyers | | | 6 | | |
| Close Rate | 27% | | | | |
| $ per Head | $12,773 | $11,045 | $5,386 | | |
| Day 2 NO SHOWS | | 0 | | | |
| Day 3 NO SHOWS | | | 7 | | |
| **Projecting Pending Total Sales** | | **$118,500** | | | |
| **Actual Total Sales** | | **$62,500** | | | |

**Attachment ZZI**

KBH11678-5
EX 13
7810

| Education Counselor | Gross Registrations | Revenue | $ per Registrations |
|---|---|---|---|
| **Dan Cook** | **8** | **$53,000** | $6,625 |
| **Brian Grolemund** | **10** | **$14,000** | $1,400 |
| **Jordan Stokes** | **9** | **$51,500** | $5,722 |
| | | | |
| | | | |
| | | | |

**Amanda Barberiz**
*World Wide Education Director*
Online Trading Academy



17780 Fitch Avenue Suite 200
Irvine, California 92614
Email  |  Website
Skype: abarberiz
949.422.5603 | Direct Line

"The best teamwork comes from those who are working independently toward one goal in unison." --*James Cash Penney*

KBH11678-6

**Attachment ZZI**

EX 13
7811

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Sunday, July 24, 2016 12:07 AM |
| **To:** | Keeley Hubbard <keeley.hubbard@otahq.com> |
| **Subject:** | FW: Ashton in CE EC Role |

??

**From:** Eyal Shahar
**Sent:** Friday, July 22, 2016 2:05 PM
**To:** Sam Seiden <sseiden@otahq.com>
**Subject:** RE: Ashton in CE EC Role

I am ok with the concept.
Let's get a good comp plan that will have less overhead but can make them more money with CE.
One question is 10% pay of Ignite whole event just his student I need much better clarification how will he get paid we should not say 10% from all ignite event as I do not know what he will do.
Referral is ok but I have an issue also on the 10% is that on top of 10% commission to the sales guy that get them? If so we will be paying 20% total commission and we do not pay now 10% extra for referrals as far as I know so that is a big change.

The email I got from Keeley about WW was in the direction of getting an EC to do student support as he can't sell and giving them 60-70 comp I said no. They used the $80k of Nicol as reface point and I said that is not the reference point we let her go the reference point needs to be $40k starting student support.

We have to keep cost at bay all the time.

Eyal Shahar
President
Online Trading Academy
**Virtual Conference**



17780 Fitch, Suite 200 Irvine, CA. 92614
eyal@otahq.com
www.tradingacademy.com
888.346.8710 I Toll Free
949.608.6010 I Direct Line

**With passion and possibility - obstacles simply give way**



**From:** Sam Seiden
**Sent:** Friday, July 22, 2016 6:36 AM
**To:** Eyal Shahar <eyal@otahq.com>
**Subject:** Ashton in CE EC Role

Eyal,

KBH12139-1
EX 13
7812

Randy plans to move Ashton (LA Student Support) into a "CE" focused EC role once we are able to recruit and train his replacement.

Our plan for the new Student Support Role will be a different compensation plan with more of an entry-level salary and incentives on sales. The goal is to transition all support people to a new comp plan that was lower but had upside sales incentives. This will only happen if the ED believes the support manager is a good fit for the role or they will replace them with someone else.

Our comp plan for Ashton would be to move him to a normal EC commission plan where he earns 13% on non-event CE sales, 10% on Ignite, and 10% on any MTO leads that he generates from referrals.

He is currently earning $57K in his Student Support Role and we'd like to put him at $5K/month guarantee/NR draw for 6 months once he starts in his EC role.  This will help us train him and get students re-engaged from the database for CE sales which typically takes 2-3 months to build a pipeline.  Randy is confident he will sell well above the $5K minimum within 3-4 months.  After the 6 months of a $5K draw, he will drop down to the normal $3K NR EC draw compensation.

Sam

KBH12139-2

**Attachment ZZI**

| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Wednesday, August 10, 2016 4:18 PM |
| **To:** | Jeremy Nosek <jnosek@otahq.com>; Eyal Shahar <eyal@otahq.com>; Gene Longobardi <gene@otahq.com>; Aaron Neilsen <aneilsen@otahq.com>; Keeley Hubbard <keeley.hubbard@otahq.com>; Shamus O. Connor <soconnor@otahq.com> |
| **Subject:** | RE: Qualifying Recap |

Never really disqualified correct.

**From:** Jeremy Nosek
**Sent:** Wednesday, August 10, 2016 11:14 AM
**To:** Sam Seiden <sseiden@otahq.com>; Eyal Shahar <eyal@otahq.com>; Gene Longobardi <gene@otahq.com>; Aaron Neilsen <aneilsen@otahq.com>; Keeley Hubbard <keeley.hubbard@otahq.com>; Shamus O. Connor <soconnor@otahq.com>
**Subject:** RE: Qualifying Recap

Hi Sam,

Looping Gene in. It looks like you had inadvertently added an incorrect email address.

I've been under the impression that COUs have never had a policy of disqualifying in IWEP – aside from extreme cases. Could you confirm? I was interpreting the note below to say that we have disqualified in the past and then changed policy when attends started decreasing, which would have been April – June of this year (spring/summer slowdown).

This will be important to understand so that we can watch trends closely as we'd expect a decrease in net PTW sales (with more refunds) and increase in MTC close rate. If we have had a policy of disqualifying in the past, than we should look at the period that were running the business with this policy in place to compare results. Again, I was under the impression that we had not been doing this so I didn't assume this was something we'd be able to look at but it sounds like maybe my assumption was incorrect.

I think this change is a good direction and am not suggesting that we do not implement it. But we should certainly look at past results if we are resorting back to a process that we have had in the past vs. doing something completely new for COUs. As you pointed out, this is not new for the network and has already been proven out with many successful centers.

Let me know. I will make sure you, Keeley and Shamus have good visibility to the changes in the sales KPIs across COUs as we implement this.

Thanks, -j.

**From:** Sam Seiden
**Sent:** Wednesday, August 10, 2016 7:53 AM
**To:** Eyal Shahar <eyal@otahq.com>; geminc (geminc@bnin.net) <geminc@bnin.net>; Jeremy Nosek <jnosek@otahq.com>; Aaron Neilsen <aneilsen@otahq.com>; Keeley Hubbard <keeley.hubbard@otahq.com>; Shamus O. Connor <soconnor@otahq.com>
**Subject:** Qualifying Recap

C Team, Keeley, Shamus,

This email is to recap a key point I pushed in the C meeting and a topic Keeley and I discuss often, disqualifying.

- We determined yesterday that it made sense to move all COUs to $299 to help fill MTO's with qualified attends, I love this and the ED's seem to also. Keeley wanted to wait on Boston and maybe one other as attends are low so she can weigh in.
- As I explained yesterday, with attend and quality issues the first half of the year, the COU strategy was NOT to disqualify and instead, put everyone in the MTO. We only disqualified very extreme cases at times. Going forward, Keeley and I will work with the EDs/ ECs to start disqualifying people during IWEP that don't have money, now that attends are up. This should have a few benefits on the sales side and also raise moral of the sales and presenter teams.

This is a significant strategy change so I wanted to recap in email before we start to implement this week. This is also closer to what strong centers in the network do.

**Attachment ZZI**

KBH12459-1
EX 13
7814

Thanks,

Sam

KBH12459-2

**Attachment ZZI**

| | |
|---|---|
| **From:** | Eyal Shahar <eyal@otahq.com> |
| **Sent:** | Thursday, October 6, 2016 5:30 AM |
| **To:** | Keeley Hubbard <keeley.hubbard@otahq.com>; Sam Seiden <sseiden@otahq.com> |
| **Subject:** | RE: COU Weekend Performance |
| **Attach:** | image005.png |

Thank you Keeley.

I read all the comment about Boston but I think Debbie is also an issue.

I had at least three discussions with you or Sam that Debbie performance is getting lower and your reply was "I agree we are removing her from our schedule" and a month later we have another low performance class with her and I get the same answer.

Why is she on the schedule?

What is the plan with her going forward?

I would like to get every month the MTO teachers schedule for the next 90 days emailed to me please.

Thanks

Eyal Shahar
President
Online Trading Academy
**Virtual Conference**



17780 Fitch, Suite 200 Irvine, CA. 92614
eyal@otahq.com
www.tradingacademy.com
888.346.8710 I Toll Free
949.608.6010 I Direct Line


**With passion and possibility - obstacles simply give way**



**From:** Keeley Hubbard
**Sent:** Monday, October 03, 2016 9:55 PM
**To:** Sam Seiden <sseiden@otahq.com>
**Cc:** Eyal Shahar <eyal@otahq.com>; Jeremy Nosek <jnosek@otahq.com>; Aaron Neilsen <aneilsen@otahq.com>; Gene Longobardi <gene@otahq.com>
**Subject:** COU Weekend Performance

Hi Sam,

Please see this past week's MTO performance--small week with only 3 MTOs.  Let me know if you have any questions!

Thanks,
Keeley

**KBH13246-001**

**Attachment ZZI**

EX 13
7816

**Total Revenue: $240,640 Actual Sales** (Additional $7K Pending to bring total to $247,640) on 3 MTOs

*Note*: 23 MTOs this month compared to 26 previous month (no WW hotel events)

**Coming Up**: 6 MTOs (see screenshot below)



Austin 9/30 (Chuck Fulkerson)
- $138,000 on 18 students ($7K Pending) $145,000 Expected Total Sales
- Only 51 MTP Attends fed this MTO –this is the norm for Austin
- 58% Show Rate / Slightly higher Re-S than normal on this class
- Dan, Victoria, and Brian King on this class (2 A players, 1 B); Dan did $80K of these sales and Brian King struggled again with studnets that had resources and he ended up with the majority of them.
- Amanda's Note on Instructor: Chuck struggled with building value and keeping on time with breaks on this class – ECs had to double up in the afternoon on Day 2 seeing two students at a time on breaks which resulted in shorter EC meetings with students after price drop and didn't allow ECs to have the depth of conversation they would have liked to have with the more resourced students.
- 30% Cash Collected Average (Higher than we've typically seen)
- 33% Close Rate

Toronto 9/30 (Lloyd Boucher)
- $77,140 (101,500 CAD) on 7 students (No Pending)
- Small Class but good performance.  Jonathan did $48K of the revenue—it's good to see his performance improve.  Sean has now blanked 4 weeks in a row which has cost the center about $120K - $150K in expected revenue.  David is doing a performance review with him this week with clear expectations of expected improvement.  Kathy is in her last 30 days of training and will be able to begin taking registrations soon which will help alleviate the risk of giving regs to Sean.
- Terrible show rate at 22%--18/36 registrations were canceled due to lack of resources and some of them lack of interest as they'd been rescheduled many times.  Sean had 10 regs and 1 show—other ECs show rates were slightly higher but dismal.  David and I have talked about the ECs having too many IWEPs to handle for each MTO which is decreasing the quality of their conversations and they aren't hungry enough to get these people through the process and closed.  This is largely caused by $149 tuition and we are discussing moving them back to $299 this week (and managing the transition so we don't have a challenge similar to Boston)
- Next MTO with Sam Evans is a healthy 38 regs
- 53% Cash Collected Average (←Another great MTO with increased deposits)

KBH13246-002

**Attachment ZZI**

EX 13
7817

- 57% Close Rate

Boston 9/30 (Debbie Hague)
- $25,500 on 12 students no pending—possible $50K shoe deal but it's shaky)
- Dave's Notes on Biggest Challenges:
  - We had 3 hiccups that I believe hurt this MTO. The first being that we had a mixed class of $149 and $299's. This was not the biggest of the problems but it did create trust issue. The issue wasn't so much what some students paid but the two different retail prices shown ($1,000 vs $499). That seemed to be where the discussions focused.
  - We felt that we overcame that price objections but then we had several students that went home after day2 and researched OTA and trading programs, one of which came in with 3 to 4 companies that offer courses in learning how to trade ranging in price from $1,000 to $5,000 and then proceeded to share what he found with others.
  - Lastly we had the finance hiccup on day2. Unfortunately, Whitney stumbled on her words, blanked out on what to say several times and in short presented finance by calculating the student's payment with 25% down (not asking for anything more than 25% and automatically going to 24 months) then simply spinning the calculator around and saying "Here's your pmt. What do you want to do?". Nice girl, just needs training--but as you know upon hearing this I immediately jumped in and took finance over but with all 3 hiccups combined I believe it hurt this MTO because I never saw such a palpable change in a classes demeanor on a day3 (despite everyone loving Debbie) and then after class, leaving so fast.
  - Keeley is starting weekly sales training with the team and this is additionally what I'll be focused on with the EC's:
    - Pattern Interrupts – prospects have been moving back into classic "lie, free consulting, lie and leave" mode.
    - Helmets – Team needs to be putting better and stronger helmets/mindset protection on their students and reinforcing them throughout the 3 days
    - For whatever reason Boston is more of the "show me state" than Missouri. A very high percentage of our students research the heck out of us and their instructor (we had students research Debbie last night and had students research Sean Kim last week and just about every MTO). They also continue to ask for social proof "who's making money?" "Can you give me the names of successful students?", etc. Need help here.
    - Lastly we as a team need to do a better job of setting students up during their TP's before the MTO so that when their students arrive they're better able to connect the dots between their pain and the solution being trading. The "ahhh haaa I totally get how this is the answer to my problem...
- 18 Original Registrations, 66% Show Rate
  - July and August had 40 MTO Attends- Sept dropped substantially to only 26 MTO Attends and October is on track for 20-22 total MTO attends based on current regs. The main challenge is lack of volume in attends and many that are lower-resourced are now being dq'd out of the process. Keeley & Jeremy have a meeting with Dave on Wednesday to address MTP Attends and the in-center/remote MTP balance.
- Keeley also traveling to Boston after IC to spend time during MTP, MTO & continuous sales training with a CE focus
- 22% Cash Collected Average
- 8% Close Rate

KBH13246-003

**Attachment ZZI**

EX 13
7818



**Keeley Hubbard**  |  Vice President of Admissions

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Cell:** 949-648-2040  **Toll Free:** 888-841-8418  |  <u>Email</u>  |  <u>Website</u>

**Attachment ZZI**

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Tuesday, January 17, 2017 7:23 PM |
| **To:** | Shamus O. Connor <soconnor@otahq.com> |
| **Cc:** | Keeley Hubbard <keeley.hubbard@otahq.com> |
| **Subject:** | RE: MTO Day 2 and Day 3 Decks |

The deck needs to include the new stock section... I will send today.

Sam

**From:** Shamus O. Connor [mailto:soconnor@otahq.com]
**Sent:** Tuesday, January 17, 2017 1:14 PM
**Subject:** MTO Day 2 and Day 3 Decks

Hi Team,

The decks are up on network connections. The only difference in Day Two is the new mastermind section. The only difference in Day Three is the Tradestation slide in the broker section. Please use these decks this weekend. We will be sending out the new decks soon but they are not to be used until the official rollout. Thanks!



**Shamus O'Connor** | Presenter Development Manager

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Office:** 949-475-5652  |  **Email**  |  **Website**

KBH15285-1

**Attachment ZZI**

EX 13
7820

**From:**      Sam Seiden <sseiden@otahq.com>
**Sent:**      Friday, January 20, 2017 1:41 PM
**To:**        Keeley Hubbard <keeley.hubbard@otahq.com>; Shamus O. Connor <soconnor@otahq.com>
**Subject:**   Sam Slides
**Attach:**    MTO Slides Day 1 new slides.pptx

Team,

Slide 6 and 7 are very similar… I built 6. Please chose between the two or consolidate based on your best judgement. This section really needs to make the stock program sizzle.

There are a couple Futures slides and some stock slides in this…



**Sam Seiden**  |  Chief Education Officer
Virtual Conference

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Office:** 847-652-6171
**Toll Free:** 888-841-8418

KBH15331-1

**Attachment ZZI**

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Wednesday, February 8, 2017 7:11 PM |
| **To:** | Gene Longobardi <gene@otahq.com>; Keeley Hubbard <keeley.hubbard@otahq.com> |
| **Subject:** | Sam/Keeley slides |
| **Attach:** | Leadership Connection Sam.pptx |

I will take first part and turn over to Keeley for MTO portion...



**Sam Seiden**  |  Chief Education Officer
[Virtual Conference](Virtual Conference)

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Office:** 847-652-6171
**Toll Free:** 888-841-8418

KBH15940-1

**Attachment ZZI**

EX 13
7822

Copyright 2016 OTA Franchise Corp. - CONFIDENTIAL

# Education



**Attachment ZZI**

# New OTA Education Path - Program Document

Program Document will detail information of the Product Implementation of the New OTA Education Path:

- Available on NetCon
  (DREW PATH)

- Emailed to Owners, GMs, and Eds



**Attachment ZZI**

KBH15940-Attach-2
EX 13
7824

---

### New OTA Education Path
*Program Document Q & A*

**In this document we will address the following major topics:**

- Core Strategy Program
- New Pro Trader Course and Pro Trader Application
- Online Practice Labs
- New Core Strategy XLT
- Green on the Screen
- Trade Tracker

**Core Strategy Program**

**Q1** What is contained in the new Core Strategy Program?

**A1** The new Core Strategy Program consists of the Pre-Essentials (discussed further below), Pro Trader Course, the Core Strategy XLT and Online Practice Labs. At a more detailed level, the Pro Trader Course is broken down into two components: Pro Trader Course (5-days) plus the Pro Trader Application (2-days). See section on Pro Trader Course and Pro Trader Application for more details on structure.

**Q2** What are the prerequisites to enter the Core Strategy Program?

**A2** New students will have just completed the Market Timing program, but the Market Timing Program is not a required prerequisite. The only prerequisite is completing the Pro Trader Pre-Essentials prior to coming to the Pro Trader Class.

**Q3** Does the Core Strategy Program serve as a prerequisite for the rest of the OTA Education Path?

**A3** The entire Core Strategy Program is the prerequisite to enter into any and all other Asset Class programs

# New OTA Education Path

## Core Strategy Program

- New Pro Trader Course
- New Practice Labs
- New Core Strategy XLT
- Green on the Screen
- Trade Tracker



Copyright 2016 OTA Franchise Corp. - CONFIDENTIAL

**Attachment ZZI**

KBH15940-Attach-3
EX 13
7825

# Core Strategy XLT – Grandfather Focus Group

We would like to invite any Owner interested in being a part of a focus group to discuss considerations related to the implementation plan for Grandfathering the Core Strategy XLT

A special focus group session will be held next week online – please indicate your interest in participating in the text box or email to Steve Albin.



**Attachment ZZI**

KBH15940-Attach-4
EX 13
7826

# Updates to Sales Process



✓ New MTO Workbook with Core Strategy Curriculum & Solution Updates

✓ New Education Plans for EC Day 1 Coaching Sessions

✓ New Offer Flyers with CS & 29K Wealth Solution

✓ New Sections in MTO



Copyright 2016 OTA Franchise Corp.- CONFIDENTIAL

**Attachment ZZI**

# MTO Updates

- Use MTO Outline Document as Resource for Sales Team
- Added Wealth Section & PAI Strategy to Day 1—
  - Formerly only Wealth Section on Day 2
  - Added Wealth Challenges & Solution (401K & Pension)

- Added All-Asset / Market Correlation Section on Day 2 to increase 3 Program Sales
- Added Powerful Stock Section





Copyright 2016 OTA Franchise Corp. - CONFIDENTIAL

**Attachment ZZI**

KBH15940-Attach-6
EX 13
7828

# MTO Updates

- Simple & Clear Structure for Each Asset Class Section:
  - Futures Explanation
  - Futures Benefits
  - Futures Education Process—Program Explained
  - Futures Trade Examples via <u>Testimonials</u>, XLT, Pro Picks, & MMC
  - Futures Solution Planning









Copyright 2016 OTA Franchise Corp. - CONFIDENTIAL

**Attachment ZZI**

# MTO Updates

- Simplified Offer Section
  - Core Strategy Program & Student Success Measurement Explained (Achieving Green on the Screen)
  - $29K (3) Program Wealth Solution
- Added Next Steps Section with Student Support Network
  - Builds Student Confidence
  - Onboarding & Support

For complete review of MTO and sales process updates, view these Forum Recordings:
January 10th
January 25th



Copyright 2016 OTA Franchise Corp. - CONFIDENTIAL

**Attachment ZZI**

KBH15940-Attach-8
EX 13
7830

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Thursday, March 2, 2017 1:05 PM |
| **To:** | Keeley Hubbard <keeley.hubbard@otahq.com> |
| **Subject:** | FW: Sam Updates |

---

**From:** Eyal Shahar
**Sent:** Thursday, March 2, 2017 4:38 AM
**To:** Sam Seiden <sseiden@otahq.com>
**Cc:** Aaron Neilsen <aneilsen@otahq.com>; Gene Longobardi <gene@otahq.com>; Jeremy Nosek <jnosek@otahq.com>; Eyal Marmareli <eyalm@otahq.com>
**Subject:** RE: Sam Updates

Great update thank you!! Good focus.

My mom is stable for now with pain medication and I feel I am helping a lot in stabilizing her.

Let me know what is the final number for UK it is very concerning to me that we can have such a low number.
I was really excited seeing we are at the $4.8 M for COU as I hoping and the set back of eth report was disappointing. We have to keep focused as you do on sales and marketing efficiency.

I am glad we are helping Ed Ponzi he needs it so let's use him at home best we can.

I will read this more in the next couple of days and email if I have more comments.

Hugs from Israel.


Eyal Shahar
President
Online Trading Academy



17780 Fitch, Suite 200 Irvine, CA. 92614
www.tradingacademy.com
888.346.8710 I Toll Free
949.608.6010 I Direct Line

**With passion and possibility - obstacles simply give way**

---

**From:** Sam Seiden
**Sent:** Wednesday, March 1, 2017 9:13 AM
**To:** Eyal Shahar <eyal@otahq.com>
**Cc:** Aaron Neilsen <aneilsen@otahq.com>; Gene Longobardi <gene@otahq.com>; Jeremy Nosek <jnosek@otahq.com>; Eyal Marmareli <eyalm@otahq.com>
**Subject:** Sam Updates
**Importance:** High

Eyal,

Here is an update of the initiatives I am working on that you asked for. There are more but these are the key ones. The attachment

**Attachment ZZI**

KBH16436-1
EX 13
7831

and info below are the same thing, read it how you want to. I was able to reply so quick because I am deeply involved in all of this so if you have any questions, just ask. Also, the NY Expo ended yesterday, went great. I will send results shortly. What worked was going in with a solid strategy for PTW registrations and a team that executed well. I am waiting for confirmation of the number. Then we will measure show rate and ultimate conversion and $$ from MTO for the Expo group. Went very well.

Update us on your mom when you can. And, how are you doing?

**Updates:**

**COU's**
Driver – Sam/Keeley

- Marketing
  - o    Using tablets in Vancouver & Boston front-end marketing
  - o    Using tablets in confirm calls for NYC/LI
  - o    No tablets in all other centers
  - o    Keeley and I working with Jeremy on Q2 Budgets
  - o    Monthly meetings with each ED to evaluate channels & performance + Remote MTP Plans (adding remote MTP test in Vancouver)

- Self-Sufficient Centers
  - o    MTO & MTP ANBs- EDs handling at center-level with extra EC staff (i.e. Brenda/Kip in Irvine) / will also incorporate selling strategy for lower-priced product
  - o    Working with Jeremy/Gene on some centers transitioning confirmation calls to the center- Keeley to present to EDs at Summit (ED's want this)

- Sam/Keeley working with Aaron on P/L
  - o    Set benchmarks & targets for Cancelations/Bad Debt
  - o    High breakeven for many centers with no solid answer as to why, we are discovering why & strategy to improve profitability. We spent an hour with Aaron yesterday on this, great discussion. We are getting             closer to answer but still don't have them. Keeley and I will now have monthly meetings with Aaron on P&L.
  - o    Keeley to show EDs @ Summit & set up monthly meeting to review with Aaron, Sam and Keeley (this is important)
- CE Re-engagement & Student Support
  - o    Will spend a lot of time here at ED Summit to come up with strategy for more CE sales from the database

**ED Summit Topics:**
Driver – Sam/Keeley
  - o    CE Re-engagement Initiative
  - o    Student Support & Retention / Improving Cancelations & Bad Debt
  - o    MTP & MTO ANB local initiative
  - o    Taking MTP Reg Confirm Calls in Center
  - o    Review P/L Structure
  - o    Best Practices for Remote MTPs
  - o    ED's #1 request: Create foundation of how we do business for COU's. More assessment and evaluation before tests and new initiatives — list of things we can't violate / mantras / i.e. if we are going to run a             tablet test, have they been run through those points—foundation of how we do business). Create more stability at COU's. Less knee jerk reactions, more ED ownership of COU's and strategic decisions.
  - o    ED's #2 request: Share best practices

**COU Feb Update:**

**Attachment ZZI**

KBH16436-2

EX 13

7832



**COU Notes:**

• Strong month for LA & Irvine –anticipate this continuing / tough MTO at the end of the month in Irvine that would have put them over $1M but was filled with resource-challenged students / should be through all of the tablet prospects in March

• Boston had a tough month but should hit their quarterly target as they have CE events in March / working on CE process with Dave & re-engagement efforts that will help hedge high-stakes MTOs

• NYC & LI collectively hit their target / seeing better quality prospects coming through NYC—evidence of this in the larger deal size & total MTO revenue (increased TV spend)

• San Diego had a tough month due to very low net preview close rate in January (18%) because of tablet quality issues / their MTOs had high close rates and high $ per head—they do well when they have full classes

• London—Dan anticipated hitting $200K this month so this final number seems pretty far off; lower-resourced students in MTOs, will also spend time with Jeremy to localize marketing

• Toronto missed target by about 100 attends / disqualified a lot of January MTP buyers from tablets and smaller MTOs similar to San Diego

• Vancouver came close to target—they still have some pending deals that could push this higher if they close in the next day; Michael working hard to make up deficit in March to hit Q1 target

• Austin—high revenue target based on SPA of 3800 and 100 attends; attends came in very high because of tablets and initial revenue around $250K—additional pending deals should push this closer to $350K

• WW's biggest win was Honolulu (additional pending still closing) and toughest event was Pittsburgh—re-evaluating mid-west markets and increasing cadence in high-performing markets; SLC underperformed by $200K—strange group of students with majority of the room around 70 years old / ideal cadence for WW in the future will be 2 of our best markets in Core and 2 RE events per month;

o **Keeley needs ability to see WW markets broken out in Sisense instead of all totaled together—difficult to evaluate WW

**MTO Instructors**
Driver – Keeley/Shamus

o Adding Daren Kimoto to Keeley's team alongside Shamus to help recruit, train, and manage MTO instructors to higher performance. He is also working on the MTO Deck and building a full day of the new Stock course. I worked with you on the frame work for a comp plan, I want to talk to you about it one more time please.

o We have 5 new MTO instructors in training (John Larson, David Thompson, Karen Trisko, Dawn Doherty, Rick Meadows, Steve Hanaho).

**OANDA**

• I talked to Steve and Aaron about Ed Ponsi helping with OANDA and Steve is working on it. We will also get him some online FX classes.

• I met our main OANDA contact at the NY Expo. He came specifically to meet me at my lecture, they aren't doing anything at the Expo. We sat down and spent some time talking about things we can do together, Expos and much more both online and off.

**Lower Price Point Product**
Driver – Sam/Chuck

• Been working with Chuck and Ryan on this and I think we have it nailed. I will send the plan this week of what the product

**Attachment ZZI**

KBH16436-3
EX 13
7833

is, how we sell it, price point, how we upsell from it, how we fulfil it at a low cost, and when          we can test it.

**Real Estate**
Driver - Keeley
- o     SLC Previews: 3/14 – 3/18 (Lance)
- o     3-Day: 3/30 (Zani) (Keeley will be on-site)
- o     Projects in the Queue:
  - ○ 3-Day Slides- Keeley spending 2 days with Zani to prepare for SLC (today and tomorrow)
  - ○ Deal Board Redesign
  - ○ 3-Day Workbook Re-write
  - ○ New offer (23K, 26K, 35K) with a lot of value built-in to the Total Solution to raise average deal size to Core Business standard
  - ○ Added On-Site Foundations Class 3 weeks after SLC event to improve retention
  - ○ Added 2 additional sales trainings for WW Team prior to event

- o     Rollout Plan: Evaluate WW markets to increase to 5 - 6 RE events per quarter, evaluate COU markets—start with smaller markets that are ideal fit for RE business & do not need additional staff or space / plan for larger rollout into bigger centers with a staffing plan.
- o     RE Business Plan: Sam, Keeley, and RE team are working on this now. We will report when you (Eyal) get back if not sooner.


**Student Success**
Driver - Steve
- •     April 1 Product Launch – Completely on track
  - o     Pro Trader Class – April 1
  - o     Core Strategy XLT – Complete and Delivering
  - o     Pre-essentials – Complete and Delivering
  - o     Practice Labs – Complete and Delivering (hasn't been volume tested yet but all is going well so far)
  - o     Post class survey to better monitor results – April 1
  - o     Fulfilment Rollout: We have held forums each week for the network with training and updates.
  - o     Core Strategy Instructor Training – Completely on track, we went over details with you in C team meetings, great work by Steve and Larry, never had training this detailed.

**Live Events**
Driver - Chuck
- o     We are building the business plan and can go over that when you get back
- o     I moved the Signature Series over to Live Events which will really help as there is now a sales team tied to this. Sales is key as we need to call to fill rooms and be at the events to upsell. This was missing with Ops driving the initiative.
- o     You get the reports each week so no need to update on that.

**OTA Webinars**
Driver – Ara/Sam
- o     We had two meetings to share with the team, Gene and Jeremy were on the calls. These are for grads and prospect (separate). Look for these to begin in March. I can go over detail anytime.

Sam

-----Original Message-----
From: Eyal Shahar
Sent: Wednesday, March 1, 2017 3:19 AM
To: Sam Seiden <sseiden@otahq.com>
Subject:

Hi Sam

Please send me a short email with updates from the last couple of weeks on all initiatives

**Attachment ZZI**

KBH16436-4
EX 13
7834

Also did you involve Ed Ponsi in Oanda transition I would love to help him earn income while he is at home

Thanks and hugs from israel

Eyal Shahar
President
Online Trading Academy
Www.tradingacademy.com
Sent from my iPhone



**Sam Seiden** | Chief Education Officer
Virtual Conference

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Office:** 847-652-6171
**Toll Free:** 888-841-8418

KBH16436-5

**Attachment ZZI**

EX 13
7835

| From: | Eyal Shahar <eyal@otahq.com> |
|---|---|
| Sent: | Friday, March 10, 2017 7:20 PM |
| To: | Keeley Hubbard <keeley.hubbard@otahq.com> |
| Cc: | Sam Seiden <sseiden@otahq.com>; Eyal Marmareli <eyalm@otahq.com>; Aaron Neilsen <aneilsen@otahq.com>; Gene Longobardi <gene@otahq.com> |
| Subject: | Re: Irvine MTO-Need Solution for Resource-Challenged Students |
| Attach: | image001.jpg |

Ok but
1. Try best you can to get $3600 down and make the $3000 exception not the rule
2. The core strategy xlt transition timing. I am Not sure 4 months is the right time what if the want more. I suggest we say the following: at any time you can switch once to forex we think it should be 4 months but you can decide your time. You must complete the forex class to switch
Once the switch was done you can not go back.

Let's see how it goes

I have no idea how the system will support that we may need to deal with this class manually

I am CC'ing Aaron Eyal and Gene so they can think of back office.

I know the franchisees asked the same think you asked me several times so after this class we need to think how we address this and how we price xlt to centers.

Eyal Shahar
President
Online Trading Academy
Www.tradingacademy.com
Sent from my iPhone

On Mar 10, 2017, at 6:42 PM, Keeley Hubbard <keeley.hubbard@otahq.com> wrote:

## Hi Eyal & Sam,

## Irvine has a huge MTO starting today and the class is very resource challenged.

## There are 45 students and based on IWEP conversations about 90% of them can afford a maximum of a $23K solution—but likely less due to deposits and monthly payments.

## We currently don't have a viable solution for these students. We had feedback from the EDs (and even had Leoni on the phone briefly) during ED summit that resource-challenged prospects are not wanting to do a $14K for Core Strategy. The issue is that they can only trade 3-4X per week and most work

**Attachment ZZI**

KBH16624-001

EX 13
7836

full-time so stock market hours are not ideal either—they don't want to make payments for 2 years and still not be able to practice in the Forex market.

We need a solution where they are able to purchase Forex and feel like they have education included in their package that allows them to earn while they learn—this is the sizzle that gets people to move forward.  The team knows that they still need to spend a great deal of time in the CS XLT and practice labs to build a foundation.

Here is what the Irvine team is asking for during this MTO:

$18,500 Tuition
$3K Down Payment (16%--they can't afford much more than this & payments are $773)
Core Strategy Program
Forex Course
*Ability to convert their Core Strategy XLT to Forex XLT & Pro Picks at 4 months and/or after they achieve 'green on the screen'

Previously we said that they could add on the Forex XLT at 7 months and extend their UGA contract—the team's feedback is that this is still not selling students and allowing them to feel like they have education to help them earn while they learn because they are missing the Forex XLT and can only trade a couple of times per week after hours in ETFs.

The bigger issue is that this class is so resource-challenged—hoping that we are almost through all of the tablet people in Irvine which will fix this challenge long-term.

Thanks,
Keeley

<image001.jpg>      **Keeley Hubbard**  |  Vice President of Admissions

**Attachment ZZI**

KBH16624-002
EX 13
7837

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Cell:** 949-648-2040  **Toll Free:** 888-841-8418  |  **Email**  |  **Website**

KBH16624-003

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Friday, October 27, 2017 6:25 PM |
| **To:** | |
| **Subject:** | This Weeks OTA Highlights |
| **Attach:** | OTA Highlights.pptx |

Team,

Attached are some OTA and Student success highlights from this week including today. These serve as strong social proof of both OTA education delivering results and students achieving success and goals. There are many more MC grid highlights from this week but I wanted to keep the slide count to 10 or fewer.

As always, we will update MTP and MTO slides with the recent highlights.

Have a great weekend.



**Sam Seiden** | Chief Education Officer
<u>Virtual Conference</u>

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Office:** 847-652-6171
**Toll Free:** 888-841-8418

KBH19195-1

**Attachment ZZI**

EX 13
7839



**Attachment ZZI**



**Attachment ZZI**

# MC Clubhouse Trading

**10/27/2017:**



- **300+ MC Members**

- **MC Members Sharing Trading Ideas**

- **Profitable Trading**

**Attachment ZZI**



**Attachment ZZI**



**Attachment ZZI**



**Attachment ZZI**



**Attachment ZZI**

KBH19195 Attachment-7
EX 13
7846

| | |
|---|---|
| **From:** | Sam Seiden <sseiden@otahq.com> |
| **Sent:** | Monday, October 30, 2017 10:02 PM |
| **To:** | Darren Kimoto <darren.kimoto@onlinetradingacademy.com>; Keeley Hubbard <keeley.hubbard@otahq.com>; Shamus O. Connor <soconnor@otahq.com> |
| **Subject:** | RE: MTO Training |

I will get that done for you.

Sam

**From:** Darren Kimoto [mailto:darren.kimoto@onlinetradingacademy.com]
**Sent:** Monday, October 30, 2017 4:59 PM
**To:** Sam Seiden <sseiden@otahq.com>; Keeley Hubbard <keeley.hubbard@otahq.com>; Shamus O. Connor <soconnor@otahq.com>
**Subject:** MTO Training

As I am putting everything together to start training the first group of MTO instructors, I am in need of some guidance......

Can any of you point me in the right direction on who to contact in order to get a GoPro type of device out to each of the instructors that I will be working with so that I can have them record their segments that we will be working on each week?  I know that some of the centers will have the ability to record the instructor, however, I cannot be assured that they will be in one of these centers each week and a Gopro would be better.

Thanks you for you help,

Darren

KBH19216-1

**Attachment ZZI**

EX 13
7847

**From:**      Sam Seiden <sseiden@otahq.com>
**Sent:**      Friday, November 3, 2017 2:59 PM
**To:**        Keeley Hubbard <keeley.hubbard@otahq.com>; Mark Patrick <mpatrick@otahq.com>; Gene Longobardi <gene@otahq.com>; Steve Albin <salbin@otahq.com>
**Subject:**   MTO master document
**Attach:**    Copy of MTO Master Document (002).xlsx

---

Team,

Attached is the MTO Master document with changes.



**Sam Seiden**  |  Chief Education Officer
Virtual Conference

**Online Trading Academy**
**17780 Fitch, Suite 200 Irvine, CA 92614**
**Office:** 847-652-6171
**Toll Free:** 888-841-8418

**KBH19265-001**
EX 13
7848

# MTO Master Document

This Document is Confidential and cannot be distributed in any way without proper permission

**Day 1 Primary Objective:**  You want the student super excited by the end of the day and on a high.  They must feel like "this makes sense" and that they are in the right place. You want them to start wanting this and seeing this as a doable endeavour.   Key Loops that must be laid out on day 1 are the Copy Principle (Anyone can do it), Traditional methods don't work, Making money is like making cookies…..all you need is a good recipe(rules increase your odds of success), Time (you don't need to quit your job) .  Avoid situations that could lead to taking anything away from the student on Day 1(i.e "you will not really know how to do this until you take our core strategy class….etc").  This will kill your day 1 and trigger the "bait and switch" response from you students.  Bottom line is that you want the students to have a very high value positive and exciting experience.

| Time | Section | Key Topics | Key Section Objectives | Key Loops | Pitfalls |
|---|---|---|---|---|---|
| 9:00- 10:00 | Welcome S&D Logic | -Why you are here<br>-Traditional way of thinking<br>-Who has the rules<br>-Compliance Slides<br>-S/D Foundational Logic | Quickly Build Rapport<br>Set expectations and Response Block (Manual issues, wifi/wonder, what will I learn, one on one sessions)<br>Soft introduction of yourself<br>Start introducing S/D via high level Loops<br>**Convey the logic behind S/D in such a way that it cannot be refuted as to its ability to put odds in your favor and make you money** | Thinking like and following institutions increases your odds of making money, Most people struggle on their own, Odds of making money are found in following a proven system, Successful investors have a mentor, If you don't have rules you will inadvertantly distroy your odds of success | Confuse the students when explaining the S/D logic. |
| Misc Notes: | | You must use something in your intro to start getting the student's interaction up. | | | |
| 10:00-10:15 | Break | | | | |
| 10:15-11:15 | SET | -S.E.T Trade<br>-Chart Basic (Candle Sticks)<br>-History of S/D origins<br>-Illustrative Examples | Continue with Establishing the logice of S/D trading<br>Clearly introduce Shorting in the S.E.T. section<br>Establish the Origins of S/D<br>**Students are believing that S/D will work for them** | Wimbledon Analogy (books, youtube will not help), Ramora Analogy. Copy Institutions. Takes Minimal Time:  Introduce the concept of set and forget trading. How we became an academy by accident (mentoring, copying) | You don't explain shorting clearly |
| Misc Notes: | | Accent this section with your passion for S/D.  If they sense you are passionate about this principle, they will believe that it works. | | | |
| 11:15-11:30 | Break | | | | |
| 11:30-12:30 | Zones | Steps to Identify Zones<br>Drawing Proximal Distals<br>Major turning points in the market slides | **Zones will make you money.**  Allow you to see turns before they happen.  Placing your trades in advance so that you do not have to sit and watch the charts all day.  You will also be empowered to know when the overall market will turn.  Illustrate that it doesn't matter the timeframe or asset class you want to trade. | Principle of Copying to be successful.  Books will not help.  Googling will not help, youtube will not help.  On your own you will likely loose a lot of money. | Students assum S/D is only for short term day trading.  Do not talk about or introduce Zone qualifiers in anyway on day 1. |
| Misc Notes: | | | | | |
| 12:30-1:30 | Working Lunch | Show S.E.T Shortfall<br>Play video twice | Establish that they cannot trust having someone else to do it for them.  The performance is too low and the costs are too high.  Use color commentary on the video as it plays. | Fire them, Hire you, know one cares more about your money than who?  Your long term wealth is dying a death of a thousand cuts. | Failing to use language to loop in people that do not have a 401K. |
| 1:30-2:15 | Solution Planning | -Income vs Wealth<br>-Objective, Capital Allocation, Time Allocation, Asset Sellection<br>-Student Testimonials | Help students clearly identify what type of solution they require, cash, wealth or both.  Clearly associate specific asset classes to the various solutions.  Great opportunity to start to show the value of options as a versitile asset class that can work everywhere….Income and Wealth.  **Pinnacle on the testimonials for the wow factor.** | Trading can replace or supplement my job<br>Trading can provide for retirement and wealth objectives<br>Time:  Does not require huge amounts of time<br>Money:  Does not require large assets to start | Spending too much time explaining the trade plans and triggering the wrong questions. |
| Misc Notes: | | | | | |
| 2:15-2:30 | Break | | | | |
| 2:30-3:15 | Wealth: 401K Dynamic Managem ent | -Wealth Pitfalls<br>-3 Legged Stool<br>-Dynamic 401k Management<br>-Retirement Calculator | Start building a defacit that they may be relying too much on SS and pensions being there for them.  You want them to feel the need for at least a plan B.  You can pick market tops and bottoms with S/D.  Show them how to do the retirement calculator.  Seed day 2 PAI and bonds. | They cannot rely on money managers.  Self directing has 3 key bennefits (no fees, flexible investment choices, potential of positive returns in a down market). | Forget to response block fat and happines before they run their retirement calculator. |
| Misc Notes: | | | | | |
| 3:15-3:30 | Break | | | | |
| 3:30-4:15 | Futures | - Benefits of Futures<br>- ETF vs Futures Comparison<br>-Discription of Futures<br>-2 Points per day | Get excited about the profit potential of futures.  The leverage, the capital effeciency and the comparitive safety vs. trading stocks short term(as long as stops are used).  This is a powerful section that can show them the "money".  Overcome time and money objections (takes only $5K to start and 24 hour markets, trade any time). | Reiterate previous loops set as opportunity presents…..Time, money, copy, job replacement, plan B that could become plan A. | Over explaining the asset class. Don't get into the weeds. |
| Misc Notes: | | | | | |
| 4:15-4:30 | Break | | | | |
| 4:30-5:00 | Day 1 Wrap up | -Hard right edge futures example<br>-Promote Day 2 content<br>-Homework reminder | You must promote the next day well. Seed showing them the XLT session and pro picks in the morning.  Remind them about their homework assignments. | | Poor execution on the hard right edge example. |
| Misc Notes: | | | | | |
| 5:00 | End of Day:  Answer student questions and participate in. your EOD wrap up team meeting | | | | |

# MTO Master Document

This Document is Confidential and cannot be distributed in any way without proper permission

*Day 2 Primary Objective:  Continue to reinforce core strategy.  Layer on leverage asset groups.  Show tools and simple process created by academy to learn core and asset groups.  Build value of education through tools such as propicks, xlt, proactive spreadsheet and mastermind community.  Create deficits for income and wealth along with proper solution.  Explain solutions and process along with powerful close.  Incorporate "Why" throughout presentation.  Day 1 was focused on getting them excited about trading/investing.  Day 2 is about what steps they need to take to become a good trader/investor, what training components they will need to do it.  XLTs, ProPicks, MM Grid, etc.  Start hinting to the fact that they cannot do this on their own.*

| Time | Section | Key Topics | Key Section Objectives | Key Loops | Pitfalls |
|---|---|---|---|---|---|
| 9:00-9:30 | XLT Propick Demonstration | Demonstrate a recent XLT and Pro Picks | Show them the proof that S/D works through trades that students are doing with us in the XLT/ ProPicks.  This closes the loops set on day of copying leads to success. | Can you copy?  Learn while you earn?  Don't have to be an expert at first to be successful.  Anyone can do it | Don't sell the XLTs or Propicks.  Just show them more passively. |
| 9:30-10:00 | Start Forex | - Bennefits<br>- Explanation<br>- Common Pitfalls<br>- Learning process | Leverage this section to show low resourced students they have an effective solution.  Show all students that it is flexible with time requirements. | Take opportunity to reiterate you key loops | Over explaining the asset class.  Leaving students thinking they can trade forex without market timming. |
| Misc Notes: You may need to finish Forex in the 10:15-11:15 segment.  Be sure to break on time. | | | | | |
| 10:00-10:15 | *Break* | | | | |
| 10:15-10:45 | Finish Forex | | | | |
| 10:45 11:15 | Start PAI | Cash secure puts<br>- Covered Calls<br>- Learning process –<br>classroom/xlt/model<br>portfolio<br>- model portfolio | Help students understand how important it is to have a retirement account. Build deficit of how a lot of people are not on pace to reach retirement goals.  Help them come to conclusion that mutual funds are a poor product.  Show how broker and mutual fund fees can have a huge impact over time.  Understand why diversification is so important.  Show how we have strategies that make money regardless of market direction.  Prove how the strategy is defensive in a down markets and you need to have plan against crashes.  Explain in a simple way how we sell options on ETFs.  Why will you need passive income for life and how selling options can help you achieve that.  Give proof of strategy working with the model portfolio.  Help them understand that this will not take a lot of time and that it will create a high degree of safety and will generate a reasonable return. | Fire them hire you…..Can you copy? | Confusing them with options  Triggering it might take too much time to learn |
| Misc Notes: | | | | | |
| 11:15-11:30 | *Break* | | | | |
| 11:30-12:00 | Finish PAI | | | | |
| 12:00-12:30 | Solutions | - Not every turn is a level<br>- History of academy<br>- Learning process<br>- Solutions | Understand the history of the academy and the learning process make we have created over the last 20 years.  Show the different solutions for students looking to generate income and/or build wealth.  Be careful not to spend too much time "selling" the programs.  Be "matter of fact".  Do not hesitate or act uncomfortable around the price. | This is where you close your loops which means connecting all the things that you have taught them (your loops) that they need to be successful to the various components of the education.  You do this by using similar key words when discribing the solutions that you used when setting your loops…i.e. copy, mentors, minimal time, safety, you will recieve rules, odds in your favor etc. | Symptoms of being uncomfortable  Appologetic for price  Taking questions |
| Misc Notes: | | | | | |
| 12:30-1:30 | *Working Lunch* | *John Oliver Comedy Retirement Video and then finding money video with Merlin (if needed)* | | | |
| 1:30-2:15 | Basic Options | Benefits of Options<br>Long call<br>Long put<br>Learning Process | Build excitement around options as a versital trading vehicle that can increase their leverage and reduce their risk by being used to replace a stock for trade short term with lower risk and increase rate of return aka leverage.  Do a hard right edge example (Apple, FB, NVDA) showing them the money. | Options are the most versitile asset class.  It can be used with stocks, futures and forex for directional or non directional or bi directional trading.  Build strong value in options as a powerful asset class. | Confusing the student with options.  Poor hard right edge execution |
| Misc Notes: | | | | | |
| 2:15-2:30 | *Break* | | | | |
| 2:30-3:15 | Master Mind | Why Mastermind?<br>Coaching<br>Community<br>Resources<br>Proof with the Grid for income and wealth | Help the students understand all the tools that are available in the mastermind community that will help them get to where they are going quicker and a huge cost savings over time | Time Trading with  other Professionals<br>You are elevated by who you associate with | Selling to hard  Losing room who can't afford it  Pushing only the grid  Overpromising |
| Misc Notes: | | | | | |
| 3:15-3:30 | *Break* | | | | |
| 3:30-4:15 | Bubble of Everything | Cycles and Frequencies<br>Magnitude of Cycles<br>Bond Bubble<br>Real Estate Bubble<br>Stock Mkt Bubble | This is a powerful deficit piece that can create high levels of urgency.  Establish that there is large opportunities to make money on the down side. "who needs a catch up opportunity".  Bear mkts are rare.  You don't want to miss it.  If you are on the wrong side of the market, it could be dissastrous.  If you miss this opportunity, you will not see another one for possibly 10 years. | Time: Urgency, You want time to prepare for this.  Got to act now.<br>Using a Broker during this time will be devstating.  No where to hide.  You have to learn how to trade to be safe.  Cash may not be safe, buy and hold may not be safe. | Too much gloom and doom without ballancing out the upside.  Overly scaring the class.  Not properly explaining all the correlations. |
| Misc Notes: | | | | | |
| 4:15-4:30 | *Break* | | | | |
| 4:30-5:00 | I-Beam Experiment | I-Beam Experiment<br>Homework<br>Promote the value of Day 3 | Hve them go home with a desire to identify their why to help them find the "courage" to act even though they may be nervous or afraid.  Make sure they are excited about the content on day 3 | Courage is not static but is influenced by your why.  If the why is big enough, the how will not matter.  You can accomplish amazing feats if you are motivated enough.  The desire for more money, may not be motivating enough, but everyone, have a key "why" that will cause them to cross the I-beam. | Be sincere. Not seeing the value of Day 3 earlier in your presentation |
| 5:00 | *End of Day:*  *Answer student questions and participate in  your EOD wrap up team meeting* | | | | |

**Attachment ZZI**

**KBH19265-003**

EX 13

7850

# MTO Master Document

This Document is Confidential and cannot be distributed in any way without proper permission

*Day 3 Primary Objective:  Wow, Wow, Wow and more Wows.  Keep the pressure on and keep closing your loops that have been set on days 1 and 2.  You can be flexible with your segments on Day 3 placing your strongest segment with the biggest Wow factors first and in the morning sections.  This is the day that you can be more direct with your, "you cannot do this on your own" loop.  Keep creating value in options, Long term investing, safety for your wealthier students.  Don't let your passion and energy slip.  This day is the difference maker allowing you to close additional business that otherwise would not close.  Prepare a few "chunks" that you can place throughout day 3 on the topic of being decisive, and choosing to move forward even though you might feel fear.*

| Time | Section | Key Topics | Key Section Objectives | Key Loops | Pitfalls |
|------|---------|------------|------------------------|-----------|----------|
| 9:00- 10:00 | Market Traps | Cramer Video News, Technical, Recommendation Traps | If you do not know what tricks institutions use to get you on the wrong sid of the trade, you can get hurt. S/D is your key tool to protect against geing caught on the wrong side of the trade. | Knowledge with out skill still means you have risk un - managed. Reading books or online free education will only lead you into the traps. | Beating up the class too hard and turning off the class. |
| Misc Notes: | | | | | |
| *10:00-10:15* | *Break* | | | | |
| 10:15-11:15 | Options Strategy Straddle Strangle | Basic construction and Guidelines Example Trade (live preffered) | You can make money in any market as long as it moves.  Shows them the money. Takes a minimal time commitment to implement this strategy since it is done only 4 times a year around earnings announcments. | Options are powerful for multiple market directions. Options can increase your odds due to being profitable in more than one direction. | Making options too complex |
| Misc Notes: | | | | | |
| *11:15-11:30* | *Break* | | | | |
| 11:30-12:30 | Long Term Stock | Owning a Company creates wealth -Best way to own a co. -ROE -Intrinsic Value -Case Studies | Powerful for showing how a large portion of your portfolio can be safely invested in stocks without a lot of time once the investment was made.  Go back and showcase great stocks and what price they could have been acquired at the bottom of the last bear mkt to show the profit potential that will be had at the bottom of the next. | You can make a lot of money, with very little risk at the bottom of the next bear mkt with this approach as long as you are ready and have made money trading on the way down. | Forgetting to show them the profit potential by showing what great stocks have done since Mar 2009 |
| Misc Notes: | | | | | |
| *12:30-1:30* | *Working Lunch* | *Show Pre-recorded XLT trading videos from NetConn, commenting and closing loops.  Edifying the XLT instructors* | | | |
| 1:30-2:15 | Wealth Strategy with bonds and hedging | -Invest Differently -Concept -Construction -Example | Show the students with wealth that they can create great safety in a portfolio with profit potential. Emphasize that the amount of time is negligable and reinforce the value of learning options. | Safety, Low maintenance | |
| Misc Notes: | | | | | |
| *2:15-2:30* | *Break* | | | | |
| 2:30-3:15 | Entry and Exits | -Entrie types -Zone Qualifiers -Examples -Exits -Examples | This section can be used to illustrate subtly that they do not have everything yet.  Zone Qualifyers are key.  You don't know what entry to take without them and you don't know what zones to trade without them. | You don't have the total formula on zones without the probability enhancers.  Still many areas you can make mistakes and these are costly in time, money and emotionally. | When setting up your day and week, feeding your nugget hunters trade ideas for the next week. |
| Misc Notes: | This section also has the Risk Management section as well as Setting up our Day and Week section | | | | |
| *3:15-3:30* | *Break* | | | | |
| 3:30-4:15 | Bonus Strategy | Other Options Strategis or examples that you may personally develop. | Make sure to show them concepts or strategies that demonstrate either safety, minimal time commitment, leveraged profit examples or all of the above.  Do as much live as possible without slides for maximum effectiveness. | | |
| Misc Notes: | | | | | |
| *4:15-4:30* | *Break* | | | | |
| 4:30-5:00 | Selecting a Broker Getting Started | -Selecting a Broker -Student Support -Getting Started | Make the students feel like they will have their hands held and that they will not be alone at anytime through the training process. Reduce possible cancelations and buyers regret. | | |
| | | | | | |
| *5:00* | *End of Day:  Answer student questions and participate in. your EOD wrap up team meeting* | | | | |

**Attachment ZZI**

**KBH19265-004**

EX 13

7851

**Objections:**
I can do it on my own
Takes too much time
I can't get it
My wife will not approve
It cost too much money
I don't know how to use a computer
I'm goint to try what I learned first
I can make more from realestate
I'm financially safe between my realestate and cash, anuities, I'm fine
You have bad  reviews
What is the success rate of students in the Academy
I heard not all of your students make money


**Created Objections:**
OTA only teaches day trading
This is too hard to understand/Learn
This will take way too much effort and or time

**KBH19265-005**
EX 13
7852

Key Loops:

Copy

You need rules

Successful investors have mentors/coaches

Successful investing is a process of putting odds in your favor

Anyone can do this.  If you are coachable and willing to leave your ego at the door you can be taught how to invest successfully

It does not require an emmense amount of time to trade

It is nearly impossible to learn this on your own

Your beliefs lead to your actions and they lead to your results

Financial advisors do not always have your interests ahead of thiers and will almost always underperform

short term trading is better than getting a part time job

**Attachment ZZI**

**KBH19265-006**

EX 13
7853