Thomas M. Biesty (NY Bar No. 4172896)
(*pro hac vice* application pending)
(202) 326-3043 / tbiesty@ftc.gov
Rhonda Perkins (VA Bar No. 75300)
(*pro hac vice* application pending)
 (202) 326-3222 / rperkins@ftc.gov
Andrew Hudson (DC Bar No. 469817)
(*pro hac vice* application pending)
 (202) 326-2213 / ahudson@ftc.gov
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580

Local Counsel
John Jacobs (CA Bar No. 134154)
(310) 824-4300 / jjacobs@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4380 (fax)

Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission**, <br><br> Plaintiff, <br><br> vs. <br><br> **OTA Franchise Corporation**, et al., <br><br> Defendants. | No. 8:20−cv−287 <br><br> **Plaintiff's Memorandum of Law In Support of a Preliminary Injunction** |

i

# TABLE OF CONTENTS

Procedural History ....................................................................................1

Argument ...................................................................................................4

   I.    The FTC Is Likely to Prevail on the Merits.......................................4

     A.   The FTC Is Likely to Prevail on Count I...................................4

     B.   The FTC Is Likely to Prevail on Count II .................................16

     C.   The FTC Is Likely to Prevail on Count III ................................17

     D.   The FTC Is Likely to Succeed in Showing Common Enterprise ...19

     E.   The FTC Is Likely to Succeed in Showing Individual Liability ....19

   II.   Entering a Preliminary Injunction Is Necessary and Proper.............19

     A.   A Freeze of Defendants' Assets Is Necessary to Maintain the
Possibility of Consumer Redress ...................................................20

     B.   Appointment of a Receiver Is Warranted .......................................23

   III.   The First Amendment Does Not Bar Issuance of a PI.....................24

     A.   The Asset Freeze Is Not a Restriction on Speech...........................26

     B.   Defendants' Preview Events and MTOs Are Advertising, Not Fully
Protected Speech ...........................................................................28

     C.   The PI Is Not an Unconstitutional Prior Restraint.........................31

     D.   Defendants' Other Arguments Are Abandoned or Wrong.............32

     CONCLUSION.............................................................................33

1

# TABLE OF AUTHORITIES

2   <u>Statutes</u>

3   15 U.S.C. § 45(a) ........................................................................ 24

4   15 U.S.C. § 45b (a)(3) .............................................................. 18

5   <u>Cases</u>

6   *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ..... 31

7   *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ..................... 28-30

8   *Charles v. City of Los Angeles*, 697 F.3d 1146 (9th Cir. 2012) ................... 29

9   *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of*

10       *New York*, 447 U.S. 557 (1980) ......................................................... 24

11   *CFTC v. Noble Metals, Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) ............. 21, 26

12   *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952 (9th Cir. 2012) ...29-30

13   *Eng v. S.E.C.*, 49 Fed. Appx. 697, 2002 WL 31356626 (9th Cir. 2002) ...... 24

14   *Fedders Corp. v. FTC*, 529 F.2d 1398 (2d Cir. 1976) ................................. 20

15   *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) ....................... 27, 31

16   *FTC v. A to Z Marketing*, 2014 U.S. Dist. LEXIS 197440

17       (C.D. Cal. Sept. 17, 2014) ................................................................. 8

18   *FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) .......................... 19

19   *FTC v. All. Doc. Prep.*, No. 17-CV-7048, 2017 WL 5178414

20       (C.D. Cal. Nov. 2, 2017) .................................................................. 21

21   *FTC v. AMG Servs., Inc.*, No. 2:12-CV-00536, 2016 WL 1275612

22       (D. Nev. Mar. 31, 2016) .................................................................. 21

23   *FTC v. Arlington Press, Inc.*, 1999 U.S. Dist. LEXIS 23210

24       (C.D. Cal. Jan. 11, 1999) ................................................................. 23

25   *FTC v. AT&T Mobility LLC*, 883 F.3d 848 (9th Cir. 2018) ........................ 18

26   *FTC v. Commerce Planet*, 815 F.3d 592 (9th Cir. 2016) ..................... 19, 21

27   *FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ................. 5, 8

28

1  *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285

2      (D. Mass. 2008) .............................................................. 10

3  *FTC v. Equifin Int'l, Inc.*, No. 97-CV-4526, 1997 U.S. Dist.

4      LEXIS 10288 (C.D. Cal. July 31, 1997) ............................ 21

5  *FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) ...................... 8

6  *FTC v. Grant Connect*, LLC, 827 F. Supp. 2d 1199 (D. Nev. 2011) ............ 5

7  *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052

8      (C.D. Cal. 2012) ...................................................... 8, 10

9  *FTC v. Johnson*, 567 Fed. Appx. 512 (9th Cir. 2014).................... 21

10  *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009)...................... 8

11  *FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006) ...................... 9

12  *FTC v. Sage Seminars*, No. 95-CV-2854,

13      1995 U.S. Dist. LEXIS 21043 (N.D. Cal. Nov. 2, 1995) .................. 20

14  *FTC v. Triangle Media Corp.*, No. 18-cv-1388, 2018 WL 4051701

15      (S.D. Cal. Aug. 24, 2018) ...................................................... 21

16  *FTC v. Triangle Media Corp.*, No. 18-cv-1388, 2018 U.S. Dist.

17      LEXIS 204422 (S.D. Cal. Dec. 3, 2018) .......................... 20

18  *FTC v. Universal Premium Servs., Inc.*, No. 06-CV-0849,

19      2006 WL 8442134   (C.D. Cal. Mar. 14, 2006) ................................ 22

20  *FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989) ........................ 19

21  *Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011) ......................... 31

22  *Illinois ex rel. Madigan v. Telemarketing Assocs.*,

23      538 U.S. 600 (2003) ...........................................25, 29-30, 32

24  *In re R.M.J.*, 455 U.S. 191 (1982) ...................................... 25

25  *In re Thompson Med. Co.*, 104 F.T.C. 648 (1984) ......................... 5

26  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,*

27      *& Prod. Liab. Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013) ........... 14

28  *Int'l Assoc. of Conf. Interpreters*, 123 F.T.C. 465 (1997). .......................... 20

iv

*Jacobellis v. State of Ohio*, 378 U.S. 184 (1964) ......................................... 27

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ................................. 21

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ..................................................................... 32

*Lacoff v. Buena Vista Publ'g, Inc.*, 705 N.Y.S.2d 183
    (N.Y. Sup. Ct. 2000) .................................................................... 29

*Metropolitan Opera Ass'n. v. Local 100, Hotel Employees and Restaurant*
    *Employees Int'l Union*, 239 F.3d 172 (2d Cir. 2001) ...................... 32

*Miller v. California*, 413 U.S. 15 (1973) ...................................................... 27

*National Automatic Laundry & Cleaning Counc. v. Shultz*,
    443 F.2d 689 (D.C. Cir. 1971) .......................................... 18

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ............................... 31

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ....................... 31

*Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843
    (9th Cir. 2014) .............................................................................. 14

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) .................. 31

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ................................... 21

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ................ 5, 8

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) .............................................................. 29, 32

*Simon & Schuster, Inc. v. Members of New York State*
    *Crime Victims Board*, 502 U.S. 105 (1991) ...................................... 28

*State ex rel. Corbin v. Tolleson*, 773 P.2d 490 (Ariz. App. 1989) ............... 31

*United States v. Ruvalcaba-Garcia*, 923 F.3d 1183 (9th Cir. 2019) ........... 14

*United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004) ............ 24-25, 28-31, 33

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) ..................................................................... 24

# TABLE OF EVIDENCE

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| I | 1 | Declaration of Greg Busche, Consumer | 1 | 7 |
| I | 2 | Declaration of Nunzio D. Ciaraulo, Consumer | 8 | 19 |
| I | 3 | Declaration of Vijaya Katukota, Consumer | 20 | 24 |
| I | 4 | Declaration of Sultana Kazi, Consumer | 25 | 28 |
| I | 5 | Declaration of Kathleen Quintas, Consumer | 29 | 109 |
| I | 6 | Declaration of Koroush Ramez, Consumer | 110 | 146 |
| I | 7 | Declaration of Verlin Richins, Consumer | 147 | 181 |
| I | 8 | Declaration of Diane Luu, former OTA salesperson | 182 | 190 |
| I | 9 | Declaration of Keeley Hubbard, former OTA executive | 191 | 193 |
| I | 10 | Declaration of Connor Gieran, FTC data analyst | 194 | 204 |
| I | 11 | Expert Report of Kapil Jain | 205 | 285 |
| I | 12 | Declaration of Robert Porter, Utah Division of Consumer Protection investigator | 286 | 287 |
| II | 13 | Declaration of Reeve Tyndall, FTC investigator | 288 | 332 |
| II | | Attachment A (Fargo Radio Ad Transcript) | 333 | 341 |
| II | | Attachment B (CA Preview Event Transcript) | 342 | 471 |
| II | | Attachment C (CA Enrollment Agreement) | 472 | 474 |

vi

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| II | | Attachment D (Letter from the President) | 475 | 476 |
| II | | Attachment E (Email from OTA) | 477 | 479 |
| II | | Attachment F (Email from EC re: IWEP) | 480 | 485 |
| II | | Attachment G (Transcript of Call with EC) | 486 | 502 |
| II | | Attachment H (CA MTO Transcript) | 503 | 1738 |
| II | | Attachment I (MTO Coursebook) | 1739 | 1935 |
| II | | Attachment J (OTA Price Sheet) | 1936 | 1937 |
| III | | Attachment K (NYC Preview Event Transcript) | 1938 | 2117 |
| III | | Attachment L (NYC Enrollment Agreement) | 2118 | 2120 |
| III | | Attachment M (Letter from the President) | 2121 | 2121 |
| III | | Attachment N (Meeting with EC - Transcript) | 2122 | 2237 |
| III | | Attachment O (NYC Buy Education Plan) | 2238 | 2244 |
| III | | Attachment P (NYC MTO Transcript) | 2245 | 3518 |
| III | | Attachment Q (NYC MTO Coursebook) | 3519 | 3710 |
| III | | Attachment R (NYC Price Sheet and Contract) | 3711 | 3712 |
| IV | | Attachment S (VA Preview Event Transcript) | 3713 | 3910 |
| IV | | Attachment T (VA Buy Enrollment Agreement) | 3911 | 3912 |
| IV | | Attachment U (Letter from the CEO) | 3913 | 3913 |

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| IV | | Attachment V (Meeting with EC - Transcript) | 3914 | 4070 |
| IV | | Attachment W (VA MTO Transcript) | 4071 | 4876 |
| IV | | Attachment X (VA MTO Coursebook) | 4877 | 5068 |
| IV | | Attachment Y (VA Price Sheet and Contract) | 5069 | 5071 |
| V | | Attachment Z (OTA Letter to FTC, Feb. 20, 2019) | 5072 | 5072 |
| V | | Attachment ZA (FTC Letter to OTA, Feb. 22, 2019) | 5073 | 5074 |
| V | | Attachment ZB (Tolling Agreement) | 5075 | 5078 |
| V | | Attachment ZC (OTA Letters to FTC) | 5079 | 5139 |
| V | | Attachment ZD (New Infomercial Transcript) | 5140 | 5169 |
| V | | Attachment ZE (2018 Infomercial Transcript) | 5170 | 5199 |
| V | | Attachment ZF (Daily Grid User Guide) | 5200 | 5207 |
| V | | Attachment ZG (First Survey Tabulation) | 5208 | 5221 |
| V | | Attachment ZH (Second Survey Tabulation) | 5222 | 5353 |
| V | | Attachment ZI (First Survey Summary) | 5354 | 5399 |
| VI | | Attachment ZJ (MTO PowerPoint Slides) | 5400 | 6030 |
| VI | | Attachment ZK (FTC Staff Email to OTA) | 6031 | 6031 |
| VI | | Attachment ZL (Bill Avery Authorization) | 6032 | 6032 |
| VI | | Attachment ZM (OTA Meeting with FTC - Transcript) | 6033 | 6192 |

viii

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| VII | | Attachment ZN (Kimoto Training Documents) | 6193 | 6238 |
| VII | | Attachment ZO (Kimoto Interrogatory Responses) | 6239 | 6261 |
| VII | | Attachment ZP (Seiden Interrogatory Responses) | 6262 | 6282 |
| VIII | | Attachment ZQ (Zelek Interrogatory Responses) | 6283 | 6303 |
| VIII | | Attachment ZR (Zelek Training Documents) | 6304 | 6361 |
| IX | | Attachment ZS (Kim Interrogatory Responses) | 6362 | 6383 |
| IX | | Attachment ZT (Utah Preview Event Oct. 2018 Transcript) | 6384 | 6565 |
| IX | | Attachment ZU (Utah Preview Event Feb. 2019 Transcript) | 6566 | 6727 |
| IX | | Attachment ZV (Utah MTO Transcript) | 6728 | 7249 |
| IX | | Attachment ZW (Preview Event PowerPoint Slides) | 7250 | 7392 |
| X | | Attachment ZX (TradeStation Interrogatory Responses) | 7393 | 7400 |
| X | | Attachment ZY (Pacific Premier Bank Records) | 7401 | 7403 |
| X | | Attachment ZZ (OTA Franchise Disclosure Document) | 7404 | 7630 |
| X | | Attachment ZA (OTA Corp. – State Filings) | 7631 | 7633 |
| X | | Attachment ZZB (NE Holdings – State Filings) | 7634 | 7638 |
| X | | Attachment ZZC (NEH Services – State Filings) | 7639 | 7643 |
| X | | Attachment ZZD (Web Posting by Purported Insider) | 7644 | 7657 |

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| X | | Attachment ZZE (Patent) | 7658 | 7678 |
| X | | Attachment ZZF (Press Release) | 7679 | 7681 |
| X | | Attachment ZZG (Keeley Hubbard IH Transcript) | 7682 | 7762 |
| X | | Attachment ZZH (First Survey Results PowerPoint) | 7763 | 7799 |
| X | | Attachment ZZI (Keeley Hubbard Emails) | 7800 | 7853 |
| XI | | Attachment ZZJ (LUU000001 – LUU-000002 - Pricing Sheet) | 7854 | 7855 |
| XI | | Attachment ZZJ (LUU-000011 – LUU-000016 - Offer Letter) | 7856 | 7861 |
| XI | | Attachment ZZJ (LUU-000035 – LUU-000213 - MTO Coursebook) | 7862 | 8040 |
| XII & XIII | | Attachment ZZJ (LUU-001717 – LUU-002060 - EC Training Binder) | 8041 | 8384 |
| XIV | | Attachment ZZJ (LUU-002061 – LUU-020752 - Call Scripts) | 8385 | 8399 |
| XIV | | Attachment ZZJ (LUU-000011 – LUU-000016 - Sample IWEPs) | 8400 | 8436 |
| XIV | | Attachment ZZJ (LUU-000035 – LUU-000213 - Sample Education Plan) | 8437 | 8443 |
| XIV | | Attachment ZZJ (LUU-001717 – LUU-002060 - Enrollment Agreement) | 8444 | 8450 |
| XV | 14 | Declaration of Michelle Tavares, FTC investigator | 8451 | 8451 |
| XV | | Attachment A (VA MTO Day 3 Transcript) | 8452 | 8714 |
| XV | 15 | Declaration of Kapil Jain, expert | 8715 | 8715 |
| | 74 | Declaration of Fernando Avila | 1 | 2 |

x

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| | 75 | Declaration of Andrew Cherry | 3 | 4 |
| | 76 | Declaration of Trisha Dallmann | 5 | 7 |
| | 77 | Declaration of Rhonda Feldbauer | 8 | 9 |
| | 78 | Declaration of Sharon Harvey | 10 | 12 |
| | 79 | Declaration of Steve Hougom | 13 | 15 |
| | 80 | Declaration of Thuy Vi Ngo | 16 | 25 |
| | 81 | Declaration of Justin Ochoa | 26 | 27 |
| | 82 | Declaration of Jaime Pereira | 28 | 30 |
| | 83 | Declaration of Scott Santos | 31 | 32 |
| | 84 | Declaration of Vishal Shah | 33 | 35 |
| | 85 | Declaration of Ernest Villany | 36 | 37 |
| | 86 | Declaration of Lulu Waters | 38 | 40 |
| | 87 | Declaration of Connor Geiran | 41 | 50 |
| | 88 | Declaration of Thomas Biesty | 51 | 53 |
| | | Attachment A (OTA Franchise Corp. Financial Disclosure Excerpts) | 54 | 58 |
| | | Attachment B (Transcript of Deposition of OTA Franchise Corp. – Excerpts) | 59 | 75 |
| | | Attachment C (Transcript of Deposition of Newport Exchange Holdings – Excerpts) | 76 | 87 |
| | | Attachment D (Eyal Shachar – Income Received Document) | 88 | 89 |
| | | Attachment E (Eyal Shachar – Assets Documents) | 90 | 92 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| TRO Exhibit Volume | EX Number | Description | First Page | Last Page |
|---|---|---|---|---|
| | | Attachment F (Sam Seiden Financial Disclosure - Excerpts ) | 93 | 96 |
| | | Attachment G (Transcript of Deposition of Darren Kimoto – Excerpts) | 97 | 110 |
| | 52 | Master MTO Document | 111 | 119 |
| | 61 | OTA Franchise Corp. Balance Sheet | 120 | 120 |
| | 89 | Declaration of Keeley Hubbard | 121 | 123 |
| | 90 | Declaration of Reeve Tyndall | 124 | 132 |
| | | Attachment A (Chart of Defendants' Purchaser Declarations) | 133 | 138 |
| | | Attachment B (OANDA Interrogatory Responses) | 139 | 143 |
| | | Attachment C (OANDA – OTA Contract) | 144 | 153 |

Defendants operate a deceptive scheme that uses false and unsubstantiated earnings and related claims to lure tens of thousands of consumers into paying hundreds, thousands, or tens of thousands of dollars for Defendants' investment training offerings ("OTA Training"). Between 2016 and 2019, Defendants took approximately $362 million from consumers, a sizeable part of which (about $35 million in the last two years) went to key Defendant Eyal Shachar.

The FTC submitted overwhelming evidence, including Defendants' admissions that they never had substantiation to support the claims they make, and direct evidence that purchasers do not make the profits Defendants claim.[1] Defendants' filings ignore most of the evidence and fail to dispute most of the facts underpinning the FTC's case. The purchaser declarations submitted by Defendants confirm that consumers purchase OTA Training because Defendants lead them to believe that OTA Training will allow them to make money. Defendants' claims that the First Amendment shields their fraud, or that equity disfavors relief, fail.

To protect consumers and preserve assets for consumer redress, the FTC respectfully requests that the Court issue the proposed preliminary injunction (Dkt. 72) ("PI") barring Defendants' unlawful misrepresentations, freezing their assets, and appointing a receiver over the Corporate Defendants.

## PROCEDURAL HISTORY

The FTC filed a Complaint against Defendants on February 12, 2020 (Dkt. 1), and, with notice to Defendants, sought a Temporary Restraining Order ("TRO") that, among other things, required Defendants to cease their deceptive marketing, and froze or preserved Defendants' assets. Dkt. 12. The FTC's application for a TRO was supported by substantial evidence, including:  (a) internal outlines of OTA's sales pitch and multiple transcripts of its delivery, showing heavy use of the

---

[1] The FTC herewith files additional evidence, including a summary of trading data from OANDA, the brokerage OTA recommended for foreign exchange trading, declarations of 12 additional consumers and one former employee, depositions of defendants, and additional consumer complaints to the FTC.

earnings claims and related claims alleged in the Complaint; (b) declarations from consumers corroborating that the net impression of OTA's sales pitch is that purchasers are likely to make substantial income; (c) admissions by OTA that it has no substantiation for the representation that purchasers of OTA Training are likely to make substantial income; (d) a summary of loan data showing that most OTA purchasers who borrowed money at high interest rates to fund their purchases were not able to quickly pay back the loans in full; (e) a summary of trading data, showing that most OTA purchasers who opened accounts at OTA's recommended brokerage do not make substantial income; (f) an expert report explaining that the "strategy" OTA provides is fatally vague and so is incapable of leading to consistent results, much less the likely profits OTA claims, and demonstrating that OTA's own application of the strategy does not live up to the sales pitch's claims of profitability; (g) trading records showing OTA presenters are not the profitable traders they claim; and (h) testimony from former employees.

Defendants opposed the entry of a TRO. Dkt. 37. Defendants did not dispute that they made the earnings and related claims alleged, did not dispute they were material or widely disseminated, did not claim that they had since removed all such claims from their marketing, did not dispute that they lack substantiation for the representation that purchasers are likely to make substantial income, and offered no evidence to rebut the FTC's showing that most purchasers are not likely to make substantial income. Instead, Defendants claimed that their earnings claims are truthful because some purchasers make money, and that fine-print disclaimers and discussion of "risk management" suffice to dispel any misleading impressions. Defendants offered an expert report and over 100 declarations from purchasers purportedly attesting to the value of OTA Training. But only a handful of the purchaser declarations described their purported profits with enough specificity to permit a fair comparison. EX 90, 130 & 133-138. None refutes the FTC's claims about OTA's sales pitch (and some confirm them), and many confirm that the

2

reason for the purchase was a desire to make money. EX 90, 129-130. And Defendants' expert's only relevant point was a conclusory assertion that their courses "would enable students … to make money" that has no basis in the report and thus is plainly inadmissible.

On February 25, this Court entered a TRO requiring Defendants to cease their deceptive marketing, freezing the Corporate Defendants' assets, and limiting the Individual Defendants' spending. Dkt. 46. The TRO also directed Defendants to appear at a hearing on March 12 and show cause why a preliminary injunction, including appointment of a receiver, should not issue against them. *Id*.

Defendants subsequently filed, with leave of court, additional objections to issuance of a TRO, based on the First Amendment (Dkt. 52, hereinafter "Objections").[2] The FTC briefly responded to the Objections. Dkt. 55.

Defendants have now filed an opposition to the issuance of a preliminary injunction. Dkt. 67 (Hereinafter, "Opp."). They largely admit that they made the claims at issue, and do not dispute that the claims have been: (1) unsubstantiated; (2) material; and (3) widely disseminated. Instead, Defendants argue that the net impression of their advertisements and sales pitch is not misleading, citing the presence of fine-print disclaimers. As to falsity, while Defendants attempt to cast doubt on the empirical data showing that purchasers are unlikely to make money, they offer no countervailing data.

Unable to dispute the FTC's evidence, Defendants resort to arguing that (1) the First Amendment bars the preliminary relief requested by the FTC, and (2) a PI should not issue as a matter of equity because some consumers are happy with their training. As shown below, these arguments lack merit.

---

[2] Defendants claim the FTC refused to allow them voluntary discovery. Opp. 33. But when Defendants asked for specific documents, the FTC produced them. EX 88, 53. In a telephone call to schedule TRO-authorized depositions, defense counsel suggested the depositions be limited to assets, and if not, raised the possibility of taking discovery of the FTC. FTC counsel noted the TRO does not authorize that.

**ARGUMENT**

I.   **The FTC Is Likely to Prevail on the Merits**

   A.   **The FTC Is Likely to Prevail on Count I**

      1.   **Defendants Admit They Make Earnings Claims**

It is undisputed that Defendants rely on ads and a sales pitch that are replete with earnings claims and related claims, the net impression of which is that purchasers are likely to make substantial income applying OTA's patented strategy. That evidence includes a company outline, directing salespeople to use testimonials of success to persuade consumers they will be profitable, and to claim that using OTA's strategy to make money is like using a recipe to bake cookies.[3] It also includes TV infomercials and multiple transcripts of OTA's three-day sales pitch known as the Market Timing Orientation ("MTO") delivered in different locations, over the course of the last year, showing the presentation is replete with earnings claims in each case.[4]

Defendants do not dispute that they orchestrate those claims through the slide presentation and MTO outline.[5] Indeed, the purchaser declarations they submitted confirm that the purchasers bought OTA Training because they believed it would show them how to make money in the markets.[6] Defendants' claim to

---

[3] EX 13, 6193-6201, 7848-7853; EX 90; EX 88, 104-107 (MTO Outline "created to help MTO instructors," and was to be given to all MTO presenters; Kimoto not aware of any other documents used in training them).

[4] EX 13, 342-471, 503-1738, 1938-2117, 2245-3518, 3713-3912, 4071-4876, 5140-5199. Defendants attempt to re-characterize the issue as whether they claim to be a "get-rich-quick" scheme. That is not the issue.

[5] EX 13, 313-315, 5400-6030. Defendant Kimoto, in charge of training MTO presenters, explained it is the only document he is aware of that is used in training them. EX 52 (MTO Outline) & EX 88, 104-107 (MTO Outline "created to help MTO instructors," and was to be given to all MTO presenters; Kimoto not aware of any other documents used in training them).

[6] EX 90, 130 (72 out of 106 bought because they wanted to make money, manage money, or improve their trading; others do not give a reason).

have recently ceased using "student success stories" featuring "specific earnings … to promote [their] products" essentially concedes the point. Opp. at 31.

## 2.   Defendants' Disclaimers Argument Has No Merit

Defendants argue that OTA's fine-print disclaimers that its offerings are educational, investing has risk, and results will vary negate any misleading impression. Opp. at 24-27. They cite no evidence to support this claim, and, indeed, the purchaser declarations they submitted give the lie to it, showing that purchasers bought because they believed OTA Training will show them how to make money. EX 90, 130.

It is settled law that disclaimers are no silver bullet. A claim can be deceptive even if contains some truthful disclosures. *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). The context and nature of Defendants' disclaimers does not suggest they are effective. Disclaimers must be "prominent and unambiguous to change the apparent meaning and leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989). And qualifications that clarify otherwise deceptive statements must be likely to come to the attention of the person who sees the basic claim; for that reason, small print or its equivalent are unlikely to be effective. *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214 (D. Nev. 2011), vacated in part on other grounds, 763 F.3d 1094 (2014); *see also In re Thompson Med. Co.,* 104 F.T.C. 648, 789 n.9 (1984).

Defendants argue that fine print displayed in OTA infomercials constitutes an adequate disclosure. Opp. at 24-25. Notably, Defendants provide only the *bottom* portion of a screenshot of an infomercial that includes a statement in small white font regarding trading risk and testimonials. *Id.*; Dkt. 67-23 at 9 & 13 (Nosek Dec. ¶ 22 and its "Exhibit 1"). In reality, the statement is not featured prominently on the screen. For example, in OTA's infomercial developed in 2018 and broadcast through at least 2019, a fine-print disclaimer lasts for approximately three seconds

at the very beginning of the 30-minute infomercial. EX 90, 124. Similar fine-print disclaimers appear when certain OTA customers discuss specific trading profits. *Id*. Others flash periodically across the bottom of the screen, but not throughout the lengthy infomercial, which touts daily, weekly, and monthly income that purchasers of the program can purportedly expect to earn. *Id*. at 124-125; EX 13, 5140-5169.

Additionally, OTA claims that it uses robust disclosures in its sales events—verbally and in its slide presentations—and in its enrollment agreements. Opp. at 25. OTA has no evidence that any significant number of consumers actually noticed their fine-print disclosures nor how they perceived them. To the contrary, the evidence shows that at sales events where disclosures are displayed in the slide presentation, OTA presenters often change the slides before a consumer can read the full disclosure. EX 13, 292, 295, & 298. When presenters discuss the disclosures, they often downplay or spin them in a manner that further buttresses OTA's misleading claims, rather than dispelling them. For example, when Defendant Kimoto displayed OTA's disclosure statement at the beginning of the March 2019 MTO, he explained it as communicating that "you can lose money" trading, noting this is particularly true if you trade without rules, and immediately contrasted that with trading using OTA's rules, where, he claimed, "the odds that you'll come out ahead over a sequence of trades are incredibly high." EX 13, 567-568; *see also* 2336 (presenter brushes off disclaimer as merely "for legal purposes" and meaning only that the MTO is "educational," and "not a recommendation," before again claiming that "the system is working" and "the students are making money with this system").

Defendants argue that disclosures also appear in the MTO workbook and prominently in OTA's contracts, but there is no evidence that any significant proportion of consumers noticed the fine print on those pages nor how they perceived them. Nor does the nature of the disclaimers suggest they would be

effective. For example, the disclosure in OTA's enrollment agreement appears in fine print in the middle of a densely worded two-page "Statement of Terms." EX 13, 2118-20. And the fine-print in the MTO workbook is much less likely to be read than the workbook's title, which offers "Short Term Income & Long Term Wealth." Dkt. 67-23, at 18.

Regardless, the fine-print disclosures that OTA's programs are educational, and that investing has risk, do not dispel the misleading net impression that purchasers are likely to profit, because Defendants have crafted their sales pitch to weaponize trading risk as an argument in favor of purchasing OTA's offerings. Defendants represent that purchasers who use their strategy will lose some trades, but will make more money on their winning trades than they lose on their losing trades, and so will profit overall. *See, e.g.*, EX 13, 293-300.[7] Defendants claim that this is in part because they will teach purchasers how to manage risk. *See*, *e.g.* EX 13, 1069-1075 (CA MTO). In contrast, Defendants claim, consumers who do not use Defendants' strategy risk losing their investments. *See e.g.*, EX 13, 567-568. Thus, generic disclosures that trading involves risk do not contradict Defendants' sales pitch, and will do nothing to dispel the misleading net impression that purchasers are likely to profit.

### 3.   Defendants Cite No Relevant Case Law

Unable to identify FTC authority that supports their defense, Defendants cite several cases that dealt with whether consumers misunderstood the source or sponsorship of a product, or one entity's affiliation with another. Opp. at 27. But none of these cases addresses earnings claims. They show only that disclaimers can be effective in clarifying who is transacting with a consumer—not that they can change the impression of a product's key feature. Where, as here, the disclaimers

---

[7] *See also* EX 13, 6851-6852 (Utah MTO); *id*. at 2683-2689 (NYC MTO); *id*. at 4289-4295 (VA MTO); EX 80, 20 (Kimoto, in MTO, claimed that "[y]ou can be right one out [of] every four trades because the gains are so big that the little losses don't matter").

1  would need to effectively disavow the impression communicated by numerous and
2  pervasive claims, disclaimers may create confusion or be deemed ineffective. *See*
3  *Removatron Int'l Corp.*, 884 F.2d at 1497; *Cyberspace.com LLC*, 453 F.3d at 1200;
4  *FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077 (N.D. Cal. 2009) ("statements
5  that defendants cite do not correct the message of the advertisements").

6      Defendants cite to the FTC's website—*Advertising FAQ's: A Guide for*
7  *Small Business*—for the proposition that a disclaimer is sufficient if clearly and
8  conspicuously disclosed. Opp. at 24. Defendants fail to mention that the FAQs also
9  state that a "fine-print disclosure at the bottom of a print ad… a brief video
10  superscript in a television ad, or a disclaimer that is easily missed on a website are
11  not likely to be effective. Nor can advertisers use fine print to contradict other
12  statements in an ad or to clear up misimpressions that the ad would leave
13  otherwise."[8] Here, the disclosures plainly fail to provide the needed clarity—they
14  do not inform consumers that OTA has no reason to believe that its strategy will be
15  profitable, much less that purchasers are unlikely to make money.[9]

16      Set against such pervasive and explicit earnings claims, to the extent
17  disclosures may appear in Defendants' materials, they cannot dispel the litany of
18  money-making claims.[10] Small print disclaimers do not preclude liability under the
19  FTC Act.[11]  Indeed, it is hard to imagine that any disclosures that flash briefly

20

---

21  [8] https://www.ftc.gov/tips-advice/business-center/guidance/advertising-faqs-guide-small-business (last visited on March 9, 2020).  For example, "if an ad for a
22  diet product claims 'Lose 10 pounds in one week without dieting,' the fine-print
23  statement 'Diet and exercise required' is insufficient to remedy the deceptive claim in the ad.  *Id.*

24  [9] *FTC v. A to Z Marketing*, 2014 U.S. Dist. LEXIS 197440 at *20-21 (C.D. Cal.
25  Sept. 17, 2014) (on summary judgment, contractual disclaimer did not create a triable issue and did not cure misrepresentations in mailers and phone calls).

26  [10] *See FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimer in
27  contract consumers eventually signed was inadequate to negate misrepresentations in advertisements).

28  [11] *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal. 2012)("[T]he small disclaimers in the [] infomercial do not preclude liability.

8

across the bottom of a screen, appear in the middle of a densely worded contract, or appear in a workbook a consumer may not read could refute the net impression consumers receive from Defendants' numerous earnings claims made throughout multiple days of presentations.[12]

### 4.    Purchaser Declarations Support the FTC's Position

Declarations from purchasers—submitted by the FTC and Defendants—demonstrate that the net impression of Defendants' marketing is that purchasers are likely to make substantial income. The first 106 declarations Defendants submitted almost uniformly avoid describing the content of the sales pitch (despite its centrality to this case),[13] many nonetheless confirm that the declarants purchased OTA Training believing that it would show them how to make money.[14] Indeed, Defendants cite no other reason why someone would purchase OTA Training.

### 5.    OTA Admits It Does Not Have Substantiation for Its Earnings Claims

As explained in the FTC's opening brief, OTA has admitted that it lacks substantiation for the representation that purchasers of OTA Training are likely to make substantial income. Dkt. 31 at 17-18. Defendants have submitted no evidence—none—that they had such substantiation at the time the claims at issue were made. Defendants still do not have the required substantiations, and, in any event, as a matter of law, later-gathered evidence, no matter how compelling,

---

The prints are so tiny that, under the circumstances, consumers are unlikely to read them while watching and listening to the testimonials of endorsers.")

[12] *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 924 n.15 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir 2008) ("Defendants' inconspicuous small-font statement appearing just six times during the 30-minute infomercial that 'this product is not intended to diagnose, treat, cure or prevent disease' is wholly inadequate to change the net impression of the pain relief claims made in the infomercial.").

[13] EX 90, 129-130. Defendants claim (Opp. at 32) that the declarations show their claims were not "inconsistent" with what they delivered. But the declarations avoid the topic almost entirely. An absence of evidence is not evidence of absence.

[14] EX 90, 130, 133-138. As of this filing, counsel's review of the newly-filed 122 declarations suggests the same is true of them.

cannot retroactively bless Defendants' earlier representations. *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012) (advertiser "must have had some recognizable substantiation for the representation *prior to making it*") (emphasis added) (quoting *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 298 (D. Mass. 2008)).

Defendants' only offered substantiation is a set of declarations from what is a relative handful of the universe of purchasers. TRO Opp. at 15; Opp. at 3 (128 in total); Opp. at 32 (claiming 70,000 consumers have paid OTA for lifetime education rights). Even there, a number stated they were not making money or had lost money. EX 90, 130. Of those who attested to profits, none submitted documentation to substantiate their claims. In some cases, trading records cast doubt on their claims. EX 87, 50. In short, the new declarations do not show that purchasers are likely to earn substantial income, as Defendants represent.

### 6.     Defendants Do Not Refute the Direct Evidence that Their Earnings and Related Claims Are False

The evidence, including trading data, demonstrates that Defendants' representations that purchasers are likely to make substantial income are false. That evidence includes:  (1) data from two online brokerage platforms OTA recommended that purchasers use to trade, showing that most OTA purchasers who opened accounts did not make money and a majority of those who traded lost money; (2) a summary of loan data showing that most purchasers who borrow from OTA to fund their purchases are unable to pay back the loans in full to avoid paying OTA high interest; (3) declarations from purchasers; and (4) the report of an expert in the field explaining that OTA's strategy is fatally vague and incapable of producing the claimed results, and demonstrating that even OTA's own application of the strategy does not live up to its claims.

Defendants' attacks on this evidence fail to detract from its weight, and the supposedly countervailing evidence they offer is not compelling.

10

First Defendants attack the trading data from brokerage firm TradeStation, relying on the testimony of an OTA employee to argue that the analyst who calculated the figures, Connor Geiran, lacks necessary expertise, and that because he did not analyze all trades and positions in the accounts, his results are inaccurate. Opp. at 20-22. But Mr. Geiran did not opine, he merely notes the results of certain identified calculations.[15] Those results provide concrete evidence of whether OTA's customers made or lost money. To be sure, Mr. Geiran's calculations are limited due to the limited nature of the data he reviewed. Specifically, the data analyzed is for a three-year period, and does not include complete information about positions held at the beginning and end of that period. EX 87, 46-50. Thus, to avoid inaccurate results, the calculations omit trades of assets for which it appears the consumer had an open position at the beginning or end of the period.[16] *Id*. at 48. Defendants appear to misunderstand how this worked, mechanically. Mr. Geiran did not eliminate all *trades* where the purchase and sale were for unequal amounts. Opp. at 21; EX 87, 47-50. Indeed, he did not attempt to identify which purchases and sales a consumer might have viewed as being part of the same "trade." Instead, he simply calculated whether each consumer had more money, or less, than he or she had when the period started, and by how much. EX 87, 46-50.

Defendants' argument that Mr. Geiran's calculations reflect "less than one percent of data" are flat wrong. Opp. at 21. Mr. Geiran calculated net gain or loss, in dollars, for the TradeStation accounts of 92.9%[17] of all OTA purchasers over the

---

[15] It is, rather, Defendants who proffer inadmissible opinion testimony from a non-expert. Opp. at 21 & Dkt. 67-4, at 2-5 (Mr. Grieco opining that calculations "require" expertise Mr. Geiran lacks and his "conclusions … lack any validity").

[16] Mr. Geiran's calculations effectively calculate net cash flow for the accounts. A consumer who purchased an asset, but had yet to sell it by the end of the period, for example, would appear to be worse off than they actually were. Eliminating all data for assets in which a consumer has open positions avoids such an inaccuracy.

[17] $4,799 \div 5,164 = 0.929$. Thus the 4,799 consumers included, out of 5,164 for whom trade data existed, constitutes 92.9%.

past three years, and the calculations reflect 92.7% of all trades in the accounts and 97% of the dollar value of the all trades in the accounts. EX 87, 50. Up until quite recently, OTA has recommended that consumers use TradeStation for all trades but foreign exchange, and its instructors have used only TradeStation to demonstrate OTA's strategy in the non-foreign exchange asset classes.[18] Defendants' claims that it is "routine" for consumers to have accounts at other brokerages is speculation, and their attempted calculation of OTA puchasers' "liquid net worth" is irrelevant.[19] In any event, Defendants offer no reason to think that consumers' trades with TradeStation (the platform OTA trained them to use) would be less profitable than trades they may make elsewhere. Tellingly, Defendants offer no alternative calculation of consumers' trading results.[20]

The FTC files herewith a second declaration from Mr. Geiran, summarizing trading data from OANDA, until recently the only brokerage platform that OTA used in its courses to demonstrate foreign exchange trading, and recommended to consumers for foreign exchange trading. EX 87, 43-46; EX 90, 132, 148. OANDA provided data on the profit and loss of OTA purchasers' OANDA accounts over the past three years. EX 90, 131-132. Over 31% of the purchasers apparently did not trade, and of those who did, over 85% lost money. EX 87, 44-46. This additional data further proves that most OTA purchasers do not make the advertised income.

Defendants do not dispute the evidence showing that most OTA purchasers who borrow from OTA to finance their purchases (at high interest rates) do not pay

---

[18] Dkt. 31, p.19, footnotes 64 – 65 (citing EX 13, 814-815 & 7394-7396).

[19] Defendants do not explain the significance of the "liquid net worth" figure, nor is it apparent. In any event, it relies on data of unknown provenance, and so is not admissible. *See* Dkt. 67-4, at 2 (Grieco relying on "Total approx.. number of names OTA sent to TradeStation in 11-year relationship" and "Based on … IWEP … data from students," neither of which has any foundation in the evidence).

[20] FTC counsel voluntarily provided the TradeStation data relied upon by Mr. Geiran to defense counsel on February 14, 2020. EX 88, 53. Defendants' claim that the evidence cannot be considered absent cross-examination cannot be taken seriously. Opp. at 22. The same would apply to all of Defendants' evidence.

back their loans in full before being hit by high interest, and many still have not paid in full after two years. EX 10, 198; EX 87, 42-43. These facts are not consistent with Defendants' claims that purchasers are likely to make substantial income.

For their part, Defendants offer little in the way of evidence on the question of falsity. Specifically, they have submitted 228 declarations from purchasers (106 in opposition to the TRO, and an additional 122 now). Some claim "successful" trading, but provide insufficient detail to demonstrate that their results live up to the claims OTA makes.[21] And none provide supporting documentation.[22]

In any event, declarations from a relative handful of purportedly satisfied purchasers do not demonstrate that their results are typical.[23] And some of the declarations OTA submits describe losses, or minimal profitability.[24] Others explicitly warn that OTA is not for everyone, and that only a subset of consumers are likely to be able to use OTA's strategy to profit.[25] Even if OTA provided no trading information at all (which the FTC does not allege), chance alone would

---

[21] For example, some merely claim they are "profitable." *See* EX X, MM, FFFF, & IIII. Others provide only a "guess" or estimate of their results. *See* EX Z, & JJ. Others claim they are successful, but admit they still haven't made back the money they paid OTA. *See e.g.*, EX HHHH, PPPP, & VVVV.

[22] Indeed, the TradeStation data calls some of the claims into question. For example, Mr. Cella claims he "make[s] 10-20k a year" in his TradeStation account (EX OO), but for the three-year period from September 1, 2016 to December 17, 2019 he had an overall profit of only $8,157.41 (based on 98% of the purchases and sales in his accounts). EX 87, 50.

[23] Particularly as they do not appear representative. *See* EX 90, 128-129 (over half are Mastermind purchasers, nearly half have prior trading experience, nearly half are not working). Even 228 is a small percentage of the alleged 70,000 purchasers. Opp. at 2 & 32.

[24] EX 90, 130; EX TTTT ("Overall, I am not yet profitable."); EX CCCC ("the balance of my trading account is still negative"); EX QQ ("I … am down approximately $2,000").

[25] EX 90, 131.

1    suggest that at least some small fraction of purchasers would nonetheless be able to

2    attain success in the markets, especially during the bull market of 2016-2019.[26]

3        Defendants also submit two reports from Dr. Harris. The first report is

4    largely devoted to describing the topics covered in OTA Training, and comparing

5    that list of topics to the topics covered in college-level courses on similar subjects.

6    Such testimony is irrelevant to this case. It does not address Defendants' marketing

7    or sales pitch, does not analyze OTA's purported strategy, and does not examine

8    actual purchasers' trading experience. It thus sheds no light on the issues here,

9    namely :  (a) whether Defendants make the claims alleged; (b) whether Defendants

10   had substantiation for the claims; and (c) whether the claims were misleading.

11       Defendants quote Dr. Harris as opining that their "education 'provides utility

12   to students and would enable students who follow the principles and techniques

13   taught by OTA to make money through trading and investing.'" TRO Opp. at 1.

14   But the report contains no discussion or analysis to ground this conclusory

15   assertion. And, as discussed above, nothing in the report could provide a basis for

16   such a conclusion. Such a baseless opinion, untethered to evidence or a reliable

17   methodology, is the epitome of the bare expert *ipse dixit* that Federal Rule of

18   Evidence 702 directs courts to preclude. *United States v. Ruvalcaba-Garcia*, 923

19   F.3d 1183, 1190 (9th Cir. 2019) (district court must exercise "gatekeeping"

20   function over expert testimony); *Ollier v. Sweetwater Union High Sch. Dist.*, 768

21   F.3d 843, 860 (9th Cir. 2014) (affirming exclusion of expert opinion on financial

22   matter where court "could not 'discern what, if any, method [expert] employed in

23   arriving at his opinions,'" and found factual basis to consist solely of "superficial"

24   review of evidence, not "systematic assessment"); *In re Toyota Motor Corp.*

25   *Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp.

---

26   [26] Over the period that the TradeStation data covers, markets rose dramatically.

27   For example, the S&P 500 index rose by more than 46% from September 1, 2016
     to December 17, 2019. https://www.wsj.com/market-data/quotes/index/SPX/

28   historical-prices (last visited March 9, 2020) (opening prices). Doing nothing could
     have yielded high returns.

1  2d 1053, 1067–68 (C.D. Cal. 2013) (Selna, J.) (excluding opinion "not based on a

2  reliable foundation or methodology," as no more than expert's "*ipse dixit*") (citing

3  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

4      Rule 702 bars admission of expert testimony unless it is the product of

5  reliable principles or methods, reliably applied to sufficient facts or data. The only

6  facts or data reflected in the report are generic descriptions of the topics OTA's

7  courses cover, and the teaching methods used. Dr. Harris made no effort to assess

8  how much of this material course attendees learn, or how it impacts their trading.

9  Nor is any other possible basis for his "conclusion" apparent. It is not admissible.

10      Dr. Harris's second report is similarly almost entirely inadmissible, and what

11  is arguably admissible does nothing to rebut the FTC's evidence.[27] It seems to

12  consist of either (a) opinions Dr. Harris is not qualified to offer (such as the

13  evidentiary significance of the granting of a patent, ¶¶14-20), or (b) non-opinion

14  arguments that are not "helpful" to the Court, as any lay person (or counsel) could

15  make them (such as his argument about the net impression of Defendants'

16  marketing (¶21) or his descriptions of the results of Mr. Jain's analysis (¶¶25-28)).

17  Most importantly, the report abandons the claim that Defendants' courses "would

18  enable students … to make money," and retreats to merely opining that

19  Defendants' courses "have value"—a fact not in issue here (¶¶11-13).

20      Defendants also claim that Mr. Jain's (the FTC's expert) analysis of their

21  Daily Grid picks "demonstrated significant profits." Opp. at 17. But in the next

22  breath they claim that Mr. Jain did not follow OTA's strategy correctly. *Id.*; Dkt.

23  67-3 at 3-4 (Albin Dec. ¶7). If so, then the analysis just shows that an expert in the

24  field can tweak Defendants' strategy into something that makes money. That an

25  expert trader can use a different strategy to make money does not show that OTA

26  purchasers are likely to make substantial income. Defendants' concession that the

27

28      [27] For example, Dr. Harris appears to concede that OTA's courses offer only "basic" information about trading. Dkt. 67-5, ¶7.

strategy is not purely objective, but relies on subjective judgments by consumers, only further undermines their claims that all purchasers are likely to profit. Opp. at 15-16; Dkt. 67-3, at 2-3 (Albin Dec. ¶¶3-5).

Defendants also reference a supposed online petition that they claim was "signed" by over 9,000 purchasers. Opp. at 3, 20; Dkt. 67-7 at 3-4. But the "signatures" are merely email addresses provided by an unknown number of unknown persons. Dkt. 67-7 at 3-4. The "statements" are not sworn, and their makers are not even identified. The Court should give this little evidentiary weight. Regardless, the petition's language does not show that the "signers" make money, nor does it otherwise refute any of the facts supporting the FTC's case.[28]

Defendants submit a number of "Web-Form-Based" declarations, more than half of which are unsigned.[29] Dkt. 67-7 at 5. These appear to consist of answers to six pre-written questions. These do not ask what claims Defendants made in their marketing, nor whether the purchaser's experience has borne out the truth of those claims. They shed no light on the merits.

In sum, the evidence weighs strongly in favor of the FTC.

**B.**     **The FTC Is Likely to Prevail on Count II**

Count II of the Complaint alleges that Defendants made additional specific misrepresentations that contributed to building the misleading net impression that purchasers were likely to earn substantial income, including that any consumer can use the strategy to make substantial income, regardless of education or aptitude, that they can do so despite lacking significant available time or investable capital, and that Defendants' instructors are active traders who have amassed substantial wealth through trading.

---

[28] Defendants (Opp. at 32) claim the petition signers vouch that they were not misled. That is simply not what the petition said.

[29] Defendants claim these were "digitally signed." Dkt. 67-7 at 5. If so, those signatures are not in evidence.

16

The FTC has presented irrefutable evidence that Defendants make these representations, including internal outlines of the sales pitch and transcripts of multiple sales seminars around the country throughout 2019. *See supra* Section I.A.1. Defendants do not dispute that they make the claims.[30] And Defendants admit that they have no substantiation for these claims.[31] Moreover, the claims are false. Because most purchasers do not make substantial income, the more specific claims set out in Count II (a-c) are necessarily false. Trading records for several prominent OTA instructors, including Chief Trading Strategist and "inventor" of the strategy, Defendant Seiden, and Defendant Kimoto, the head MTO presenter with responsibility for training all other MTO presenters, further demonstrate that they have not amassed substantial wealth through trading. EX 13, 317-318.

As shown in the FTC's opening brief (Dkt. 31, pp.10 & 30), these representations are material, and Defendants do not dispute that. The evidence shows these representations are made throughout Defendants' marketing and sales pitches, and thus are widely disseminated. *See* Dkt. 31 at 3-16. Defendants do not contest either point.

## C. The FTC Is Likely to Prevail on Count III

Count III alleges that the Corporate Defendants and Defendant Shachar's use of non-disparagement clauses ("NDAs") in their standard refund contracts violates the Consumer Review Fairness Act ("CRFA"). The CRFA bars the use of such clauses in form contracts after December 14, 2017. Defendants do not contest that they used such provisions, and did so after December 14, 2017. The contracts

---

[30] Indeed, Defendants admit that their claims of offering an "objective" strategy are false. Dkt. 67-3, at 2-3 (Albin Dec. ¶ 5) (conceding that implementing OTA's strategy "will always rely on a subjective judgment by the consumer," and claiming Mr. Jain misses the boat when he complains that "OTA's systems is not an explicit, objective, step-by-step set of rules or a recipe of specific instructions").

[31] Defendants' instructors need provide only minimal information about their trading. EX 13, 6098-6101 (OTA demands presenters demonstrate only "a minimum level of activity in the market"; they need not show profits). Defendants' lack of substantiation of their earnings claims equally evidences their lack of substantiation of the other related claims.

17

provided by consumer declarants shows that the NDA clauses in the different contracts are all the same,[32] and consumer testimony shows that purchasers have no meaningful opportunity to negotiate the language of the NDA clauses.[33] These facts bring them within the scope of "form" refund contracts under the CRFA.[34]

Defendants argue that the refund contracts are not "in the course of selling," and thus fall outside the CRFA's coverage. TRO Opp. at 28-29. But nothing in the CRFA compels that result. Rather, as a remedial statute intended to curtail the use of non-disparagement provisions to help preserve the credibility and value of online consumer reviews (H.R. Rep. No. 114-731, at 6 (2016)), the CRFA should be construed broadly, and its exceptions read narrowly, to effectuate its purposes.[35] Particularly where, as here, the evidence shows that Defendants used the NDA clauses to chill the dissemination of truthful negative information about their scheme, so as to preserve their ability to make further sales. *See* EX 2, 10; EX 5, 42; EX 6, 113-114. Defendants' consumer declarations do not refute the FTC's allegations.[36] Finally, no legitimate company will attempt to bar customers from talking to law enforcement, and, in any event, the majority of the relief sought in the proposed PI is premised on Counts I and II.

---

[32] *Compare* EX 5, 92-93 *with* EX 2, 17 *and* EX 6, 143.

[33] *See, e.g.*, EX 6, 112-113 (detailing negotiation process, and OTA's refusal to amend the provision per consumer's request). The provision's uniformity across contracts further attests to OTA's refusal to negotiate it.

[34] 15 U.S.C. § 45b (a)(3) (defining "form contract" as one used in the course of selling, with standardized terms, and no opportunity for meaningful negotiation).

[35] *See FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018) (en banc) (FTC Act is a remedial statute that should be construed broadly to effectuate its purposes); *National Automatic Laundry & Cleaning Counc. v. Shultz*, 443 F.2d 689, 706-07 (D.C. Cir. 1971) (similar).

[36] Defendants offer testimony from three consumers who purportedly signed refund contracts with the NDA language. EX KKKKK, LLLLL, & MMMMM. But they do not submit the contracts nor quote the NDA clauses, and their conclusory statements that they "had a meaningful opportunity to negotiate" prove nothing. *Id*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.   The FTC Is Likely to Succeed in Showing Common Enterprise

As the FTC showed in its opening brief, the evidence demonstrates that the Corporate Defendants have operated as a common enterprise and thus each should be held liable for the total injury caused by OTA. Dkt. 31 at 31-32. Defendants do not argue otherwise, and offer no evidence to rebut the FTC's showing.

### E.   The FTC Is Likely to Succeed in Showing Individual Liability

As the FTC showed in its opening brief, the evidence demonstrates that Defendants Shachar, Kimoto, and Seiden are individually liable under the law. *FTC v. Commerce Planet*, 815 F.3d 592, 600 (9th Cir. 2016). Dkt. 31 at 32-33. Defendants do not argue otherwise, and offer no evidence to rebut the FTC's showing.

## II.   Entering a Preliminary Injunction Is Necessary and Proper

The Court should enter a preliminary injunction because, as shown above, the FTC is likely to succeed on the merits, and the injunctive relief is in the public interest. "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989). The public interest in this case is compelling—halting Defendants' unlawful and injurious deceptive conduct and preserving assets for redress to injured consumers. Defendants, by contrast, have no legitimate interest in continuing to deceive and bilk consumers.[37] Based on the evidence before the Court, the FTC is likely to succeed on the merits, and the equities weigh in the public's favor. A PI is warranted.

Defendants claim they recently stopped using testimonials featuring specific earnings claims and, in "January 2020," directed MTO presenters to cease doing so. Opp. at 31-32. But Defendants provide no evidence that the purportedly "new"

---

[37] *See World Wide Factors*, 882 F.2d at 347 ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment").

19

presentations are not just as deceptive. And Defendants admit they continued to use the misleading 2019 Infomercial until early February 2020. Dkt. 67-23, at 7-8 (Nosek Dec. ¶¶16-17). Defendants have known they were under government scrutiny for a year.[38] Their last-minute conversion suggests an expectation of litigation more than it evidences a genuine intent to abide by the law. Nor is it relevant As courts routinely have held, cessation of wrongful conduct is not a valid defense when the misconduct ceased because of a government's investigation. *FTC v. Triangle Media Corp.*, No. 18-cv-1388, 2018 U.S. Dist. LEXIS 204422, at *3-4 (S.D. Cal. Dec. 3, 2018); *FTC v. Sage Seminars*, No. C 95-2854, 1995 U.S. Dist. LEXIS 21043, at *16-17 (N.D. Cal. Nov. 2, 1995); *Fedders Corp. v. FTC*, 529 F.2d 1398, 1403 (2d Cir. 1976); *Int'l Assoc. of Conf. Interpreters*, 123 F.T.C. 465, 658 (1997).

## A.   A Freeze of Defendants' Assets Is Necessary to Maintain the Possibility of Consumer Redress

Defendants' scheme has devastated consumers:  many have lost vast sums of money and gone deep into debt.[39] To preserve its ability to redress consumers, this Court should issue a PI with a freeze of all Defendants' assets. At the same time, it is appropriate to lift the restrictions on the Individual Defendants' spending with respect to any new moneys earned after entry of the TRO and not tainted by fraud.

When, as here, frozen assets amount to substantially less than the potential monetary liability, assets should be frozen to preserve them for potential consumer

---

[38] And claim to have hired competent counsel to advise them on compliance many years ago. EX 88, 68-69 (OTA hired Venable to "review[] all of our advertising" "around 2010").

[39] *See, e.g.*, EX 75, 3-4 (purchased "Diamond Package" for $ 60,180 and lost about $120,000 in the markets trying to apply OTA's core strategy); EX 74, 1-2 (financed through OTA $35,000 of his purchase of the "Mastermind Package" and lost $5,000 trading); EX 85, 36-37 (took over $20,000 in financing from OTA and has been unable to successfully utilize OTA's core strategy).

redress.[40] Consumer harm is measured by the amount consumers paid Defendants minus refunds and chargebacks.[41] Based on Defendants' records, the FTC estimates consumer harm of close to $362 million.[42] The Corporate Defendants claim to have had less than $2 million in cash available at the time of the TRO.[43] This is just over 0.5% of the estimated consumer harm.[44] As a result, the asset freeze as to the Corporate Defendants should be maintained. *See FTC v. Triangle Media Corp.*, 2018 WL 4051701, at *7 (S.D. Cal. Aug. 24, 2018) (finding asset freeze in PI warranted where defendants' wrongful gain amounted to approximately $30 million and frozen assets amounted to only $1.8 million); *see also Johnson v. Couturier*, 572 F.3d 1067, 1080 (9th Cir. 2009) (denying request for release of assets because it would "dollar for dollar, reduce the funds available for distribution" to victims); *FTC v. Johnson*, 567 Fed. Appx. 512, 514 (9th Cir. 2014) ("A district court may freeze assets when doing so is necessary to preserve the possibility of full relief.").

When the public interest is involved, as it is here, the Court's "equitable powers assume an even broader and more flexible character."[45] In light of the

---

[40] *CFTC v. Noble Metals, Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (where "the frozen assets fell far short of the amount needed to compensate [defendants'] customers," court had "reason enough" within its discretion to deny application to unfreeze assets). *See also FTC v. Equifin Int'l, Inc.*, No. 97-CV-4526, 1997 U.S. Dist. LEXIS 10288, *48-50 (C.D. Cal. July 31, 1997); *FTC v. AMG Servs., Inc.*, No. 2:12-CV-00536, 2016 WL 1275612, at *5–6 (D. Nev. Mar. 31, 2016).

[41] *See FTC v. Commerce Planet*, 815 F.3d 592, 603 (9th Cir. 2016).

[42] For years 2016-2019, defendant OTA Franchise Corporation has generated nearly $362 million in revenues.  *See* EX 88, 57 (revenue figures), 84 (revenue figures are net of refunds).

[43] *Id.* at 66-67 (Defendants' CFO's testimony on cash holdings). The Corporate Defendants have less than $40 million in total assets, and this figure is exceeded by their total liabilities. EX 61.

[44] This gap will only grow worse, as Corporate Defendants may now access previously frozen funds for the payment of employee salaries and health insurance premiums. *See* Dkt. at 65 (order modifying asset freeze).

[45] *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); *see also Commerce Planet*, 815 F.3d at 598-99; *FTC v. All. Doc. Prep.*, No. 17-CV-7048,

21

1    yawning gap between the amount of consumer harm and Corporate Defendants'

2    frozen funds, the Court should also institute an asset freeze over the Individual

3    Defendants. As an initial matter, the Individual Defendants do not deny having

4    knowledge of and control over the deceptive conduct at issue.[46] Second, in light of

5    the paucity of frozen corporate funds, the freezing of the individuals' assets is

6    necessary to preserve the possibility of meaningful consumer redress.

7         While Defendants intimate that an asset freeze is not necessary because there

8    is little risk of improper asset dissipation,[47] a risk of dissipation does in fact exist.

9    For example, Defendant Shachar, who took in nearly $35 million from OTA over

10   the last two years, has yet to provide a completed sworn statement to the FTC (as

11   required by the TRO), and has significant assets in his native country of Israel.[48]

12   Likewise, OTA paid Seiden nearly $4 million from January 2016 through late

13   November 2019.[49] Yet, his net worth is comprised mainly of a note owed to him by

14   OTA and a heavily encumbered home.[50]

---

2017 WL 5178414, at *10 (C.D. Cal. Nov. 2, 2017 (PI with asset freeze, as "public has a compelling interest in ensuring the robust enforcement of federal consumer protection laws," which "would be harmed if Defendants … continue operations").

[46] *See FTC v. Universal Premium Servs., Inc.*, No. 06-CV-0849, 2006 WL 8442134, at *9 (C.D. Cal. Mar. 14, 2006) ("[i]n addition, to freezing the corporate assets, courts have frozen *individual* defendants' assets where the individual defendants controlled the deceptive activity and had actual or constructive knowledge of the deceptive nature of the practices in which they were engaged.").

[47] Opp. at 3 n.4. While Defendants stress that Mr. Shachar recently provided funds to OTA, these funds are in the form of a loan subordinate only to a line of credit with Pacific Mercantile Bank. *See* EX 88, 83 (OTA's debt obligation to Mr. Shachar has preferred status to other OTA creditors).

[48] EX 88, 53, 89, 91-92.

[49] EX 13, 6269.

[50] EX 88, 95.

Defendants have caused terrible financial harm to numerous consumers. Securing possible relief for victims in the form of partial repayment outweighs any harm Defendants may suffer as a result of the asset freeze.[51]

Defendants also state that satisfied purchasers have an interest in receiving what they paid, arguing that this interest weighs in favor of lifting the freeze to allow OTA to resume operations. Opp. at 32. First, *all* of Defendants' purchasers have an interest in getting what they paid for—but compelling evidence shows that Defendants do not have it to give. *See* Section I.A, *supra*. Allowing Defendants to access their ill-gotten gains will not fix that. Second, the proposed PI does not bar Defendants from providing the services they claim some consumers want. And to the extent that an asset freeze makes it more difficult to do so, that burden is outweighed by the interests of the many purchasers injured by Defendants' deception, who are, in equity, owed their money back.[52] On balance, Defendants' arguments do not outweigh the interest of injured consumers in getting some measure of redress for the harm Defendants caused them.[53]

**B.    Appointment of a Receiver Is Warranted**

A receiver is necessary to determine whether Defendants' business can continue to operate lawfully and profitably. Appointment of a receiver is important to ensure that the Corporate Defendants' assets are marshalled, that appropriate steps are taken to preserve the assets and evidence, and to provide a mechanism to ensure that the claims and concerns of the numerous purchasers, third parties, and other stakeholders can be heard and addressed. A receiver will also ensure that Corporate Assets are not dissipated.

[51] *FTC v. Arlington Press, Inc.*, 1999 U.S. Dist. LEXIS 23210, at *40 (C.D. Cal. Jan. 11, 1999 ("benefit in protecting consumers against potentially fraudulent activity, and securing for those who may have already been injured some form of redress outweighs the harm that may be served by individuals associated with the business.").

[52] There is no showing that OTA's leadership cannot find alternative financing to continue their operations, free of deception.

[53] *See supra* footnote 39.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   The First Amendment Does Not Bar Issuance of a PI

Defendants argue that the First Amendment bars this Court from enjoining deceptive marketing. Opp. at 4-15. As previously shown (Dkt. 55), that is not the law. The proposed PI does not enjoin protected speech, and is not otherwise barred by the First Amendment's protections.

It is important to note what is at issue here, and what is not. The PI, by its explicit terms, bans only deceptive, and thus illegal, advertising. Nothing more. Its speech restrictions impose no obligation that Defendants were not already under.[54] The PI does not categorically ban Defendants from advertising or teaching. It does not ban them from advertising and teaching their "patented strategy." This is not about *what* Defendants advertise or teach, it is about *how* they do so. Specifically, it is about whether Defendants may use deception in their advertising and sales pitch.

It is settled law that the First Amendment affords no protection to deceptive commercial speech. *See United States v. Schiff*, 379 F.3d 621, 629-30 (9th Cir. 2004) (upholding preliminary injunction barring sales of book that functioned as deceptive advertisement); *Eng v. S.E.C.*, 49 Fed. Appx. 697, 2002 WL 31356626, at *1 (9th Cir. 2002) ("First Amendment protection is only given for commercial speech to statements that are truthful and not misleading."); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980) ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it."); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or

---

[54] *See* 15 U.S.C. § 45(a) (banning "unfair or deceptive acts or practices in or affecting commerce").

24

misleading."); *In re R.M.J.*, 455 U.S. 191, 203 (1982) ("Misleading advertising may be prohibited entirely.").

The Ninth Circuit's decision in *United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004), which Defendants fail to address, is dispositive. Schiff was accused of deceptively marketing and selling books and other products with the claim that they would teach consumers how to legally avoid paying income tax. The district court issued a TRO, and, after a hearing, a PI, that barred marketing and sales of the book. The book contained both otherwise-protected expressive political speech, and commercial speech touting Schiff's other products. The Ninth Circuit found that the book "is intended to help sell [Schiff's] other products," and "is an integral part of Schiff's whole program to market his various products." *Id.* at 628. Because Schiff could offer the political speech "without simultaneously urging his readers to buy his products," it was not "inextricably entwined" with the book's commercial elements. *Id.* at 629. The Ninth Circuit upheld the PI, explaining "[f]raudulent commercial speech may be enjoined. An advertisement is fraudulent when it misleads customers about the benefit of the offered product." *Id.* at 630 (citing *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600 (2003) (citation omitted)). Thus, the First Amendment does not protect deceptive commercial speech even when it is included in a scheme that also involves purportedly protected but distinct speech.

Defendants' arguments to the contrary lack merit. Their main argument is that the asset freeze is a restriction on speech. But it is not. Defendants' other arguments, including claims that their sales pitch is protected as non-commercial speech, and that the PI is an unconstitutional prior restraint, fare no better.

The FTC does not concede that OTA's scheme includes any protected speech (OTA itself has told state regulators that its "education" is akin to "ski school"). But, as stated above, this case is not about whether Defendants can teach their investing strategy, what methods they may use to do so, or even whether they can

advertise their training. All it is about is whether Defendants may use false and unsubstantiated claims. They may not, and this Court has full authority to so order.

### A.   The Asset Freeze Is Not a Restriction on Speech

Defendants' chief argument rests on the bold claim that an injunction that freezes their current assets should be analyzed as if it explicitly barred them from offering their courses, assuming they are entitled to First Amendment protection.[55] Defendants cite no case so holding. And that is not the law. Were it, defendants in all manner of cases would be able to retain funds that would otherwise be required to be turned over, merely by arguing that they intended to use the funds to finance protected speech.[56] Whatever right Defendants have to teach or to promote their teachings, they have *no* right to finance such endeavors with ill-gotten funds.[57]

Defendants' argument is also unsupported by evidence. Defendants claim they are unable to present their courses without spending frozen funds. But there is no evidence of that, no showing that there is no other possible means of financing provision of their courses but the frozen funds.[58] This evidentiary failing dooms their argument even if the law were as they claim. And Defendants admit their tacit

---

[55] Opp. at 5-7 (claiming that asset freeze "has forced OTA to suspend operations and lay off its employees," and characterizing TRO and PI as thus "suppress[ing] all of OTA's training programs, seminars, courses, and instructional materials").

[56] Defendants' logic would seem to imply that a pastor who robs a bank to fund church services could keep the money simply because it would be used to finance protected religious speech. And the IRS would be unable to collect from a for-profit college that had under-reported its taxes for years if doing so would bankrupt it. This is not the law.

[57] Protected Constitutional rights do not entail the right to finance exercise of those rights with stolen moneys. *See CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) ("Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler . . . cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime.").

[58] If, as Defendants claim, they are a legitimate business with tens of thousands of happy customers and hundreds of employees (all of whom know how to make money in the markets), it seems entirely plausible that Defendants could arrange a bridge loan to re-launch a new, non-deceptive version of OTA.

26

1     factual claim is untrue:  At least as of late last week, Defendants were continuing to

2     provide training to purchasers.[59]

3            To be sure, the FTC's proposed PI would also impose a receiver over the

4     Corporate Defendants. But this does not change the analysis. The PI does not

5     require the receiver to shut down the enterprise or to stop provision of its courses.

6     Indeed, it expressly contemplates that the receiver independently examine whether

7     the business may be operated legally and profitably, and report his determination to

8     the Court to inform further proceedings. Appointment of the receiver is not

9     motivated by the content of the courses, but by the evidentiary showing that the

10    enterprise's continued operation relies on deception, and that its assets are

11    insufficient to redress injured consumers. *See* Section II, *supra*.

12           Defendants suggest that injunctions "encumbering a company's assets"

13    constitute restraints on speech. Opp. at 8. They cite no authority so holding. In *Fort*

14    *Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), the Court addressed an

15    injunction directing the seizure of "all property" used in or derived from a

16    bookstore's allegedly illegal conduct, based on a showing of probable cause that a

17    book it sold was obscene. *Id*. at 51-52. The Court held that the injunction violated

18    the First Amendment, not because it seized the store's bank accounts, but because

19    it seized all copies of the allegedly obscene book based on no more than a showing

20    of probable cause, and so constituted an attempted end run around the "rigorous

21    procedural safeguards" that apply to seizures of allegedly "obscene" speech. *Id*. at

22    63-66. The PI does not stop dissemination of Defendants' courses. And perhaps

23    more pertinently, the protections afforded speech as notoriously difficult to identify

24    as obscenity[60] cannot be simply uprooted and applied wholesale to another area of

25    law altogether. Particularly not to deceptive commercial speech, which can be

26    [59] EX 88, 70-72.

27    [60] *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)
("I know it when I see it…."); *Miller v. California*, 413 U.S. 15, 27 (1973) (setting

28    out three-part test turning on non-objective factors including "community
standards," and "literary, artistic, political, or scientific value" of work).

decided objectively through evidence. *See Schiff*, 379 F.3d at 630 (upholding preliminary injunction barring sale of book due to deception).

Defendants also cite *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105 (1991). Contrary to Defendants' suggestion, *Simon & Schuster* did not hold that the government cannot freeze a criminal's assets if they derive from expressive conduct. Rather, it stands for the unremarkable proposition that a state may not impose such a freeze *based on the content of the expression*. *Id*. at 120-121 (law invalid because while state had "compelling interest in compensating victims," it had "little if any interest in limiting such compensation" to proceeds of works with specific content). The PI's freeze is not based on the content Defendants teach. It is based on their extensive use of deception in their advertising.

In sum, the law and the facts do not support Defendants' arguments.[61]

## B.     Defendants' Preview Events and MTOs Are Advertising, Not Fully Protected Speech

Defendants claim that their Preview Events and MTOs, which they describe as "[p]romotional [e]ducational [s]eminars," are fully protected speech, and that the PI's regulation of them must survive "[h]eightened [s]crutiny." Opp. at 12. But, as already shown, under settled law the sales events are commercial speech. Dkt. 55, at 4 (explaining that sales events meet three-factor test set out in *Bolger v. Youngs Drug Prods. Corp*., 463 U.S. 60 (1983)). Defendants do not contest that the *Bolger* three-factor test is met, nor could they plausibly do so.[62] Instead, they seize

---

[61] *Stanley v. Georgia*, 394 U.S. 557 (1969) is not to the contrary. It held only that consumers have a right to possess obscene material in their homes. *Id*. at 559. It expressly acknowledged that such right does not immunize purveyors of obscenity. *Id*. at 563-64.

[62] Sales event staff are paid commission (EX 13, 6165), they need not have any experience in financial markets or education (EX 13, 7690 & 7702-7703), their training materials are about how to sell (EX 13, 318-319, 332, 6193-6238, 6304-6361, & 8041-8384; EX 52, EX 88, 104-107 (Kimoto not aware of other training materials)), and the sales events generate 80% of their revenue (EX 13, 5120).

on dicta in a footnote in *Bolger* and a state trial court decision ruling on a matter of state law,[63] suggesting that advertisement of protected speech, even if deceptive, is fully protected. Opp. at 12-13. Not so. *See Schiff*, 379 F.3d at 630 (upholding pre-trial bar to sale of book as deceptive advertising); *Charles v. City of Los Angeles*, 697 F.3d 1146, 1155–56 (9th Cir. 2012) (regulation of advertisement for protected speech not automatically entitled to heightened scrutiny; protection based on need to protect truthful dissemination of information).[64]

Defendants also cite *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 964-65 (9th Cir. 2012), suggesting that under *Dex*, their sales events are fully protected because their commercial content is "inextricably intertwined" with protected speech. Opp. at 14. That is wrong for several reasons. First, the Ninth Circuit explained in *Dex* that its review is directed to the speech burdened by the regulation—here, that is the advertising claims, not the sales events as a whole (or any purportedly protected curriculum). In *Dex*, the state argued that yellow pages books were commercial speech because they contained advertisements. The Ninth Circuit rejected that argument, explaining that the law at issue, which imposed fees and licensing requirements on the books' distribution, "regulates a yellow pages phone book as a whole, not simply the individual advertisements contained therein," *Id*. at 957. Accordingly, the *Dex* court looked to the yellow pages book as a whole to assess whether it was commercial speech. In contrast, Section I of the PI regulates purely commercial content—earnings and related claims. It does not impose a fee or a licensing requirement on the sales events as a whole. Under *Dex*,

[63] Opp. at 12-13 citing *Lacoff v. Buena Vista Publ'g, Inc.*, 705 N.Y.S.2d 183, 189 (N.Y. Sup. Ct. 2000). To the extent *Lacoff* discussed the First Amendment, it leaned heavily on *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988), and thus may no longer be good law after *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003), which limited *Riley*'s impact.

[64] Defendants (Opp. at 13-14) ignore the thrust of *Charles*'s holding and mischaracterize its reference to *Lacoff*. *Charles* cites *Lacoff* as an example of the function of a doctrine of New York state law. *Charles*, 697 F.3d at 1154-55. It does not state that *Lacoff*'s holding was compelled by the First Amendment. In any event, Defendant's position is foreclosed by *Schiff*, 379 F.3d at 630.

then, the Court need only determine whether *the specific claims barred by the injunction* are commercial speech, not the sale events as a whole. They are, and the analysis ends there. *See Bolger*, 463 U.S. at 66-68.

Even were that not the case, *Dex* is still no help to Defendants, as it merely applied the test articulated in *Bolger*, and found that the yellow pages satisfied only one of the three *Bolger* factors, namely commercial motive for publication. *Dex*, 696 F.3d at 960. The *Dex* court explained that (unlike OTA's marketing) the yellow pages "does not refer to a specific product" and "was not created to serve merely as a vehicle for the delivery of ads." *Id*. at 959 & 963. To the contrary, the court noted that publication of the yellow pages was "require[d]" by the state, "demonstrating that the directories serve more than a commercial purpose." *Id*. at 957. OTA's advertisements and sales pitch are nothing like a state-mandated listing of important information including telephone numbers of residents and businesses.

Defendants reference the *Dex* Court's discussion of a doctrine that protects otherwise-commercial speech if it has non-commercial elements that are "inextricably intertwined" with the commercial ones. Opp. at 14. But the discussion was unnecessary to the holding in *Dex*, and *Dex*'s reasoning is inapplicable here. *Dex*, 696 F.3d at 963-64 (exception applied as yellow pages started as merely a means of delivering useful information and "[t]he commercial elements came later," merely to subsidize provision of the noncommercial information, like advertising in a newspaper). In any event, *Madigan* and *Schiff* demonstrate that the exception is not available to Defendants. *Madigan*, 538 U.S. at 612 (even though the Court created the "inextricably intertwined" exception to provide First Amendment protection to charitable solicitation, protection did not extend to claims that charitable solicitors made "misleading … representations"); *Schiff*, 379 F.3d at 629 (not "inextricably entwined" where non-commercial speech could be made "without simultaneously urging" purchases); *see also Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473-74 (1989) (product

30

"demonstration" sessions akin to "Tupperware parties" that both pitched household goods and discussed related topics such as "how to run an efficient home," and "be financially responsible" were not protected, as "nothing in the nature of things requires [the noncommercial elements of the sessions] to be combined with commercial messages"); *Hunt v. City of Los Angeles*, 638 F.3d 703, 716 (9th Cir. 2011) (sidewalk vendors' inclusion of otherwise-protected speech in their sales pitch did not immunize the pitch from regulation as commercial speech, because, as in *Fox*, "[n]othing in the nature of Plaintiffs' products requires their sales to be combined with a noncommercial message").

### C. The PI Is Not an Unconstitutional Prior Restraint

Defendants argue that the PI constitutes a prior restraint on their speech and thus violates the First Amendment. Opp. at 7-12. But Defendants' argument relies on construing the PI as enjoining Defendants' courses or their sales events *in toto*. As explained above, the PI is narrowly drawn to bar only deceptive commercial speech—it does no more than require compliance with the law. Such an injunction is permissible. *See Schiff*, 379 F.3d at 630; *see also Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441–45 (1957) (upholding preliminary injunction banning sales of allegedly obscene materials). Defendants cite no authority holding that preliminary injunctive relief, narrowly drawn to bar only by-definition illegal conduct, offends the First Amendment.[65]

Defendants rely chiefly on *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931) and *State ex rel. Corbin v. Tolleson,* 773 P.2d 490 (Ariz. App. 1989). Opp. at 7-9. But both of those cases invalidated injunctions that, by their explicit terms, barred future speech that might be protected. The PI is limited, by its express terms, to barring by-definition unprotected speech. Nor should the Court

---

[65] Defendants also cite *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (content-based restriction); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) (*ex parte* seizure of allegedly obscene books); and *New York Times Co. v. United States*, 403 U.S. 713 (1971) (Pentagon Papers case). The PI does not enjoin Defendants' deceptive advertising based on content, obscenity, or national security.

find *Tolleson*'s pre-*Madigan* application of the "intextricably intertwined" test announced in *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781,796 (1988), persuasive. *Tolleson*, an intermediate state appellate court decision, pre-dates *Madigan*'s explanation that *Riley* had been interpreted overly expansively by the lower courts, and did not extend First Amendment protection to misleading representations even in otherwise-protected speech. *Madigan*, 538 U.S. at 619-23.

### D. Defendants' Other Arguments Are Abandoned or Wrong

Defendants previously argued that their offerings are "educational," and thus are entitled to heightened protections. As the FTC has shown (Dkt. 55, pp. 2-4), the basis for the line of cases Defendants referenced (Objs. at 6, citing *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967)) is absent here. As exemplified by the Supreme Court's ruling in *Keyishian*, that line of authority seeks to protect robust debate and the exchange of differing views—the "marketplace of ideas." 385 U.S. at 603, 606-10. OTA's courses are no town square or "marketplace" of ideas; instead, Defendants' policy is to squelch dissent and expel dissenting voices.[66] The concerns animating *Keyishian* and its brethren are not present here.

Defendants also appear to have abandoned their vagueness challenge to the PI. It, too, lacked merit. The PI's speech prohibitions are detailed and narrowly drawn to bar only deceptive advertising—speech that is by definition unprotected. It tracks well established law on deception. Defendants' reliance on *Metropolitan Opera Ass'n. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 239 F.3d 172 (2d Cir. 2001) is misplaced. There, the Second Circuit addressed an injunction barring union organizers from using "threatening,"

---

[66] EX 13, 8106-8107 (suggesting employees tell consumers to "plug your ears to everyone in that room except for me and [OTA's instructor]"); EX 84, 34-35 (OTA threatened to ban purchaser for publicly criticizing OTA's strategy and attempting to persuade others to adopt a different trading strategy).

"harassing," "fraudulent," or "defamatory" speech. *Id*. at 178. Citing the "special breadth of protection" afforded to "union speech that publicizes labor conflicts," the court held that at least some speech covered by the injunction was protected. *Id*. at 177-78 (explaining that the very elements sought to be enjoined—the speech's "harassing, upsetting, or coercive" nature—were "constitutionally protected" under the First Amendment, "[e]specially within the labor context"). This is not a labor dispute, Defendants do not argue that deceptive advertising is protected speech, and the issue here is deception, not defamation or harassment.

Finally, Defendants have argued that the government "must prove that speech is beyond First Amendment protection before it may enjoin it or freeze the speaker's assets." Dkt. 57, p.2; *see also* Opp. at 9 (PI "unconstitutional … because it stops speech that the  government has not proven is unprotected by the First Amendment"). Defendants cite no authority for this bold proposition, which would bar nearly all preliminary injunctive relief enjoining speech. Nor do Defendants explain how such a rule would bar issuance of an injunction that, like the PI here, is explicitly defined to enjoin *only* unprotected speech. In any event that argument is squarely foreclosed by binding precedent. *Schiff*, 379 F.3d at 630 (upholding preliminary injunction banning sales of book, based on showing of deception).

## CONCLUSION

For the reasons set out above, the Court should enter the FTC's proposed PI.[67]

---

[67] Defendants' opposition to the TRO argued that the Court should not grant injunctive relief because this matter should be heard in another court. TRO Opp. at 20-21. Defendants appear to have abandoned that argument. *See generally* Opp. In any event, such arguments are properly presented in a motion to dismiss or transfer. The FTC will respond to any such motion if and when it is made.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  March 10, 2020

/s/ Andrew Hudson

Thomas M. Biesty
Rhonda Perkins
Andrew Hudson
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3043 / tbiesty@ftc.gov
(202) 326-3222 / rperkins@ftc.gov
(202) 326-2213 / ahudson@ftc.gov

John Jacobs
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
(310) 824-4300 / jjacobs@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION