1   Wayne W. Call, State Bar No. 56676
      wcall@calljensen.com
2   Mark L. Eisenhut, State Bar No. 185039
3     meisenhut@calljensen.com
    William P. Cole, State Bar No. 186772
4     wcole@calljensen.com
5   Chris C. Scheithauer, State Bar No. 184798
      cscheithauer@calljensen.com
6   CALL & JENSEN
7   A Professional Corporation
8   610 Newport Center Drive, Suite 700
    Newport Beach, CA  92660
9   Tel:   (949) 717-3000
10  Fax:   (949) 717-3100

11  Robert Corn-Revere (Admitted Pro Hac Vice)
      bobcornrevere@dwt.com
12  Ronald G. London (Admitted Pro Hac Vice)
13    ronnielondon@dwt.com
    DAVIS WRIGHT TREMAINE LLP
14  1919 Pennsylvania Avenue, NW, Suite 800
15  Washington, DC 20006
    Tel:   (202) 973-4235
16  Fax:   (202) 973-4425

17  Attorneys for Defendants OTA Franchise Corporation,
18  Newport Exchange Holdings, Inc., NEH Services, Inc.,
    Eyal Shachar, Samuel R. Seiden and Darren Kimoto
19

20            UNITED STATES DISTRICT COURT
21            CENTRAL DISTRICT OF CALIFORNIA

22  **Federal Trade Commission**,            Case No.  8:20-cv-00287 JVS (KESx)

23            Plaintiff,
                                             **DEFENDANTS' OBJECTIONS AND**
24       vs.                                 **RESPONSE TO FTC'S PROPOSED**
                                             **PRELIMINARY INJUNCTION**
25  **OTA Franchise Corporation**, et al.,

26            Defendants.
                                             Complaint Filed:   February 12, 2020
27                                           Trial Date:   None Set

28

# TABLE OF CONTENTS

Page

I.    THE PI NEED NOT AND SHOULD NOT INTERFERE WITH
      OTA'S CRITICAL BUSINESS RELATIONSHIPS .................................................. 1

II.   THE FTC's PROPOSAL IS INCONSISTENT WITH THE
      COURT'S INSTRUCTIONS, DOES NOT PRESERVE THE
      STATUS QUO, AND DESTROYS RATHER THAN
      PRESERVES ASSETS ............................................................................................ 4

III.  OBJECTIONS ......................................................................................................... 5

      A.    The Preliminary Statement and Findings are Unnecessary
            and Off Base ................................................................................................ 5

      B.    The FTC's Proposed "Monitor" is Not What the Court
            Intended and Would be Abusive .................................................................. 6

      C.    The Proposed "Monitored Entities" Definition is Overbroad ....................... 9

      D.    The "Prohibited Business Activities" Are Poorly Defined
            and Overbroad ............................................................................................. 9

      E.    Prohibitions on "Review-Limiting Contracts" are Overbroad
            and Unnecessary ........................................................................................ 12

      F.    Prohibitions on Collection of Loans are Contrary to the
            Court's Order and Destructive .................................................................... 13

      G.    This Case has Nothing To Do With Use of Customer
            Information ................................................................................................. 13

      H.    Preservation of Records is Governed Mutually by
            Applicable Law and Rules, and Should Not be Included in a
            PI ................................................................................................................ 14

      I.    Preservation of Individual Assets Must Be Appropriately
            Tailored to Allow Normal Course of Living Expenses ............................. 15

      J.    The Corporate Asset Freeze Needs Adjusting ............................................ 15

      K.    The Exceptions to the Asset Freeze Need Adjustments .............................. 17

1

**TABLE OF CONTENTS(con't)**

2

<u>Page</u>

3

L. There Is No Good Reason To Require Asset Holders to Also
4   Monitor and Enforce Compliance ................................................................ 18

5

M. Financial Disclosures Were Already Completed and Should
6   not Be Compelled Again .............................................................................. 21

7

N. The FTC Should Not Be Allowed Repeatedly to Request
8   Credit Reports............................................................................................... 21

9

O. There Should be No Requirement for Defendants, or Others,
10   to Report About Unrelated Businesses......................................................... 22

11

P. The Newly Invented Requirement to Record All Sales
   Events Was Not Ordered and is Wasteful and Impractical........................... 22

12

Q. Identification of the Monitor ........................................................................ 23

13

R. The FTC Should Be Required To Provide Notice of The
14   Preliminary Injunction To Nonparties.......................................................... 24

15

S. There is No Basis for the FTC's Proposed Ongoing Right to
16   Expedited Discovery .................................................................................... 24

17

T. The FTC's Attempt to Address Jurisdiction Should be
18   Rejected ........................................................................................................ 25

19 IV. CONCLUSION........................................................................................................ 25

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**Cases**

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ..................................................................................... 12

*Big Mama Rag, Inc. v. United States*,
   631 F.2d 1030 (D.C.Cir.1980) ..................................................................... 12

*Burton v. City of Belle Glade*,
   178 F.3d 1175 (11th Cir. 1999) ..................................................................... 11

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ..................................................................................... 18

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ....................................................................................... 14

*Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
   528 U.S. 167 (2000) ..................................................................................... 14

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ..................................................................................... 12

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ..................................................................... 14

*Payne v. Travenol Labs., Inc.*,
   565 F.2d 895 (5th Cir. 1978) ....................................................................... 11

*PersonalWeb Techs., LLC v. Google Inc.*,
   No. C13-01317-EJD (HRL), 2014 WL 580290 (N.D. Cal. Feb. 13, 2014) ............. 14

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
   241 F.3d 232 (2d Cir. 2001) ......................................................................... 11

1

# TABLE OF AUTHORITIES (con't)

2

<u>Page</u>

3

## **Statutes**

4

15 U.S.C. § 45b ............................................................................................................. 12

5

6

7

## **Rules**

8

Fed. R. Civ. P. 26 through 37 ........................................................................................ 12

9

Fed. R. Civ. P. 26(b)(2)(A) ........................................................................................... 25

10

Fed. R. Civ. P. 65(d) ..................................................................................................... 11

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- iv -

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

## I. THE PI NEED NOT AND SHOULD NOT INTERFERE WITH OTA'S CRITICAL BUSINESS RELATIONSHIPS

Several complications have resulted from the implementation of the TRO that the Court should be mindful of in fashioning the Preliminary Injunction ("PI").

First, the PI should allow OTA's relationships with Universal Guardian Acceptance ("UGA") and Universal Account Servicing ("UAS") to function fully. UGA/UAS services more than $16 million of receivables owed by students to the Corporate Defendants. [Declaration of Eyal Shachar ("Shachar Dec.") ¶ 2]. UGA/UAS sends the invoices to students, receives the payments from them, tracks student balances owing, etc., and it charges a commercially reasonable fee for these services. [Shachar Dec. ¶ 2].  At times, UGA/UAS also purchases receivables from OTA. [Shachar Dec. ¶ 2]. In those scenarios, UGA/UAS pays OTA the amount of the receivable less a commercially reasonable charge, then assumes all responsibility for each receivable. [Shachar Dec. ¶ 2]. This relationship is highly valuable to OTA and critical to OTA's cash flow and ability to operate. [Shachar Dec. ¶ 2].

UGA/UAS is aware of the TRO and pending preliminary injunction, and is cautious not to violate any aspect of it. Even though the Court, after issuing the TRO, clearly ordered that OTA "may continue to collect money" (Dkt. 64), the FTC has told UGA/UAS that this clarification does not permit UGA/UAS to collect on receivables owed to OTA, and does not permit UGA/UAS to transfer any collected funds to OTA. [Declaration of Mark L. Eisenhut ("Eisenhut Dec."), Exh. 1]. In light of this threat by the FTC, UGA/UAS has notified OTA through counsel that, absent further direction from the Court, it will not remit to OTA any of OTA's money in its possession, will not actively service any of OTA's accounts, will not send monthly periodic statements to consumers for OTA accounts, and will not deposit any cash or checks received from consumers for OTA accounts. [Eisenhut Dec., Exh. 2].

The position taken by the FTC is contrary to the intent of the Court's order. OTA cannot collect its receivables without the services provided by UGA/UAS, and if

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

UGA/UAS cannot service OTA's accounts or remit payments received from students on balances owed, then OTA will be unable to continue providing the education students have paid for. [Shachar Dec. ¶ 3]. And, if OTA cannot continue providing education to students, the students will most definitely stop paying what they otherwise owe (and will have strong arguments that they owe nothing). This, in turn, will render the receivables practically worthless, and reduce OTA's assets by at least $16 million. [Shachar Dec. ¶ 3]. On the other hand, converting receivables into receipts significantly increases the value of these assets, and that increase in value far outweighs the cost of any reasonable service fees paid to UGA/UAS. [Shachar Dec. ¶ 3]. Defendants respectfully request that the PI allow the UGA/UAS relationship to function normally. It is critical to OTA's survival as a functioning entity, and to the students who receive the education.

Second, the PI should allow sharing of customer information as necessary to accommodate educational offerings. As part of its educational programs, OTA gives students access to a newly developed educational software platform, "CliK," which guides students through the risk management steps taught by OTA before executing trades. [Shachar Dec. ¶ 4]. The CliK software helps students ensure they have planned out each step, and that once they begin executing a trade, the trade complies with their plan. [Shachar Dec. ¶ 4]. To facilitate students getting market data and executing trades, OTA has relationships with certain companies, including Dev Experts, dxFeed, Tastyworks, and IG which are critical to deliver effective education to students. [Shachar Dec. ¶ 4]. These relationships require, with the students' express permission, the sharing of student information with these companies.[1] [Shachar Dec. ¶ 4]. Students are not required to participate in these programs, nor are they required to give OTA

---

[1] With respect to Tastyworks, student information is required in order to receive market data. Unauthorized data distribution is prohibited by the exchange's data distribution rules, and brokers such as Tastyworks cannot provide it to students in the classroom unless they have sufficient information about each student receiving the data to comply with the exchange's rules. [Shachar Dec. ¶ 4].

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

permission to share their information, but if they choose to participate, they receive the benefits intended by the CliK platform. [Shachar Dec. ¶ 4]. However, following the TRO, Tastyworks and IG paused their relationships with OTA, and Dev Experts and dxFeed are seriously considering this action, citing concerns about the injunction against sharing customer information. [Shachar Dec. ¶ 4]. Tastyworks and IG would like to resume their relationships with OTA, and Dev Experts and dxFeed would like to continue theirs. [Shachar Dec. ¶ 4]. But OTA will not be able to provide the required information to brokers such as Tastyworks if an injunction restricts its sharing of student information. Defendants respectfully request that the PI allow sharing of customer information (with the customer's consent) to accommodate these educational offerings.

Third, the PI must make clear that bank payments are permitted under the terms of the order. OTA banks primarily with Pacific Mercantile Bank ("PM Bank"). [Shachar Dec. ¶ 5]. Most of OTA's payments to employees, independent contractors, and vendors flow through PM Bank. [Shachar Dec. ¶ 5]. Although the Court clarified the TRO to permit OTA to "pay their employees" (Dkt. 64), PM Bank remained unwilling to release funds on the grounds the Court's order did not specifically alter the portion of the TRO that instructed the bank not to allow withdrawals. [Shachar Dec. ¶ 5]. It took several rounds of discussions and emails, and substantial attorney time for both the bank and OTA, before PM Bank finally agreed to release funds for the Court-approved payments. [Shachar Dec. ¶ 5]. PM bank also prohibited OTA from using standard online banking functionality for routine ACH and wire payments in order to comply with their interpretation of the TRO. [Shachar Dec. ¶ 5]. The PI's wording needs to avoid such confusion in the future.

Fourth, the PI should not require financial institutions to freeze funds. For example, Meridian Systems is OTA's primary credit card processor. [Shachar Dec. ¶ 6]. It receives payments via credit card from individuals and entities that owe money to OTA. [Shachar Dec. ¶ 6].  As with PM Bank and UGA, the FTC's proposed PI will

cause confusion as to whether Meridian Systems can release funds to OTA, even though the Court ordered that OTA can continue to collect money. [Shachar Dec. ¶ 6]. Funds are already frozen in the sense that OTA is not allowed to use them without Court permission, but funds are also *unfrozen* in the sense that the Court has allowed certain payments. To require the financial institutions to impose a freeze, but to also allow certain payments only if they comply with the Court's orders, puts the institutions in the difficult (if not impossible) position of having to police and monitor OTA's compliance. It also encourages them to err on the side of not processing payments, which cripples OTA's ability to function, and thus dissipates, rather than preserves assets. If OTA cannot function, its assets will naturally dissipate. Defendants respectfully request that the PI remove these unnecessary obstacles.

## II.   THE FTC'S PROPOSAL IS INCONSISTENT WITH THE COURT'S INSTRUCTIONS, DOES NOT PRESERVE THE STATUS QUO, AND DESTROYS RATHER THAN PRESERVES ASSETS

Although the purpose of a preliminary injunction is to preserve the status quo, and despite this Court's expressed concern about giving the government "sweeping powers," the proposed PI would not preserve assets for potential consumer redress, and would empower the FTC to control every facet of OTA's business. Although it avoids the term "receiver," the proposed PI dramatically departs from the Court's stated intentions for the Monitor by requesting an army of advocates (including "deputy monitors," "representatives," "accountants," "attorneys, investigators, and other independent contractors and technical specialists") to do the FTC's job and far more, at OTA's unlimited expense. The unlimited team of "monitors" would have "immediate, unfettered" power to repeatedly and instantly demand to interview anyone, subpoena information, "conduct discovery in the action," and engage in other intrusive activities. The proposed PI would also force Defendants to record all sales events (something Defendants are not equipped to do and that would require an enormous outlay of capital and employee time), and to compel Defendants to "provide to the Monitor, immediately

CALL & JENSEN

upon request, without need of any subpoena or further order," any information the monitors may desire to have. And OTA is to be whipped around like this at the same time the FTC has objected to OTA's request for permission to operate even at 1/3 its normal capacity. In the meantime, despite the Court's expressed willingness to conduct an expedited trial, the FTC insists it cannot be expected to proceed to trial any sooner than December (despite having already investigated for well over a year with full cooperation from Defendants and the full powers and funding of the federal government at its disposal), and yet simultaneously requests that Defendants be strapped with onerous asset freezes (precluding even *individual defendants* from using their assets for basic living expenses) and that Defendants meet unrealistic demands on their time and resources.

The FTC's approach has no possibility of preserving "assets" for potential consumer redress. Rather, the FTC's proposed PI is geared to annihilate the FTC's chosen adversary before the FTC has to prove its case or even participate in an evidentiary hearing. This is not fair, constitutional, or humane.

On the other hand, OTA desires what one would expect to be fairly uncontroversial: to resume operations (status quo) subject to monitoring of future marketing claims, engage in a prompt trial, and allow the Court to make a fully-informed decision after hearing from all witnesses and thoroughly reviewing all evidence.

## III.   OBJECTIONS

### A.   The Preliminary Statement and Findings are Unnecessary and Off Base

The Court has already issued a 16-page order with its stated findings and reasons for issuing a PI (Mar. 16, 2020 Order), and the FTC's attempt to insert its own additional "findings" and reasoning should be rejected as unnecessary and redundant. As the Court has already made and stated its findings, the PI should simply delineate the conduct it governs and restricts.

### B.     The FTC's Proposed "Monitor" is Not What the Court Intended and Would be Abusive

The Court denied the FTC's request for a receiver, and issued clear instructions as to the limited role a monitor would serve. Nevertheless, the FTC has seized upon the invitation to submit a "proposed" PI by giving the "monitor" more powers than even a typical receiver would be granted. The "monitor" proposed by the FTC in Sections XIV-XIX of its proposed order is not a "monitor" with limited authority. It is much more than that, and has no resemblance to the Court's expressed intentions.

In its ruling denying a receiver but granting a limited "monitor," the Court explained that the purpose of the "independent monitor" is "to review Defendants' advertising and sales claims to ensure they are not deceptive and misleading." Mar. 16, 2020 Order, p.16. This ruling is consistent with the colloquy that occurred at the March 12 hearing about a potential monitor. The Court introduced precisely what it contemplated for the "limited" role of a monitor, by asking: "What if I appointed a Receiver whose role was limited to being a monitor. Wouldn't that provide a vehicle for bringing to the Court any dispute that [the parties] might have as to a specific representation?" [Dkt No. 96 (Transcript), 20:5-8.] Defendants agreed with this, stating "[i]f that was the role, to monitor and allow us to bounce off new marketing materials that we're going to use or new presentations we're going to use, absolutely that would be workable." *Id*., 20:9-14. When OTA's counsel expressed First Amendment concerns with the breadth of the proposed PI, and with the FTC's claims that even the MTO manual with its educational content and many pages of risk disclosures somehow constitutes misleading advertising, the Court asked, "Would you agree that a monitor would help directly address that problem?" OTA's counsel responded "Yes," "where the monitor is not . . . having the sweeping powers that Your Honor suggested would be problematic." *Id.* at 29:1-15. When the Court inquired, "What role would you see for a monitor that is consistent with the First Amendment?", counsel responded, "[w]here the defendants . . . have that kind of assistance really in making sure that they're not

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

crossing a line, where you have that kind of reporting regime while the matter gets litigated, that would be I think acceptable within First Amendment bounds." *Id.* at 32:25-33:8.

OTA's counsel agreed at all points of the hearing with the Court's intentions regarding a monitor, and added: "If there is another provision or two [in the PI] that would give us some clear guidance that we could then make sure with the monitor that we're doing it right, we can do that." *Id.* at 38:17-20. There was no discussion anywhere in the record, and no suggestion in the Court's order, that the monitor should be morphed into a de facto receiver.

Indeed, what the FTC proposes is unrecognizable, as it would vastly expand the powers of the intended monitor. For example, the FTC proposes:

- The "monitor" will actually be an investigative and enforcement agency made up of multiple people, with the goal of assisting the FTC to prevail in the case;

- The initial "monitor" can develop this agency by appointing "deputy monitors," "representatives," "attorneys, investigators, and other independent contractors and technical specialists," and even "accountants," with no limit other than what he/she "deems advisable or necessary" (Dkt. 107-1, 6:23, 18:3, 20:1-4, 22:9);

- the monitor will use his or her newly assembled agency to do the FTC's job, and far more, including: "issue subpoenas to obtain Documents and records pertaining to the Monitored Entities" (which includes other entities besides just Corporate Defendants); and "conduct discovery in the action" (*Id.* at 17:24-28);

- the "monitor" will have "immediate, unfettered access" to "all information or Documents," "all property or premises," and "interview any current or former employee, independent contractor, principal, owner, manager, member, or other person . . . including Individual Defendants" (Id., 18:28-19:16);

- the monitor may also interview third parties, including financial institutions, vendors, telecommunications providers, and others (*Id.* at 19:17-22); and

- this army of monitors would be paid for out of "the assets now held by . . . the Monitored Entities or otherwise frozen pursuant to this Order" (*Id.* at 22:7-12).

The FTC's proposed order goes even further, requiring Defendants (and not the FTC) to "provide to the Monitor, immediately upon request, without need of any subpoena or further order," various types of potentially voluminous information (*Id.*, 20:18-21:8); requiring Defendants (and not the FTC) to "cooperate with and assist the Monitor" (*Id.*, 21:9-13); and restraining Defendants (not the FTC) from "interfering" with the Monitor, "destroying" documents, or "refusing to cooperate" (*Id.*, 21:17-22:5). (Yet nothing in the proposed Order allows OTA to have even remotely close to the resources it would need to comply with such sweeping demands. Rather, the FTC opposed OTA's request to operate even at 1/3 its pre-TRO capacity.)

What the Court ordered, and what should be reflected in the PI (consistent with what Defendants propose concurrently herewith), is simply the following: the monitor will be available to promptly resolve any concerns raised by the FTC or Corporate Defendants as to Corporate Defendants' "advertising and sales claims" and whether or not they are deceptive or misleading. Corporate Defendants will resume sales activity, and will make claims they believe are compliant with the Court's Order. If any Party has concerns over claims being made or if Corporate Defendants wish to inquire before making a certain claim, any party may bring such concerns to the Monitor. If the Monitor finds the claims to be appropriate, or some variant of the claims, Corporate Defendants will be allowed to make claims approved by the Monitor; if he/she finds any claims to be deceptive or misleading, Corporate Defendants shall not make those claims pending the outcome of trial, unless they make an application to the Court and the Court overrules the Monitor's decision. If the Monitor desires any information to assist in the

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

decision, all parties must fully cooperate in providing any relevant information available to them.

Section XIX of the proposed order requires that the vast agency created by the "monitor" be paid for by OTA. Thus, ironically, while the FTC has attempted to prevent Defendants from having access to funds to pay for counsel for their defense, the FTC now proposes that the Monitor have access to compensation not only for himself or herself, but for counsel, accountants, representatives, investigators, and others. If the Monitor's role is limited as contemplated by the Court, no additional personnel will be needed. If the Court's Magistrate Judge serves as Monitor, there will be no payments required for Monitor fees. If a private party serves as Monitor, the Party who does not prevail in any proceeding before the Monitor should pay the Monitor's fees for that proceeding; and any fees not covered by the non-prevailing party provision should be paid by the FTC, as it is they who desire the injunctive relief and the Monitor, and all parties desire to preserve OTA's assets. In addition, the Court should strike all provisions authorizing the Monitor to hire accountants, counsel, or other personnel.

### C.      The Proposed "Monitored Entities" Definition is Overbroad

The FTC's definition of "Monitored Entities" (proposed Definitions, Section I) is substantially overbroad. It apparently includes banks, credit card processors, and a host of other entities (because they "participated in the transfer of assets stemming from" OTA's activities). There is no need to include any entity other than a Corporate Defendant. The Monitor merely needs to "review Defendants' advertising and sales claims" (Mar. 16, 2020 Order, p. 16), not monitor unrelated entities that are not engaged in advertising or marketing OTA's educational offerings.

### D.      The "Prohibited Business Activities" Are Poorly Defined and Overbroad

The section on "Prohibited Business Activities" (Section I, pp. 7-8) in the FTC's proposed PI is overbroad, duplicative and needlessly complicated, particularly in light of the limited role of the monitor as contemplated by the Court. Generally, the



prohibitions would prevent making any claims about earnings "directly or by implication" regarding what students may learn in OTA's courses. This expansive language potentially could extend to any claims about the benefit of learning how to trade in the financial market, and the FTC's expansive view of these terms was revealed at the hearing. In discussing OTA's materials, FTC counsel stated that, notwithstanding the prominent disclaimers, OTA's entire seminar manual itself constituted an earnings claim because its cover mentions "income and wealth." Dkt. 96, 9:14-17. And yet the concepts of and differences between "income and wealth" are basic, core teachings one will find discussed in almost any course manual, syllabus, or article that discusses investing.[2] Quite literally, the FTC appears to consider any discussion of participating in the financial markets with a goal of making money as being deceptive. The various provisions of Section I are vague and overbroad.

First, Section I.A relies on a proposed definition of "Earnings Claim" that is unworkably overbroad. Specifically, the definition of Earnings Claim includes "the details of specific profitable trades, whether actual or hypothetical." (Proposed PI, p.6.) If that particular aspect of the Earning Claims definition is combined with the restrictions in Section I.A of the proposed PI, then the Court will have imposed a prior restraint on OTA from discussing any trades (actual or hypothetical) regarding real-time market conditions (like a live trade), because it is obviously impossible to have in OTA's possession written materials about a live actual or hypothetical trade based on real-time market quotes. The results of such a trade are not known (and the details of them cannot be discussed) until conducted in real time. Likewise, OTA's education teaches about trading, and must use historical trades to demonstrate many of the principles taught. Accordingly, portion (a) of the Earnings Claim definition should be deleted altogether, and at the very least should not apply to live trades.

---

[2] *See, e.g.,* https://www.businessinsider.com/difference-between-wealth-net-worth-income-2019-1.

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

Second, Section I.C of the proposed PI is confusingly duplicative of Sections I.A and I.B. Specifically, Sections I.A and I.B already would require Defendants not to make misleading claims of the type set forth in Section I.C. Indeed, Sections I.A and I.B already would prohibit OTA from making such claims unless they are "non-misleading" and substantiated. Section I.C is therefore superfluous and serves no purpose other than to create ambiguity and confusion. For example, is Section I.C purporting to define as a "misrepresentation" any representation that consumers "are likely to earn substantial income"? That cannot be the case, because Section I.A permits Earnings Claims so long as they comply with the requirements of Section I.A. This would also offend the First Amendment, as it goes to the heart of what is being taught. Section I.C should be stricken, and the Order should be clear that Corporate Defendants are free to describe their educational offerings, including that the courses are designed to increase a student's knowledge and skills to make money in the markets.

Third, Section I.D of the proposed PI should be stricken because it is unnecessary and impermissibly vague. It adds nothing other than a general instruction to "obey the law." There has been no claim or showing in this case, for example, that Defendants have misrepresented the "total cost" of its services, and it is entirely unclear what other "material restriction, limitation, or condition" or "material aspect" of OTA's services are even at issue beyond what is already covered by Sections I.A and I.B. Under Fed. R. Civ. P. 65(d), "an injunction must be more specific than a simple command that the defendant obey the law." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (also noting the rule against broad, vague injunctions is designed "to prevent uncertainty and confusion on the part of those to whom the injunction is directed" and to be sure that the "appellate court knows precisely what it is reviewing"); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (courts are "incapable of enforcing so broad and vague an injunction as "obey the law"); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (injunction that prohibited "discrimination on the basis of color, race, or sex in employment practices or conditions

of employment" was a general obey the law injunction). Section I.D is nothing more than a general order not to make any "material" misrepresentations about anything to consumers—in other words, a vague and unenforceable "obey the law" injunction. Accordingly, Section I.D should be stricken.

Such a general command is particularly objectionable when the regulated activity involves speech. Vague requirements that affect "sensitive areas of basic First Amendment freedoms" are unconstitutional because they "inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Both for those who must comply with government directives as well as those who must enforce them, "officials must have 'explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Big Mama Rag, Inc. v. United States,* 631 F.2d 1030, 1035 (D.C.Cir.1980)). At the same time, vague restrictions on speech are inherently overbroad, because a nebulous law really imposes "no rule or standard at all." *Baggett v. Bullitt*, 377 U.S. 360, 365 (1964).

Fourth, sections A and B contemplate certain written materials being made available to the FTC upon request. Now that the parties are past the TRO and are in full litigation, the FTC should be governed by the same rules as Defendants, namely, Rules 26 through 37 of the Federal Rules of Civil Procedure. To be fair, any rights to expedited discovery must be reciprocal, not unilateral.  If there is a dispute that the Monitor is to resolve, all materials will of course be provided.

### E.     Prohibitions on "Review-Limiting Contracts" are Overbroad and Unnecessary

Section II completely misses the mark regarding the scope of the law governing what the FTC refers to as "Review-Limiting Contracts," and is overbroad and vague. The Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, only applies to contracts that are: (1) "used by a person in the course of selling"; and (2) "imposed on an individual without a meaningful opportunity for such individual to negotiate the

standardized terms." Neither element applied to the non-standardized, negotiated agreements OTA previously used when negotiating refunds (never in the course of selling). Regardless, as Defendants have previously apprised the Court, they have not used any supposed "review-limiting contract" for a long time, long before this case was filed, and will not do so. Thus, Defendants will not expend further resources objecting to a prohibition on such use.

### F.     Prohibitions on Collection of Loans are Contrary to the Court's Order and Destructive

Section III on loan payments is contrary to the Court's post-TRO orders, and should not be included in the PI. Defendants, and assignees such as UGA, are free to collect amounts owing to Defendants. Defendants and assignees are not using, and will not use forceful means to collect (*i.e.*, no letters or calls threatening consequences for non-payment, no legal actions to collect, etc.), but they are free to send invoices and collect amounts paid to them. Defendants are also free to receive their money held by UGA, and collect amounts owing to them from others, such as franchisees, etc. For the same reasons, the proposed prohibition on selling or assigning accounts receivable is not appropriate, as the normal course of business includes this type of transaction with UGA and others. Defendants will continue to instruct UGA and others not to use any forceful means of collection.

### G.     This Case has Nothing To Do With Use of Customer Information

Section IV of the FTC's proposed Preliminary Injunction seeks to preclude the sale, disclosure, etc. of Customer Information. (Proposed PI at 10:11-19). It is so broad as to disrupt OTA's relationships with IG, Tastyworks, and others, even though students explicitly grant permission before they participate, and students greatly benefit from having their information shared with these vendors. The FTC has not shown (or even alleged) any wrongdoing regarding the use of customer information, or any need for this prohibition. Supreme Court precedent establishes that courts lack authority to issue injunctive relief absent a showing the plaintiff or the public "is under threat of suffering

'injury in fact' that is concrete and particularized . . . actual and imminent, not conjectural or hypothetical[,] and fairly traceable to the challenged action of the defendant[s]." *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–181 (2000). For this same reason, the Supreme Court reversed a preliminary injunction to prevent use of chokeholds by law enforcement where "[t]he plaintiff [did not] show that he 'ha[d] sustained or [was] immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and [that] the injury or threat of injury [was] both 'real and immediate,' not "'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) "[A]bstract injury is not enough" to grant preliminary injunctive relief. *Id.*, 461 U.S. at 101. The FTC's attempt to enjoin activity wholly unrelated to the case, and yet crucial to OTA's business, and for which the FTC has made no showing whatsoever of any wrongdoing or need for injunctive relief, violates these requirements. Section IV should be stricken.

## H.     Preservation of Records is Governed Mutually by Applicable Law and Rules, and Should Not be Included in a PI

Section V of the FTC's proposed Preliminary Injunction regarding Preservation of Records is likewise unjustified. The FTC seeks to enjoin Defendants from "[d]estroying, erasing . . . or otherwise disposing of" a broad category of documents (Proposed PI at 11:3-9). The proposed Section V would also require Defendants to create and then maintain detailed financial records. (*Id.* at 11:10-12). However, there is no basis for either component of such a far-reaching preliminary injunction.

All parties, including the FTC, are already governed by laws requiring preservation of records while litigation is pending. *See, e.g.*, *PersonalWeb Techs., LLC v. Google Inc.*, No. C13-01317-EJD (HRL), 2014 WL 580290, at *2 (N.D. Cal. Feb. 13, 2014) (citations omitted). There has been no showing that Defendants have failed to abide by such rules. And because no such showing has been made, and no wrongdoing has occurred, there is no basis to impose the equivalent of a discovery sanction on Defendants with additional record-keeping and accounting duties. *Cf. Johnson v.*

CALL&
JENSEN

*Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (imposing a duty for defendant to account for his assets was only appropriate because a showing had already been made that defendant diverted $35 million into his own personal bank account and was likely to place assets beyond the reach of a judgment).

Here, the parties' respective duties to preserve and produce records should remain on equal terms. The Court should not impose unfair unilateral discovery obligations on the Defendants. If Defendants find the FTC has failed to preserve records, they will bring an appropriate motion to this Court, and the FTC should be required to do the same, per L.R. 37-1 to 37-4. Section V, representing the FTC's camouflaged discovery sanction, is not justified and should be rejected.

## I.     Preservation of Individual Assets Must Be Appropriately Tailored to Allow Normal Course of Living Expenses

Section VI, Preservation of Individual Defendants' Assets, is overly onerous, vague, and broad. It seeks to block individual defendants from spending any further money, at all, unless they earn it doing something unrelated to OTA (as OTA is currently precluded from paying any amounts to any individual defendant). These Defendants are intent on working as hard as necessary to keep OTA viable, to preserve assets such as the more than $16M in receivables that will dry up if OTA stops educating, and to show the Court that OTA can and does operate lawfully, without deception, and with enormous benefit to its students. To tell them they need to go work in another industry, contrary to each of their long careers, while the FTC attacks them with full force in *this* industry is unfair, and unconstitutional for all of the same reasons discussed previously. If the individuals' pre-TRO assets are to be frozen, they must be allowed a reasonable monthly spending allowance of at least $25,000.

## J.     The Corporate Asset Freeze Needs Adjusting

Defendants recognize the Court has ordered that there will be some form of asset freeze over Corporate Defendants' assets. However, the language in Section VII of the FTC's proposed PI needs to be tailored to accomplish the Court's intentions, and cannot

CALL &
JENSEN

be so overbroad as currently drafted. The basic objectives are these: (1) Corporate Defendants are not to spend, conceal, or dissipate assets other than as approved by the Court in the PI or by further Order; (2) Corporate Defendants may liquidate or otherwise sell assets via arms-length, commercially reasonable transactions, but still subject to the first principle, which is that they cannot spend, conceal or dissipate any assets, including cash received from liquidating or selling assets (in other words, the money will need to remain in the Corporate Defendant's bank accounts, to be spent only as allowed by the Court). Defendants' proposed alternative language would achieve these objectives, while the FTC's proposed asset freeze goes much too far.

There are many reasons for the need to liquidate assets, including, for example: selling receivables to UGA, as they have done in the normal course of business for many years; selling excess office furniture and equipment; etc. So long as Corporate Defendants abide by the Court's restrictions on spending, there is no need to restrict them from having the cash needed to carry out the approved spending.

Likewise, there is no need (as proposed in the FTC's VII.B) to restrict Corporate Defendants' ability to use commercial mail boxes or storage facilities, when commercially reasonable to do so. This is not a drug case, or one involving illegal weapons. There is no demonstrated need for this irrelevant and superfluous prohibition, nor has the FTC made or even attempted to make any showing of such need.

Importantly, the final paragraph of the FTC's section VII is particularly inappropriate. The FTC's proposal acknowledges that "assets obtained by the Corporate Defendants after this Order" should not be restricted by the PI, but they seek to vaguely claw back any assets derived from conduct "prohibited by this Order." That is circular, vague, and overbroad. If conduct prohibited by the Order occurs, that will be resolved by the Court. In the meantime, the PI should not impact any assets obtained after the TRO, period. If the FTC believes any funds were obtained through contravention of the Court's Orders, it is free to bring an appropriate motion.

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

### K.    The Exceptions to the Asset Freeze Need Adjustments

The FTC's proposed Section VIII Exceptions to the Asset Freeze, does not allow for OTA to resume operations.

First, it purports in section A to allow OTA to "collect money from consumers," but it does not allow OTA to collect from UGA (which services the more than $16M portfolio of students receivables), credit card companies (which receive and process payments made to OTA), franchisees, other vendors, etc. There is no reason to limit OTA's ability to collect from any entity. If such collections are enjoined, OTA will not be able to survive, and no assets will remain for any student refunds.

Second, the list of approved expenditures set forth in section B should be expanded to reflect the expenses OTA regularly and necessarily incurs in the normal course of business, as well to pay legal expenses (as discussed in Defendants' Application for Permission to Make Payments, Dkt. 92). OTA has proposed a scaled-down plan to operate at merely one-third their pre-TRO capacity. That scaled-down plan would be impeded by the current proposal. Corporate Defendants' proposal accommodates for normal-course-of-business expenditures, and provides a prompt mechanism for addressing any other expenses.

To the extent a more complete set of expenditures is approved, section C's limitation of $5,000 per month per payee will become obsolete, will be in conflict with the approved plan, and thus should be deleted. Furthermore, many of OTA's vendors will not provide services for only $5,000 per month.

From a big picture perspective, the FTC's proposal of limiting payments to $5,000 per payee per month, requiring extensive documentation and justification for every payment to the Court and to them, which also requires legal briefing, then after obtaining permission from the Court requiring further documentation and certifications to third party financial institutions before payments will be processed, is highly problematic. It will not work in the real world. OTA is working without any employees at all, other than those few who are essentially volunteers; it has proposed permission to

operate at approximately one-third normal capacity (Dkt. 92), which the FTC has opposed; and if it is allowed to operate at the proposed limited capacity, it cannot reasonably be expected to perform three times its normal workload (running the business, preparing for trial, submitting extensive requests, legal briefing, etc. for each expenditure, then reporting all expenditures).

As to section D, Corporate Defendants do not object to being required to submit to the Court their prior month's expenditures. However, there are two modifications needed to this section: (1) There should be a blanket permission to submit such reports under seal, so Defendants need not waste resources making such a request every time they report; and (2) Individual Defendants should not have the same reporting requirements. Individual Defendants should not have to report in detail every person and entity to whom they pay money – that is deeply invasive of privacy and unnecessary. The Individual Defendants will certainly abide by any restrictions placed on them by the Court (and can provide periodic certifications, if the Court desires them), but they should not be saddled with the needlessly burdensome and invasive reporting requirement proposed by the FTC.

## L.    There Is No Good Reason To Require Asset Holders to Also Monitor and Enforce Compliance

Section IX should be eliminated entirely, as it violates the longstanding rule "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). It also causes confusion. Currently, OTA's banks, credit card processors, UGA (who services the more than $16M in notes owed from students), and other OTA vendors are concerned that under the TRO they cannot transmit funds to OTA once received (and, as discussed in section I, the FTC has reinforced that concern). Even as amended in accordance with Defendants' objections, Sections VI, VII, and VIII will be sufficient to give effect to the asset freeze contemplated in the Court's ruling. These sections place significant restrictions on the Defendants' ability to withdraw and/or

transfer assets without express court approval. Violation of these restrictions would be punishable by contempt, and they are more than sufficient to alleviate any concern the FTC may have that Defendants will attempt to dissipate assets. Defendants voluntarily agreed, during the FTC's investigation, not to dissipate assets, and they have not done so. The FTC has not suggested otherwise. Yet the FTC also requests the Court adopt an order dragging third party asset holders, including Defendants' banks, into the case and restrict their ability to release funds. This section of the order serves no purpose other than to create uncertainty, and to make it more difficult, time-consuming, and expensive, for Defendants to access funds the Court has already agreed they may use.

Section IX.A. of the proposed PI is simply a mirror image of Section VII.A. Section VII.A. is all that is needed. It would, with certain exceptions, prohibit the Defendants from "transferring, . . . spending, withdrawing, . . . or otherwise disposing of" assets held by the asset holders. Section IX.A. is unnecessary. It would prohibit the asset holders from permitting the "withdrawal, . . . transfer, . . . disbursement, . . . or other disposal of" such assets. If adopted, this language would transform each asset holder into a mini-court or monitor, with the responsibility to make determinations regarding Defendants' compliance with the injunction on a transaction-by-transaction basis before honoring a request to release funds.

It is unlikely that PM Bank or any of OTA's other financial institutions has either the desire or the aptitude to make such judgments, and if they are at risk of contempt sanctions for mistakenly releasing funds they will be, and already have been, inclined to be overly cautious. Under the TRO, PM Bank was not willing to release funds even after the Court ordered that OTA could pay employees and others; UGA has not released any funds to OTA, and the FTC has specifically told them not to, even *after* the Court specifically ordered that OTA can collect money. The natural result of including this section in the order will be to make it difficult or impossible for Defendants to access funds that the Court has approved for use. This likelihood is compounded by the proposed language that asset holders "may" release funds if an officer of a Corporate

Defendant certifies in writing that the funds will be used to make payments authorized by the Court, implying that asset holders have discretion to withhold funds even if Defendants make the requisite certification.

Defendants are already operating with extremely limited capacity—they propose to continue operating at approximately two thirds below normal—and these onerous restrictions will stretch that capacity by requiring Defendants' limited number of employees to waste time and energy on a process that serves no beneficial purpose.

Subsections B, C, and D of the proposed order are likewise unnecessary and improper. As for subsection B, there is no evidence whatsoever that Defendants are likely to violate an order prohibiting them from removing assets from safe deposit boxes, commercial mailboxes, or storage facilities such that third-party asset holders must be ordered to deny Defendants' access. And, as for providing information regarding Defendants' accounts and assets, both the FTC and this Court were already provided with all of that information in connection with the temporary restraining order. The information provided was detailed and thorough, and it would serve no purpose to order asset holders to update the information at this time, or at the beck and call of the FTC. At this point, if the FTC desires further information, they should be governed by the same discovery rules as Defendants.

In short, section IX should not be adopted. The Court's ruling indicates that an asset freeze would be imposed, but that is fully accomplished via other sections of the Order. To deputize asset holders as additional enforcers of the order would impose serious burdens on both the asset holders and Defendants without any benefit to anyone.

If the Court is for any reason inclined to grant the FTC's request for this unnecessary and onerous provision, it must at least require—not merely permit—asset holders to release funds as permitted by the Court's Orders. Moreover, an order should not give the FTC the unfettered ability to harass Defendants' asset holders with constant discovery requests.

**M.    Financial Disclosures Were Already Completed and Should not Be Compelled Again**

Section X regarding "financial disclosures" should not be adopted. The FTC already obtained a TRO which required disclosure of the information in Attachments A, B, and C to the proposed preliminary injunction. Indeed, while the Defendants and their counsel were working diligently to respond to the Court's OSC regarding why a preliminary injunction should not issue, on March 5 and 6, 2020, the FTC took six depositions of Defendants, double-tracked to occur at overlapping times in Illinois and in California. [Eisenhut Dec. ¶ 4]. Defendants Sam Seiden, Darren Kimoto, Eyal Shachar, OTA Franchise Corporation, Newport Exchange Holdings, Inc., and NEH Services, Inc. all appeared for deposition, for several hours each, and answered detailed and targeted questions regarding their assets. [Eisenhut Dec. ¶ 4]. Defendants each spent many hours searching for and providing financial information available to them. [Eisenhut Dec. ¶ 4]. The TRO also authorized the FTC to go directly to financial institutions and obtain much of this information from them. The FTC has not shown any justification for compelling the Defendants to make any additional financial disclosures. At this point, the FTC can and should be governed by the same discovery rules as Defendants.

Hence, the Court should also reject the FTC's proposed Section X.

**N.    The FTC Should Not Be Allowed Repeatedly to Request Credit Reports**

Section XI allows the FTC to continue to request credit reports of Defendants indefinitely, without restriction, and without providing any justification therefor. They were already allowed to do so under the TRO, and to do so repeatedly is unfair to Defendants, harmful to their credit ratings, and wholly unjustified. The FTC can conduct relevant discovery under the applicable rules, just as can Defendants.



DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

## O. There Should be No Requirement for Defendants, or Others, to Report About Unrelated Businesses

Section XII is unnecessary, overbroad, unjustified, and extremely intrusive. It prohibits not only defendants, but also their employees, attorneys, and others, from "creating, operating, or exercising any control over any business entity" without first providing FTC counsel and the Monitor with various details regarding such business, including information invading the privacy of third parties such as "the names of the business entity's officers, directors, principals, managers, members, and employees." This appears to mean that if attorney Wayne Call chooses to join the board of directors of a private entity, he must disclose to the FTC and the Monitor all of the private details set forth in the Order before he can do so. This is clearly not the Court's intention. And there is no reason to impose this restriction on any Defendant, let alone non-parties, as to do so is grossly unfair. Who would want to do business with a Defendant who is obligated to disclose private details about the business that would otherwise be protected? The FTC has made no showing of need for this provision, and it should not be adopted.

## P. The Newly Invented Requirement to Record All Sales Events Was Not Ordered and is Wasteful and Impractical

Section XIII of the proposed preliminary injunction should be stricken. It is another newly-invented, onerous and nonsensical provision inserted by the FTC without any request or direction from the Court. It is also redundant, as the FTC has retained its authority to send personnel to monitor OTA's sales events and classes.

This new section purports to order "Defendants and their officers, agents, employees, and attorneys, all other persons in active concert or participation with any of them" to make recordings of all live sales events and retain copies of the recordings. First, it makes no sense for all such persons (even including all attorneys and agents) to simultaneously be under an order to record all live sales events. Why and how, for example, would an Individual Defendant be expected or required to record a live sales

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

event the Individual Defendant does not even attend? Why would Defendants' *attorneys* be ordered to record all live sales events, when the attorneys are not responsible for conducting those events or attending them (and, ironically, when the FTC is fighting against the attorneys even being paid to defend this litigation, let alone be responsible for recording live sales events)? How and why would all employees be ordered to record live sales events, when the vast majority of employees are not present for such live sales events?

Second, Section XIII would impose on Defendants an obligation they currently are not physically able to accomplish. Defendants do not possess the extensive audio-visual equipment, much less the technologically-capable staff, required to accomplish such a vast amount of continual recording at so many different locations. [Shachar Dec. ¶ 7]. The Corporate Defendants' staffing has already been severely limited by the TRO, and the FTC has consistently attempted to hamstring the Corporate Defendants' ability to carry on even their *existing* operations, let alone add vast new recording obligations that would require additional financing in the way of new equipment and staffing. The FTC also makes no effort to explain how the Corporate Defendants can force franchisees to record all live sales events, or why the Corporate Defendants (or their agents, attorneys, or employees) should be at risk of contempt if a third-party franchisee fails to record an event. Defendants do not have authority to control franchisees to that degree.

### Q.    Identification of the Monitor

In section XIV, the FTC proposed a particular person to serve as monitor. We propose either: (1) the Honorable Karen E. Scott, who has already been assigned as the Magistrate Judge to this case, and can resolve any disputes regarding the appropriateness of marketing or advertising, subject to appeal to and review by the Court, without additional cost; or (2) the Honorable Tom Campbell.[3] If neither proposal

---

[3] A copy of Hon. Tom Campbell's CV is attached hereto as Exhibit A.

is acceptable, Defendants propose the Court appoint some other individual with experience in this field who will approach the monitoring responsibilities as a neutral referee, not as an arm of the FTC or as one who typically fills the much different role of receiver not applicable here (such as the individual proposed by the FTC), and at the Court's request Defendants would be happy to submit a list of such individuals. For these reasons, Defendants object to the "monitor" proposed by the FTC.

**R.     The FTC Should Be Required To Provide Notice of The Preliminary Injunction To Nonparties**

Section XX of the FTC's proposed preliminary injunction seeks to impose an onerous and needless burden on the Defendants to provide a copy of the PI to the full list of recipients that the TRO already required Defendants to notice. (Proposed PI at 22:19-23). As required by the TRO, the Defendants provided notice of the TRO to all such persons, *and* provided the contact information for all such persons to the FTC. (Dkt. 46, 14:23-15:8). Therefore, the FTC now has all the information it needs to provide notice of the PI to appropriate recipients.

**S.     There is No Basis for the FTC's Proposed Ongoing Right to Expedited Discovery**

By including Section XXI in the proposed order, the FTC attempts, *ex post facto* and without notice, to expand the relief contemplated in the Court's order to show cause why a preliminary injunction should not issue. While the Court's TRO/OSC granted the FTC leave to unilaterally engage in limited expedited discovery *prior* to the hearing on the preliminary injunction, neither the FTC's motion papers nor the Court's orders have ever given any indication that the FTC would have a standing right to take expedited discovery *after* the hearing. As indicated above, Defendants participated in many hours of depositions over multiple days to accommodate the same provisions in the TRO. It would be patently unfair to permit the FTC to continue taking unlimited depositions (including examining the same individuals multiple times) on 48 hours' notice, or to demand the production of documents within a few days of a request, or to require

answers to interrogatories on short notice throughout the remainder of this case. And even if shortening the time for discovery could be justified in this case in order to accommodate an early trial, the FTC offers no argument as to why it should be entitled to harass Defendants with burdensome expedited discovery, while Defendants are held to traditional discovery rules. While the Court has discretion to alter the limits on discovery set forth in the Rules of Civil Procedure, *see* Fed.R.Civ.P. 26(b)(2)(A), if any changes are to be made to the timing or limitations on discovery, they must apply evenly to all parties, and only by mutual agreement or after a properly noticed and briefed motion.

The FTC's original request for expedited discovery in connection with the TRO/OSC was based on the short timeframe for resolving its request for a preliminary injunction. Now that the request for a preliminary injunction has been granted, there is no cause to order additional unilateral expedited discovery solely in favor of the FTC.

### T.    The FTC's Attempt to Address Jurisdiction Should be Rejected

Section XXIV of the proposed order is completely gratuitous and should not be included in the Court's final order. Whether this Court has "jurisdiction of this matter for all purposes" has not been presented to the Court for decision. Defendants have not even filed an answer to the Complaint yet. No statement regarding "retention of jurisdiction" is necessary to make the Court's order effective—obviously a court that issues an injunction has power to enforce it. To the extent any issues arise regarding jurisdiction for purposes other than enforcing the injunction, they can be addressed when they are ripe for decision, following briefing by the parties.

## IV.    CONCLUSION

For the reasons stated, Defendants request the Court issue Defendants' proposed PI submitted concurrently herewith, or, in the alternative, a PI that satisfies the concerns set forth above.

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION

1  | Dated: March 25, 2020

2  CALL & JENSEN
A Professional Corporation
3  Wayne W. Call
Mark L. Eisenhut
4  William P. Cole
Chris C. Scheithauer

5

6  By: */s/ Mark L. Eisenhut*

7  Mark L. Eisenhut

8  Attorneys for Defendants OTA Franchise
9  Corporation, Newport Exchange Holdings, Inc.,
NEH Services, Inc., Eyal Shachar, Samuel R.
10  Seiden and Darren Kimoto

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OBJECTIONS AND RESPONSE TO FTC'S PROPOSED PRELIMINARY INJUNCTION