Thomas M. Biesty (NY Bar No. 4172896)
(202) 326-3043 / tbiesty@ftc.gov
Rhonda Perkins (VA Bar No. 75300)
(202) 326-3222 / rperkins@ftc.gov
Andrew Hudson (DC Bar No. 469817)
(202) 326-2213 / ahudson@ftc.gov
Roberto Anguizola (IL Bar No. 6270874)
(202) 326-3284 / ranguizola@ftc.gov
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580

Local Counsel
John Jacobs (CA Bar No. 134154)
(310) 824-4300 / jjacobs@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4380 (fax)

Attorneys for Plaintiff
Federal Trade Commission

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission**, <br><br> Plaintiff, <br><br> vs. <br><br> **OTA Franchise Corporation**, et al., <br><br> Defendants. | No.   8:20-CV-00287 JVS (KESx) <br><br> **Opposition to Defendants' *Ex Parte* Application for Approval to Pay Litigation Costs and Attorneys' Fees to Call & Jensen, Davis, Wright Tremaine, and Jeffrey Harris for January and February, 2020** |

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ......................................................................... iii

Factual and Procedural History ................................................................. 1

Argument ..................................................................................................... 4

I.   Legal Standard ....................................................................................... 5

II.  Defendants' Application Should Be Denied ......................................... 7

    A.   The FTC Is Likely to Succeed on the Merits ................................. 7

    B.   The Frozen Assets Are Dwarfed by the Large Injury Defendants Caused to Consumers ................................................................... 10

    C.   The Requested Attorneys' Fees Are Not Reasonable .................... 11

    D.   Defense Counsel Were Aware that this Court Might Deny or Limit Attorneys' Fees ............................................................................. 15

    E.   Defendants Have Not Shown an Inability to Obtain Other Funds . 16

III. Equity Requires that Any Release of Funds Should Be Limited, and Restricted to Foreign Assets ................................................................ 17

    Conclusion ........................................................................................... 18

# TABLE OF AUTHORITIES

<u>Statutes</u>

15 U.S.C. § 45(a) ............................................................................ 2

15 U.S.C. § 45b................................................................................ 2

<u>Cases</u>

*CFTC v. Noble Metals, Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995)............. 5-6, 11

*CFTC v. Wilson*, No. 11-CV-1651, 2011 WL 6398933
        (S.D. Cal. December 20, 2011)............................................. 11

*FSLIC v. Dixon,* 835 F.2d 554 (5th Cir. 1987) ................................. 6

*FSLIC v. Ferm*, 909 F.2d 372 (9th Cir. 1990) ................................5-6

*FTC v. AMG Services, Inc.,* No. 2:12-cv-00536, 2016 WL 5791416
        (D. Nev. Sep. 30, 2016) ....................................................... 9

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016)............... 1, 9-10

FTC v. Digital Altitude, et al., No. 2:18-cv-0729-JAK, 2019 WL 1976453
        (C.D. Cal. Mar. 6, 2019) ..................................................... 10

*FTC v. Digital Altitude, et al.*, No. 2:18-cv-0729-JAK-MRW
        (C.D. Cal. July 26, 2018) ..................................................... 7

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993)....................................9-10

*FTC v. Gill,* 265 F.3d 944, 958 (9th Cir. 2001) ............................... 10

*FTC v. Grant Connect, LLC,* 827 F.Supp.2d 1199 (D. Nev. 2011) ............... 9

*FTC v. IAB Mktg. Assocs.,* No. 12-61830-Civ, 2013 WL 2433214
        (S.D. Fla. June 4, 2013)......................................................16-17

*FTC v. Ideal Financial Solutions, Inc.,* 2:13-cv-00143-JAD-GWF,
        2014 WL 4541191 (D. Nev. Sept. 9, 2014) ......................... 6

*FTC v. Inc21.com Corp.*, 475 Fed. App'x 106 (9th Cir. 2012)................. 9, 17

*FTC v. Johnson*, No. 2:10-CV-02203, 2015 WL 9243920
        (D. Nev. Dec. 17, 2015).......................................................... 5

*FTC v. Lights of Am., Inc.,* No. SACV10-01333,

    2013 WL 5230681  (C.D. Cal. Sept. 17, 2013) ..................................... 9

*FTC v. LoPinto*, No. CV-S-93-0561, 1994 U.S. Dist. LEXIS 21695

    (D. Nev. Feb. 1, 1994) ...............................................................5-6, 16

*FTC v. Money Now Funding, No. CV-13-1583-PHX-ROS (D. Ariz.)* ........*5-6*

*FTC v. Nat'l Prize Info. Group Corp.*, No. 2:06-CV-01305,

    2006 WL 3234360 (D. Nev. 2006) ...................................................... 17

*FTC v. RCA Credit Services, LLC*, 2008 WL 5428039

    (M.D. Fla. December 31, 2008)............................................................ 16

*FTC v. Rincon Mgmt. Servs., LLC, et al.*, No. 5:11-CV-01623

    (C.D. Cal. Jan. 31, 2012) ..........................................................12-13, 17

*FTC v. Sharp,* No. CV-S89-870 RDF, 1991 WL 214076

    (D. Nev. Jul. 23, 1991).......................................................................... 16

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)  ........................................... 9

*FTC v. Williams*, Scott & Associates, LLC, No. 1:14-CV-1599-HLM,

    2015 WL 7351993, at *3 (N.D. Ga. Sep. 22, 2015).......................... 15

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989)...................5-6, 17

*Lopez v. San Francisco Unified School Dist.,* 385 F.Supp.2d 981

    (N.D. Cal. 2005) .................................................................................. 14

*Pierce v. Cnty of Orange,* 905 F. Supp. 2d 1017, 1031-32

    (C.D. Cal. 2012) .................................................................................. 13

*Sam K. ex rel. Diane C. v. Hawaii Dep't of Educ.*, 788 F.3d 1033

    (9th Cir. 2015)...................................................................................... 13

*SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV-9-2901,

    2009 WL 2058247 (C.D. Cal. July 9, 2009)...................................... 13

*SEC v. Quinn*, 997 F.2d 287 (7th Cir. 1993) ..................................................... 1

*Young v. Wolfe*, No. CV 07-03190 RSWL-AJWx, 2017 WL 3184167         (C.D. Cal. Jul. 26, 2017) ............................................................................. 13

iv

The Court should deny Defendants' request to use frozen assets to pay their litigation costs and attorneys' fees. Until the entry of the Temporary Restraining Order ("TRO") in this matter, Dkt. No. 46, Defendants operated a deceptive scheme under the name Online Trading Academy ("OTA") that used false and unsubstantiated earnings claims to take hundreds of millions of dollars from tens of thousands of consumers for purported investment training offerings. Only a fraction of that amount in liquid assets, approximately $2 million, was frozen pursuant to the TRO and Preliminary Injunction ("PI").[1] Dkt. No. 130. As a result, it is unlikely that the consumer victims of Defendants' deception will ever be made whole. The money that remains frozen does not rightfully belong to the Defendants who unlawfully took it from consumers through deception. It should remain frozen to fund consumer redress. As Judge Easterbrook observed decades ago, "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler…cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (internal citations omitted).

## FACTUAL AND PROCEDURAL HISTORY

This is a straightforward fraud case brought by the FTC under Section 13(b) and Section 19 of the FTC Act. As is typical in such cases, the FTC seeks to halt Defendants' deceptive scheme and redress consumer injury. To that end and in support of its motion for a TRO and request for a PI, the FTC presented substantial evidence that Defendants perpetrated a deceptive scheme purporting to show consumers how to make substantial income trading in the financial markets. This

---

[1] Individual Defendants are subject to asset preservation provisions under these orders. The FTC's review of their financial disclosures is ongoing. While the Individual Defendants appear to have amassed significant wealth from Defendants' scheme totaling approximately $34 million (Dkt. No. 110, pp. 1-2), these assets do not come close to covering the injury to consumers, which exceeds $362 million.

evidence shows that Defendants have no support for the earnings and related claims Defendants have used to sell their "training," that Defendants' claims are false, and that Defendants have taken at least $362 million from consumers over the last four years. The evidence also shows that Defendants have sought to use form contract provisions to prevent consumers who obtained a refund from publishing reviews about Defendants and from communicating with law enforcement about Defendants and their practices.

Based on the FTC's evidence, the Court entered a TRO against Defendants on February 25, 2020, finding "good cause to believe that Defendants have engaged in and are likely to engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), that the Corporate Defendants and Defendant Shachar have engaged in and are likely to engage in acts or practices that violate the [Consumer Review Fairness Act], 15 U.S.C. § 45b, and that Plaintiff is therefore likely to prevail on the merits of this action." TRO, Dkt. No. 46 at 2.

The Court further found "good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers—including monetary restitution, rescission, disgorgement, or refunds— will occur from the sale, transfer, destruction, or other disposition or concealment by Defendants of their assets or records, unless Defendants are immediately restrained and enjoined by order of this Court." *Id*. at 3. The Court instituted a freeze and preservation of Defendants' assets to maintain its ability to provide redress to injured consumers. *Id*. at 3, 10-11.

On March 6, 2020, the Court issued an order allowing Defendants to "continue to collect money subject to all [TRO] asset restrictions once received. They may also pay their employees, other than defendants, their usual current salaries; however, no single payment or aggregate of payments in a single month

shall exceed $5,000 without a prior order of the Court. [OTA] may also pay for the employer's share of health insurance benefits already in effect." Dkt. No. 64 at 2.

In their filings and at a PI show-cause hearing on March 12, Defendants largely declined to take issue with the merits,[2] instead arguing that the First Amendment barred injunctive relief, and that any such relief should permit OTA to continue to operate. Dkt. Nos. 66-1 (Opposition to PI) & 96 (PI Hearing Transcript). At the hearing, Defendants asked that the Court "narrow" Section I of the proposed PI, which bars them from making false, deceptive, or unsubstantiated earnings claims, "because the ability to do business and to have any hope of continuing demands" such a narrowing. PI Hearing Transcript., p. 37. While their arguments at the hearing centered on ensuring the PI would not prevent them from resuming operations, Defendants presented no evidence that they would be unable to pay expenses without resort to the funds preserved for consumer redress. The Court determined that a PI with an asset freeze applicable to Corporate Defendants' assets and asset preservation provisions pertaining to Individuals Defendants' assets should issue. Dkt. No. 87.

In entering a PI with an asset freeze, the Court found that: (1) the FTC is likely to prevail on the merits of its allegations; (2) there is good cause to believe immediate and irreparable damage to the Court's ability to grant effective monetary relief to consumers will occur without an asset freeze; and (3) a PI with an asset freeze is in the public interest.  PI, Dkt. No. 130, at 3-4.

---

[2] Defendants have not denied making the claims at issue and provided no evidence to negate the FTC's evidence that such claims were material, unfounded and false.

3

The Corporate Defendants testified that they had less than $2 million in cash at the time of the TRO, when the freeze of their assets went into effect.[3] Since that time, they have spent at least $1,987,634.69. Dkt. No. 158-1. And they seek permission to spend much more. Dkt. No. 153 (*Ex Parte* Application to Pay Interest and Independent Contractors). Defendants represent to the Court that they have yet to resume sales. Defendants' *Ex Parte* Application for Approval to Pay Litigation Costs and Attorneys Fees ("App."), Dkt. No. 140, at 5.

Defendants now ask to spend more than $300,000 more out of the frozen funds to pay their attorneys, and seek what appears to be a blank check to make additional payments to counsel for the rest of this case. App. at 1 & 13-14.

## ARGUMENT

While Defendants have the right to use their own untainted money to pay for whatever they please, including legal services, the FTC has put forth substantial evidence that the frozen assets are not theirs, but in equity belong to the numerous consumers Defendants defrauded. Equity demands that they be preserved to fund redress to those consumers.

The Court has frozen and preserved Defendants' assets after a substantial evidentiary showing by the FTC on the merits, and a showing that the amount of consumer loss, over $362 million (EX 88, 57 & 84), dwarfs the amount of Defendants' assets. The Individual Defendants claim to have approximately $34 million in total net assets all together,[4] and the Corporate Defendants appear to be

---

[3] EX 88, 66-67 (Defendants' CFO's testimony on cash holdings). The Corporate Defendants have less than $40 million in total assets, and this figure is exceeded by their total liabilities. EX 61.

[4] Dkt. 110, pp.1-2. Even this amount is uncertain, as despite multiple attempts spanning over a month's time,  Defendant Eyal Shachar's jumbled efforts to meet his obligations under the TRO and PI to submit financial disclosures are unnecessarily lengthy, confusing, and disorganized. The FTC's review of these documents is ongoing. It is not yet clear that they are complete.

4

out of cash and underwater. Third Declaration of Reeve Tyndall, ¶¶ 10-14, Dkt. No. 110 ("Tyndall Dec."); Declaration of Andrew Hudson (filed herewith). In their application, Defendants do not make clear which assets should be used to fund their defense and given their ongoing spending of such funds, it is impossible for the Court or the FTC to understand Defendants' current financial condition without updated financial reporting from them.

Defendants previously sought approval to pay litigation costs out of frozen funds (Dkt. No. 92), the FTC opposed that request (Dkt. No. 105), and the Court denied it (Dkt. No. 129). As shown below, while more detailed, this application fails for many of the same reasons the first application did, and should be denied.

## I.    Legal Standard

Whether to release frozen assets to pay defendants' litigation costs is a matter reserved to the District Court's discretion. *See CFTC v. Noble Metals, Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995). The Ninth Circuit and other courts have "recognized the importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another." *FSLIC v. Ferm*, 909 F.2d 372, 374 (9th Cir. 1990). District courts in the Ninth Circuit have considered the following factors, individually and in various combinations, in determining whether to release frozen funds to pay legal fees:  (1) the likelihood that plaintiff will prevail on the merits; (2) the availability of assets for consumer redress; (3) the reasonableness of defendant's request; (4) whether defense counsel was aware of the possibility that the court might deny or limit attorney fees; and (5) a defendant's access to alternative assets. *See FTC v. Johnson*, No. 2:10-CV-02203, 2015 WL 9243920, at *2 (D. Nev. Dec. 17, 2015) (applying all five factors); *Noble Metals*, 67 F.3d at 775 (considering availability of assets for consumer redress); *FTC v. World Wide Factors*, 882 F.2d 344, 348 (9th Cir. 1989) (considering reasonableness of request, approving of district court's

5

desire to limit release to "reasonable" attorneys' fees); *FTC v. LoPinto*, No. CV-S-93-0561, 1994 U.S. Dist. LEXIS 21695, at *3-4 (D. Nev. Feb. 1, 1994) (defense counsel was aware that he might not receive payment from frozen funds when he took on the representation; releasing funds "would decrease the amount of funds available for restitution" to consumers) (attached as **Attachment A**); *Ferm,* 909 F.2d at 374 (citing likelihood of plaintiff's success on the merits and reasonableness of request).  As demonstrated below, these factors weigh decisively against releasing frozen funds to pay Defendants' attorneys.

Defendants do not show otherwise. While Defendants imply that the equitable factors listed above are not dictated by binding precedent (App. at 8), they fail to show that considering them would be an abuse of the Court's discretion, or that some other (unidentified) factor(s) would be more appropriate to consider. And Defendants misstate the law when they (repeatedly) claim that some funds "must" be released from frozen assets to fund their defense in this matter.[5] App. at 6, 7 (quoting *FSLIC v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987)). Courts in this circuit can, and do, completely deny requests to pay attorney's fees out of frozen funds when the equities weigh against release for that purpose.[6] Indeed, in *Noble Metals* the Ninth Circuit affirmed the district court's decision to completely bar use of frozen assets for attorney's fees.[7] 67 F.3d at 774-75; *see also FTC v.*

---

[5] Similarly, their 22 ½ line footnote (App. at 9 n. 7) speculating on what the law may be in the future fails to show that the law is, now, other than as the FTC describes it.

[6] Defendants have no constitutional right to counsel in this civil enforcement matter. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *FTC v. Ideal Financial Solutions, Inc.*, 2:13-cv-00143, 2014 WL 4541191, at *4 (D. Nev. Sept. 9, 2014) (Dorsey, J.) ("Generally, a person has no right to counsel in civil actions."). That they raise constitutional claims does not change that.

[7] Defendants suggest (App. at 10) that *Noble Metals* requires allowing corporate defendants at least some use of frozen assets to pay counsel. App. at 10. But it held precisely the opposite—there the district court froze the corporate defendants'

6

*Money Now Funding*, No. CV-13-1583-PHX-ROS (D. Ariz.) Motion for Attorneys Fees from Frozen Funds (Aug. 16, 2013) and Order (September 5, 2013) (denying the motion) (attached hereto as **Attachments B-C**). Nor does the *Digital Altitude* case help Defendants (App. at 6, 9), as there the Court released only $5,000 in order to fund supplementation of an inadequate motion for attorneys' fees—which it then denied. *FTC v. Digital Altitude, et al.*, No. 2:18-cv-0729-JAK-MRW (C.D. Cal. July 26, 2018) (attached hereto as **Attachment D**) (noting propriety of considering the various equitable factors and denying any further fees).

## II.   Defendants' Application Should Be Denied

Each of the relevant factors weighs decisively against releasing frozen funds to pay for Defendants' litigation costs. First, as the Court found in entering the TRO and the PI, the FTC is likely to succeed on the merits. Second, the Defendants' frozen assets constitute less than ten percent of the estimated $362 million injury to consumers.[8] Third, the requested attorneys' fees are excessive. Fourth, defense counsel should have known that an asset freeze was a strong possibility when they took on this representation. Fifth, Defendants have not demonstrated a lack of access to alternative funds.

### A.   The FTC Is Likely to Succeed on the Merits

This Court has found that the FTC is likely to succeed on the merits. PI, Dkt. No. 130, at 3. Defendants have not produced any new evidence that could alter that decision. Defendants bilked consumers out of thousands, sometimes tens of thousands, of dollars and strapped them with short-term high interest loans to pay

---

assets and completely denied their requests to use frozen funds to pay attorneys, and the Ninth Circuit affirmed. Defendants fail to show how this case is different.

[8] The Corporate Defendants had approximately $2 million in cash at the time of the TRO, but appear to have nearly exhausted these funds. Hudson Declaration. Their liabilities exceed their assets. EX 61. The Individual Defendants appear to have less than $35 million collectively, the majority of which is non-liquid. Dkt. 110, at 1-2.

for Defendants' "training." Thus, this factor weighs strongly in favor of denying Defendants' application.

While Defendants protest the Court's finding, they offer no new evidence that would merit revisiting it. Nor should the Court be swayed by their invocation (again) of the number of allegedly satisfied customers. This evidence is not new, and it does not negate the fact that Defendants had no support for the claims used to sell their "training," including the claim that consumers were likely to make substantial income with Defendants' patented strategy. In short, the evidence Defendants rely on cannot carry the weight they would place on it.

Defendants are simply mistaken when they argue the FTC has not established a likelihood of obtaining restitution. In entering the PI with asset freeze, the Court found:

> There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers—including monetary restitution, rescission, disgorgement, or refunds—will occur from the sale, transfer, destruction, or other disposition or concealment by Defendants of their assets or records, unless Defendants are immediately restrained and enjoined by order of this Court.

PI, Finding J., Dkt. No. 130, at 4.

The Court's finding is based on the controlling Ninth Circuit precedent and the substantial evidence the FTC submitted in support of its motion for TRO and request for entry of the PI.

Defendants misstate the law when they claim that the FTC must show that the deception was the but-for cause of all consumers' purchases whom the FTC seeks to redress. App. at 11. It is firmly established law that the FTC does not need to prove actual consumer reliance on Defendants' misrepresentations to warrant

8

redress or restitution as a remedy for the deception. Rather, reliance is presumed (the "*Figgie* presumption") once the FTC shows that: (1) Defendants made material representations in the marketing of their products or services; (2) the misrepresentations were widely disseminated; and (3) consumers purchased the relevant products.[9] The FTC has made those showings here.

When the FTC prevails on the merits and establishes the *Figgie* presumption, equitable monetary relief such as restitution is appropriate. *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 604 (9th Cir. 2016).[10] A proper starting point for calculating the amount of equitable monetary relief is the total amount consumers paid for the product or service minus refunds and chargebacks. *Id.*; *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009); *FTC v. AMG Services*, Inc., No. 2:12-cv-00536, 2016 WL 5791416 at *11 (D. Nev. Sep. 30, 2016) (consumer loss is amount paid less any refunds). "The FTC bears the initial burden of providing 'a reasonable approximation of [consumer injury],' which may be established by gross receipts, net customer loss, or other comparable evidence."[11] Here, the FTC has met this burden by relying on Defendants' own statements, which establish an approximate consumer injury amount of $362 million.

After the FTC presents a "reasonable approximation" of consumer injury, "the burden then shifts to the defendant to show the FTC's figures overstate the

---

9   *FTC v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993); *FTC v. Lights of Am., Inc.*, No. SACV10-01333, 2013 WL 5230681 at *49 (C.D. Cal. Sept. 17, 2013) (Selna, J.) ("The Commission need only prove that material misrepresentations were widely disseminated and that consumers purchased products bearing those deceptive claims.").

10   *See also FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) ("restitution is a form of ancillary relief available … to effect complete justice"); *FTC v. Inc21.com Corp.*, 475 Fed. Appx. 106, 110 (9th Cir. 2012) (restitution in amount of consumer loss was proper).

11   *Grant Connect, LLC*, 827 F. Supp.2d at 1233 (quoting *Direct Mktg. Concepts*); *see also Commerce Planet, Inc.*, 815 F.3d at 604.

amount of the defendant's unjust gains."[12] Defendants bear any "risk of uncertainty" regarding the accuracy of the FTC's approximation.[13] Defendants may also reduce the injury amount with evidence that certain purchases were not the result of deception. *Commerce Planet*, 815 F.3d at 604. Defendants offer no such evidence here.[14]

In short, the FTC is likely to prevail on the merits and to establish that equitable monetary relief is warranted. And the FTC has met its burden of coming forward with a reasonable approximation of the consumer injury, which more than supports the asset freeze entered by the Court. Defendants offer no evidence to show otherwise. This factor weighs firmly against release of frozen funds.

## B. The Frozen Assets Are Dwarfed by the Large Injury Defendants Caused to Consumers

Defendants fail to show that the frozen assets suffice to redress all of the injury they caused. As addressed above, they appear to misunderstand the law governing how consumer injury is calculated.

At this time, the evidence shows that injury is approximately $362 million.[15] Defendants do not dispute that the frozen and preserved assets are far, far less than this amount. Indeed, at present, it appears that the unencumbered, Corporate

---

[12] *FTC v. Digital Altitude, et al.,* No. 2:18-cv729-JAK, 2019 WL 1976453, at *8 (C.D. Cal. Mar. 6, 2019) (quoting *Commerce Planet, Inc.*, 815 F.3d at 603-04).

[13] *Id.*

[14] While they advert to what they see as large numbers of satisfied customers, the numbers they claim are still a small fraction of the total number of purchasers, and there is no evidence that these purportedly satisfied customers were not deceived. For example, there is no evidence that any consumer purchased from OTA while believing he or she was not likely to make money.

[15] EX 88, 57 & 84 (consumer loss is at least $362 million). Consumer loss is the amount consumers paid, less what they received back; here that is $362 million. *Commerce Planet*, 815 F.3d at 604; *FTC v. Figgie Int'l*, 994 F.2d 595, 606-7 (9th Cir. 1993).

Defendant liquid assets frozen under the TRO and PI are nearly exhausted.[16] In *Noble Metals*, the Ninth Circuit upheld a denial of defendants' application to release frozen funds to pay legal fees because "the frozen assets fell far short of the [likely] amount needed to compensate [defendants'] customers," and "[t]his was reason enough in the circumstances of this case for the district court, in the exercise of its discretion, to deny the attorney fee application." 67 F.3d at 775. *See also CFTC v. Wilson*, No. 11-CV-1651, 2011 WL 6398933, at *4 (S.D. Cal. December 20, 2011) (retainers paid to attorneys were appropriately frozen under injunction, where frozen funds were "less than the amount owed to the alleged victims").

Spending frozen money on attorneys' fees will reduce the already very limited amount available for consumer redress.[17] This factor, too, weighs firmly against Defendants' request.

## C.    The Requested Attorneys' Fees Are Not Reasonable

In their application, Defendants ask the Court to release $300,650.76 for attorneys' fees and other litigation costs incurred in January and February 2020. And this is only the beginning as the Complaint was just filed on February 12, 2020. At this rate, Defendants will incur more than $3 million in attorneys' fees and other litigation costs before this matter goes to trial in December. Given that Corporate Defendants appear to have essentially tapped out the funds in their bank

---

[16] *See* Declaration of Andrew Hudson (filed herewith).  The Individual Defendants' assets total approximately $34 million. However, even this figure is uncertain. *See* supra footnote 4.

[17] The Court should not accept Defendants' invitation (App. at 12) to speculate as to the precise effect on redress checks of reducing the pool of funds by $3 million. Consumers did not all pay the same amount of money to OTA, so they would not necessarily all get equal checks. And it is not at all clear how much money in total will be available for redress--$3 million could well be the lion's share of the pot.

accounts, and have yet to resume sales, this litigation approach is plainly
untenable.

To begin with, there is no reason why Defendants need not one, but two
major law firms—Call & Jensen and Davis Wright Tremaine LLP—to defend a
straightforward fraud case like this one. Defendants have also utilized the services
of a third major law firm, as well, Venable LLP, in connection with this matter.
Allowing the Defendants to use frozen assets being preserved for consumer redress
to pay for numerous large law firms is unreasonable. Only a party that recognizes it
is spending other people's money would suggest such an inefficient and
extravagant approach.

A review of Defense counsel's invoices reveals their inefficient and wasteful
approach to the litigation thus far. Since January 2020, seven Call & Jensen
Shareholders have billed time to this matter. These Shareholders, billing at hourly
rates between $450 and $717.06, did not see fit to delegate any of their work to
junior associates or staff attorneys who would presumably bill at lower, more
efficient, rates. Instead, Call & Jensen Shareholders often billed for routine tasks
such as the preparation of *pro hac vice* applications at their premium Shareholder
billing rates. Much of the time billed by Call & Jensen is insufficiently described.[18]
Another problem with Call & Jensen's invoices is the repeated use of block-
billing—the failure to itemize the time expended on specific tasks. "Even where
entries are sufficiently detailed to give courts an accurate sense of the task
performed, block-billing runs the risk that the time spent was inflated, even if only
slightly, and does not allow a court to precisely determine whether the time
devoted to each individual task was reasonable." *Young v. Wolfe*, No. CV 07-03190

---

[18] *See, e.g.,* Order, *Rincon Mgmt. Servs., LLC*, No. 5:11-CV-01623 (C.D. Cal. Jan.
31, 2012) (attached hereto as **Attachment E** and available at Dkt. No. 98-1)
(denying defendants' request to unfreeze "personal expenses," including attorneys'
fees, when defendants failed to provide "a detailed showing of their expenses").

RSWL-AJWx, 2017 WL 3184167 (C.D. Cal. Jul. 26, 2017) ("Courts generally impose a 5% to 20% reduction for hours block-billed.") (citing *Pierce v. Cnty of Orange*, 905 F. Supp. 2d 1017, 1031-32 (C.D. Cal. 2012).

Like Call & Jensen, Davis Wright Tremaine LLP excessively staffed the matter with three Partners and one Of Counsel—all billing at hourly rates exceeding $725. And their time entries suffer from similar infirmities including billing premium rates for routine tasks like the preparation of *pro hac vice* applications, inadequate task descriptions, and block billing. Defendants claim that the hiring of Davis Wright Tremaine LLP was necessary based on their expertise with the First Amendment. However, as the Court noted at the hearing, this argument has no merit because there is no First Amendment protection for fraud. Dkt. No. 96, at 10 ("You don't have a First Amendment right to commit fraud. …. I think that's the long and the short of the discussion."). This well-established principle is not novel and did not require the involvement of one of the nation's preeminent First Amendment law firms, nor "one of the leading First Amendment lawyers in the nation." App. at 13.

Additionally, other than submitting self-serving declarations, neither Call & Jensen nor Davis Wright Tremaine LLP have provided evidence demonstrating that their billing rates are reasonable. This is reason enough to deny the request entirely.[19] *Sam K. ex rel. Diane C. v. Hawaii Dep't of Educ.*, 788 F.3d 1033, 1041 (9th Cir. 2015) (party seeking fees bears the burden to show that requested rate is reasonable); *see e.g.*, *S.E.C. v. Private Equity Mgmt. Grp., Inc.*, No. CV-9-2901, 2009 WL 2058247, at *3 (C.D. Cal. July 9, 2009) (denying request to release frozen funds to pay attorneys' fees because generalized request failed to

---

[19] *See, e.g.,* Order, *Rincon Mgmt. Servs., LLC*, No. 5:11-CV-01623 (C.D. Cal. Jan. 31, 2012) (attached hereto as **Attachment E**) (denying defendants' request to unfreeze "personal expenses," including attorneys' fees, when defendants failed to provide "a detailed showing of their expenses").

demonstrate reasonableness with specificity). There is zero evidentiary basis to support a finding that the requested fees are reasonable. This factor weighs strongly in favor of denying the requested release.

Whether a premium billing rate is appropriate for a particular matter depends on the professional's experience handling that type of matter and the customary rate charged for that type of work. *See, e.g.*, *Lopez v. San Francisco Unified School Dist.*, 385 F.Supp.2d 981, 988-89 (N.D. Cal. 2005) (finding in disability access case that prevailing attorney's appropriate billing rate would be that of civil rights attorney rate not usual corporate litigator rate). Here, none of the attorneys seeking fees claims to have experience handling consumer fraud matters. While counsel's premium billing rates might be appropriate in the types of cases they have experience handling, they are not appropriate for straightforward fraud matters such as this case. Any amount of time they spend getting up to speed on the basics of consumer protection law should not be billed at premium large law firm rates that are normally reserved for specialized counsel in complex commercial litigation. Such rates are not appropriate in a consumer protection matter brought in the public interest and for the benefit of consumers. For example, in contrast to the $625 hourly billing rate sought by Call & Jensen lead attorney Mark L. Eisenhut, attorney Thomas W. McNamara, the court-appointed monitor in this matter, has agreed to a $495 hourly billing rate. Unlike Mr. Eisenhut, Mr. McNamara has deep experience handling consumer fraud matters and has served in numerous cases brought by the FTC.

Finally, Defendants make no effort whatsoever to provide anything other than a cursory explanation regarding the reasonableness of the fees charged by Mr. Harris as a supposed expert rebuttal witness. Mr. Harris has not supplied a declaration justifying his fees. Even had he done so, his cursory time entries leave the Court with no way to examine whether the amount of time spent on various

14

tasks was justified. Nor does the record permit a finding that Mr. Harris's work was reasonable, as there is nothing in his rebuttal report that is not either inadmissible, irrelevant, or both. *See* Dkt. No. 74, at 15. Without more, the Court should deny Defendants' request for payment of Mr. Harris's fees.

### D.  Defense Counsel Were Aware that this Court Might Deny or Limit Attorneys' Fees

Defense counsel knew the Court might freeze their clients' assets and bar payment to them from those frozen funds. Defense counsel's protestations to the contrary (App. at 14) are belied by the facts. Prior to the filing of this action, the FTC advised Defendants' counsel that the FTC intended to file an action with a noticed application for a temporary restraining order that would include, among other relief, appointment of a receiver and asset preservation.[20] Dkt. 13 at 7. Thus when Defense counsel entered their appearances in this matter, they did so with full knowledge that the Court might quickly enter an order barring their clients from spending their current assets.

This factor weighs against release of frozen funds because, unlike the numerous consumers Defendants defrauded, counsel knowingly assumed the risk that they would have to represent their clients without pay. *See FTC v. Williams, Scott & Associates, LLC*, No. 1:14-CV-1599-HLM, 2015 WL 7351993, at *3 (N.D. Ga. Sep. 22, 2015) ("counsel should have been well aware that Defendant Lenyszyn might lack sufficient funds to pay counsel's attorneys' fees when they began to represent Defendant Lenyszyn. As such, counsel assumed the risk of nonpayment … Given the important consumer interests at stake in this case, the

---

[20] Nearly a year ago, FTC staff informed Defense counsel's former co-counsel, Len Gordon of the Venable law firm, that staff viewed this as a fraud matter. Dkt. 13. Mr. Gordon, former Regional Director—FTC, Northeast Regional Office, would have been well aware that this portended a possible asset freeze. Defense counsel was thus on notice long ago of this possibility.

15

Court finds that the fairest course of action is to require counsel to bear the risks of nonpayment. The Court therefore exercises its discretion to decline to release the assets."); *LoPinto*, 1994 U.S. Dist. LEXIS 21695, at *3 (denying request to unfreeze assets for attorneys' fees, where counsel knew of asset freeze and "chose to work for defendants anyway"); *FTC v. Sharp*, No. CV-S89-870 RDF, 1991 WL 214076 at *1 (D. Nev. Jul. 23, 1991) (denying release of frozen funds for attorneys' fees).

Moreover, "while parties to litigation generally may spend their resources as they see fit to retain counsel, they may not use their victims' assets to hire counsel to help them retain the fruits of their violations." *FTC v. IAB Mktg. Assocs.*, No. 12-61830-Civ, 2013 WL 2433214, at *2, (S.D. Fla. June 4, 2013) (quoting *FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, at *4 (M.D. Fla. December 31, 2008).

Thus, this factor weighs against the release of frozen funds.

### E. Defendants Have Not Shown an Inability to Obtain Other Funds

Defendants do not offer evidence to show that they cannot obtain funds from non-tainted sources to pay their counsel. To the contrary, Defendants anticipate that OTA "will begin generating new revenues in the near future." Dkt. No. 140 at 10. To the extent OTA anticipates generating new revenues legally and in full compliance with the PI, Defendants should pay counsel from those untainted funds. There is no reason why defense counsel cannot wait until then to get paid. None of the defense counsel claim financial hardship and the large law firms that employ them can surely handle the delay. To the extent that OTA is rendered insolvent and does not have the wherewithal to pay its creditors with legally attained revenues, there is no reason why defense counsel should be preferred over other creditors such as the consumer victims of Defendants' scheme. Defendants

have not, and cannot, explain why defrauded consumers should pay for their attorneys. Thus, this factor, too, weighs heavily against release of frozen funds.

## III.     Equity Requires that Any Release of Funds Should Be Limited, and Restricted to Foreign Assets

For the reasons described above, equity requires denial in full of Defendants' Application. But if the Court were to release some funds to pay Defendants' attorneys, the release should be significantly reduced.[21] Such restraint is common in circumstances like those here. *See. e.g., IAB Mktg. Assocs.*,12-CV-61830, 2013 WL 2433214, at \*2 ("The Court has already released $75,000 from the asset freeze to pay attorney fees [before issuing the preliminary injunction] … The IAB Defendants now seek the release of additional funds to pay attorney fees. But funds should not be released from the asset freeze to pay for the IAB Defendants' attorney fees because the IAB Defendants' monetary liability greatly exceeds the frozen funds."); *World Wide Factors*, 882 F.2d at 348 (district court choosing to release "reasonable" attorneys' fees could set a maximum amount, a minimum amount of  funds to remain frozen, or a maximum hourly rate); *FTC v. Inc21.com Corp.*, 475 Fed. App'x 106, 110 (9th Cir. 2012) (approving district court's decision to limit release of attorneys' fees); Order, *FTC v. Rincon Mgmt. Servs., LLC, et al.*, No. 5:11-CV-01623 (C.D. Cal. Jan. 31, 2012) (attached hereto as **Attachment E**) (requiring defendants to provide the court with "a detailed showing of their expenses" in order to obtain the release of frozen funds to pay "personal expenses," including attorneys' fees); *FTC v. Nat'l Prize Info. Group Corp.*, No. 2:06-CV-01305, 2006 WL 3234360, at \*1 (D. Nev. 2006) (court limited total attorneys' fees to one-time amount). This Court should not approve fees billed at

---

[21] This is particularly so where, as here, it is not clear how much counsel has already been paid for their work in this case, nor how much work counsel will perform in the months to come.

unjustified premium rates, or fees for time not reasonably necessary (such as where there was duplication of effort, or excessive time spent on tasks, or where block billing renders it impossible to detect such overcharges). Defendants' counsel's bills suffer from these problems and should not be approved without significant reduction to remedy them.

Further, Defendants appear to seek blanket approval to pay future litigation costs without further order or oversight by the Court. App. at 1, 13-14. This the Court should deny. Any release of funds should be limited to reasonable fees already incurred. The factors may weigh differently in the future—the Court should not be required to pre-judge future applications without evidence.

Finally, any release of funds should be paid out of funds Defendant Shachar holds overseas. Shachar has represented he has significant assets, including bank accounts, offshore and the FTC has received no assurances that the offshore banks that hold Shachar's assets will honor the Court's asset preservation provisions. Repatriation of such funds for consumer redress pursuant to a judgment will likely be more speculative, costly and burdensome than the recovery of domestic assets. Thus, efficiency and equity require that, to the extent any funds are released for litigation costs, they should come solely from assets held overseas.

## CONCLUSION

Defendants took hundreds of millions of dollars from consumers through deception, and have lived well on the millions they stole. They now want the Court to release frozen tainted moneys to fund their team of prominent and expensive lawyers and an expert witness. The amount that is frozen for potential redress is a small fraction of the enormous injury Defendants caused. Defendants provide no evidence that they do not have access to alternative funds to pay the claimed expenses, and make no showing that the expenses are reasonable. The FTC respectfully requests that the Court deny Defendants' Application in its entirety.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  April 16, 2020                   /s/ Roberto Anguizola
Thomas M. Biesty
Rhonda Perkins
Andrew Hudson
Roberto Anguizola
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3043 / tbiety@ftc.gov
(202) 326-3222 / rperkins@ftc.gov
(202) 326-2213 / ahudson@ftc.gov
(202) 326-3284 /ranguizola@ftc.gov

John Jacobs
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
(310) 824-4300 / jjacobs@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

19