Thomas M. Biesty (NY Bar No. 4172896)
(202) 326-3043 / tbiesty@ftc.gov
Rhonda Perkins (VA Bar No. 75300)
(202) 326-3222 / rperkins@ftc.gov
Andrew Hudson (DC Bar No. 469817)
(202) 326-2213 / ahudson@ftc.gov
Roberto Anguizola (IL Bar No. 6270874)
(202) 326-3284 / ranguizola@ftc.gov
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580

Local Counsel
John Jacobs (CA Bar No. 134154)
(310) 824-4300 / jjacobs@ftc.gov
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4380 (fax)

Attorneys for Plaintiff
Federal Trade Commission

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Federal Trade Commission**, | No.  8:20-CV-00287 JVS (KESx) |
| Plaintiff, | |
| vs. | **FTC'S RESPONSE TO DEFENDANTS' BUSINESS PLAN** |
| **OTA Franchise Corporation**, et al., | |
| Defendants. | |

Per the Court's request (Dkt. 195), the FTC files this response to Defendants' Business Plan (Dkt. 190). As demonstrated below, the barebones Plan—much like Defendants' deceptive earnings claims at issue in this litigation—

1

is devoid of any support. It does not provide sufficient grounds for the Court to allow Defendants to continue their rapid dissipation of the funds remaining for potential consumer redress in this case. Since the issuance of the Temporary Restraining Order ("TRO"), Defendants have spent more than $3 million of the frozen funds and are seeking to spend millions more. Declaration of Andrew Hudson, filed herewith, ¶¶6-9. Defendants' failure to produce a viable business plan counsels strongly against the release of any additional frozen funds, and in favor of ending the exceptions to the freeze, and the appointment of a receiver.

## BACKGROUND

Substantial evidence demonstrates that for years, Defendants have operated a deceptive scheme that used false and unsubstantiated claims to sell expensive "training" in how to use Defendants' patented trading strategy. The overwhelming majority of Defendants' sales were consummated at in-person live sales events where salespeople worked one-on-one with consumers to convince them to buy. The evidence shows that Defendants' marketing and sales pitch were replete with explicit and implicit representations that purchasers of their training were likely to make substantial income. Even the declarations Defendants submitted in their defense demonstrate that consumers purchased because they believed that OTA's training would help them to make money (indeed, Defendants have offered no other reason to purchase training in their patented money-making strategy). The evidence shows that not only had Defendants relied on such claims for years, but they continued to do so—for nearly a year—after learning about the FTC's investigation into their deceptive marketing practices.

On the strength of this evidence, the Court entered first a TRO, and then a Preliminary Injunction ("PI") that barred Defendants from using such claims, required Defendants to disclose their assets, and froze or preserved those assets for potential redress to consumers injured by the deception. Dkt. 46; 130. Defendants' submissions showed that preserved assets were less than one tenth of the injury

caused to consumers, and that the business was underwater. Dkt. 110. At the same time, the spread of the novel coronavirus led to unprecedented restrictions on travel and gatherings across the country and the world, which independently preclude the operation of Defendants' business as it previously existed.

In their filings and at the March 12, 2020 show cause hearing, Defendants argued that they provided a valuable product and could continue to operate legally and profitably. On the basis of these representations, the Court has allowed limited business expenses to be paid out of frozen funds, which Defendants have claimed are necessary to such continued operations.

Now, less than two months after the PI's issuance, Defendants have already spent over $3 million out of frozen funds (Hudson Dec. ¶¶6-9), and seemingly have yet to generate any new sales (Dkt. 140-6 (as of April 9, 2020, OTA was "working with the monitor to be able to re-start" sales)). The Court expressed concern over the continued and substantial expenditures, and directed Defendants to submit a detailed business plan demonstrating how they will generate profits in the coming months. Dkt. 169. Defendants have now submitted papers in response to this directive. Dkt. 190 ("Business Plan").

## DEFENDANTS' BUSINESS PLAN

Defendants' Business Plan is wholly inadequate and unsupported. It lacks any explanation, at all, of how any aspect of the business will be conducted. It contains a chart of numbers, purporting to show increasing profits over time, but provides no explanation of where the numbers come from, much less evidence to show they are reasonable estimates based on relevant measurable data.

In short, there is no "plan," no explanation of how Defendants intend to generate their projected "positive cash flow over the next six months." All Defendants offer is a spreadsheet of numbers and a statement that the people who wrote those numbers are "seasoned professionals at OTA who have over 85 years of combined experience in management and finance." Dkt. 190-2, pp. 2-3.

Defendants offer the Court no way to determine whether the "plan" is likely to succeed. Without an explanation and support for the numbers in their chart, Defendants are simply asking the Court to take it on faith that their business will be profitable. The evidence strongly counsels against doing so.

## I. Defendants Do Not Explain How They Will Generate New Sales

The most important of the many pieces of Defendants' plan that is missing from their filing is an explanation for how Defendants will generate new revenue. Defendants' sales to date have been driven by marketing and sales pitches that featured deceptive, unsubstantiated representations that purchasers of Defendants' training were likely to earn substantial income. And nearly all of Defendants' sales to date stem from a multi-step process involving several in-person meetings with prospective clients in which salespeople can establish rapport,[1] use OTA's office locations and classroom environments to build trust that its offerings are legitimate,[2] and leverage a one-on-one in-person meeting to attempt to close the sale.[3] The loss of either of these tools would be expected to dramatically curtail sales of their expensive training offerings.

Not only is this just common sense, it is demonstrated by Defendants' own actions. If they could have achieved similar sales without deceptive earnings claims, they presumably would have dropped the claims, at the latest, when they learned of the FTC's investigation a year ago. Indeed, the evidence, including the consumer declarations Defendants filed, shows that consumers purchased because they sought to make money—there is no reason to think such consumers would have purchased if Defendants had not represented that the patented trading strategy they offered to train consumers to use would generate substantial income. Likewise, if Defendants could have achieved similar sales without multiple levels

---

[1] Answer, Dkt. 142, ¶¶68-69; EX 1, 3; EX 13, 1162-1197, 1454-1484.
[2] EX 13, 345-46, 2077; EX 82, 29.
[3] EX 4, 26; EX 5, 32; EX 79, 13; EX 13, 1719-1724.

of commissioned salespeople[4] and lengthy live events for which presenters are often flown in from out of state,[5] they would have done so long ago.

These key sales tools (baseless earnings claims and in-person sales) are unavailable to Defendants. To resume operations, Defendants will need a completely different sales process, and a different value proposition.[6] They offer no hint of what these might be, much less a reason to believe that they will be effective.[7]

## II. Defendants' Projected Income from UGA Is Unsupported

The Business Plan provides that a sizeable portion of OTA's revenues purportedly will come "from UGA Billing Portfolio Receivables." Dkt. 190-4, p. 3. UGA is the company that has serviced the short-term high interest loans OTA has made to consumers to finance expensive purchases from OTA. *See* Dkt. 41, p. 3. The Plan provides no explanation, let alone support or data, for the cash Defendants say OTA will receive from UGA. Since April 14, 2020, UGA has transferred over $1 million to OTA from frozen funds. Hudson Dec. ¶8. It is far from clear that much more remains.

Nor is it clear how much income can reasonably be expected, going forward, from the pre-TRO loans UGA services for Defendants. The PI bars Defendants

---

[4] Defendants' sales process required paying commissions to no less than three salespeople for every sale: the Preview Event presenter, the MTO presenter, and the education counselor. Answer, Dkt. 142, ¶¶39 & 64-66 (education counselors' "compensation is primarily commission based"); EX 13, 6165 (MTO presenters paid on commission), 7703 (Preview presenters paid on commission).

[5] EX 13, 565 (Defendant Kimoto flies from Utah "twice a month, normally" to lead MTOs), 2258 (OTA presenter Darek Zelek traveled from Arizona to New York City to lead MTO), 4555-4556 (OTA presenter Dale Sargood traveled from Toronto, Canada to Vienna, Virginia, to lead MTO).

[6] The Business Plan is devoid of additional basic key factors, such as the products and services OTA will offer and the price points for such offerings.

[7] Defendants seem aware that their sales process will be different, as their master spreadsheet contains no provision for payments of commissions. Dkt. 189-4, p.3. Again, if they have a plan for how they will replace the sales generated by commissioned salespeople, they do not share it with the Court.

from imposing late fees or additional interest if consumers withhold payment on loans OTA made to customers prior to April 2, 2020. OTA is also prohibited from using collections agencies to collect on the loans, and from selling the debt to others or reporting consumers to credit bureaus for non-payment of the loans. Dkt. 130 at § III. In addition, the economic disruptions incident to the public health measures taken to combat the novel coronavirus pandemic have left record numbers of consumers unemployed or otherwise struggling financially. Defendants do not explain (or support with evidence) the amount of income they would have historically expected from these loans, and they do not explain, much less demonstrate, how their new plan accounts for the inevitable reduction in income due to these factors.

In short, Defendants provide neither explanation nor data that might allow the Court to determine the reasonableness or likelihood of this projected cash flow.

**III.   Defendants Offer No Evidence to Support Their Income Projections**

Defendants make two half-hearted attempts to ground their "$3,616,927 in positive cash flow" projection in evidence, but upon closer inspection neither provides them any support. Defendants (Dkt. 190-4, p.3) assert that:

- "OTA-owned centers' 'run rates'[8] for April 2020 are already at 75% of those forecasted for May 2020 in the Business Plan"; and
- "The Business Plan's growth forecasts … represent only 30% of OTA's historical six-month run rates."

In the first statement, Defendants appear to be making a claim about current, post-TRO sales data. This is surprising because Defendants have, quite recently, represented that they were not yet making any new sales. Dkt. 140-6 (as of April 9, 2020). But the point is muddled, as "run rates" is defined in a confusing manner that references predictions of the future, making unclear the extent to which the

---

[8] Defined as "OTA's financial performance based on using current financial information as a predictor of future performance." Dkt. 190-3, p. 3, n.1.

figure represents relevant data, versus solely hypothesis. Even if it were clear that the term meant current sales, Defendants do not actually identify OTA's past or current "run rates," nor do they explain how the rates are calculated, or what has historically driven changes in the run rates. There is no way to determine what this "evidence" tends to show, or how much weight, if any, to place on it.

The second statement seeks to ground Defendants' income projections by comparing them to "OTA's historical six-month run rates." But this reference is both unsupported and irrelevant. Defendants do not explain or identify these supposed "run rates," much less provide evidence to support their claims. Even if they had, for the reasons discussed above, pre-TRO sales data is unhelpful in assessing new sales in the current environment. There is no reason to think that sales of OTA's expensive training in its proprietary trading strategy will be anything close to what they once were, now that OTA can no longer make false and unsubstantiated claims about the strategy's profitability, and cannot (at present) use the live sales events and one-on-one in-person closings that have driven OTA's sales to date. Defendants do not explain how they will generate sales now that the key elements of their sales pitch are unavailable to them. In short, the statement does nothing to support Defendants' claims.

### IV. Other Aspects of the Business Plan Raise Serious Concerns

Defendants' Business Plan includes inconsistencies that undermine confidence in the entire document. For example, the line item for "rent" in the master spreadsheet (Dkt. 190-4, p. 3) apparently does not include the $183,700 in rent for the Irvine headquarters that Shachar wants OTA to pay to his wholly-owned company, ELO Investments, Inc. (or, if the Court gives ELO permission to sell, to the third party purchaser). Adding that amount would more than double the "rent" line item.

As another example, the line item for "Online Student Learning Technologies" fluctuates wildly from one month to the next, without explanation.

Dkt. 190-4, p.3. Defendants provide a breakdown of what that amount represents, but this only deepens the mystery, as it lists monthly expenses totaling to an amount greater than all but one of the monthly amounts listed on the main spreadsheet. Dkt. 109-4, p.8.

The details of the "Online Student Learning Technologies" line item are separately concerning. Three monthly expenses, adding up to a significant amount, relate to CliK, a new software product Defendants have recently been developing. Dkt. 190-4, p.8; Dkt. 37, p.11. Defendants do not explain their choice to spend significant funds on something other than their core offerings, and it is not apparent how doing so will benefit the business. Much less that such expenses need to be borne now, when re-establishing a sustainable cash flow from new sales should, presumably, be the first priority.

Yet another problem is the lack of explanation for most of the items in the detailed breakouts. The Court is rightly concerned with whether Defendants' continued spending will produce returns within the next six months. Defendants' unexplained expenses give no comfort on that front.

These and other details undermine any confidence Defendants' Business Plan might otherwise have been able to provide.

## V.     Defendants Fail to Grapple with Their Business's Pre-Lawsuit Failings

Defendants' financial disclosures reflect that, even before the TRO and PI restricted Defendants' marketing and even before the coronavirus pandemic led to the closure of in-person classrooms and sales events, OTA was on the ropes. Its liabilities significantly exceed its assets. Dkt. 110, p.3. If this came about because OTA's expenses exceeded its income, then there is simply no plausible argument that it can continue, now, on a profitable basis. If there is some other explanation, more compatible with continued operations, Defendants do not say what it is, much less why the Court should believe OTA's debts will not ultimately sink it. This risk is real, and has only grown larger because a very large share of OTA's

assets are receivables from consumers. Dkt. 110, p.3. The PI's restrictions regarding OTA loans to consumers will likely reduce the inflow of funds from those loans.

Even without this particular concern, Defendants' Business Plan should, one presumes, be supported by a balance sheet. None is provided.

The Court was right to seriously consider appointing a receiver in this case. The Business Plan does not alleviate these concerns. And as shown, those concerns have only grown.

## VI. Defendants' Warnings Regarding the Purported Perils of Not Approving the Business Plan Are Unsupported and Unpersuasive

Relying solely on conclusory statements from an OTA officer that are backed by no data or documents, Defendants warn the Court that "OTA's Business Plan is not only likely to succeed; but is necessary to prevent significant harm to OTA, its students, its employees and franchisees, and to all stakeholders in OTA." Dkt. 190-2, p. 4. But as shown above, the Business Plan is grossly inadequate and totally unsupported. While it is reasonable to assume that OTA officers and employees might be harmed from not getting additional access to funds taken from OTA's victims, that is not the reason the Court requested a business plan from Defendants. Instead, the Court is "concerned whether the release of funds to operate the business … will produce net income to the benefit of the business and potentially injured consumers." Dkt. 169. Defendants have not produced a viable business plan and they fail to show that the release of additional funds will produce any net income.

## CONCLUSION

For the foregoing reasons, the Court should reject Defendants' Business Plan and decline to release additional frozen funds preserved for potential consumer redress.

In the FTC's view, the same reasons strongly support appointment of a receiver over the Corporate Defendants. If the business is not to continue, a receiver should be appointed to marshal and preserve its assets and address inquiries from stakeholders, including business partners and customers.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  May 1, 2020

/s/ *Thomas M. Biesty*
Thomas M. Biesty
Rhonda Perkins
Andrew Hudson
Roberto Anguizola
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3043 / tbiety@ftc.gov
(202) 326-3222 / rperkins@ftc.gov
(202) 326-2213 / ahudson@ftc.gov
(202) 326-3284 / ranguizola@ftc.gov

John Jacobs
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
(310) 824-4300 / jjacobs@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION